In the

# United States Court of Appeals

### For the Federal Circuit

HORIZON PHARMA IRELAND LIMITED, HZNP
LIMITED, HORIZON PHARMA USA, INC.,

*Plaintiffs-Appellants*

v.

ACTAVIS LABORATORIES UT, INC.,

*Defendant-Cross-Appellant*

_____

2017-2149, -2152, -2153, -2202, -2203, -2206

_____

Appeal from the United States District Court for the
District of New Jersey in Nos. 1:14-cv-07992-NLH-AMD,
1:15-cv-05025-NLH-AMD, 1:15-cv-06131-NLH-AMD,
1:15-cv-06989-NLH-AMD, 1:15-cv-07742-NLH-AMD,
1:16-cv-00645-NLH-AMD, Judge Noel Lawrence Hillman.

## CORRECTED PRINCIPAL BRIEF OF PLAINTIFFS-APPELLANTS
## (NON-CONFIDENTIAL)

ROBERT F. GREEN
CARYN C. BORG-BREEN
JESSICA M. TYRUS
GREEN, GRIFFITH & BORG-BREEN LLP
NBC Tower, Suite 3100
455 North Cityfront Plaza Drive
Chicago, IL 60611
(312) 883-8000

*Counsel for Plaintiffs-Appellants*

<u>**CERTIFICATE OF INTEREST**</u>

Counsel for Plaintiffs-Appellants Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma USA, Inc. certifies the following:

- The full name of every party or amicus represented by me is: Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma USA, Inc.

- The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A.

- All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: Horizon Pharma plc, Horizon Pharma, Inc.

- The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| | |
|---|---|
| John E. Flaherty | Robert F. Green |
| Ravin R. Patel | Christopher T. Griffith |
| Guillermo C. Artiles | Caryn C. Borg-Breen |
| McCARTER & ENGLISH | L. Scott Beall |
| | Jessica M. Tyrus |
| Dennis A. Bennett | Benjamin D. Witte |
| GLOBAL PATENT GROUP, LLC | GREEN, GRIFFITH & BORG-BREEN LLP |

Dated: August 16, 2017     Respectfully submitted,

/s/ Caryn C. Borg-Breen
Caryn C. Borg-Breen

i

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ....................................................................... i

TABLE OF CONTENTS.................................................................................. ii

TABLE OF AUTHORITIES ........................................................................... v

TABLE OF ABBREVIATIONS ....................................................................... x

STATEMENT REQUESTING ORAL ARGUMENT ........................................ xii

STATEMENT OF RELATED CASES .............................................................. xiii

JURISDICTIONAL STATEMENT .................................................................. 1

STATEMENT OF THE ISSUES....................................................................... 2

STATEMENT OF THE CASE.......................................................................... 3

STATEMENT OF THE FACTS ....................................................................... 6

    I.         PENNSAID® 2%.......................................................................... 6

    II.       ACTAVIS'S ANDA PRODUCT ......................................................... 6

    III.    THE '450 AND '838 PATENT FAMILIES....................................... 7

          A.    The '450 Patent Family................................................ 7

          B.    The '838 Patent Family................................................ 8

SUMMARY OF THE ARGUMENT .................................................................. 11

STANDARD OF REVIEW ............................................................................... 14

ARGUMENT .................................................................................................. 17

    I.       THE DISTRICT COURT ERRED IN FINDING THAT
                ACTAVIS'S LABELING DID NOT INDUCE
                INFRINGEMENT OF THE '450, '078 AND '110 PATENTS ......... 17

A. The PENNSAID® 2% Labeling and Actavis's Labeling Closely Tracks the Claim Language of the '450 Patent Family ........................................................................17

B. The District Court Erred When It Found That Actavis's Labeling Does Not Recommend, Encourage, or Promote the Claimed Method.................................................22

C. The District Court Erred in Granting Summary Judgment in Favor of Actavis Because There Exist Questions of Material Fact ........................................................29

II. THE DISTRICT COURT ERRED WHEN IT FOUND THE CLAIM TERM "CONSISTING ESSENTIALLY OF" INDEFINITE.........................................................................31

A. The District Court's Opinion ....................................31

B. The Legal Standard .................................................33

C. The District Court Committed Legal Error When It Applied the *Nautilus* Definiteness Standard to the Basic and Novel Properties of the Claimed Invention........................36

 1. There is No Legal Basis to Apply the Definiteness Requirements To "Basic and Novel Properties" ............36

 2. Because "Basic and Novel Properties" Are Not Part and Parcel of the Language of the Claims, 35 U.S.C. § 112, ¶ 2 Does Not Apply ...........................39

D. The District Court Erred in Finding the Basic and Novel Property "Better Drying Time" Indefinite ................................43

 1. The District Court Erred in Relying on Data in the Intrinsic Record Irrelevant to the Effect of Additional Components on "Drying Time" ..................45

 2. The District Court Erred in Failing to Evaluate the Definiteness of "Better Drying Time" on a Claim-By-Claim Basis ..............................................47

3. The District Court Improperly Conflated "Drying Rate" with "Better Drying Time" ..................................49

4. The District Court Erred in Relying on Dr. Michniak-Kohn's Expert Testimony Relating to "Drying Rate" Rather Than "Drying Time" ..................52

5. The District Court Erred in Not Hearing Expert Testimony Relating to "Drying Time" ...........................53

E. The District Court Erred in Finding the Basic and Novel Property "Favorable Stability" Indefinite ..................................54

III. THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE "DEGRADES" CLAIM TERMS AND "IMPURITY A" ARE INDEFINITE ..................................................................56

A. The District Court Erred When It Found That the Intrinsic Evidence Equates Degradation with Stability ............57

B. The Intrinsic Evidence Shows That the "Degrades" Claim Terms Refer to the Degradation of Diclofenac Sodium into Impurity A ...........................................59

C. The District Court Erred When It Found That "Impurity A" Is Indefinite ..........................................................60

IV. CONCLUSION REGARDING DEFINITENESS AND INFRINGEMENT ...............................................................64

# TABLE OF AUTHORITIES

## Cases

*AK Steel Corp. v. Sollac and Ugine*,
  344 F.3d 1234 (Fed. Cir. 2003) .............................................................. 33, 38, 41

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986) ............................................................................15

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010) ............................................................ 26, 28, 29

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*,
  750 F.2d 1569 (Fed. Cir. 1984) ...........................................................41

*Bayer Schering Pharma AG v. Lupin, Ltd.*,
  676 F.3d 1316 (Fed. Cir. 2012) ...........................................................29

*Biovail Labs. Int'l SRL v. Abrika, LLLP*,
  No. 04-61704, 2006 WL 6111777 (S.D. Fla. Aug. 24, 2006).............................42

*Braintree Labs., Inc. v. Breckenridge Pharm., Inc.*,
  -- F. App'x –, 2017 WL 1829140 (Fed. Cir. 2017) (unpublished) ....................29

*CardSoft v. Verifone, Inc.*,
  807 F.3d 1346 (Fed. Cir. 2015) ...........................................................16

*Classified Cosmetics, Inc. v. Del Labs., Inc.*,
  No. 03-4818-AHM, 2004 WL 56465578 (C.D. Cal. June 14, 2004) .................42

*Cox Commc'ns, Inc. v. Spring Commc'n Co.*,
  838 F.3d 1224 (Fed. Cir. 2016),
  *cert. denied* No. 16-1106, 2017 WL 978188 (U.S. June 19, 2017) .............. 15, 60

*Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*,
  807 F.2d 955 (Fed. Cir. 1986) ...........................................................47

*Dayco Prods., Inc. v. Total Containment, Inc.*,
  329 F.3d 1358 (Fed. Cir. 2003) ...........................................................47

*Depomed, Inc. v. Sun Pharma Global FZE*,
  C.A. No. 11-3553 (JAP), 2012 WL 3201962 (D.N.J. Aug. 3, 2012) .................42

*Depuy Mitek, Inc. v. Arthrex, Inc.*,
   297 Fed. Appx. 995 (Fed. Cir. 2008) ..................................................41

*Dow Chem. Co. v. Nova Chem. Corp. (Canada)*,
   809 F.3d 1223 (Fed. Cir. 2015) .........................................................35

*Eidos Display, LLC v. AU Optronics Corp.*,
   779 F.3d 1360 (Fed. Cir. 2015) .................................................... 15, 16

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
   845 F.3d 1357 (Fed. Cir. 2017) .........................................................28

*Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*,
   796 F.3d 1312 (Fed. Cir. 2015) .........................................................35

*Ex parte Davis*,
   80 U.S.P.Q. 448 (Pat. Office Bd. App. 1948) ....................................40

*Frolow v. Wilson Sporting Goods, Co.*,
   710 F.3d 1303 (Fed. Cir. 2013) .........................................................15

*Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*,
   401 F.3d 1367 (Fed. Cir. 2005) .........................................................15

*In re De Lajarte*,
   337 F.2d 870 (C.C.P.A. 1964)............................................................41

*In re Depomed Patent Litigation*,
   Civ. No. 13-4507, 2016 WL 7163647 (D.N.J. Sept. 30, 2016),
   *appeal docketed*, No. 17-1153 (Fed. Cir. Nov. 3, 2016)............................. 24, 25

*In re Garnero*,
   412 F.2d 276 (C.C.P.A. 1969).............................................................41

*In re Herz*,
   537 F.2d 549 (C.C.P.A. 1976).............................................................41

*In re Janakirama-Rao*,
   317 F.2d 951 (C.C.P.A. 1963).............................................................41

*Kim v. Conagra Foods, Inc.*,
   No. 01-2467, 2003 WL 2122266 (N.D. Ill. May 23, 2003) ..................42

*L'Oreal S.A. v. Johnson & Johnson Consumer Cos., Inc.*,
No. 12-98-GMS, 2014 U.S. Dist. LEXIS 190268 (D. Del. Nov. 5, 2014) ..........42

*Markman v. Westview Instruments, Inc.*,
52 F.3d 967 (Fed. Cir. 1995) (en banc) ...............................................40

*Mayne Pharma Int'l Pty Ltd. v. Merck & Co., Inc.*,
Civ. No. 15-438, 2016 WL 7441069 (D. Del. Dec. 27, 2016)............................36

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913, 125 S.Ct. 2764 (2005) ...................................................23

*Momentus Golf, Inc. v. Swingrite Golf Corp.*,
312 F.Supp. 2d 1134 (S.D. Iowa 2004)..................................................42

*Nautilus, Inc. v. Biosig Instruments Inc.*,
134 S. Ct. 2120, 189 L. Ed. 2d 37 (2014) ..................................... passim

*Nicini v. Morra*,
212 F.3d 798 (3d Cir. 2000) .............................................................15

*One-E-Way, Inc. v. Int'l Trade Comm'n.*,
859 F.3d 1059 (Fed. Cir. 2017) ................................................... 34, 35

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) ........................................................39

*PPG Indus. v. Guardian Indus. Corp.*,
156 F.3d 1351 (Fed. Cir. 1998) ................................................. passim

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012) ........................................................33

*Prostrakan, Inc. v. Actavis Labs. UT, Inc.*,
Civ. No. 16-cv-0044, 2017 WL 3028876 (E.D. Tex. July 15, 2017) .................36

*Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*,
No. 12-5311 JLL, 2015 WL 5032650 (D.N.J. Aug. 25, 2015)...........................46

*Senju Pharm. Co., Ltd. v. Lupin Ltd.*,
162 F.Supp.3d 405 (D.N.J. November 18, 2015)..................................42

*Shire LLC v. Amneal Pharms., LLC*,
   Civ. No. 11-3781, 2014 WL 2861430 (D.N.J. June 23, 2014),
   *aff'd in part, rev'd in part*, 802 F.3d 1301 (Fed. Cir. 2015) ...............................24

*Standard Oil Co. v. Am. Cyanamid Co.*,
   774 F.2d 448, 227 USPQ 293 (Fed.Cir.1985)....................................................61

*Teva Pharm. USA, Inc. v. Sandoz*,
   789 F.3d 1335 (Fed. Cir. 2015) .......................................................................16

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   135 S.Ct. 831 (2015) ................................................................................ passim

*Trs. Of Boston Univ. v. Everlight Elecs. Co., Ltd.*,
   23 F.Supp.3d 50 (D. Mass. 2014)....................................................................42

*Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*,
   212 F.3d 1377 (Fed. Cir. 2000) .......................................................................33

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009) .......................................................................26

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir 1996) ..........................................................................39

*Warner-Lambert Co. v. Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003) ................................................................ 26, 27

**Statutes**

21 U.S.C. § 355(j)(2)(A)(vii)(IV).........................................................................4

21 U.S.C. § 355(j)(2)(B)......................................................................................4

28 U.S.C. § 1295(a) .............................................................................................1

28 U.S.C. § 1331..................................................................................................1

28 U.S.C. § 1338(a) .............................................................................................1

28 U.S.C. § 2201..................................................................................................1

28 U.S.C. § 2202..................................................................................................1

35 U.S.C § 282(a) ..................................................................35

35 U.S.C. § 112, ¶ 2 ........................................................ passim

35 U.S.C. § 271 ....................................................................1

35 U.S.C. § 282 (2000) ........................................................47

**Rules**

Fed. R. Civ. P. 56(a) ............................................................14

**Treatises**

MPEP 2111.03 ......................................................................33

# TABLE OF ABBREVIATIONS

| Parties | |
|---|---|
| Horizon | *Plaintiffs-Appellants* Horizon Pharma Ireland Ltd., HZNP Ltd., and Horizon Pharma USA, Inc. |
| Actavis | *Defendant-Cross-Appellant* Actavis PLC, Actavis, Inc., and/or Watson Laboratories, Inc. (later known as Actavis Laboratories UT, Inc.) |
| Defined Terms | |
| Actavis's ANDA | Actavis's ANDA No. 207238 filed with FDA |
| Actavis's labeling | Actavis's proposed labeling for Actavis's ANDA product described in ANDA No. 207238 |
| ANDA | Abbreviated New Drug Application |
| Br. Ph. | British Pharmacopoeia |
| C.A. No(s). | Civil Action Number(s) |
| Court | United States Court of Appeals for the Federal Circuit |
| District Court | United States District Court for the District of New Jersey |
| DMSO | Dimethyl Sulfoxide |
| Eur. Ph. | European Pharmacopoeia |
| FDA | The United States Food and Drug Administration |
| HPC | hydroxypropylcellulose |
| HPLC | High Performance Liquid Chromatography |
| MPEP | Manual of Patent Examining Procedure |
| Orange Book | FDA's *Approved Drug Products with Therapeutic Equivalence Evaluations* |

| Patents-in-Suit | the '838 patent, the '078 patent, the '450 patent, the '164 patent, the '613 patent, the '809 patent, the '913 patent, the '591 patent, and the '110 patent |
|---|---|
| PENNSAID® 2% | Horizon's PENNSAID® (diclofenac sodium topical solution) 2% w/w product |
| POSA | A Person of Ordinary Skill in the Art |
| PTO | United States Patent and Trademark Office |
| the '450 patent | United States Patent No. 8,546,450 |
| the '164 patent | United States Patent No. 8,618,164 |
| the '078 patent | United States Patent No. 8,217,078 |
| the '110 patent | United States Patent No. 9,132,110 |
| the '838 patent | United States Patent No. 8,252,838 |
| the '613 patent | United States Patent No. 8,563,613 |
| the '809 patent | United States Patent No. 8,871,809 |
| the '913 patent | United States Patent No. 9,066,913 |
| the '591 patent | United States Patent No. 9,101,591 |
| the '304 patent | United States Patent No. 9,168,304 |
| the '305 patent | United States Patent No. 9,168,305 |
| the '784 patent | United States Patent No. 9,220,784 |
| the '450 patent family | the '450 patent, the '078 patent, and the '110 patent |
| the '838 patent family | the '838 patent, the '613 patent, the '809 patent, the '913 patent, the '591 patent, the '304 patent, the '305 patent, and the '784 patent |
| USP | United States Pharmacopoeia |

## STATEMENT REQUESTING ORAL ARGUMENT

Horizon requests oral argument in this appeal.

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from the same civil actions or proceedings in the lower court was previously before this or any other appellate court.

Counsel for the Plaintiffs-Appellants are aware of the following cases presently pending before the United States District Court for the District of New Jersey that may directly affect or be affected by this Court's decision:

- *Horizon Pharma Ireland Ltd., et al. v. Lupin Ltd., et al.*, No. 15-3051;

- *Horizon Pharma Ireland Ltd., et al. v. Lupin Ltd., et al.*, No. 15-5027;

- *Horizon Pharma Ireland Ltd., et al. v. Lupin Ltd., et al.*, No. 15-6935;

- *Horizon Pharma Ireland Ltd., et al. v. Lupin Ltd., et al.*, No. 15-7745;

- *Horizon Pharma Ireland Ltd., et al. v. Lupin Ltd., et al.*, No. 16-732;

- *Horizon Pharma Ireland Ltd., et al. v. Actavis Labs. UT, Inc., et al.*, No. 16-5051;

- *Horizon Pharma Ireland Ltd., et al. v. Lupin Ltd., et al.*, No. 16-5054; and

- *Horizon Pharma Ireland Ltd., et al. v. Actavis Labs. UT, Inc.*, No. 17-3342.

At issue in these cases are the validity of certain claims from U.S. Patent Nos.: 8,217,078; 8,252,838; 8,546,450; 8,563,613; 8,618,164; 8,741,956; 8,871,809; 9,066,913; 9,101,591; 9,132,110; 9,168,304; 9,168,305; 9,220,784; 9,339,551;

9,339,552; 9,370,501; 9,375,412; 9,539,335.  As some of these patents are related to the patents at issue in this appeal, these cases may directly affect or be affected by this Court's decision.  Fed. Cir. R. 47.5.

# JURISDICTIONAL STATEMENT

This is an appeal from six related patent infringement cases before Judge Noel L. Hillman of the United States District Court for the District of New Jersey. The District Court exercised subject matter jurisdiction over these cases pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, 2202 and 35 U.S.C. § 271.

Final judgment was entered on May 23, 2017. Horizon timely appealed on June 9, 2017. This Court has jurisdiction under 28 U.S.C. § 1295(a).

# STATEMENT OF THE ISSUES

1.    Did the District Court err in finding no induced infringement, on the basis that Actavis's labeling does not constitute an instruction, encouragement, or recommendation to practice the methods of claims 10, 11, 15, and 17 of the '450 patent, claim 14 of the '078 patent, and claims 3, 11, and 13 of the '110 patent?

2.    Did the District Court err when it applied the *Nautilus* standard of definiteness to the basic and novel properties of the invention, finding the claim term "consisting essentially of" indefinite and claims 49-52 and 55-61 of the '838 patent, claims 12-15, 17, 19, 24, and 25 of the '591 patent, claims 2-5 and 8-11 of the '304 patent, claims 2-5 and 9-12 of the '305 patent, and claims 2-5 and 9-12 of the '784 patent invalid?

3.    Did the District Court err in finding that a POSA could not determine with reasonable certainty whether adding an additional ingredient to the claimed formulations would materially alter the basic and novel properties of the invention of claims 49-52 and 55-61 of the '838 patent, claims 12-15, 17, 19, 24, and 25 of the '591 patent, claims 2-5 and 8-11 of the '304 patent, claims 2-5 and 9-12 of the '305 patent, and claims 2-5 and 9-12 of the '784 patent on the basis that the basic and novel properties "better drying time" and "favorable stability" are indefinite?

4.      Did the District Court err in failing to consider the definiteness of the claim
term "consisting essentially of" on a claim-by-claim basis, when finding
claims 49-52 and 55-61 of the '838 patent, claims 13-14 of the '591 patent,
claims 9-11 of the '304 patent, claims 10-12 of the '305 patent, and claims
10-12 of the '784 patent, indefinite on the basis that the basic and novel
property "better drying time" is indefinite?

5.      Did the District Court err in finding the claim terms "the formulation
degrades by less than 1% over 6 months" in claims 1-5, 9-19, and 22-23 of
the '613 patent and claims 10, 11, and 19 of the '591 patent, and "the
formulation degrades by less than 0.5% over 6 months" in claim 24 of the
'613 patent indefinite, on the basis that the patents lack guidance as to how
to evaluate degradation?

6.      Did the District Court err in finding the claim term "the topical formulation
produces less than 0.1% impurity A after 6 months at 25°C and 60%
humidity" in claim 4 of the '913 indefinite, on the basis that the identity of
"impurity A" is unknown?

## STATEMENT OF THE CASE

Actavis filed Actavis's ANDA with FDA seeking approval to market a
generic version of PENNSAID® 2% prior to the expiration of the Patents-in-Suit.
APPX8388-8389, -8420, ¶196.  HZNP Limited is the sole owner of the Patents-in-

3

Suit.  APPX573, ¶¶36-41; APPX15956, ¶43; APPX16007, ¶43; APPX16069, ¶43; APPX16127, ¶¶ 43, 45; APPX16853, ¶43.

Pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV), Actavis certified to FDA that the Patents-in-Suit, Orange Book listed relative to PENNSAID 2%, are invalid, unenforceable, and/or will not be infringed by the manufacture, use or sale of Actavis's ANDA product.  APPX8420, ¶199.  Pursuant to 21 U.S.C. § 355(j)(2)(B), in letters dated November 12, 2014, March 25, 2015, July 29, 2015, September 8, 2015, and October 8, 2015, Actavis notified Horizon that it filed 21 U.S.C. § 355(j)(2)(A)(vii)(IV) certifications with respect to each of the Patents-in-Suit.  APPX8420, ¶200.

On December 23, 2014, Horizon filed C.A. No. 1:14-07992-NLH-AMD against Actavis, asserting infringement of the '078 patent, the '838 patent, the '450 patent, the '613 patent, the '164 patent, and the '809 patent.  APPX566; APPX573-574.  On June 30, 2015, August 11, 2015, and September 17, 2015, Horizon filed C.A. Nos. 1:15-cv-05025-NLH-AMD, 1:15-cv-06131-NLH-AMD, and 1:15-cv-06989-NLH-AMD against Actavis, asserting infringement of the '913 patent, the '591 patent, and the '110 patent, respectively.  APPX15949, -15956; APPX16000, -16007; APPX16062, -16069.  On September 30, 2015, C.A. Nos. 1:14-07992-NLH-AMD, 1:15-cv-05025-NLH-AMD, 1:15-cv-06131-NLH-AMD, and 1:15-cv-06989-NLH-AMD were consolidated.  APPX810-812.  On October 27, 2015,

Horizon filed C.A. No. 1:15-cv-7742-NLH-AMD against Actavis, asserting infringement of the '304 patent and the '305 patent. APPX16120, -16127. On February 5, 2016, Horizon filed C.A. No. 1:16-cv-00645-NLH-AMD against Actavis, asserting infringement of the '784 patent. APPX16886, -16893.

The parties disputed the meanings of certain claim terms appearing in the '838, '613, '809, '913 and '591 patents. Horizon and Actavis agreed that these claim terms would have the same meaning in the '304 patent, the '305 patent, and the '784 patent. Following a *Markman* hearing held March 3, 2016, the District Court ruled that claim terms (1) "consisting essentially of," (2) "the topical formulation produces less than 0.1% impurity A after 6 months at 25°C and 60% humidity," and (3) "the formulation degrades by less than 1% over 6 months" were indefinite. APPX1-28; *see also* APPX29-30; APPX31-39.

On January 27, 2017, Actavis filed a Motion for Summary Judgment asserting the claims of the '450 patent family are not infringed. The District Court granted Actavis's Motion on March 16, 2017. APPX40-61.

This is an appeal from the Judgment entered May 23, 2017, as well as the underlying Orders: (a) granting Actavis's Motion for Summary Judgment that the claims of the '450 patent family are not infringed, and (b) finding the claim terms "the topical formulation produces less than 0.1% impurity A after 6 months at

25°C and 60% humidity," "the formulation degrades by less than 1% over 6 months," and "consisting essentially of" invalid as indefinite.  APPX62-64.

## STATEMENT OF THE FACTS

### I.    PENNSAID® 2%

PENNSAID® 2% is the first and only twice-daily topical formulation approved by FDA for the treatment of the pain of osteoarthritis of the knee(s). APPX7878.  PENNSAID® 2% provides the same relief of knee pain despite being administered via only two pumps, twice daily (*i.e.*, every 12 hours), relative to the prior PENNSAID® 1.5% product which requires the application of 40 drops per knee, four times daily (*i.e.*, every 6 hours for a total of 160 drops per knee). *Compare* APPX6649 *with* APPX6923.

### II.    ACTAVIS'S ANDA PRODUCT

Actavis filed Actavis's ANDA with FDA seeking approval to market a generic version of PENNSAID® 2%.[1]  APPX7999; APPX8025-8026.  Actavis's labeling describes its generic product as "Diclofenac Sodium Topical Solution" and states "[d]iclofenac sodium topical solution 2% is a nonsteroidal anti-inflammatory drug indicated for the treatment of the pain of osteoarthritis of the knee(s)."  APPX5873; APPX5888.  Actavis's labeling instructs patients to (1)

---

[1] At the time of filing with FDA, the ANDA holder was Watson Laboratories, Inc. The name was later changed to Actavis. *See* APPX695.

apply Actavis's ANDA product to clean, dry skin of the knee, (2) protect the treated knee(s) from natural and artificial sunlight because studies in animals indicated topical diclofenac treatment resulted in an earlier onset of ultraviolet light-induced skin tumors, and (3) wait until the area is completely dry before covering with clothing or applying sunscreen, insect repellant, cosmetics, topical medications, or other substances. APPX5873-5899, -5875-5876, -5881, -5898.

## III. THE '450 AND '838 PATENT FAMILIES

PENNSAID® 2% is protected by the '450 patent family and the '838 patent family, both of which are listed in the Orange Book.

### A. The '450 Patent Family

The patents in the '450 patent family are from the same patent family and have substantially similar specifications. APPX66; APPX152; APPX294. The '450 patent is directed to methods of safely administering topical diclofenac compositions containing DMSO which do not increase systemic exposure of environmental toxins (*e.g.*, oxybenzone (active ingredient in sunscreen), DEET (active ingredient in insect repellant), and 2,4-D (pesticide agent)) present in subsequently applied topical products, wherein the subsequently applied topical product is not applied until the area treated with the topical diclofenac composition is dry. *See, e.g.*, APPX163-164, 4:20-28, 4:60-5:7; APPX165-166, 8:65-9:20; APPX180-181, 38:60-39:28; APPX182, 41:1-11; APPX187, 51:55-60.

## B. The '838 Patent Family

The patents in the '838 patent family are from the same patent family and share the same specification.  APPX121; APPX201; APPX231; APPX263; APPX376; APPX409; APPX440.  The '838 patent is directed to diclofenac sodium gel formulations that have certain advantages over the prior art PENNSAID® 1.5% product, referred to as the "comparative liquid formulation," including (a) better drying time, (b) higher viscosity, (c) increased transdermal flux, and (d) greater pharmacokinetic absorption *in vivo*.  APPX136, 4:22-27.  In some embodiments, the formulations of the invention also have favorable stability compared to the prior art.  *See, e.g.*, APPX145, 21:6-14; APPX146, 24:22-28.

**"Better Drying Time."**  The inventive formulations of the '838 patent are thickened formulations of diclofenac sodium having shorter drying times than the "comparative liquid formulation."  The '838 patent outlines two tests for comparing drying times including an *in vivo* test in which the drying time difference is evaluated when equal amounts of the two products are tested on opposite limbs and an *in vitro* test in which differences in drying rate and drying time are evaluated by placing equal amounts of the formulation in weighing dishes.  APPX139, 10:16-30.  This *in vitro* method is described in the '838 patent as being more quantitative than the *in vivo* method.  APPX139, 10:22-23.  All the inventive formulations tested had shorter drying times than the "comparative liquid

formulation." APPX133, Fig. 11; APPX139, 10:5-30; APPX145-146, 21:39-23:27. All the inventive formulations comprising HPC as the thickening agent further dried faster at all time points than the "comparative liquid formulation," under both the *in vitro* method and the *in vivo* method. *See, e.g.*, APPX145-146, Table 12.

"**Favorable Stability.**" The '838 patent states that, in addition to better drying time, higher viscosity, increased transdermal flux and greater pharmacokinetic absorption *in vivo*, "the preferred diclofenac sodium gel formulations of the present invention provide other advantages," including "favorable stability at six (6) months as reflected in the lack of any substantial changes in viscosity, the absence of phase separation and crystallization at low temperature, and a low level of impurities." APPX136, 4:27-32. The '838 patent describes "favorable stability" as including metrics, such as aspects of physical stability, in addition to evaluation of degradation of the active ingredient to form impurities such as "impurity A." *See, e.g.*, APPX142, 16:40-42.

"**Degradation.**" A POSA would understand that degradation in the context of the '838 patent refers only to degradation of diclofenac sodium. The patent states: "Additional features of the preferred formulations include ***decreased degradation of diclofenac sodium***, which degrades by less than 0.04% over the course of 6 months and a pH of 6.0-10.0, for example around pH 9.0." APPX137,

5:50-53 (emphasis added).  Similarly, the '838 patent states that the inventive formulations provide "improved stability of the active agent … as evidenced in a formulation which degrades by less than 0.034% or 0.09%, over 6 months …." APPX146, 24:23-27.

"**Impurity A.**"  A POSA would understand that impurity A in the context of the '838 patent is a degradation product of diclofenac sodium and refers to the known impurity "A" having the chemical name [*N*-(2,6-dichlorophenyl)indolin-2-one], also known as reference standard "USP Diclofenac Related Compound A RS."  Example 6 of the '838 patent, the only example setting forth data concerning degradation, describes that degradation of diclofenac sodium is determined by measuring production of a degradant known as "impurity A."  APPX146, 23:48-58.  Consistent with other discussions of degradation in the '838 patent, Example 6 concludes that the inventive gel formation "provides improved stability of the ***active agent*** … as evidenced in a formulation which ***degrades by less than 0.034% or 0.09%***, over 6 months…," wherein 0.034% and 0.09% refer to "Percent 'impurity A'" according to Table 13.  APPX146, 23:62-24:10, 24:23-28 (emphasis added).

The USP, Eur. Ph. and Br. Ph. available to a POSA as of 2006 identify impurity "A" as a degradation product of diclofenac sodium defined as [*N*-(2,6-dichlorophenyl)indolin-2-one], also named 1-(2,6-dichlorophenyl)-1,3-dihydro-

2$H$-indol-2-one, having the chemical formula $C_{14}H_9Cl_2NO$. *See* APPX1654-1655; APPX1650-1652; APPX2878; APPX1657-1661; APPX1663-1666; APPX3665-3669; *see also* APPX1533-1534, -1545-1546, ¶¶47-54, -1562; APPX4641, -4654-4655, ¶¶37-38, -4659. The USP identifies [*N*-(2,6-dichlorophenyl)indolin-2-one] as a reference standard "USP Diclofenac Related Compound A RS." *See* APPX1654-1655; APPX1650-1652; APPX2878. Actavis's expert, Dr. Michniak-Kohn, admits that USP Related Diclofenac Compound A RS "was a known impurity of diclofenac sodium at the time of the earliest priority application that led to the '838, '613, '916, and '591 patents." APPX2010, -2032-2034, ¶55 (citing APPX2878).

## SUMMARY OF THE ARGUMENT

The District Court committed legal and factual errors in granting Actavis's motion for summary judgment of noninfringement and in finding the claim terms (1) "consisting essentially of," (2) "the topical formulation produces less than 0.1% impurity A after 6 months at 25°C and 60% humidity," and (3) "the formulation degrades by less than 1% over 6 months" indefinite.

First, the District Court erred in granting Actavis's motion for summary judgment of noninfringement because Actavis's labeling instructs, encourages, or recommends the practice of the methods claimed in the '450 patent family. Indeed, the "Indications and Usage" section of Actavis's labeling closely tracks the

language of these claims, as Actavis's labeling instructs that a patient is to "[w]ait until the area is completely dry before covering with clothing or applying sunscreen, insect repellent, cosmetics, topical medications, or other substances." Such language in Actavis's labeling is not "indifferent" to how subsequent topical agents, such as sunscreen, insect repellant, and topical medications, are applied. Rather, this language explicitly instructs that other topical agents should only be applied after waiting for Actavis's ANDA product to dry.

Second, the District Court erred in holding the "consisting essentially of" claim term indefinite. In so holding, the District Court was the first court to evaluate an invention's "basic and novel properties" for definiteness pursuant to 35 U.S.C. § 112, ¶ 2 and the standard set forth in *Nautilus*. There is no legal support for the application of the definiteness requirement to "basic and novel properties" of an invention, nor is there legal support for the proposition that "basic and novel properties" are part and parcel of claim language that defines claim scope. The evolution of the concept of "basic and novel properties," which was created as a tool by PTO Examiners for evaluating claims containing "consisting essentially of," underscores that they are not part of the claim language. Courts typically consider the "basic and novel properties" only as part of a validity or infringement analysis—and not subject to the definiteness requirements of 35 U.S.C. § 112, ¶ 2.

However, even if the District Court did not err in subjecting the "basic and novel" properties of the invention to the requirements of 35 U.S.C. § 112, ¶ 2, the District Court did err in finding the basic and novel properties "better drying time" and "favorable stability" indefinite. With respect to "better drying time," the District Court erred because it relied upon intrinsic data irrelevant to whether an additional ingredient added to the claimed formulations will have a material effect on the "drying time" of that composition. The District Court also improperly conflated "drying rate" and "better drying time," and based its holding on Actavis's expert testimony concerning "drying rate," as neither party presented any expert testimony concerning "better drying time." Additionally, the District Court erred in not evaluating the definiteness of "better drying time" on a claim-by-claim basis, as there is no evidence of any inconsistent "drying time" results when inventive formulations containing HPC are tested.

With respect to "favorable stability," the District Court erred because it failed to cite any evidence supporting its opinion that "favorable stability" is indefinite, and ignored the ample evidence provided by Horizon that a POSA would be able to determine with reasonable certainty whether an unlisted ingredient has a material effect on the basic and novel property "favorable stability." The District Court also improperly equated "favorable stability" with the "degrades" claim terms.

Third, the District Court erred in holding the "degrades" terms and "impurity A" indefinite. The District Court improperly interchanged the "degrades" claim terms with the concept of stability, despite clear teachings in the specification that degradation is a subset of a formulation's overall stability. A POSA would understand that the "degrades" claim terms refer to the degradation of the active ingredient, diclofenac sodium, into "impurity A," as the specification discusses degradation only in the context of the degradation of diclofenac sodium, and includes degradation data only with respect to the production of "impurity A."

Moreover, a POSA would understand that "impurity A" means "USP Diclofenac Related Compound A," and the District Court committed both legal and factual error in holding otherwise. The specification indicates that "impurity A" is a degradant of diclofenac sodium, and Horizon presented ample evidence that a POSA would know, based on the pharmacopeias available at the time of the invention, that "impurity A" is a known diclofenac impurity defined as [*N*-(2,6-dichlorophenyl)indolin-2-one] or "USP Related Diclofenac Compound A RS."

## STANDARD OF REVIEW

This Court owes no deference to the District Court's judgment of noninfringement of the '450 patent family. Summary judgment is only appropriate if Actavis demonstrates no genuine issue of material fact as to whether the asserted claims are infringed. Fed. R. Civ. P. 56(a). In deciding, and reviewing, a motion

for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

This Court reviews the grant of summary judgment under the law of the regional circuit, here, the Third Circuit. *Frolow v. Wilson Sporting Goods, Co.*, 710 F.3d 1303, 1308 (Fed. Cir. 2013). The Third Circuit reviews a grant of summary judgment of noninfringement *de novo*. *Id*. (citing *Nicini v. Morra*, 212 F.3d 798, 805 (3d Cir. 2000) (en banc)). This Court should therefore review *de novo* the District Court's grant of summary judgment that Actavis does not infringe the claims of the '450 patent family.

This Court also reviews a finding of indefiniteness under 35 U.S.C. § 112, ¶ 2 without deference. *Cox Commc'ns, Inc. v. Spring Commc'n Co.*, 838 F.3d 1224, 1228 (Fed. Cir. 2016), *cert. denied* No. 16-1106, 2017 WL 978188 (U.S. June 19, 2017); *Howmedica Osteonics Corp. v. Tranquil Prospects, Ltd.*, 401 F.3d 1367, 1370 (Fed. Cir. 2005). The conclusion that a claim is invalid as indefinite is a legal conclusion and, as such, is subject to *de novo* review. *Cox*, 838 F.3d at 1228 (*citing Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1364 (Fed. Cir. 2015)). The analysis of intrinsic evidence underlying the determination of indefiniteness is also subject to *de novo* review. *See Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S.Ct. 831, 840-41 (2015).

The District Court's underlying factual determinations based on extrinsic evidence are reviewed for clear error. *Teva*, 135 S. Ct. at 841. Clear error only applies if the District Court actually made a factual finding—it is not enough that the District Court simply heard extrinsic evidence during a claim construction proceeding. *CardSoft v. Verifone, Inc.*, 807 F.3d 1346, 1350 (Fed. Cir. 2015); *Teva Pharm. USA, Inc. v. Sandoz*, 789 F.3d 1335, 1342 (Fed. Cir. 2015) ("Teva cannot transform legal analysis about the meaning or significance of the intrinsic evidence into a factual question simply by having an expert testify on it."); *see also Teva*, 135 S. Ct. at 840 ("[S]ubsidiary fact-finding is unlikely to loom large in the universe of litigated claim construction."). And even then, this Court may nevertheless review the District Court's constructions *de novo* if the intrinsic record provides the proper scope of the disputed claim terms. *CardSoft*, 807 F.3d at 1350; *Eidos*, 779 F.3d at 1365 ("To the extent the district court considered extrinsic evidence in its claim construction order or summary judgment order, that evidence is ultimately immaterial to the outcome because the intrinsic record is clear.").

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN FINDING THAT ACTAVIS'S LABELING DID NOT INDUCE INFRINGEMENT OF THE '450 PATENT FAMILY

### A. The PENNSAID® 2% Labeling and Actavis's Labeling Closely Tracks the Claim Language of the '450 Patent Family

Actavis's labeling for its generic version of PENNSAID® 2% constitutes an instruction, encouragement, or recommendation to practice the methods of the '450 patent family. Thus, Actavis's labeling constitutes evidence of induced infringement.

Use by a patient of PENNSAID® 2% in accordance with its labeling is described by the asserted claims of the '450 patent family. APPX118-119; APPX198; APPX373-374; APPX6649-6652, §§ 1, 2, 3, -6661-6662, §11, -6665, §17; APPX5705-5709, ¶12, -5711-5712, ¶17, -5719-5720, ¶32, -5740-5742, ¶69, -5852-5853, ¶¶445-452, -5860; APPX5976-5992, -6000, -6006, -6015; APPX5425-5434, ¶16, -5441-5443, ¶43-46, -5448-5450, ¶¶67-71; -5455-5460, ¶¶96-115, -5468-5472, ¶¶146-157; -5474-5479, ¶¶170-185; APPX5872-5876, §§ 1, 2, 3, -5888, §11, -5892, §17. A table comparing the PENNSAID® 2% labeling with claim 10 of the '450 patent (selected as illustrative of the asserted claims) is set forth below. *Compare* APPX198, 73:35-74:10 *with* APPX6649-6652 at Highlights, §§ 1, 2, 3, -6661-6662, §11.

| '450 Patent, Claim 10 | PENNSAID® 2% Labeling |
|---|---|
| A method for applying topical agents to a knee of a patient with pain, said method comprising: applying a first medication consisting of a topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient | **1 INDICATIONS AND USAGE** PENNSAID is a nonsteroidal anti-inflammatory drug (NSAID) **indicated for the treatment of the pain of osteoarthritis of the knee(s).** (1)<br><br>**2 DOSAGE AND ADMINISTRATION Apply diclofenac sodium topical solution, PENNSAID to clean, dry skin.** (2.1) |
| wherein the topical diclofenac preparation comprises a therapeutically effective amount of a diclofenac salt and 40-50% w/w dimethylsulfoxide | **3 DOSAGE FORMS AND STRENGTHS** • 2% w/w topical solution (3)<br><br>**11 DESCRIPTION PENNSAID contains 2% w/w diclofenac sodium**… Each 1 gram of solution contains 20 mg of diclofenac sodium. In addition, PENNSAID contains the following inactive ingredients: **dimethyl sulfoxide USP (DMSO, 45.5% w/w),** ethanol, purified water, propylene glycol, and hydroxypropyl cellulose. |
| Waiting for the treated area to dry; | **2 DOSAGE AND ADMINISTRATION Wait until the treated area is dry** before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID |
| Subsequently applying a sunscreen, or an insect repellant to said treated area after said treated area is dry, wherein | **2 DOSAGE AND ADMINISTRATION** |

| said step of applying a first medication does not enhance the systemic absorption of the subsequently applied sunscreen or insect repellant | Wait until the treated area is dry **before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID** |
|---|---|
| Wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation. | **1 INDICATIONS AND USAGE** PENNSAID is a nonsteroidal anti-inflammatory drug (NSAID) **indicated for the treatment of the pain of osteoarthritis of the knee(s).** (1) |

The importance of the PENNSAID® 2% labeling instruction regarding drying before application of another agent, such as sunscreen, is clear from the development history of the product. The inventive method of the asserted patents was discovered by the inventors at Nuvo Research, following extensive clinical research conducted to respond to FDA's concerns. APPX7097-7103, -7099; APPX7362-7365, -7362; APPX7422-7427, -7440, -7454; APPX7201-7210, -7252-7257; APPX7634-7637, -7645, -7651, -7662; APPX7704, -7712; APPX7520-7564; APPX7585-7632. Nuvo discovered that repeated application of the topical diclofenac compositions containing DMSO did not result in increased systemic absorption of environmental toxins (*i.e.*, sunscreen, insect repellant and pesticide) *so long as the treated area was first allowed to dry completely*. *Id.* Subsequently, FDA requested that the PENNSAID® labeling include instructions in the Dosage and Administration, Drug Interactions, and Patient Counseling Information

sections that patients should and "wait until the treated area is completely dry" "[b]efore applying sunscreen, insect repellant, cosmetics, topical medications, or other substances." APPX7634-7637, §2.2, -7650-7651, §7.9, -7661-7662, §17.5. This labeling is in stark contrast to the earlier labeling approved for prior PENNSAID® 1.5% product sold in Canada before these clinical tests were performed. Instead of setting forth the instructions for safe use with subsequent topical agents, the prior labeling set forth an instruction *prohibiting* the application of any other topical agent. APPX6875-6876, -6888, -6897-6898. That label stated, "Do not apply any other medication to the treated area" and "Do not apply any other topical medication together with PENNSAID®." APPX6888, -6898, -6903.

Actavis's labeling is substantially the same as that for PENNSAID® 2%. APPX5441, ¶43; APPX5853, ¶¶448-449; APPX5872-5876, §§ 1, 2, 3, -5888, §11, -5892, §17; APPX5976-5992, -6000, -6006, -6015. The first page of Actavis's labeling, under "Highlights Of Prescribing Information," instructs patients to "[d]ispense 40 mg (2 pump actuations) directly onto the knee or first into the hand and then onto the knee. Spread evenly around front, back and sides of the knee" and then "[w]ait until the area is completely dry before covering with clothing or applying sunscreen, insect repellent, cosmetics, topical medications, or other substances." APPX5873. Actavis's labeling provides numerous other instructions

in the Full Prescribing Information regarding safe application of a second topical agent (such as sunscreen) as follows:

- "Wait until the treated area is dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with diclofenac sodium topical solution."  APPX5876, §2.2.

- "Instruct patients to wait until the area treated with diclofenac sodium topical solution is completely dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication." APPX5892, §17.

- "**After you use diclofenac sodium topical solution:  Do not** … put sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medicines on your knee until it is completely dry." APPX5898.

Actavis's labeling, just like the PENNSAID® 2% labeling, further instructs patients to "[p]rotect the treated knee(s) from natural and artificial sunlight" and "[i]nstruct patients to avoid exposure to natural or artificial sunlight on treated knee(s) because studies in animals indicated topical diclofenac treatment resulted in an earlier onset of ultraviolet light-induced skin tumors."  APPX5876, §2.2, -5881, §5.14.

The Full Prescribing Information of Actavis's labeling also warns patients in Section 6 that the two most significant adverse reactions to PENNSAID® 2% are "dry skin" and "contact dermatitis," just as in the PENNSAID® 2% labeling – skin conditions that call for topical corticosteroid. *Compare* APPX5882-5883, Table 2, *with* APPX6657-6658, Table 2; APPX5449-5450, ¶70; APPX5612-5613, 337:9-339:16. In fact, Actavis's labeling contains all the same instructions regarding safe use of the product for the treatment of pain of osteoarthritis of the knees as are found on the PENNSAID® 2% labeling. APPX5976-5992, -6000, -6006, -6015.

Actavis's labeling includes a "Dosage and Administration" section that instructs patients to "apply diclofenac sodium topical solution," "protect the treated knee(s) from natural and artificial sunlight," and then "[w]ait until the area is completely dry before covering with clothing or applying sunscreen, insect repellent, cosmetics, topical medications, or other substances." APPX5873, -5875-5876, §§ 2.1, 2.2. This instruction, together with other similar instructions appearing throughout Actavis's labeling, evidences Actavis's specific intent to induce infringement of the asserted claims of the '450 patent family.

**B.     The District Court Erred When It Found That Actavis's Labeling Does Not Recommend, Encourage, or Promote the Claimed Method**

While not every patient will have a "need" to apply sunscreen, or insect repellant, or another topical medication, when such a "need" arises, Actavis's

instructions inevitably lead a patient to wait for the topical diclofenac composition to dry before applying the sunscreen, insect repellant, or another topical medication. APPX5617-5620, ¶6, -5638-5639, ¶¶41-44, -5641, ¶¶47-48; APPX5716-5717, ¶26, -5727-5729, ¶46, -5841, ¶402, -5845, ¶417, -5849, ¶430, -5855, ¶¶454-455; APPX8141-8153; APPX6970-6975, ¶¶7-26.

Actavis noticeably has not disputed that patients who will use Actavis's ANDA product may have a "need" to apply sunscreen, insect repellant, or another topical medication to the area of treatment. Actavis also has not disputed that if patients follow Actavis's labeling instruction regarding application of a second topical such as sunscreen, the patients will infringe the claimed method of treatment of pain of osteoarthritis of the knee. Actavis's labeling clearly establishes that Actavis has taken "affirmative steps" through its labeling "to foster infringement." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 919, 125 S.Ct. 2764, 2770 (2005).

Despite the clear instructions in Actavis's labeling, the District Court granted summary judgment of non-infringement, holding that "Horizon has not met its burden to show that Actavis's label recommends, encourages, or promotes a use of its ANDA product with the intent to directly infringe on Horizon's claimed methods." APPX55. To reach this decision, the Court improperly relied on two cases, *Shire LLC v. Amneal Pharms., LLC*, Civ. No. 11-3781, 2014 WL 2861430,

at *5 (D.N.J. June 23, 2014), *aff'd in part, rev'd in part*, 802 F.3d 1301 (Fed. Cir. 2015) and *In re Depomed Patent Litigation*, Civ. No. 13-4507, 2016 WL 7163647, at *58 (D.N.J. Sept. 30, 2016), *appeal docketed*, No. 17-1153 (Fed. Cir. Nov. 3, 2016).  APPX55-58.  The District Court held that, "[j]ust like the generic's labeling in *Shire* and *In re Depomed*, no evidence in this case demonstrates that Actavis's proposed label does more than simply permit, rather than require or direct, the post-product application of sunscreen, insect repellant, or a second topical medication."  APPX58.

*Shire* is factually distinguishable because Actavis's labeling is not "indifferent" to infringement.  *Shire*, 2014 WL 2861430, at *5.  In *Shire*, this Court concluded that Amneal's label instruction to take the drug "with or without food" was insufficient evidence to support induced infringement because the statement was "indifferent to which option is selected."  *Id.*  In this case, Actavis's labeling is not indifferent to how subsequent topical agents (sunscreen, insect repellant, topical medications) are to be applied.  To the contrary, Actavis's labeling explicitly instructs that other topical agents should only be applied after waiting for Actavis's ANDA product to dry.  APPX5873, -5876, §2.2, -5892, §17, -5898; APPX5633, ¶¶31-32, -5636-5643, ¶¶37-51.  Indeed, Actavis's labeling cannot be indifferent because FDA is not indifferent to issues of safety.  *See, e.g.*, APPX5623-5633, ¶¶12-32; APPX5792-5794, ¶¶252-258; APPX7097-7103, -7099;

APPX7362-7365, -7362; APPX7422-7427, -7440, -7454; APPX7201-7210, -7252-7257; APPX7634-7637, -7645, -7651, -7662; APPX7704, -7712; APPX7520-7564; APPX7585-7632.

*In re Depomed* is also not relevant. That case, like many others relied upon by Actavis, relates to a scenario wherein the patentee is asserting infringement of a patent that covers an indication that is not in the ANDA holder's label. *In re Depomed*, 2016 WL 7163647, at *60. That is not the present situation. Actavis's labeling clearly sets forth steps which infringe the asserted claims. *See, e.g.*, APPX5440-5444, ¶¶37-46; -5448-5450, ¶¶67-71, -5455-5460, ¶¶96-103, 107-109; APPX5468-5472, ¶¶147-157, -5474-5479, ¶¶ 170-185; APPX5633-5643, ¶¶31-32, 37-51; APPX4891-4892, ¶¶ 1-2; APPX5873, -5875, §§ 1-3, -5892.

When the District Court's factual findings are viewed under this Court's precedent, those findings actually support a holding in Horizon's favor. The District Court found, "[t]he medical reason for specifying 'sunscreen, insect repellant, and other topical medications' is important," and then concluded that "[t]he proposed product label directs a patient on how to apply the ANDA product, and provides guidance to the patient on how to proceed from there if he wishes to have anything else come in contact with [his] knee afterward." APPX59-60. The "anything else" on the label includes the claimed application of sunscreen and

insect repellants, and the "how to apply" certainly includes the "wait until the treated area is dry" instruction.

The District Court properly referred to this Court's guidance with respect to finding specific intent, acknowledging that "the question is not whether a patient following the instructions on the packaging may end up using the medication in an infringing way, but rather whether the proposed label instructs the patient to perform the patented method," citing this Court's decision in *AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2010), which in turn cites to *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1329 n.2 (Fed. Cir. 2009). APPX52.

But the District Court did not follow this Court's guidance. Instead, the District Court appears to have relied upon another decision from this Court, where the asserted specific intent was being tied not to the label itself, but rather to activities outside of the label. The District Court turned to *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003) ("[W]here a product has substantial noninfringing uses, intent to induce infringement cannot be inferred even when the [alleged inducer] has actual knowledge that some users of its product may be infringing the patent."). APPX52.

In *Warner Lambert Co.*, this Court affirmed the grant of Apotex's motion for summary judgment on the basis of no induced infringement because Warner Lambert's patent covered only the use of the drug (gabapentin) for treating

neurodegenerative diseases (*e.g.*, stroke, Alzheimer's, Huntington's, Parkinson's),
a use not approved by FDA, whereas Apotex sought approval only for use in the
treatment of epilepsy, a use covered by a previously-expired patent. *Warner-
Lambert*, 316 F.3d at 1352. That decision is not relevant to the present facts—and
neither is the issue of the purported presence of "substantial noninfringing uses."
The fact that a patient may apply clothing, cosmetics or other substances is simply
not relevant.

The presence of intent to induce infringement based on Actavis's labeling is
especially compelling when the focus is on the application of sunscreen. Actavis's
labeling states in Section 5.14 that patients should be instructed to "avoid exposure
to natural or artificial sunlight on treated knee(s) because studies in animals
indicated topical diclofenac treatment resulted in an earlier onset of ultraviolet
light-induced skin tumors." APPX5881, §5.14. Application of sunscreen as a
second topical agent is medically necessary because of the increased risk of
photosensitization and tumors in the skin, per the warning in Actavis's labeling.
APPX5641-5643, ¶¶48-51; APPX8289-8292, -8343-8344, 211:2-213:10, 215:8-
21.

In this regard, this case is analogous to *AstraZeneca* where this Court
affirmed a finding of induced infringement on the basis that AstraZeneca's claimed
method of "once-daily" dosing would be infringed by some, but not all, users of

the generic Apotex product because the Apotex labeling included language in the "Dosage and Administration" section recommending to "downward-titrate to the lowest effective dose" – a recommendation that meant some users would infringe because the product was only available in two dosage strengths. *AstraZeneca*, 633 F.3d at 1057. Once-daily dosing was inevitable for some users of the Apotex product because of Apotex's recommendation of downward titration. *Id*. at 1060. Similarly, that some patients will apply sunscreen or insect repellent or another topical medication, following the instructions on Actavis's labeling (and thus the asserted patent claims), is inevitable for those patients. Actavis's instruction is that it is safe to do so after waiting for Actavis's ANDA product to dry completely. APPX5442-5443, ¶46, -5449-5450, ¶70, -5457-5458, ¶¶99-100, -5470-5471, ¶150, -5475-5476, ¶173, -5478-5479, ¶181; APPX5633, ¶¶31-32, -5636-5640, ¶¶37-46.

The present case also is similar to *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, wherein this Court affirmed a finding of induced infringement because Eli Lilly's claimed method of administering the chemotherapy drug pemetrexed together with folic acid and vitamin B12 to avoid side effects would be infringed because the Teva labeling included language recommending vitamin supplementation in the "Physician Prescribing Information" section. 845 F.3d 1357, 1366 (Fed. Cir. 2017).

It is further submitted that induced infringement should be found in the present action if this Court applies the standard as expressed in *Braintree Labs., Inc. v. Breckenridge Pharm., Inc.*, -- F. App'x –, 2017 WL 1829140 (Fed. Cir. 2017) (unpublished).  In that case, this Court found, "Breckenridge's labeled indication for colon cleansing 'recommends or suggests to physicians that the drug is safe and effective for administration to patients for the purposes of inducing [purgation].'"  *Braintree*, 2017 WL 1829140, at *4 (citing *Bayer Schering Pharma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1322 (Fed. Cir. 2012)).  This Court then found that "[b]ecause Breckenridge's ANDA label 'instruct[s] how to engage in an infringing use, [it] show[s] an affirmative intent that the product be used to infringe.'"  *Braintree*, 2017 WL 1829140, at *4 (quoting *AstraZeneca*, 633 F.3d at 1059).  Because Actavis's labeling clearly instructs how to engage in a use that infringes the asserted claims, the label is evidence of induced infringement.

### C.  The District Court Erred in Granting Summary Judgment in Favor of Actavis Because There Exist Questions of Material Fact

Actavis's summary judgment motion should have been denied because there exist questions of material fact regarding whether Actavis's labeling constitutes an instruction, encouragement or recommendation to practice the methods claimed by the '450 patent family.

Horizon presented expert evidence by Dr. Marco Pappagallo that: (1) while not all patients will have a "need" to apply sunscreen, or insect repellant, or

another topical medication such as a corticosteroid following application of Actavis's ANDA product, those patients who have such a "need" will inevitably infringe because of Actavis's instructions in its labeling (APPX5633-5643, ¶¶31-32, 33-36, 37-51; APPX8342-8343, 206:20-208:4, 212:13-213:10, -5608, 281:5-15); (2) the language placed prominently on the first page of Actavis's labeling under "Highlights of Prescribing Information" creates no doubt that the "wait until completely dry" step is important and is an instruction rather than a mere warning (*id*.); (3) the "wait until completely dry" instruction is not conditional, but is an instruction that must be followed to ensure the safe use of the topical diclofenac product (*id*.); and (4) Actavis's labeling provides an instruction to apply sunscreen, because the labeling also warns of the risk of photosensitization and tumors in skin resulting from sun exposure, and sunscreen is medically necessary in view of that warning (APPX5636-5643, ¶¶37-51; APPX5876, §2.2, -5881, §5.14).

The District Court, in reviewing the summary judgment motion, should have viewed Dr. Pappagallo's testimony in the light most favorable to Horizon and denied Actavis's motion. Instead, the District Court ignored Dr. Pappagallo's testimony. To the extent this Court concludes that there exist questions of fact, the grant of the summary judgment of no infringement should be reversed and the case remanded. Should this Court conclude that there are no issues of material fact in dispute, this Court should grant summary judgment that Actavis is liable for

induced infringement of claims 10, 11, 15, and 17 of the '450 patent, claim 14 of the '078 patent, and claims 3, 11, and 13 of the '110 patent.

## II. THE DISTRICT COURT ERRED WHEN IT FOUND THE CLAIM TERM "CONSISTING ESSENTIALLY OF" INDEFINITE

The District Court committed legal and factual errors in holding the term "consisting essentially of" indefinite and claims 15, 49-52 and 55-61 of the '838 patent, claims 13-14 of the '591 patent, claims 9-11 of the '304 patent, claims 10-12 of the '305 patent and claims 10-12 of the '784 patent invalid under 35 U.S.C. § 112, ¶ 2. APPX14-27; APPX63. The District Court improperly applied the law when it held, as a matter of first impression, that "basic and novel properties" identified in connection with the transitional phrase "consisting essentially of" must satisfy the requirements of 35 U.S.C. § 112, ¶ 2 and the accompanying "reasonable certainty" standard set forth in *Nautilus, Inc. v. Biosig Instruments Inc.*, 134 S. Ct. 2120, 2124 (2014). APPX23. The District Court erred because (a) there is no legal support for the District Court's application of 35 U.S.C. § 112, ¶ 2 to the basic and novel properties, and (b) the basic and novel properties are not part and parcel of the language of the claims that define claim scope.

### A. The District Court's Opinion

The District Court recognized that "consisting essentially of" is a transitional phase having a well-established legal meaning: it requires that the invention necessarily includes the listed ingredients and is open to the inclusion of additional

unlisted ingredients "that do not materially affect the basic and novel properties of the invention." APPX14-15 (citing *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998)). Because the "basic and novel properties" were in dispute, the District Court concluded it was necessary to identify the "basic and novel properties" so as "to delineate what must be shown for the purposes of infringement or invalidity." APPX15. The District Court found that the "basic and novel properties" of the invention were set forth in the '838 patent and identified the "basic and novel properties" of the invention as including: (1) better drying time; (2) higher viscosity; (3) increased transdermal flux; (4) greater pharmacokinetic absorption; and (5) favorable stability. APPX23.

Even though no court had ever before applied the definiteness standard of 35 U.S.C. § 112, ¶ 2 to "basic and novel properties," the District Court proceeded to assess definiteness of the "basic and novel properties" under 35 U.S.C. § 112, ¶ 2, applying the Supreme Court's "reasonable certainty" standard under *Nautilus*. The District Court found that two of the "basic and novel properties" of the invention – "better drying time" and "improved stability" – were indefinite, and therefore concluded that because the "group of properties" did not have the requisite "reasonable certainty," the term "consisting essentially of" was indefinite. APPX23-27; APPX36-39.

## B.    The Legal Standard

**"Consisting Essentially Of."**  Transitional phrases, such as "comprising," "consisting of," and "consisting essentially of," are terms of art in patent law that "define the scope of the claim with respect to what unrecited additional components or steps, if any, are excluded from the scope of the claim."  MPEP 2111.03; *accord Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1382-83 (Fed. Cir. 2000).  The phrase "consisting essentially of" is a partially open transition phrase that signals that the invention necessarily includes the listed ingredients and is open to unlisted ingredients that do not "materially affect the basic and novel properties of the invention."  *PPG Indus.*, 156 F.3d at 1354.

**Determination of Infringement of "Consisting Essentially Of."**

Evaluating infringement is a two-step analysis:  First, the patent claim must be properly interpreted, a step imposing a question of law.  Second, the accused product must be compared to the properly-interpreted claim, a step imposing a question of fact.  *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 702 F.3d 1351, 1358 (Fed. Cir. 2012).  The analysis of infringement of a "consisting essentially of" claim similarly involves a two-step process.  First, the basic and novel properties are determined as a matter of law, using the same sources of evidence as used for claim construction.  *AK Steel Corp. v. Sollac and Ugine*, 344 F.3d 1234, 1239-40 (Fed. Cir. 2003); *PPG Indus.*, 156 F.3d at 1355.  Second, if the

accused product or asserted prior art contains an ingredient not recited in the claims, the fact finder must determine whether that unrecited ingredient materially affects those basic and novel properties. *PPG Indus.*, 156 F.3d at 1354-55. Because the evaluation of infringement (or validity) of "consisting essentially of" claims involves questions of fact, courts generally do not engage in such analysis in the context of *Markman* proceedings. *See infra* Section C.2.

**Standard for Indefiniteness**. "The Patent Act requires that a patent specification 'conclude with one or more claims *particularly pointing out and distinctly claiming* the subject matter which the applicant regards as [the] invention.'" *Nautilus,* 134 S. Ct. at 2124 (quoting 35 U.S.C. § 112, ¶ 2). The Supreme Court recently interpreted § 112, ¶ 2 holding "that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id*. "[D]efiniteness is to be evaluated from the perspective of someone skilled in the relevant art." *Id*. at 2128.

Terms of degree are not inherently indefinite. "As long as claim terms satisfy [the *Nautilus*] test, relative terms and words of degree do not render patent claims invalid." *One-E-Way, Inc. v. Int'l Trade Comm'n.*, 859 F.3d 1059, 1062 (Fed. Cir. 2017). The Supreme Court has accommodated the inclusion of terms of degree due to "the inherent limitations of language" and in recognition of the fact

that "absolute precision is unattainable" during the drafting process. *Nautilus,* 134 S. Ct. at 2129. This Court has even recognized that when quantitative values are available, a qualitative term is still adequate. *See One-E-Way*, 859 at 1066 ("[T]he lack of a technical definition does not render [a] term [of degree] indefinite.").

**Burden of proof**. Actavis must prove by clear and convincing evidence that the claims are invalid for failure to meet the requirements of § 112, ¶ 2. 35 U.S.C § 282(a); *Nautilus*, 134 S. Ct. at 2130 n.10. The fact that a claim may include one or more limitations that require measuring a variable (*e.g.*, drying time) does not alter Actavis's burden. *Dow Chem. Co. v. Nova Chem. Corp. (Canada)*, 809 F.3d 1223, 1227 (Fed. Cir. 2015) (per curiam) (Moore, Newman, O'Malley, Taranto, & Chen, JJ., concurring). Actavis must establish, by clear and convincing evidence, not only that multiple methods of measuring the variable (*e.g.*, drying time) existed at the time the patent application was filed, but that a POSA would not be able to choose among those methods in order to evaluate whether the patent claims were infringed. *See Ethicon Endo-Surgery, Inc. v. Covidien, Inc.*, 796 F.3d 1312, 1319 (Fed. Cir. 2015) ("If such an understanding of how to measure the claimed average pressures was within the scope of knowledge possessed by one of ordinary skill in the art, there is no requirement for the specification to identify a particular measurement technique.").

**C. The District Court Committed Legal Error When It Applied the *Nautilus* Definiteness Standard to the Basic and Novel Properties of the Claimed Invention**

The District Court committed legal error in extending 35 U.S.C. § 112, ¶ 2 and applying the requirement of definiteness to the "basic and novel properties" of the invention. The District Court's finding of invalidity due to indefiniteness of one or more "basic and novel properties" should be reversed.

**1. There is No Legal Basis to Apply the Definiteness Requirements To "Basic and Novel Properties"**

As the District Court acknowledged, until its ruling below, no court had ever evaluated the definiteness of "basic and novel properties," let alone found the term "consisting essentially of" invalid under 35 U.S.C. § 112, ¶ 2 on the basis that the "basic and novel properties" were indefinite.[2] APPX17. Because there is no legal basis to apply the requirements of 35 U.S.C. § 112, ¶ 2 to the "basic and novel properties" of an invention, the District Court's ruling that "consisting essentially of" is indefinite because the "basic and novel properties" are indefinite should be reversed as a matter of law. Notably the District Court undertook the task of determining whether the "basic and novel properties" are definite, even though

---

[2] Since the District Court issued its opinion, two other district courts have addressed the definiteness of "basic and novel properties" but neither found the "basic and novel properties" indefinite. *See Prostrakan, Inc. v. Actavis Labs. UT, Inc.*, Civ. No. 16-cv-0044, 2017 WL 3028876, at *8-9 (E.D. Tex. July 15, 2017); *Mayne Pharma Int'l Pty Ltd. v. Merck & Co., Inc.*, Civ. No. 15-438, 2016 WL 7441069 (D. Del. Dec. 27, 2016).

Actavis's ANDA product does not contain any "unspecified ingredients." APPX4888-4894, APPX4891-4892, ¶2. The District Court had no need to decide whether an "unspecified ingredient" had a material effect on the basic and novel properties.

The District Court cited to *PPG Industries*, but *PPG Industries* does not compel or sanction application of the requirements of 35 U.S.C. § 112, ¶ 2 to the "basic and novel properties" of an invention. APPX18-20; *PPG Indus.*, 156 F.3d at 1354. *PPG Industries* does not involve analysis of the definiteness of "consisting essentially of" or the "basic and novel properties." Instead, this Court considered whether the district judge "improperly construed the term 'consisting essentially of'" before instructing the jury on its meaning. *PPG Indus.*, 156 F.3d at 1354. PPG argued that the district court erred in (a) failing to determine, as a matter of claim construction, "whether iron sulfide has a 'material effect' on the invention," and (b) failing to construe the term "material effect" in a manner consistent with the patent specification. This Court analyzed whether iron sulfide had a "material effect" on the invention and concluded that the "proper allocation of tasks of construing a claim and determining infringement in which a claim contains an imprecise limitation" is to construe the claim term consistent with the intrinsic record and then to make a factual determination of infringement. *Id.* at 1355. This Court did not address 35 U.S.C. 112, ¶ 2 apart from a general comment

that claim language must comply with that section. *Id.* Thus, *PPG Industries* fails to support the District Court's statement that the "lesson to be applied to this case, therefore, is that a court's assessment of the basic and novel properties may be performed at the claim construction phase because under certain circumstances the basic and novel properties of an invention are part of the construction of a claim containing the phrase 'consisting essentially of.'" APPX21.

Though not expressly stated, the District Court appears to be attempting to extend the reasoning of *AK Steel*, yet *AK Steel* also does not compel or sanction application of the definiteness requirements of 35 U.S.C. § 112, ¶ 2 to the "basic and novel properties" of an invention. *AK Steel* involved unique facts, wherein this Court considered whether the district court erred when it found, as a matter of claim construction, that the term "consisting essentially of" did not permit an amount of silicon in excess of 0.5% in the aluminum coating. *AK Steel Corp.*, 344 F.3d at 1239. This Court found that the specification clearly identified "good wetting" as the "basic and novel property," and that the specification contained clearly limiting statements which drew "a precise line" "demarking the exact percentage of silicon that the inventors considered to be too much silicon" to achieve the goal of "good wetting." *Id.* at 1239-40. In this case, there are no such clearly limiting statements concerning the effect of additional components on the "basic and novel properties" of the claimed composition.

The District Court also relied upon *Nautilus* in its opinion, but *Nautilus* does not compel or sanction application of the definiteness requirements of 35 U.S.C. § 112, ¶ 2 to the "basic and novel properties" of an invention. APPX21-23. *Nautilus* nowhere discusses the term "consisting essentially of"—let alone address the concept of "basic and novel properties." *Nautilus* merely sets forth an indefiniteness standard for claim terms stating, "a patent is invalid for indefiniteness if its *claims*, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus,* 134 S. Ct. at 2124 (emphasis added).

## 2. Because "Basic and Novel Properties" Are Not Part and Parcel of the Language of the Claims, 35 U.S.C. § 112, ¶ 2 Does Not Apply

It is well-settled law that it is the *language of the claims* that defines the scope of the invention. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). "We look to the words of the claims themselves ... to define the scope of the patented invention." *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir 1996). "The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims."

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc).

"Basic and novel properties" are not part of the language of the claims. "Basic and novel properties" are a tool conceived by PTO Examiners to evaluate claims containing "consisting essentially of" language against prior art disclosures and potentially infringing products. The meaning of "consisting essentially of" was first construed in *Ex parte Davis*, an appeal of the PTO Examiner's final rejection of the appellants patent claim to a sealing tape having an adhesive composition "consisting essentially of" three components, which the PTO Examiner rejected as lacking invention over prior art describing the same three components together with a fourth component. *Ex parte Davis*, 80 U.S.P.Q. 448, 450 (Pat. Office Bd. App. 1948). Finding no authoritative decision construing "consisting essentially of," the Board adopted a "code of terms for use in compositions to aid uniformity of practice" used by a group of Primary Examiners at the PTO, whereby recital of "essentially" along with "consisting of" was construed as "rendering the claim open only for the inclusion of unspecified ingredients which do not materially affect the basic and novel characteristics of the composition." *Id.*.

The Board's definition of "consisting essentially of" was later adopted by the United States Court of Customs and Patent Appeals (C.C.P.A.) and used for the

same purpose. Subsequent C.C.P.A. cases evaluated the "basic and novel properties" as a means for determining whether the appellant patentee had provided sufficient evidence to show that the additional elements described by the prior art should be excluded by the "consisting essentially of" limitation of the claims at issue. *See In re Janakirama-Rao*, 317 F.2d 951, 953 (C.C.P.A. 1963); *In re De Lajarte*, 337 F.2d 870, 873-874 (C.C.P.A. 1964); *In re Garnero*, 412 F.2d 276, 279 (C.C.P.A. 1969); *In re Herz*, 537 F.2d 549, 552 (C.C.P.A. 1976). The C.C.P.A. never considered definiteness of the "basic and novel properties."

This Court also considers "basic and novel properties" solely as a part of the factual determinations of validity and infringement. *See, e.g.*, *Atlas Powder Co. v. E.I. du Pont De Nemours & Co.*, 750 F.2d 1569, 1574 (Fed. Cir. 1984); *PPG Indus.*, 156 F.3d at 1354; *AK Steel Corp.*, 344 F.3d at 1239; *Depuy Mitek, Inc. v. Arthrex, Inc.*, 297 Fed. Appx. 995, 997 (Fed. Cir. 2008). In no case has this Court held or even suggested that "basic and novel properties" are part of the language of the claims such that they are subject to the definiteness requirements of 35 U.S.C. § 112, ¶ 2.

Unlike the District Court in this case, district courts generally have little enthusiasm for "consisting essentially of" and "basic and novel properties." As one court recognized, "consisting essentially of" "is a turgid, difficult nook of patent law." *Trs. Of Boston Univ. v. Everlight Elecs. Co., Ltd.*, 23 F.Supp.3d 50,

64 (D. Mass. 2014). Most courts simply construe "consisting essentially of" according to its well-established legal meaning and stop, without identifying the "basic and novel properties." *Depomed, Inc. v. Sun Pharma Global FZE*, C.A. No. 11-3553 (JAP), 2012 WL 3201962, at *13 (D.N.J. Aug. 3, 2012); *Biovail Labs. Int'l SRL v. Abrika, LLLP*, No. 04-61704, 2006 WL 6111777, at *18 (S.D. Fla. Aug. 24, 2006); *Classified Cosmetics, Inc. v. Del Labs., Inc.*, No. 03-4818-AHM, 2004 WL 56465578, at *5 (C.D. Cal. June 14, 2004); *Senju Pharm. Co., Ltd. v. Lupin Ltd.*, 162 F.Supp.3d 405, 421 (D.N.J. November 18, 2015). When courts are forced to identify "basic and novel properties" because they are disputed by the parties, the analysis consists solely of identification of "basic and novel properties," with issues relating to infringement or validity being addressed only after a full record is developed. *L'Oreal S.A. v. Johnson & Johnson Consumer Cos., Inc.*, No. 12-98-GMS, 2014 U.S. Dist. LEXIS 190268, *4, Docket Item 196, slip op. at 2 (D. Del. Nov. 5, 2014); *Trs. Of Boston Univ.*, 23 F.Supp.3d at 65; *Momentus Golf, Inc. v. Swingrite Golf Corp.*, 312 F.Supp. 2d 1134, 1144 (S.D. Iowa 2004); *Kim v. Conagra Foods, Inc.*, No. 01-2467, 2003 WL 2122266, at *8 (N.D. Ill. May 23, 2003).

The reason that courts, prior to the District Court, did not address definiteness of "basic and novel properties" is that they have never been considered "part and parcel" of the claims. "Basic and novel properties" have

always been understood to simply be a tool for assessing whether, as a matter of fact, claims with "consisting essentially of" limitations are either invalid in view of prior art or infringed.

### D. The District Court Erred in Finding the Basic and Novel Property "Better Drying Time" Indefinite

The District Court committed both legal and factual errors in holding that the basic and novel property "better drying time" is indefinite.

The District Court erred when it relied upon the intrinsic evidence relating only to the comparison of the inventive compositions to the prior art "comparative liquid formulation," in determining that the basic and novel property "drying time" is indefinite because a POSA would not have "reasonable certainty" about whether an additional ingredient would materially alter the basic and novel property "better drying time." APPX24-27. This Court should review these factual findings *de novo*. Because this evidence does not address the question of whether an additional ingredient will have a material effect on "drying time" it cannot be used to conclude that the basic and novel property "better drying time" is indefinite.

The District Court also committed legal error in failing to evaluate definiteness of the basic and novel property "better drying time" on a claim-by-claim basis. The District Court's findings are based on data showing that the F971 formulation did not demonstrate a faster drying rate than the prior art "comparative liquid formulation" at time points less than 4 hours. APPX25-26 (discussing

Example 5).  The District Court erred in failing to recognize that claims 49-52 and 55-61 of the '838 patent, claims 13-14 of the '591 patent, claims 9-11 of the '304 patent, claims 10-12 of the '305 patent, and claims 10-12 of the '784 patent do not encompass the F971 formulation, and accordingly, the alleged inconsistencies identified by the District Court do not apply.  Indeed, the District Court did not find any inconsistencies concerning the formulations of the invention containing HPC, which are the subject of those claims.  *See* APPX25-26.

The District Court further erred because during its review of the intrinsic evidence it confused "drying rate" with "drying time" and failed to understand the data being presented.  The Court should review these factual findings *de novo*. The District Court erroneously found that (1) the methods described in the specification for evaluating "better drying time" did not "provide consistent results at consistent times," and (2) "the claimed results are not seen across all formulations of the claimed invention, and when 'dryness' is evaluated at any time shorter than four hours, not all formulations of the claimed invention actually exhibit 'better drying time.'"  APPX26-27.  Contrary to the District Court's findings, the methods described in the '838 patent provide consistent results for "drying time," and all formulations of the claimed invention exhibit "better drying time."

The District Court further erred when it relied upon expert testimony relating to the claim term "greater drying rate," rather than the basic and novel property "better drying time." As the District Court noted, the parties only briefed the definiteness of the claim term "a greater drying <u>rate</u>" in their Opening Briefs. APPX24, fn. 9.  Importantly, the parties did not brief the definiteness of "better drying <u>time</u>," and there was no expert discovery concerning this property.  The District Court's findings based upon extrinsic evidence, specifically the opinions of Actavis's expert Dr. Michniak-Kohn, which relate only to "drying rate," should be disregarded as clear error.

1.     **The District Court Erred in Relying on Data in the Intrinsic Record Irrelevant to the Effect of Additional Components on "Drying Time"**

There is no evidence that a POSA would be unable to test whether an "additional ingredient" alters the "drying time" when added to a formulation otherwise within the scope of the claims.  The District Court erroneously relied on data presented by the inventors to demonstrate that the inventive formulations had improved properties over the prior art "comparative liquid formulation."  APPX23-27; *see also* APPX139, 10:6-11.  The District Court's analysis of this data reads more like an analysis of whether the data presented in the patent support the description of the claimed inventions, rather than an assessment of whether the method can be used to assess whether an unrecited additional component will have

a "material effect" on drying time.  APPX23-27.  For example, the District Court states "the claimed results are not seen across all formulations of the claimed invention, and when 'dryness' is evaluated at any time shorter than four hours, not all formulations of the claimed invention actually exhibit 'better drying time.'" APPX26.

None of these data address the question of whether an additional ingredient will have a material effect on "drying time."  None of the data has any bearing on whether the basic and novel property "better drying time" is indefinite.  Thus, there remains a question of fact concerning whether a POSA would have "reasonable certainty" about whether an additional ingredient would materially alter the basic and novel property of "better drying time."  Where a patent is alleged to disclose multiple methods of evaluating a limitation, a claim may not be held invalid based on a hypothetical possibility for inconsistent results.  *See Purdue Pharm. Prods. L.P. v. Actavis Elizabeth LLC*, No. 12-5311 JLL, 2015 WL 5032650, at *57 (D.N.J. Aug. 25, 2015) (concluding post-*Nautilus*, "[h]ere, the only credible and pertinent evidence before the Court showed consistent results.  The Court will not appease Defendants and find indefiniteness based on a hypothetical possibility for inconsistent results.  Such is far from the clear and convincing standard.  As the Federal Circuit has previously held, there is the potential for inconsistent results

even within the same method of measurement, but that surely does not render a

claim indefinite.") (internal quotation omitted.))

### 2. The District Court Erred in Failing to Evaluate the Definiteness of "Better Drying Time" on a Claim-By-Claim Basis

The District Court erred in not evaluating validity (definiteness) of the

"consisting essentially of" claim term, and the related "basic and novel properties,"

on a claim-by-claim basis. It is well settled that evidence of invalidity must be

considered on a claim-by-claim basis. *See Dayco Prods., Inc. v. Total*

*Containment, Inc.*, 329 F.3d 1358, 1370 (Fed. Cir. 2003) (quoting 35 U.S.C. § 282

(2000)) ("each claim of a patent (whether in independent, dependent, or multiple

dependent form) shall be presumed valid independently of the validity of other

claims…."); *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955,

961 (Fed. Cir. 1986) ("The burden is on the party asserting invalidity to prove the

invalidity of each claim … with facts supported by clear and convincing

evidence.").

As outlined above, the District Court found "better drying rate" indefinite

based on alleged inconsistencies between the data for the F971 (Carbopol)

formulations of the invention and the prior art. APPX24-27. However, many of

the asserted claims do not encompass the F971 formulation but rather are limited to

formulations where the polymer is HPC, instead of a Carbopol polymer as used in

F971.  For the "consisting essentially of" claims that are limited to HPC, there is no evidence of, nor does the District Court cite any, inconsistent results based on either the method of measuring the results (*e.g.*, *in vivo* v. *in vitro*), or the timing of such measurements (*e.g.*, after 5 minutes, 4 hours, or 24 hours). APPX4641, -4648-4649, ¶¶20-21, -4659; APPX145-146, 22:31-23:27.

A POSA would understand that (1) the inventive HPC formulations (the F14/2 gels) exhibit better drying at all time points under either method of comparing drying, and (2) the difference in the degree of drying at 30 minutes across the two alleged tests is irrelevant.  APPX4647-4649, ¶¶19-21; APPX139, 10:16-30.  Specifically, based on the data in Table 12, at all time points after time zero, the formulations F14/2 gel 2.5% and F14/2 gel 4.0% containing, among other ingredients, HPC, demonstrated more rapid drying than the comparative liquid formulation. APPX4648, ¶20; APPX146, 23:10-27.

Because the District Court failed to assess validity (definiteness) on a claim-by-claim basis, the District Court's finding of invalidity due to indefiniteness of "better drying time" should be reversed as to each of those claims that exclude the F971 formulation and instead require the polymer to be HPC (*i.e.*, claims 49-52 and 55-61 of the '838 patent, claims 13-14 of the '591 patent, claims 9-11 of the '304 patent, claims 10-12 of the '305 patent, and claims 10-12 of the '784 patent).

### 3. The District Court Improperly Conflated "Drying Rate" with "Better Drying Time"

The District Court erred in failing to distinguish between "drying rate" (how quickly it dries) and "drying time" (how long it takes to dry) during its review of the intrinsic evidence. Actavis's expert agrees that "drying time" and "drying rate," are two different, albeit related, drying properties. APPX2010-2011, -2016-2017, ¶¶21-22, -2033-2034. And both are discussed in the '838 patent. For example, the '838 patent states that the formulations of the invention have "a better *drying time*" and "improved properties of *drying time*" than the prior art comparative formulation. APPX136, 4:24-25; APPX138, 7:36 (emphasis added). The '838 patent also states that when the formulations of the invention are applied to the skin, "the *drying rate* is quicker … than previously described compositions." APPX137, 5:46-49 (emphasis added). The section titled "Drying Time" referenced in the District Court's opinion addresses the relationship between "drying rate" and "drying time," noting that the compositions of the invention "dry quicker," resulting in a "drying time difference" that can be observed within thirty (30) minutes using an *in vivo* test method. APPX139, 10:6-21. The '838 patent states that after thirty minutes the composition of the invention is "almost completely dry," whereas a "significant amount" of the comparative liquid formulation remained. *Id.*, 10:17-21.

The alleged inconsistencies in the *in vitro* test data of Example 5, which are identified by the District Court as supporting indefiniteness of "better drying time," reflect differences in *drying rate* at early time points (*e.g.*, time points of 4 hours or less) rather than inconsistencies concerning the *drying time* of the inventive formulations as compared to the prior art.[3] Much of the data presented in Example 5 and Table 12 of the '838 patent relates to "drying rate," a fact made clear by the Table 12 description which states, "The gels of this invention showed faster drying kinetics than the comparative liquid formulation, with F14/2 showing the fastest drying rate." APPX146, 23:6-9. The data in Table 12 show that none of the formulations tested were dry after 5 minutes, 1 hour or even 4 hours, since each of the formulations continued to undergo evaporation even after the 4-hour time point. APPX146, 23:19-27. Because the formulations were not yet dry at 4 hours,

---

[3] The District Court also noted an inconsistency between the inventors' statement that "the three gel formulations displayed more rapid drying than the liquid formulation" within the first five minutes and the data presented in Table 12. APPX26. This inconsistency does not render "drying time" indefinite, as it is apparent from the data presented that the statement is erroneous, and regardless relates only to "drying rate" and not "drying time." APPX145, 21:63-22:6; APPX146, 23:20-27.

a POSA would understand that the time points earlier than 4 hours do not reflect drying time, but rather reflect drying rates that can change over time. APPX2016, ¶21.

Both the "*in vivo* test" and the "*in vitro* test" demonstrated that the drying time (*i.e.*, time to dryness) was shorter for the formulations of the invention than for the "comparative liquid formulation."[4] Using the "*in vivo* test," the compositions of the invention were "almost completely dry" after thirty minutes, unlike the "comparative liquid formulation" for which "a significant amount" remained. APPX139, 10:18-21. Using the more quantitative "*in vitro* test" of Example 5, the inventors observed that a difference in drying rate became dramatic

---

[4] The District Court's observation that "there is an apparent problem in the assertion … in the specification that the claimed invention would be drier within thirty minutes" reflects the District Court's failure to comprehend the differences in the two test methods. APPX25. The statement regarding a difference in drying time after thirty minutes is based upon the results of the "*in vivo* test." APPX139, 10:16-21. The fact that the same formulation evaluated using the "*in vitro* method*" was not "almost completely dry" after 30 minutes does not render the term "drying time" indefinite because both methods establish that the inventive formulations had a shorter drying time than the prior art. APPX139, 10:22-30.

at 4 hours and even more so at 24 hours, at which point only a small percentage of the applied formulations of the invention remain as compared to the prior art formulation.  APPX145, 21:63-22:13.

### 4. The District Court Erred in Relying on Dr. Michniak-Kohn's Expert Testimony Relating to "Drying Rate" Rather Than "Drying Time"

The District Court clearly erred in relying upon the testimony of Actavis's expert, Dr. Michniak-Kohn, to support its finding that the basic and novel property "better drying time" was indefinite.  Dr. Michniak-Kohn's expert declaration analyzed the claim term "a greater drying rate" not "drying time."  APPX2015-2022, ¶¶19-31.  Dr. Michniak-Kohn's declaration goes to great length to distinguish "drying rate" from "drying time," finding these terms not equivalent.  APPX2016-2017, ¶¶21-22.  Dr. Michniak-Kohn's declaration describes "drying rate" as the "rate at which moisture leaves a material," which changes over time.  APPX2016, ¶21.  Dr. Michniak-Kohn also describes how the '838 patent discusses both "drying rate" and "drying time."  APPX2017, ¶22.  Dr. Michniak-Kohn then discusses why in her opinion the claim term "a greater drying rate" is indefinite, arguing that the '838 patent describes two different tests for "comparing the relative drying rates of a given formulation" and complaining that the patent does not inform a POSA which test method or time point to use for determining "rate." APPX2017-2022, ¶¶23-31.

The District Court found Dr. Michniak-Kohn's opinions persuasive and relied upon them in finding the basic and novel property "better drying **time**" indefinite. APPX27. The District Court's own reasoning closely parallels and uses the same citations to the specification as Dr. Michniak-Kohn. *Compare* APPX24-26 with APPX2017-2022, ¶23-31. Because the District Court's conclusion that the basic and novel property "drying time" is indefinite is based in large part upon expert testimony concerning "drying rate" instead of "drying time," the District Court's findings should be reversed for clear error.

### 5. The District Court Erred in Not Hearing Expert Testimony Relating to "Drying Time"

The District Court found the need "to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S.Ct. at 841. However, the District Court consulted the wrong extrinsic evidence, *i.e.*, evidence that discussed the wrong term, "a greater drying rate." As discussed above, this constitutes error.

Once the District Court made the decision to rely on extrinsic evidence to understand the meaning of a term, the District Court should have sought extrinsic evidence to understand the meaning of the correct term, "better drying time." The District Court did not hear any testimony to understand the meaning of the term "better drying time" in the relevant art during the relevant time period. In fact,

there was no testimony for the District Court to rely upon because the record does not contain any testimony as to the meaning of the term "better drying time." Horizon's expert, Dr. Kenneth Walters, did not provide any opinion concerning the basic and novel property of "better drying time," and the District Court rejected Dr. Walter's opinions concerning the definiteness of "a greater drying rate." APPX26-27. The District Court committed clear error in not seeking expert testimony to understand the meaning of the basic and novel property "better drying time" in the relevant art during the relevant time period before rendering its decision that the term is indefinite.

### E. The District Court Erred in Finding the Basic and Novel Property "Favorable Stability" Indefinite

The District Court committed both legal and factual errors in holding that the basic and novel property "favorable stability" is indefinite. The District Court did not address the definiteness of the basic and novel property "favorable stability" in its opinion on claim construction. APPX37. The District Court first addressed "favorable stability" in its opinion denying Horizon's motion for reconsideration, holding that the indefiniteness of "consisting essentially of" was "confirmed by the finding that the stability and degradation claims are indefinite," referencing the earlier claim construction opinion finding that the "degrades" claim terms and "impurity A" were indefinite. APPX37-39.

In so doing, the District Court committed clear legal error in failing to cite any evidence in support of its opinion that "favorable stability" is indefinite (*id.*), and in ignoring the ample evidence provided by Horizon that a POSA would be able to determine with reasonable certainty whether an unlisted ingredient has a material effect on the basic or novel property of "favorable stability" (*see* APPX4656-4657, ¶¶41-46). The only citation in this section of the District Court's opinion is to its prior *Markman* decision concerning the "degrades" terms. APPX37-38.

The District Court erred in equating the basic and novel property "favorable stability" with the "degrades" claim terms, which the District Court found indefinite, for the reasons set forth at length in Section III.A. below. APPX37-38. The District Court erred because the specification refers to degradation as a subset of, rather than the same thing as, "stability." *See* APPX136, 4:27-32. The District Court should have conducted a separate definiteness analysis for the basic and novel property "favorable stability," not merely bootstrapping its conclusion that "favorable stability" is indefinite because the "degrades" claim terms are indefinite.

Additionally, the District Court ignored the ample evidence and expert testimony offered by Horizon that a POSA would be able to determine with reasonable certainty whether an unlisted ingredient has a material effect on the

basic or novel property of "favorable stability." *See* APPX4656-4657, ¶¶41-46.

Namely, Horizon offered expert testimony that a POSA would understand the '838

patent as describing "favorable stability" as reflecting "[1] the lack of any

substantial changes in viscosity, [2] the absence of phase separation and

crystallization at low temperature, and [3] a low level of impurities." APPX4656,

¶41; APPX136, 4:27-32. Horizon also offered expert testimony that a POSA

would be able to (1) measure with reasonable certainty the viscosity and any

changes thereto by using the method for measuring viscosity agreed-upon by the

parties (APPX4656, ¶42; APPX136, 4:27-32, -140, 12:53-55), (2) determine with

reasonable certainty the absence of any phase separation with the commonly-used

visual test and whether there was crystallization at low temperature using the well-

known freeze-thaw cycling method (APPX4656-4657, ¶¶43-4), and (3) determine

the level of total impurities using well-known HPLC or other analytical methods

(APPX4657, ¶45). The District Court did not consider any of this evidence in its

opinion. As such, the District Court committed legal error.

## III. THE DISTRICT COURT ERRED WHEN IT FOUND THAT THE "DEGRADES" CLAIM TERMS AND "IMPURITY A" ARE INDEFINITE

The District Court committed both legal and factual errors in holding that

the "degrades" and "impurity A" claim terms are indefinite. The District Court

committed clear factual error when it found that the specification refers to

"stability" and "degradation" interchangeably, and the District Court erred as a matter of law when it found that because "stability" is indefinite, so, too, are the "degrades" claim terms. APPX13-14. The specification makes clear that the "degrades" terms refer to the degradation of diclofenac sodium into "impurity A," and that such degradation is a subset of the overall "stability" of the inventive formulations.

The District Court committed legal error when it failed to consider the evidence presented by Horizon concerning how a POSA would understand "impurity A." A POSA would understand that the "impurity A" referenced in the specification is USP Diclofenac Related Compound A RS, as set forth in the USP, the Eur. Ph., and the Br. Ph. Thus, the District Court committed legal error in finding the term "impurity A," and in turn, the "degrades" terms, indefinite.

## A. The District Court Erred When It Found That the Intrinsic Evidence Equates Degradation with Stability

The specification refers to degradation as a subset of, rather than the same thing as, "stability." APPX136, 4:27-32. The District Court committed clear factual error in finding that the specification equated stability and degradation. *See* APPX13. The District Court looked only to intrinsic evidence to make this determination. As such, this factual finding should be reviewed *de novo*. *See* *Teva*, 135 S.Ct. at 840.

The portions of the intrinsic record cited by the District Court to support its finding that the specification equates stability with degradation do not support such a finding. Rather, these portions support the opposite—that degradation is just one aspect of stability. The District Court recognized this, stating that "stability is referred to as a catch all for a number of things," and referenced the portion of the specification that lists the things encompassed by "stability"—namely, no phase separation, negligible shift in pH, *and* low amounts of degradation products. *See* APPX13. Yet, the District Court then inexplicably concludes that stability and degradation "are two sides of the same coin." *Id*.

Throughout the specification, it is clear that the two terms are not used interchangeably. For example, the specification states that "the preferred diclofenac sodium formulations of the present invention provide other advantages including favorable stability," and then states that "favorable stability" is "reflected in the lack of any substantial changes in viscosity, the absence of phase separation and crystallization at low temperatures, and a low level of impurities." APPX136, 4:27-32; APPX4656, ¶41. Similarly, Example 3 describes the stable gels of the invention as "demonstrating . . . no phase separation, negligible shift in pH, and low amounts of degradation products." APPX142, 16:39-41. The intrinsic record is clear—degradation is just one aspect of stability. The District Court erred in

equating stability and degradation, then using this finding to support a finding of indefiniteness.

## B. The Intrinsic Evidence Shows That the "Degrades" Claim Terms Refer to the Degradation of Diclofenac Sodium into Impurity A

A POSA reading the claims in light of the specification would understand that the "degrades" claim terms refer to the degradation of the active ingredient, diclofenac sodium, and not the degradation of any of the excipients used in the inventive formulations. APPX1533-1534, -1544, ¶44, -1562; APPX137, 5:50-52; APPX139, 9:66-10:4. The specification discusses degradation in the context of the degradation of diclofenac sodium. For example, the specification states that "[a] feature" of the inventive gel formulations is decreased "[d]egradation of diclofenac sodium." APPX137, 5:50-51; *see also* APPX1544, ¶44. The specification does not mention degradation of any other ingredient.

Additionally, a POSA reading the claims in light of the specification would understand that the "degrades" claim terms refer to the appearance of impurity A, also known as Diclofenac Related Compound A RS. APPX1543-1546, ¶¶42-54. Example 6 is the only example that sets forth specific data regarding degradation. APPX146, 23:30-24:34; *see also* APPX1544-1545, ¶45. Example 6 looks to the production of impurity A. *Id.* A POSA would understand that the "degrades" claim terms are referring to the degradation of diclofenac sodium into impurity A.

APPX1543-1546, ¶¶42-54.  Indeed, the District Court properly found as such.

APPX13.

Table 13 in Example 6 further supports such an interpretation.  Example 6 refers to the degradation of "a formulation," and then indicates that this "formulation . . . degrades by less than 0.034% or 0.09%, over 6 months." APPX146, 24:26-27; *see also* APPX1544-1545, ¶45.  Table 13 includes these same numbers, 0.034% and 0.09%, as the "[p]ercent 'impurity A' after 6 months of storage (wt/wt)."  *Id.,* Table 13, 23:62-64.  Example 6 makes clear that the degradation discussed in the specification is the degradation of diclofenac sodium into impurity A.

## C.  The District Court Erred When It Found That "Impurity A" Is Indefinite

A POSA would know that the term "impurity A" means "USP Diclofenac Related Compound A."  APPX1545-1546, ¶¶47-54; APPX4653-4654, ¶36.  The District Court committed both legal and factual error in holding that "[t]he identity of 'impurity A' is unknowable to a reasonable certainty to a POSA," and that the term "impurity A" is indefinite.  APPX12.  The District Court's overall determination that the term "impurity A" is indefinite is subject to *de novo* review by this Court, while the District Court's underlying factual determinations concerning "impurity A" are subject to the clear error standard.  *Cox*, 838 F.3d at 1228; *Teva*, 135 S.Ct. at 840.

The District Court erred as a matter of law in failing to accept that a POSA would know the meaning of "impurity A," based on the intrinsic evidence and the definition of a POSA. *Nautilus,* 134 S. Ct. at 2128 ("[D]efiniteness is to be evaluated from the perspective of someone skilled in the relevant art."). The law of this Court is that the hypothetical POSA is "presumed to be aware of **all** the pertinent prior art." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454, 227 USPQ 293, 297 (Fed.Cir.1985) (emphasis added). The specification indicates that "impurity A" is a degradant of the inventive formulations. APPX1544, ¶44; APPX4653-4654, ¶36; APPX146, 23:55-56. Horizon presented ample evidence that a POSA would know, from the pertinent pharmacopeias available at the time of the invention, that "impurity A" is a known impurity of diclofenac sodium defined as [*N*-(2,6-dichlorophenyl)indolin-2-one], also named 1-(2,6-dichlorophenyl)-1,3-dihydro-2*H*-indol-2-one, or "USP Related Diclofenac Compound A RS," having the chemical formula $C_{14}H_9Cl_2NO$. *See* APPX1650-1652; APPX1654-1655; APPX1657-1661; APPX1663-1666; APPX3665-3669; APPX4654-4655, ¶¶37-8; APPX1545-1546, ¶¶47-54; APPX3644-3645, -3647, ¶¶11-12, -3651. *See also Standard Oil Co.,* 774 F.2d at 454 (the hypothetical POSA is "presumed to be aware of all the pertinent prior art.")

A POSA would have known that when the specification refers to degradation of the formulation, it is referring to degradation of diclofenac sodium,

as opposed to the degradation of any excipients in the inventive formulations, because the only component of the inventive formulations, including the active ingredient and all excipients, with a known impurity that is referred to as "impurity A" is diclofenac sodium. APPX137, 5:50-53; APPX4653-4655, ¶¶36-38; APPX1545-1546, ¶¶47-54. Actavis's expert, Dr. Michniak-Kohn, admits that USP Related Diclofenac Compound A RS "was a known impurity of diclofenac sodium at the time of the earliest priority application that led to the '838, '613, '916, and '591 patents." APPX2032, ¶55. The Ph. Eur. uses the term "impurity A" and contains the same identification of USP Related Diclofenac Compound A RS as the USP, only naming it 1-(2,6-dichlorophenyl)-1,3-dihydro-2*H*-indol-2-one. APPX1660; APPX1666; APPX4654-4655, ¶¶37-8; APPX1545-1546, ¶¶47-54. Indeed, "Diclofenac Sodium Related Compound A" is acknowledged by Watson (now Actavis) as a degradation product of diclofenac sodium in its FDA documents. APPX24691, -24724-24726. "Impurity A" was so well-known even at the time of the invention that the USP made it available as a reference standard, denoted by the "RS" in "USP Related Diclofenac Compound A RS." APPX1652; APPX1655.

Rather than accepting Horizon's evidence, which is not disputed, the District Court engaged in a lengthy discussion regarding HPLC data and testing conditions. APPX9-11. For all the reasons discussed above, a POSA would not need to

consider HPLC data to know that "impurity A" is referring to USP Related Diclofenac Compound A RS. APPX4654-4655, ¶¶ 37-38. Moreover, because the identity of "impurity A" was already known, a POSA would understand that the HPLC data was not included in the specification for purposes of identifying "impurity A." Rather, the HPLC data was include in the specification for quantification purposes, *i.e.*, to determine how much diclofenac sodium has degraded to "impurity A." APPX146, Table 13; APPX3650, ¶20. Thus, the intrinsic and extrinsic evidence supports Horizon's proposed construction, and the District Court erred in finding the term "impurity A," and in turn, the "degrades" terms, to be indefinite.

## IV. CONCLUSION REGARDING DEFINITENESS AND INFRINGEMENT

For the reasons above, the District Court's judgment that the claim terms "consisting essentially of," "degrades" and "impurity A" are indefinite and the claims of the '450 patent family are not infringed, should be reversed.

Respectfully submitted,

/s/ Robert F. Green
Robert F. Green
Caryn C. Borg-Breen
Jessica M. Tyrus
GREEN, GRIFFITH & BORG-BREEN LLP
NBC Tower, Suite 3100
455 North Cityfront Plaza Drive
Chicago, Illinois 60611
Telephone: (312) 883-8000

*Counsel for Plaintiffs-Appellants*
*Horizon Pharma Ireland Limited,*
*HZNP Limited and Horizon*
*Pharma USA, Inc.*

# CERTIFICATE OF SERVICE

**CERTIFICATE OF SERVICE AND FILING**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

I hereby certify that on August 16, 2017, the foregoing CORRECTED PRINCIPAL BRIEF OF PLAINTIFFS-APPELLANTS was filed electronically with the U.S Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on the following counsel of record, by means of electronic mail:

John Christopher Rozendaal      (jcrozendaal@skgf.com)
Michael E. Joffre               (mjoffre@skgf.com)
Kristina Caggiano Kelly         (kckelly@skgf.com)
William H. Milliken             (wmilliken@skgf.com)
STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Avenue, NW
Washington, D.C.
Phone: (202) 772-8854

*Attorneys for Defendant-Cross-Appellant Actavis Laboratories UT, Inc.*

Dated:  August 16, 2017              /s/ Jessica M. Tyrus
                                     Jessica M. Tyrus
                                     GREEN, GRIFFITH & BORG-BREEN LLP
                                     NBC Tower, Suite 3100
                                     455 North Cityfront Plaza Drive
                                     Chicago, Illinois 60611
                                     Telephone: (312) 883-8000

                                     *Counsel for Plaintiffs-Appellants Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma USA, Inc.*

# CERTIFICATE OF COMPLIANCE

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS,
<u>AND TYPE STYLE REQUIREMENTS</u>**

1.      This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B) because this brief contains 13958 words,

excluding the parts of the brief exempted by Federal Rule of Appellate Procedure

32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of

Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of

Appellate Procedure 32(a)(6) because this brief has been prepared in

proportionally spaced typeface using Microsoft Word 14-point Times New Roman

font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the

undersigned has relied upon the word count feature of this word processing system

in preparing this certificate.


Dated:      August 16, 2017              <u>/s/ Caryn C. Borg-Breen  </u>
                                         Caryn C. Borg-Breen

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE MOTIONS OR BRIEFS CONTAINING MATERIAL SUBJECT TO A PROTECTIVE ORDER

**Motion / Response / Reply** Containing Material Subject to a Protective Order

☐ This motion, response, reply complies with the limitations set forth in Fed. Cir. R. 27(m) and contains [*state the number of*] _____ words (including numbers) marked as confidential, or

☐ This motion, response, reply does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion requesting permission to exceed the maximum word count limitation is being filed contemporaneously with the filing of this motion, response, or reply.

**Briefs** Containing Material Subject to a Protective Order

☑ This brief complies with the limitations set forth in Fed. Cir. R. 28(d) and contains [*state the number of*] 0 _____ words (including numbers) marked as confidential, or

☐ This brief does not comply with the word count limitations set forth in Fed. Cir. R. 27(m) and a motion is requesting permission to exceed the maximum word count limitation is being filed contemporaneously with the filing of this brief.

_Jessica M. Tyrus_
(Signature of Attorney)

Jessica M. Tyrus
(Name of Attorney)

Plaintiffs-Appellants
(State whether representing appellant, appellee, etc.)

August 16, 2017
(Date)

*Horizon Pharma Ireland Limited, HZNP Limited, Horizon Pharma USA, Inc.*
*v.*
*Actavis Laboratories UT, Inc.,*
*17-2149, -2152, -2153, -2202, -2203, -2206*

# Addendum

1. August 17, 2016 Opinion, *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories, UT, Inc.,* 14-cv-7992 (D.N.J.)……..………………………………………....…A1-A28

2. August 17, 2016 Order, *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories, UT, Inc.,* 14-cv-7992 (D.N.J.)……………………………..…………………A29-A30

3. January 6, 2017 Opinion, *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories, UT, Inc.,* 14-cv-7992 (D.N.J.)…………………………………………..A31-A39

4. March 16, 2017 Opinion and Order, *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories, UT, Inc.,* 14-cv-7992 (D.N.J.)……………………………………...…A40-A61

5. May 23, 2017 Final Judgment, *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories, UT, Inc.,* 14-cv-7992 (D.N.J.)………………………………………...…A62-A64

6. United States Patent No. 8,217,078……….…………..…..A65-A119

7. United States Patent No. 8,252,838…………………………...A120-A150

8. United States Patent No. 8,546,450……………………….....A151-A199

9.  United States Patent No. 8,563,613……………………………...A200-A229

10. United States Patent No. 9,066,913……………………………...A230-A261

11. United States Patent No. 9,101,591……………………………...A262-A292

12. United States Patent No. 9,132,110……………………………...A293-A374

13. United States Patent No. 9,168,304……………………………...A375-A407

14. United States Patent No. 9,168,305……………………………...A408-A438

15. United States Patent No. 9,220,784…………………………...…A439-A471

**CONFIDENTIAL MATERIAL OMITTED:**
The material omitted in Addendum 4 contains portions of
Actavis's ANDA No. 207238 filed with the FDA, including
direct quotes from Actavis's labeling for Actavis's ANDA
product.

# Addendum 1

August 17, 2016 Opinion, *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories, UT, Inc.,*
14-cv-7992 (D.N.J.)

A1-A28

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HORIZON PHARMA IRELAND LIMITED, et al., | Civil No. 14-7992 (NLH/AMD) |
| Plaintiffs, | **OPINION** |
| v. | |
| ACTAVIS LABORATORIES, UT, INC., et al., | |
| Defendants. | |

<u>**APPEARANCES**</u>:

John E. Flaherty
Ravin R. Patel
McCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102

Robert F. Green
Christopher T. Griffith
Caryn C. Borg-Breen
Benjamin D. Witte
GREEN, GRIFFITH & BORG-BREEN LLP
NBC Tower, Suite 3100
455 North Cityfront Plaza Drive
Chicago, Illinois 60611

Dennis A. Bennett
GLOBAL PATENT GROUP, LLC
1005 North Warson Road, Suite 404
St. Louis, Missouri 63132

     On behalf of Plaintiffs

Liza M. Walsh
Christine I. Gannon
Christopher J. Borchert
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd.

**APPX1**

6th Floor
Newark, NJ 07102

Ralph J. Gabric
Laura A. Lydigsen
Joshua E. Ney, Ph.D.
Joshua H. James
BRINKS GILSON & LIONE
455 North Cityfront Plaza Drive, Suite 3600
Chicago, Illinois 60611

    On behalf of Defendants

**HILLMAN, District Judge**

    Presently before the Court in this Hatch-Waxman Act[1] action

is the dispute over the construction of claims in nine patents

relating to PENNSAID® 2%, which is the first FDA-approved twice-

daily topical diclofenac sodium formulation for the treatment of

the pain of osteoarthritis ("OA") of the knees.  Plaintiff

Horizon (Horizon Pharma Ireland Limited, HZNP Limited and

---

[1] The Third Circuit Court of Appeals recently explained,

> With the Drug Price Competition and Patent Term Restoration
> Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585, commonly
> known as the Hatch-Waxman Act, Congress attempted to
> balance the goal of "mak[ing] available more low cost
> generic drugs," H.R. Rep. No. 98-857, pt. 1, at 14-15
> (1984), reprinted in 1984 U.S.C.C.A.N. 2647, 2647-48, with
> the value of patent monopolies in incentivizing beneficial
> pharmaceutical advancement, see H.R.Rep. No. 98-857, pt. 2,
> at 30 (1984), reprinted in 1984 U.S.C.C.A.N. 2686, 2714.
> The Act seeks to accomplish this purpose, in part, by
> encouraging "manufacturers of generic drugs . . . to
> challenge weak or invalid patents on brand name drugs so
> consumers can enjoy lower drug prices." S. Rep. No. 107-
> 167, at 4 (2002).

King Drug Co. of Florence, Inc. v. Smithkline Beecham Corp., 791
F.3d 388, 394 (3d Cir. 2015).

Horizon Pharma USA, Inc.) is the current owner and assignee of the patents-in-issue, and of the PENNSAID® 2% New Drug Application ("NDA"); all rights therein were acquired from third parties.  These patents are:  U.S. Patent Nos. 8,252,838 ("the '838 patent"), 8,563,613 ("the '613 patent"), 8,871,809 ("the '809 patent"), 9,066,913 ("the '913 patent"), 9,101,591 ("the '591 patent"), 8,546,450 ("the '450 patent"), 8,217,078 ("the '078 patent"), 8,618,164 ("the '164 patent") and 9,132,110 ("the '110 patent").

The patents may be segregated into groups in accordance with their related specifications.  The first group of Horizon patents – the '838, '613, '809, '913 and '591 patents – share substantially identical specifications and claim priority to the same provisional application filed on October 17, 2006. According to Horizon, the inventors recognized a significant unmet need for, *inter alia*, topical OA pain treatments suitable for chronic use that will deliver the active agent to the underlying tissue in sufficient concentration.  The second group of Horizon patents – the '450, '078, '164 and '110 patents – also share substantially identical specifications, and claim priority to the same provisional application filed on October 31, 2012.  Horizon states that the inventors recognized a need for, *inter alia*, improved methods of dosing topical diclofenac formulations.

Horizon has filed several Hatch-Waxman actions alleging patent infringement against generic companies seeking to market copies of Horizon's PENNSAID® 2% formulation prior to the expiration of Horizon's patents.  This particular action concerns claim construction issues relevant to Actavis Laboratories UT, Inc. ("Actavis").  Horizon brought this action in response to Actavis' assertion that the generic copy of PENNSAID® 2% described in Actavis' Abbreviated New Drug Application No. 207238 ("ANDA"), if approved by the FDA, would not infringe any valid and enforceable patent owned by Horizon.[2]

A claim construction hearing was held on March 3, 2016. Following the conclusion of the parties' arguments, the Court directed the parties to submit supplemental briefing, and on June 7, 2016, the Court, having considered the entire record and additional briefing and argument by counsel, issued an oral Opinion on the Court's final construction of the patent claims. This Opinion formally memorializes the Court's findings as to its construction of the patent claims at issue pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996).

[2] This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, 2202 and 35 U.S.C. § 271.

## I.   LAW OF CLAIM CONSTRUCTION

Claim construction is "an issue for the judge, not the jury." Markman v. Westview Instruments, Inc., 517 U.S. 370, 391 (1996); see also Teva Pharms. USA, Inc. v. Sandoz, Inc., 135 S. Ct. 831, 841 (2015) ("This ultimate interpretation is a legal conclusion."). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" Phillips v. AWH Corp., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art [the "POSA"] in question at the time of the invention." Id. at 1313. Claim construction begins with the intrinsic evidence of the patent -- the claims, the specification, and the prosecution history -- and may require consultation of extrinsic evidence to understand the state of the art during the relevant time period. Teva Pharms., 135 S. Ct. at 841.

As part of construing claims, the Court can assess whether a claim term is indefinite, and reach "'a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims.'" In re Aoyama, 656 F.3d 1293, 1299 (Fed. Cir. 2011) (quoting Personalized Media Commc'ns, L.L.C. v. Int'l Trade Comm'n, 161 F.3d 696, 705 (Fed. Cir. 1998)). For a

claim term to be definite under 35 U.S.C. § 112, ¶ 2 (2012),[3] "a patent's claims, viewed in the light of the specification and prosecution history, [must] inform those skilled in the art about the scope of the invention with reasonable certainty." Nautilus, Inc. v. Biosig Instruments, Inc., 134 S. Ct. 2120, 2129 (2014).

It is permissible to read in testing conditions from the specification without violating the basic canon of construction not to import limitations from the specification into the claims, but only where this will "reconcile[ ] the ambiguous claim language with the inventor's disclosure." Chimie v. PPG Indus., Inc., 402 F.3d 1371, 1378-79 (Fed. Cir. 2005). Where, however, the specification discloses multiple methods for evaluating a claim limitation without guidance to a person of ordinary skill in the art about which method to use, the claim limitation is indefinite. Dow Chem. Co. v. Nova Chems. Corp. (Can.), 803 F.3d 620, 634-35 (Fed. Cir. 2015); Teva Pharms. USA, Inc. v. Sandoz, Inc., 789 F.3d 1335, 1344-45 (Fed. Cir. 2015), on remand from 135 S. Ct. 831 (2015).

---

[3] The statute has been subsequently amended under the Leahy-Smith America Invents Act ("AIA"), Pub. L. No. 112-29, 125 Stat. 284 (2011), such that this provision has been replaced by 35 U.S.C. § 112(b).  Because the applications predate the AIA, the pre-AIA version of § 112 applies.  Biosig Instruments, Inc. v. Nautilus, Inc., 783 F.3d 1374, 1377 n.1 (Fed. Cir. 2015), on remand from 134 S. Ct. 2120 (2014).

## II.   DISPUTED TERMS

As set forth above, there are nine patents asserted in this matter.  Of these, five patents – U.S. Patent Nos. 8,252,838; 8,563,613; 8,871,809; 9,066,913; and 9,101,591 – are part of the "'838 Patent Family" and all agreed to have the same specification.  The other four patents – U.S. Patent Nos. 8,546,450; 8,217,078; 8,618,164; and 9,132,110 – are part of the "'450 Patent Family" and similarly agreed to have the same specification.

All of the disputed terms for the Court to construe are contained within the '838 Patent Family, thus all references to the specification will be to the specification of the '838 Patent.

**A.   "the topical formulation produces less than 0.1% impurity A after 6 months at 25°C and 60% humidity"**

| Horizon's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Less than 0.1% of Impurity A (USP Diclofenac Related Compound A RS) present in a formulation sample after the sample was maintained at 25°C and 60% humidity for 6 months | This term is indefinite because it does not inform a person of ordinary skill with reasonable certainty of what is claimed.  If impurity A is construed to mean USP Diclofenac Related Compound A RS, then the remainder of the term should be given its plain and ordinary meaning. |

**Court's construction:**  indefinite as to the identity of "impurity A"

Horizon's construction seeks to equate the claim term

"impurity A" with USP Diclofenac Related Compound A RS ("USP

Compound A").[4]  Horizon acknowledges that no reference to USP

Compound A exists in the intrinsic evidence, but relies on the

fact that a POSA would know that "impurity A" would refer to USP

Compound A.  Actavis submits that the language of the

specification and absence of testing information within the

specification make the identity of "impurity A" impossible to

know.  Actavis also argues that even if "impurity A" is

knowable, the verb "produces" mandates an assessment of the

amount of "impurity A" before storage to determine a baseline

amount to compare against the amount of "impurity A" after the

six month storage period to calculate what was "produced" during

the storage period, as opposed to what was present as a result

of the synthesis of diclofenac sodium.

Looking to the specification, as mentioned, USP Compound A

is never mentioned.  Horizon's position is that because the

relevant pharmacopoeias at the time -- the U.S. Pharmacopoeia

("USP"), the European Pharmacopoeia ("Ph. Eur."), and the

---

[4] The chemical name for this compound is either $N$-(2,6-dichlorophenyl)indolin-2-one (see USP (26th ed. 2003) at 1975 (Pl.'s Ex. 16); USP (24th ed. 2000) at 1786 (Pl.'s Ex. 17)) or 1-(2,6-dichlorophenyl)-1,3-dihydro-2$H$-indol-2-one (see Ph. Eur. (5th ed. 2004) at 1420 (Pl.'s Ex. 18); Ph. Eur. (6th ed. 2005) at 1687 (Pl.'s Ex. 19)).  The literature references referred to by both experts refer to USP Compound A by both names.

British Pharmacopoeia ("BP") -- identify five degradants for sodium diclofenac by letters (e.g., A, B, C), a POSA would know that "impurity A" meant the first impurity for sodium diclofenac, which is disclosed in the USP as USP Compound A. Actavis does not appear to disagree that this is a possibility, but it argues that without any further identifying information given about "impurity A," it would be impossible for a POSA to know what "impurity A" is.

The only identity information provided for "impurity A" in the specification are retention times derived from a high performance liquid chromatography ("HPLC") characterization. However, the specification merely says "the samples were tested for impurities by high performance liquid chromatography (HPLC)." '838 Patent at 23:50-52. The specification provides no additional information about the conditions under which the HPLC experiment were undertaken -- most notably, details regarding the column, the mobile phase, and the flow rate are not given. (See Marvin C. McMaster, HPLC: A Practical User's Guide 53-56 (2d ed. 2007).)

Actavis' expert explains that the disclosure is insufficient for a POSA to replicate and understand the HPLC results to identify "impurity A." (Michniak-Kohn Decl. ¶¶ 52-54.) Dr. Kohn also explains that the specification fails to inform a POSA whether "impurity A" is produced as a result of

the diclofenac, or as a result of any of the other excipients in the formulation.  (Id. ¶ 51.)  Horizon's expert responds that the literature available at the time would demonstrate that "impurity A" was USP Compound A.  (Walters Resp. Decl. ¶ 16–20.)

Dr. Walters assumes that the HPLC experiment was carried out using a pharmacopoeia chromatographic system (see Walters Resp. Decl. ¶ 16), but the specification does not support this position.  The word "pharmacopoeia" appears nowhere in the '838 Patent, and Dr. Walters has not explained why a POSA would know that the HPLC tests described in the '838 Patent were undertaken using a pharmacopoeia chromatographic system.  Looking to the pharmacopoeia excerpts submitting by Horizon, they do not comport with the HPLC characterization data disclosed in the specification.  Both editions of the Ph. Eur. and the USP provide detailed descriptions of a reference solution, the mobile phase, the flow rate, and details about the column.  (See Ph. Eur. (6th ed. 2005) at 1686–87; Ph. Eur. (5th ed. 2004) at 1421; USP (26th ed. 2003) at 595–96; USP (24th ed. 2000) at 546.)  Further, even assuming that the HPLC experiment in the '838 Patent was undertaken using pharmacopoeia chromatographic systems, the relative retention times disclosed in the specification only comport with the characterization of diclofenac given in the USP (0.6 for USP Compound A and 1.0 for

diclofenac),[5] and do not comport with the information given in
the Ph. Eur. (0.48 for USP Compound A and 1.0 for diclofenac).[6]
The specification provides no guidance as to which of the
proposed pharmacopoeia chromatographic systems a POSA could use
to evaluate the identity of "impurity A."

Further, in neither of the literature references relied
upon by Dr. Walters that he asserts use pharmacopoeia
chromatographic systems does the reference omit the details of
the HPLC experiment (see Roy (2001) at ACT-PENN0014822
(explicitly relying on the BP for the HPLC conditions while
still explaining in detail the conditions used); Hajkova (2002)
at HZNPENN_00071424 (explicitly relying on the USP for baseline
HPLC conditions while also disclosing conditions for a newly
described HPLC experimental setup)) or identify USP Compound A
by anything other than its actual chemical formula and/or
structure (see Roy (2001) at ACT-PENN0014821 ("a stable
intermediate, 1-(2,6-dichlorophenyl)indolin-2-one, which is
commonly known as the indolinone derivative"); Hajkova (2002) at

[5] This corresponds to 6.6 minutes for "impurity A" and 11 minutes
for diclofenac as disclosed in the specification.

[6] This would correspond to either an elution of "impurity A" at
5.28 minutes if diclofenac eluted at 11 minutes as disclosed, or
an elution of diclofenac at 13.75 minutes if "impurity A" eluted
at 6.6 minutes as disclosed.

HZNPENN_00071423 ("The main impurity, 1-(2,6-

dichorophenyl)indolin-2-one (DPI, Fig. 1) . . . .")).

The identity of "impurity A" as claimed in claim 4 of the

'913 Patent is unknowable to a reasonable certainty to a POSA.

Accordingly, "impurity A" is indefinite.  The Court need not

reach the issue of whether "produces" requires an assessment of

the amount if "impurity A" before storage to provide a baseline

to compare against the amount of "impurity A" after the six

month storage period.

**B.    "the formulation degrades by less than 1% over 6**
       **months"**

| Horizon's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Less than 1% of Impurity A (USP Diclofenac Related Compound A RS) present in a formulation sample after the sample was maintained at 25°C and 60% humidity for 6 months | This term is indefinite because it does not inform a person of ordinary skill with reasonable certainty of what is claimed.  If construed, the term should be given its plain and ordinary meaning. |

**Court's construction:**  indefinite

Horizon seeks to do two things in their construction:

(1) explain storage conditions by relying on Example 6 of the

specification; and (2) explain what it means if something

"degrades" by using "impurity A" from Example 6.  Actavis

responds that this is improper importation of limitations from

the specification into the claims, and that even if this were

permissible, the specification provides multiple methods of

storage without specifying when one is proper, making the terms indefinite.

Having already concluded that the identity of "impurity A" is indefinite, this term must also be indefinite.  No other explanation for how to identify the means of degradation is provided.  Even if the Court were to try to identify another way to evaluate degradation, the specification does not provide guidance.  The specification refers to stability and degradation as two sides of the same coin, a point which Horizon also made during the hearing.  (See Hr'g Tr. at 45:22-46:1.)  However, stability is referred to as a catch all for a number of things, especially in Example 3 when the gels "remain stable for at least six months demonstrating:  no phase separation, negligible shift in pH, and low amounts of degradation products (<0.04%)." '838 Patent at 16:39-41; see also id. at 12:56-58 (referring to discoloration and phase separation in the context of stability), 20:37-64 (referring to appearance for stability), 23:30-24:32 (referring to production of "impurity A" for stability).  For purposes of claim construction, it is presumed that claim terms are used consistently throughout a patent.  Phillips, 415 F.3d at 1314.  Thus, it is unclear when "stability" and therefore "degradation" is referring to production of "impurity A," or something else, such as appearance, phase separation, and/or pH shift.

Thus, no matter how the Court tries to interpret the term, the result is indefiniteness.  Either degradation is equated with "impurity A", which has already been deemed indefinite, or the Court is presented with multiple methods for how to evaluate stability -- and accordingly how to evaluate degradation -- without further guidance, rendering the term indefinite.

The Court need not reach the issue of whether Horizon's proposed construction would impermissibly import limitations from the specification with respect to storage conditions.

C.   "consisting essentially of"

| Horizon's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Legal issue – no construction needed in Markman phase; also, meaning cannot be ascertained in the absence of proper context | Comprising; if interpreted otherwise, the claims are invalid as indefinite and/or lacking adequate written description under 35 U.S.C. § 112 |

**Court's construction:**  indefinite due to indefiniteness of the basic and novel properties of the invention

1.   "Consisting Essentially Of" and the "Basic and Novel Properties" Require Construction

"Consisting essentially of" is a transitional phrase that has a well-established legal meaning in Federal Circuit case law.  "By using the term 'consisting essentially of,' the drafter signals that the invention necessarily includes the listed ingredients and is open to unlisted ingredients that do not materially affect the basic and novel properties of the

invention." PPG Indus. v. Guardian Indus. Corp., 156 F.3d 1351, 1354 (Fed. Cir. 1998). This presents a middle ground between the open-ended "comprising" that does not exclude any unrecited claim elements and the closed "consisting of" that excludes any elements not explicitly recited in the claim. AK Steel Corp. v. Sollac & Ugine, 344 F.3d 1234, 1239 (Fed. Cir. 2003).

When asked to construe this term, courts have generally declined to construe the term, or declined to provide any further construction beyond the well-established legal meaning of the term. See, e.g., Depomed, Inc. v. Sun Pharma Global FZE, Civ. No. 11-3553 (JAP), 2012 WL 3201692, at *13 (D.N.J. Aug. 3, 2012); Biovail Labs. Int'l SRL v. Abrika, LLLP, No. 04-61704, 2006 WL 6111777, at * 18 (S.D. Fla. Aug. 24, 2006); Classified Cosmetics, Inc. v. Del Labs., Inc., No. 03-4818, 2004 WL 5645578, at *5 (C.D. Cal. June 14, 2004).

When, however, the "basic and novel properties" themselves are in dispute, courts have construed the term in order to define the "basic and novel properties" to delineate what must be shown for the purposes of infringement or invalidity. See, e.g., AK Steel, 344 F.3d at 1239-40 (determining the basic and novel property of the invention by referring to the specification); L'Oreal S.A. v. Johnson & Johnson Consumer Cos., Inc., No. 12-98-GMS, Docket Item 183, slip op. at 1 n.2 (D. Del. Nov. 5, 2014) ("As with claim construction, the court determines

the basic and novel properties of an invention as a matter of law, while resorting to the same sources of evidence used for claim construction."); Trs. of Boston Univ. v. Everlight Elecs. Co., Ltd., 23 F. Supp. 3d 50, 63–65 (D. Mass. 2014) (noting that "[t]he caselaw is somewhat unclear as to how to determine the 'basic and novel properties' of an invention" and that "[t]his is a turgid, difficult nook of patent law"); Momentus Golf, Inc. v. Swingrite Golf Corp., 312 F. Supp. 2d 1134, 1144 (S.D. Iowa 2004) (identifying "[t]he novel property" of the claimed invention in construing "consisting essentially of"), rev'd, 187 F. App'x 981 (Fed. Cir. 2006) (reversing judgment of noninfringement for misconstruing what would materially alter the basic and novel property); Kim v. Conagra Foods, Inc., No. 01-2467, 2003 WL 2122266, at *8 (N.D. Ill. May 23, 2003) (identifying "the novel property of the claimed invention" in discussing claim construction); General Elec. Co. v. Hoechst Celanese Corp., 698 F. Supp. 1181, 1187 (D. Del. 1988) (holding that "the determination of the basic and novel characteristic of [the asserted patent] is part of determining the scope of the claim" and then declining to do so due to a disputed issue of fact under pre-Markman case law).  It further appears that where the parties can agree on the basic and novel properties, then the issue of what materially affects those properties is not raised until the infringement and invalidity analyses.  See,

e.g., PPG Indus., 156 F.3d at 1354 ("[The parties] agreed that
the basic and novel characteristics of the glass are color,
composition, and light transmittance.").

Based on the weight of authority, the Court will construe
"consisting essentially of" in accordance with the well-
established legal meaning, "consisting of only the specified
materials and those that do not materially affect the basic and
novel properties of the claimed invention."  Because the parties
dispute what those basic and novel properties or characteristics
are, the Court will go on to identify them.[7]

### 2.   **Nautilus Applies to the "Basic and Novel Properties"**

A major dispute between the parties is whether the Nautilus
standard applies to the determination of the "basic and novel
properties."  The parties agree that no court has yet to apply
the Nautilus standard for indefiniteness to this issue, and the
Court has been unable to identify any.  Accordingly, this is an
issue of first impression.  Horizon submits that because
Nautilus applies only to the bounds of claims that it should not
be read so broadly as to apply to the basic and novel properties
in construing "consisting essentially of."  Actavis counters
that because the basic and novel properties are part of defining

[7] The Court will not address the timing issues variously raised
by the parties about the basic and novel properties.

**APPX17**

the scope of the claim, <u>Nautilus</u> should apply to them as well. The Court agrees with Actavis that the basic and novel properties are part of the scope of the claim, and as such are part and parcel of the claims.

As a primary matter, the Federal Circuit has found that the definiteness requirement of 35 U.S.C. § 112, ¶ 2 applies to a "consisting essentially of" claim.  <u>See</u> <u>PPG Indus.</u>, 156 F.3d at 1354–55.  For example, in <u>PPG Industries</u>, PPG held a patent for tinted glass used in automobiles, and filed an infringement action against Guardian, claiming that Guardian's glass product infringed PPG's patent.  At the <u>Markman</u> phase, the district court was tasked with construing the following claim term:  "A green tinted, ultraviolet absorbing glass having a base glass composition consisting essentially of: [various specific ingredients] and a colorant portion consisting essentially of: [various specific ingredients]."  <u>Id.</u> at 1352.  The parties agreed that that the basic and novel characteristics of PPG's glass were color, composition, and light transmittance.  <u>Id.</u> at 1354.  Guardian argued that its glass contained iron sulfide, an ingredient not listed in PPG's patent, as a colorant, and it therefore did not infringe.  <u>Id.</u> at 1353.

PPG argued that the district court was required to determine as a part of claim construction whether iron sulfide could have a material effect on the basic and novel

characteristics of the claimed glass.  Id. at 1354.  If iron

sulfide did not materially affect PPG's patented glass product,

then Guardian's glass could be found to be infringing.  The

Federal Circuit affirmed the district court, which left the

material-effect determination for the jury.  The Federal Circuit

explained,

> Claims are often drafted using terminology that is not as
> precise or specific as it might be.  As long as the result
> complies with the statutory requirement to "particularly
> point[ ] out and distinctly claim[ ] the subject matter
> which the applicant regards as his invention," 35 U.S.C. §
> 112, para. 2, that practice is permissible.  That does not
> mean, however, that a court, under the rubric of claim
> construction, may give a claim whatever additional
> precision or specificity is necessary to facilitate a
> comparison between the claim and the accused product.
> Rather, after the court has defined the claim with whatever
> specificity and precision is warranted by the language of
> the claim and the evidence bearing on the proper
> construction, the task of determining whether the construed
> claim reads on the accused product is for the finder of
> fact.

Id. at 1355.  The Federal Circuit emphasized that PPG's patent

"contained some inherent imprecision resulting from the use of

the term 'consisting essentially of.'"  Id.  It also emphasized

that "PPG was entitled to provide its own definition for the

terms used in its patent claim, including the transition phrase

'consisting essentially of,'" and that "PPG could have defined

the scope of the phrase 'consisting essentially of' for purposes

of its patent by making clear in its specification what it

regarded as constituting a material change in the basic and

novel characteristics of the invention." Id. The Federal

Circuit found that because PPG failed to do so at the claim

construction phase, whether the iron sulfide present in

Guardian's glass materially affected the basic and novel

properties of PPG's glass was for a jury to decide. Id.

The PPG Industries case affirms that claims containing the

phrase "consisting essentially of" must meet the definiteness

requirement of 35 U.S.C. § 112, ¶ 2, but the case also

recognizes that the phrase itself is imprecise. In order to

assess the definiteness of a patent claim that contains an

imprecise phrase, the construction of the term "consisting

essentially of" can be separated into two categories: (1) the

specific listed ingredients or steps, and (2) the unlisted

ingredients or steps that do not materially affect the basic and

novel properties of the invention. At the claim construction

phase, a court may construe the second category of a "consisting

essentially of" claim term as long as the patent holder shows,

through the specification and prosecution history, that a person

skilled in the art would know that a particular unlisted

ingredient could materially affect the basic and novel

properties of the patent. If the patent holder fails to do so,

a jury must determine whether an unlisted ingredient or step

materially affects the basic and novel properties of the

invention.

The lesson to be applied to this case, therefore, is that a court's assessment of the basic and novel properties may be performed at the claim construction phase because under certain circumstances the basic and novel properties of an invention are part of the construction of a claim containing the phrase "consisting essentially of."

The Supreme Court's decision in Nautilus simply reaffirms the long-established requirement that a patent's claims must be definite.  The Supreme Court issued such a decision to make clear that centuries-old precedent applying the definiteness requirement of 35 U.S.C. § 112, ¶ 2, is still the standard today.  See Nautilus, 134 S. Ct. at 2124, 2130 (finding that the current terminology "can leave the courts and the patent bar at sea without a reliable compass").  The Supreme Court directed, "In place of the 'insolubly ambiguous' standard, we hold that a patent is invalid for indefiniteness if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention."  Id.

Through this direction, the Supreme Court recognized the delicate balance between the inherent limitations of language and the need for language precise enough to afford clear notice of what is claimed in order to avoid a zone of uncertainty for inventors.  Id. at 2129.  Indeed, the Supreme Court observed

that "absent a meaningful definiteness check . . . patent applicants face powerful incentives to inject ambiguity into their claims," and that "[e]liminating that temptation is in order."  Id. (citations omitted).  The Supreme Court noted that the "patent drafter is in the best position to resolve the ambiguity in patent claims."  Id. (citation omitted).

After setting forth the redefined standard for assessing definiteness under 35 U.S.C. § 112, ¶ 2, the Supreme Court remanded the case to the Federal Circuit so that it could apply the standard to the claim at issue:  a heart rate monitor that "'comprise[s],' among other elements, an 'elongate member' (cylindrical bar) with a display device; 'electronic circuitry including a difference amplifier'; and, on each half of the cylindrical bar, a live electrode and a common electrode 'mounted ... in spaced relationship with each other.'  Id. at 2126 (noting that parties presented differing views on the definiteness of the term "spaced relationship").

The Nautilus decision replaced the Federal Circuit's amorphous standard for assessing whether a claim is indefinite with a standard that will allow only claims that meet the statutory definiteness requirement to stand.  Because the basic and novel properties of an invention are part of the construction of a claim containing the phrase "consisting essentially of," the Nautilus standard applies to the assessment

of an invention's basic and novel properties.  Accordingly, the construction of the basic and novel properties is governed by 35 U.S.C. § 112, ¶ 2 and the accompanying analysis from <u>Nautilus</u>.

### 3.    The Basic and Novel Properties of the Claimed Invention Are Indefinite

Horizon has identified five basic and novel properties for the claimed invention, relying on the specification of the '828 Patent:  (1) better drying time; (2) higher viscosity; (3) increased transdermal flux; (4) greater pharmacokinetic absorption; and (5) favorable stability.  '838 Patent at 4:24–35, 9:1–10:47.  Actavis argues that these are not identified as the basic and novel properties in the specification, and that these comparative terms do not provide the "reasonable certainty" required by <u>Nautilus</u>.

Relying on the canons of claim construction, the Court agrees with Horizon that the specification does identify these five properties as the "Characteristics of the Gel Formulation." '838 Patent at 9:1–10:47.  Further, these characteristics are identified early on in the summary of the invention as being the characteristics that demonstrate improvement over the prior art. '838 Patent at 4:23–35.  This is sufficient to identify these as the basic and novel properties of the claimed invention.  <u>See</u>

L'Oreal, slip op. at 1 n.2 (identifying basic and novel properties even when not clearly titled as such).[8]

The focus now shifts to Actavis' position that the identified basic and novel properties are indefinite under 35 U.S.C. § 112, ¶ 2.  Actavis argues that these generic comparative terms are too imprecise to be definite.  As an exemplar of their argument, Actavis points to the first identified basic and novel property -- better drying time.[9]

In the section of the specification that identifies the basic and novel properties, under the subheading for "Drying Time," the specification explains that "[r]elative to previously disclosed [liquid] compositions . . . the compositions of the invention dry quicker . . . . The drying time difference is evident when equal amounts of the two products are tested on opposite limbs.  Within thirty (30) minutes the compositions of the invention are almost completely dry whereas a significant amount of the previously described liquid formulation remains."

---

[8] Even if the Court were to accept Actavis' invitation to extrapolate out the requirements of means-plus-function claiming under 35 U.S.C. § 112, ¶ 6 to require a clear identification, which it does not do so, the '838 Patent would accomplish this.

[9] The parties briefed the definiteness of the claim term "a greater drying rate" in their opening Markman briefs and submitted expert declarations on the issue.  Subsequently, Horizon dropped claims including this term, and the issue was not briefed again in responsive Markman briefs or in responsive expert declarations.

'838 Patent at 10:5-21.  No data is ever provided in the
specification for this on-limb testing.  This section of the
specification then discusses how to test for drying time more
quantitatively and refers to data from an example later in the
specification.  See '838 Patent at 10:22-30.[10]

Turning to Example 5 and Table 12 which discuss drying
time, there is an apparent problem in the assertion from earlier
in the specification that the claimed invention would be drier
within thirty minutes.  Example 5 is conducted using the "more
quantitative[ ]" method, wherein the formulations are spread on
a plate and weighed at various time intervals, with "dryness"
being determined by the percentage of weight remaining on the
plate.  See '838 Patent at 21:38-22:49.  Example 5 discusses
three different gel compositions, all of which are embodiments
of the claimed invention of the '838 Patent.  See id.  Of the
three gel compositions, only two of the described compositions
are "drier" than the prior art liquid comparative at thirty

---

[10] The specification refers to Table 11 and Figure 10.  '838
Patent at 10:29-30.  However, these contain transdermal flux
data and not weight and drying time, whereas Table 12 and Figure
11 contain the weight and drying time data.  Accordingly, the
Court finds this is a typographical error and one a POSA
reviewing the '838 Patent would readily understand to look to
Table 12 and Figure 11 rather than Table 11 and Figure 10.  Cf.
Lucent Techs., Inc. v. Gateway, Inc., 525 F.3d 1200, 1215 & n.8
(Fed. Cir. 2008) (permitting courts to redraft claim language
"when there is an obvious administrative or typographical error
not subject to reasonable debate") (citing Hoffer v. Microsoft
Corp., 405 F.3d 1326, 1331 (Fed. Cir. 2005)).

minutes.  '838 Patent at Table 12.  The third formulation shows
100% of the weight remaining at thirty minutes as compared to
the prior art liquid comparative which shows 95.6% of its weight
remaining.  Id.  Only at four hours does the third formulation
begin to show that it is drier than the prior art liquid
comparative (86.8% vs. 93%).  Id.

    The contradictions specifically within Example 5 are even
more problematic.  Example 5 claims that "even within the first
five minutes, the three gel formulations displayed more rapid
drying than the liquid formulation."  '838 Patent at 21:63–65.
This is simply not supported by the data, which shows that at
five minutes the third formulation had 100.3% of its weight
present as compared to 98.1% of the prior art liquid
comparative.  '838 Patent at Table 12.

    In short, the specification describes two different methods
for evaluating "better drying time," and the two methods do not
provide consistent results at consistent times.  Further, the
claimed results are not seen across all formulations of the
claimed invention, and when "dryness" is evaluated at any time
shorter than four hours, not all formulations of the claimed
invention actually exhibit "better drying time."  Horizon's
expert urges the Court to only evaluate the drying rate at the
twenty-four hour mark.  (See Walters Opening Decl. ¶¶ 89–96.)
However, Dr. Walters' reasoning does not comport with the plain

language of the specification, as explained.  Even considering

his references to the prosecution history, these still do not

provide any clarity on the appropriate time frame under which to

evaluate the drying rate.  (See id. ¶ 92; Walters Ex. P.)  More

persuasive is Dr. Kohn's reasoning that a POSA would not know

under what standard to evaluate the drying rate of the claimed

invention.  (See Michniak-Kohn Decl. ¶¶ 23-31.)

     The result is that the "better drying rate" basic and novel

property is indefinite.  If a POSA reading the patent would

understand the five principles identified by Horizon to be the

basic and novel properties of the claimed invention, then once

one of them is indefinite, they all become problematic.  As

stated, the purpose of the requirement of 35 U.S.C. § 112, ¶ 2

is to "inform those skilled in the art about the scope of the

invention with reasonable certainty."  Nautilus, 134 S. Ct. at

2129.  Once one property does not have "reasonable certainty,"

it follows that the group of properties itself does not have the

requisite "reasonable certainty."  Consequently, the term

"consisting essentially of" must be construed as indefinite due

to the inability for a POSA to have "reasonable certainty" about

what the basic and novel properties of the invention are, and

thus the POSA would lack "reasonable certainty" about whether an

additional ingredient would materially alter the basic and novel

properties of the claimed invention.

**III. CONCLUSION**

For the foregoing reasons, the disputed terms are all held

to be indefinite under 35 U.S.C. § 112, ¶ 2.


Date: __August 17, 2016____          __s/ Noel L. Hillman____
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

# Addendum 2

August 17, 2016 Order, *Horizon Pharma Ireland Limited, et al. v.*
*Actavis Laboratories, UT, Inc.,*
14-cv-7992 (D.N.J.)

A29-A30

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

HORIZON PHARMA IRELAND
LIMITED, et al.,                              Civil No. 14-7992 (NLH/AMD)

         Plaintiffs,

                               **ORDER**

    v.

ACTAVIS LABORATORIES, UT,
INC., et al.,

         Defendants.

For the reasons expressed in the Court's Opinion filed today,

**IT IS** on this ___17th___ day of ___August___, 2016

**ORDERED** that the Court's construction of the disputed claim terms in U.S. Patent Nos. 8,252,838 ("the '838 patent"), 8,563,613 ("the '613 patent"), 8,871,809 ("the '809 patent"), 9,066,913 ("the '913 patent"), 9,101,591 ("the '591 patent"), 8,546,450 ("the '450 patent"), 8,217,078 ("the '078 patent"), 8,618,164 ("the '164 patent") and 9,132,110 ("the '110 patent") is as follows:

1. "the topical formulation produces less than 0.1% impurity A after 6 months at 25ºC and 60% humidity" is indefinite as to the identity of "impurity A"

2. "the formulation degrades by less than 1% over 6 months" is indefinite

3. "consisting essentially of" is indefinite due to indefiniteness of the basic and novel properties of

the invention.

                                          s/ Noel L. Hillman
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.

# Addendum 3

January 6, 2017 Opinion, *Horizon Pharma Ireland Limited, et al. v.*
*Actavis Laboratories, UT, Inc.,*
14-cv-7992 (D.N.J.)

A31-A39

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

———————————————————

HORIZON PHARMA IRELAND              Civil No. 14-7992 (NLH/AMD)
LIMITED, et al.,

            Plaintiffs,           **OPINION**

    v.

ACTAVIS LABORATORIES, UT,
INC., et al.,

            Defendants.

———————————————————

**APPEARANCES**:

John E. Flaherty
Ravin R. Patel
McCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102

Robert F. Green
Christopher T. Griffith
Caryn C. Borg-Breen
L. Scott Beall
Jessica M. Tyrus
Benjamin D. Witte
GREEN, GRIFFITH & BORG-BREEN LLP
NBC Tower, Suite 3100
455 North Cityfront Plaza Drive
Chicago, Illinois 60611

Dennis A. Bennett
GLOBAL PATENT GROUP, LLC
1005 North Warson Road, Suite 404
St. Louis, Missouri 63132
    On behalf of HORIZON PHARMA IRELAND LIMITED, et al.

Liza M. Walsh
Christine I. Gannon
Katelyn O'Reilly
WALSH PIZZI O'REILLY FALANGA LLP

One Riverfront Plaza
1037 Raymond Blvd.
6th Floor
Newark, NJ 07102

Ralph J. Gabric
Laura A. Lydigsen
Joshua E. Ney, Ph.D.
Joshua H. James
Andrew S. McElligott
BRINKS GILSON & LIONE
455 North Cityfront Plaza Drive, Suite 3600
Chicago, Illinois 60611
       On behalf of ACTAVIS LABORATORIES, UT, INC., et al.

**HILLMAN**, District Judge

Before the Court is the motion of Plaintiff Horizon

(Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma

USA, Inc.) for reconsideration (Docket No. 192) of the Court's

August 17, 2016 Markman Opinion (Docket No. 188).  Horizon is

the current owner and assignee of the patents-in-issue and of

the PENNSAID® 2% New Drug Application, which is the first FDA-

approved twice-daily topical diclofenac sodium formulation for

the treatment of the pain of osteoarthritis of the knees.

Horizon has filed several Hatch-Waxman actions alleging

patent infringement against generic companies seeking to market

copies of Horizon's PENNSAID® 2% formulation prior to the

expiration of Horizon's patents, and this particular action

concerns Horizon's claims against Actavis Laboratories UT, Inc.

("Actavis").[1]   Horizon brought this action[2] in response to

Actavis' assertion that the generic copy of PENNSAID® 2%

described in Actavis' Abbreviated New Drug Application No.

207238 ("ANDA"), if approved by the FDA, would not infringe any

valid and enforceable patent owned by Horizon.

   In the Markman phase of the case,[3]  the Court was tasked

with construing the following terms in the '838 Patent Family[4]:

   A.   "the topical formulation produces less than 0.1%
        impurity A after 6 months at 25°C and 60% humidity"

   B.   "the formulation degrades by less than 1% over 6
        months"

   C.   "consisting essentially of"

---

[1] Another group of cases filed by Horizon against a generic
company seeking to market copies of Horizon's PENNSAID® 2%
formulation prior to the expiration of Horizon's patents is
against Lupin Ltd. and Lupin Pharmaceuticals, Inc.  Because the
Court's findings in the Actavis actions directly impact the
claims in the Lupin actions, Lupin filed a brief in opposition
to Horizon's motion for reconsideration and appeared at the
January 4, 2017 hearing on that motion.  (See Civil Action No.
15-3051, Docket No. 137.)

[2] This Court has jurisdiction over the subject matter of this
action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, 2202 and 35
U.S.C. § 271.

[3] Claim construction is "an issue for the judge, not the jury."
Markman v. Westview Instruments, Inc., 517 U.S. 370, 391 (1996).

[4] There are nine patents asserted in this matter.  Of these, five
patents – U.S. Patent Nos. 8,252,838; 8,563,613; 8,871,809;
9,066,913; and 9,101,591 – are part of the "'838 Patent Family"
and all agreed to have the same specification.  The other four
patents – U.S. Patent Nos. 8,546,450; 8,217,078; 8,618,164; and
9,132,110 – are part of the "'450 Patent Family" and similarly
agreed to have the same specification.

**APPX33**

The Court found each of these terms to be indefinite.

(Docket No. 188 at 12, 14, 27.)  Specially with regard to

"consisting essentially of," the Court noted that Horizon

identified five basic and novel properties for the claimed

invention: (1) better drying time; (2) higher viscosity; (3)

increased transdermal flux; (4) greater pharmacokinetic

absorption; and (5) favorable stability.  (Id. at 23.)  The

Court found that the basic and novel property of "better drying

time" was indefinite, which therefore caused the term

"consisting essentially of" to be indefinite.  (Id. at 27.)

Horizon has filed the instant motion for reconsideration,

arguing that the Court erred in two ways:

> The Court did not consider the alleged "indefiniteness"
> on a claim-by-claim basis, but instead broadly held the term
> "consisting essentially of" to be indefinite.  When claims
> requiring use of hydroxypropyl cellulose (HPC) as a
> thickening agent are considered as independent inventions,
> those claims should not be found to be indefinite because the
> test results for such inventions are consistent.  The only
> evidence of alleged inconsistent testing results was in the
> context of different claimed inventions that require carbopol
> thickening agents; and

> The Court's finding of indefiniteness is based on
> allegedly "unrebutted" expert testimony that the patent
> discloses two methods for comparing drying rates, which
> provide inconsistent results.  However, Horizon's responsive
> expert evidence on this issue was not presented to the Court
> because of an agreement between the parties to not brief the
> definiteness of "greater drying rate" in Responsive Markman
> briefs.  At the time of the Markman briefing and Markman
> Hearing, Actavis had not sought leave to amend their
> contentions to include the argument that the basic and novel
> properties were themselves indefinite.  Indeed, to date, the
> only indefiniteness argument presented with respect to

4

**APPX34**

"consisting essentially of" in Actavis' Contentions is that
a person of ordinary skill ("POSA") cannot identify the basic
and novel properties.

(Docket No. 192-1 at 7.)  Horizon also objects to the Court's

application of Nautilus, Inc. v. Biosig Instruments, Inc., 134

S. Ct. 2120, 2129 (2014) to the analysis of the invention's

basic and novel properties.  (Docket No. 192-1 at 10.)

The Court will grant Horizon's request that it reconsider

its Markman decision, but after having fully considered the

parties' briefing and oral argument, the Court stands by its

prior findings.[5]

With regard to Horizon's argument that it was precluded

from fully presenting its evidence to support its construction

---

[5] A motion for reconsideration may be treated as a motion to
alter or amend judgment under Fed. R. Civ. P. 59(e), or as a
motion for relief from judgment or order under Fed. R. Civ. P.
60(b), or it may be filed pursuant to Local Civil Rule 7.1(i).
The purpose of a motion for reconsideration "is to correct
manifest errors of law or fact or to present newly discovered
evidence." Max's Seafood Cafe ex rel. Lou-Ann, Inc. v.
Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).  A judgment may be
altered or amended only if the party seeking reconsideration
shows: (1) an intervening change in the controlling law; (2) the
availability of new evidence that was not available when the
court granted the motion for summary judgment; or (3) the need
to correct a clear error of law or fact or to prevent manifest
injustice.  Id.  A motion for reconsideration may not be used to
re-litigate old matters or argue new matters that could have
been raised before the original decision was reached, P.
Schoenfeld Asset Mgmt., L.L.C. v. Cendant Corp., 161 F.Supp.2d
349, 352 (D.N.J. 2001), and mere disagreement with the Court
will not suffice to show that the Court overlooked relevant
facts or controlling law, United States v. Compaction Sys.
Corp., 88 F.Supp.2d 339, 345 (D.N.J. 1999).

5

**APPX35**

of the term "better drying time," the Court does not agree.  The
timeline of events, detailed by Actavis in its presentation at
the January 4, 2017 hearing, demonstrates that Horizon had ample
notice of Actavis's indefiniteness challenge to "better drying
time," and several opportunities – including during the two
Markman hearings on March 2, 2016 and June 7, 2016, the
supplemental briefing in between, and during the ten weeks after
the second Markman hearing and the issuance of the Court's
Markman Opinion on August 17, 2016 – to voice its concerns about
presenting all of its evidence to support its construction of
"better drying time."

Similarly, Horizon chose to present its position on the
`838 Patent Family as a whole, and has only raised the request
that each claim of every patent should be considered
individually in its motion for reconsideration.  It is clear
that Horizon was not "sandbagged" by the course of the claim
construction process that took place over many months.

Even considering, however, Horizon's belated arguments to
support its construction of "better dying time" and request for
claim-by-claim construction, the Court comes to the same
conclusion as detailed in the Markman Opinion.  As the Court
summed up its analysis, (1) the specification describes two
different methods for evaluating "better drying time," and the
two methods do not provide consistent results at consistent

times, (2) the claimed results are not seen across all
formulations of the claimed invention, and when "dryness" is
evaluated at any time shorter than four hours, not all
formulations of the claimed invention actually exhibit "better
drying time," and (3) Horizon's expert Dr. Walters' reasoning
does not comport with the plain language of the specification,
and his references to the prosecution history do not provide any
clarity on the appropriate time frame under which to evaluate
the drying rate, while Actavis' expert Dr. Kohn is more
persuasive that a POSA would not know under what standard to
evaluate the drying rate of the claimed invention.  (Docket No.
188 at 26-27.)  Thus, Horizon's requested relief in its motion
for reconsideration, even if granted, does not change the
Court's conclusion.

Putting aside the construction of "better drying time," the
finding that the term "consisting essentially of" is indefinite
is also confirmed by the finding that the stability and
degradation claims are indefinite.  As noted above, one of the
basic and novel properties of Horizon's claimed invention is
"favorable stability."  The Court did not specifically address
this term in the context of assessing the definiteness of the
basic and novel properties, but earlier in the Markman Opinion
the Court extensively analyzed the terms "the topical
formulation produces less than 0.1% impurity A after 6 months at

7

25°C and 60% humidity" and "the formulation degrades by less than 1% over 6 months."  In construing those terms, the Court found that the identity of "impurity A" was unknowable to a reasonable certainty to a POSA.  (Docket No 188 at 7-12.)  The Court further found that the patent did not provide guidance on how to evaluate degradation because it was either equated with "impurity A", which had already been deemed indefinite, or could be determined by multiple methods for how to evaluate stability without further guidance.  (Id. at 7-13.)  Thus, the Court concluded that both terms relating to stability were indefinite.[6]

The finding that the claim terms relating to stability are indefinite renders the claim term "consisting essentially of" indefinite.  This is because the basic and novel property of "favorable stability" is indefinite.  As stated in the Court's Markman Opinion, if a POSA reading the patent would understand the five principles identified by Horizon to be the basic and novel properties of the claimed invention, then once one of them is indefinite, they all become problematic.  (Id. at 27.)  When one property does not have "reasonable certainty," it follows that the group of properties itself does not have the requisite "reasonable certainty."  Consequently, the term "consisting

---

[6] Horizon has not specifically challenged this finding in its motion for reconsideration.

essentially of" must be construed as indefinite due to the inability for a POSA to have "reasonable certainty" about what the basic and novel properties of the invention are, and the POSA would lack "reasonable certainty" about whether an additional ingredient would materially alter the basic and novel properties of the claimed invention. (Id.)  Thus, regardless of the Court's construction of "better drying time," the indefiniteness of the stability terms also warrants the finding that "consisting essentially of" is indefinite.

Finally, with regard to Horizon's argument that the standard for an indefiniteness analysis reiterated by the Supreme Court in Nautilis should not be performed as to the basic and novel properties, the Court stands by its Markman Opinion, which explained why Nautilis should, and does, apply here. (Id. at 17-23.)

Horizon's bases for reconsideration were ably briefed and argued at the January 4, 2017 hearing, such that Horizon persuaded the Court to reconsider its August 17, 2016 Markman Opinion.  But after reconsideration, the Court is not persuaded to disturb the prior result.

An appropriate Order will be entered.


Date:   January 6, 2017             s/ Noel L. Hillman
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

# Addendum 4

March 16, 2017 Opinion and Order, *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories, UT, Inc.,*
14-cv-7992 (D.N.J.)

A40-A61

**CONFIDENTIAL MATERIAL
HAS BEEN OMITTED**

---

HORIZON PHARMA IRELAND
LIMITED, et al.,                    Civil No. 14-7992 (NLH/AMD)

      Plaintiffs,

                       **OPINION**
      v.                 **FILED UNDER SEAL**

ACTAVIS LABORATORIES, UT,
INC., et al.,

          Defendants.

---

**APPEARANCES**:

John E. Flaherty
Ravin R. Patel
McCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ 07102

Robert F. Green
Christopher T. Griffith
Caryn C. Borg-Breen
Benjamin D. Witte
GREEN, GRIFFITH & BORG-BREEN LLP
NBC Tower, Suite 3100
455 North Cityfront Plaza Drive
Chicago, Illinois 60611

Dennis A. Bennett
GLOBAL PATENT GROUP, LLC
1005 North Warson Road, Suite 404
St. Louis, Missouri 63132

    On behalf of Plaintiffs

Liza M. Walsh
Christine I. Gannon
Christopher J. Borchert
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd.

6th Floor
Newark, NJ 07102

Ralph J. Gabric
Mark H. Remus
Laura A. Lydigsen
Joshua E. Ney, Ph.D.
Joshua H. James
Andrew S. McElligott
BRINKS GILSON & LIONE
455 North Cityfront Plaza Drive, Suite 3600
Chicago, Illinois 60611

     On behalf of Defendants

**HILLMAN**, District Judge

     This is a Hatch-Waxman Act[1] action that concerns the

Abbreviated New Drug Application No. 207238 ("ANDA") filed by

Defendant, Actavis Laboratories UT, Inc., for its generic copy

of PENNSAID® 2%. Plaintiff Horizon (Horizon Pharma Ireland

Limited, HZNP Limited and Horizon Pharma USA, Inc.) is the

---

[1]   Prior to 1984, both name-brand and generic drug manufacturers
     were required to go through the same NDA process. That year,
     Congress passed the Drug Price Competition and Patent Term
     Restoration Act, also known as the Hatch-Waxman Act. The Act
     loosened the approval rules for generics by creating an
     Abbreviated New Drug Application ("ANDA") process. The ANDA
     process permits generic drug companies to rely on a name-
     brand drug company's original NDA approval for a particular
     drug in order to gain quicker, less costly FDA approval of a
     generic version of the drug. By enabling generic
     manufacturers to piggy-back on a brand drug's scientific
     studies and the significant costs associated with their NDA,
     Hatch-Waxman speeds the introduction of low-cost generic
     drugs to market, thereby furthering drug competition.

Mylan Pharmaceuticals Inc. v. Warner Chilcott Public Limited
Company, 838 F.3d 421, 427 (3d Cir. 2016) (internal quotations
and citations omitted).

current owner and assignee of the patents-in-issue,[2] and of the
PENNSAID® 2% New Drug Application ("NDA"). PENNSAID® 2%
(hereinafter "PENNSAID") is the first FDA-approved twice-daily
topical diclofenac sodium formulation for the treatment of the
pain of osteoarthritis ("OA") of the knees.

The patents-in-suit fall into two patent families: the '838
formulation patent family and '450 method of treatment patent
family. The current matter before the Court is Actavis's motion
for summary judgment [245] on Horizon's claims that Actavis's
ANDA product, through its package labeling, will, if placed into
the market, infringe on three patents in the '450 method of
treatment patent family.[3] For the reasons expressed below,

---

[2] U.S. Patent Nos. 8,252,838 ("the '838 patent"), 8,563,613 ("the
'613 patent"), 8,871,809 ("the '809 patent"), 9,066,913 ("the
'913 patent"), 9,101,591 ("the '591 patent"), 8,546,450 ("the
'450 patent"), 8,217,078 ("the '078 patent"), 8,618,164 ("the
'164 patent") and 9,132,110 ("the '110 patent").

[3] The FDA will not give final approval to produce a generic
version of a drug that is entitled to non-patent exclusivity
under the Hatch-Waxman Act, and it "cannot authorize a generic
drug that would infringe a patent." In re Modafinil Antitrust
Litigation, 837 F.3d 238, 243 (3d Cir. 2016) (citation omitted).
Brand manufacturers are required to include the patent number
and expiration date of the patent that covers the drug or that
covers a method of using that drug in their NDAs, which are then
published by the FDA in the Orange Book, more formally known as
the Approved Drug Products with Therapeutic Equivalence
Evaluations. Id. (citations omitted). Once a patent has been
listed in the Orange Book, the generic manufacturer is free to
file an ANDA if it can certify that its proposed generic drug
will not actually violate the brand manufacturer's patents. Id.
(citation omitted). Under 21 U.S.C. § 355(j)(2)(A)(vii), there
are four ways in which a generic manufacturer can make this

Actavis's motion will be granted.

## DISCUSSION

### A.  Subject matter jurisdiction

This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, 2202 and 35 U.S.C. § 271.

---

certification: (I) that such patent information has not been filed, (II) that such patent has expired, (III) of the date on which such patent will expire, or (IV) that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted.  An ANDA with a paragraph IV certification may only be filed after the expiration of the fourth year of the New Chemical Entity ("NCE") five-year exclusivity period.  Id. (citing 21 U.S.C. § 355(j)(5)(E)(ii)).  The paragraph IV route automatically counts as patent infringement.  Id. (citing 35 U.S.C. § 271(e)(2)(A)) (quotations and other citations omitted).  As a result, this often "means provoking litigation" instituted by the brand manufacturer.  Id. (citation omitted).  If the brand manufacturer initiates a patent infringement suit, the FDA must withhold approval of the generic for at least 30 months while the parties litigate the validity or infringement of the patent; if the suit has concluded at the end of this 30-month period, then the FDA will follow the outcome of the litigation.  Id. (citations omitted).  In response, an ANDA applicant sued for patent infringement may "assert a counterclaim seeking an order requiring the [brand] to correct or delete the patent information submitted by the [brand] under subsection (b) or (c) [of § 355] on the ground that the patent does not claim either— "(aa) the drug for which the [brand's NDA] was approved; or "(bb) an approved method of using the drug."  21 U.S.C. § 355(j)(5)(C)(ii)(I).  The counterclaim thus enables a generic competitor to obtain a judgment directing a brand to "correct or delete" certain patent information that is blocking the FDA's approval of a generic product.  Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S, 566 U.S. 399, 408–09 (2012)

This action is a "paragraph IV" case, Actavis has asserted counterclaims, and the 30-month period expires on May 14, 2017.

**B. Summary judgment standard**

Summary judgment is appropriate where the Court is satisfied that the materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations, admissions, or interrogatory answers, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986); Fed. R. Civ. P. 56(a).

**C. Analysis**

The '450, '078, and '110 patents-in-suit are all from the same method patent family and share substantially similar specifications. The particular claims at issue are: '450 patent, claims 10, 11, 15, 17; '078 patent, claim 14; '110 patent, claims 3, 11, 13.

Horizon alleges that Actavis's ANDA product would improperly induce infringement of its patents in violation of 35 U.S.C. § 271(b), which states, "Whoever actively induces infringement of a patent shall be liable as an infringer." Specifically, Horizon alleges that the FDA-approved use of PENNSAID and the use sought by Actavis is the same use that is claimed in Horizon's '450, '078, and '110 patents. Horizon further claims that Actavis's proposed labeling for its generic version of PENNSAID constitutes an instruction, encouragement,

or recommendation to practice the methods of Horizon's '450,
'078, and '110 patents, and the labeling therefore constitutes
induced infringement.  Actavis argues that it is entitled to
summary judgment on these allegations because Horizon cannot
demonstrate Actavis's specific intent to induce infringement.
Actavis also contends that Horizon cannot refute that its
labeling does not induce infringement because its claimed method
is different from the methods claimed in Horizon's patents.

In order to determine whether Actavis's labeling induces a
use of its product that infringes on Horizon's method patents,
the Court must first look to the relevant claims in the method
patents.

### '450 patent

10. A method for applying topical agents to a knee of a patient with pain, said method comprising:

applying a first medication consisting of a topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient, wherein the topical diclofenac preparation comprises a therapeutically effective amount of a diclofenac salt and 40- 50% w/w dimethyl sulfoxide;

waiting for the treated area to dry;

subsequently applying a sunscreen, or an insect repellant to said treated area after said treated area is dry, wherein said step of applying a first medication does not enhance the systemic absorption of the subsequently applied sunscreen, or insect repellant;

and wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation.

### '078 patent

14. A method for applying topical agents to a knee of a patient with pain, said method comprising:

applying a first medication consisting of a topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient, wherein the topical

diclofenac preparation comprises a therapeutically effective amount of diclofenac and 40-50% w/w dimethyl sulfoxide;

waiting for the treated area to dry; and

subsequently applying a second medication consisting of a topical medication, which is other than said first medication and comprises a corticosteroid, to said treated area after said treated area is dry, wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation.

'110 patent

1. A method for applying topical agents to a knee of a patient with pain, the method comprising:

(a) a patient obtaining a topical diclofenac preparation;

(b) the patient being informed to:

i) apply a first medication consisting of the topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient, wherein the topical diclofenac preparation comprises a therapeutically effective amount of diclofenac, or a pharmaceutically acceptable salt thereof, and 40-50% w/w dimethyl sulfoxide;

ii) wait for the treated area to dry;

iii) subsequently apply a sunscreen, an insect repellant or a second medication consisting of a topical medication, which is other than said first medication, to said treated area after said treated area is dry, wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation, and then

(c) the patient carrying-out steps i-iii as informed.

3. The method according to claim 1, wherein said therapeutically effective amount of diclofenac, or a pharmaceutically acceptable salt thereof, is 2% w/w diclofenac sodium.

10. A method for applying topical agents to a knee of a patient with pain, said method comprising:

(a) providing a topical diclofenac preparation;

(b) providing information to:

i) apply a first medication consisting of the topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient, wherein the topical diclofenac preparation comprises a therapeutically effective amount of diclofenac, or a pharmaceutically acceptable salt thereof, and 40-50% w/w dimethyl sulfoxide;

ii) wait for the treated area to dry;

iii) subsequently apply a sunscreen, an insect repellant or a second medication consisting of a topical medication, which is other than said first medication, to said treated area after said treated area is dry, wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation, and then

(c) the patient conducting steps i-iii in accordance with published material.

11. The method according to claim 10, wherein said therapeutically effective amount of diclofenac is 2% w/w diclofenac sodium.

12. A method for applying topical agents to a knee of a patient with pain, said method comprising:

(a) providing a topical diclofenac preparation to the patient;

    (b) informing the patient to:

i) apply a first medication consisting of the topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient, wherein the topical diclofenac preparation comprises a therapeutically effective amount of diclofenac, or a pharmaceutically acceptable salt thereof, and 40-50% w/w dimethyl sulfoxide;

ii) wait for the treated area to dry;

iii) subsequently apply a sunscreen, an insect repellant or a second medication consisting of a topical medication, which is other than said first medication, to said treated area after said treated area is dry, wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation, and then

(c) administering the first medication to the knee conducting steps i-iii in accordance with a medium providing information.

13. The method according to claim 12, wherein said therapeutically effective amount of diclofenac is 2% w/w diclofenac sodium.

(Docket No. 246 at 11.)

    Next, the Court must consider the package labeling.  The

relevant portions of Horizon's label provides:

-----------------------------INDICATIONS AND USAGE --------------------------

PENNSAID is a nonsteroidal anti-inflammatory drug indicated for the treatment of the pain of osteoarthritis of the knee(s). (1)

------------------------ DOSAGE AND ADMINISTRATION --------------------

Use the lowest effective dosage for the shortest duration consistent with individual patient treatment goals.

The recommended dose is 2 pump actuations on each painful knee, 2 times a day. (2)

- Apply PENNSAID, to clean, dry skin. (2.1)
- Dispense 40 mg (2 pump actuations) directly onto the knee or first into the hand and then onto the knee. Spread evenly around front, back and sides of the knee. (2.1)
- Wash hands completely after administering the product. (2.2)
- Wait until the area is completely dry before covering with clothing or applying sunscreen, insect repellent, cosmetics, topical medications, or other substances. (2.2)
- Until the treated knee(s) is completely dry, avoid skin-to-skin contact between other people and the treated knee(s). (2.2)
- Do not get PENNSAID in your eyes, nose, or mouth (2.2).

## 2 DOSAGE AND ADMINISTRATION

### 2.1 General Dosing Instructions

Use the lowest effective dosage for the shortest duration consistent with individual patient treatment goals [see *Warnings and Precautions (5.2)*].

For relief of the pain of osteoarthritis (OA) of the knee(s), the recommended dose is 40 mg of diclofenac sodium (2 pump actuations) on each painful knee, 2 times a day.

Apply PENNSAID to clean, dry skin.

The pump must be primed before first use. Instruct patients to fully depress the pump mechanism (actuation) 4 times while holding the bottle in an upright position. This portion should be discarded to ensure proper priming of the pump. No further priming of the bottle should be required.

After the priming procedure, PENNSAID is properly dispensed by completely depressing the pump 2 times to achieve the prescribed dosage for one knee. Deliver the product directly into the palm of the hand and then apply evenly around front, back, and sides of the knee.

Application of PENNSAID in an amount exceeding or less than the recommended dose has not been studied and is therefore not recommended.

### 2.2 Special Precautions

- Avoid showering/bathing for at least 30 minutes after the application of PENNSAID to the treated knee.
- Wash and dry hands after use.
- Do not apply PENNSAID to open wounds.
- Avoid contact of PENNSAID with eyes and mucous membranes.
- Do not apply external heat and/or occlusive dressings to treated knees.
- Avoid wearing clothing over the PENNSAID-treated knee(s) until the treated knee is dry.
- Protect the treated knee(s) from natural and artificial sunlight.
- Wait until the treated area is dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID.
- Until the treated knee(s) is completely dry, avoid skin-to-skin contact between other people and the treated knee(s).
- Do not use combination therapy with PENNSAID and an oral NSAID unless the benefit outweighs the risk and conduct periodic laboratory evaluations.

(Docket No. 255 at 11-12.)

The primary language in dispute is, "Wait until the area is completely dry before covering with clothing or applying sunscreen, insect repellant, cosmetics, topical medications, or other substances" and "Wait until the treated area is dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID."

Federal law prevents generic drug manufacturers from

changing their labels. Mutual Pharmaceutical Co., Inc. v. Bartlett, 133 S. Ct. 2466, 2476 (U.S. 2013) (21 U.S.C. § 355(j)(2)(A)(v) ("[T]he labeling proposed for the new drug is the same as the labeling approved for the [approved brand-name] drug.") (other citations omitted). ████████████████

████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████

    With the patent claims and the product labeling in mind, the Court must now determine whether Actavis's proposed labeling would induce a patient[4] to infringe on Horizon's patents.[5] The

---

[4] A party being induced to infringe a patent may be, among others, the patient using the drug, a doctor prescribing the drug, or a pharmacist who advises a customer on how to use the drug. For simplicity, the Court will refer to "the patient" as the alleged induced party.

[5] Actavis argues that judgment should be entered in its favor because Horizon has not shown that any acts of infringement have actually occurred as a result of Actavis's label. Such evidence would be an impossibility at this time because Actavis's ANDA product has not yet been approved for the public. The Federal Circuit has explained that 35 U.S.C. § 271(e)(2)(A)

    provides an "artificial" act of infringement that creates case-or-controversy jurisdiction to enable the resolution of an infringement dispute before the ANDA applicant has actually made or marketed the proposed product. Once jurisdiction is established, however, the substantive determination whether actual infringement or inducement will take place is determined by traditional patent infringement analysis, just the same as it is in other infringement suits, including those in a non-ANDA context,

Federal Circuit has set forth the analysis of a § 271(b) induced

infringement claim in the context of ANDA proposed package

labeling:

> The sale of a lawful product by lawful means, with the
> knowledge that an unaffiliated, third party may infringe,
> cannot, in and of itself, constitute inducement of
> infringement.  The accused infringer must have knowingly
> aided and abetted direct infringement. . . .  [T]here is no
> indirect infringement when a defendant merely sells a
> commercial product suitable for some lawful use.
> Infringement only exists where there is evidence that goes
> beyond a product's characteristics or the knowledge that it
> may be put to infringing uses.  Inducement can be found
> where there is evidence of active steps taken to encourage
> direct infringement, which can in turn be found in
> advertising an infringing use or instructing how to engage
> in an infringing use.  But such instructions need to
> evidence intent to encourage infringement.  The question is
> not just whether instructions describe the infringing mode,
> but whether the instructions teach an infringing use of the
> device such that we are willing to infer from those
> instructions an affirmative intent to infringe the patent.
> Merely describing an infringing mode is not the same as
> recommending, encouraging, or promoting an infringing use,
> or suggesting that an infringing use should be performed.

Takeda Pharmaceuticals U.S.A., Inc. v. West-Ward Pharmaceutical

Corp., 785 F.3d 625, 630-31 (Fed. Cir. 2015) (internal

quotations, alterations, and citations omitted).  With regard to

---

> the only difference being that the inquiries now are
> hypothetical because the allegedly infringing product has
> not yet been marketed.  The plain language of 35 U.S.C. §
> 271(e)(2)(A) does not alter a patentee's burden of proving
> infringement.  The proper inquiry under § 271(e)(2)(A) is
> whether, if a particular drug were put on the market, it
> would infringe the relevant patent.

Warner-Lambert Co. v. Apotex Corp., 316 F.3d 1348, 1365-66 (Fed.
Cir. 2003) (internal citations omitted).

finding specific intent, the question is not whether a patient
following the instructions on the packaging may end up using the
medication in an infringing way, but rather whether the proposed
label instructs the patient to perform the patented method.
AstraZeneca LP v. Apotex, Inc., 633 F.3d 1042, 1060 (Fed. Cir.
2010) (citing Vita-Mix Corp. v. Basic Holding, Inc., 581 F.3d
1317, 1329 n.2 (Fed. Cir. 2009)); Warner-Lambert Co. v. Apotex
Corp., 316 F.3d 1348, 1365 (Fed. Cir. 2003) ("[W]here a product
has substantial noninfringing uses, intent to induce
infringement cannot be inferred even when the [alleged inducer]
has actual knowledge that some users of its product may be
infringing the patent."). Thus, Horizon has the burden of
proving that Actavis's instructions in its proposed package
labeling teach an infringing method of applying its ANDA product
such that those instructions infer Actavis's affirmative intent
to infringe Horizons' patents.

Actavis argues that its labeling does not compel
infringement because Horizon's patents present three methods by
which PENNSAID must be applied, and those methods are different
from its method.

Horizon's methods instruct:

(1) apply medication to the knee;

(2) wait for treated area to dry; and

(3) subsequently apply sunscreen or insect repellant (`450

patent)

(3) subsequently apply a second medication consisting of a topical medication (`078 patent)

(3) subsequently apply a sunscreen, an insect repellant or a second medication consisting of a topical medication (`110 patent).

Actavis contends that these three steps are required when applying PENNSAID in accordance with the methods claimed in Horizon's patents. Actavis states that its ANDA product only requires steps one, and it does not require the subsequent application of sunscreen, insect repellant, or a second topical medication. Actavis argues that its package labeling does not induce infringement, therefore, because the language ▊▊▊▊

▊▊▊▊▊▊▊▊▊▊

▊▊▊▊▊▊ ▊▊▊▊▊ ▊▊▊ ▊▊

▊▊▊▊ ▊▊▊▊▊▊▊ is a warning that may or may not implicate steps two and three. In other words, Actavis argues that the label contemplates an "if/then" scenario: If a patient wants to cover the treated area with clothing or wishes to apply sunscreen, insect repellant, cosmetics, topical medications, or any other substance to the treated area, then the patient should wait until the treated area is dry. Actavis argues that unlike the methods claimed in Horizon's patents, the patient using Actavis's ANDA product is not required by its

label or its ANDA product's claimed methods to do any of these things if the patient does not wish to do them.

In response, Horizon argues that step three is not required by its patents – i.e., its patents do not require that a patient must apply sunscreen or insect repellant or a second topical medication. Horizon contends that the only reason those three items are specified in its method patents' claims is because of the treated area's increased photosensitivity (hence the need for sunscreen), and to prevent PENNSAID from "dragging in" to the patient's skin dangerous pesticides or another topical medication. Horizon further argues that Actavis's labeling will induce infringement because inevitably at some point in time a patient will want to apply sunscreen, insect repellant, or a second topical medication to the treated area. When that patient does so in accordance with Actavis' package labeling, Horizon contends that Actavis has induced that patient to infringe on Horizon's patents.

When a generic version's package labeling is required to be materially identical to the brand's, it would seem difficult for a generic's proposed ANDA labeling to escape a claim of induced infringement unless the brand's underlying patent claims are deemed invalid or determined to be distinguishable from the ANDA product's claims. The issue of invalidity is not currently

before the Court,[6] but a construction of Horizon's method claims strongly suggests that those claims require the post-PENNSAID application of sunscreen, insect repellant, or a second topical medication. The Court does not need to directly rule on either of these issues in order to resolve Actavis's motion for summary judgment, however, because Horizon has not met its burden to show that Actavis's label recommends, encourages, or promotes a use of its ANDA product with the intent to directly infringe on Horizon's claimed methods.

Illustrative are two cases that analyzed similar arguments presented in this action. In one case, the brand patent holder alleged that the generic's ANDA product labeling constituted a violation of 35 U.S.C. § 271(b) because it would induce a patient to directly infringe on the brand's method patent claim, which provided, "A method of treating an adult subject having attention deficit hyperactivity disorder, said method comprising orally administering to said subject a pharmaceutically effective amount of L-lysine-d-amphetamine or a pharmaceutically acceptable salt thereof with intake of food by said subject." Shire LLC v. Amneal Pharmaceuticals, LLC, 2014 WL 2861430, at *5 (D.N.J. 2014), affirmed in part, reversed in part and remanded

_____

[6] Actavis contends that the method claims in Horizon's patents are invalid due to obviousness. That issue is to be decided during a bench trial before this Court.

on other grounds, 802 F.3d 1301 (Fed. Cir. 2015).  The proposed

product label provided that the medication was to be taken "with

or without food," and the brand claimed that the generic label

would induce infringement of its claim that the medication was

to be "with intake of food."  The court rejected the brand's

argument:

> The problem is that the statement that the medication may
> be taken with or without food cannot be reasonably
> understood to be an instruction to engage in an infringing
> use.  As Defendants contend, it is indifferent to which
> option is selected.  At most, it may be understood to
> permit an infringing use, but permission is different from
> encouragement.  Plaintiffs point to the statements of their
> expert, . . . but none of his conclusory assertions get
> around the simple fact that the proposed label does not
> contain any instruction to take the medication with food.
> Plaintiffs have failed to raise a material factual dispute
> over whether the proposed label encourages infringement of
> method claims requiring administration with food.

Shire, 2014 WL 2861430, at *5.

Similarly, the court in In re Depomed Patent Litigation,

2016 WL 7163647, at *58 (D.N.J. 2016) was tasked with

determining whether the generic's proposed ANDA product label

would induce a party to infringe on the brand's method patent

claim, which provided, "1. A method of treating polyneuropathic

pain in a subject suffering therefrom, said method comprising

administering to said subject an effective polyneuropathic pain

inhibiting amount of (1R,2R)-3-(3-dimethylamino-1-ethyl-2-

methyl-propl)phenol or a pharmaceutically acceptable salt

thereof."  The proposed label provided, "Tapendadol extended-

release is an opioid agonist indicated for the management of:
Pain severe enough to require daily, around-the-clock, long-term
opioid treatment and for which alternative treatment options are
inadequate." In re Depomed Patent Litigation, 2016 WL 7163647,
at *59.

The brand argued that the generic specifically intended for
its product to be used to treat polyneuropathic pain, because
polyneuropathic pain often manifests as severe chronic pain and
that it is likely that some doctors, pharmacists, and patients
will use the generic's ANDA product to treat polyneuropathic
pain. Id. The court found that the brand could not meet its
burden on induced infringement, explaining:

> As the instruction in [the generic's] label only instructs
> the user to administer the drug to treat severe chronic
> pain, which undisputedly includes nociceptive pain, it
> cannot reasonably be understood to be an instruction to
> engage in the infringing use of administering the drug to
> treat polyneuropathic pain. Thus, even if the label
> permits administration for polyneuropathic pain, permission
> is different from encouragement.
>
> Plaintiffs rely heavily on the language of the Federal
> Circuit in AstraZeneca LP v. Apotex, Inc., where the court
> stated: "[T]he district court found that [the defendant]
> had the requisite specific intent to induce infringement
> because [the defendant] included instructions in its
> proposed label that will cause at least some users to
> infringe the asserted method claims." 633 F.3d, 1042, 1060
> (Fed. Cir. 2010). Plaintiffs contend that [the generic's]
> label fits this description. However, even if "some users"
> may use [the generic's] product to treat polyneuropathic
> pain in a way that infringes, . . . the Court does not
> agree that [the generic's] label "includes instructions . .
> . that will cause" those users to infringe. In Apotex, the
> court determined that following the label instruction to

"titrat[e] down from the recommended starting doses would necessarily lead to [the infringing] once-daily usage." Here, on the other hand, doctors can and likely will follow the instructions on [the generic's] label to prescribe [the generic's] product for noninfringing purposes, such as treating nociceptive and mononeuropathic pain. Furthermore, to the extent doctors prescribe [the generic's] product for infringing polyneuropathic pain treatments, it will not be because they have been encouraged by [the generic's] label to do so.

Id. at *63–64 (some internal and other citations omitted).

Just like the generic's labeling in Shire and In re Depomed, no evidence in this case demonstrates that Actavis's proposed label does more than simply permit, rather than require or direct, the post-product application of sunscreen, insect repellant, or a second topical medication. While both labels direct the application of the product, what the label instructs the patient to do after the product is applied is much broader than the claims in Horizon's patents.



Horizon's claims only concern the method of the post-PENNSAID application of sunscreen, insect repellant, and other topical medications.

Although               **REDACTED**

in the proposed label may be

understood to permit an infringing use, and accepting that it is
inevitable that at some point a patient will ███████████████

███████████████ after using the ANDA product, that permission
does not amount to encouragement because ███████████████

███████████████ of what a patient might wish to apply to his knee
after treatment, if anything is to be applied at all.  The
medical reason for specifying ████████████ ███████████████ ███

███████████████████████ is important, but the post-treatment
application of clothing, water, lotions, cosmetics, and any
other substances before the area is dry ostensibly has other
medical implications.  Horizon, however, has only claimed the
application of its product in connection with the subsequent
application of "sunscreen, insect repellant, and other topical
medications," which is a different method than the post-
treatment application of nothing, or the application of anything
else.[7]

In short, no material disputed facts exist as to whether
the proposed product label recommends, encourages, or promotes
an infringing use, or suggests that an infringing use should be

---

[7] Horizon argues that Actavis could have avoided infringement if
███████████████████████████████████████████████ was
replaced by an instruction prohibiting application of any other
topical agent. (Br. 28.)  The suggestion that Horizon's claims
cover all "subsequent topical agents" appears too broad.

performed. The proposed product label directs a patient on how to apply the ANDA product, and provides guidance to the patient on how to proceed from there if he wishes to have anything else come in contact with is knee afterward. Actavis's proposed product label does not constitute induced infringement in violation of 35 U.S.C. § 271(b).

**CONCLUSION**

For the foregoing reasons, Actavis's motion for summary judgment on Horizon's claims that Actavis's proposed ANDA product label induces infringement of Horizon's '450, '078, and '110 patents under 35 U.S.C. § 271(b) must be granted. An appropriate Order will be entered following oral argument on Tuesday, March 21, 2017 regarding the parties' differing positions on when the Order on this motion, as well as other Court Orders, shall be docketed.

This Opinion shall remain under seal until the resolution of the parties' consolidated motion to seal their submissions relating to Actavis's motion for summary judgment. In their motion to seal, the parties shall indicate which, if any, portions of this Opinion should be redacted in accordance with Local Civil Rule 5.3.

Date: ___March 16, 2017___          ___s/ Noel L. Hillman___
At Camden, New Jersey              NOEL L. HILLMAN, U.S.D.J.

HORIZON PHARMA IRELAND
LIMITED, et al.,                          Civil No. 14-7992 (NLH/AMD)

            Plaintiffs,

                        **ORDER**

    v.

ACTAVIS LABORATORIES, UT,
INC., et al.,

            Defendants.

    For the reasons expressed in the Court's Opinion filed today,

    IT IS on this   16th   day of   March  , 2017

    ORDERED that entry of the Order resolving the MOTION for Summary Judgment by ACTAVIS LABORATORIES, UT, INC. [245] be, and the same hereby is, CONTINUED pending oral argument on Tuesday, March 21, 2017 regarding the parties' differing positions on when the Order on this motion should be entered.

                                     s/ Noel L. Hillman
At Camden, New Jersey         NOEL L. HILLMAN, U.S.D.J.

# Addendum 5

May 23, 2017 Final Judgment, *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories, UT, Inc.,*
14-cv-7992 (D.N.J.)

A62-A64

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HORIZON PHARMA IRELAND LIMITED, HZNP LIMITED and HORIZON PHARMA USA, INC.,<br><br>*Plaintiffs,*<br><br>v.<br><br>ACTAVIS LABORATORIES UT, INC.,<br><br>*Defendant.* | Civil Action No. 1:14-cv-07992; 1:15-cv-07742; 1:16-cv-00645-NLH-AMD |

## FINAL JUDGMENT

This matter having been tried before this Court from March 21, 2017 through March 30, 2017, the Court having heard testimony on behalf of Plaintiffs Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma USA, Inc. ("Plaintiffs"), and Defendant Actavis Laboratories UT, Inc. ("Defendant"), the Court having considered the written post-trial submissions of the parties, and the Court having issued its Opinion on May 12, 2017 (Dkt. 371);

The Court having held *Markman* hearings on March 3, 2016 and June 7, 2016, the Court having considered the written submissions of the parties, and the Court having issued Opinions and Orders on August 17, 2016 (Dkts. 188, 189) and January 6, 2017 (Dkt. 234);

The Court having received Defendant's Motion for Summary Judgment of Non-Infringement of U.S. Patent Nos. 8,217,078, 8,546,450, and 9,132,110 (Dkt. 245), the Court having considered the written submissions of the parties, and the Court having issued an Opinion granting Defendant's Motion for Summary Judgment on March 16, 2017 (Dkt. 300);

**IT IS ORDERED AND ADJUDGED**, for the reasons set forth in the Court's Opinion dated May 12, 2017, that Judgment is entered in favor of Plaintiffs and against Defendant on all claims and counterclaims regarding the validity of claim 12 of U.S. Patent No. 9,066,913;

**IT IS ORDERED AND ADJUDGED**, pursuant to the Stipulation And Order Regarding Infringement (Dkt. 233), that the use, offer for sale, or sale of Actavis' ANDA Product (*i.e.*, the generic version of PENNSAID® 2% that is the subject of Actavis' ANDA No. 207238, submitted under 35 U.S.C. § 271(e)(2)(A)) within the United States or administration of Actavis' ANDA Product for the treatment of the pain of osteoarthritis of the knee(s) according to its prescribing information within the United States would infringe claim 12 of U.S. Patent No. 9,066,913;

**IT IS ORDERED AND ADJUDGED**, for the reasons set forth in the Court's Opinions dated August 17, 2016 and January 6, 2017 (Dkts. 188, 189, 234), that Judgment is entered in favor of Defendant and against Plaintiffs on all claims and counterclaims regarding the invalidity of claims 49-52 and 55-61 of U.S. Patent No. 8,252,838, claims 1-5, 9-19, and 22-24 of U.S. Patent No. 8,563,613, claim 4 of U.S. Patent No. 9,066,913, claims 10-15, 17, 19, 24, and 25 of U.S. Patent No. 9,101,591, claims 2-5 and 8-11 of U.S. Patent No. 9,168,304, claims 2-5 and 9-12 of U.S. Patent No. 9,168,305, and claims 2-5 and 9-12 of U.S. Patent No. 9,220,784;

**IT IS ORDERED AND ADJUDGED**, for the reasons set forth in the Court's Opinion dated March 16, 2017 (Dkt. 300), that Judgment is entered in favor of Defendant and against Plaintiffs on all claims and counterclaims regarding the noninfringement of claims 10, 11, 15, and 17 of U.S. Patent No. 8,546,450, claim 14 of U.S. Patent No. 8,217,078, and claims 3, 11, and 13 of U.S. Patent No. 9,132,110; and

**APPX63**

**IT IS ORDERED AND ADJUDGED**, that all claims for infringement of any claim of the following patents that is not expressly enumerated above are dismissed with prejudice: U.S. Patent Nos. 8,217,078; 8,252,838; 8,546,450; 8,563,613; 8,618,164; 8,871,809; 9,066,913; 9,101,591; 9,132,110; 9,168,304; 9,168,305; and 9,220,784;

**IT IS ORDERED AND ADJUDGED**, that all counterclaims for any claim of the following patents that is not expressly enumerated above are dismissed without prejudice: U.S. Patent Nos. 8,217,078; 8,252,838; 8,546,450; 8,563,613; 8,618,164; 8,871,809; 9,066,913; 9,101,591; 9,132,110; 9,168,304; 9,168,305; and 9,220,784;

**ORDERED** that, pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any final approval by the United States Food and Drug Administration ("FDA") of Defendant's ANDA No. 207238 shall be a date which is not earlier than the expiration of U.S. Patent No. 9,066,913, or any later expiration or exclusivity to which Plaintiffs are or become entitled; and it is further,

**ORDERED** that, pursuant to 35 U.S.C. § 271(e)(4)(B), Defendant and its officers, agents and employees, and those acting in privity or in concert with any of them, and their successors and assigns, are enjoined from engaging in the commercial use, offer for sale or sale within the United States, of products that are the subject of Actavis' ANDA No. 207238 until the expiration of U.S. Patent No. 9,066,913.

Dated this 22 day of May, 2017

Honorable Noel L. Hillman
United States District Court Judge

**APPX64**

# Addendum 6

U.S. Patent No. 8,217,078

A65-A119



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 27, 2015

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,217,078*
ISSUE DATE: *July 10, 2012*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. R. GRANT
Certifying Officer

HZNPENN_00000198

**APPX65**

US008217078B1

(12) **United States Patent**     (10) Patent No.:   **US 8,217,078 B1**

Singh et al.     (45) **Date of Patent:**   *Jul. 10, 2012

(54) **TREATMENT OF PAIN WITH TOPICAL DICLOFENAC**

(75) Inventors: **Jagat Singh**, Scarborough (CA); **Joseph Zev Shainhouse**, North York (CA); **Bradley S. Galer**, West Chester, PA (US); **Robert Dominic King-Smith**, San Diego, CA (US); **Lisa Marie Grierson**, Richmond Hill (CA); **Maria Burian**, Stolberg (DE); **Jonathan Wilkin**, Columbus, OH (US); **Edward T. Kisak**, San Diego, CA (US); **John M. Newsam**, La Jolla, CA (US)

(73) Assignee: **Nuvo Research Inc.**, Mississauga (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **12/914,867**

(22) Filed: **Oct. 28, 2010**

**Related U.S. Application Data**

(63) Continuation of application No. 12/660,865, filed on Mar. 4, 2010, which is a continuation-in-part of application No. 12/459,998, filed on Jul. 10, 2009.

(60) Provisional application No. 61/211,600, filed on Mar. 31, 2009.

(51) Int. Cl.
| A01N 37/12 | (2006.01) |
| A01N 37/44 | (2006.01) |
| A01N 37/10 | (2006.01) |
| A01N 41/10 | (2006.01) |
| A61K 31/195 | (2006.01) |
| A61K 31/19 | (2006.01) |
| A61K 31/10 | (2006.01) |
| C07C 229/00 | (2006.01) |
| C07C 315/00 | (2006.01) |
| C07C 317/00 | (2006.01) |

(52) **U.S. Cl.** ........ 514/561; 514/568; 514/708; 562/433; 568/27

(58) **Field of Classification Search** .................. 514/561, 514/568, 708; 562/433; 568/27
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 4,441,739 A | 4/1984 | Cluff et al. |
| 2004/0175415 A1 | 9/2004 | Chan et al. |
| 2008/0300311 A1 | 12/2008 | Kisak et al. |
| 2009/0131447 A1 | 5/2009 | Kamboj et al. |

FOREIGN PATENT DOCUMENTS

| WO | WO 2007016766 A1 * | 2/2007 |
| WO | WO 2010/060798 A1 | 6/2010 |

OTHER PUBLICATIONS

Popovich et. al., Remington: The Science and Practice of Pharmacy, 2005, Lippincott, Williams & Wilkins, 21st ed., p. 2033.*

Heyneman et. al., Drugs, 2000, Adis International Limited, vol. 60, issue 3, pp. 555-574.*

Bookman et al.; An article entitled "Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial." Canadian Medical Journal 2004; 171(4), 333-338. Retrieved from the Internet: http://canadianmedicaljournal.ca/cgi/reprint/171/4/333.

Towheed; An article entitled "Pennsaid® Therapy for Osteoarthritis of the Knee: A Systematic Review and Metaanalysis of Randomized Controlled Trials." The Journal of Rheumatology 2006, 33(3), 567-573.

Towheed; An article entitled "Published meta-analyses of pharmacological therapies for osteoarthritis". Osteoarthritis and Cartilage 2002, 10, 836-837.

Tug Well et al.; An article entitled "Equivalence Study of a Topical Diclofenac Solution (Pennsaid®) Compared with Oral Diclofenac in Symptomatic Treatment of Osteoarthritis of the Knee: A Randomized Controlled Trial." The Journal of Rheumatology 2004; 31(10), 2002-2012.

Roth et al.; An article entitled "Efficacy and Safety of a Topical Diclofenac Solution (Pennsaid) in the Treatment of Primary Osteoarthritis of the Knee." Arch Intern Med. 2004, 164, 2017-2023.

Hui et al.; An article entitled "In Vivo Bioavailability and Metabolism of Topical Diclofenac Lotion in Human Volunteers." Pharmaceutical Research 1998, 15(10), 1589-1595.

Hewitt et al.; An article entitled "In Vitro Cutaneous Disposition of a Topical Diclofenac Lotion in Human Skin: Effect of a Multi-Dose Regimen." Pharmaceutical Research 1998, 15(7), 988-992.

Shainhouse; An article entitled "OARSI guidelines for hip and knee OA: deciphering the topical drug melange." Osteoarthritis Cartilage, 2008, 16(12), 1586-7.

An article entitled "Other articles noted" by Evidence-Based Medicine, 2005, 10, 63-64.

Shainhouse et al.; An article entitled "A Long-Term, Open-Label Study to Confirm the Safety of Topical Diclofenac Solution Containing Dimethyl Sulfoxide in the Treatment of the Osteoarthritic Knee." American Journal of Therapeutics 0, 000-000 (2010). Simon et al.; An article entitled "Efficacy and safety of topical diclofenac containing dimethyl sulfoxide (DMSO) compared with those of topical placebo, DMSO, vehicle and oral diclofenac for knee osteoarthritis." Pain, 2009, 143(3), 238-45.

Lin et al.; An article entitled "Efficacy of topical nonsteroidal antiinflammatory drugs in the treatment of osteoarthritis: meta-analysis of randomized controlled trials." BMJ 2004, 329(7461), ff.

Ozguney; An article entitled "An alternative topical treatment of osteoarthritis of the knee with cutaneous diclofenac solution." Expert Opinion on Pharmacotherapy 2008, 9(10), 1805-1816.

Baer et al.; An article entitled "Treatment of osteoarthritis of the knee with a topical diclofenac solution: a randomized controlled, 6-week trial [ISRCTN53366886]" BMC Musculoskeletal Disorders 2005, 6:44, Aug. 8, 2005. Retrieved from the Internet: http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1201146/pdf/1471-2474-6-44.pdf.

Galer et al.; An article entitled "Use of Topiceuticals (Topically Applied, Peripherally Acting Drugs) in the Treatment of Chronic Pain." Current Drug Therapy 2006, 1(3), 273-282.

(Continued)

*Primary Examiner* — Sreeni Padmanabhan

*Assistant Examiner* — Sarah Pihonak

(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

The field involves compositions useful for pain relief, including diclofenac solution and gel formulations, in particular methods of use thereof. articles of manufacture and kits that provide novel preclinical, clinical and other information to users.

**15 Claims, 10 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000199

APPX66

## OTHER PUBLICATIONS

Moen; An article entitled "Topical Diclofenac Solution." Drugs, 2009, 69(18), 2621-32. Retrieved from the Internet: http://www.ncbi.nlm.nih.gov/pubmed/19943711.

"Product Monograph, PR Pennsaid®"; Dimethaid Health Care Ltd, Oct. 20, 2003. Retrieved from the Internet: http://www.osteo-arthritis.org/downloads/Pennsaid_HCP_Mono.pdf.

Nelson et al.; An article entitled "Phase IV, open-label assessment of the treatment of actinic keratosis with 3.0% diclofenac sodium topical gel (Solaraze™)." Journal of Drugs in Dermatology 2004,3(4), 401ff.

Novartis Consumer Health, Inc.; Prescribing Information of Voltaren® Gel; pp. 1-23; revised Jul. 2009.

S. Baboota, et al.; Formulation and Evaluation of Once-a-Day Transdermal Gels of Diclofenac Diethylamine; Methods and Findings in Experimental and Clinical Pharmacology; 2006; 109-114; Thomson Reuters, New York.

Anchordoguy, T.J., "Temperature-dependent perturbation of phospholipid bilayers by dimethylsulfoxide," Biochimica et Biophysica Acta, 1104:117-122, 1992.

Anigbogu, A.N.C. et al., "Fourier transform Raman spectroscopy of interactions between the penetration enhancer dimethyl sulfoxide and human stratum corneum," International Journal of Pharmaceutics, 125:265-282, 1995; Mak Declaration: Exhibit A2; Wilkin Declaration: Exhibit A2.

Argoff, Charles E., M.D., Declaration under 37 CFR 1.132, 6 pages, executed Feb. 6, 2012.

Argoff, Charles E., M.D., Professor of Neurology, Albany Medical College, Director, Comprehensive Pain Program, Curriculum Vitae, 35 pages; Argoff Declaration: Exhibit C1, Feb. 6, 2012.

Barry, B.W., "Mode of action of penetration enhancers in human skin," Journal of Controlled Release, 6:85-97, 1987.

Baynes, R.E. and Riviere, J.E., "Influence of inert ingredients in pesticide formulations on dermal absorption of carbaryl," Am. J. Vet. Res., 59:168-175, 1998.

Baynes, R.E. et al., "The influence of diethyl-m-toluamide (DEET) on the percutaneous absorption of permethrin and carbaryl," Toxicology and Applied Pharmacology, 144:332-339, 1997.

Büyüktimkin, N. et al., "Chemical means of transdermal drug permeation enhancement," Chapter 11 of Transdermal and Topical Drug Delivery Systems, Tapash K. Ghosh et al., eds., pp. 357 and 404-407, 1997.

Carter-Horner Corp., "Kemsol®, Dimethylsulfoxide, Scleroderma Therapy," in 2000 Compendium of Pharmaceuticals and Specialties (CPS), Louise Wellbanks et al., eds., Canadian Pharmacists Association, Ontario, Canada, p. 804, 2000.

Dimethaid Research Inc., Product Monograph: PrPennsaid® (1.5% w/w diclofenac sodium solution), 41 pages, Dimethaid Health Care Ltd., Ontario, Canada, 2003; Wilkin Declaration: Exhibit A8; Argoff Declaration: Exhibit C2.

Drug and Therapeutic Information, Inc., "A further warning on DMSO," The Medical Letter on Drugs and Therapeutics, vol. 7, No. 20, Issue 175, p. 80, 1965.

Drug and Therapeutic Information, Inc., "Dimethyl Sulfoxide (DMSO)," The Medical Letter on Drugs and Therapeutics, vol. 7, No. 11, Issue 166, pp. 42-44, 1965.

FDA's guidelines for inactive ingredients for Jan. 2010, 1 page, 2010; Wilkin Declaration: Exhibit A9.

FDA's guidelines for inactive ingredients for Jun. 2010, 1 page, 2010; Wilkin Declaration: Exhibit A10.

Fluhr, J.W. et al. "Transepidermal water loss reflects permeability barrier status: validation in human and rodent in vivo and ex vivo models," Experimental Dermatology. 15:483-492, 2006; Mak Declaration: Exhibit B4.

G.D. Searle & Co., Celebrex® (Celecoxib) Capsules I Safety Information, Revised label based on FDA letter Feb. 23, 2000, 21 pages, G.D. Searle & Co, IL, USA and Pfizer Inc., NY, USA, Apr. 24, 2000.

G.D. Searle & Co., Celebrex® (Celecoxib) Capsules, NDA 20-998/S-018, NDA 20-998/S-019, Revised: Jul. 2005, 25 pages (pp. 3-27), G.D. Searle LLC, Division of Pfizer Inc., NY, USA, 2005; Argoff Declaration: Exhibit C3.

Greve, T.M. et al., "Penetration mechanism of dimethyl sulfoxide in human and pig ear skin: An ATR-FTIR and near-FT Raman spectroscopic in vivo and in vitro study," Spectroscopy, 22:405-417, 2008; Wilkin Declaration: Exhibit A3.

Hadgraft, J., "Mini review: Passive enhancement strategies in topical and transdermal drug delivery," International Journal of Pharmaceutics, 184:1-6, 1999.

Henderson, T.R. and Henderson, R.F., "Effects of dimethyl sulfoxide on subunit proteins," Ann. N Y Acad. Sci., 243:38-53, 1975; Wilkin Declaration: Exhibit A5.

Hsu, L.R. et al., "The effect of pretreatment by penetration enhancers on the in vivo percutaneous absorption of piroxicam from its gel form in rabbits," International Journal of Pharmaceutics, 71:193-200, 1991.

Kanikkannan, N. et al., "Structure-activity relationship of chemical penetration enhancers in transdermal drug delivery," Current Medicinal Chemistry, 6(7):593-608, 1999.

Kemppainen, B.W. et al., "Comparison of penetration and metabolism of [3H]Diacetoxyscirpenol, [3H]Verrucarin A and [3H]T-2 toxin in skin," Fd Chem. Toxic., 25(5):379-386, 1987.

Kemppainen, B.W. et al., "Evaluation of monkey skin as a model for in vitro percutaneous penetration and metabolism of [3H]T-2 Toxin in Human Skin," Fundamental and Applied Toxicology, 7:367-375, 1986.

Kemppainen, B.W. et al., "In vitro percutaneous penetration and metabolism of [3H]t-2 toxin: comparison of human, rabbit, guinea pig and rat," Toxicon, 25(2):185-194, 1987.

Kligman, A.M., "Topical pharmacology and toxicology of dimethyl sulfoxide-Part I," JAMA, 193(10):140-148, 1965.

Lin, S.Y., "Direct or indirect skin lipid-ordering effect of pyrrolidone carboxylate sodium after topical treatment with penetration enhancers," Bio-Medical Materials and Engineering, 5(1):9-20, 1995.

Mak, Vivien H.W., PH.D., Curriculum Vitae, 7 pages; Mak Declaration: Exhibit B1, Jan. 31, 2012.

Mak, Vivien H.W., PH.D., Declaration under 37 CFR 1.132, 4 pages, executed Jan. 31, 2012.

Malten, K.E. and Arend, J.D., "Topical toxicity of various concentrations of DMSO recorded with impedance measurements and water vapour loss measurements," Contact Dermatitis, 4:80-92, 1978; Wilkin Declaration: Exhibit A6.

Notman, R. et al., "The permeability enhancing mechanism of DMSO in ceramide bilayers simulated by molecular dynamics," Biophysical Journal, 93:2056-2068, 2007; Wilkin Declaration: Exhibit A4.

Oertel, R.P., "Protein conformational changes induced in human stratum corneum by organic sulfoxides: An infrared spectroscopic investigation," Biopolymers, 16:2329-2345, 1977.

Pharmacia, Product Label: Rogaine® Extra Strength Topical Solution, Pharmacia Consumer Healthcare, Peapack, NJ, USA, 2002; Wilkin Declaration: Exhibit A7.

Physicians Total Care, Inc., Retin-A—tretinoin cream/tretinoin gel product insert, 6 pages, Ortho Dermatological, Division of Ortho-McNeil Pharmaceutical, Inc., Skillman, New Jersey, USA, 2001; Mak Declaration: Exhibit B6.

Rodgers, K. and Xiong, S., "Effect of acute administration of malathion by oral and dermal routes on serum histamine levels," Int. J. Immunopharmac., 19(8):437-441, 1997.

Walker, R.B. and Smith E.W., "The role of percutaneous penetration enhancers," Advanced Drug Delivery Reviews, 18:295-301, 1996.

Walter, J.M. et al., "Keratolytic" properties of benzoyl peroxide and retinoic acid resemble salicylic acid in man," Skin Pharmacol Physiol, 19:283-289, 2006; Mak Declaration: Exhibit B5.

Wilkin, Jonathan K., M.D., Curriculum Vitae, 6 pages; Wilkin Declaration: Exhibit A1, Feb. 8, 2012.

Wilkin, Jonathan K., M.D., Declaration under 37 CFR 1.132, 7 pages, executed Feb. 8, 2012.

Williams, A.C. and Barry, B.W., "Penetration enhancers," Advanced Drug Delivery Reviews, 56:603-618, 2004; Mak Declaration: Exhibit B2.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

## FIG. 1

MEAN TEWL SCORES FOR RETIN-A® BY DAY – ITT



LSmean TEWL SCORES FOR RETIN-A® BY DAY – ITT

— TREATED RETIN-A    ---■--- UNTREATED RETIN-A

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000201



*FIG. 2*

MEAN TEWL SCORES FOR PENNSAID® BY DAY – ITT

LSmean TEWL SCORES FOR PENNSAID® BY DAY – ITT

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000202

**APPX69**

APPX70

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_0000203

### FIG. 3

MEAN PLASMA CONCENTRATION – TIME PROFILE FOR DICLOFENAC SODIUM (ng/mL)

ANALYTE = DICLOFENAC SODIUM



TIME (HR)



*FIG. 4*

MEAN PLASMA CONCENTRATION – TIME PROFILE FOR DIMETHYL SULFOXIDE (µg/mL)

ANALYTE = DIMETHYL SULFOXIDE

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX71

HZNPENN_00000204

APPX72

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000205

## FIG. 5

MEAN PLASMA CONCENTRATION – TIME PROFILE FOR DICLOFENAC SODIUM (ng/mL)

ANALYTE = DICLOFENAC SODIUM



Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX73

HZNPENN_00000206

## FIG. 6

MEAN PLASMA CONCENTRATION – TIME PROFILE FOR DIMETHYL SULFOXIDE (ng/mL)

ANALYTE = DIMETHYL SULFOXIDE





FIG. 7

MEAN PLASMA CONCENTRATION – TIME PROFILE FOR DIMETHYL SULFONE ($\mu g/mL$)

ANALYTE = DIMETHYL SULFONE

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000207

HZNPENN_00000208

APPX75

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

## FIG. 8

LOG DICLOFENAC PLASMA CONCENTRATION VERSUS TIME AFTER
SINGLE AND MULTIPLE DOSE APPLICATION OF A TOPICAL SOLUTION
CONTAINING 1.5% w/w DICLOFENAC SODIUM AND 45.5% DMSO



LOGATHMIC PLOT DICLOFENAC PLASMA CONCENTRATION

SINGLE DOSE
MULTI DOSE

LOG[CONC (ng/mL)]

TIME(hr)

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

## FIG. 9

ANALYSIS OF ELIMINATION RATE CONSTANT ($K_{el}$) SINGLE AND MULTI DOSE APPLICATION
OF A TOPICAL SOLUTION CONTAINING 1.5% w/w DICLOFENAC SODIUM AND 45.5% DMSO



CUMULATIVE DISTRIBUTION FUNCTION

——— MULTI DOSE
—·—·— SINGLE DOSE
– – – GAUSSIAN FIT
—·–·— GAUSSIAN FIT

$K_{el}$ ($h^{-1}$)

HZNPENN_00000209

*FIG. 10A*



Figure 1. Dispense 10 drops of PENNSAID® at a time

*FIG. 10B*



Figure 2. Spread PENNSAID® evenly on the front, and sides of your knee

*FIG. 10C*

Figure 3. Spread PENNSAID® evenly on the back of your knee

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000210

# TREATMENT OF PAIN WITH TOPICAL DICLOFENAC

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation application claiming priority to U.S. patent application Ser. No. 12/660,865, filed Mar. 4, 2010, which is a continuation-in-part of U.S. patent application Ser. No. 12/459,998, filed Jul. 10, 2009, which in turn claims the benefit of priority under 35 USC §119(e) to U.S. Provisional Application No. 61/211,600, filed Mar. 31, 2009, the disclosures all of which are incorporated herein by reference in their entirety for all purposes.

## FIELD

The field involves the delivery of compounds useful for pain relief, including diclofenac formulations, methods of use thereof, articles of manufacture and kits that include providing novel preclinical, clinical and other information to users.

## BACKGROUND

The following includes information that may be useful in understanding the present invention. It is not an admission that any of the information provided herein is prior art, or relevant, to the presently described or claimed inventions, or that any publication or document that is specifically or implicitly referenced is prior art.

Today, pain has become the universal disorder, a serious and costly public health issue, and a challenge for family, friends, and health care providers who must give support to the individual suffering from the physical as well as the emotional consequences of pain. In general, there are two basic types of pain, acute and chronic. Acute pain, for the most part, results from disease, inflammation, or injury to tissues. This type of pain generally comes on suddenly, for example, after trauma or surgery. In some instances, it can become chronic. Chronic pain is widely believed to represent disease itself. Chronic pain persists over a longer period of time than acute pain and is resistant to most medical treatments. It can, and often does, cause severe problems for patients.

Arthritis is considered to be one of the most pervasive diseases in the United States and a leading cause of disability. According to the Centers for Disease Control and Prevention, it is estimated that 1 of every 3 Americans is affected by one or more of the more than 100 types of arthritis. Pain, particularly of the joints throughout the body, characterizes arthritis. Psoriasis, primarily a skin disorder, can progress to psoriatic arthritis if left untreated. Rheumatoid arthritis, osteoarthritis, and ankylosing spondylitis are all examples of degenerative arthritic diseases.

In addition to, for example, arthritic causes, normal function of a joint and its movement, and other portions of the body, can be severely impaired as a result of trauma or following orthopedic and other surgical procedures. This may result in tenderness, aching, pain, and lengthy recovery times, as well as loss of joint mobility or reduced range of motion, tonicity, or elasticity of the joint/articular structures, such as for example, muscle, tendon, capsule, bone, or ligament. Reduced joint mobility may also involve permanently altered or shortened joint or tissue architecture. Altered or abnormal joint mobility or joint architecture may also be associated with or caused by a variety of injuries and conditions such as, for example, metabolic disorders, ischemia, injury to joint, capsule, bone, cartilage, tendon, ligament or muscle, frac-

tures, subluxation, dislocation, crush injuries, prolonged immobilization (e.g., immobilization of a joint in a cast or splint), and paralysis.

When non-pharmacological measures are not sufficient to control the symptoms of osteoarthritis, current evidence-based guidelines support pharmacological treatment with acetaminophen or oral nonsteroidal anti-inflammatory drugs ("NSAID"s) (American College of Rheumatology Subcommittee on Osteoarthritis Guidelines. Recommendations for the medical management of osteoarthritis of the hip and knee: 2000 update. *Arthritis Rheum.* 2000; 43:1905-15; National Collaborating Centre for Chronic Conditions. Osteoarthritis: National clinical guideline for care and management in adults. London: Royal College Physicians, 2008. Available at: http://www.nice.org.uk/nicemedia/pdf/ CG059FullGuideline.pdf.; Zhang W, et al., *Osteoarthritis Cartilage* 2007; 15:981-1000; Zhang W, et al., *Osteoarthritis Cartilage* 2008; 16:137-62. Acetaminophen has been linked with an increased risk of hepatic, hypertensive and cardiovascular adverse effects (e.g., Chan A T, et al., *Circulation.* 2006; 113:1578-87. Epub 2006 Mar. 13; Pincus T, et al., *Ann Rheum Dis.* 2004; 63:931-9).

NSAIDs are more effective (Towheed T E, *J. Rheumatol.* 2006; 33:567-73) and carry more well-known gastrointestinal and cardiovascular risk (e.g., Antman E M, et al. Use of nonsteroidal anti-inflammatory drugs: an update for Clinicians: a scientific statement from the American Heart Association. *Circulation.* 2007; 115:1634-42; Chan A T, et al. Nonsteroidal anti-inflammatory drugs, acetaminophen, and the risk of cardiovascular events. *Circulation.* 2006; 113: 1578-87). The attempt to minimize the risk of both morbidity and potential mortality by prescribing COX-2 selective NSAIDs ('coxibs') has not achieved the goal (Kearney P M, et al. *BMJ.* 2006; 332:1302-8; Mamdani M, et al., *BMJ.* 2004; 328:1415-6).

Diclofenac is used, most commonly, as the sodium or potassium salt for relief from pain and inflammation such as musculoskeletal and joint disorders including rheumatoid arthritis, osteoarthritis, and ankylosing spondylitis. U.S. Pat. Nos. 4,575,515 and 4,652,557 disclose topical NSAID compositions, one of which, consisting of 1.5% diclofenac sodium, 45.5% dimethylsulphoxide ("DMSO"), ethanol, propylene glycol, glycerine, and water, has been shown to be effective in the treatment of chronic osteoarthritis (e.g., Towheed, *Journal of Rheumatology* 33:3 567-573 (2006); Oregon Evidence Based Practice Center entitled "Comparative Safety and Effectiveness of Analgesics for Osteoarthritis," AHRQ Pub. No. 06-EHC09-EF).

The skin provides a protective barrier against foreign materials and infection. In mammals this barrier is created primarily by the outermost epidermal layer, the stratum corneum. The stratum corneum is comprised of flat, extended, enucleated cells, termed corneocytes, the periphery of which comprises a highly insoluble protein and lipid structure, called the cornified envelope ("CE"), surrounded by lipids. (Downing et al., Dermatology in General Medicine, Fitzpatrick, et al., eds., pp. 210-221 (1993); Ponec, M, The Keratinocyte Handbook, Leigh, et al., eds., pp. 351-363 (1994)). The CE is composed of polar lipids, such as ceramides, sterols, and fatty acids, and a complicated network of cross-linked proteins; however, the cytoplasm of stratum corneum cells remains polar and aqueous. The stratum corneum is extremely thin (some 20 microns) but provides a substantial barrier. Nevertheless, the skin has been considered as a route for the administration of drugs. Various transdermal delivery systems achieve epidermal penetration by using a skin penetration enhancing vehicle.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000211

| 3 | 4 |

Topical NSAIDs present a safer potential alternative to oral therapy, with decreased systemic exposure to the active NSAID molecule. While previous reviews (Mason L, et al., *BMC Musculoskelet Disord.* 2004; 5:28) have suggested that topical NSAIDs are effective for osteoarthritis, Lin et al. (BMJ. 2004; 329:324-6) in their meta-analysis of the same studies stressed that the various products showed symptom relief at 1 or 2 weeks but loss of benefit at 4 weeks, and rejected them as there was insufficient evidence to justify a recommendation of long-term use.

Subsequently published randomized controlled studies have described a penetrating topical diclofenac solution in a dimethyl sulfoxide (DMSO)-containing vehicle as efficacious and safe in relieving the symptoms of primary osteoarthritis of the knee over 4-, 6-, and 12-week treatment periods (Baer P A, et al. *BMC Musculoskelet Disord.* 2005; 6:44; Bookman A A, et al. *CMAJ.* 2004; 171:333-8; Roth S H, Shainhouse J Z. *Arch Intern Med.* 2004; 164:2017-23; Tugwell P S, et al. *J Rheumatol.* 2004; 31:2002-12). Recent topical NSAID reviews and meta-analyses (Banning M., *Br J Community Nurs* 2006; 11:487-92; Banning M., *Expert Opin Pharmacother* 2008; 9:2921-9; Biswal S, et al., *J Rheumatol.* 2006; 33:1841-4; Haynes S, Gemmell H., *Clinical Chiropractic* 2007; 10:126-38; Moore R A, et al., *Rheum Dis Clin N Am* 2008; 34:415-32; Ozguney I, *Expert Opin Pharmacother* 2008; 9:1805-16; Towheed T E, *J. Rheumatol.* 2006; 33 : 567-73; Zacher J, et al., *Current Medical Research and Opinions* 2008; 24(4):925-950) have evaluated the data from these topical diclofenac solution studies, and subsequently published national guidelines (Chou R, et al. Comparative Effectiveness and Safety of Analgesics for Osteoarthritis. Comparative Effectiveness Review No. 4. Rockville, Md.: Agency for Healthcare Research and Quality. September 2006. Available at: www.effectivehealthcare.ahrq.gov/reports/final.cfm; National Collaborating Centre for Chronic Conditions. Osteoarthritis: National clinical guideline for care and management in adults. London: Royal College Physicians, 2008. Available at: http://www.nice.org.uk/nicemedia/pdf/CG059FullGuideline.pdf; Tannenbaum H, et al., *J Rheumatol.* 2006; 33:140-57; Zhang W, et al. 2007, supra; Zhang W, et al. 2008 supra) have cited these studies as evidence for the use of topical NSAIDs as first line therapy for osteoarthritis. Topical diclofenac solution is used for the treatment of osteoarthritis and is currently approved for sale in Canada and several European countries.

The efficacy of NSAIDs, such as topical diclofenac solution, is thought to be due to local action of the active NSAID molecule following its penetration through the skin to the tissue sites of inflammation and pain. Diclofenac sodium is a member of the arylacanoic acid group of NSAIDs with lipophilic properties that limit its percutaneous penetration (Nishihata T, et al., *Chem. Pharm. Bull* 1987; 35:3807-12). The biological property of DMSO to enhance skin penetration of both hydrophilic and lipophilic molecules is known (Williams A C, Barry B W, *Adv Drug Deliv Rev* 2004; 56:603-18), with recent research focusing on the mechanism of enhancement (Gurtovenko A A, Anwar J, *J Phys Chem B* 2007; 111:10453-60). The percutaneous absorption of diclofenac following a multidose regimen of a topical diclofenac solution (based on a DMSO-containing vehicle) was significantly enhanced compared to an aqueous diclofenac formulation without DMSO (Hewitt, P G, et al., *Pharmacol Res.* 1998: 15:988-92). Within the extensive literature on DMSO are unsubstantiated claims of therapeutic efficacy in the treatment of osteoarthritis, but no efficacy of DMSO vehicle was shown in a previous, 4-week randomized controlled study of a topical diclofenac solution (Bookman A

A, et al. Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial. *CMAJ.* 2004; 171:333-8).

There remains a need in the art for methods of dosing topical diclofenac formulations, and providing users and prescribers with information regarding drug product attributes and desired therapeutic effects as well as instructions on uses in conjunction with other topical agents. Such needs are met by the inventions and discoveries provided herein.

BRIEF SUMMARY

The inventions described and claimed herein have many attributes and embodiments including, but not limited to, those set forth or described or referenced in this Brief Summary. It is not intended to be all-inclusive and the inventions described and claimed herein are not limited to or by the features or nonlimiting embodiments identified in this Brief Summary, which is included for purposes of illustration only and not restriction.

Disclosed herein are methods of treatment and methods of manufacturing and using a topical diclofenac pharmaceutical product and related articles and kits. Also disclosed herein are methods of preventing or treating pain, including joint pain, and arthritis, including osteoarthritis.

In one nonlimiting embodiment, a method of using topical diclofenac, and related methods of treatment, comprises informing a user of certain information regarding topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water (sometimes referred to herein as "Pennsaid"), said information comprising one or more of the following: (1) clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular four times per day ("QID") dosing; (b) the effects of QID dosing in one or more clinical trials; (c) results from a 12-week, double-blind controlled trial of topical diclofenac in a solution containing dimethyl sulfoxide in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide; (d) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (2) an adverse event profile of a topical diclofenac, including, for example (a) that concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (b) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects with the combination of topical diclofenac and oral diclofenac; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (4) a statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®).

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000212

In another nonlimiting embodiment, a method of using topical diclofenac for the treatment of osteoarthritis, and related methods of treatment, comprises providing a patient with said topical diclofenac and providing certain information to the patient regarding said topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water (sometimes referred to herein as "Pennsaid"), said information comprising one or more of the following: (1) clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular four times per day ("QID") dosing; (b) the effects of QID dosing in one or more clinical trials; (c) results from a 12-week, double-blind controlled trial of topical diclofenac in a solution containing dimethyl sulfoxide in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide; (d) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (2) an adverse event profile of a topical diclofenac, including, for example (a) that concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (b) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects with the combination of a topical diclofenac and oral diclofenac; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (4) a statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®). In one nonlimiting embodiment the method is used to treat osteoarthritis in patients with osteoarthritis of the knee. In another non-limiting embodiment the patient is further informed of the results of pharmacokinetic studies of said topical diclofenac solution in healthy human volunteers in which the measured plasma half life of diclofenac following a single dose application was shorter than said the measured plasma half life of diclofenac following a multi-dose application.

In another nonlimiting embodiment, a method of using topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, and related methods of treatment, comprises obtaining topical diclofenac from a container providing information regarding (1) clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) results from a 12-week, double-blind controlled trial of topical diclofenac in a solution containing dimethyl sulfoxide in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl

sulfoxide; (d) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (2) an adverse event profile of topical diclofenac, including, for example (a) that concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (b) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects with the combination of a topical diclofenac and oral diclofenac; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (4) a statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied in an area previously treated with a topical diclofenac solution (e.g., Pennsaid®).

In still yet another nonlimiting embodiment, a method of using topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, and related methods of treatment, comprises providing a user with topical diclofenac, and informing the user of one or more of the following: (1) clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) results from a 12-week, double-blind controlled trial of topical diclofenac in a solution containing dimethyl sulfoxide in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide; (d) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (2) an adverse event profile of a topical diclofenac, including, for example (a) that concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (b) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects with the combination of topical diclofenac and oral diclofenac; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (4) a statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®).

In another nonlimiting embodiment, a method of using topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine,

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000213

7

and water, and related methods of treatment, comprises administering a topical diclofenac DMSO formulation to a patient, wherein the administration provides a therapeutic diclofenac concentration by application of (of, for example, about 40 drops) to one or both knees to a subject having osteoarthritis of the knees, and the user is informed with regard to one or more of the following: (1) clinical effects of topical diclofenac in DMSO dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) results from a 12-week, double-blind controlled trial of topical diclofenac in a solution containing DMSO in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide; (d) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (2) an adverse event profile of a topical diclofenac in DMSO, including, for example (a) that concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (b) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects with the combination of topical diclofenac and oral diclofenac; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (4) a statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®).

In yet another nonlimiting embodiment, a method of manufacturing a topical diclofenac pharmaceutical product comprises packaging a topical diclofenac dosage form, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, with some or all of the following information, in written or electronic form: (1) clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) results from a 12-week, double-blind controlled trial of topical diclofenac in a solution containing dimethyl sulfoxide in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide; (d) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (2) an adverse event profile of a topical diclofenac, including, for example (a) that concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (b) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects

8

with the combination of topical diclofenac and oral diclofenac; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (4) a statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®).

In one nonlimiting embodiment, an article of manufacture comprises a container containing a dosage form of topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, wherein the container is associated with published material providing some or all of the following information: (1) clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) results from a 12-week, double-blind controlled trial of topical diclofenac in a solution containing dimethyl sulfoxide in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide; (d) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (2) an adverse event profile of a topical diclofenac, including, for example (a) that concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (b) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects with the combination of topical diclofenac and oral diclofenac; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (4) a statement that, once dry sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®).

In one nonlimiting embodiment, information regarding the clinical effects of dosing of a topical diclofenac solution includes the effects of 40-drop QID dosing of said topical diclofenac solution, and/or the effects of 40-drop QID dosing of said topical diclofenac solution in one or more clinical trials.

In one nonlimiting embodiment, the article of manufacture is a kit. Thus, one aspect of the invention provides a novel kit of parts comprising topical diclofenac solution (for example, a topical diclofenac solution or gel as described, or referenced, herein) and information informing a user or prescriber of novel results from preclinical and clinical studies.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000214

In one nonlimiting embodiment, or in any of the methods described herein, the user or prescriber is informed of the results of or more preclinical studies in which concomitant use of topical diclofenac with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens), was investigated. In one aspect of this embodiment, the user or prescriber is informed that repeated application of topical diclofenac did not enhance the systemic absorption of these products. In another aspect of this embodiment, the user or prescriber is informed that before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same skin surface of the knee treated with topical diclofenac, one should wait until the treated area is dry, which occurs most often within from about 10-15 or about 30 minutes. In another aspect of this embodiment, including in any of the methods described herein, the user or prescriber is informed that concomitant use of topical diclofenac and sunscreens and insect repellants is safe. In another aspect of this embodiment, including in any of the methods described herein, the user or prescriber is informed that use of topical diclofenac does not reduce the efficacy of a sunscreen. In another aspect of this embodiment, including in any of the methods described herein, the user or prescriber is informed that use of topical diclofenac does not reduce the efficacy of an insect repellant.

In one nonlimiting embodiment, or any of the methods described herein, a user may also be informed of the effects of use of other topical products in conjunction with topical diclofenac in DMSO, including, for example, that concomitant topical use of diclofenac in DMSO by repeated application with other topical products, including DEET, 2,4-D and/or oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products; and/or (b) the effect of the use of topical diclofenac in DMSO on absorption of environmental toxins, including, for example, the results of a study showing that repeated topical application of diclofenac in DMSO did not increase systemic environmental toxin exposure.

In one nonlimiting embodiment, or in any of the methods described herein, the user or prescriber is informed of the results of a transepidermal water loss study in which no alteration in skin barrier function following chronic use of topical diclofenac was found. In one aspect of this embodiment, including in any of the methods described herein, the user or prescriber is informed that the study was performed on human volunteers' skin.

In one nonlimiting embodiment, or in any of the methods described herein, the user or prescriber is informed of the pharmacokinetic results from studies in which single and multiple doses of a topical diclofenac in a vehicle solution containing dimethyl sulfoxide was applied topically to healthy human volunteers;

In one nonlimiting embodiment, or in any of the methods described herein, the user or prescriber is informed that in clinical trials the combination of topical diclofenac and oral diclofenac, compared to oral diclofenac alone, resulted in a higher rate of rectal hemorrhage (3% vs. less than 1%), and more frequent abnormal creatinine (12% vs. 7%), urea (20% vs. 12%), and hemoglobin (13% vs. 9%), but no difference in elevation of liver transaminases.

In one nonlimiting embodiment, or in any of the methods described herein, the user or prescriber is informed that the diclofenac half life and elimination constant $K_{el}$ for a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water is statistically significantly different depending on whether the solution is applied as a single dose or as multiple doses.

In one nonlimiting embodiment, the user or prescriber is informed of the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of certain systemic adverse events in osteoarthritis patients. In one aspect of this embodiment, the user or prescriber is further informed that the combination of topical diclofenac and oral diclofenac did not increase the incidence of digestive system events over oral diclofenac alone. In another nonlimiting embodiment, the user or prescriber is informed of a study showing that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone and/or the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone.

In another nonlimiting embodiment, the user or prescriber is informed of the results of a clinical trial in which one knee was successfully treated with topical diclofenac even though most subjects had bilateral osteoarthritis of the knees. In one aspect of this embodiment, the user or prescriber is further informed that topical diclofenac may be applied to only one knee despite the existence of bilateral osteoarthritis.

In another nonlimiting embodiment, the user or prescriber is informed that a regimen of topical diclofenac and oral diclofenac is useful for treating an individual with persistent or breakthrough knee pain despite using an oral NSAID.

In another nonlimiting embodiment, the user or prescriber is informed that topical diclofenac, or a regimen of topical diclofenac and oral diclofenac, is useful when topical diclofenac is applied to only one knee of a subject with osteoarthritis even though both knees of an individual may be affected.

In yet another nonlimiting embodiment, the user is provided with some or all of the topical diclofenac clinical and preclinical information described herein for purposes of enhancing the safety profile of topical diclofenac.

The topical diclofenac composition will comprise diclofenac and at least one transdermal penetration enhancer in an amount sufficient to aid in the delivery of a therapeutically effective amount of diclofenac to a desired area. The topical diclofenac may also include one or more pharmaceutically acceptable carriers, thickening agents, solubilizing agents, dispersants, etc.

In certain embodiments, the diclofenac is in the form of a pharmaceutically acceptable salt or free acid. Examples of pharmaceutically acceptable salts include metal salts, including alkali metal, alkaline earth metal, and nitrogen-based salts such as ammonium salts. Sodium, potassium, epolamine and diethylamine salts are preferred. In one preferred embodiment the diclofenac is diclofenac monosodium salt.

In one nonlimiting embodiment, the topical diclofenac is a solution.

In another nonlimiting embodiment, the topical diclofenac is a gel.

In one nonlimiting embodiment, the topical diclofenac is a solution that comprises or consists essentially of diclofenac and between about 40% and about 85% DMSO by weight of the solution, preferably between about 40% and about 60% DMSO by weight of the solution, more preferably between about 40% and about 50% DMSO by weight of the solution, still more preferably between about 42.5% and about 48.5% DMSO by weight of the solution, and most preferably about 45.5% DMSO by weight of the solution; a polyalcohol, pref-

HZNPENN_00000215

**11**

erably having 3-5 carbon atoms, for the retention of moisture in the skin, which in certain embodiments is glycerol or glycerine; a dispersant for assisting to disperse the components in solution to provide a homogeneous solution when applied to the skin and when penetrating the skin, which in one embodiment is propylene glycol; and water.

In one nonlimiting embodiment, the topical diclofenac is a solution comprising or consisting essentially of 1.5% w/w diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzene-acetic acid, monosodium salt) and 45.5% w/w dimethyl sulfoxide.

In another nonlimiting embodiment, the topical diclofenac is a solution that comprises or consists essentially of 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzene-acetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation according to PCT/US2007/081674 (International Publication No. WO 2008/049020 A2), the contents of which are incorporated herein in their entirety by this reference. The topical diclofenac may be any of the formulations described or claimed therein. In another nonlimiting embodiment, the topical diclofenac is a gel formulation according to US Patent Application No. 20080300311 (published Dec. 4, 2008), the contents of which are incorporated herein in their entirety by this reference. The topical diclofenac may be any of the formulations described or claimed therein.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising diclofenac (e.g., diclofenac sodium), dimethyl sulfoxide, ethanol, propylene glycol, one or more thickening agents, and water. In one aspect of this embodiment, the topical diclofenac gel formulation further comprises glycerol. In another aspect, the thickening agent is selected from the group consisting of cellulose polymers, carbomer polymers, a carbomer derivative, a cellulose derivative, polyvinyl alcohol, poloxamers, polysaccharides, and mixtures thereof.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of 1-5% w/w diclofenac (preferably diclofenac monosodium); 30-60% w/w dimethyl sulfoxide; 1-50% w/w ethanol; 1-15% w/w propylene glycol; a thickener; and water (added to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of 10-50,000 centipoise.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of about 2% w/w diclofenac (preferably diclofenac monosodium); about 45.5% w/w dimethyl sulfoxide; about 23-29% w/w ethanol; about 11% w/w propylene glycol; about 0-6% w/w hydroxypropylcellulose (HY119); and water (added to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of 500-5,000 centipoise.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of diclofenac (preferably diclofenac monosodium) at a concentration selected from the group consisting of 1, 1.5, 2 and 3% w/w; dimethyl sulfoxide at a concentration selected from the group consisting of 42, 43, 44, 45, 45.5 46, 47, 48 and 49% w/w and fractions in between; ethanol at 23-29% w/w; propylene glycol at a concentration selected from the group consisting of 9, 10, 11, 12, 13% w/w and fractions in between; hydroxypropylcellulose (HY119) at 0-6% w/w; and water (included in an amount sufficient to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of about 500-5000 centipoise.

**12**

In certain embodiments, the above-described topical diclofenac gel formulations include 1-5% glycerol. In such embodiments, the gel formulation will have a drying rate and a transdermal flux that are greater than a comparative liquid topical diclofenac formulation. In other embodiments, the above-described topical diclofenac gel formulations will have a pH of about 6.0 to about 10.0.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising diclofenac (e.g., diclofenac sodium), ethanol, dimethyl sulfoxide, propylene glycol, hydroxypropylcellulose and water. In one aspect of this embodiment, the hydroxypropylcellulose is substituted with alklycellulose, hydroxyalkylcellulose, carboxyalkylcellulose, or sodium carboxyalkylcellulose, where alkyl is methyl, ethyl or propyl, or a mixture thereof.

In another aspect of the present invention, some or all of the user information described herein is provided and pain is reduced in a supporting body structure of a subject, including joints, muscles, tendons, ligaments, cartilage and skin, by topically administering to a subject in need thereof a pharmaceutical composition comprising a therapeutically effective amount of diclofenac in dimethyl sulfoxide, preferably 45.5% w/w dimethyl sulfoxide, or a pharmaceutical composition comprising a therapeutically effective amount of diclofenac in a gel formulation, as described herein, in PCT/US2007/081674, or in US Patent Application No. 20080300311. In another nonlimiting embodiment, pain in the musculoskeletal system of a subject is reduced. In another nonlimiting embodiment, pain in a supporting body structure of a subject and/or in the musculoskeletal system of a subject is reduced.

Various uses of the information provided herein following new clinical and preclinical studies include uses for treatment, or in the manufacture or preparation of formulations, compositions, articles of manufacture and kits.

The invention also includes methods employing topical diclofenac, kits and articles of manufacture useful for pain relief or prevention in the treatment of a subject, including in the treatment of a subject following an invasive medical procedure or surgery, including an orthopedic procedure or surgery, or a subject predisposed to or otherwise at risk for pain, wherein said methods, kits and articles of manufacture comprise some or all of the user information described herein. The topical diclofenac described herein is administered to a site of pain (acute or chronic, for example) and/or proximally thereto (including, for example, areas of reflected or secondary pain). Thus, for example, some or all of the user information described herein is provided and the topical diclofenac is administered to the skin at a site of pain and/or to skin locations proximal thereto in a supporting body structure of a subject, including joints, muscles, tendons, ligaments, cartilage and skin (including any one or more of these, together, or in any combination), and/or in the musculoskeletal system, by topical administration as provided herein, whereby pain is reduced.

In one aspect, the present invention is directed to a method for reducing pain in a supporting body structure of a subject, comprising topically administering to said subject in need thereof a pharmaceutical composition comprising a therapeutically effective amount of a transdermal diclofenac solution or gel formulation comprising DMSO, whereby pain is reduced, and providing to a user some or all of the clinical and preclinical information described herein. According to one nonlimiting embodiment, the supporting body structure is a joint. According to another nonlimiting embodiment, the supporting body structure is selected from the group consisting of muscles, bones, tendons, ligaments and cartilage. These

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

**APPX83**

US 8,217,078 B1

13

methods are suitable for treating a subject suffering from arthritis. Conditions which may be treated include osteoarthritis, rheumatoid arthritis, and anklyosing spondylitis.

In a further nonlimiting embodiment this method is suitable for treating a subject suffering from acute pain. Suitable pain conditions for treatment by this method include back pain, knee pain, hip pain, shoulder pain, ankle or leg pain, hand pain or finger pain, in which a user is also provided with some or all of the clinical and preclinical information described herein. In an alternate nonlimiting embodiment, the subject is suffering from chronic pain, which may include back pain, knee pain, hip pain, shoulder pain, ankle or leg pain, hand pain or finger pain. In another nonlimiting embodiment, the subject is suffering from postoperative pain.

In another aspect, the present invention is directed to a method for applying multiple topical agents to an subject with pain comprising topically administering a pharmaceutical composition comprising a therapeutically effective amount of a topical diclofenac comprising diclofenac in DMSO, waiting for the treated area to dry (the time for which can be dependent on individual skin characteristics, environmental conditions such as temperature and humidity, and surface area, being often about 5-30 minutes, or about 5-20 minutes, for example, or typically about 10 minutes or less for a topical diclofenac preparation, including a topical diclofenac solution as described in the Examples), and applying another topical agent(s). In one nonlimiting embodiment, the subject has osteoarthritis. In another nonlimiting embodiment, the subject has osteoarthritis of the knee. In one embodiment, the topical agent administered after the topical diclofenac is a sunscreen or an insect repellant.

In another nonlimiting embodiment, the invention includes a method of protecting a subject with osteoarthritis from UV exposure and alleviating the signs and symptoms of osteoarthritis in the subject comprising the steps of applying a therapeutically effective amount of a transdermal diclofenac solution or gel formulation comprising diclofenac in DMSO; waiting for the treated area to dry (the time for which can be dependent on individual skin characteristics, environmental conditions such as temperature and humidity, and surface area, being often about 5-30 minutes, or about 5-20 minutes, for example, or typically about 10 minutes or less for a topical diclofenac preparation, including a topical diclofenac solution as described in the Examples), and applying sunscreen to all or a portion of the same area of treatment.

In a further aspect, provided is an article of manufacture comprising a topical diclofenac preparation (e.g., a solution or gel formulation for transdermal administration as described herein) and a packaging material, wherein said topical diclofenac preparation comprises a pain relief effective amount of diclofenac in DMSO, wherein said packaging material comprises a label or insert that indicates that said composition may be used for reducing pain in a supporting structure, and wherein a user is also provided with some or all of the clinical and preclinical information described herein.

In another aspect, a kit of information concerning a topical diclofenac product comprising diclofenac and dimethyl sulfoxide is provided, said kit comprising information about (a) clinical effects of dosing of a topical diclofenac solution comprising 1.5% w/w diclofenac sodium and 45.5% w/w dimethyl sulfoxide, including (i) the effects of (for example, 40-drop) QID dosing of said topical diclofenac solution; (ii) the effects of (for example, 40-drop) QID dosing of said topical diclofenac solution in one or more clinical trials; (iii) results from a 12-week, double-blind, controlled trial of topical diclofenac solution in subjects with osteoarthritis of the knee which compared the performance of said topical

14

diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide; and (iv) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (b) an adverse event profile for a topical diclofenac solution comprising 1.5% w/w diclofenac sodium and 45.5% w/w dimethyl sulfoxide, including, (i) concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (ii) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects with the combination of topical diclofenac and oral diclofenac; and (iii) results of a clinical study demonstrating that the addition of said topical diclofenac solution to oral diclofenac did not cause an elevation of liver transaminases over use of oral diclofenac alone; (c) preclinical study results for a topical formulation comprising dimethyl sulfoxide, including for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (d) a statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®).

In another aspect, a method of treating osteoarthritis of the knee is provided which comprises supplying a topical diclofenac preparation and the Attachment to the patient.

Also provided is a method of obtaining marketing authorization from a regulatory authority for a topical diclofenac product comprising referencing the kit of information.

In another embodiment, a method for distribution of a topical diclofenac product is provided, comprising the steps of (a) obtaining marketing authorization from a regulatory authority for a topical diclofenac product comprising referencing the kit of information; and providing said topical diclofenac product to one or more distributors.

These and other aspects of the present inventions, which are not limited to or by the information in this Brief Summary, are provided below.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows mean TEWL scores for Retin-A® by Day—ITT.

FIG. 2 shows mean TEWL Scores for Pennsaid® by Day—ITT.

FIG. 3 shows mean plasma concentration-time profile for diclofenac sodium (ng/mL).

FIG. 4 shows mean plasma concentration-time profile for dimethyl sulfoxide (µg/mL).

FIG. 5 shows mean plasma concentration-time profile for diclofenac sodium (ng/mL).

FIG. 6 shows mean plasma concentration-time profile for dimethyl sulfoxide (µg/mL).

FIG. 7 shows mean plasma concentration-time profile for dimethyl sulfone (µg/mL).

FIG. 8 shows log diclofenac plasma concentration versus time after single and multiple dose application of a topical solution containing 1.5% w/w diclofenac sodium and 45.5% DMSO.

FIG. 9 shows an analysis of elimination rate constant (IQ) after single and multi dose application of a topical solution containing 1.5% w/w diclofenac sodium and 45.5% DMSO.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX84

HZNPENN_00000217

FIG. **10**A shows diagram of FIG. **1**. Dispense 10 drops of PENNSAID® at a time.

FIG. **10**B shows diagram of FIG. **2**. Spread PENNSAID® evenly on the front, and sides of your knee.

FIG. **10**C shows diagram of FIG. **3**. Spread PENNSAID® evenly on the back of your knee.

## DETAILED DESCRIPTION

As used herein, a "disorder" is any disorder, disease, or condition involving pain that would benefit from topical diclofenac.

"Enhancing the safety profile" of topical diclofenac means implementing actions or articles designed or intended to help reduce the incidence of adverse events associated with administration of topical diclofenac, including adverse effects associated with patient-related factors (e.g., age, gender, ethnicity, race, target illness, abnormalities of cardiovascular, gastrointestinal, renal or hepatic function, co-morbid illnesses, characteristics such as pregnancy or environment, including sun exposure) and topical diclofenac-related factors (e.g., dose, plasma level, duration of exposure, or concomitant medication).

"Informing" means referring to or providing, published material including in electronic form, for example, providing published material to a user; or presenting information orally, for example, by presentation at a seminar, conference, or other educational presentation, by conversation between a pharmaceutical sales representative and a medical care worker, or by conversation between a medical care worker and a patient; or demonstrating the intended information to a user for the purpose of comprehension. "Published" material may be in any form, including printed and electronic forms. Electronic forms include material stored in any memory or data storage format or medium (e.g., memory stick, CD, DVD, or other machine readable form), as well as materials available or accessible via the Internet or online databases, for example.

A "medical care worker" means a worker in the health care field who may need or utilize information regarding topical diclofenac including a dosage form thereof, including information on safety, efficacy, dosing, administration, or pharmacokinetics. Examples of medical workers include physicians, pharmacists, physician's assistants, nurses, aides, caretakers (which can include family members or guardians), emergency medical workers, and veterinarians.

As used herein, "musculoskeletal system" (also known as the locomotor system) refers to the system that gives animals the ability to physically move using the muscles and the skeletal system. The musculoskeletal system includes the skeleton, made by bones attached to other bones with joints and ligaments, and skeletal muscle attached to the skeleton by tendons. Particularly useful applications of the present invention include the prevention or treatment of musculoskeletal pain, including pain that affects the joints, muscles, ligaments and tendons, along with bones.

As used herein, "pain" includes acute pain and chronic pain.

A "patient" means a subject in need of medical treatment. Medical treatment can include treatment of an existing condition, such as a disease or disorder, prophylactic or preventative treatment. In some embodiments the patient is a human patient.

A "pharmaceutical supplier" means a person (other than a medical care worker), business, charitable organization, governmental organization, or other entity involved in the transfer of topical diclofenac, including a dosage form thereof,

between entities, for profit or not. Examples of pharmaceutical suppliers include pharmaceutical distributors, pharmacy chains, pharmacies (online or physical), hospitals, HMOs, supermarkets, the Veterans Administration, or foreign businesses or individuals importing topical diclofenac into the United States.

As used herein, "preventing" or "prevention" means preventing in whole or in part, or ameliorating, reducing or controlling.

A "product" or "pharmaceutical product" means a dosage form of topical diclofenac plus published material and optionally packaging.

"Providing" means giving, administering, selling, distributing, transferring (for profit or not), manufacturing, compounding, or dispensing.

"Published material" means a medium providing information, including printed, audio, visual, or electronic medium, for example a flyer, an advertisement, a product insert, printed labeling, an internet web site, an internet web page, an internet pop-up window, a radio or television broadcast, a compact disk, a DVD, a podcast, an audio recording, or other recording or electronic medium.

"Safety" means the incidence or severity of adverse events associated with administration of topical diclofenac, including adverse effects associated with patient-related factors, including as noted above, and topical diclofenac-related factors, including as noted above.

As used herein, "subject" refers to any mammal, including humans, domestic and farm animals, and zoo, sports, or pet animals, such as dogs, horses, cats, sheep, pigs, cows, etc. Non-limiting preferred mammals are a human, including adults, children, and the elderly. Non-limiting preferred sports animals are horses and dogs. Non-limiting preferred pet animals are dogs and cats.

As used herein, "supporting body structure of a subject" refers to skeletal elements, joints, muscles, tendons, ligaments, cartilage, and skin of that subject. Particularly useful applications of the present invention include the prevention or treatment of pain in and around joints, including shoulders, hips, knees, elbows, hands and fingers. Other particularly useful applications of the present invention include the prevention or treatment of pain in the knee, including pain resulting from osteoarthritis of the knee. Each of these may be treated separately, as may each of joints, muscles, tendons, ligaments, cartilage, and skin be the subject of separate treatment for pain.

As used herein, a "therapeutically effective amount" or "effective amount" in reference to the compounds or compositions of the instant invention refers to an amount sufficient to induce a desired biological, pharmaceutical, or therapeutic result. That result can be alleviation of the signs, symptoms, or causes of a disease or disorder or condition, or any other desired alteration of a biological system. In the present invention, the result will involve preventing pain.

The term "topical", as used herein, means the epicutaneous application of an agent to the skin.

Topical diclofenac solutions include any of the diclofenac solutions described or claimed herein (or described or claimed in U.S. Pat. No. 4,575,515 or 4,652,557), which are useful for the transdermal administration of diclofenac to a subject, including, for example, a formulation containing 1.5% w/w/ diclofenac sodium (2-[(2,6-dichlorophenyl) amino]benzeneacetic acid, monosodium salt) and 45.5% w/w DMSO, and a formulation containing 1.5% w/w/ diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% w/w DMSO ethanol, propylene glycol, glycerine, and water.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000218

Topical diclofenac gel formulations include any one or more of the diclofenac gel formulations described or claimed herein (or described or claimed in PCT/US2007/081674 or US Patent Application No. 20080300311), which are useful for the transdermal administration of diclofenac to a subject.

The term "transdermal," as used herein, means the delivery of an agent into and/or through the skin for therapy.

The terms "treating" and "treatment" mean implementation of therapy with the intention of reducing the severity or frequency of symptoms. As used herein, the terms "treating" and "treatment" refer to both therapeutic treatment and prophylactic or preventative measures.

A "user" means a patient, a medical care worker, or a pharmaceutical supplier.

Disclosed herein are methods of using topical diclofenac formulations, articles of manufacture incorporating topical diclofenac formulations, and kits. Specifically disclosed are methods of using topical diclofenac and informing users of certain preclinical and/or clinical information.

In one nonlimiting embodiment, a method is provided in which a subject is treated for a disorder with a transdermally delivered therapeutically effective amount of topical diclofenac and a user is provided with some or all of the user information described herein. In another nonlimiting embodiment, a method is provided in which a supporting body structure or the musculoskeletal system of a subject is treated for a disorder with topical diclofenac and a user is provided with some or all of the user information described herein. In another nonlimiting embodiment, the supporting body structure is selected from joints, muscles, tendons, ligaments, cartilage and skin, and includes treatment of pain in and around joints, including shoulders, hips, knees, elbows, hands and fingers, as well as the back, particularly the lower back. In one nonlimiting embodiment the pain is acute pain. In one nonlimiting embodiment the pain is chronic pain. In one nonlimiting embodiment the pain is treated. In another nonlimiting embodiment the pain is prevented. In one preferred nonlimiting embodiment, the pain results from osteoarthritis of the knee. Preferably, the subject is a human subject.

In one nonlimiting embodiment, information provided to the user consists of, consists essentially of, or comprises

1. A clinical profile for topical diclofenac including, for example
   a. the effects of particular QID dosing of diclofenac;
   b. the effects of QID dosing in one or more clinical trials;
   c. results from a 12-week, double-blind controlled trial of topical diclofenac in a solution containing dimethyl sulfoxide in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide (for example, a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects);
   d. pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a vehicle solution containing dimethyl sulfoxide was applied topically to healthy human volunteers;

2. An adverse event profile for a topical diclofenac, including, for example
   a. that concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, and more frequent abnormal creatinine, urea and hemoglobin (including that a combination of

topical diclofenac and oral diclofenac, compared to oral diclofenac alone, resulted in a higher rate of rectal hemorrhage (3% vs. less than 1%), and more frequent abnormal creatinine (12% vs. 7%), urea (20% vs. 12%), and hemoglobin (13% vs. 9%));
   b. that in a controlled trial, a higher concentration of dermatitis with vesicles was observed after treatment of 152 subjects with the combination of topical diclofenac and oral diclofenac;
   c. that in clinical trials; (d) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone;

3. A preclinical study profile for topical diclofenac, including, for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®);

4. A statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®)

This information, which may relate, for example, to a topical diclofenac containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, is sometimes referred to herein as the "Information."

Other adverse event information may include that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone; that the addition of topical diclofenac to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients; the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; and, the results of a clinical study showing that no eye lens abnormalities were observed with DMSO-vehicle or topical diclofenac solution treatment; that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone; and, the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone.

Other preclinical profile information may include the effect of the use of topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated application of topical diclofenac solution did not increase systemic environmental toxin exposure; and the effects of use of other topical products in conjunction with topical diclofenac, including, for example, that concomitant use of diclofenac topical solution by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

Other information provided to the user may include the pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a vehicle solution containing dimethyl sulfoxide was applied topically to healthy human volunteers;

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000219

Other information provided to the user may include that the diclofenac half life and elimination constant $K_{el}$ for a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water is statistically significantly different depending on whether the solution is applied as a single dose or as multiple doses.

In one nonlimiting embodiment, a user is provided with the Information, or with some or all of the Information, or with some or all of the topical diclofenac clinical and preclinical information described herein and in the Examples, for purposes of enhancing the safety profile of topical diclofenac and/or enhancing its application to or by a subject in need thereof.

In one nonlimiting embodiment, information provided to the user comprises information regarding the clinical effects of dosing a topical diclofenac containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt, and may be prepared, for example, (1) the effects of particular QID dosing of diclofenac; (2) the effects of QID dosing in one or more clinical trials including the results from a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee; (3) the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; and/or (4) results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed.

In another nonlimiting embodiment, information provided comprises information regarding the adverse event profile of a topical diclofenac containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, including, for example (1) that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone; (2) that the addition of topical diclofenac to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients; (3) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; and/or (4) the results of a clinical study showing that no eye lens abnormalities were observed with DMSO-vehicle or topical diclofenac solution treatment.

In yet another nonlimiting embodiment, information provided comprises information regarding preclinical study results with a topical diclofenac containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, including, for example, (1) the effect of the use of the topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated application of the topical diclofenac did not increase systemic environmental toxin exposure; and, (2) the effects of use of other topical products in conjunction with the topical diclofenac, including, for example, that concomitant use of diclofenac topical solution by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

In still another nonlimiting embodiment, information provided comprises information regarding the clinical effects of topical diclofenac dosing, information regarding the adverse event profile of topical diclofenac, and/or information regarding preclinical study results with topical diclofenac, as described herein, wherein the topical diclofenac contains 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino] benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

In one nonlimiting embodiment, the diclofenac is in the form of a topical diclofenac solution formulation. In another nonlimiting embodiment, the diclofenac is in the form of a topical diclofenac gel formulation.

Diclofenac sodium is a benzene-acetic acid derivative that is a nonsteroidal anti-inflammatory drug, designated chemically as 2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt, and may be prepared by means known in the art. See, for example, U.S. Pat. No. 4,575,515.

Following synthesis a topical diclofenac solution may be formulated by methods known in the art as 1.5% w/w diclofenac sodium in DMSO (45.5% w/w). It is a clear, colorless to faintly pink-orange solution for topical application. Each 1 mL of solution may contain 16.05 mg of diclofenac sodium. In addition, the topical diclofenac solution will preferably contain the following inactive ingredients: propylene glycol, alcohol, glycerin and purified water.

In this disclosure, examples relating to new preclinical and clinical discoveries regarding topical diclofenac are provided.

While topical non-steroidal anti-inflammatory drugs are considered safe, their long-term efficacy for osteoarthritis has been suspect. Example 1 describes the results of a 12-week, double-blind, double-dummy, randomized controlled trial of a topical diclofenac solution containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water was conducted in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee. This 5-arm study compared the topical diclofenac solution with a placebo solution, DMSO vehicle, oral diclofenac and a combination of the topical diclofenac solution+oral diclofenac for relieving the signs and symptoms of knee osteoarthritis. Subjects applied study solution, 40 drops QID (four times daily), and took one study tablet daily for 12 weeks. Co-primary efficacy variables were Western Ontario McMaster Universities Osteoarthritis Index ("WOMAC") pain and physical function scores and a patient overall health assessment. Secondary variables were WOMAC stiffness and patient global assessment ("PGA") of the knee osteoarthritis. The topical diclofenac solution was superior to placebo for pain (−6.0 vs. −4.7, P=0.015), physical function (−15.8 vs. −12.3, P=0.034), overall health (−0.95 vs. −0.37, P<0.0001), and PGA (−1.36 vs. −1.01, P=0.016), and was superior to DMSO vehicle for all efficacy variables. The most common adverse event was dry skin (18.2%). Surprisingly, no significant difference was observed between DMSO vehicle and placebo or between the topical diclofenac solution and oral diclofenac, yet fewer digestive system and laboratory abnormalities were observed with topical diclofenac than oral diclofenac. Further, addition of the topical diclofenac solution to oral diclofenac did not increase the incidence of systemic adverse events. Additionally, administration of topical diclofenac resulted in less frequent adverse events associated with the NSAID class than oral diclofenac alone, and the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone. Users may be apprised of the above information according to the invention.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000220

A further unexpected discovery of the study, the results for which are provided as Example 1, is that in the study the topical diclofenac solution was applied to only one knee. Most patients suffer from osteoarthritis equally in both knees, yet single knee application yielded a clinical benefit in both knees. Users or prescribers may be further apprised of this additional information according to the invention.

Topical diclofenac in a DMSO vehicle is an effective treatment option for osteoarthritis of the knee with efficacy similar to, but tolerability better than, oral diclofenac. DMSO vehicle was no more efficacious than placebo. According to the invention, users may be apprised of this information with regard to use of topical diclofenac, particularly with regard to the use of a topical diclofenac solution comprising 1.5% w/w diclofenac sodium and 45.5% w/w DMSO, which also optionally contains propylene glycol, alcohol, glycerin and purified water as inactive ingredients.

Examples 2 and 3 describe the results of environmental toxin studies. Surprisingly in light of the efficacy of DMSO in facilitating the skin penetration of diclofenac, these studies show that concomitant, repeated use of a topical diclofenac solution containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens), did not enhance the systemic absorption of these products. According to the invention, users may be apprised of this information with regard to use of topical diclofenac, particularly with regard to the use of a topical diclofenac solution containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

Example 4 describes the results of a transepidermal water loss ("TEWL") study performed on human volunteers' skin. TEWL is a parameter useful for measuring changes to stratum corneum barrier function. Unexpectedly given the role of DMSO in permeabilizing the skin for diclofenac uptake, the results show no alteration in skin barrier function following chronic use of topical diclofenac. According to the invention, users may be apprised of this information with regard to use of topical diclofenac, particularly with regard to the use of a topical diclofenac solution comprising 1.5% w/w diclofenac sodium and 45.5% w/w DMSO, which also optionally contains propylene glycol, alcohol, glycerin and purified water as inactive ingredients. Users may also be informed that, before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same skin surface, for example, a knee, that has been treated with topical diclofenac, the user should wait until the treated area is dry, which occurs most often within 10 minutes.

Example 5 describes the results of a study to evaluate the ophthalmologic effects of topically applied DMSO in a 52-week non-occluded dermal toxicity study in Göttingen minipigs. It provides information about the ocular safety profile of dermally applied formulations containing purified DMSO. Results showed that there was no increased risk for development of lens opacities or changes in refractive indices associated with DMSO. In fact no test article-related ophthalmoscopic abnormalities were detected during the study.

Example 6 describes the results of a study to evaluate the toxicity of test articles containing 9, 45.5, and 90% w/w DMSO after dermal administration for 26 weeks, three times per day, and to evaluate reversibility of any observed changes

following a 12-week postdose observation period in male and female Sprague-Dawley rats. No test article-related ophthalmological abnormalities were detected in any animal during the pretest, terminal, and recovery ophthalmoscopic examinations.

Examples 7 and 8 describe studies to evaluate the pharmacokinetics of diclofenac sodium, dimethyl sulfoxide (DMSO) and dimethyl sulfone (the major metabolite of DMSO) after a single- and multiple-dose applications of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water. These data provide compelling evidence that the systemic exposure to diclofenac caused by use of the topical diclofenac to treat osteoarthritis of the knee (40 drops per knee QID) is much lower than that caused by a typical oral dose of diclofenac used in treatment of osteoarthritis (e.g., 50 mg three times per day or "TID"). The fact that the topical diclofenac can be shown to be comparable to oral diclofenac sodium for treatment of osteoarthritis (see Example 1) is very surprising in view of these facts, especially as it is widely believed that NSAIDs, such as diclofenac, exert their analgesic effects both locally and centrally. From the data in Example 8 it also can be computed that $C_{max}$ of orally administered diclofenac is more than one hundred fold higher than $C_{max}$ for the topical diclofenac.

Example 9 describes a study to assess the drying time of a topical diclofenac solution containing 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water when applied topically to the skin surface of the knee following a single dose application, from which it can be concluded that the mean drying time for the topical diclofenac solution following a single dose application was approximately 15 minutes, with considerable variability among subjects and dryness occurring as early as 10 minutes in most subjects. A 30 minute drying time prior to the application of other topicals is considered safe. The results of the study further indicate that it is appropriate to instruct a user that a patient using a topical diclofenac solution should wait at least 30 minutes after putting the topical diclofenac solution on the knee(s) before, for example, taking a shower or bath or otherwise wetting the knee(s).

Example 10 describes a study comparing the elimination constant after single and multiple dose application of a topical solution containing 1.5% diclofenac sodium and 45.5% DMSO.

Example 11 describes a multi-dose, comparative, exposure study under maximum use conditions per labeling of both Pennsaid® Topical Solution (Diclofenac Sodium topical solution 1.5% w/w and 45.5% w/w DMSO) and Solaraze® Gel (Diclofenac Sodium 3%).

In one nonlimiting embodiment, the user is provided with information in the faun of (or substantially in the form of) the Attachment. In another nonlimiting embodiment, the information in the Attachment is provided in a form that has been modified where appropriate to refer to the subject product as a topical diclofenac gel or other formulation rather than a topical solution. In another nonlimiting embodiment, the user is provided with information comprising or consisting essentially of in the Attachment. In another nonlimiting embodiment, the user is provided with information consisting essentially of the Attachment.

Many embodiments are suitable for treatment of subjects either as a preventive measure (e.g., to avoid pain) or as a therapeutic composition to treat subjects who are suffering from acute or chronic pain. In one nonlimiting embodiment, for example, a method of treatment or prevention of pain,

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000221

including pain associated with an arthritic condition, and related kits and articles of manufacture, comprises using a topical diclofenac solution or topical gel formulation described herein together with some or all of the clinical and/or preclinical information described herein. Arthritic conditions include the various forms of arthritis, including rheumatoid arthritis, osteoarthritis, and ankylosing spondylitis.

Disclosed herein are topical diclofenac formulations, kits, and methods of using topical diclofenac and topical diclofenac formulations. Specifically disclosed are methods of using topical diclofenac and informing the user of certain information as provided herein. With the knowledge of the particular information, the administration of topical diclofenac to the patient can be optimized to provide safer and more effective use of topical diclofenac, alone or together with oral diclofenac. As used herein, topical diclofenac formulations include topical diclofenac solutions and topical diclofenac gel formulations, including a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

Topical diclofenac therapy can be considered optimal when combined with the new clinical, preclinical, adverse event information provided and described herein. Disclosed herein are methods of using topical diclofenac for transdermal administration, which may provide an increase in the safety or efficacy of topical diclofenac treatment. Extensive research has been performed on administering topical diclofenac that now reveal several developments relating to improvements in safe and effective treatment using topical diclofenac. In certain preferred embodiments, the topical diclofenac for transdermal administration is in the form of a solution or a gel.

In one nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 1, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Examples 2 and/or 3, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 4, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 5, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 6, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Examples 7 and/or 8, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 9, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 10, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 11, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in two or more or all of Examples 1-6. In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in two or

more or all of Examples 1-8. In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in two or more or all of Examples 1-11.

In yet another nonlimiting embodiment, such nonlimiting information provided to a user is the information in the Attachment.

In one embodiment, such nonlimiting information provided to a user is or comprises the information in one or more or all of Sections 6 ("Adverse Reactions"), 7.8 ("Oral Nonsteroidal Anti-inflammatory Drugs"), 7.9 ("Topical Treatments"), 12.3 ("Pharmacokinetics), 13.2 ("Animal Toxicology and/or Pharmacology") and 14 ("Clinical Studies") of the Attachment.

Topical diclofenac can be formulated for administration where the formulation generally contains DMSO and one or more pharmaceutically acceptable excipients. As used herein, "pharmaceutically acceptable excipient" means any other component added to the pharmaceutical formulation other than the diclofenac and the DMSO. Excipients may be added to facilitate manufacture, enhance stability, control release, enhance product characteristics, enhance bioavailability, enhance patient acceptability, etc. Pharmaceutical excipients include, for example, carriers, fillers, binders, disintegrants, lubricants, glidants, colors, preservatives, suspending agents, dispersing agents, film formers, buffer agents, pH adjusters, preservatives etc.

In certain embodiments, the diclofenac is in the form of a pharmaceutically acceptable salt or free acid. Examples of pharmaceutically acceptable salts include metal salts, including alkali metal, alkaline earth metal, and nitrogen-based salts, such as ammonium salts. Sodium, potassium, epolamine and diethylamine salts are preferred. In one preferred embodiment the diclofenac is diclofenac monosodium salt.

In one nonlimiting embodiment, the topical diclofenac is a solution.

In another nonlimiting embodiment, the topical diclofenac is a gel.

In one embodiment, the topical diclofenac is 1.5% w/w diclofenac sodium in a vehicle solution containing DMSO 45.5% w/w and other excipients. In one aspect of this embodiment, the other excipients comprise propylene glycol, alcohol, glycerin and purified water.

In one nonlimiting embodiment, the topical diclofenac is a gel formulation according to PCT/US2007/081674 (International Publication No. WO 2008/049020 A2), the contents of which are incorporated herein in their entirety by this reference. The topical diclofenac may be any of the gel formulations described or claimed therein. In another nonlimiting embodiment, the topical diclofenac is a gel formulation according to US Patent Application No. 20080300311 (published Dec. 4, 2008), the contents of which are incorporated herein in their entirety by this reference. The topical diclofenac may be any of the gel formulations described or claimed therein.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising diclofenac sodium, dimethyl sulfoxide, ethanol, propylene glycol, one or more thickening agents, and water. In one aspect of this embodiment, the topical diclofenac gel formulation further comprises glycerol. In another aspect, the thickening agent is selected from the group consisting of cellulose polymers, carbomer polymers, a carbomer derivative, a cellulose derivative, polyvinyl alcohol, poloxamers, polysaccharides, and mixtures thereof.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of 1-5% w/w diclofenac sodium; 30-60% w/w dimethyl sulfox-

HZNPENN_00000222

ide; 1-50% w/w ethanol; 1-15% w/w propylene glycol; a thickener; and water (added to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of 10-50,000 centipoise.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of about 2% w/w diclofenac sodium; about 45.5% w/w dimethyl sulfoxide; about 23-29% w/w ethanol; about 11% w/w propylene glycol; about 0-6% w/w hydroxypropylcellulose (HY119); and water (added to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of 500-5,000 centipoise.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of diclofenac sodium at a concentration selected from the group consisting of 1, 1.5, 2 and 3% w/w; dimethyl sulfoxide at a concentration selected from the group consisting of 42, 43, 44, 45, 45.5 46, 47, 48 and 49% w/w and fractions in between; ethanol at 23-29% w/w; propylene glycol at a concentration selected from the group consisting of 9, 10, 11, 12, 13% w/w and fractions in between; hydroxypropylcellulose (HY119) at 0-6% w/w; and water (included in an amount sufficient to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of about 500-5000 centipoise.

In certain embodiments, the above-described topical diclofenac gel formulations include 1-5% glycerol. In such embodiments, the gel formulation will have a drying rate and a transdermal flux that are greater than a comparative liquid topical diclofenac formulation. In other embodiments, the above-described topical diclofenac gel formulations will have a pH of about 6.0 to about 10.0.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising diclofenac sodium, ethanol, DMSO, propylene glycol, hydroxypropylcellulose and water. In one aspect of this embodiment, the hydroxypropylcellulose is substituted with alklycellulose, hydroxyalkylcellulose, carboxyalkylcellulose, or sodium carboxyalkylcellulose, where alkyl is methyl, ethyl or propyl, or a mixture thereof. In a further aspect of this embodiment, the said alklycellulose, hydroxyalkylcellulose, carboxyalkylcellulose, or sodium carboxyalkylcellulose is replaced in whole or in part by an acrylic polymer (for example, Carbopol polymers, Noveon polycarbophils and Pemulen polymeric emulsifiers available commercially from Noveon Inc. of Cleveland, Ohio), an acrylic polymer derivative, a cellulose polymer derivative, polyvinyl alcohol ("PVA"), polyvinylpyrrolidone ("PVP"), a poloxamer, a polysaccharide, or a mixture thereof.

In another aspect, gel formulations useful in the invention are NSAID gel formulations, such as a topical diclofenac gel formulation, and components of the formulations are as follows: The gel formulations comprise an active agent, preferably a non-steroidal anti-inflammatory drug or pharmaceutically acceptable salts thereof. More preferably, the non-steroidal anti-inflammatory is diclofenac in the form of a pharmaceutically acceptable salt or free acid. Examples of pharmaceutically acceptable salts include metal salts, including alkali metal, alkaline earth metal, and nitrogen-based salts, such as ammonium salts. Sodium, potassium, epolamine and diethylamine salts are preferred. In one preferred embodiment the diclofenac is diclofenac monosodium salt.

In a preferred embodiment, the sodium salt of diclofenac is used. Diclofenac may be present in a range of approximately 0.1% to 10%, such as 1, 2, 3, 4, or 5% w/w. In another embodiment, the present invention includes a penetration enhancer. The penetration enhancer can be dimethyl sulfoxide ("DMSO") or derivatives thereof. The DMSO may be

present in an amount by weight of 1% to 70%, and more preferably, between 25% and 60%, such as 25, 30, 40, 45, 50, 55, or 60% w/w. Preferably, DMSO is used in the present invention at a concentration of about 40 to about 50% w/w, such as 41, 42, 43, 44, 45, 46, 47, 48, 49 and 50% and all fractions in between such as 44, 44.5, 45, 45.5, 46, 46.5%, and the like. In certain embodiments, the gel formulation includes a lower alkanol, such as methanol, ethanol, propanol, butanol or mixtures thereof. In certain embodiments, the alkanol is present at about 1 to about 50% w/w. Preferably, ethanol is used at about 1-50% w/w, such as 1, 5, 10, 15, 20, 25, 30, 35, 40, 45, or 50% w/w, and all fractions in between. In certain embodiments, the gel formulation includes a polyhydric alcohol, such as a glycol. Suitable glycols include ethylene glycol, propylene glycol, butylene glycol, dipropylene glycol, hexanetriol and a combination thereof. Preferably, propylene glycol is used at about at 1-15% w/w, such as 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15% w/w, and all fractions in between. In certain embodiments, the gel formulation includes glycerol (also referred to as glycerine) at a concentration of 0-12% w/w. Preferably, glycerol is used at 0-4% w/w, such as 0, 1, 2, 3, or 4% w/w, and all fractions in between. In some embodiments, no glycerol is used in the formulation. In a preferred embodiment, the gel formulation provides comprises a diclofenac solution and at least one thickening agent to make a gel. The at least one thickening agent of the present invention may be an acrylic polymer (for example, Carbopol polymers, Noveon polycarbophils and Pemulen polymeric emulsifiers available commercially from Noveon Inc. of Cleveland, Ohio), an acrylic polymer derivative, a cellulose polymer, a cellulose polymer derivative, polyvinyl alcohol, poloxamers, polysaccharides or mixtures thereof. Preferably the at least one thickening agent is hydroxypropylcellulose (HPC) used such that the end viscosity is between 10 and 50000 centipoise (cps). More preferably the end viscosity is between 500 and 20000 cps. The gel formulation may optionally include at least one antioxidant and/or one chelating agent. Preferred antioxidants may be selected from the group consisting of butylated hydroxytoluene (BHT), butylated hydroxyanisole (BHA), ascorbyl linoleate, ascorbyl dipalmitate, ascorbyl tocopherol maleate, calcium ascorbate, carotenoids, kojic acid, thioglycolic acid, tocopherol, tocopherol acetate, tocophereth-5, tocophereth-12, tocophereth-18, tocophereth-80, and mixtures thereof. Preferred chelating agents may be selected from the group consisting of ethylenediamine tetraacetic acid (EDTA), diammonium EDTA, dipotassium EDTA, calcium disodium EDTA, HEDTA, TEA-EDTA, tetrasodium EDTA, tripotassium EDTA, trisodium phosphate, diammonium citrate, galactaric acid, galacturonic acid, gluconic acid, glucuronic acid, humic acid, cyclodextrin, potassium citrate, potassium ethylenediaminetetramethylenephosphonic acid ("EDTMP"), sodium citrate, sodium EDTMP, and mixtures thereof. In addition, the topical gel formulations can also comprise a pH adjusting agent. In one particular embodiment, the pH adjusting agent is a base. Suitable pH adjusting bases include bicarbonates, carbonates, and hydroxides such as alkali or alkaline earth metal hydroxide as well as transition metal hydroxides. Alternatively, the pH adjusting agent can also be an acid, an acid salt, or mixtures thereof. Further, the pH adjusting agent can also be a buffer. Suitable buffers include citrate/citric acid buffers, acetate/acetic acid buffers, phosphate/phosphoric acid buffers, formate/formic acid buffers, propionate/propionic acid buffers, lactate/lactic acid buffers, carbonate/carbonic acid buffers, ammonium/ammonia buffers, and the like. The pH adjusting agent is present in an amount sufficient to adjust the pH of the composition to

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000223

27

28

between about pH 4.0 to about 10.0, more preferably about pH 7.0 to about 9.5. In certain embodiments, the unadjusted pH of the admixed components is between 8 and 10, such as 9, without the need for the addition of any pH adjusting agents.

The present invention includes a method for applying multiple topical agents to a subject with pain comprising topically administering a pharmaceutical composition comprising a therapeutically effective amount of a topical diclofenac in DMSO, waiting for the treated area to dry (the time of which can be dependent on individual skin characteristics, environmental conditions such as temperature and humidity, and surface area, often about 5-30 minutes, about 5-20 minutes, for example, and typically about 10 minutes or less for a topical diclofenac preparation, including a topical diclofenac solution as described in the Examples), and applying another topical agents. In one nonlimiting embodiment, the subject has osteoarthritis. In another nonlimiting embodiment, the subject has osteoarthritis of the knee. In one embodiment, the topical agent administered after the topical diclofenac is a sunscreen or an insect repellant. In another nonlimiting embodiment, the invention includes a method of protecting a subject with osteoarthritis from UV exposure and alleviating the signs and symptoms of osteoarthritis in the subject comprising the steps of applying a therapeutically effective amount of a topical diclofenac in DMSO; waiting for the treated area to dry (the time of which can be dependent on individual skin characteristics, environmental conditions such as temperature and humidity, and surface area, often about 5-30 minutes, about 5-20 minutes, for example, and typically about 10 minutes or less for a topical diclofenac preparation, including a topical diclofenac solution as described in the Examples), applying sunscreen to the same area of treatment.

Also included herein are pharmaceutical products (kits) useful, for example, for the treatment or prevention of pain, including pain caused by arthritis, such as osteoarthritis, for example, which comprise one or more containers containing a topical diclofenac formulation and information or published material, e.g., as product inserts or product labels. The information can indicate quantities of the components to be administered, guidelines for administration, safety issues, and the like, all as disclosed and provided herein.

The kits may further comprise one or more conventional pharmaceutical kit components, such as, for example, one or more containers to aid in facilitating compliance with a particular dosage regimen, etc. Exemplary kits can be in the form of a package. Suitable packages and packaging are known in the art or easily ascertained by one of ordinary skill in the art.

In one nonlimiting embodiment, the topical diclofenac formulation is packaged with information informing the user that the topical diclofenac solution will not cause an uptake of one or more environmental toxins. In another nonlimiting embodiment, the topical diclofenac formulation is packaged with information that includes reference to a lack of anticipated or expected adverse events or adverse reactions in patients from exposure to one or more environmental toxins following the acute and/or chronic use of a topical diclofenac solution, for example a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl) amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

In one nonlimiting embodiment, a method of manufacturing a topical diclofenac pharmaceutical product comprises packaging a topical diclofenac dosage form with the Information. Additional information can include the information

disclosed, summarized or otherwise provided herein, including the information provided in any of Examples 1-4.

In another nonlimiting embodiment, an article of manufacture comprises a container containing a dosage form of topical diclofenac, wherein the container is associated with published material informing the user of some of all of the Information. Additional information can include the information disclosed, summarized or otherwise provided herein, including the information provided in any of Examples 1-4.

In one nonlimiting embodiment of the methods and articles of manufacture provided herein, a topical diclofenac dosage form can comprise about 40 drops per knee, QID. In one aspect of this embodiment, a diclofenac oral dosage form may also be provided or recommended or included within the methods and articles of manufacture provided herein. In another nonlimiting embodiment of the methods and articles of manufacture provided herein, a topical diclofenac dosage form can comprise application of a topical diclofenac gel formulation twice daily.

In another nonlimiting embodiment of the methods and articles of manufacture provided herein, a kit of information concerning a topical diclofenac product comprising diclofenac and dimethyl sulfoxide is prepared and/or provided, said kit comprising information about (a) clinical effects of dosing of a topical diclofenac solution comprising 1.5% w/w diclofenac sodium and 45.5% w/w dimethyl sulfoxide, including (i) the effects of 40-drop QID dosing of said topical diclofenac solution; (ii) the effects of 40-drop QID dosing of said topical diclofenac solution in one or more clinical trials; (iii) results from a 12-week, double-blind, controlled trial of said topical diclofenac solution in subjects with osteoarthritis of the knee which compared the performance of said topical diclofenac solution against a vehicle solution containing 45.5% dimethyl sulfoxide and a placebo solution containing 2.3% dimethyl sulfoxide; and (iv) pharmacokinetic results from one or more studies in which single and multiple doses of a topical diclofenac in a solution containing dimethyl sulfoxide was applied topically to healthy human volunteers; (b) an adverse event profile for a topical diclofenac solution comprising 1.5% w/w diclofenac sodium and 45.5% w/w dimethyl sulfoxide, including, (i) concomitant use of oral NSAIDs with topical diclofenac resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin; (ii) that in a controlled trial, a higher rate of contact dermatitis with vesicles was observed after treatment of 152 subjects with the combination of topical diclofenac and oral diclofenac; and (iii) results of a clinical study demonstrating that the addition of said topical diclofenac solution to oral diclofenac did not cause an elevation of liver transaminases over use of oral diclofenac alone; (c) preclinical study results for a topical formulation comprising dimethyl sulfoxide, including for example, the results of an animal study in which no adverse ocular effects were observed after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in a topical diclofenac solution (e.g., Pennsaid®); and (d) a statement that, once dry, sunscreen, insect repellant, lotion, moisturizer, cosmetics, and/or other topical products can be applied to an area previously treated with a topical diclofenac solution (e.g., Pennsaid®).

Yet another nonlimiting embodiment is a method of obtaining marketing authorization from a regulatory authority for a topical diclofenac product comprising referencing the kit of information.

In another embodiment, a method for distribution of a topical diclofenac product is provided, comprising the steps of (a) obtaining marketing authorization from a regulatory

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000224

authority for a topical diclofenac product comprising refer-encing said kit of the invention; and providing said topical diclofenac product to one or more distributors.

The following examples further illustrate the invention but, of course, are not to be construed as in any way limiting its scope.

## EXAMPLES

### Example 1

12-Week, Double-Blind, Double-Dummy, Randomized Controlled Trial of Topical Diclofenac Solution

This Example describes novel clinical information that may, for example, be provided to a user according to the present invention, comprising safety and efficacy results from a 12-week, double-blind, double-dummy, randomized con-trolled trial of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino] benzeneacetic acid, monosodium salt), 45.5% DMSO, etha-nol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee. The study included a placebo arm to establish efficacy, a DMSO vehicle arm to address possible DMSO efficacy, an oral diclofenac arm for comparison with the topical diclofenac solution, and a combination of Topical Diclofenac Solution plus oral diclofenac to assess combined treatment.

Study Subjects: This randomized, double-blind, double-dummy, placebo-, vehicle- and active-controlled study was conducted at 40 outpatient centers in Canada and 21 centers in the United States following approval by the appropriate insti-tutional review boards. Eligible subjects, after written informed consent, included men and non-pregnant women aged 40-85 with primary OA of the knee based on (i) standard radiological criteria for OA (Altman, R D, et al., Atlas of individual radiographic features in osteoarthritis. *Osteoar-thritis Cartilage* 1995; 3 (Suppl A):3-70) on a recent (within 3 months) examination, (ii) pain, with regular use of an NSAID or other analgesic medication (at least 3 days a week for the previous month) and (iii) a flare of pain and minimum Likert pain score of 8 (40 on a scale normalized to 0-100; see below, Efficacy Measures) at baseline, following washout of that medication. A flare was defined as an increase in total Likert pain score of 25% and at least 2, and a score of at least moderate on one or more of the five items/questions of the WOMAC LK3.1 pain subscale (Bellamy, N, et al., Validation study of WOMAC: a health status instrument for measuring clinically important patient relevant outcomes to antirheu-matic drug therapy in patients with osteoarthritis of the hip or knee. *J. Rheumatol.* 1988 December; 15(12):1833-40). All knee films were reviewed by a single radiologist and each compartment was scored (none=1, mild=2, moderate=3, severe=4). Only one knee was treated; where both knees met all entry criteria, the more painful knee (or dominant knee if they scored the same) was selected. Standard exclusion cri-teria were employed, as described in Roth S H, Shainhouse J Z. Efficacy and safety of a topical diclofenac solution (Pennsaid®) in the treatment of primary osteoarthritis of the knee: a randomized, double-blind, vehicle-controlled clinical trial. *Arch Intern Med.* 2004: 164:2017-23.

Study Design: Eligible subjects were stratified by the investigator at baseline into stratum 1 (no pain and normal radiological examination in the non-study knee) or stratum 2 (pain and/or abnormal radiological examination in the non-

study knee), and then randomized into the trial by receiving the next numbered study kit at that clinic for that stratum. Each study kit contained topical solution and oral tablets for one of the five treatment regimens: (i) Topical Diclofenac Solution [Pennsaid® Topical Solution, Nuvo Research Inc., Mississauga, Canada] plus oral placebo tablets, (ii) 'DMSO vehicle'; vehicle solution plus oral placebo tablets (vehicle solution was the complete carrier, including 45.5% DMSO and other excipients, with no diclofenac), (iii) 'placebo'; placebo solution plus oral placebo tablets (placebo solution was a modified vehicle solution with only 2.3% DMSO, for blinding purposes, and no diclofenac), (iv) 'oral diclofenac'; placebo solution plus oral diclofenac tablets (100 mg slow release), or (v) 'topical diclofenac+oral diclofenac'; Topical Diclofenac Solution plus oral diclofenac tablets. Subjects applied 40 drops of solution (approximately 1.2 mL) around the entire circumference of the study knee, without massage, 4 times daily, and took one oral tablet daily for up to 12 weeks.

Concomitant analgesic and anti-inflammatory medica-tions, including over the counter NSAIDs and other analge-sics, were prohibited. Continuation of stable treatment with glucosamine, chondroitin, anti-depressants or a proton pump inhibitor (previous 90 days), or low-dose ($\leq$325 mg/day) acetylsalicylic acid (previous 30 days) was permitted. Acetaminophen was provided, and permitted (up to four 325-mg caplets per day) except during the 3 days before each efficacy assessment. Other topical products on the knee, including skin emollients, were prohibited. A patient with a gastrointestinal adverse event was allowed to start a proton pump inhibitor. Compliance with the treatment regimen was assessed by weighing the solution bottles and counting study tablets at each clinic visit.

All study solutions appeared as identical clear, colorless liquids. It was expected that some subjects applying Topical Diclofenac Solution or DMSO vehicle would report a garlic taste or odor from exhaling dimethyl sulfide, a volatile DMSO metabolite; therefore, a token amount of DMSO (2.3%) was included in the placebo solution. Previous trials with topical diclofenac confirmed the success of this blinding procedure as the incidence of 'taste perversion' adverse events was no different with placebo solution from topical diclofenac. Oral diclofenac and placebo tablets appeared identical (Novop-harm® Inc.). Each study kit was assembled according to a computer-generated randomization schedule created by an external statistician for each stratum using a block size of 5. The randomization sequence was concealed from investiga-tors, subjects and the sponsor's clinical research personnel until after data lock.

Efficacy Measures: Each subject completed a full efficacy assessment questionnaire after randomization at baseline and at 4, 8 and 12 weeks, or at drop out. The co-primary efficacy variables (Bookman A A, et al., Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial. *CMAJ.* 2004; 171: 333-8) were defined a priori as WOMAC pain and physical function, measured by the 5-point Likert scale (Biswal S, et al., Longterm efficacy of topical nonsteroidal anti-inflamma-tory drugs in knee osteoarthritis: metaanalysis of randomized placebo controlled clinical trials. *J. Rheumatol.* 2006; 33:1841-4), and patient overall health assessment ("POHA"). The POHA asked the question, "Considering all the ways your osteoarthritic (study) knee and its treatment affect you, including both positive and negative effects, how would you rate your overall state of health in the past 48 hours?" Sec-ondary efficacy variables were WOMAC stiffness and patient global assessment ("PGA") of knee osteoarthritis. The PGA

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000225

asked the question, "How has the osteoarthritis in your study joint been over the last 48 hours?" The POHA and PGA were scored on a 5-point Likert scale. There was no assessment of the non-treated knee. Safety Measures: At all visits, vital signs were measured, dermatological evaluation of the study knee was done according to a standard numerical (0-4) scale (Shirley H H, et al. Efficacy and safety of a tropical diclofenac solution (Pennsaid®) in the treatment of primary osteoarthritis of the knee: a randomized, double-blind, vehicle-controlled clinical trial. *Arch. Intern. Med.* 2004; 164:2017-23) and adverse events were solicited using open-ended questions. Adverse events were categorized according to Coding Symbols for Thesaurus of Adverse Reaction Terms ("COS-TART"). Blood and urine samples were obtained for routine laboratory analysis at baseline, 4 and 12 weeks. Ocular examination (visual acuity test, slit lamp examination and lens assessment) was conducted at the baseline and final visit.

Statistical Analysis Plan: All planned analyses were specified a priori. Analysis of the Likert efficacy data was by modified intent to treat ("mITT"), excluding only those subjects who had no baseline data or did not administer at least one dose of both study solution and tablets. Statistical tests were two-sided at the 5% level of significance. All efficacy analyses were by analysis of covariance of the change in score from baseline to landmark final assessment, with baseline score as the covariate. Subjects in both randomization strata were combined for all analyses.

The primary efficacy comparison was topical diclofenac vs. placebo for the primary efficacy variables, with no correction for analysis of multiple primary variables (regulatory design required superiority for each primary variable). The sample size required to show the superiority of topical diclofenac over placebo was 142 subjects per arm, based on an estimate from previous trials of the difference (standard deviation) between groups for the change in score of 1.5 (4.5) for pain, 5.0 (15) for physical function and 0.4 (1.2) for PGA, power of 80% and Type 1 error rate of $\alpha=0.05_{2\text{-}tailed}$ (Baer P A, et al., Treatment of osteoarthritis of the knee with a topical diclofenac solution: a randomised controlled, 6-week trial [ISRCTN53366886]. *BMC Musculoskelet Disord,* 2005; 6:44; Bookman A A, et al., Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial. *CMAJ.* 2004; 171: 333-8; Roth S H, Shainhouse Efficacy and safety of a Topical Diclofenac Solution (Pennsaid®) in the treatment of primary osteoarthritis of the knee: a randomized, double-blind, vehicle-controlled clinical trial. *Arch Intern Med.* 2004; 164: 2017-23).

A post hoc sensitivity analysis of the primary efficacy data was performed by imputing no improvement (i.e., baseline score carried forward and imputed as final score ("BOCF") to

non-completers by reason of an adverse event or lack of effect and for subjects excluded from mITT.

Secondary comparisons included topical diclofenac vs. placebo for the secondary variables, topical diclofenac vs. DMSO vehicle and DMSO vehicle vs. placebo for all variables. A post hoc efficacy analysis compared topical diclofenac vs. oral diclofenac and topical diclofenac+oral diclofenac vs. oral diclofenac. For a missing final score, last observation was carried forward ("LOCF"). Safety analyses were performed on all subjects who received even one dose of either study medication. There was no imputation of missing safety data. Results were as follows.

Study Subjects: Of 1396 subjects screened, 775 were randomized to one of the 5 treatment arms and 527 subjects completed treatment. Over 95% of patients had bilateral disease (pain or abnormal radiological examination also in non-study knee) with pain in the contralateral knee in 90%. A total of 88% of subjects met the modified (Hochberg M C, et al., Guidelines for the Medical Management of Osteoarthritis Part Osteoarthritis of the Knee. *Arthritis & Rheumatism* 1995; 38(1):1541-1546) American College of Rheumatology (ACR) criteria (Altman R, et al., Development of criteria for the classification and reporting of osteoarthritis: classification of osteoarthritis of the knee. *Arthritis Rheum.* 1986; 29:1039-1049) for osteoarthritis, pain and osteophytes, and the remaining had pain with either joint space narrowing or subchondral sclerosis. Subjects in each treatment arm had similar demographic and baseline characteristics, duration of exposure and compliance (>89% of expected use for topical solution and oral tablets). Withdrawals for an adverse event were similar among treatment groups. Withdrawals for lack of effect were similar among topical diclofenac, placebo and DMSO vehicle arms, but fewer with the oral diclofenac arms.

There were 772 subjects included in the mITT group. Excluded were 3 subjects who did not take at least one dose of both topical and oral medication, or had no data. Individual subjects who omitted baseline assessment for a specific efficacy variable were excluded from that analysis.

Efficacy: The primary efficacy analyses, as shown in the below Table 2 ("Efficacy Variable Scores"), show the superiority of topical diclofenac over placebo for the three co-primary variables—pain (P=0.015), physical function (P=0.034), and POHA (P<0.0001). Superiority was observed also for the secondary variable PGA (P=0.016), but not for stiffness. There was greater improvement with topical diclofenac (P<0.05) compared to DMSO vehicle for all five variables (Table 2). A post-hoc BOCF sensitivity analysis of the primary efficacy data of all 775 patients did not change any of the conclusions of superiority of topical diclofenac compared with placebo (pain, P=0.031; physical function, P=0.041; POHA, P=0.0001).

TABLE 2

| | Efficacy variable scores[a] | | | | | P value | | |
|---|---|---|---|---|---|---|---|---|
| | TDiclo[b] | placebo[b] | DMSO[b] | ODiclo[b] | TDiclo + ODiclo[b] | TDiclo vs. placebo | TDiclo vs. DMSO | TDiclo vs. ODiclo |
| WOMAC Pain | (n = 154) | (n = 155) | (n = 161) | (n = 151) | (n = 151) | | | |
| Baseline score | 13.2 (3.4) | 12.9 (3.3) | 13.0 (3.2) | 13.2 (3.0) | 13.2 (3.4) | | | |
| Change in score[c] | −6.0 (4.5) | −4.7 (4.4) | −4.7 (4.3) | −6.4 (4.1) | −7.0 (4.8) | 0.015 | 0.009 | 0.429 |
| WOMAC Physical Function | (n = 154) | (n = 155) | (n = 161) | (n = 151) | (n = 150) | | | |
| Baseline score | 41.7 (12.8) | 41.6 (11.7) | 41.4 (11.4) | 42.1 (12.0) | 41.0 (11.2) | | | |
| Change in score[c] | −15.8 (15.1) | −12.3 (14.7) | −12.1 (14.6) | −17.5 (14.3) | −18.7 (14.0) | 0.034 | 0.026 | 0.319 |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000226

TABLE 2-continued

Efficacy variable scores[a]

|  | TDiclo[b] | placebo[b] | DMSO[b] | ODiclo[b] | TDiclo + ODiclo[b] | P value | | |
|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  | TDiclo vs. placebo | TDiclo vs. DMSO | TDiclo vs. ODiclo |
| POHA | (n = 154) | (n = 152) | (n = 160) | (n = 150) | (n = 148) |  |  |  |
| Baseline | 2.34 (1.02) | 2.22 (1.03) | 2.30 (1.14) | 2.23 (1.12) | 2.19 (1.04) |  |  |  |
| Change in score[c] | −0.95 (1.30) | −0.37 (1.04) | −0.65 (1.12) | −0.88 (1.31) | −0.95 (1.21) | <0.0001 | 0.016 | 0.956 |
| PGA | (n = 154) | (n = 153) | (n = 161) | (n = 151) | (n = 150) |  |  |  |
| Baseline | 3.12 (0.78) | 3.04 (0.82) | 3.13 (0.74) | 3.04 (0.87) | 3.08 (0.81) |  |  |  |
| Change in score[c] | −1.36 (1.19) | −1.01 (1.18) | −1.07 (1.10) | −1.42 (1.29) | −1.53 (1.27) | 0.016 | 0.018 | 0.439 |
| WOMAC Stiffness | (n = 154) | (n = 153) | (n = 161) | (n = 151) | (n = 150) |  |  |  |
| Baseline | 5.14 (1.63) | 5.01 (1.70) | 5.12 (1.61) | 5.21 (1.72) | 5.07 (1.53) |  |  |  |
| Change in score[c] | −1.93 (2.01) | −1.52 (2.05) | −1.48 (2.07) | −2.07 (2.02) | −2.30 (2.00) | 0.112 | 0.035 | 0.596 |

Abbreviations: TDiclo, Topical Diclofenac Solution plus oral placebo; placebo, topical placebo plus oral placebo; DMSO, topical dimethyl sulfoxide-containing vehicle plus oral placebo; ODiclo, oral diclofenac plus topical placebo; TDiclo + ODiclo, Topical Diclofenac Solution plus oral diclofenac; WOMAC, Western Ontario McMaster Universities LK3.1 Osteoarthritis Index; POHA, patient overall health assessment; PGA, patient global assessment of the study knee.
[a]Data are presented as mean (SD). Maximum score for pain, 20; physical function, 68; POHA and PGA, 4; stiffness, 8.
[b]The number of subjects (n) varied by efficacy parameter because individual subjects did not submit a full baseline assessment.
[c]Final score minus baseline score.

Additionally, the Efficacy Variable Score shows that no significant efficacy advantage of the DMSO vehicle over placebo was observed for the primary or secondary variables, except for the POHA. Furthermore, a comparison of oral diclofenac vs. topical diclofenac found no statistical difference for any of the 5 efficacy variables. The combination of topical diclofenac+oral diclofenac was no better than oral diclofenac alone for all variables (pain, P=0.30; physical function, P=0.33; POHA, P=0.43; stiffness, P=0.16; PGA, P=0.50).

Mean [SD] acetaminophen use with topical diclofenac (0.64 [0.83] caplets per day) was lower than with placebo (0.95 [1.14], P=0.005) and DMSO vehicle (0.99 [1.11], P=0.002), and was not different than that for oral diclofenac (0.55 [0.82], P=0.41) or topical diclofenac+oral diclofenac (0.46 [0.70]; P=0.10).

Safety: Skin adverse events predominated with topical diclofenac, most being dry skin. The overall incidence of skin adverse events was similar in topical diclofenac+oral diclofenac, and lower in placebo, and oral diclofenac arms. The rate with DMSO vehicle was intermediate between topical diclofenac and placebo. Only 5 (3.2%) subjects in topical diclofenac withdrew due to an application site reaction. Importantly, as shown in the below Table 3 ("Incidence of Adverse Events") the incidence of adverse events of the digestive system with topical diclofenac was no greater than placebo and much lower than oral diclofenac and topical diclofenac+oral diclofenac. Withdrawal due to a digestive system adverse event was higher in oral diclofenac (11 [7.3%]) vs. topical diclofenac (4 [2.6%]) and placebo (3 [1.9%]). Additionally, as shown in the below Table 3, the combination topical diclofenac+oral diclofenac did not increase the incidence of digestive system events over oral diclofenac alone.

TABLE 3

Incidence of adverse event[a]

| Adverse Event | TDiclo (n = 154) | placebo (n = 157) | DMSO (n = 161) | ODiclo (n = 151) | TDiclo + ODiclo (n = 152) |
|---|---|---|---|---|---|
| Any adverse event | 96 (62.3) | 90 (57.3) | 97 (60.2) | 94 (62.3) | 98 (64.5) |
| Abnormal taste sensation or odor | 0 (0.0) | 1 (0.6) | 1 (0.6) | 0 (0.0) | 1 (0.7) |
| Any digestive system event | 10 (6.5) | 15 (9.6) | 18 (11.2) | 36 (23.8) | 39 (25.7) |
| Abdominal pain | 5 (3.2) | 1 (0.6) | 5 (3.1) | 11 (7.3) | 3 (2.0) |
| Dyspepsia | 4 (2.6) | 6 (3.8) | 6 (3.7) | 6 (4.0) | 5 (3.3) |
| Diarrhea | 2 (1.3) | 3 (1.9) | 2 (1.2) | 7 (4.6) | 12 (7.9) |
| Liver function tests abnormal | 3 (1.9) | 1 (0.6) | 6 (3.7) | 12 (7.9) | 11 (7.2) |
| Rectal hemorrhage | 1 (0.6) | 0 (0.0) | 0 (0.0) | 0 (0.0) | 5 (3.3) |
| Nausea | 0 (0.0) | 0 (0.0) | 1 (0.6) | 3 (2.0) | 5 (3.3) |
| Any skin/appendages event | 41 (26.6) | 12 (7.6) | 27 (16.8) | 11 (7.3) | 47 (30.9) |
| Dry skin (application site) | 28 (18.2) | 5 (3.2) | 18 (11.2) | 4 (2.6) | 30 (19.7) |
| Contact dermatitis (application site) | 4 (2.6) | 1 (0.6) | 5 (3.1) | 1 (0.7) | 12 (7.9) |
| Rash | 4 (2.6) | 0 (0.0) | 2 (1.2) | 0 (0.0) | 0 (0.0) |
| Contact dermatitis with vesicles (application site) | 3 (1.9) | 0 (0.0) | 0 (0.0) | 1 (0.7) | 6 (3.9) |
| Pruritis (application site) | 2 (1.3) | 0 (0.0) | 0 (0.0) | 0 (0.0) | 1 (0.7) |
| Other system event[b] |  |  |  |  |  |
| Headache | 27 (17.5) | 18 (11.5) | 21 (13.0) | 26 (17.2) | 21 (13.8) |
| Back pain | 15 (9.7) | 10 (6.4) | 15 (9.3) | 11 (7.3) | 4 (2.6) |
| Arthralgia | 14 (9.1) | 15 (9.6) | 25 (15.5) | 12 (7.9) | 7 (4.6) |
| Pain | 7 (4.5) | 5 (3.2) | 11 (6.8) | 8 (5.3) | 1 (0.7) |
| Respiratory disorder | 5 (3.2) | 6 (3.8) | 4 (2.5) | 8 (5.3) | 7 (4.6) |
| Accidental injury | 4 (2.6) | 6 (3.8) | 7 (4.3) | 4 (2.6) | 6 (3.9) |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

TABLE 3-continued

| | Incidence of adverse event[a] | | | | |
|---|---|---|---|---|---|
| Adverse Event | TDiclo (n = 154) | placebo (n = 157) | DMSO (n = 161) | ODiclo (n = 151) | TDiclo + ODiclo (n = 152) |
| Abnormal vision | 4 (2.6) | 5 (3.2) | 4 (2.5) | 4 (2.6) | 1 (0.7) |
| Conjunctivitis | 4 (2.6) | 1 (0.6) | 0 (0.0) | 3 (2.0) | 0 (0.0) |

Abbreviations: TDiclo, Topical Diclofenac Solution plus oral placebo; placebo, topical placebo plus oral placebo; DMSO, topical dimethyl sulfoxide-containing vehicle plus oral placebo; ODiclo, oral diclofenac plus topical placebo; TDiclo + ODiclo, Topical Diclofenac Solution plus oral diclofenac
[a]Data are presented as number (%) of subjects.
[b]Other adverse events with incidence ≥2% in the TDiclo group

No difference between treatment groups was observed for cardiovascular events, which were <2% in each treatment group. The incidence of hypertension was similar for all groups (1.3% for Topical Diclofenac Solution, oral diclofenac and Topical Diclofenac Solution+oral diclofenac; 1.2% for DMSO vehicle; 0.6% for placebo). There was no difference among the groups in reports of an abnormal taste sensation or odor, confirming the success of the blinding procedure for DMSO.

There was no serious adverse event in the Topical Diclofenac Solution arm, 4 in placebo (1 anemia, 1 cere-brovascular accident, I fractured hip, 1 dislocated prosthetic hip), 1 in DMSO vehicle (acute enteritis), 1 in oral diclofenac (post-polypectomy lower gastrointestinal bleed, 8 days after withdrawal of study medication) and 3 in topical diclofenac+ oral diclofenac (1 leg cellulitis, 1 unstable angina, 1 transient ischemic attack).

Changes in key NSAID-related laboratory parameters are shown in the below Table 4 ("Analysis of Change in Laboratory Parameters").

TABLE 4

| | Analysis of change[a] in laboratory parameters | | | | |
|---|---|---|---|---|---|
| | TDiclo (n = 145) | placebo (n = 142) | DMSO (n = 150) | ODiclo (n = 138) | TDiclo + ODiclo (n = 141) |
| AST | | | | | |
| Mean change, U/L | −0.9 (10.3) | −0.6 (5.2) | 0.2 (8.5) | 2.5 (10.9) | 4.1 (29.6) |
| Normal to abnormal[b], N (%) | 10 (6.9) | 5 (3.5) | 8 (5.3) | 27 (19.6) | 20 (14.2) |
| ALT | | | | | |
| Mean change, U/L | −1.0 (11.7) | −0.3 (9.9) | −0.6 (9.8) | 7.2 (25.3) | 8.2 (68.9) |
| Normal to abnormal, N (%) | 6 (4.1) | 4 (2.8) | 2 (1.3) | 26 (18.8) | 24 (17.0) |
| Hemoglobin | | | | | |
| Mean change, g/L | −1.7 (6.2) | −0.8 (6.2) | −0.4 (6.5) | −3.8 (7.1) | −4.8 (6.8) |
| Normal to abnormal, N (%) | 3 (2.1) | 7 (4.9) | 5 (3.3) | 8 (5.8) | 18 (12.6) |
| Creatinine | | | | | |
| Mean change, μmol/L | −0.4 (10.5) | 0.8 (9.0) | 0.3 (10.3) | 3.1 (11.0) | 4.4 (11.2) |
| Normal to abnormal, N (%) | 4 (2.8) | 8 (5.6) | 6 (4.0) | 10 (72) | 15 (10.6) |
| Creatinine Clearance[c] | | | | | |
| Mean change, mL/min | 0.4 (10.3) | −0.5 (8.6) | −0.5 (8.3) | −2.4 (8.7) | −3.3 (9.7) |
| Normal to abnormal, N (%) | 11 (7.6) | 8 (5.7) | 9 (6.0) | 10 (7.2) | 16 (11.4) |

Abbreviations: TDiclo, Topical Diclofenac Solution plus oral placebo; placebo, topical placebo plus oral placebo; DMSO, topical dimethyl sulfoxide-containing vehicle plus oral placebo; ODiclo, oral diclofenac plus topical placebo; TDiclo + ODiclo, Topical Diclofenac Solution plus oral diclofenac; ALT, alanine aminotransferase; AST, aspartate aminotransferase.
[a]Mean (SD) unless otherwise indicated. Only subjects with both a baseline and final lab value for the parameter are shown.
[b]Change from normal at baseline to above upper limit of normal for AST, ALT, creatinine, or below lower limit of normal for hemoglobin, creatinine clearance.
[c]Calculated as per Cockroft DW and Gault MW, Prediction of creatinine clearance from serum creatinine, Nephron 1976; 16:31-41.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX95

HZNPENN_00000228

Overall, the mean change in the laboratory value and the number of subjects developing an abnormality showed no difference between topical diclofenac and placebo or DMSO vehicle, but a greater mean change and higher incidence of abnormality occurred with the oral diclofenac arms. With oral diclofenac compared with topical diclofenac, there was a greater mean change in hemoglobin, alanine aminotransferase, gamma-glutamyl transpeptidase, creatinine and creatinine clearance, and a greater number of subjects developing an abnormality for these parameters. With respect to the transaminases ALT (alanine aminotransferase) and AST (aspartate aminotransferase), there was no statistically significant change in mean values between the oral diclofenac and oral plus topical diclofenac treatment arms. Development of abnormal laboratory parameters was generally below clinically relevant levels. No subject developed a clinically significant change in hemoglobin or creatinine. An increase in any liver enzyme to three times the upper limit of normal occurred in 1 subject with placebo, 1 with DMSO vehicle, 2 with oral diclofenac and 3 with topical diclofenac+oral diclofenac, but none with topical diclofenac.

Ocular examination at baseline and final revealed no change in visual acuity (data not shown) and no difference in the development of lens abnormality (cataract) with placebo (4 [2.6%] subjects) vs. topical diclofenac (2 [1.3%]) or DMSO vehicle (6 [3.8%]).

Conclusions: The results of this clinical study clearly show the effectiveness of Topical Diclofenac Solution applied topically to treat the symptoms of osteoarthritis of the knee.

Topical Diclofenac Solution was superior to both topical comparator groups (placebo and DMSO vehicle) for all 3 primary efficacy variables, pain, function and patient overall health. Efficacy was confirmed by a conservative BOCF sensitivity analysis.

The WOMAC physical function questionnaire asks patients to score physical function in areas such as difficulty descending stairs, difficulty ascending stairs, difficulty rising from sitting, difficulty standing, and difficulty walking on a flat surface. The superiority of topical diclofenac solution over placebo was surprising given that (i) the physical functions measured in the WOMAC physical function questionnaire are generally accomplished with the use of both knees, (ii) only one knee was treated in the study, (iii) 95% of patients had disease in both knees (with pain in the contralateral knee occurring in 90% of the study population) and (iv) the blood levels of diclofenac produced by the topical diclofenac solution when treating one knee are far below the levels achieved by oral administration of the drug and regarded as necessary to achieve a systemic effect (see Examples 7 and 8 below). Remarkably, there was no statistical difference between topical diclofenac solution treatment of one knee and oral diclofenac (which would provide treatment for both knees) for the physical function efficacy variable.

This study followed a typical 12-week oral NSAID trial design, namely, primary osteoarthritis of the knee with pain and abnormal radiological findings. Although most subjects had bilateral osteoarthritis, only one painful knee was treated with topical solution. Inasmuch as outcome measures of physical function and overall patient health assessment are likely to be negatively influenced by symptoms in the non-treated knee, this trial design biased against Topical Diclofenac Solution. In any oral NSAID trial, and in this study's oral diclofenac arms, subjects automatically treat both knees, avoiding these factors. The inclusion of oral therapy for all groups added a second placebo effect to the topical comparator arms, imposing a yet higher burden to prove efficacy of Topical Diclofenac Solution over placebo.

Despite these elements in trial design the efficacy of Topical Diclofenac Solution was robustly established.

The response of patients in the oral diclofenac group in this study (40-48% improvement in variable score) was the same as seen in other oral NSAID trials (Bellamy N, Buchanan W W et al., A multicenter study of tenoxicam and diclofenac in patients with osteoarthritis of the knee. J. Rheum. 1993; 20:999-1004; Yocum D, et al., Safety and efficacy of meloxicam in the treatment of osteoarthritis. Arch Int Med. 2000; 160:2947-54), providing a powerful external audit on the validity of the trial design and conduct, and further confirmation of the sustained efficacy of Topical Diclofenac Solution. Topical Diclofenac Solution was found to be as effective as oral diclofenac at relieving the symptoms of knee osteoarthritis with less NSAID-related systemic toxicity than oral diclofenac. These observations support the safety and efficacy results of a previous equivalence study of Topical Diclofenac Solution vs. oral diclofenac.

Claims of therapeutic efficacy for DMSO itself in osteoarthritis were discounted in an earlier, 4-week trial with topical diclofenac (Bookman A A, et al., Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial. CMAJ. 2004; 171: 333-8) and are further disproven by this 12-week study.

There was no apparent difference between Topical Diclofenac Solution and placebo in NSAID-associated gastrointestinal adverse events (the incidence was actually lower with Topical Diclofenac Solution). In this study, no eye lens abnormalities were observed with DMSO-vehicle or Topical Diclofenac Solution treatment. The combination Topical Diclofenac Solution+oral diclofenac showed no increase in adverse events relative to Topical Diclofenac Solution or oral diclofenac alone. The blood level of diclofenac following topical application as Topical Diclofenac Solution is only about 12 ng/ml, and the incremental increase with the combination would be negligible compared with the predicted level of 1500 ng/mL that is reported with oral diclofenac. Although combined treatment with Topical Diclofenac Solution+oral diclofenac did not provide a statistical advantage over oral diclofenac alone, this regimen could be a reasonable treatment paradigm in an individual with persistent or breakthrough knee pain despite using an oral NSAID.

In conclusion, this Example shows that Topical Diclofenac Solution provides durable improvement in the symptoms of osteoarthritis of the knee, and that relief is not contributed by the DMSO-carrier. Efficacy of Topical Diclofenac Solution was comparable to that achieved with oral diclofenac. For the patient initiating pharmacological therapy for relief of symptoms associated with osteoarthritis of the knee based on current treatment guidelines, Topical Diclofenac Solution is a viable, evidence-based treatment option.

#### Example 2

Influence of a Topical Diclofenac Solution on Percutaneous Absorption Of Three Different Environmental Toxins after Repeated Epicutaneous Administration to minipigs

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, which relates to the influence of a topical diclofenac solution containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") on the

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000229

percutaneous absorption of three different environmental toxins, as evaluated in a study involving repeated epicutaneous administration to minipigs.

The Test Item was Topical Diclofenac Solution [Pennsaid® Topical Solution, Nuvo Research Inc., Mississauga, Canada]. The environmental toxins selected for use in the study were oxybenzone (in the form of Equaline SPF 23 faces sunscreen; active compound 6% oxybenzone), DEET, i.e., N,N-diethyl-m-toluamide (in the form of Deep woods OFF!® pump spray; active compound 25% N,N-diethyl-m-toluamide), and 2,4-D, i.e., 2,4-D, dimethylamine salt (in the form of Spectracide Weed Stop 2× For Lawns Concentrate; active compound 7.57% 2,4-D, dimethylamine salt). The control items used in the study were Retin-A 0.1% (tretinoin) cream, Men's Rogaine® Extra Strength Topical Solution (minoxidil 5% w/v), both of which are approved and marketed in the United States. Both control products have skin permeation enhancing capabilities and were selected for comparison to the Topical Diclofenac Solution in the enhancement of environmental toxins. Retin-A (tretinoin) stimulates mitotic activity and increased turnover of follicular epithelial cells, resulting in disruption of the skin barrier function with consequent enhancement of transepidermal water loss. Compromising skin barrier function can cause enhancement in permeation of molecules through the skin. The skin permeation enhancement of Rogaine is associated with its high content of propylene glycol (50%), a known skin permeation enhancer.

Methods: In this study, performed according to Good Laboratory Practices ("GLP"), 18 female Göttingen Minipigs, a commonly used non-rodent species for pharmacokinetic studies, were selected for entry into the study based on the results of a satisfactory preliminary health screening. There were six treatment groups with 3 female animals per group. Animals were allocated employing a pseudo-random body weight stratification procedure that yielded groups with approximately equal mean body weight.

The Test Item and the controls were supplied ready-to-use. Toxin No. 1 (sunscreen) was applied undiluted. Toxins Nos. 2 (DEET) and 3 (2,4-D) were diluted in ethanol and water, respectively, before use on test day 1 according to the below dilution scheme. The same toxin administration solutions were used on test day 1, 21, 28 and 35. Between the administrations, the solutions were stored at +2° C. to +4° C.

Preparation of the toxin administration dose

| Toxin No. | Active compound | Strength of active cmpd in the toxin (w/v) | Targeted exposure of active cmpd to 150 cm² [μg] | Dilution of the toxin | Volume of diluted toxin to be applied to 150 cm² [mL] |
|---|---|---|---|---|---|
| 1 | oxy-benzone | 6% | 300000 | 1 | 5 |
| 2 | DEET | 25% | 6723 | 40 | 1.08 |
| 3 | 2,4-D | 7.57% | 13.35 | 5000 | 0.88 |

Toxin was applied by epicutaneous administration via syringe onto the back region. There was a single administration on test day 1 (before administration of the Test Item or the Controls) and single administration on days 21, 28 and 35 (after administration of the Test Item or the Controls). The administration area was 150 cm²/animal. The administration site was situated on the animal's back between the fore and the hind extremities. The surface area of the application site was selected to provide a high toxin exposure that would ensure measurable systemic levels of the toxins.

Prior to the start of the study, the administration sites were cleared of bristles, if present. The remaining hairs were clipped. The toxin was spread onto the administration area using a syringe. The administration area was not covered with any dressing. Following administration the animals were restrained for at least 1 hour (until the toxin had completely dried) in slings which allowed free movement of the head but prevented a complete body turn in order to prevent access by the animals to the toxins.

The six treatment groups were assigned to receive toxins, Test Items and Controls as set forth in the following table.

| Group | Toxin No. (Name) | Test Item/Control |
|---|---|---|
| 1 | 1 (oxybenzone) | Topical Diclofenac Solution (Test Item) |
| 2 | 2 (DEET) | Topical Diclofenac Solution (Test Item) |
| 3 | 3 (2,4-D) | Topical Diclofenac Solution (Test Item) |
| 4 | 1 (oxybenzone) | Retin-A (Control no. 1) |
| 5 | 2 (DEET) | Rogaine ® (Control no. 2) |
| 6 | 3 (2,4-D) | Rogaine ® (Control no. 2) |

On test day 21, Topical Diclofenac Solution (Test Item) or Rogaine Topical Solution (Control No. 2), respectively, was applied 30 minutes before toxin administration based on a pre-specified schedule. No administration of Retin-A (Control No. 1) was scheduled for test day 21. On test day 21 the toxin administration was carried out after the Test Item/Control administration according to the following schedule: Groups 1, 2 and 3: 30 minutes after Test Item/Control administration; Group 4: after an overnight break; Groups 5 and 6: 30 minutes after Test Item/Control administration.

In sum, Test Item/Control application was as follows: Topical Diclofenac Solution (Test Item), 0.22 mL/administration site four times daily from test days 6 to 20 (7:30, 12:30, 17:30, 22:30) and one single dose on day 21 (7:30); Retin-A 0.1% cream (Control No. 1), 112.5 mg/administration site once daily from test days 6 to 20 (22:30); Rogaine E S (Control No. 2), 0.8 mL/administration site twice daily from test days 6 to 20 (7:30, 17:30) and one single dose on day 21 (7:30). The administration site of the Test Item or Controls was exactly the same as for the toxins, i.e. 150 cm² on the animal's back between the fore and hind extremities, as noted above. Toxin dose levels were selected based upon available human environmental and occupational exposure data. Dose levels for the Test Item or Controls were based on the recommended doses of the products in humans.

The Test Item or Control was spread onto the administration area using a syringe. The administration area was not covered with any dressing. Following administration the animals were restrained for at least 1 hour (until the test item and controls had completely dried) in slings which allowed free movement of the head but prevented a complete body turn in order to prevent access by the animals to the Test Item or Controls.

Any contact of the test areas with water was avoided throughout the whole experiment.

Observations: Observations related to individual animals made throughout the study included clinical signs, body weight and food/water consumption.

For evaluation of local tolerance, skin reactions were examined once daily throughout the study, prior to each administration (end of the respective exposure period), if applicable. Reactions, namely, erythema, eschar and oedema formation were scored based on Draize J H, Appraisal of the Safety of Chemicals in Food, Drugs and Cosmetics, Associa-

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000230

**41**

tion of Food and Drug Officials of the United States, Austin, Tex., 1959. Any other lesions were also recorded, if any occurred.

Blood sampling for pharmacokinetics was undertaken for each animal at predetermined sampling times and processed for at least 2 mL Li—Heparin plasma/sample, which were split into two aliquots of 1 mL each.

The area under the concentration-time curve ("AUC") from time zero to 48h, $AUC_{0-48h}$, for each toxin was calculated for each minipig after each toxin administration on test days 1, 21, 28 and 35 using a linear trapezoid method. Descriptive statistics (arithmetic mean, standard deviation) of non-transformed $AUC_{0-48h}$ and natural log-transformed $AUC_{0-48h}$ were calculated for each treatment group for the administration days on test days 1, 21, 28 and 35. Log-transformed $AUC_{0-48h}$ were compared using the repeated measurements employing a generalized linear model of variance using treatment group and administration day as covariates. The achievement of steady state of diclofenac was assessed by using repeated measurements employing analysis of variance ("ANOVA") with log-transformed trough concentrations on test days 19, 20 and 21. All statistical analyses were two-sided and in all analyses the Type 1 (alpha) error was fixed at the 5% level.

Results: With regard to clinical signs, no signs of local intolerance reactions were observed in any of the minipigs after repeated epicutaneous administration of 0.22 mL. Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) and any of the Toxin Nos. 1, 2 or 3. Additionally, no signs of local intolerance reactions were observed in any of the minipigs after repeated epicutaneous administration of either Control No. 1 or Control No. 2.

Additionally, no signs of systemic intolerance reactions were observed in any of the minipigs after repeated epicutaneous administration of 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) and any of the three toxins. No signs of systemic intolerance reactions were observed in any of the minipigs after repeated epicutaneous administration of either 112.5 mg Retin-A 0.1% (tretinoin) cream/animal (control no. 1) or 0.8 mL Men's Rogaine® Extra Strength Topical Solution/animal (control no. 2) and any of the three toxins.

The body weight was in the normal range throughout the course of the study in all animals after repeated epicutaneous administration of 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) or the two controls and any of the three toxins.

No influence on the food consumption was noted for any of the animals after repeated epicutaneous administration of 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) or the two controls and any of the three toxins.

The visual appraisal of the drinking water consumption did not reveal any Test Item-related influence.

Pharmacokinetic data results indicated that systemic diclofenac steady state was reached by day 19.

Due to limitation in the sensitivity of the analytical methods employed in the study, no DEET (Toxin no. 2) or 2,4-D (Toxin no. 3) could be quantified in plasma for any of the animals treated with the Topical Diclofenac Solution or the Rogaine so no firm conclusions could be drawn from the study concerning the enhancement of systemic absorption of these toxins. A subsequent study (described in Example 3 below) using higher concentrations of DEBT and 2.4-D was therefore conducted.

In contrast, the exposure to oxybenzone could be well quantified on all application days. The courses of the plasma concentrations of oxybenzone were summarized non-com-

**42**

partmentally by means of $C_{max}$ (maximum observed plasma concentration), tmax (time of $C_{max}$ after application of the toxin), and the $AUC_{0-48}$ (the trapezoidal area under the time course of the plasma concentrations up to 48 hours after application).

Based on the ANOVA of the log-transformed $AUC_{0-48}$, the area exposure to oxybenzone for the animals treated with Topical Diclofenac Solution was statistically significantly lower ($p \leq 0.05$) on days 21, 28 and 35 compared with the animals treated with the control (Retin-A), whereas there was no statistically significant difference between the treatments groups on day 1 (before the start of the treatments with the test and control items). No statistically significant differences were noted for the Topical Diclofenac Solution or control (Retin-A) treated animals of groups 1 and 4, respectively, for $C_{max}$ and AUC-values of test day 1 compared to test days 21, 28 and 35.

Conclusions: Epicutaneous application of Topical Diclofenac Solution four times daily from test day 6 to 20 with a single dose applied on the morning of day 21, while resulting in relevant systemic exposure to diclofenac, did not induce relevant local or systemic untoward changes. Treatment with Topical Diclofenac Solution, however, did not amplify the exposure of oxybenzone, an epicutaneously applied toxin.

That systemic diclofenac steady state was reached by day 19 indicates that a maximum degree of skin permeabilization for diclofenac by the Topical Diclofenac Solution vehicle has been reached after 14 days of treatment with Topical Diclofenac Solution.

Results also showed that there was no quantifiable systemic absorption of DEBT or 2,4-D at baseline (prior to treatment with Topical Diclofenac Solution or Rogaine) or following a 15-day pre-treatment with Topical Diclofenac Solution or Rogaine (Treatment Groups 2, 3, 5 and 6).

According to the results, systemic absorption of oxybenzone occurred prior to treatment with Topical Diclofenac Solution and Retin-A control (days 1-3) and this level thus represents baseline systemic absorption of oxybenzone. There was no significant difference in baseline oxybenzone systemic levels and systemic levels obtained following a 14 day pre-treatment period with Topical Diclofenac Solution and it is therefore concluded Topical Diclofenac Solution did not enhance the systemic absorption of oxybenzone. However, there was a significant difference in baseline oxybenzone systemic levels and systemic levels obtained following a 14 day pre-treatment period with Retin-A Control. Therefore, Retin-A enhances the systemic absorption of oxybenzone.

It can be concluded that a 15-day repeat dose treatment with Topical Diclofenac Solution, QID, while resulting in a maximum degree of skin permeabilization for diclofenac, does not enhance the systemic absorption of oxybenzone.

Example 3

Influence of a Topical Diclofenac Solution on Percutaneous Absorption of Two Different Environmental Toxins after Repeated Epicutaneous Administration to Minipigs

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention. which relates to the influence of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") on the percu-

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

**APPX98**

HZNPENN_00000231

taneous absorption of two environmental toxins from Example 2, evaluated at higher doses in a study involving repeated epicutaneous administration to minipigs. In Example 2 the dose levels for the toxins were selected based on the available human environmental and occupational exposure data but the results did not provide systemic exposure above the limit of quantitation. Thus, to increase the potential systemic exposure of the toxin, the maximum dermal exposure to the toxin was selected for this study. As in Example 2, the Test Item was Topical Diclofenac Solution.

The two environmental toxins DEET, i.e., N,N-diethyl-m-toluamide (in the form of Deep woods OFF!® pump spray; active compound 25% N,N-diethyl-m-toluamide) and 2,4-D, i.e., 2,4-D, dimethylamine salt (in the form of Spectracide Weed Stop 2× For Lawns Concentrate; active compound 7.57% 2,4-D, dimethylamine salt) with Toxin no. 2 The single Control Item used in the study was Retin-A 0.1% (tretinoin) cream.

Methods: The study was carried out as described in Example 2 using 12 minipigs (four groups of three female minipigs each). Animals of groups 1 and 2 were treated with the Test Item from the morning of day 6 until the morning of day 21; groups 3 and 4 were treated with Retin-A 0.1% (the Control Item) from the evening of day 6 until the evening of day 20.

Single doses of the toxins were administered on the morning of days 1, 21, 28, and 35. Groups no. 1 (Test Item) and 3 (Control Item) were investigated with Toxin no. 1 (DEET), whereas the animals of groups 2 (Test item) and 4 (Control Item) were investigated with Toxin no. 2 (2,4-D). The volume of the toxin formulation applied was 1 mL on day 1 and 1.5 mL on subsequent doses starting on day 21. In contrast to Example 2, the 1.5 mL toxin volume resulted in an administered dose of DEET (Toxin No. 1) of 375,000 μg and an administered dose of 2,4-D (Toxin No. 2) of 113,550 μg.

The Test Item, Control Item and Toxins were administered as follows. The Test Item was administered four times daily from test days 6 to 20 (7:30, 12:30, 17:30, 22:30); one single dose on day 21 (7:30). The Control Item was administered once daily from test days 6 to 20 (22:30). Toxin Nos. 1 and 2 were administered once on test day 1 (before administration of the Test Item or the Controls) and once on test days 21 (after administration of the Test Item), 28 and 35.

Results: Exposure to DEET could be well-quantified on all application days. In the Topical Diclofenac Solution arm, the dose-normalized area exposure to DEET ($AUC_{0-48}$) on days 21, 28, and 35 was on average 1.18, 1.61, and 1.44 times higher than on day 1, respectively; but was not statistically significantly different. Under the Retin-A Control treatment, the dose normalized area exposure on these days was on average 1.56, 1.83, and 1.30 times higher than on day 1 and were statistically significantly different on test day 28.

Exposure to 2,4-D could be well-quantified on all application days. Under the Test treatment, the dose normalized area exposure to 2,4-D on days 21, 28, and 35 was on average 2.04, 1.27, and 1.16 times lower than on day 1, respectively, but was not statistically significantly different. Under the Control treatment, the dose normalized area exposure on these days was on average 10.84, 8.86, and 7.29 times higher than on day 1 and were statistically significantly different. Accordingly, there is a distinct amplification of the 2,4-D exposure in the control group (Retin-A), but not in the animals treated with the Test treatment (Topical Diclofenac Solution).

No signs of local intolerance reactions were observed for any of the minipigs after repeated epicutaneous administration of 0.22 mL Topical Diclofenac solution/animal (approx. 3.5 mg diclofenac sodium/animal) and Toxin No. 1. Animal no. 4 (group 2) treated with 0.22 mL Topical Diclofenac

Solution/animal (approx. 3.5 mg diclofenac sodium/animal) and Toxin No. 2 revealed a very slight to well defined erythema on test days 7 to 14. Animal nos. 7 and 8 (group 3) treated with 112.5 mg Retin-A 0.1% (tretinoin) cream/animal and Toxin No. 1 revealed a well defined erythema on test days 21 and 22 and a very slight to well defined erythema on test day 35. Animal no. 12 (group 4) treated with 112.5 mg Retin-A 0.1% (tretinoin) cream/animal and toxin no. 2 (group 4) revealed a moderate to severe erythema on test day 21 and a well defined erythema on test day 35.

No signs of systemic intolerance were noted for any of the minipigs after repeated epicutaneous administration of either 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) or the Control Item and the two toxins. Additionally, none of the animals died prematurely; the body weight was in the normal range in all animals throughout the course of the study; and no influence was noted on the food and drinking water consumption for any of the animals.

Epicutaneous application of Topical Diclofenac Solution four times daily from test day 6 to 20 with a single dose applied on the morning of day 21 resulted in relevant systemic exposure to diclofenac.

Conclusions: Epicutaneous application of Topical Diclofenac Solution four times daily from test day 6 to 20 with a single dose applied on the morning of day 21, while resulting in relevant systemic exposure to diclofenac, did not induce relevant local or systemic untoward changes. The achievement of steady state levels of diclofenac by day 21 indicates that a maximum degree of skin permeabilization for diclofenac had been reached. In contrast to Retin-A, treatment with Topical Diclofenac Solution did not amplify the toxic risk of epicutaneously applied toxins such as 2,4-D and DEET.

### Example 4

Effect on Stratum Corneum Barrier Function of Multiple Doses of Topical Diclofenac Solution as Measured by Transepidermal Water-Loss

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, which comprise information regarding an assessment of the effect on stratum corneum barrier function, as measured by transepidermal water loss ("TEWL"), of multiple doses of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino] benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") compared with a positive control, Retin-A®, and an untreated site as a negative control.

Study Design: The study was conducted as a four-period, open label, paired comparison in a single group. Four-Period One (Baseline) was a period of one week prior to the first application on Day 1. At Period Two (Treatment), subjects applied test articles (Topical Diclofenac Solution or Retin-A®) for a period of six weeks. At Period Three (Recovery), subjects underwent a recovery period of two weeks following the treatment period. At Period Four (Retin-A® Challenge) subjects applied Retin-A® under occlusion to the same test site as during Period Two for a period of up to two weeks. Thus, the total study duration was approximately 12 weeks, with eight treatment weeks spread between Period Two (six-week treatment period) and Period Four (two-week treatment period).

HZNPENN_00000232

45

Protocol: At Period One (Baseline), baseline measurements of TEWL were performed on Days −7, −5, and −3 prior to the first application on Day 1. At Period Two (Treatment), subjects applied test articles for a period of six weeks. TEWL was measured on each of the test sites (4 cm×4 cm) immediately before application of the morning dose of test articles on Days 1, 3, 5, 8, 15, 22, 29, 36 and 43. Each subject applied one drop (approximately 30 μL) of Topical Diclofenac Solution to a test site on the right or left volar forearm (as randomized) four times a day for six weeks, at approximately 08:00, 13:00, 18:00 and 23:00. The dose of Topical Diclofenac Solution utilized in this study (approximately 30 μL to a surface area of 16 cm²) was calculated to approximate the Topical Diclofenac Solution dose that applied QID to the knee is shown in Example 1 to be effective for treatment of the pain and symptoms of knee osteoarthritis, namely 40 drops (approximately 1.2 mL) to a knee surface area of approximately 800 cm². Each subject applied a dab (about 12 mg) of Retin-A® to a separate test site on the opposite volar forearm once per day for six weeks, at approximately 08:00 hours. The subject used his/her finger to spread the test articles over their respective test sites. Each forearm had a test area that was left untreated as a negative control. The subjects allowed the test articles to dry before covering the test sites with clothing and avoided sunlight exposure to the test sites during the study. At Period Three (Recovery), subjects underwent a recovery period of two weeks following the treatment period. TEWL was measured on each of the test sites on the morning of Days 45, 47, 50, and 58. At Period Four (Retin-A® Challenge) on Days 58-71, Retin-A® was applied under occlusion to the same test site to which Retin-A® had been applied during Period Two. A designated member of the study staff applied two dabs (about 24 mg) of Retin-A® to the Retin-A® test site, once daily for 14 days, at approximately 08:00 hours. The Retin-A® test site was occluded using polyethylene film (Saran Wrap®) for 15 hours following each application. TEWL was measured on the Retin-A® site and the untreated control site of the same arm on the morning of Days 59-72.

TEWL: TEWL analysis was carried out on the data of the intent-to-treat ("ITT") analysis group. The ITT analysis group included all enrolled subjects who received at least one dose of test article. TEWL was quantified using a VapoMeter, a closed chamber evaporimeter. Change in TEWL between the treated and untreated sites was monitored over time. Descriptive statistics (arithmetic mean, standard deviation, coefficient of variation, median, minimum, and maximum) for the TEWL data was summarized for each treatment. Individual and mean TEWL time profiles were plotted by treatment and period on a linear scale.

To assess the validity of the study to measure changes in TEWL, the post-treatment results for the positive control, Retin-A®, were compared to the untreated site on the same arm using repeated measures analysis of covariance ("ANCOVA") with the average pre-treatment TEWL measure as the covariate. During conduct of the study and preliminary review of the data, it appeared that the positive control was not causing skin irritation to the expected degree. In order to validate the study, a Reign-A® Challenge Period was added via a protocol amendment as described above, and the ANCOVA analysis was repeated for the Challenge Period using Day 58 TEWL measure as the baseline covariate. The TEWL response for the Topical Diclofenac Solution during the Treatment Period was compared to the untreated site on the same arm using repeated measures ANCOVA with the average pre-treatment TEWL measure as the covariate. Secondary analyses included comparisons between Topical Diclofenac Solution and Retin-A® change in TEWL (differ-

46

ence from untreated site) for the Treatment Period, and correlation analyses between TEWL and the variables: skin irritation score, temperature and humidity.

Safety: Safety was assessed through evaluation of the safety variables: adverse events, skin irritation score, laboratory analysis and vital signs. Safety analysis was carried out on the data of every subject who received at least one treatment with study article.

TEWL Results: The results for treatment with Topical Diclofenac Solution indicate that it did not cause an increase in TEWL relative to the untreated site following 6 weeks of treatment at a dose, that applied QID to the knee, is shown in Example 1 to be effective for treatment of the pain and symptoms of knee osteoarthritis. No difference between Topical Diclofenac Solution and Retin-A® was noted during the Treatment Period (neither caused an increase in TEWL during this period of the study).

During the Challenge Period with Retin-A®, skin irritation was noted (see Safety Results) and a significant increase in TEWL relative to the untreated site was observed. These results for the Challenge Period validate the study design by showing that the subjects were responsive to this positive control, a known skin irritant.

Mean TEWL time profiles are shown in FIG. 1 (Retin-A®) and FIG. 2 (Topical Diclofenac Solution). Review of FIG. 1 shows an increase in TEWL for the Retin-A® treated site during the Challenge Period relative to the untreated site, and no difference between treated and untreated sites for Topical Diclofenac Solution and Retin-A® during the Treatment Period.

Safety Results: There were a total of 75 adverse events reported by 12 subjects. The majority of adverse events were classified as mild in severity (35 events) and classified as probably related to the test article (32 events). The majority of the adverse events reported consisted of skin irritation responses (i.e. contact dermatitis, dry skin, pruritus). These were observed at the Retin-A® application test sites for all subjects except for one who reported the adverse event 'dry skin' that occurred at the Topical Diclofenac Solution treated test site.

The frequency of worst skin irritation score during the Treatment Period for Topical Diclofenac Solution revealed 14 of 15 subjects with a worst score of zero, indicating no skin irritation. One subject had a score of 0.5 (dryness or flaking) for the Topical Diclofenac Solution treated site. For Retin-A®, no skin irritation was observed during the Treatment and Recovery Periods. During the Challenge Period, 7 subjects had a worst score of 3 (erythema with induration and vesiculation) and one subject had a score of 1 (erythema) for the Retin-A® treated site. The occurrence of skin irritation for the Retin-A® sites was expected for this positive control.

Two subjects experienced changes in clinical laboratory evaluations (glucose, ALT and AST elevations) that were documented as adverse events. All three adverse events were considered mild and not related to the test articles.

There were no clinically significant findings related to blood pressure, pulse or respiration rates.

Conclusions: The objective of this study was to evaluate the effect on stratum corneum barrier function, as measured by TEWL, of chronic application of Topical Diclofenac Solution as compared with a positive control, Retin-A®, and an untreated site as a negative control.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000233

47

The dose of Topical Diclofenac Solution utilized in this study (approximately 30 μL to a surface area of 16 cm²) was calculated to approximate that shown in Example 1 to be effective for treatment of the pain and symptoms of knee osteoarthritis when applied QID to the knee (40 drops (approximately 1.2 mL) to a knee surface area of approximately 800 cm²). Following chronic dosing with Topical Diclofenac Solution for 6 weeks in this study, no significant increase in TEWL was observed. As measurement of TEWL has been shown to be a validated method for assessing skin barrier function (Fluter J W, Feingold K R, Elias P M. Transepidermal water loss reflects permeability status: validation in human and rodent in vivo and ex vivo models. Exp Dermatol 2006; 15:483-492), these results indicate that Topical Diclofenac Solution did not alter the stratum corneum barrier function.

Treatment with Retin-A®, used as a positive control in this study, in the Challenge Period confirmed skin irritation following Retin-A® treatment and a resulting increase in TEWL, thus validating the study.

In conclusion, the results of this study demonstrate that following chronic dosing with Topical Diclofenac Solution, no significant increase in TEWL was observed, indicating that Topical. Diclofenac Solution did not substantially alter the stratum corneum barrier function.

Example 5

Ophthalmologic Effects of Topically Applied DMSO in a 52-Week Non-Occluded Dermal Toxicity Study in Göttingen Minims

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, comprising the results of a study that was conducted on minipips which provides information about the ocular safety profile of dermally applied formulations containing purified DMSO.

The broad aim of the study was to evaluate the potential dermal toxicity of DMSO when administered topically to four groups of Göttingen Minipigs® for 52 weeks at concentrations of 0, 9%, 45.5% and 90% (w/w) and to evaluate reversibility, progression, or delayed appearance of any observed changes following a 1-month postdose observation period. Two additional groups of Göttingen Minipigs® were dosed topically for 39 weeks at 0% and 90% followed by a 4-month recovery dose observation period.

Four groups consisting of six animals/sex/group received DMSO at respective dose levels of 0, 9, 45.5, or 90% (w/w) by dermal application three times a day for 364 consecutive days. Following 52 weeks of administration, two animals/sex at 0, 9, 45.5, and 90% dose levels were maintained for a 4-week recovery period. Two additional groups consisting of six animals/sex/group received the control or 90% (w/w) DMSO by dermal application three times a day for 273 consecutive days. Following 39 weeks of administration, two animals/sex at 0 and 90% dose levels were maintained for a 4 month recovery period. The control or test article was administered to all groups at a dose volume of 4.5 mL/dose/application site (0.015 mL/cm²; 300 cm² application site) until Week 20. Beginning Week 20 the control or test article was administered to all groups at a dose volume 5.6 mL/dose/application site (0.015 mL/cm²; 375 cm² application site).

48

| Group Assignments | | | |
|---|---|---|---|
| | | Number of Animals | |
| Group Number | Dose Concentration (%) | Male | Female |
| 1ᵃ | 0 | 6 | 6 |
| 2ᵃ | 9 | 6 | 6 |
| 3ᵃ | 45.5 | 6 | 6 |
| 4ᵃ | 90 | 6 | 6 |
| 5ᵇ | 0 | 6 | 6 |
| 6ᵇ | 90 | 6 | 6 |

ᵃFour animals/sex/roup were necropsied after 52 weeks of administration.
Two animals/sex/group remained on the study for a 4-week. recovery period.
ᵇFour animals/sex/group were necropsied after 39 weeks of administration.
Two animals/sex/group remained on study for a 4-month recovery period.

Compositions of the control and test articles were as follows

| Control Vehicle | |
|---|---|
| Ethanol (95% v/v) | 11.79% w/w |
| Propylene Glycol | 11.20% w/w |
| Glycerin | 11.20% w/w |
| Purified Water | 65.81% w/w |
| 9% DMSO | |
| Ethanol (95% v/v) | 11.79% w/w |
| Propylene Glycol | 11.20% w/w |
| Glycerin | 11.20% w/w |
| DMSO | 9.00% w/w |
| Purified Water | 56.81% w/w |
| 45.5% DMSO | |
| Ethanol (95% v/v) | 11.79% w/w |
| Propylene Glycol | 11.20% w/w |
| Glycerin | 11.20% w/w |
| DMSO | 45.50% w/w |
| Purified Water | 20.31% w/w |
| 90% DMSO | |
| Ethanol (95% v/v) | 2.00% w/w |
| Propylene Glycol | 2.00% w/w |
| Glycerin | 2.00% w/w |
| DMSO | 90.00% w/w |
| Purified Water | 4.00% w/w |

Observations for morbidity, mortality, injury, and the availability of food and water were conducted twice daily for all animals. Clinical observations were conducted weekly. At the end of the each treatment and recovery period, necropsy examinations were performed, organ weights were recorded, and selected tissues were microscopically examined.

One female at 90% DMSO was euthanized in extremis on Day 151 of the study. The cause of the morbidity of this animal was determined to be respiratory distress and this was considered incidental to treatment and not test article-related. All remaining animals survived to their scheduled termination at the terminal necropsy at 39 Or 52 weeks and the 4-week and 4-month recovery periods.

Ophthalmoscopic examinations were conducted pretest, and during Weeks 26, 39, and 52. Examinations were performed by a doctor of veterinary medicine with Diplomate, American College of Veterinary Ophthalmologists credentials.

Unexpectedly given the results of earlier studies on non-primate species, no increased risk for development of lens opacities or refractive index changes associated with DMSO were observed. In fact, no test article-related ophthalmoscopic abnormalities of any kind were detected during the

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000234

APPX101

49

study. One female in the control group (i.e. an animal that had not been exposed to DMSO) had a posterior cortical axial cataract with equatorial extrusion at the Week 39 ophthalmoscopic examination. One male at 45.5% DMSO, one male at 90% DMSO, and one control female had conjunctivitis in one or both eyes only at the pretest examination. No other abnormalities were detected in any male or female at any of the ophthalmoscopic examinations.

### Example 6

### Ophthalmologic Effects of DMSO in a 26-Week Dermal Toxicity Study in Sprague-Dawley Rats Followed by a 12-Week Recovery Period

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, comprising the results of a study conducted to evaluate the toxicity of test articles containing DMSO after dermal administration for 26 weeks, three times per day, and to evaluate reversibility of any observed changes following a 12-week post-dose observation period. Three treatment groups of 25 male and 25 female CD® [Crl:CD® (SD)] Sprague-Dawley rats were administered the test article, Dimethyl sulfoxide (DMSO), at respective dose concentrations of 9, 45.5, and 90% w/w. One additional group of 25 animals/sex served as the control and received the vehicle. Compositions of the test articles and control were identical to those used in Example 5 above. The vehicle or test article was administered to all groups epicutaneously, three times a day for 182 consecutive days, at a dose volume of 0.65 mL. Prior to test article administration, the hair was clipped from the back of the animal comprising no less than 10% of the total body surface area as estimated using the equation $A=9.6*W^{2/3}$ where A was the estimated total body surface in square centimeters and W was the body weight in grams. The area was adjusted weekly by group based on the mean body weight for each sex. Following 182 days of administration, 5 animals/sex/group were maintained for a 12-week recovery period.

Observations for morbidity/mortality, injury, and the availability of food and water were conducted twice daily for all animals. Ophthalmoscopic examinations were conducted pretest on all animals and prior to the terminal and recovery necropsies on all main study animals by doctors of veterinary medicine with Diplomate, American College of Veterinary Ophthalmologists credentials.

One female at 9% DMSO (Low dose), two males and one female at 90% DMSO (High dose), and two females at 45.5% DMSO (Mid dose), and one female at 90% DMSO were euthanized in extremis during the study. None of these deaths were considered to be related to treatment.

No test article-related ophthalmoscopic abnormalities were detected in any animal during the pretest, terminal, and recovery ophthalmoscopic examinations. At the recovery ophthalmoscopic examination, one female at 45.5% DMSO was seen with superficial keratitis in both eyes. This isolated common finding was considered incidental to treatment.

### Example 7

### A Single-Dose Pharmacokinetic Evaluation of a Topical Solution Containing 1.5% w/w Diclofenac Sodium and 45.5% DMSO in Normal Healthy Non-Smoking Male and Female Subjects

This Example describes novel clinical information that may, for example, be provided to a user according to the

50

present invention, comprising the results of study conducted to evaluate the pharmacokinetics of diclofenac sodium, dimethyl sulfoxide (DMSO) and dimethyl sulfone (the major metabolite of DMSO) after a single-dose application of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution" [Pennsaid® (Nuvo Research line, Mississauga, Ontario Canada]). The study followed a one-period, open-label, single-dose design in 18 normal, healthy, non-smoking male and female subjects in which Topical Diclofenac Solution was applied to both knees of each subject in the study.

The 18 subjects enrolled in the study consisted of 14 Caucasians, 1 Asian and 3 Blacks (9 males, 9 females) with a mean age of 33 years (range=22 to 46 years). The subjects' mean height was 174 cm (range=163 to 188 cm) and the mean weight was 75 kg (range=54 to 90 kg).

Each subject was instructed to apply Topical Diclofenac Solution to clean knees, total 40 drops per knee: 10 drops each to the front of the knee, to each side and to the back. To avoid spillage, the subject was instructed to apply and spread 5 drops at a time, directly onto his/her hand, and then onto the site. The application left the area visibly wet for several minutes and was applied without massaging. Topical Diclofenac Solution was applied to both knees; the order of application did not matter. After each dosing, subjects waited for the application site to dry prior to dressing. The subject washed his/her hands after complete application to both knees.

The subjects fasted overnight for at least ten hours prior to Topical Diclofenac Solution administration and at least four hours following dosing. The treatments were administered topically to both knees in each subject starting at 7:00 a.m. (0.0 hour), with three-minute intervals between subjects.

Subjects were informed not to take any prescription medication, other than hormonal contraceptives, from at least 14 days prior to the study until the end of the study. Subjects were also advised not to take any over-the-counter drugs, except for spermicidal barrier contraceptive products, for at least seven days prior to the study up until the end of the study. They were specifically reminded that this included cold preparations, Aspirin®, Bufferin®, Excedrin®, Anacin®, etc., herbal/natural supplements, vitamins and antacid (magnesium and aluminum hydroxide) preparations. Subjects were informed that concomitant medication, whether prescription or over-the-counter, was not permitted during the study. Subjects were requested to abstain from grapefruit products, xanthine-and caffeine-containing foods and beverages (this included tea, coffee, chocolate and cola drinks) for 24 hours prior to the start of the study and until after the final blood draws for the study. Subjects were also requested to abstain from alcohol products for 48 hours prior to the start of the study and until after the final blood draws of the study.

Blood samples were collected at 0.0 hour (pre-dose), 1.0, 2.0, 4.0, 6.0, 8.0, 10.0, 12.0, 24.0, 36.0, 48.0, 60.0, 72.0, 96.0, 120.0, 144.0, 168.0, 192.0, 216.0 and 240.0 (hours post-dose).

The blood samples were kept in an ice bath prior to centrifugation and were centrifuged as soon as possible (within 30 minutes) under refrigerated conditions at 3,500 rpm for seven minutes. The plasma was removed from each blood collection tube and aliquoted into pre-cooled, labeled, duplicate, polypropylene tubes, kept in an ice bath prior to being flash frozen in an upright position, in a dry-ice acetone bath and stored frozen at minus (–) 70° C.±10° C. The tubes were labeled with the study number, dosing period, subject num-

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000235

ber, study period, sampling time point, aliquot/tube number and matrix. Upon completion of the clinical portion of the study, all samples were transported in dry-ice to an analytical laboratory (Maxxam Analytics Inc.) for the analysis of diclofenac sodium, dimethyl sulfoxide and dimethyl sulfone using validated analytical methods.

Dimethyl sulfone was below the limit of quantitation in most samples and therefore pharmacokinetic analysis was not conducted. Graphs showing the average measured diclofenac sodium concentration and DMSO concentration in the subjects as a function of time are provided in FIGS. **3** and **4**.

Pharmacokinetic analysis of the data was conducted using WinNonlin version 4.0 (Pharsight, Carry, US). The principal statistical software used was SAS®, version 8.00 (Statistical Analysis System). Results for pharmacokinetic parameters are summarized in the following tables.

Single-dose Pharmacokinetic Parameters for Diclofenac Sodium
(for two knee application)

| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 18 |
|---|---|
| | Mean ± SD |
| $AUC_{0-t}$ (ng · hr/mL) | 177.51 ± 72.62 |
| $AUC_{0-inf}$ (ng · hr/mL)† | 196.27 ± 68.47 |
| $C_{max}$ (ng/mL) | 8.05 ± 5.94 |
| $T_{max}$ (hr) | 11.01 ± 6.44 |
| $t_{1/2}$ (hr)† | 36.72 ± 20.82 |
| $K_{el}$ (hr⁻¹)† | 0.024 ± 0.0098 |
| CL/F (L/hr)† | 244.66 ± 84.72 |

†n = 13

Single-dose Pharmacokinetic Parameters for Dimethyl Sulfoxide
(for two knee application)

| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 18 |
|---|---|
| | Mean ± SD |
| $AUC_{0-t}$ (µg · hr/mL) | 8.719 ± 4.611 |
| $AUC_{0-inf}$ (µg · hr/mL)† | 9.174 ± 3.751 |
| $C_{max}$ (µg/mL) | 0.475 ± 0.335 |
| $T_{max}$ (hr) | 8.451 ± 2.708 |
| $t_{1/2}$ (hr)† | 8.422 ± 7.307 |
| $K_{el}$ (hr⁻¹)† | 0.1136 ± 0.0470 |
| CL/F (L/hr)† | 163.49 ± 64.14 |

†n = 9

Meanings of each of the parameters in the tables above are as follows:

| $AUC_{0-t}$ | Area under the concentration-time curve from time zero to time of last sampling time point |
|---|---|
| $AUC_{0-inf}$ | Area under the concentration-time curve from time zero to infinity |
| $C_{max}$ | Maximum plasma concentration after dosing |
| $T_{max}$ | Time to occurrence of Cmax |
| $t_{1/2}$ | Apparent elimination half-life |
| $K_{el}$ | Apparent elimination rate constant |
| CL/F | Apparent total body clearance |

## Example 8

A Multi-Dose Pharmacokinetic Evaluation of a Topical Solution Containing 1.5% w/w Diclofenac Sodium and 45.5% DMSO in Normal Healthy Non-Smoking Male and Female Subjects

This Example describes novel clinical information that may, for example, be provided to a user according to the present invention, comprising the results of a study conducted to evaluate the pharmacokinetics of diclofenac sodium, dimethyl sulfoxide and dimethyl sulfone after multiple doses of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution" [Pennsaid® (Nuvo Research Inc, Mississauga, Ontario Canada)] which, as in the previous Example 7, was applied to both knees of each subject. This study followed a one-period, open-label, multiple-dose design in 20 normal healthy, non-smoking male and female subjects.

Twenty subjects (10 males, 10 females) with a mean age of 33 years (range=18 to 43 years) were enrolled in this study. The subjects' mean height was 171 cm (range=157 to 185 cm) and their mean weight was 69 kg (range=48 to 87 kg). The subjects consisted of 15 Caucasians, 3 Asians and 2 Blacks.

The treatment (40 drops, applied on the knee four times a day) was carried on for 7 days, and the pharmacokinetic profile was characterized on Day 8 after the 29th administration. Each dose of Topical Diclofenac Solution was applied to the knee following the procedure described previously in Example 7.

Doses were applied either at a clinic or at home according to following schedule:

Days 1 and 6: The subjects applied the first dose of Topical Diclofenac Solution to both knees in the clinic under supervision. The subjects applied the second, third and fourth doses of Topical Diclofenac Solution at home.

Days 2 to 5: The subjects applied all four doses of Topical Diclofenac Solution at home.

Day 7: The subjects applied the first dose of Topical Diclofenac Solution in the clinic and then exited. The second and third doses were applied at home. The fourth dose was applied in the clinic.

Day 8: The subjects applied the last dose of Topical Diclofenac Solution to both knees in the clinic following an overnight fast of at least ten hours.

Blood samples were drawn according to the following:

Days 1 and Day 6: 0.0 hour (pre-dose).

Day 7: 0.0 hour (pre-dose).

Day 8: 0.0 hour (pre-dose), 1.0, 2.0, 4.0, 6.0, 8.0, 12.0, 24.0, 36.0, 48.0, 60.0, 72.0, 96.0, 120.0, 168.0, 216.0, 264.0, 312.0 and 360.0 hours post 0.0 hour post-drug administration Day 8.

Blood samples were processed and analyzed using the methods described previously in Example 7.

One subject dropped out of the study for personal reasons so plasma concentration data from the 19 subjects who received the Topical Diclofenac Solution and who completed the study period were used in the pharmacokinetic analyses.

Steady state was achieved on Day 6 for all three of the 3 molecular entities analyzed. On Day 8, diclofenac sodium remained measurable up to 360 hours post-dose in 11 subjects. On Day 8, DMSO and dimethyl sulfone ("DMSO₂") remained measurable up to 120 hours (10 subjects) and 216 hours (9 subjects) post-dose, respectively.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000236

53

Plots of Diclofenac, DMSO and DMSO$_2$ concentrations are provided in FIGS. 5-7.

The pharmacokinetic analysis was conducted using Win-Nonlin Version 4.0 (Pharsight, Carry, US). The principal statistical software used was SAS®, version 8.00. Results for important pharmacokinetic parameters are provided in the tables below.

| Multiple-Dose Pharmacokinetic Parameters for Diclofenac Sodium (for two-knee application) | |
| --- | --- |
| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 19 Mean ± SD |
| AUC$_{0-\tau}$ (ug · hr/mL) | 695.398 ± 348.866 |
| AUC$_{0-inf}$ (ng · hr/mL)† | 745.192 ± 374.740 |
| C$_{max}$ (ug/mL) | 19.415 ± 9.326 |
| T$_{max}$ (hr) | 4.005 ± 6.541 |
| t$_{1/2}$ (hr)† | 78.972 ± 38.133 |
| K$_{el}$ (hr$^{-1}$)† | 0.0105 ± 0.0040 |

†n = 15

| Multiple-Dose Pharmacokinetic Parameters for Dimethyl Sulfoxide (for two-knee application) | |
| --- | --- |
| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 19 Mean ± SD |
| AUC$_{0-\tau}$ (ug · hr/mL) | 31.887 ± 15.520 |
| AUC$_{0-inf}$ (ug · hr/mL)† | 35.979 ± 15.419 |
| C$_{max}$ (ug/mL) | 1.206 ± 0.575 |
| T$_{max}$ (hr) | 3.842 ± 3.468 |
| t$_{1/2}$ (hr)† | 43.123 ± 22.968 |
| K$_{el}$ (hr$^{-1}$)† | 0.0213 ± 0.0124 |

†n = 13

| Multiple-Dose Pharmacokinetic Parameters for Dimethyl Sulfone (for two-knee application) | |
| --- | --- |
| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 19 Mean ± SD |
| AUC$_{0-\tau}$ (ug · hr/mL) | 1525.292 ± 1065.245 |
| AUC$_{0-inf}$ (ug · hr/mL)† | 2339.190 ± 1276.555 |
| C$_{max}$ (ug/mL) | 18.033 ± 10.587 |
| T$_{max}$ (hr) | 9.397 ± 13.341 |
| t$_{1/2}$ (hr)† | 61.287 ± 18.376 |
| K$_{el}$ (hr$^{-1}$)† | 0.0123 ± 0.0039 |

†n = 11

Quantities reported in the above tables have the meanings provided previously in Example 7. Origin of time (t=0) for calculation of AUC$_{0-\tau}$ and AUC$_{0-inf}$ is time of the last dose of drug on Day 8.

It will be appreciated that the data provided in Examples 7 and 8 evidence that the systemic exposure to diclofenac caused by use of Topical Diclofenac Solution to treat osteoarthritis of the knee (40 drops per knee QID) is much lower than that caused by a typical oral dose of diclofenac used in treatment of osteoarthritis (e.g. 50 mg TID). For example the label of Voltaren® Gel (http://www.voltarengel.com/pdf/Voltaren-PI-10-19.pdf) reports mean AUC$_{0-24}$=3890 ng·h/mL and

54

mean C$_{max}$ of 2270 ng/mL for subjects taking 50 mg of oral diclofenac TID. Assuming the effects of additional doses of Topical Diclofenac Solution are additive, one would conclude from the AUC$_{0-inf}$ provided in Example 7 that the Topical Diclofenac Solution osteoarthritis dose results in only about 20% of the systemic exposure to the active provided by the oral drug. The fact that Topical Diclofenac Solution is shown to be comparable in efficacy to oral diclofenac sodium for treatment of osteoarthritis (see Example 1) is very surprising in view of these facts, especially as it is widely believed that NSAIDs, such as diclofenac, exert their analgesic effects both locally and centrally. Using the data from Example 8 it also can be computed that C$_{max}$ of orally administered diclofenac is more than one hundred fold higher than C$_{max}$ for Topical Diclofenac Solution.

Example 9

Assessment of Drying Time Following Application of a Topical Formulation Containing Diclofenac Sodium to Normal Subjects

The objective of this study was to assess the drying time of a topical diclofenac solution containing 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") when applied topically to the skin surface of the knee following a single dose application.

Using a pre-designed template, the knee application area (100 cm$^2$ centered just above the patella) was outlined in ink (the choice of knee was assigned by randomization). Each subject received an applied dose, 0.15 mL, of Topical Diclofenac Solution to the 100 cm$^2$ area on his/her knee and spread the test article using his/her fingers to completely cover the application area just up to the margin of the demarcation (this amount of drug product corresponding to a typical areal dose of Topical Diclofenac Solution used in the treatment of osteoarthritis of the knee). The applied dose remained un-occluded throughout the study duration.

Visual and blotted assessments were made at pre-dose, immediately following dose application (approximately 2 minutes post-dose) and at 5, 10, 15, 20, 30, 60, 120, and 240 minutes after dose application to the treated knee. Assessments were conducted on 9 separate 3 cm×3 cm test sites within the 100 cm$^2$ dosed area. The pre-dose assessment was performed on the test site in the center of the dosed area. The 9 post-dose assessments were conducted on the 9 test sites, in sequence starting at one corner. Only one test site was assessed for each post-dose assessment time point.

Four parameters were defined in the protocol to assess drying time. These included the weight of the tissue/vial combination, Visual Appearance Score, Visual Adhesion Score and Visual Adsorption Score as explained further below. The visual examination of the test sites was scored using the scale below.

Visual Appearance Score:

1. Wet, shiny with a clear look of physical solution being present,

2. Damp, shiny, visible film with no visible solution present,

3. Damp, matte appearance, visible film,

4. Dry, matte appearance, visible film,

5. Dry, no visible film

Following the visual assessment, the dosed site was tested for adsorption or adherence to a 3 cm×3 cm square laboratory tissue (e.g. KimWipes). Using forceps, the tissue was removed from a sealed, previously weighed vial and gently

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000237

placed onto the test site. After five seconds, the tissue was removed using forceps by one corner while monitoring its adhesion to the site. Adherence of the tissue to the test site was scored using the scale below.

Visual Adhesion Score:

1. Distinct adhesion to the full test site,

2. Light to moderate adhesion to all or a portion of the test site,

3. No adhesion to the test site.

The tissue was visually inspected for fluid adsorption to the tissue and the adsorption was scored using the scale below.

Visual Adsorption Score:

1. Demonstrates fluid adsorption to the tissue to the size of the test area,

2. Demonstrates fluid adsorption to the tissue to a size less than the test area,

3. Demonstrates no fluid adsorption to the tissue.

The tissue was placed back into its labeled vial and the vial was sealed to prevent evaporation. Within 2 hours of collection the vial was re-weighed and the weight recorded.

A total of 12 healthy adult male and female subjects participated in the study. The study was successfully completed by all 12 subjects enrolled. Data for these subjects were used in the statistical analysis, except where one subject was removed as a statistical outlier.

The results of this study indicate that dryness occurred as early as 10 minutes post-dose in most subjects, as shown by visual appearance of dryness (7/11 subjects), no adhesion of the tissue to the test site (11/11 subjects) and no fluid adsorption to the tissue (10/12 subjects). A summary of the drying time data for each of the drying time parameters is shown below:

| Parameter | Time, minutes [Mean (95% CI)] |
|---|---|
| Visual appearance of dryness | 15.0 (9.6-20.4) |
| No adhesion to the test site | 10.0 (NA) |
| No fluid adsorption to the tissue | 10.4 (8.8-12.1) |
| Time to 10% or Less of Peak | 14.2 (8.3-20.1) |
| Weight Recovered | |

Considering the data for all the study parameters, it can be concluded that the mean drying time for Topical Diclofenac Solution following a single dose application was approximately 15 minutes, but there was considerable variability among subjects with dryness occurring as early as 10 minutes in most subjects.

Beyond the 30 minute time point all visual appearance scores were 5 for all subjects, visual adsorption scores were 3, and differences between postdose and predose tissue/vial weights were measured as 0.00 mg. Once the drug product has dried on the surface of the skin it is anticipated that residual unabsorbed diclofenac will be crystallized on the skin surface and will not be bioavailable. Therefore a patient being treated with Topical Diclofenac Solution can wash and shower after the product is dried without materially impacting the efficacy of the drug. The results of the study indicate that it is appropriate to instruct a user that a patient using Topical Diclofenac Solution should wait at least 30 minutes after putting Topical Diclofenac Solution on the knee(s) before taking a shower or bath.

Example 10

Comparison of Elimination Constant after Single and Multiple Dose Application of a Topical Solution Containing 1.5% Diclofenac Sodium and 45.5% DMSO

It has been discovered that the elimination constant $K_{el}$ (which is inversely related to the half life through $K_{el} = \ln(2)/T_{1/2}$) for the topical diclofenac solution of Examples 7 and 8 is highly statistically significantly different depending on whether the solution is applied as a single dose or as multiple doses. In general it would be reasonable to assume that the effects of multiple doses of the topical solution would have additive effects on the pharmacokinetics with the result that the half-life and $K_{el}$ would be independent of dosage regime. Intriguingly, Examples 7 and 8 demonstrate that the apparent plasma half life of diclofenac is increased after multiple doses of the solution are applied as is evident in the log-linear plot showing average diclofenac plasma concentration after discontinuation of application of drug following the protocols of the previous examples. The table below provides the half life and elimination constant for each subject in the studies (NC indicates that half life was not determined due to difficulties in identifying an exponential tail in the experimental data).

| Multi Dose | | | Single Dose | | |
|---|---|---|---|---|---|
| Subject # | $T_{1/2}$ (hr) | $K_{el}$ (hr$^{-1}$) | Subject # | $T_{1/2}$ (hr) | $K_{el}$ (hr$^{-1}$) |
| 1 | 68.8 | 0.010075 | 1 | 75.96 | 0.009125 |
| 2 | 66.85 | 0.010369 | 2 | NC | NC |
| 3 | NC | NC | 3 | 19.66 | 0.035347 |
| 4 | 43.41 | 0.015967 | 4 | 21.75 | 0.031869 |
| 5 | NC | NC | 5 | NC | NC |
| 6 | 128.94 | 0.005376 | 6 | NC | NC |
| 7 | NC | NC | 7 | 23.63 | 0.029333 |
| 9 | 72.74 | 0.009529 | 8 | NC | NC |
| 10 | 90.29 | 0.007677 | 9 | 21.72 | 0.031913 |
| 11 | NC | NC | 10 | 66.44 | 0.010433 |
| 12 | 151.36 | 0.004579 | 11 | NC | NC |
| 13 | 50.18 | 0.013813 | 12 | 34.21 | 0.020262 |
| 14 | 46.64 | 0.014862 | 13 | 41.65 | 0.016642 |
| 15 | 86.11 | 0.00805 | 14 | 28.13 | 0.024641 |
| 16 | 77.48 | 0.008946 | 15 | 30.29 | 0.022884 |
| 17 | 52.36 | 0.013238 | 16 | 23.23 | 0.029838 |
| 18 | 43.36 | 0.015986 | 17 | 71.69 | 0.009669 |
| 19 | 157.25 | 0.004408 | 18 | 19 | 0.036481 |
| 20 | 48.81 | 0.014201 | | | |
| Max | 157.3 | 0.0160 | Max | 76.0 | 0.0365 |
| Min | 43.4 | 0.0044 | Min | 19.0 | 0.0091 |
| Mean | 79.0 | 0.0105 | Mean | 36.7 | 0.0237 |
| Std Dev | 38.1 | 0.0040 | Std Dev | 20.8 | 0.0098 |

The distribution of the elimination constant $K_{el}$ is well represented by a Normal distribution as shown in FIG. 9, which compares the cumulative distribution function of the $K_{el}$ values from each study with cumulative distribution functions for a Gaussian using mean and standard deviation (Std Dev) values provided in the table above. A t-test was performed and $K_{el}$ was found to be highly significantly different (p<0.001) depending on whether a single or multiple dosing regime of the topical solution was applied.

The reasons for the differences in diclofenac half life and $K_{el}$ on dosing regime are at present unknown. In general drugs with longer half lives will tend to show more uniform plasma concentrations as a function of time and may have improved safety profiles by reducing the maximum plasma concentration that a patient experiences and allowing efficacy to be achieved with a lower overall dose. This point is particularly

important for patients that will use a relatively high risk drug such as diclofenac on long-term basis to treat a chronic condition such as osteoarthritis. It will therefore be appreciated that the extension of half-life observed with the multiple dosing regime of the topical diclofenac solution containing DMSO is an unexpected but fortuitous property of the solution.

### Example 11

A Multi-Dose, Comparative, Exposure Study Under Maximum use Conditions Per Labeling of Both Pennsaid® Topical Solution (Diclofenac Sodium Topical Solution 1.5% w/w and 45.5% w/w DMSO) and Solaraze® Gel (Diclofenac Sodium 3%)

A study was to conducted compare the exposure under maximum use conditions per labeling of diclofenac sodium following multiple applications of PENNSAID® Topical Solution (diclofenac sodium topical solution) 1.5% w/w and Solaraze® Gel (diclofenac sodium 3%).

The study was a two-period, open-label, non-randomized, crossover study. All subjects applied PENNSAID® to both knees for 1 week during Period 1 and Solaraze® to their actinic keratosis lesions for 4 weeks during Period 2. A 3-week washout period was observed between the last application of Period 1 and the first application of Period 2.

Thirty subjects were enrolled into the study. Thirty subjects completed Period 1 and 27 subjects completed Period 2. Pharmacokinetic and statistical analyses were performed on data obtained from the 27 subjects that completed the entire study.

The study population consisted of male and female subjects diagnosed with actinic keratosis (AK) affecting at least 500 cm2 of skin on the face, head, scalp, neck, shoulders, arms, and/or upper trunk, not necessarily continuous, of which at least 100 cm2 of the total affected area was on the face, head or scalp. Subjects were required to have a total of at least 20 non-hypertrophic AK lesions on all areas combined and a total of at least 6 non-hypertrophic AK lesions on the face, head or scalp.

During Period 1 subjects applied 40 drops (approx. 1.2 mL) q.i.d. of PENNSAID® Topical Solution (diclofenac sodium topical solution) 1.5% w/w (Novo Research Inc.) to each knee, 80 drops total per application, on Days 1 to 7 and dosed once on the morning of Day 8.

During Period 2 subjects applied 0.02 g/cm2 b.i.d of Solaraze® Gel (diclofenac sodium 3%) to the area of skin affected by actinic keratosis, up to a maximum of 1000 cm2 area on Days 1 to 27 and once on the morning of Day 28.

Using a validated HPLC method, plasma diclofenac sodium was analyzed from blood samples collected at the following timepoints (relative to first dose of the day):

Period 1 (PENNSAID®):
Day 1: 0.0 hour (pre-dose)
Day 6 and 7: 0.0 hour (pre-dose)
Day 8: 0.0 hour (pre-dose), 0.5, 1.0, 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, 5.0 and 6.0 hour

Period 2 (Solaraze®):
Day 1: 0.0 hour (pre-dose)
Day 26 and 27: 0.0 hour (pre-dose)
Day 28: 0.0 hour (pre-dose), 1.0, 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, 5.0, 6.0, 8.0, 10.0 and 12.0 hour

Pharmacokinetic parameters for plasma diclofenac sodium were calculated for each treatment period by standard non-compartmental methods: $C_{max(ss)}$, $C_{min(ss)}$, $C_{avg(ss)}$, $AUC_{T(ss)}$, $AUC_{0-24(ss)}$, $T_{max(ss)}$. For PENNSAID®, $AUC_{T(ss)}$ was calcu-

lated over the dosing interval of 0-6 hours, and for Solaraze®, $AUC_{T(ss)}$ was calculated over the dosing interval of 0-12 hours. For each treatment $AUC_{T(ss)}$ was adjusted to a 24-hour exposure parameter, $AUC_{0-24(ss)}$ (calculated as $AUC_{T(ss)} \times 2$ for Solaraze® and $AUC_{T(ss)} \times 4$ for PENNSAID®), so that a comparison between the exposure of each treatment was assessed on a daily basis.

Steady-state of plasma diclofenac was attained within 8 days for PENNSAID® and within 28 days for Solaraze®. The calculated $C_{max(ss)}$, $C_{min(ss)}$, $C_{avg(ss)}$, $AUC_{T(ss)}$ and $AUC_{0-24(ss)}$ of diclofenac were substantially lower and $T_{max(ss)}$ was shorter following the maximum therapeutic dose of PENNSAID® compared to that observed following the application of Solaraze® as per label as summarized in the table below.

| Summary Statistics of Pharmacokinetic Parameters* (mean [SD]) | | |
|---|---|---|
| PK Parameter | PENNSAID® N = 30 | Solaraze® N = 27 |
| $C_{max(SS)}$ (ng/mL) | 35.0 (28.6) | 125.9 (119.3) |
| $C_{min(SS)}$ (ng/mL) | 16.7 (10.4) | 30.4 (19.4) |
| $C_{avg(SS)}$ (ng/mL) | 24.2 (16.3) | 72.3 (63.5) |
| $AUC_{T(SS)}$ (ng · h/mL) | 144.9 (98.0) | 868.1 (762.2) |
| $AUC_{0-24(SS)}$ (ng · h/mL) | 579.7 (392.2) | 1736.3 (1524.4) |
| $T_{max(SS)}$** (h) | 1.0 | 2.5 |

*uncorrected for surface area,
**median for $T_{max(SS)}$

The analysis of the PENNSAID®/Solaraze® ratio (and corresponding 90% confidence interval [CI]) of the geometric mean for ln-transformed $C_{max(ss)}$ and $AUC_{0-24(ss)}$ for both uncorrected and corrected for surface area data (i.e. making comparison $C_{max(ss)}$ and $AUC_{0-24(ss)}$ per unit area of skin treated) revealed the rate and extent of bioavailabity of diclofenac following the maximum therapeutic dose of PENNSAID® were approximately ⅓ that of Solaraze®, with upper confidence limits well below the 80-125% range.

| Mean Relative Bioavailability Pharmacokinetic Parameters* (ln transformed, N = 27) | | | |
|---|---|---|---|
| Parameter | PENNSAID® | Solaraze® | Ratio, % (90% CI) |
| | Uncorrected | | |
| $C_{max(SS)}$ | 26.9 | 91.8 | 29.4 (21.7-39.7) |
| $AUC_{0-24(SS)}$ | 474.2 | 1346.2 | 35.2 (27.6-45.0) |
| | Corrected for Surface Area | | |
| $C_{max(SS)}$ | 0.025 | 0.0739 | 34.2 (25.0-46.9) |
| $AUC_{0-24(SS)}$ | 0.39 | 1.24 | 31.5 (24.4-40.7) |

*least square mean

### ATTACHMENT

HIGHLIGHTS OF PRESCRIBING INFORMATION
These highlights do not include all the information needed to use PENNSAID® Topical Solution safely and effectively. See full prescribing information for PENNSAID Topical Solution.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX106

HZNPENN_00000239

PENNSAID Topical Solution (diclofenac sodium topical solution) 1.5% w/w is for topical use only.

Initial U.S. Approval: 1988

WARNING: CARDIOVASCULAR AND GASTROINTESTINAL RISK

See full prescribing information for complete boxed warning.

Cardiovascular Risk

Non steroidal anti-inflammatory drugs (NSAIDs) may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal. Patients with cardiovascular disease or risk factors for cardiovascular disease may be at greater risk. ((5.1)

PENNSAID Topical Solution is contraindicated for the treatment of peri-operative pain in the setting of coronary artery bypass graft (CABG) surgery. (4)

Gastrointestinal Risk

NSAIDs, including PENNSAID Topical Solution, cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal. These events can occur at any time during use and without warning symptoms. Elderly patients are at greater risk for serious gastrointestinal events. (5.2)

## INDICATIONS AND USAGE

PENNSAID Topical Solution is a nonsteroidal anti-inflammatory drug (NSAID) indicated for the treatment of signs and symptoms of osteoarthritis of the knee(s). (1)

## DOSAGE AND ADMINISTRATION

For the relief of the signs and symptoms of osteoarthritis of the knee(s), the recommended dose is 40 drops on each painful knee, 4 times a day. (2)

Apply PENNSAID Topical Solution to clean, dry skin. (2.1.)

Dispense PENNSAID Topical Solution 10 drops at a time either directly onto the knee or first into the hand and then onto the knee. Spread PENNSAID Topical Solution evenly around front, back and sides of the knee. Repeat this procedure until 40 drops have been applied and the knee is completely covered with solution. (2.1)

Wash hands completely after administering the product.

Wait until the area is completely dry before covering with clothing or applying sunscreen, insect repellent, cosmetics, topical medications, or other substances.

Do not get Pennsaid in your eyes, nose or mouth.

## DOSAGE FORMS AND STRENGTHS

1.5% w/w topical solution (3)

## CONTRAINDICATIONS

Known hypersensitivity to diclofenac sodium. (4)

History of asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. (4)

Use in the perioperative period of coronary artery bypass graft (CABG) surgery. (4)

## WARNINGS AND PRECAUTIONS

Serious and potentially fatal cardiovascular thrombotic events, myocardial infarction, and stroke can occur with NSAID treatment. Use the lowest effective dose of PENNSAID Topical Solution in patients with known CV disease or risk factors for CV disease. (5.1)

NSAIDs can cause serious gastrointestinal (GI) adverse events including inflammation, bleeding, ulceration, and perforation. Prescribe PENNSAID Topical Solution with caution in those with a prior history of ulcer disease or gastrointestinal bleeding. (5.2)

Elevation of one or more liver tests may occur during therapy with NSAIDs. Discontinue PENNSAID Topical Solution immediately if abnormal liver tests persist or worsen. (5.3)

Hypertension can occur with NSAID treatment. Monitor blood pressure closely with PENNSAID Topical Solution treatment. (5.4)

Use PENNSAID Topical Solution with caution in patients with fluid retention or heart failure. (5.5)

Long-term administration of NSAIDs can result in renal papillary necrosis and other renal injury. Use PENNSAID Topical Solution with caution in patients at greatest risk of this reaction, including the elderly, those with impaired renal function, heart failure, liver dysfunction, and those taking diuretics and ACE inhibitors. (5.6)

Anaphylactoid reactions may occur in patients with the aspirin triad or in patients without prior exposure to PENNSAID Topical Solution. E (5.7)

NSAIDs can cause serious skin adverse events such as exfoliative dermatitis, Stevens-Johnson Syndrome (SJS), and toxic epidermal necrolysis (TEN), which can be fatal. (5.8)

Not for use during pregnancy. (5.9)

Do not administer to patients with aspirin sensitive asthma and use with caution in patients with preexisting asthma. (5.10)

Avoid exposure of treated knee(s) to natural or artificial sunlight (5.11)

Avoid contact of PENNSAID Topical Solution with eyes and mucosa (5.12)

Avoid concurrent use with oral NSAIDs (5.13)

## ADVERSE REACTIONS

The most common adverse events with PENNSAID Topical Solution are application site reactions. (6.1)

To report SUSPECTED ADVERSE REACTIONS, contact Mallinckrodt Brand Pharmaceuticals, Inc. at 1-800-xxx-xxxx or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.

## DRUG INTERACTIONS

Concomitant administration of diclofenac and aspirin is not generally recommended because of the potential of increased adverse effects including increased GI bleeding. (7.1)

Concomitant use of anticoagulants and diclofenac have a risk of serious GI bleeding higher than users of either drug alone. (7.2)

## USE IN SPECIFIC POPULATIONS

Pregnancy: Not recommended for use during pregnancy. (8.1)

Nursing Mothers: Use with caution, as it is not known if diclofenac is excreted in human milk. (8.3)

See 17 for PATIENT COUNSELING INFORMATION and Medication Guide. Revised: 02/2009

FULL PRESCRIBING INFORMATION: CONTENTS*

WARNING: CARDIOVASCULAR AND GASTROINTESTINAL RISK

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000240

INDICATIONS AND USAGE
DOSAGE AND ADMINISTRATION
2.1 General Instructions
2.2 Special Precautions
DOSAGE FORMS AND STRENGTHS
CONTRAINDICATIONS
WARNINGS AND PRECAUTIONS
5.1 Cardiovascular Thrombotic Events
5.2 Gastrointestinal Effects—Risk of GI Ulceration, Bleeding, and Perforation
5.3 Hepatic Effects
5.4 Hypertension
5.5 Congestive Heart Failure and Edema
5.6 Renal Effects
5.7 Anaphylactoid Reactions
5.8 Skin Reactions
5.9 Pregnancy
5.10 Preexisting Asthma
5.11 Sun Exposure
5.12 Eye Exposure
5.13 Oral Nonsteroidal Anti-inflammatory Drugs
5.14 Corticosteroid Treatment
5.15 Inflammation
5.16 Hematological Effects
5.17 Monitoring
ADVERSE REACTIONS
6.1 Clinical Studies Experience
6.2 Postmarketing Experience
DRUG INTERACTIONS
7.1 Aspirin
7.2 Anticoagulants
7.3 ACE-Inhibitors
7.4 Diuretics
7.5 Lithium
7.6 Methotrexate
7.7 Cyclosporine
7.8 Oral Nonsteroidal Anti-inflammatory Drugs
7.9 Topical Treatments
USE IN SPECIFIC POPULATIONS
8.1 Pregnancy
8.2 Labor and Delivery
8.3 Nursing Mothers
8.4 Pediatric Use
8.5 Geriatric Use
10. OVERDOSAGE
11. DESCRIPTION
12. CLINICAL PHARMACOLOGY
12.1 Mechanism of Action
12.2 Pharmacodynamics
12.3 Pharmacokinetics
12.4 Platelets
NONCLINICAL TOXICOLOGY
13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility
13.2 Animal Toxicology and/or Pharmacology
14. CLINICAL STUDIES
14.1 Pivotal Studies in Osteoarthritis of the Knee
16. HOW SUPPLIED/STORAGE AND HANDLING
17. PATIENT COUNSELING INFORMATION
17.1 Medication Guide
17.2 Cardiovascular Effects
17.3 Gastrointestinal Effects
17.4 Hepatotoxicity
17.5 Adverse Skin Reactions
17.6 Weight Gain and Edema
17.7 Anaphylactoid Reactions
17.8 Effects during Pregnancy
17.9 Eye Exposure

Sections or subsections omitted from the full prescribing information are not listed.

FULL PRESCRIBING INFORMATION

WARNING: CARDIOVASCULAR AND GASTROINTESTINAL RISK

Cardiovascular Risk

Nonsteroidal anti-inflammatory drugs (NSAIDs) may cause an increased risk of serious cardiovascular thrombotic events, myocardial infarction, and stroke, which can be fatal. This risk may increase with duration of use. Patients with cardiovascular disease or risk factors for cardiovascular disease may be at greater risk [see Warnings and Precautions (5.1)].

PENNSAID Topical Solution is contraindicated in the peri-operative setting of coronary artery bypass graft (CABG) surgery [see Contraindications (4)].

Gastrointestinal Risk

NSAIDs cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal. These events can occur at any time during use and without warning symptoms. Elderly patients are at greater risk for serious gastrointestinal events [see Warnings and Precautions (5.2)].

1. Indications and Usage

PENNSAID Topical Solution is a nonsteroidal anti-inflammatory drug (NSAID) indicated for the treatment of signs and symptoms of osteoarthritis of the knee(s).

2. Dosage and Administration

2.1 General Instructions

For the relief of the signs and symptoms of osteoarthritis of the knee(s), the recommended dose is 40 drops per knee, 4 times a day.

Apply PENNSAID Topical Solution to clean, dry skin.

To avoid spillage, dispense PENNSAID 10 drops at a time either directly onto the knee or first into the hand and then onto the knee. Spread PENNSAID Topical Solution evenly around front, back and sides of the knee. Repeat this procedure until 40 drops have been applied and the knee is completely covered with solution.

To treat the other knee, if symptomatic, repeat the procedure.

Application of PENNSAID Topical Solution in an amount exceeding or less than the recommended dose has not been studied and is therefore not recommended.

2.2 Special Precautions

Avoid showering/bathing for at least 30 minutes after the application of PENNSAID Topical Solution to the treated knee.

Wash and dry hands after use.

Do not apply PENNSAID Topical Solution to open wounds.

Avoid contact of PENNSAID Topical Solution with eyes and mucous membranes.

Do not apply external heat and/or occlusive dressings to treated knees.

Avoid wearing clothing over the PENNSAID Topical Solution-treated knee until the treated knee is dry.

Protect the treated knee(s) from sunlight.

Wait until the treated area is dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID Topical Solution.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000241

3. Dosage Forms and Strengths

1.5% w/w topical solution

4. Contraindications

PENNSAID Topical Solution is contraindicated in patients with a known hypersensitivity to diclofenac sodium or any other component of PENNSAID Topical Solution.

PENNSAID Topical Solution is contraindicated in patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients [see Warnings and Precautions (5.7, 5.10)].

PENNSAID Topical Solution is contraindicated in the setting of coronary artery bypass graft (CABG) surgery [see Warnings and Precautions (5.1)].

5. Warnings and Precautions

5.1 Cardiovascular Thrombotic Events

Clinical trials of several oral COX-2 selective and nonselective NSAIDs of up to three years duration have shown an increased risk of serious cardiovascular (CV) thrombotic events, myocardial infarction (MI), and stroke, which can be fatal. All NSAIDs, including PENNSAID and COX-2 selective and nonselective orally administered NSAIDs, may have a similar risk. Patients with known CV disease or risk factors for CV disease may be at greater risk. To minimize the potential risk for an adverse CV event in patients treated with an NSAID, use the lowest effective dose for the shortest duration possible. Physicians and patients should remain alert for the development of such events, even in the absence of previous CV symptoms. Inform patients about the signs and/or symptoms of serious CV events and the steps to take if they occur.

Two large, controlled, clinical trials of an orally administered COX-2 selective NSAID for the treatment of pain in the first 10-14 days following CABG surgery found an increased incidence of myocardial infarction and stroke [see Contraindications (4)].

There is no consistent evidence that concurrent use of aspirin mitigates the increased risk of serious CV thrombotic events associated with NSAID use. The concurrent use of aspirin and NSAIDs, such as diclofenac, does increase the risk of serious GI events [see Warnings and Precautions (5.2)].

5.2 Gastrointestinal Effects—Risk of GI Ulceration, Bleeding, and Perforation

NSAIDs, including diclofenac, can cause serious gastrointestinal (GI) adverse events including bleeding, ulceration, and perforation of the stomach, small intestine, or large intestine, which can be fatal. These serious adverse events can occur at any time, with or without warning symptoms, in patients treated with NSAIDs. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. Upper GI ulcers, gross bleeding, or perforation caused by NSAIDs occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue with longer duration of use, increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

Prescribe NSAIDs, including Pennsaid, with extreme caution in those with a prior history of ulcer disease or gastrointestinal bleeding. Patients with a prior history of peptic ulcer disease and/or gastrointestinal bleeding who use NSAIDs have a greater than 10-fold increased risk for developing a GI bleed compared to patients with

neither of these risk factors. Other factors that increase the risk of GI bleeding in patients treated with NSAIDs include concomitant use of oral corticosteroids or anticoagulants, longer duration of NSAID therapy, smoking, use of alcohol, older age, and poor general health status. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore, use special care when treating this population.

To minimize the potential risk for an adverse GI event, use the lowest effective dose for the shortest possible duration. Remain alert for signs and symptoms of GI ulceration and bleeding during diclofenac therapy and promptly initiate additional evaluation and treatment if a serious GI adverse event is suspected. For high-risk patients, consider alternate therapies that do not involve NSAIDs.

5.3 Hepatic Effects

Borderline elevations (less than 3 times the upper limit of the normal [ULN] range) or greater elevations of transaminases occurred in about 15% of oral diclofenac-treated patients in clinical trials of indications other than acute pain. Of the markers of hepatic function, ALT (SGPT) is recommended for the monitoring of liver injury.

In clinical trials of a oral diclofenac—misoprostol combination product, meaningful elevations (i.e., more than 3 times the ULN) of AST (SGOT) occurred in about 2% of approximately 5,700 patients at some time during diclofenac treatment (ALT was not measured in all studies).

In an open-label, controlled trial of 3,700 patients treated for 2-6 months, patients with oral diclofenac were monitored first at 8 weeks and 1,200 patients were monitored again at 24 weeks. Meaningful elevations of ALT and/or AST occurred in about 4% of the 3,700 patients and included marked elevations (>8 times the ULN) in about 1% of the 3,700 patients. In this open-label study, a higher incidence of borderline (less than 3 times the ULN), moderate (3-8 times the ULN), and marked (>8 times the ULN) elevations of ALT or AST was observed in patients receiving diclofenac when compared to other NSAIDs. Elevations in transaminases were seen more frequently in patients with osteoarthritis than in those with rheumatoid arthritis. Almost all meaningful elevations in transaminases were detected before patients became symptomatic.

Abnormal tests occurred during the first 2 months of therapy with oral diclofenac in 42 of the 51 patients in all trials who developed marked transaminase elevations. In postmarketing reports, cases of drug-induced hepatotoxicity have been reported in the first month, and in some cases, the first 2 months of NSAID therapy.

Postmarketing surveillance has reported cases of severe hepatic reactions, including liver necrosis, jaundice, fulminant hepatitis with and without jaundice, and liver failure. Some of these reported cases resulted in fatalities or liver transplantation.

In a European retrospective population-based, case-controlled study, 10 cases of oral diclofenac associated drug-induced liver injury with current use compared with non-use of diclofenac were associated with a statistically significant 4-fold adjusted odds ratio of liver injury. In this particular study, based on an overall number of 10 cases of liver injury associated with diclofenac, the adjusted odds ratio increased further with female gender, doses of 150 mg or more, and duration of use for more than 90 days.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000242

Measure transaminases (ALT and AST) periodically in patients receiving long-term therapy with diclofenac, because severe hepatotoxicity may develop without a prodrome of distinguishing symptoms. The optimum times for making the first and subsequent transaminase measurements are not known. Based on clinical trial data and postmarketing experiences, monitor transaminases within 4 to 8 weeks after initiating treatment with diclofenac. However, severe hepatic reactions can occur at any time during treatment with diclofenac. If abnormal liver tests persist or worsen, if clinical signs and/or symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash, abdominal pain, diarrhea, dark urine, etc.), discontinue PENNSAID immediately.

To minimize the possibility that hepatic injury will become severe between transaminase measurements, inform patients of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, diarrhea, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms), and the appropriate action to take if these signs and symptoms appear.

To minimize the potential risk for an adverse liver-related event in patients treated with PENNSAID, use the lowest effective dose for the shortest duration possible. Exercise caution when prescribing PENNSAID with concomitant drugs that are known to be potentially hepatotoxic (e.g. acetaminophen, certain antibiotics, antiepileptics). Caution patients to avoid taking unprescribed acetaminophen while using Pennsaid.

### 5.4 Hypertension

NSAIDs, including diclofenac, can lead to new onset or worsening of preexisting hypertension, either of which may contribute to the increased incidence of CV events. Use NSAIDs, including Pennsaid, with caution in patients with hypertension. Monitor blood pressure (BP) closely during the initiation of NSAID treatment and throughout the course of therapy.

Patients taking ACE inhibitors, thiazides or loop diuretics may have impaired response to these therapies when taking NSAIDs.

### 5.5 Congestive Heart Failure and Edema

Fluid retention and edema have been observed in some patients treated with NSAIDs, including PENNSAID Topical Solution. Use PENNSAID Topical Solution with caution in patients with fluid retention or heart failure.

### 5.6 Renal Effects

Use caution when initiating treatment with Pennsaid in patients with considerable dehydration.

Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of an NSAID may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly. Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state.

No information is available from controlled clinical studies regarding the use of PENNSAID Topical Solution in patients with advanced renal disease. Therefore, treatment with PENNSAID Topical Solution is not recom-

mended in patients with advanced renal disease. If PENNSAID Topical Solution therapy is initiated, close monitoring of the patient's renal function is advisable.

### 5.7 Anaphylactoid Reactions

As with other NSAIDs, anaphylactoid reactions may occur in patients without prior exposure to PENNSAID Topical Solution. Do not prescribe PENNSAID Topical Solution to patients with the aspirin triad. This symptom complex typically occurs in asthmatic patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs [see Contraindications (4) and Warnings and Precautions (5.10]. Seek emergency help in cases where an anaphylactoid reaction occurs.

### 5.8 Skin Reactions

Do not apply PENNSAID Topical Solution to open skin wounds, infections, inflammations, or exfoliative dermatitis, as it may affect absorption and tolerability of the drug.

NSAIDs, including PENNSAID Topical Solution, can cause serious skin adverse events such as exfoliative dermatitis, Stevens-Johnson Syndrome (SJS), and toxic epidermal necrolysis (TEN), which can be fatal. These serious events may occur without warning. Inform patients about the signs and symptoms of serious skin manifestations, and discontinue use of the drug at the first appearance of skin rash or any other signs of hypersensitivity.

### 5.9 Pregnancy

PENNSAID Topical Solution should not be used by pregnant or nursing women or those intending to become pregnant.

### 5.10 Preexisting Asthma

Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm, which can be fatal. Since cross-reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, do not administer PENNSAID Topical Solution to patients with this form of aspirin sensitivity and use with caution in patients with preexisting asthma.

### 5.11 Sun Exposure

Instruct patients to avoid exposure to natural or artificial sunlight on treated knee(s) because studies in animals indicated topical diclofenac treatment resulted in an earlier onset of ultraviolet light-induced skin tumors. The potential effects of PENNSAID Topical Solution on skin response to ultraviolet damage in humans are not known.

### 5.12 Eye Exposure

Avoid contact of PENNSAID Topical Solution with eyes and mucosa. Advise patients that if eye contact occurs, immediately wash out the eye with water or saline and consult a physician if irritation persists for more than an hour.

### 5.13 Oral Nonsteroidal Anti-inflammatory Drugs

Concomitant use of oral NSAIDs with PENNSAID Topical Solution resulted in a higher rate of rectal hemorrhage, more frequent abnormal creatinine, urea and hemoglobin. Therefore, do not use combination therapy with PENNSAID Topical Solution and an oral NSAID unless the benefit outweighs the risk and conduct periodic laboratory evaluations.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000243

**5.14 Corticosteroid Treatment**

PENNSAID Topical Solution cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-response illness. For patients on prolonged corticosteroid therapy, taper slowly if a decision is made to discontinue corticosteroids.

**5.15 Inflammation**

The pharmacological activity of PENNSAID Topical Solution in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting complications of presumed noninfectious, painful conditions.

**5.16 Hematological Effects**

The effects of PENNSAID Topical Solution on platelet function were studied in 10 healthy subjects administered 80 drops four times a day for 7 days. There was no significant change in platelet aggregation following one week of treatment [see Clinical Pharmacology (12.4)].

Anemia is sometimes seen in patients receiving NSAIDs. This may be due to fluid retention, occult or gross GI blood loss, or an incompletely described effect upon erythropoiesis. Check hemoglobin or hematocrit of patients on PENNSAID Topical Solution if they exhibit any signs or symptoms of anemia or blood loss.

NSAIDs inhibit platelet aggregation and have been shown to prolong bleeding time in some patients. Unlike aspirin, their effect on platelet function is quantitatively less, of shorter duration and reversible. Carefully monitor patients receiving PENNSAID Topical Solution who may be adversely affected by alterations in platelet function, such as those with coagulation disorders or patients receiving anticoagulants.

**5.17 Monitoring**

Because serious GI tract ulcerations and bleeding can occur without warning symptoms in patients taking NSAIDs, monitor patients for signs or symptoms of GI bleeding. Check CBC and a chemistry profile periodically in patients on long-term treatment with NSAIDs. Discontinue PENNSAID Topical Solution if abnormal liver tests or renal tests persist or worsen.

**6. Adverse Reactions**

**6.1 Clinical Studies Experience**

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

The data described below reflect exposure to PENNSAID Topical Solution of 911 patients treated between 4 and 12 weeks (mean duration of 49 days) in seven Phase 3 controlled trials, as well as exposure of 793 patients treated in an open-label study, including 463 patients treated for at least 6 months, and 144 patients treated for at least 12 months. The population mean age was approximately 60 years, 89% of patients were Caucasians, 64% were females, and all patients had primary osteoarthritis. The most common adverse events with PENNSAID Topical Solution were application site skin reactions. These events were the most common reason for withdrawing from the studies.

Application Site Reactions:

In controlled trials, the most common treatment-related adverse events in patients receiving PENNSAID Topical Solution were application site skin reactions. Application site reactions were characterized by one or more of

the following: dryness, erythema, induration, vesicles, paresthesia, pruritus, vasodilation, acne, and urticaria. The most frequent of these reactions were dry skin (32%), contact dermatitis characterized by skin erythema and induration (9%), contact dermatitis with vesicles (2%) and pruritus (4%). In one controlled trial, a higher rate of contact dermatitis with vesicles (4%) was observed after treatment of 152 subjects with the combination of PENNSAID Topical Solution and oral diclofenac. In the open label uncontrolled long-term safety study, contact dermatitis occurred in 13% and contact dermatitis with vesicles in 10% of patients, generally within the first 6 months of exposure, leading to a withdrawal rate for an application site event of 14%.

Adverse Events Common to the NSAID Class.

In controlled trials, subjects treated with PENNSAID Topical Solution experienced some adverse events associated with the NSAID class more frequently than subjects using placebo (constipation, diarrhea, dyspepsia, nausea, flatulence, abdominal pain, edema; see Table 1). The combination of PENNSAID Topical Solution and oral diclofenac, compared to oral diclofenac alone, resulted in a higher rate of rectal hemorrhage (3% vs. less than 1%), and more frequent abnormal creatinine (12% vs. 7%), urea (20% vs. 12%), and hemoglobin (13% vs. 9%), but no difference in elevation of liver transaminases.

Table 1 lists all adverse reactions occurring in $\geqq 1\%$ of patients receiving PENNSAID Topical Solution, where the rate in the PENNSAID Topical Solution group exceeded placebo, from seven controlled studies conducted in patients with osteoarthritis. Since these trials were of different durations, these percentages do not capture cumulative rates of occurrence.

TABLE 1

Adverse Reactions occurring in $\geqq 1\%$ of patients treated with PENNSAID ® Topical Solution in placebo and oral diclofenac-controlled trials.

| Treatment Group: Adverse Reaction† | PENNSAID ® Topical Solution N = 911 N (%) | Topical Placebo N = 332 N (%) |
|---|---|---|
| Dry Skin (Application Site) | 292 (32) | 17 (5) |
| Contact Dermatitis (Application Site) | 83 (9) | 6 (2) |
| Dyspepsia | 72 (8) | 13 (4) |
| Abdominal Pain | 54 (6) | 10 (3) |
| Flatulence | 35 (4) | 1 (<1) |
| Pruritus (Application Site) | 34 (4) | 7 (2) |
| Diarrhea | 33 (4) | 7 (2) |
| Nausea | 33 (4) | 3 (1) |
| Pharyngitis | 40 (4) | 13 (4) |
| Constipation | 29 (3) | 1 (<1) |
| Edema | 26 (3) | 0 |
| Rash (Non-Application Site) | 25 (3) | 5 (2) |
| Infection | 25 (3) | 8 (2) |
| Ecchymosis | 19 (2) | 1 (<1) |
| Dry Skin (Non-Application Site) | 19 (2) | 1 (<1) |
| Contact Dermatitis, vesicles (Application Site) | 18 (2) | 0 |
| Paresthesia (Non-Application Site) | 14 (2) | 3 (<1) |
| Accidental Injury | 22 (2) | 7 (2) |
| Pruritus (Non-Application Site) | 15 (2) | 2 (<1) |
| Sinusitis | 10 (1) | 2 (<1) |
| Halitosis | 11 (1) | 1 (<1) |
| Application Site Reaction (not otherwise specified) | 11 (1) | 3 (<1) |

†Preferred Term according to COSTART

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000244

### 6.2 Postmarketing Experience

In non-US post-marketing surveillance, the following adverse reactions have been reported during post-approval use of PENNSAID Topical Solution. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

Body as a whole: abdominal pain, accidental injury, allergic reaction, asthenia, back pain, body odor, chest pain, edema, face edema, halitosis, headache, lack of drug effect, neck rigidity, pain

Cardiovascular: palpitation, cardiovascular disorder

Digestive: diarrhea, dry mouth, dyspepsia, gastroenteritis, decreased appetite, mouth ulceration, nausea, rectal hemorrhage, ulcerative stomatitis

Metabolic and Nutritional: creatinine increased

Musculoskeletal: leg cramps, myalgia

Nervous: depression, dizziness, drowsiness, lethargy, paresthesia, paresthesia at application site

Respiratory: asthma, dyspnea, laryngismus, laryngitis, pharyngitis

Skin and Appendages: At the Application Site: contact dermatitis, contact dermatitis with vesicles, dry skin, pruritus, rash; Other Skin and Appendages Adverse Reactions: eczema, rash, pruritus, skin discoloration, urticaria

Special senses: abnormal vision, blurred vision, cataract, ear pain, eye disorder, eye pain, taste perversion

### 7. Drug Interactions

Drug interactions with the use of PENNSAID Topical Solution have not been studied. The following drug interactions [sections 7.1 to 7.7] are noted for oral diclofenac sodium.

#### 7.1. Aspirin

When diclofenac is administered with aspirin, the binding of diclofenac to protein is reduced, although the clearance of free diclofenac is not altered. The clinical significance of this interaction is not known; however, as with other NSAIDs, concomitant administration of diclofenac and aspirin is not generally recommended because of the potential of increased adverse effects.

#### 7.2 Anticoagulants

The effects of anticoagulants such as warfarin and NSAIDs on GI bleeding are synergistic, such that users of both drugs together have a risk of serious GI bleeding higher than users of either drug alone.

#### 7.3 ACE-Inhibitors

NSAIDs may diminish the antihypertensive effect of angiotensin converting enzyme (ACE) inhibitors. Consider this interaction in patients taking NSAIDs concomitantly with ACE-inhibitors.

#### 7.4 Diuretics

Clinical studies, as well as post-marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. The response has been attributed to inhibition of renal prostaglandin synthesis. During concomitant therapy with NSAIDs, observe the patient closely for signs of renal failure [see Warnings and Precautions (5.6)], as well as to assure diuretic efficacy.

#### 7.5 Lithium

NSAIDs have produced an elevation of plasma lithium levels and a reduction in renal lithium clearance. The mean minimum lithium concentration increased 15% and the renal clearance was decreased by approximately 20%. These effects have been attributed to inhibition of

renal prostaglandin synthesis by the NSAID. Thus, when NSAIDs, including diclofenac, and lithium are administered concurrently, observe patients carefully for signs of lithium toxicity.

#### 7.6 Methotrexate

NSAIDs have been reported to competitively inhibit methotrexate accumulation in rabbit kidney slices. This may indicate that they could enhance the toxicity of methotrexate. Use caution when NSAIDs, including diclofenac, are administered concomitantly with methotrexate.

#### 7.7 Cyclosporine

Diclofenac, like other NSAIDs, may affect renal prostaglandins and increase the toxicity of certain drugs. Therefore, concomitant therapy with diclofenac may increase cyclosporine's nephrotoxicity. Use caution when diclofenac is administered concomitantly with cyclosporine.

#### 7.8 Oral Nonsteroidal Anti-inflammatory Drugs

Concomitant use of oral NSAIDs with PENNSAID Topical Solution has been evaluated in one Phase 3 controlled trial and in combination with oral diclofenac, compared to oral diclofenac alone, resulted in a higher rate of rectal hemorrhage (3% vs. less than 1%), and more frequent abnormal creatinine (12% vs. 7%), urea (20% vs. 12%) and hemoglobin (13% vs. 9%). Therefore, do not use combination therapy with PENNSAID Topical Solution and an oral NSAID unless the benefit outweighs the risk and conduct periodic laboratory evaluations.

#### 7.9 Topical Treatments

Instruct patients that before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same skin surface of the knee treated with PENNSAID Topical Solution, they must wait until the treated area is completely dry.

### 8. Use in Specific Populations

#### 8.1 Pregnancy

Pregnancy Category C prior to 30 weeks gestation; Category D starting 30 weeks gestation.

Teratogenic Effects:

There are no adequate and well-controlled studies of PENNSAID Topical Solution in pregnant women. PENNSAID Topical Solution should not be used by pregnant women as its safe use has not been adequately determined and starting at 30 weeks gestation, diclofenac and other NSAIDs should be avoided by pregnant women as premature closure of the ductus arteriosus in the fetus may occur. Developmental studies in animals demonstrated that diclofenac sodium administration did not produce teratogenicity despite the induction of maternal toxicity and fetal toxicity in mice at doses up to 20 mg/kg/day (0.6-fold the maximum recommended human dose [MRHD] of 154 mg/day based on body surface area comparison), and in rats and rabbits at doses up to 10 mg/kg/day (approximately 0.6-fold and 1.3-fold the MRHD, respectively). Published reproductive and developmental studies of dimethyl sulfoxide (DMSO, the solvent used in PENNSAID Topical Solution) are equivocal as to potential teratogenicity.

Nonteratogenic Effects

In rats, maternally toxic doses of diclofenac were associated with dystocia, prolonged gestation, reduced fetal weights and growth, and reduced fetal survival.

#### 8.2 Labor and Delivery

The effects of PENNSAID Topical Solution on labor and delivery in pregnant women are unknown. In rat studies maternal exposure to diclofenac, as with other NSAID

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000245

71

drugs, known to inhibit prostaglandin synthesis, increased the incidence of dystocia, delayed parturition, and decreased offspring survival.

### 8.3 Nursing Mothers

It is not known whether this drug is excreted in human milk; however, there is a case report in the literature indicating that diclofenac can be detected at low levels in breast milk. Because many drugs are excreted in human milk and because of the potential for serious adverse reactions in nursing infants from PENNSAID Topical Solution, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

### 8.4 Pediatric Use

Safety and effectiveness in pediatric patients have not been established.

### 8.5 Geriatric Use

Of the 911 patients treated with PENNSAID Topical Solution in seven controlled, Phase 3 clinical trials, 444 subjects were 65 years of age and over. There was no age-related difference in the incidence of adverse events. Of the 793 patients treated with PENNSAID Topical Solution in one open-labeled safety trial, 334 subjects were 65 years of age and over including 107 subjects 75 and over. There was no difference in the incidence of adverse events with long-term exposure to PENNSAID Topical Solution for this elderly population. As with any NSAID, use caution in treating the elderly (65 years and older) and it may be useful to monitor renal function since they are more likely to have decreased baseline renal function.

### 10. Overdo Sage

There have been no known experiences of overdose with PENNSAID Topical Solution.

Symptoms following acute NSAID overdose are usually limited to lethargy, drowsiness, nausea, vomiting, and epigastric pain, which are generally reversible with supportive care. Gastrointestinal bleeding can occur. Hypertension, acute renal failure, respiratory depression and coma may occur, but are rare. Anaphylactoid reactions have been reported with therapeutic ingestion of NSAIDs, and may occur following an overdose.

Manage patients using symptomatic and supportive care following an NSAID overdose. There are no specific antidotes. Emesis is not recommended due to a possibility of aspiration and subsequent respiratory irritation by DMSO contained in PENNSAID Topical Solution. Activated charcoal (60 to 100 g in adults, 1 to 2 g/kg in children) and/or osmotic cathartic may be indicated in patients seen within 4 hours of ingestion with symptoms or following a large overdose (5 to 10 times the usual dose). Forced diuresis, alkalinization of urine, hemodialysis, or hemoperfusion may not be useful due to high protein binding.

For additional information about overdose treatment, call a poison control center (1-800-222-1222).

### 11. Description

PENNSAID Topical Solution is a clear, colorless to faintly pink-orange solution for topical application.

PENNSAID Topical Solution contains 1.5% w/w diclofenac sodium, a benzene-acetic acid derivative that is a nonsteroidal anti-inflammatory drug (NSAID), designated chemically as 2-[(2,6-dichlorophenyl)amino] benzeneacetic acid, monosodium salt. The molecular

72

weight is 318.14. Its molecular formula is $C_{14}H_{10}Cl_2NNaO_2$ and it has the following structural formula:



Each 1 mL of solution contains 16.05 mg of diclofenac sodium. In addition, PENNSAID Topical Solution contains the following inactive ingredients: dimethyl sulfoxide USP (DMSO, 45.5% w/w), propylene glycol, alcohol, glycerin and purified water.

### 12. Clinical Pharmacology

#### 12.1 Mechanism of Action

The mechanism of action of diclofenac is similar to that of other nonsteroidal anti-inflammatory drugs. Diclofenac inhibits the enzyme, cyclooxygenase (COX), an early component of the arachidonic acid cascade, resulting in the reduced formation of prostaglandins, thromboxanes and prostacylin. It is not completely understood how reduced synthesis of these compounds results in therapeutic efficacy.

#### 12.2 Pharmacodynamics

Diclofenac, the active component of PENNSAID Topical Solution has anti-inflammatory, anti-nociception, and antipyretic effects.

#### 12.3 Pharmacokinetics

After topical administration to healthy human volunteers of single and multiple maximum doses of PENNSAID Topical Solution, 40 drops (approximately 1.2 mL) to each knee (80 drops total dose), the following diclofenac pharmacokinetic parameters were obtained: (see Table 2).

TABLE 2

Single-dose (80 drops) and Multiple Dose (80 drops four times daily for 7 days) PENNSAID Topical Solution Pharmacokinetic Parameters

| Pharmacokinetic Parameters | Diclofenac sodium | |
| --- | --- | --- |
| | Normal Adults [N = 18] (Age: 18-55 years) Single Dose | Normal Adults [N = 19] (Age: 18-55 years) Multiple Dose Four times daily for 7 days |
| $AUC_{0-t}$ | 177.5 ± 72.6 ng · h/mL | 695.4 ± 348.9 ng · h/mL |
| $AUC_{0-inf}$ | 196.3 ± 68.5 ng · h/mL | 745.2 ± 374.7 ng · h/mL |
| Plasma $C_{max}$ | 8.1 ± 5.9 ng/mL | 19.4 ± 9.3 ng/mL |
| Plasma $T_{max}$ (h) | 11.0 ± 6.4 | 4.0 ± 6.5 |
| Plasma $t_{1/2}$ (h) | 36.7 ± 20.8 | 79.0 ± 38.1 |
| $K_{el}$ ($h^{-1}$) | 0.024 ± 0.010 | 0.011 ± 0.004 |
| CL/F (L/h) | 244.7 ± 84.7[1] | — |

[1]Apparent total body clearance

Absorption

Diclofenac systemic exposure from PENNSAID application (4 times daily for 1 week) was approximately ⅓ of the diclofenac systemic exposure from the Solaraze (diclofenac topical gel) application (twice daily for 4 weeks).

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000246

**Distribution**

Diclofenac is more than 99% bound to human serum proteins, primarily to albumin.

Diclofenac diffuses into and out of the synovial fluid. Diffusion into the joint occurs when plasma levels are higher than those in the synovial fluid, after which the process reverses and synovial fluid levels are higher than plasma levels. It is not known whether diffusion into the joint plays a role in the effectiveness of diclofenac.

**Metabolism**

Five diclofenac metabolites have been identified in human plasma and urine. The metabolites include 4'-hydroxy-, 5-hydroxy-, 3'-hydroxy-, 4',5-dihydroxy- and 3'-hydroxy-4'-methoxy diclofenac. The major diclofenac metabolite, 4'-hydroxy-diclofenac, has very weak pharmacologic activity. The formation of 4'-hydroxy diclofenac is primarily mediated by CPY2C9. Both diclofenac and its oxidative metabolites undergo glucuronidation or sulfation followed by biliary excretion. Acylglucuronidation mediated by UGT2B7 and oxidation mediated by CPY2C8 may also play a role in diclofenac metabolism. CYP3A4 is responsible for the formation of minor metabolites, 5-hydroxy and 3'-hydroxy-diclofenac.

**Excretion**

Diclofenac is eliminated through metabolism and subsequent urinary and biliary excretion of the glucuronide and the sulfate conjugates of the metabolites.

Little or no free unchanged diclofenac is excreted in the urine.

**Special Populations**

Pediatric: The pharmacokinetics of PENNSAID has not been investigated in pediatric patients.

Race: Pharmacokinetic differences due to race have not been studied.

**12.4 Platelets**

The effect of PENNSAID Topical Solution on platelet function was evaluated in 10 healthy human volunteers as a sub-study of a multiple-dose pharmacokinetic study [see Pharmacokinetics (12.3)]. Average (range) platelet aggregation time following stimulation with adenosine diphosphate, collagen, epinephrine and arachidonic acid was 101.3% (73.3-128.1), 99.8% (69.6-112.9), 109.9% (66.2-178.1) and 99.0% (15.5-126.6) of baseline value, respectively. These results indicate that there was no effect on platelet aggregation after application of the maximum clinical dose for 7 days [see Pharmacokinetics (12.3)].

**13. Nonclinical Toxicology**

**13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility.**

Carcinogenicity studies in mice and rats administered diclofenac sodium as a dietary constituent for 2 years resulted in no significant increases in tumor incidence at does up to 2 mg/kg/day corresponding to approximately 0.35- and 0.7-fold (mouse and rat, respectively) of the maximum recommended human topical dose (MRHD) of PENNSAID Topical Solution (based on apparent bioavailability and body surface area comparison).

In a dermal carcinogenicity study conducted in albino mice, daily topical applications of diclofenac sodium for two years at concentrations up to 0.035% diclofenac sodium (a 43-fold lower diclofenac sodium concentration than present in PENNSAID Topical Solution) did not increase neoplasm incidence.

In a photococarcinogenicity study conducted in hairless mice, topical application of diclofenac sodium at doses

up to 0.035% diclofenac sodium (a 43-fold lower diclofenac sodium concentration than present in PENNSAID Topical Solution) resulted in an earlier median time of onset of tumors.

Mutagenesis: Diclofenac was not mutagenic or clastogenic in a battery of genotoxicity tests that included the bacterial reverse mutation assay, in vitro mouse lymphoma point mutation assay, chromosomal aberration studies in Chinese hamster ovarian cells in vitro, and in vivo rat chromosomal aberration assay of bone marrow cells.

Impairment of Fertility: Fertility studies have not been conducted with Pennsaid Topical Solution. Diclofenac sodium administered to male and female rats at doses up to 4 mg/kg/day (1.4-fold of the MRHD of PENNSAID Topical Solution based on apparent bioavailability and body surface area comparison) did not affect fertility. Studies have not been conducted to determine the safety of DMSO on fertility.

**13.2 Animal Toxicology and/or Pharmacology**

**Ocular Effects**

No adverse effects were observed using indirect ophthalmoscopy after multiple-daily dermal application to rats for 26 weeks and minipigs for 52 weeks of DMSO at twice the concentration found in PENNSAID Topical Solution. Published studies of dermal or oral administration of DMSO to rabbits, dogs and pigs described refractive changes of lens curvature and cortical fibers indicative of myopic changes and/or incidences of lens opacity or discoloration when evaluated using slit-lamp biomicroscopy examination, although no ocular abnormalities were observed in rhesus monkeys during daily oral or dermal treatment with DMSO for 9 to 18 months.

**14. Clinical Studies**

**14.1 Pivotal Studies in Osteoarthritis of the Knee**

The use of PENNSAID Topical Solution for the treatment of the signs and symptoms of osteoarthritis of the knee was evaluated in two double-blind controlled trials conducted in the US and Canada, involving patients treated with PENNSAID Topical Solution at a dose of 40 drops four times a day for 12 weeks. PENNSAID Topical Solution was compared to topical placebo (2.3% DMSO with other excipients) and/or topical vehicle solution (45.5% w/w DMSO with other excipients), applied directly to the study knee. In both trials, PENNSAID Topical Solution treatment resulted in statistically significant clinical improvement compared to placebo and/or vehicle, in all three primary efficacy variables—pain, physical function (Western Ontario and McMaster Universities LK3.1 OA Index (WOMAC) pain and physical function dimensions) and Patient Overall Health Assessment (POHA)/Patient Global Assessment (PGA). Numerical results are summarized in Tables 3 and 4.

TABLE 3

| | Study I Mean baseline score and mean change in efficacy variables after 12 weeks of treatment | | | |
| --- | --- | --- | --- | --- |
| Efficacy Variable | Mean Baseline score | PENNSAID ® N = 154 | Topical placebo[1] N = 155 | Topical vehicle[2] N = 161 |
| WOMAC pain score (Likert 3.1, 0-20) | 13 | -6.0 | -4.7 | -4.7 |

Change in treatment outcomes after 12 weeks of treatment in one study of efficacy of PENNSAID ® Topical Solution

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000247

75

TABLE 3-continued

Change in treatment outcomes after 12 weeks of treatment in one
study of efficacy of PENNSAID ® Topical Solution

Study I
Mean baseline score and mean change in efficacy
variables after 12 weeks of treatment

| Efficacy Variable | Mean Baseline score | PENNSAID ® N = 154 | Topical placebo[1] N = 155 | Topical vehicle[2] N = 161 |
|---|---|---|---|---|
| WOMAC physical function (Likert 3.1, 0-68) | 42 | −15.7 | −12.3 | −12.1 |
| POHA (0-4) | 2.3 | −1.0 | −0.4 | −0.6 |

[1]placebo formulation included 2.3% DMSO
[2]vehicle formulation included 45.5% DMSO

TABLE 4

Change in treatment outcomes after 12 weeks of treatment in one study
of efficacy of PENNSAID Topical Solution

Study II
Mean baseline score and mean change in efficacy
variables after 12 weeks of treatment

| Efficacy Variable | Mean Baseline score | PENNSAID N = 164 | Topical vehicle[1] N = 162 |
|---|---|---|---|
| WOMAC pain score (Likert 3.1, 0-20) | 13 | −5.9 | −4.4 |
| WOMAC physical function (Likert 3.1, 0-68) | 42 | −15.3 | −10.3 |
| PGA (0-4) | 3.1 | −1.3 | −1.0 |

[1]vehicle formulation included 45.5% DMSO

16. How Supplied/Storage and Handling

PENNSAID Topical Solution is supplied as a clear, colorless to faintly pink-orange solution containing 16.05 mg of diclofenac sodium per mL of solution, in a white high density polyethylene bottle with a white low-density dropper cap.

16.1 NDC Number & Size

| 15 mL bottle (physician sample) | NDC #23635-310-11 |
|---|---|
| 60 mL bottle | NDC #23635-310-60 |
| 150 mL bottle | NDC #23635-310-15 |

16.2 Storage

Store at 25° C. (77° F.); excursions permitted to 15-30° C. (59-86° F.) [See USP Controlled Room Temperature].

17. Patient Counseling Information

See Medication Guide.

17.1 Medication Guide

Inform patients of the following information before initiating therapy with an NSAID and periodically during the course of ongoing therapy. Encourage patients to read the NSAID Medication Guide that accompanies each prescription dispensed prior to using PENNSAID Topical Solution.

17.2 Cardiovascular Effects

PENNSAID Topical Solution, like other NSAIDs, may cause serious CV side effects, such as MI or stroke, which may result in hospitalization and even death.

76

Although serious CV events can occur without warning symptoms, instruct patients to be alert for the signs and symptoms of chest pain, shortness of breath, weakness, slurring of speech, and to ask for medical advice when observing any indicative sign or symptoms. Inform patients of the importance of this follow-up [see Warnings and Precautions (5.1)].

17.3 Gastrointestinal Effects

PENNSAID Topical Solution, like other NSAIDs, may cause GI discomfort and, rarely, serious GI side effects, such as ulcers and bleeding, which may result in hospitalization and even death. Although serious GI tract ulcerations and bleeding can occur without warning symptoms, inform patients to be alert for the signs and symptoms of ulceration and bleeding, and to ask for medical advice when observing any indicative sign or symptoms including epigastric pain, dyspepsia, melena, and hematemesis. Instruct patients of the importance of this follow-up [see Warnings and Precautions (5.2)].

17.4 Hepatotoxicity

Inform patients of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms). If these occur, instruct patients to stop therapy with PENNSAID Topical Solution and seek immediate medical therapy [see Warnings and Precautions (5.3)].

17.5 Adverse Skin Reactions

PENNSAID Topical Solution, like other NSAIDs, can cause serious systemic skin side effects such as exfoliative dermatitis, SJS, and TEN, which may result in hospitalizations and even death. Although serious systemic skin reactions may occur without warning, instruct patients to be alert for the signs and symptoms of skin rash and blisters, fever, or other signs of hypersensitivity such as itching, and to ask for medical advice when observing any indicative signs or symptoms. [see Warnings and Precautions (5.8)].

Advise patients to stop PENNSAID Topical Solution immediately if they develop any type of generalized rash and contact their physicians as soon as possible.

PENNSAID Topical Solution can cause a localized skin reaction at the application site. Advise patients to contact their physicians as soon as possible if they develop any type of localized application site rash.

Instruct patients not to apply PENNSAID Topical Solution to open skin wounds, infections, inflammations, or exfoliative dermatitis, as it may affect absorption and reduce tolerability of the drug.

Instruct patients to wait until the area treated with Pennsaid topical solution is completely dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication.

Instruct patients to minimize or avoid exposure of treated knee(s) to natural or artificial sunlight.

17.6 Weight Gain and Edema

Instruct patients to promptly report to their physician signs or symptoms of unexplained weight gain or edema following treatment with PENNSAID Topical Solution [see Warnings and Precautions (5.5)].

17.7 Anaphylactoid Reactions

Inform patients of the signs of an anaphylactoid reaction (e.g., difficulty breathing, swelling of the face or throat). If these occur, instruct patients to seek immediate emergency help [see Warnings and Precautions (5.7)].

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000248

17.8 Effects During Pregnancy

Instruct patients who are pregnant or intending to become pregnant not to use Pennsaid Topical Solution. [see Use in Specific Populations (8.1) and Impairment of Fertility (13.1)]

17.9 Eye Exposure

Instruct patients to avoid contact of PENNSAID Topical Solution with the eyes and mucosa. Advise patients that if eye contact occurs, immediately wash out the eye with water or saline and consult a physician if irritation persists for more than an hour.

Revised –02/2009r

Manufactured for:

Mallinckrodt Brand Pharmaceuticals, Inc.

Hazelwood, Mo. 63042 USA

Manufactured By:

Nuvo Manufacturing (a division of Nuvo Research Inc.)

Varennes, Quebec, Canada J3X 1P7

Medication Guide

For

Non-steroidal Anti-Inflammatory Drugs (NSAIDS)

(See the End of this Medication Guide for a List of Prescription NSAID Medicines.)

What is the most important information I should know about medicines called Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?

NSAID medicines may increase the chance of a heart attack or stroke that can lead to death. This chance increases:

with longer use of NSAID medicines

in people who have heart disease

NSAID medicines should never be used right before or after a heart surgery called a "coronary artery bypass graft (CABG)."

NSAID medicines can cause ulcers and bleeding in the stomach and intestines at any time during treatment. Ulcers and bleeding:

can happen without warning symptoms

may cause death

The chance of a person getting an ulcer or bleeding increases with:

taking medicines called "corticosteroids" and "anticoagulants"

longer use

smoking

drinking alcohol

older age

having poor health

NSAID medicines should only be used:

exactly as prescribed

at the lowest dose possible for your treatment

for the shortest time needed

What are Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?

NSAID medicines are used to treat pain and redness, swelling, and heat (inflammation) from medical conditions such as:

different types of arthritis

menstrual cramps and other types of short-term pain

Who should not take a Non-Steroidal Anti-Inflammatory Drug (NSAID)?

Do not take an NSAID medicine:

if you had an asthma attack, hives, or other allergic reaction with aspirin or any other NSAID medicine

for pain right before or after heart bypass surgery

Tell your healthcare provider:

about all of your medical conditions.

about all of the medicines you take. NSAIDs and some other medicines can interact with each other and cause serious side effects. Keep a list of your medicines to show to your healthcare provider and pharmacist.

if you are pregnant. NSAID medicines should not be used by pregnant women late in their pregnancy.

if you are breastfeeding. Talk to your doctor.

What are the possible side effects of Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?

| Serious side effects include: |
| --- |
| heart attack |
| stroke |
| high blood pressure |
| heart failure from body swelling (fluid retention) |
| kidney problems including kidney failure |
| bleeding and ulcers in the stomach and intestine |
| low red blood cells (anemia) |
| life-threatening skin reactions |
| life-threatening allergic reactions |
| liver problems including liver failure |
| asthma attacks in people who have asthma |

| Other side effects include: |
| --- |
| stomach pain |
| constipation |
| diarrhea |
| gas |
| heartburn |
| nausea |
| vomiting |
| dizziness |

Get emergency help right away if you have any of the following symptoms:

| | |
| --- | --- |
| shortness of breath or trouble breathing | slurred speech |
| chest pain | swelling of the face or throat |
| weakness in one part or side of your body | |

Stop your NSAID medicine and call your healthcare provider right away if you have any of the following symptoms:

| | |
| --- | --- |
| nausea | there is blood in your bowel movement or it is black and sticky like tar |
| more tired or weaker than usual | |
| itching | |
| your skin or eyes look yellow | unusual weight gain |
| stomach pain | skin rash or blisters with fever |
| flu-like symptoms | swelling of the arms and legs, hands and feet |
| vomit blood | |

These are not all the side effects with NSAID medicines. Talk to your healthcare provider or pharmacist for more information about NSAID medicines.

Other information about Non-Steroidal Anti-Inflammatory Drugs (NSAIDs):

Aspirin is an NSAID medicine but it does not increase the chance of a heart attack. Aspirin can cause bleeding in

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000249

the brain, stomach, and intestines. Aspirin can also cause ulcers in the stomach and intestines.

Some of these NSAID medicines are sold in lower doses without a prescription (over-the-counter). Talk to your healthcare provider before using over-the-counter NSAIDs for more than 10 days.

NSAID Medicines that Need a Prescription

| Generic Name | Tradename |
|---|---|
| Celecoxib | Celebrex |
| Diclofenac | Flector, Cataflam, Voltaren, Arthrotec ™ (combined with misoprostol), PENNSAID Topical Solution |
| Diflunisal | Dolobid |
| Etodolac | Lodine, LodineXL |
| Fenoprofen | Nalfon, Nalfon200 |
| Flurbirofen | Ansaid |
| Ibuprofen | Motrin, Tab-Profen, Vicoprofen* (combined with hydrocodone), Combunox ™ (combined with oxycodone) |
| Indomethacin | Indocin, IndocinSR, Indo-Lemmoon ™, Indomethagan ™ |
| Ketoprofen | Oruvail |
| Ketorolac | Toradol |
| Mefenamic Acid | Ponstel |
| Meloxicam | Mobic |
| Nabumetone | Relafen |
| Naproxen | Naprosyn, Anaprox, AnaproxDS, EC-Naprosyn, Naprelan, Naprapac (copackaged with lansoprazole) |
| Oxaprozin | Daypro |
| Piroxicam | Feldene |
| Sulindac | Clinoril |
| Tolmetin | Tolectin, Tolectin DS, Tolectin600 |

*Vicoprofen contains the same dose of ibuprofen as over-the-counter (OTC) NSAID, and is usually used for less than 10 days to treat pain. The OTC NSAID label warns that long term continuous use may increase the risk of heart attack or stroke.

This Medication Guide has been approved by the U.S. Food and Drug Administration.
Revised: Month Year

Patient Instructions for Use

PENNSAID [pen/sed]

(diclofenac sodium)

Topical Solution

Your doctor has prescribed PENNSAID® Topical Solution to treat your pain from osteoarthritis in your knee(s) and help you manage your daily activities better.
Before you use PENNSAID® Topical Solution:
Apply PENNSAID® Topical Solution exactly as your doctor tells you. Do not apply PENNSAID® Topical Solution anywhere on your body other than where your doctor tells you.
Apply PENNSAID® Topical Solution on clean, dry skin that does not have any cuts, infections or rashes.
Use PENNSAID® Topical Solution 4 times each day on your knee(s).
Do not get PENNSAID® Topical Solution in your eyes, nose or mouth. Only use PENNSAID® Topical Solution on your skin (topical use). If you get PENNSAID® Topical Solution in your eyes, rinse your eyes right away with water or saline. Call your doctor if your eyes are irritated for more than one hour.
Steps for using PENNSAID® Topical Solution:
Step 1. Wash your hands with soap and water before and after applying PENNSAID® Topical Solution.

Step 2. Your total dose for each knee is 40 drops of PENNSAID® Topical Solution. You will use 10 drops at a time. Put 10 drops of PENNSAID® Topical Solution either on your hand or directly on your knee. See FIG. 10A.
FIG. 1. Dispense 10 drops of PENNSAID® at a time
Step 3. Spread PENNSAID® Topical Solution evenly on the front, back and sides of your knee. Repeat this step 4 times so that your knee is completely covered with a total of 40 drops of PENNSAID® Topical Solution.
See FIGS. 10B & 10C.
FIG. 2. Spread PENNSAID® evenly on the front, and sides of your knee
FIG. 3. Spread PENNSAID® evenly on the back of your knee
Step 4. Repeat steps 2 and 3 for the other knee if needed.
After you use PENNSAID® Topical Solution:
Do not
cover your knee with clothing until your knee is completely dry
put sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medicines on your knee until it is completely dry
take a shower or a bath for at least 30 minutes after you put PENNSAID® Topical Solution on your knee(s).
use heating pads or apply bandages to the skin where you have applied PENNSAID® Topical Solution.
expose your skin to sunlight or artificial light (tanning booths) where you have put PENNSAID® Topical Solution.
How should X store PENNSAID® Topical Solution?:
Store PENNSAID® Topical Solution between 59° F. to 86° F. (15° C. to 30° C.).
Keep PENNSAID® Topical Solution and all medicines out of the reach of children.

All patents, publications, scientific articles, web sites, and other documents and materials referenced or mentioned herein are indicative of the levels of skill of those skilled in the art to which the invention pertains, and each such referenced document and material is hereby incorporated by reference to the same extent as if it had been incorporated by reference in its entirety individually or set forth herein in its entirety. Applicants reserve the right to physically incorporate into this specification any and all materials and information from any such patents, publications, scientific articles, web sites, electronically available information, and other referenced materials or documents.

The written description portion of this patent includes all claims. Furthermore, all claims, including all original claims as well as all claims from any and all priority documents, are hereby incorporated by reference in their entirety into the written description portion of the specification, and Applicants reserve the right to physically incorporate into the written description or any other portion of the application, any and all such claims. Thus, for example, under no circumstances may the patent be interpreted as allegedly not providing a written description for a claim on the assertion that the precise wording of the claim is not set forth in haec verba in written description portion of the patent.

The claims will be interpreted according to law. However, and notwithstanding the alleged or perceived ease or difficulty of interpreting any claim or portion thereof, under no circumstances may any adjustment or amendment of a claim or any portion thereof during prosecution of the application or applications leading to this patent be interpreted as having forfeited any right to any and all equivalents thereof that do not form a part of the prior art.

All of the features disclosed in this specification may be combined in any combination. Thus, unless expressly stated

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000250

otherwise, each feature disclosed is only an example of a generic series of equivalent or similar features.

It is to be understood that while the invention has been described in conjunction with the detailed description thereof, the foregoing description is intended to illustrate and not limit the scope of the invention, which is defined by the scope of the appended claims. Thus, from the foregoing, it will be appreciated that, although specific nonlimiting embodiments of the invention have been described herein for the purpose of illustration, various modifications may be made without deviating from the spirit and scope of the invention. Other aspects, advantages, and modifications are within the scope of the following claims and the present invention is not limited except as by the appended claims.

The specific methods and compositions described herein are representative of preferred nonlimiting embodiments and are exemplary and not intended as limitations on the scope of the invention. Other objects, aspects, and embodiments will occur to those skilled in the art upon consideration of this specification, and are encompassed within the spirit of the invention as defined by the scope of the claims. It will be readily apparent to one skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention. The invention illustratively described herein suitably may be practiced in the absence of any element or elements, or limitation or limitations, which is not specifically disclosed herein as essential. Thus, for example, in each instance herein, in nonlimiting embodiments or examples of the present invention, the terms "comprising", "including", "containing", etc. are to be read expansively and without limitation. The methods and processes illustratively described herein suitably may be practiced in differing orders of steps, and that they are not necessarily restricted to the orders of steps indicated herein or in the claims.

The terms and expressions that have been employed are used as terms of description and not of limitation, and there is no intent in the use of such terms and expressions to exclude any equivalent of the features shown and described or portions thereof, but it is recognized that various modifications are possible within the scope of the invention as claimed. Thus, it will be understood that although the present invention has been specifically disclosed by various nonlimiting embodiments and/or preferred nonlimiting embodiments and optional features, any and all modifications and variations of the concepts herein disclosed that may be resorted to by those skilled in the art are considered to be within the scope of this invention as defined by the appended claims.

The invention has been described broadly and generically herein. Each of the narrower species and subgeneric groupings falling within the generic disclosure also form part of the invention. This includes the generic description of the invention with a proviso or negative limitation removing any subject matter from the genus, regardless of whether or not the excised material is specifically recited herein.

It is also to be understood that as used herein and in the appended claims, the singular forms "a," "an," and "the" include plural reference unless the context clearly dictates otherwise, the term "X and/or Y" means "X" or "Y" or both "X" and "Y", and the letter "s" following a noun designates both the plural and singular forms of that noun. In addition, where features or aspects of the invention are described in terms of Markush groups, it is intended, and those skilled in the art will recognize, that the invention embraces and is also thereby described in terms of any individual member and any subgroup of members of the Markush group, and applicants reserve the right to revise the application or claims to refer

specifically to any individual member or any subgroup of members of the Markush group.

Other nonlimiting embodiments are within the following claims. The patent may not be interpreted to be limited to the specific examples or nonlimiting embodiments or methods specifically and/or expressly disclosed herein. Under no circumstances may the patent be interpreted to be limited by any statement made by any Examiner or any other official or employee of the Patent and Trademark Office unless such statement is specifically and without qualification or reservation expressly adopted in a responsive writing by Applicants.

What is claimed is:

1. A method for applying topical agents to a knee of a patient with pain, said method comprising:

applying a first medication consisting of a topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient, wherein the topical diclofenac preparation comprises a therapeutically effective amount of diclofenac and 40-50% w/w dimethyl sulfoxide;

waiting for the treated area to dry; and

subsequently applying a second medication consisting of a topical medication, which is other than said first medication and is selected from the group consisting of an NSAID, tretinoin, minoxidil, a corticosteroid, to said treated area after said treated area is dry, wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation.

2. The method according to claim 1, wherein said diclofenac preparation comprises about 45.5% w/w dimethyl sulfoxide.

3. The method according to claim 1, wherein said therapeutically effective amount of diclofenac is 1.5% w/w diclofenac sodium.

4. The method according to claim 1, wherein said diclofenac preparation further comprises ethanol, propylene glycol, glycerine, and water.

5. The method according to claim 1, wherein said therapeutically effective amount of diclofenac comprises a pharmaceutically acceptable salt of diclofenac selected from a sodium salt, a potassium salt, a diethylamine salt, or an epolamine salt.

6. The method according to claim 1, wherein said step of subsequently applying comprises subsequently applying said second medication, which is an NSAID.

7. The method according to claim 6, wherein said topical medication other than said first medication comprises a medical compound or composition in an amount sufficient to induce a desired biological, pharmaceutical, or therapeutic result, wherein the result relates to alleviation of a sign, a symptom, or a cause of a disease or disorder or condition, or any other desired alteration of a biological system.

8. The method according to claim 1, wherein the topical medication other than said first medication is tretinoin.

9. The method according to claim 5, wherein said therapeutically effective amount of diclofenac comprises diclofenac sodium.

10. The method according to claim 1, wherein the topical medication other than said first medication is minoxidil.

11. The method according to claim 1, wherein the topical medication other than said first medication is a corticosteroid.

12. A method for applying topical agents to a knee of a patient with pain, said method comprising:

applying a first medication consisting of a topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient,

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000251

83

wherein the topical diclofenac preparation comprises a therapeutically effective amount of diclofenac and 40-50% w/w dimethyl sulfoxide;

waiting for the treated area to dry; and

subsequently applying a second medication consisting of a topical medication, which is other than said first medication and comprises an NSAID, to said treated area after said treated area is dry, wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation.

**13.** The method according to claim **12**, wherein said therapeutically effective amount of diclofenac is 1.5% w/w diclofenac sodium.

**14.** A method for applying topical agents to a knee of a patient with pain, said method comprising:

applying a first medication consisting of a topical diclofenac preparation to an area of the knee of said

84

patient to treat osteoarthritis of the knee of said patient, wherein the topical diclofenac preparation comprises a therapeutically effective amount of diclofenac and 40-50% w/w dimethyl sulfoxide;

waiting for the treated area to dry; and

subsequently applying a second medication consisting of a topical medication, which is other than said first medication and comprises a corticosteroid, to said treated area after said treated area is dry, wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation.

**15.** The method according to claim **14**, wherein said therapeutically effective amount of diclofenac is 1.5% w/w diclofenac sodium.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000252

APPX119

# Addendum 7

U.S. Patent No. 8,252,838

A120-A150



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 19, 2015

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *8,252,838*
ISSUE DATE: *August 28, 2012*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office



*M. Tam*

**M. TARVER**
**Certifying Officer**

Defendants'
Exhibit No.
**9**


(12) **United States Patent**
    Kisak et al.

(10) Patent No.: **US 8,252,838 B2**
(45) **Date of Patent:** Aug. 28, 2012

---

(54) **DICLOFENAC TOPICAL FORMULATION**

(75) Inventors **Ed Kisak**, San Diego, CA (US); **Jagat Singh**, Toronto (CA)

(73) Assignee: **Nuvo Research Inc.**, Mississauga (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 187 days.

(21) Appl. No.: 12/134,121

(22) Filed: **Jun. 5, 2008**

(65) **Prior Publication Data**

US 2008/0300311 A1    Dec. 4, 2008

**Related U.S. Application Data**

(63) Continuation of application No PCT/US2007/081674, filed on Oct 17, 2007.

(60) Provisional application No. 60/829,756, filed on Oct 17, 2006.

(51) **Int. Cl.**
*A61K 31/196*     (2006.01)
*A61P 19/02*     (2006.01)

(52) **U.S. Cl.** ... ... ........... .. .. ......... ...... **514/567**

(58) **Field of Classification Search** .. .. ... None
See application file for complete search history

(56) **References Cited**

U S PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,740,421 A | * | 6/1973 | Schmolka | 424/65 |
| 4,441,739 A | | 4/1984 | Cluff et al. | |
| 4,543,251 A | | 9/1985 | Kamishita | |
| 4,575,515 A | * | 3/1986 | Sandborn | 514/708 |
| 4,652,557 A | | 3/1987 | Sandborn | |
| 4,855,294 A | * | 8/1989 | Patel et al | 514/212 03 |
| 5,350,769 A | * | 9/1994 | Kasai et al | 514/567 |
| 5,374,661 A | * | 12/1994 | Betlach, II | 514/772 4 |
| 6,399,093 B1 | | 6/2002 | Petrus | |
| 2003/0082226 A1 | | 5/2003 | Samour et al | |
| 2005/0239894 A1 * | | 10/2005 | Steiger | 514/567 |
| 2009/0131447 A1 | | 5/2009 | Kamboj et al | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 245 126 | 11/1987 |
| EP | 0 450 123 | 10/1991 |
| WO | WO 97/13528 | 4/1997 |
| WO | WO 99/09954 | 3/1999 |
| WO | WO 03/094905 A1 | 11/2003 |
| WO | WO 2005/009510 | 2/2005 |
| WO | WO 2006/096360 | 9/2006 |
| WO | WO 2007/015766 A1 | 2/2007 |
| WO | WO 2010/060798 A1 | 6/2010 |

OTHER PUBLICATIONS

Laba, 1993. Chapter 4 Rheological Additives. Rheological Properties of Cosmetics and Toiletries Cosmetic Science and Technology series, vol 13 55-152 *

Hewitt et al, 1998 In vitro cutaneous disposition of a topical diclofenac lotion in human skin. effect of a multi-dose regimen Pharmaceutical Research vol 15(7) 1998 *

Ho et al, 1994. The influence of cosolvents on the in-vitro percutaneous penetration of diclofenac sodium from a gel system. J Pharm pharmacol, vol 46 636-642 *

Hewitt et al (Pharmaceutical Research, vol 15(7) 988-992, 1998) *

ICIS News 1999-2011 (http //www. chemindustry com /chemicals/ 0197997 html) *

Hewitt et al ("In vitro cutaneous disposition of a topical diclofenac lotion in human skin. effect of a multi-dose regimen," Pharmaceutical Research, vol 15(7) 988-992, 1998 *

Obata et al ("Effect of ethanol on skin permeation of nonionized and ionized diclofenac," International Journal of Pharmaceutics, 89 (1993) 191-198) *

Asingbogu et al ("Fourier transform Raman spectroscopy of interactions between the penetration enhancer dimethyl sulfoxide and human stratum corneum," International Journal of Pharmaceutics 125 (1995) 265-282).*

ICIS News 1999-2011 (http //www chemundustry com/chemicals/ 0197997 html.*

Lin et al , Efficacy of topical non-steroidal anti-inflammatory drugs in the treatment of osteoarthritis meta-analysis of randomized controlled trials, BMJ, 2004 (239)

Bellamy,et al , Recommendations for a Core Set of Outcome Measures for Future Phase III Clinical Trials in Knee, Hip, and Hand Osteoarthritis, J Rheumatol, 1997, 24 799-802.

Towheed, Pennsaid® Therapy for Osteoarthritis of the Knee A Systematic Review and Metaanalysis of Randomized Controlled Trials, J Rheumatol, 2006, 33 3 567-573

Rosenstein, Topical Agents in the Treatment of Rheumatic Disorders, Rheum Dis Clin North Am , 1999, 25(4) 899-918

Ostrenga et al , Significance of Vehicle Composition I Relationship between Topical Vehicle Composition, Skin Penetrability, and Clinical Efficacy, J Pharm Sciences, 1971, vol. 60, No 8

Naito et al , Percutaneous absorption of diclofenac sodium ointment, Int Jour of Pharmaceutics, 1985; 24 115-124

Obata, et al ; Effect of ethanol on skin permeation of nonionized and ionized diclofenac; Int Jour of Pharmaceutics, 1993, 89 191-198

Minghetti, et al , Ex Vivo Study of Transdermal Permeation of Four Diclofenac Salts from Different Vehicles; Jour of Pharm Sci ; 2007; vol. 96, No 4

Kantarci et al , In Vitro Permeation of Diclofenac Sodium from Novel Microemulsion Formulations Through Rabbit Skin, Drug Development Research, 2005, 65 17-25

Sarigullu, et al , Transdermal Delivery of Diclofenac Sodium Through Rat Skin from Various Formulations, APS PharmSciTech, 2006, 7(4) Article 88 E1-E7

Baboota et al ; Formulation and Evaluation of Once-a-Day Transdermal Gels of Diclofenac Diethylamine, Methods Find Exp Clin Pharmacol ; 2006; 28 109-114.

Franz, Percutaneous absorption. on the Relevance of In Vitro Data, J Invest Derm, 1975, 64 190-195

Hsiu-O Ho, et al , The Influence of Cosolvents on the In-vitro Percutaneous Penetration of Diclofenac Sodium From a Gel System, J Pharm Pharmacol , 1994, 45 636-642

(Continued)

*Primary Examiner* — Suzanne Ziska
(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

The present invention provides a gel formulation comprising diclofenac sodium which has superior transdermal flux properties, which may be used for the topical treatment of pain, such as in osteoarthritis.

**69 Claims, 12 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.002

HZNPENN_00000002

APPX121

## OTHER PUBLICATIONS

U.S. Appl. No. 12/459,998, Singh et al.

U.S. Appl. No. 12/660,865, Singh et al.

U.S. Appl. No. 12/914,867, Singh et al.

Bookman et al., An article entitled "Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee a randomized controlled trial" Canadian Medical Journal 2004, 171(4), 333-338 Retrieved from the Internet http://canadianmedicaljournal.ca/cgi/reprint/171/4/333.

Towheed; An article entitled "Pennsaid® Therapy for Osteoarthritis of the Knee A Systematic Review and Metaanalysis of Randomized Controlled Trials" The Journal of Rheumatology 2006, 33(3), 567-573.

Towheed, An article entitled "Published meta-analyses of pharmacological therapies for osteoarthritis" Osteoarthritis and Cartilage 2002, 10, 836-837

Tugwell et al., An article entitled "Equivalence Study of a Topical Diclofenac Solution (Pennsaid®) Compared with Oral Diclofenac in Symptomatic Treatment of Osteoarthritis of the Knee A Randomized Controlled Trial." The Journal of Rheumatology 2004; 31(10), 2002-2012.

Roth et al.; An article entitled "Efficacy and Safety of a Topical Diclofenac Solution (Pennsaid) in the Treatment of Primary Osteoarthritis of the Knee" Arch Intern Med 2004, 164, 2017-2023

Hui et al.; An article entitled "In Vivo Bioavailability and Metabolism of Topical Diclofenac Lotion in Human Volunteers" Pharmaceutical Research 1998, 15(10), 1589-1595

Hewitt et al., An article entitled "In Vitro Cutaneous Disposition of a Topical Diclofenac Lotion in Human Skin Effect of a Multi-Dose Regimen" Pharmaceutical Research 1998, 15(7), 988-992

Shamhouser; An article entitled "OARSI guidelines for hip and knee OA decyphering the topical drug mélange" Osteoarthritis Cartilage, 2008, 16(12), 1586-7

An article entitled "Other articles noted" by Evidence-Based Medicine, 2005, 10, 63-64

Shamhouser et al., An article entitled "A Long-Term, Open-Label Study to Confirm the Safety of Topical Diclofenac Solution Containing Dimethyl Sulfoxide in the Treatment of the Osteoarthritic Knee" American Journal of Therapeutics 0, 000-000 (2010)

Simon et al., An article entitled "Efficacy and safety of topical diclofenac containing dimethyl sulfoxide (DMSO) compared with those of topical diclofenac, DMSO, vehicle and oral diclofenac for knee osteoarthritis." Pain, 2009, 143(3), 238-45.

Lin et al.; An article entitled "Efficacy of topical non-steroidal anti-inflammatory drugs in the treatment of osteoarthritis meta-analysis of randomized controlled trials" BMJ 2004, 329(7461), 1f

Ozguney, An article entitled "An alternative topical treatment of osteoarthritis of the knee with cutaneous diclofenac solution" Expert Opinion on Pharmacotherapy 2008, 9(10), 1805-1816

Baer et al., An article entitled "Treatment of osteoarthritis of the knee with a topical diclofenac solution: a randomized controlled, 6-week trial (ISRCTN53366886)" BMC Musculoskeletal Disorders 2005, 6:44, Aug. 8, 2005 Retrieved from the Internet http://www.ncbi.nlm.nih.gov/pmc/articles/PMC1201146/pdf/1471-2474-6-44.pdf

Galer et al., An article entitled "Use of Topiceuticals (Topically Applied, Peripherally Acting Drugs) in the Treatment of Chronic Pain" Current Drug Therapy 2006, 1(3), 273-282

Moen; An article entitled "Topical Diclofenac Solution" Drugs, 2009, 69(18), 2621-32 Retrieved from the Internet http://www.ncbi.nlm.nih.gov/pubmed/19943711

"Product Monograph, PR Pennsaid®", Dimethaid Health Care Ltd, Oct. 20, 2003 Retrieved from the Internet http://www.osteo-arthritis.org/downloads/Pennsaid_HCP_Mono.pdf

Nelson et al.; an article entitled "Phase IV, open-label assessment of the treatment of actinic keratosis with 3.0% diclofenac sodium topical gel (Solaraze™)" Journal of Drugs in Dermatology 2004,3(4), 401ff

Nishihata et al. "Percutaneous absorption of diclofenac in rats and humans aqueous gel formulations," International Journal of Pharmaceutics, 1988, vol 46, pp 1-7

Miao et al. "Preparation and Clinical Application of Diclofenac Sodium Gel," Railway Medical Journal, 2000, vol 28, No. 1, pp 14-15

Karande, Pankaj, Insights into synergistic interactions in binary mixtures of chemical permeation enhancers for transdermal drug delivery; Journal of Controlled Release, 115 (2006) 85-93

Karande, Pankaj, High Throughput Screening of Transdermal Formulations, Pharmaceutical Research, vol 19, No. 5, May 2002, 655-660

Prausnitz, Mark, Nature Reviews, vol 3, Feb 2004, 115-124

Barry, B W., "Mode of action of penetration enhancers in human skin," Journal of Controlled Release, 6 85-97, 1987

Büyüktimkin, N. et al., "Chemical means of transdermal drug permeation enhancement," Chapter 11 of Transdermal and Topical Drug Delivery Systems, Tapash K. Ghosh et al., eds., pp 357, 404-407, 1997.

Hadgraft, J., "Mini review Passive enhancement strategies in topical and transdermal drug delivery," International Journal of Pharmaceutics, 184 1-6, 1999

Walker, R B. and Smith E W., "The role of percutaneous penetration enhancers," Advanced Drug Delivery Reviews, 18 295-301, 1996

Williams, A C. and Barry, B W., "Penetration enhancers," Advanced Drug Delivery Reviews 56 603-618, 2004.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.003

HZNPENN_00000003

APPX122



FIG. 1

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.004

APPX123

HZNPENN_00000004



**FIG. 2**

DTX001.005

APPX124

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000005



FIG. 3

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.006

APPX125



FIG. 4

HZNPENN_00000007

DTX001.007

APPX126

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

Copy provided by USPTO from the PIRS Image Database on 05/15/2016



FIG. 5

HZNPENN_00000008

DTX001.008

APPX127



FIG. 6

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.009

APPX128

HZNPENN_00000009



FIG. 7

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.010

APPX129

HZNPENN_00000010



FIG. 8

Accumulated dose

- Comparative
- F14/2 gel 2.5%
- F14/2 gel pH 8.5

DTX001.011

APPX130

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000011



FIG. 9

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.012

APPX131

HZNPENN_00000012



FIG. 10

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.013

APPX132

HZNPENN_00000013



FIG. 11

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.014

APPX133



**FIG. 12**

Diclofenac plasma concentrations at steady state (day 7)

diclofenac plasma concentrations (pg/ml)

post-dose (h)

gel
comparator

DTX001.015

APPX134

HZNPENN_00000015

1

# DICLOFENAC TOPICAL FORMULATION

## CROSS-REFERENCES TO RELATED APPLICATIONS

This application claims priority to U.S. Provisional Application No. 60/829,756, filed Oct. 17, 2006, the teachings of which are incorporated herein by reference in its entirety for all purposes.

## FIELD OF THE INVENTION

The present invention relates generally to compositions and methods for treating osteoarthritis

## BACKGROUND OF THE INVENTION

1 Osteoarthritis

Osteoarthritis (OA) is a chronic joint disease characterized by progressive degeneration of articular cartilage. Symptoms include joint pain and impaired movement. OA is one of the leading causes of disability worldwide and a major financial burden to health care systems. It is estimated to affect over 15 million adults in the United States alone. See Boh L. E. Osteoarthritis. In: DiPiro J. T., Talbert R. L., Yee G. C., et al., editors. *Pharmacotherapy: a pathophysiological approach.* 4th ed. Norwalk (CT): Appleton & Lange, pp 1441-59 (1999).

Oral non-steroidal anti-inflammatory drugs (NSAIDs) are a mainstay in the management of OA. They have analgesic, anti-inflammatory and antipyretic effects and are useful in reducing pain and inflammation. NSAIDs are however associated with serious potential side effects including nausea, vomiting, peptic ulcer disease, GI haemorrhage, and cardiovascular events

Topical NSAIDs offer the possibility of achieving local therapeutic benefit while reducing or eliminating the risk of systemic side effects. There has been widespread interest in this approach to treating OA, but data in support of the efficacy of topical NSAIDs in the treatment of OA is limited. For instance, a study of 13 randomized placebo controlled trials (RCT's) of various topical NSAIDs tested specifically for use in the treatment of OA concluded that they were not generally efficacious for chronic use in OA. (Lin et al., Efficacy of topical non-steroidal anti-inflammatory drugs in the treatment of osteoarthritis: meta-analysis of randomized controlled trials, BMJ, doi.10.1136/bmj.38159.639028.7C (2004)).

There are generally three outcomes used to measure the efficacy of an OA treatment: pain, physical function, and a patient global assessment. See Bellamy N, Kirwan J, Boers M, Brooks P, Strand V, Tugwell P, et al Recommendations for a core set of outcome measures for future phase III clinical trials in knee, hip and hand osteoarthritis. Consensus development at OMERACT III, *J Rheumatol.* 24:799-802 (1997). To be suitable for chronic use, a therapy must generally show efficacy on these three variables over a sustained period of time. In the U.S. for instance, the Food and Drug Administration (FDA) requires OA therapies to show superiority over placebo over a 12 week period Notwithstanding the significant potential for topical NSAIDs in the treatment of OA, as of the time of filing this application, none have been approved for such treatment in the U.S.

U.S. Pat. Nos. 4,575,515 and 4,652,557 disclose topical NSAID compositions, one of which, consisting of 1.5% diclofenac sodium, 45.5% dimethylsulphoxide, 11.79% ethanol, 11.2% propylene glycol, 11.2% glycerine, and water, has

2

been shown to be effective in chronic OA treatment. See Towheed, *Journal of Rheumatology* 33.3 567-573 (2006) and also Oregon Evidence Based Practice Center entitled "Comparative Safety and Effectiveness of Analgesics for Osteoarthritis", AHRQ Pub. No. 06-EHC09-EF. This particular composition is referred to herein as "comparative liquid formulation" or "comparative" in the Examples section. However, the compositions of these prior inventions have drawbacks in that they are slow to dry and runny. They also require frequent dosing of three to four times a day to achieve efficacy in OA, which increases exposure to potential skin irritants and increases the risk of skin irritation

In general, the failure of topical NSAIDs to fulfill their promise in OA may be due in part to the difficulty associated with delivering a molecule through the skin in sufficient quantities to exert a therapeutic effect and in a manner that makes the treatment itself tolerable. It is generally believed that clinical efficacy in OA requires absorption of the active ingredient and its penetration in sufficient quantities into underlying inflamed tissues including the synovium and synovial fluid of joints. See Rosenstein, Topical agents in the treatment of rheumatic disorders, *Rheum. Dis. Clin North Am.*, 25: 899-918 (1999)

However, the skin is a significant barrier to drug permeation, and despite nearly four decades of extensive research, the number of transdermal drugs in general remains fairly limited with only a small number of transdermal drug products commercially available.

In connection with topical dosage forms applied to the skin, a number of interactions can occur including vehicle-skin, vehicle-drug, and drug-skin. Each can affect the release of an active agent from a topical dosage form (Roberts, M. S. Structure-permeability considerations in percutaneous absorption. In *Prediction of Percutaneous Penetration*, ed. by R. C. Scott et al., vol. 2, pp 210-228, IBC Technical Services, London, 1991). Thus various factors can affect absorption rates and penetration depth including the active ingredient, the vehicle, the pH, and the relative solubility of the active in the vehicle versus the skin (Ostrenga J. et al., Significance of vehicle composition I: relationship between topical vehicle composition, skin penetrability, and clinical efficacy, *Journal of Pharmaceutical Sciences*, 60: 1175-1179 (1971)). More specifically, drug attributes such as solubility, size and charge, as well as, vehicle attributes such as the drug dissolution rate, spreading-ability, adhesion, and ability to alter membrane permeability can have significant effects on permeability.

There is significant variability observed from seemingly minor variations in formulations. For instance, Naito demonstrates significant variability in penetration among topical NSAID formulations simply by changing the gelling agent used in the compositions (Naito et al., Percutaneous absorption of diclofenac sodium ointment, *Int. Jour. of Pharmaceutics*, 24. 115-124 (1985)). Similarly, Ho noted significant variability in penetration by changing the proportions of alcohol, propylene glycol, and water (Ho et al., The influence of cosolvents on the in-vitro percutaneous penetration of diclofenac sodium from a gel system, *J Pharm Pharmacol*, 46 636-642 (1994)). It was noted that the changes affected three distinct variables: (i) the solubility of the drug in the vehicle, (ii) the partition coefficient, and (iii) effects on alteration of skin structure

Ho et al (1994) also noted that (i) the pH of the vehicle, (ii) the drug solubility, and (iii) the viscosity of a gel medium can influence penetration from a gel dosage form. The pH value affects the balance between ionized and non-ionized forms of the drug, which have different penetration properties (Obata, *International Journal of Pharmaceutics*, 89: 191-198

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

3

(1993)) The viscosity can affect diffusion of the drug through the gel matrix and release of the drug from the vehicle into the skin. The solubility of the drug in the vehicle will affect the partition coefficient of the drug between the formulation and the recipient membrane/tissue (Ho et al. 1994).

Chemical penetration enhancers are one means for reversibly lowering the skin barrier. Other methods include iontophoresis, ultrasound, electroporation, heat, and microneedles. At least 250 chemicals have been identified as enhancers which can increase skin permeability. General categories include pyrrolidones, fatty acids, esters and alcohols, sulfoxides, essential oils, terpenes, oxazolidines, surfactants, polyols, azone and derivatives, and epidermal enzymes.

The mechanisms by which penetration enhancers reduce the skin barrier function are not well understood (see Williams and Barry "Penetration Enhancers" *Advanced Drug Delivery Reviews* 56: 603-618 (2004)) although it has been proposed that the mechanisms can be grouped into three broad categories: lipid disruption, increasing corneocyte permeability, and promoting partitioning of the drug into the tissue.

The challenge with use of chemical penetration enhancers is that few seem to induce a significant or therapeutic enhancement of drug transport at tolerable levels. This is because the act of disrupting the skin barrier will have the potential of causing skin irritation. With increased duration, skin irritation will become a greater issue. This is particularly problematic with topical OA treatments where the goal is to have the active penetrate into joint tissue and where the drug must be utilized on a long-term basis due to the nature of the disease. The inventors have developed methods and compositions that deliver more active ingredient per unit dose than previously known compositions, and this would be expected to lead to a lower incidence of skin irritation.

The compositions of the invention use diclofenac sodium which is a commonly used NSAID. Diclofenac has four different salts that show significant variability in the degree of permeation in solutions using different solvents. Minghetti, for instance, teaches that a diclofenac salt with an organic base is best for topical applications (Minghetti et al., Ex vivo study of transdermal permeation of four diclofenac salts from different vehicles, *Jour. of Pharm. Sci, DOI* 10.1002/jps.20770 (2007)).

Other research points to microemulsion formulations as a means for delivery of diclofenac sodium (Kantarci et al., In vitro permeation of diclofenac sodium from novel microemulsion formulations through rabbit skin, *Drug Development Research*, 65 17-25 (2005) and Sarigullu I et al., Transdermal delivery of diclofenac sodium through rat skin from various formulations, *APS Pharm Sci Tech*, 7(4) Article 88, E1-E7 (2006))

Other topical diclofenac compositions are disclosed in a number of patents including U.S. Pat. No. 4,543,251, U.S. Pat. No. 4,670,254, U.S. Pat. No. 5,374,661, U.S. Pat. No. 5,738,869, U.S. Pat. No. 6,399,093 and U.S. Pat. No. 6,004,566. United States Patent Application No. 20050158348 points out that various solvents are widely used for gel preparations, but notes that they are limited in potential due to skin irritation. This reference also notes that gel compositions are associated with fast termination of action as the active precipitates from solution in the upper skin layers, limiting anti-inflammatory action in deeper tissues. The gels of the present invention are designed to accomplish the opposite, namely prolonged action and anti-inflammatory action in the deeper tissues.

4

2. Gel Formulations of Diclofenac

None of the previous references disclose the compositions of the invention or their use in the treatment of OA. Rather, these references highlight the significant unmet need with respect to topical OA treatments for chronic use and the complexity of transdermal transport in general, where significant variability in permeation is observed by changing composition elements or their relative proportions.

In light of the foregoing, there is a considerable need for improvement in the development of a topical NSAID suitable for long term use in the treatment of OA. The challenge has been to develop an optimal formulation which will deliver the active agent to the underlying tissue in sufficient concentration to treat OA on a long term basis, while reducing or minimizing the incidence of intolerable skin irritation caused by disrupting the skin barrier and while providing a formulation and dosage that leads to and encourages patient compliance. The present invention satisfies these and other needs.

BRIEF SUMMARY OF THE INVENTION

The present invention overcomes the disadvantages of the prior art by providing diclofenac sodium gel formulations for the treatment of osteoarthritis that display a better drying time, higher viscosity, increased transdermal flux, and greater pharmacokinetic absorption in vivo when compared to previously described compositions. Furthermore, the preferred diclofenac sodium gel formulations of the present invention provide other advantages including favorable stability at six (6) months as reflected in the lack of any substantial changes in viscosity, the absence of phase separation and crystallization at low temperatures, and a low level of impurities. Moreover, the present gel formulations adhere well to the skin, spread easily, dry quicker, and show greater in vivo absorption in comparison to previously described compositions. Thus, the gel formulations of the present invention provide superior means for delivery of diclofenac sodium through the skin for the treatment of osteoarthritis, as compared to previously described compositions.

As such, in one embodiment, the present invention provides a gel formulation comprising, consisting essentially of, or consisting of

(i) diclofenac sodium;
(ii) DMSO;
(ii) ethanol;
(iii) propylene glycol;
(v) a thickening agent,
(vi) optionally glycerol; and
(vii) water

In another embodiment, the present invention provides a method of treating osteoarthritis in a subject suffering from articular pain, the method comprising the topical administration to an afflicted joint area of a subject a therapeutically effective amount of a gel formulation comprising, consisting essentially of, or consisting of:

(i) diclofenac sodium,
(ii) DMSO,
(ii) ethanol,
(iii) propylene glycol,
(v) a thickening agent;
(vi) optionally glycerol; and
(vi) water,

thereby treating osteoarthritis

A further embodiment provides for the use of diclofenac sodium in the preparation of a medicament for the treatment of pain, the medicament comprising a gel formulation comprising, consisting essentially of, or consisting of

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

5 6

(i) diclofenac sodium;
(ii) DMSO;
(ii) ethanol;
(iii) propylene glycol;
(v) a thickening agent;
(vi) optionally glycerol; and
(vii) water

In yet a further embodiment, the present invention provides a gel formulation comprising, consisting essentially of, or consisting of: a diclofenac sodium solution and at least one thickening agent, which can be selected from cellulose polymer, a carbomer polymer, a carbomer derivative, a cellulose derivative, polyvinyl alcohol, poloxamers, polysaccharides, and mixtures thereof.

In an aspect of this embodiment, the diclofenac sodium solution comprises, consists essentially of, or consists of:

(i) diclofenac sodium;
(ii) DMSO;
(ii) ethanol;
(iii) propylene glycol;
(iv) optionally glycerol; and
(v) water.

In an aspect of the above embodiments, the thickening agents can be selected from cellulose polymers, carbomer polymers, a carbomer derivative, a cellulose derivative, polyvinyl alcohol, poloxamers, polysaccharides, and mixtures thereof.

In an aspect of the above gel embodiments, diclofenac sodium is present at 1-5% w/w, such as 1, 2, 3, 4, or 5% w/w, DMSO is present at 30-60% w/w, ethanol is present at 1-50% w/w; propylene glycol is present at 1-15% w/w, glycerol is present at 0-15% w/w, a thickening agent is present such that the end viscosity of the gel is between 10 and 50000 centipoise, and water is added to make 100% w/w. In other aspects, glycerol is present at 0-4% w/w. In further aspects, no glycerol is present.

In another aspect of the above embodiments, diclofenac sodium is present at 2% w/w, DMSO is present at 45 5% w/w, ethanol is present at 23-29% w/w, propylene glycol is present at 10-12% w/w; hydroxypropylcellulose (HY119) is present at 0-6% w/w; glycerol is present at 0-4%, and water is added to make 100% w/w. In other aspects, there is no glycerol in the gel formulation. In further aspects, the end viscosity of the gel is 500-5000 centipoise.

A feature of the above gel formulations is that when such formulations are applied to the skin, the drying rate is quicker and transdermal flux is higher than previously described compositions, such as those in U.S. Pat. Nos. 4,575,515 and 4,652,557. Additional features of the preferred formulations include decreased degradation of diclofenac sodium, which degrades by less than 0.04% over the course of 6 months and a pH of 6.0-10.0, for example around pH 9.0.

In certain embodiments, the gel formulations of the invention comprise 1-5% glycerol, wherein the gel formulation when applied to the skin has a drying rate and transdermal flux greater than a comparative liquid formulation. In some aspects, the drying rate results in a residue of at most 50% of a starting amount after 24 hours and the transdermal flux is 1.5 or more greater than a comparative liquid formulation as determined by Franz cell procedure at finite or infinite dosing, or both.

In other embodiments, the gel formulations and methods of their use provide a reduction of pain over 12 weeks when the formulations are applied topically. In various aspects, the gel formulations are applied twice daily and the pain can be due to osteoarthritis.

These and other objects, embodiments, and advantages will become more apparent when read with the figures and detailed description which follow.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a bar graph of flux rate of HEC and PVP gels. Franz diffusion cells were dosed at 15 mg per Franz cell

FIG. 2 shows a bar graph of flux rate of gels made with Carbopol 981 and Ultrez 10 Franz diffusion gels were dosed with 200 μl per Franz cell

FIG. 3 shows a bar graph of flux rate of carbopol 971 and carbopol 981 gels. Franz diffusion cells were dosed at 50 μl per cell.

FIG. 4 shows a bar graph of flux rate of various gels and a comparative liquid formulation. Franz cells were dosed at 10 mg per Franz cell.

FIG. 5 shows a bar graph illustrating the effect of the pH of various gels and a comparative liquid formulation on flux rate. Franz diffusion cells were dosed at 7 mg per cell.

FIG. 6 shows a bar graph of flux rates of various gels Franz cells were dosed at 7 mg per Franz cell.

FIG. 7 shows a bar graph of flux rates of various diclofenac formulations. The comparative liquid formulation (1 5% diclofenac sodium) was dosed at 20 mg per Franz cell, Solaraze® (a commercially available 3% diclofenac sodium gel) was dosed at 10 mg per Franz cell, and a formulation of the invention, F14/2, was dosed at 15 mg per Franz diffusion cell. At this dosing, all cells were dosed with equivalent amounts of diclofenac sodium

FIG. 8 shows a bar graph of flux rates in multidosing experiments The comparative liquid formulation was dosed at 0.9 mg per Franz cell at 0, 4, 8, and 12 hrs. A formulation of the invention, F14/2, was dosed at 1.5 mg per Franz cell at 0 and 6 hrs

FIG. 9 shows a bar graph of flux rates of various diclofenac formulations Franz cells were dosed at 20 mg per cell

FIG. 10 shows a bar graph of data on diclofenac flux rates from gels disclosed in Baboota et al. and gels of this invention. Franz cells were dosed at 4 mg per cell

FIG. 11 shows the drying profile over time of three gel formulations and one liquid formulation of diclofenac sodium.

FIG. 12 shows the in vivo steady state plasma concentrations of diclofenac sodium after administration of either a liquid or gel formulation.

DETAILED DESCRIPTION OF THE INVENTION

1 Definitions

The term "transdermal" is used herein to generally include a process that occurs through the skin. The terms "transdermal" and "percutaneous" are used interchangeably throughout this specification.

The term "topical formulation" is used herein to generally include a formulation that can be applied to skin or a mucosa Topical formulations may, for example, be used to confer therapeutic benefit to a patient or cosmetic benefits to a consumer. Topical formulations can be used for both topical and transdermal administration of substances

The term "topical administration" is used herein to generally include the delivery of a substance such as a therapeutically active agent, to the skin or a localized region of the body

The term "transdermal administration" is used herein to generally include administration through the skin. Transdermal administration is often applied where systemic delivery

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

of an active is desired, although it may also be useful for delivering an active to tissues underlying the skin with minimal systemic absorption.

The term "penetration enhancer" is used herein to generally include an agent that improves the transport of molecules such as an active agent (e.g. a medicine) into or through the skin. Various conditions may occur at different sites in the body either in the skin or below the skin creating a need to target delivery of compounds For example, in a treatment for osteoarthritis, the delivery of the active agent into relatively deep underlying joint tissue may be necessary to achieve therapeutic benefit. Thus, a "penetration enhancer" may be used to assist in the delivery of an active agent directly to the skin or underlying tissue or indirectly to the site of disease through systemic distribution A penetration enhancer may be a pure substance or may comprise a mixture of different chemical entities.

The term "finite dosing" is used herein to generally include an application of a limited reservoir of an active agent. The reservoir of the active agent is depleted with time leading to a tapering off of the active absorption rate after a maximum absorption rate is reached

The term "infinite dosing" is used herein to generally include an application of a large reservoir of an active agent The reservoir is not significantly depleted with time, thereby providing a long term, continuous steady state of active absorption.

As used herein, the term "comparative liquid formation" or "comparative" refers to a formulation such as that described in U.S. Pat Nos. 4,575,515 and 4,652,557 consisting of 1 5% diclofenac sodium, 45.5% dimethylsulfoxide, 11.79% ethanol, 11 2% propylene glycol, 11.2% glycerine, and water

II. Gel Formulations

1. Components of the Gel Formulations

In order to provide a diclofenac sodium gel formulation having improved properties of drying time, increased transdermal flux and greater pharmacokinetic absorption in vivo, higher viscosity, good adherence to the skin, and ready spreadability, while maintaining stability over time, the inventors have discovered that a surprisingly advantageous combination of the following compounds can be utilized in the preparation of the gel compositions of the present invention.

The present invention provides gel formulations comprising an active agent, preferably a non-steroidal anti-inflammatory drug or pharmaceutically acceptable salts thereof More preferably, the non-steroidal anti-inflammatory is diclofenac, which can exist in a variety of salt forms, including sodium, potassium, and diethylamine forms In a preferred embodiment, the sodium salt of diclofenac is used Diclofenac sodium may be present in a range of approximately 0.1% to 10%, such as 1, 2, 3, 4, or 5% w/w Use of the sodium salt has been known to create a challenge with respect to stability of an aqueous gel in that higher salt concentrations can cause a breakdown in the gel matrix through interaction with certain thickening agents.

In another embodiment, the present invention includes a penetration enhancer The penetration enhancer may be dimethyl sulfoxide ("DMSO") or derivatives thereof The DMSO may be present in an amount by weight of 1% to 70%, and more preferably, between 25% and 60%, such as 25, 30, 40, 45, 50, 55, or 60% w/w Preferably, DMSO is used in the present invention at a concentration of about 40 to about 50% w/w such as 41, 42, 43, 44, 45, 46, 47, 48, 49 and 50% and all fractions in between such as 44, 44 5, 45 5, 46, 46 5%, and the like

In certain embodiments, the present invention includes a lower alkanol, such as methanol, ethanol, propanol, butanol

or mixtures thereof In certain embodiments, the alkanol is present at about 1 to about 50% w/w. Preferably, ethanol is used at about 1-50% w/w, such as 1, 5, 10, 15, 20, 25, 30, 35, 40, 45, or 50% w/w, and all fractions in between.

In certain embodiments, the present invention includes a polyhydric alcohol, such as a glycol. Suitable glycols include ethylene glycol, propylene glycol, butylene glycol, dipropylene glycol, hexanetriol and a combination thereof. Preferably, propylene glycol is used at about at 1-15% w/w, such as 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15% w/w, and all fractions in between

In certain embodiments, the present invention includes glycerol (also referred to herein as glycerine) at a concentration of 0-12% w/w Preferably, glycerol is used at 0-4% w/w, such as 0, 1, 2, 3, or 4% w/w, and all fractions in between In some embodiments, no glycerol is used in the formulation.

In a preferred embodiment, the present invention provides a formulation comprising a diclofenac solution and at least one thickening agent to make a gel. The at least one thickening agent of the present invention may be an acrylic polymer (for example, Carbopol polymers, Noveon polycarbophils and Pemulen polymeric emulsifiers available commercially from Noveon Inc. of Cleveland, Ohio), an acrylic polymer derivative, a cellulose polymer, a cellulose polymer derivative, polyvinyl alcohol, poloxamers, polysaccharides or mixtures thereof Preferably the at least one thickening agent is hydroxypropylcellulose (HPC) used such that the end viscosity is between 10 and 50000 centipoise (cps). More preferably the end viscosity is between 500 and 20000 cps

The present gel formulation may optionally include at least one antioxidant and/or one chelating agent.

Preferred antioxidants for use in the present invention may be selected from the group consisting of butylated hydroxytoluene (BHT), butylated hydroxyanisole (BHA), ascorbyl linoleate, ascorbyl dipalmitate, ascorbyl tocopherol maleate, calcium ascorbate, carotenoids, lauric acid, thioglycolic acid, tocopherol, tocopherol acetate, tocophereth-5, tocophereth-12, tocophereth-18, tocophereth-80, and mixtures thereof

Preferred chelating agents may be selected from the group consisting of ethylenediaminetetraacetic acid (EDTA), diammonium EDTA, dipotassium EDTA, calcium disodium EDTA, HEDTA, TEA-EDTA, tetrasodium EDTA, tripotassium EDTA, trisodium phosphate, diammonium citrate, galactaric acid, galacturonic acid, gluconic acid, glucuronic acid, humic acid, cyclodextrin, potassium citrate, potassium EDTMP, sodium citrate, sodium EDTMP, and mixtures thereof

In addition, the topical formulations of the present invention can also comprise a pH adjusting agent. In one particular embodiment, the pH adjusting agent is a base Suitable pH adjusting bases include bicarbonates, carbonates, and hydroxides such as alkali or alkaline earth metal hydroxide as well as transition metal hydroxides. Alternatively, the pH adjusting agent can also be an acid, an acid salt, or mixtures thereof Further, the pH adjusting agent can also be a buffer Suitable buffers include citrate/citric acid buffers, acetate/acetic acid buffers, phosphate/phosphoric acid buffers, formate/formic acid buffers, propionate/propionic acid buffers, lactate/lactic acid buffers, carbonate/carbonic acid buffers, ammonium/ammonia buffers, and the like The pH adjusting agent is present in an amount sufficient to adjust the pH of the composition to between about pH 4 0 to about 10 0 more preferably about pH 7 0 to about 9 5 In certain embodiments, the unadjusted pH of the admixed components is between 8 and 10, such as 9, without the need for the addition of any pH adjusting agents

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.019          HZNPENN_00000019

APPX138

2. Characteristics of the Gel Formulation

a) Transdermal Flux

As shown below in the Examples, the present invention provides diclofenac sodium gel formulations that display surprisingly effective rates of transdermal flux when compared to previously described formulations.

Accordingly, in one embodiment, the present gel formulation comprises a non-steroidal anti-inflammatory and at least one thickening agent and having a flux, as determined by a finite dose Franz cell procedure, equal to or greater than the flux of a comparative liquid formulation. Preferably, the flux is greater than the flux of the comparative liquid formulation. More preferably, the flux is at least 1.5 times greater than the flux of the comparative liquid formulation. In other words, the ratio of: (i) the flux of the gel formulation comprising the non-steroidal anti-inflammatory and at least one thickening agent to (ii) the flux of the comparative liquid formulation is preferably greater than 1.0, and more preferably at least about 1.5.

In a further embodiment, the present invention further provides a diclofenac sodium gel formulation comprising a diclofenac solution and at least one thickening agent and having a flux as determined by the finite Franz cell procedure at least equivalent to the flux of the diclofenac solution alone. Preferably, the diclofenac sodium gel formulation has a flux that is at least 2.0 times greater compared to the flux of the diclofenac sodium solution alone. More preferably, the present invention provides a diclofenac sodium gel formulation having a flux that is at least 4.0 times greater compared to the flux of the diclofenac sodium solution alone. In other words, the ratio of: (i) the flux of the diclofenac sodium gel formulation to (ii) the flux of the diclofenac sodium solution is at least about 1.0, preferably at least about 2.0, more preferably at least about 4.0.

In yet further embodiment, the present invention provides a diclofenac sodium gel formulation comprising diclofenac sodium and at least one thickening agent and having a flux as determined by the multiple finite dosing Franz cell procedure (dosing at 2.5 mg/cm$^2$ at 0 and 6 hours) of at least 0.1 $\mu$g/hr/cm$^2$ at 24 hours, preferably at least 0.2 $\mu$g/hr/cm$^2$ at 24 hours.

b) Viscosity

In another embodiment, the present invention provides a gel formulation comprising a non-steroidal anti-inflammatory drug (NSAID) and at least one thickening agent, the gel formulation having a viscosity of at least 100 cP. Preferably, the gel formulation has a viscosity of at least 500 cP. More preferably, the gel formulation has a viscosity of at least 1000 cP. In other embodiments, the viscosity is 5000-10,000, 10,000-15,000, or 15,000-20,000 cP.

In a further embodiment, the present invention provides a diclofenac gel formulation comprising a diclofenac solution and at least one thickening agent, the gel formulation having a viscosity of around 1000 cP and a flux of at least 0.2 $\mu$g/cm$^2$/hr as determined by the multiple finite dose Franz cell procedure (2.5 mg/cm$^2$ at 0 and 6 hours) at 24 hours.

c) Stability

The stability of a drug product composition can have a significant impact on the length and cost of drug development, the nature of the studies required to support regulatory submissions, and the ultimate safety and approvability.

It is important for instance to minimize the amount of impurities or degradation products that form over time due to interactions between the various ingredients in a composition. This can be particularly important in compositions that are designed to increase skin permeability.

Thus, in some embodiments, the present invention provides a diclofenac sodium gel formulation that degrades by

less than 1% over the course of 6 months at room temperature. More preferably, the rate of degradation is less than 0.9, 0.8, 0.7, 0.6, 0.5, 0.4, 0.3, 0.2, or less than 0.1%, and all fractions in between, over the course of 6 months at room temperature.

d) Drying Time

Relative to previously disclosed compositions, such as those in U.S. Pat. Nos. 4,575,515 and 4,652,557 (termed herein as "comparative liquid formulation" or "comparative"), the compositions of the invention dry quicker while achieving higher transdermal flux of the drug. It is surprising that higher flux rate and quicker drying can be achieved together as skin hydration is known to increase transdermal flux or penetration. The drying of the skin caused by rapid evaporation would tend to reduce the transdermal transport of drug remaining on the skin. The drying time difference is evident when equal amounts of the two products are tested on opposite limbs. Within thirty (30) minutes the compositions of the invention are almost completely dry whereas a significant amount of the previously described liquid formulation remains.

To compare the drying times more quantitatively, side-by-side comparisons were conducted. To accomplish this, the inventors measured the residual weight of formulations by placing equal amounts (100 mg) of a prior art formulation and compositions of the invention in weighing dishes over 10 cm$^2$ area and weighing the amount remaining over time. Using this methodology, a difference is immediately noticeable, and becomes dramatically different by 4 hours (Table 11 and FIG 10).

e) Pharmacokinetics

A comparison of the absorption of diclofenac sodium of compositions of the invention and a comparable composition from U.S. Pat. Nos. 4,575,515 and 4,652,557 was conducted in animals. The gels of the invention were shown to have improved absorption on a per dose basis than the comparative liquid compositions of the invention. In absolute terms, the clinical dose of the gels of the invention delivered a maximum observed plasma concentration ($C_{max}$) at steady state of 81 ng/ml and an area under the curve (AUC) of 584 ng/ml. This compared to 12 ng/ml and 106 ng/ml for the comparator compositions.

These results speak to the properties of the vehicle in delivering the active agent. The higher numbers for gel were seen even though the solution composition was dosed four (4) times per day (total 5.2 ml) compared to twice (2) per day (total 4.0 ml) for the gels.

III. Preparation of Gel Formulations

In another embodiment, the present invention provides a method for making gel formulations of diclofenac sodium. The gel formulations of the present invention are preferably made by carrying out the following steps: (i) dispersing the thickener, derivative thereof and/or mixture thereof in dimethyl sulfoxide and stirring for 1 hour; (ii) dissolving diclofenac sodium in an aqueous alcohol mixture (e.g., an ethanol/water mixture), (iii) dispersing propylene glycol and glycerol into the NSAID solution from (ii), and (iv) mixing the resulting NSAID solution into the thickener/dimethyl sulfoxide blend and stirring for 1 hour at ambient temperature. Alternatively, the gel formulations of the present invention may be made by carrying out the following steps: (i) dissolving the NSAID (e.g., diclofenac sodium) in an alcohol solution of DMSO (e.g. an ethanol/dimethyl sulfoxide mixture), (ii) dispersing the thickener, derivative thereof and/or mixture thereof in a solution of water/propylene glycol/glycerol and stirring for 1 hour, (iii) mixing the NSAID solution from (i) into the thickener blend from (ii) and stirring for 1

DTX001.020          HZNPENN_00000020

11

hour at ambient temperature. Heating can also be used during these mixing processes to help facilitate the gel formation.

Diclofenac sodium may be present in a range of approximately 0.1% to 10% w/w, such as 0.5, 1.0, 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, 5.0, 6.0, 7.0, 8.0, and 9.0% w/w.

IV. Methods of Use

Compositions of the invention are particularly suited for use in treating osteoarthritis (OA) chronically. They may also be useful for the treatment of other chronic joint diseases characterized by joint pain, degeneration of articular cartilage, impaired movement, and stiffness. Suitable joints include the knee, elbow, hand, wrist and hip.

Due to the properties of higher flux and greater in vivo absorption, it is believed that the formulations of the present invention can be administered at lower dosing than previously described formulations. In particular, it is expected that the compositions of the invention can be used at twice a day dosing or once a day dosing in the treatment of OA. This would represent a significant improvement as lower dosing is associated with better patient compliance, an important factor in treating chronic conditions.

Suitable amounts per administration will generally depend on the size of the joint, which varies per individual and per joint, however a suitable amount may range from 0.5 µl/cm² to 4.0 µl/cm². Preferably the amount ranges from 2.0 to 3.0 µl/cm².

Compositions of the present invention may, if desired, be presented in a bottle or jar or other container approved by the FDA, which may contain one or more unit dosage forms containing the active ingredient. The pack or dispenser may also be accompanied by a notice associated with the container in a form prescribed by a governmental agency regulating the manufacture, use or sale of pharmaceuticals, which notice indicates approval by the agency of the form of the compositions for human or veterinary administration. Such notice, for example, may be of labeling approved by the U.S. Food and Drug Administration for prescription drugs, or of an approved product insert. Compositions comprising a preparation of the invention formulated in a compatible pharmaceutical carrier may also be prepared, placed in an appropriate container, and labeled for treatment of an indicated condition.

The following examples are offered to illustrate, but not to limit, the claimed invention.

EXAMPLES

Example 1

Materials and Methods

Table 1 provides a list of the materials used in the examples provided below:

TABLE 1

| | | Materials | | | |
|---|---|---|---|---|---|
| Abbr | Chemical | FW | Source | Vendor # | CAS |
| BHA | Butylated hydroxy-anisole | 180.24 | Sigma | B1253 | 25013-16-5 |
| BHT | Butylated hydroxy-toluene | 220.36 | Spectrum | BH110-07 | 128-37-0 |
| Carb940 | Carbopol 940 | | Noveon | Carbopol 940 | 9003-01-4 |
| Carb971 | Carbopol 971 | | Noveon | Carbopol 971 | 9003-01-4 |

12

TABLE 1-continued

| | | Materials | | | |
|---|---|---|---|---|---|
| Abbr | Chemical | FW | Source | Vendor # | CAS |
| Carb974 | Carbopol 974 | | Noveon | Carbopol 974 | 9003-01-4 |
| Carb981 | Carbopol 981 | | Noveon | Carbopol 981 | 9003-01-4 |
| Carb1342 | Carbopol 1342 | | Noveon | Carbopol 1342 | 9003-01-4 |
| Diclo | Diclofenac Sodium | 318.1 | Labchm | | 15307-79-6 |
| DMSO | Dimethyl Sulfoxide (USP) | 78.1 | Gaylord | EM-2951 | 67-68-5 |
| EDTA | Disodium Ethylene-diamine-tetraacetate Dihydrate | | VWR | MK139504 | 6381-92-6 |
| EtOH | Ethanol (USP) | 46.1 | Spectrum | G1015 | 64-17-5 |
| Gly | Glycerin (USP) | 92.1 | Proctor & Gamble | Superol V | 56-81-5 |
| Guar | Guar gum | | Spectrum | G1044 | 9000-30-0 |
| HEC | Hydroxy-ethyl cellulose - Natrasol 250 M | | Hercules | Natrasol 250 M | 9004-62-0 |
| HPMC | Hydroxy-propyl methyl cellulose | | Dow Chemical | Methocel E4M | 9004-65-3 |
| HY117 | Hydroxy-propyl cellulose | 95,000 | Spectrum | HY117 | 9004-64-2 |
| HY119 | Hydrox-propyl cellulose | 370,000 | Spectrum | HY119 | 9004-64-2 |
| Locu | Locust Bean gum | | Spectrum | L1135 | 9000-40-2 |
| Peg300 | Poly(ethylene glycol) 300 (USP) | ~300 | Spectrum | PO108 | 25322-68-3 |
| PG | Propylene Glycol (USP) | 76.1 | Dow Chemical | | 57-55-6 |
| PVA | Polyvinyl alcohol | 44.1 | Sigma | 81386 | 9002-89-5 |
| PVP | Polyvinyl pyrrolidone | 360,000 | Sigma | 81440 | 9003-39-8 |
| P407 | Poloxamer 407 | | Spectrum | P1125 | 9003-11-6 |
| Ultrez10 | Ultrez 10 | | Noveon | Ultrez10 | 9003-01-4 |

The general methodology for preparation of each example provided is as follows, unless otherwise indicated.

Final weight for each formulation was 25 g prepared in 50-mL glass vials. Vortexing or magnetic stir bars were used to mix the gels.

Viscosity was measured at 22° C. using Brookfield DV-III Ultra, programmable Rheometer with LV Spindle #31 at 10 rpm. For stability testing, gels were stored at ambient temperature or in an incubator at 50° C. Discoloration or changes in appearance including phase separation over time were evaluated.

The concentration of the DMSO was consistent in all of the experiments (45.5% w/w). Propylene glycol was at either 11 or 11.2% w/w. Ethanol concentration varied from 11% to 30% w/w. Glycerol concentrations were varied from 0 to 11.2% w/w. The diclofenac sodium concentration was at either 1.5% (w/w) or 2% (w/w). Water was adjusted to compensate for the amount of inactives, thickening agents, and diclofenac sodium present in solution.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

13

Franz diffusion cell experiments were used to analyze diclofenac sodium flux rates of varying gel formulations across a substrate membrane. Franz diffusion cells are a common and well known method for measuring transdermal flux rates. The general Franz cell procedure is described in Franz, T. J., Percutaneous absorption: on the relevance of in vitro data. *J Invest Derm*, 64:190-195 (1975). The following was the methodology used in the present Examples.

Franz cells with a 3 ml receptor well volume were used in conjunction with split thickness cadaver skin (0 015"-0.018", AlloSource). The donor well had an area of ~0.5 cm². Receptor wells were filled with isotonic phosphate buffered saline (PBS) doped with 0 01% sodium azide The flanges of the Franz cells were coated with vacuum grease to ensure a complete seal and were clamped together with uniform pressure using a pinch clamp (SS #18 VWR 80073-350) After Franz cells were assembled, the skin was allowed to prehydrate for 45 minutes with PBS PBS was then removed and an appropriate amount of formulation is added to the skin Dosing levels varied from 2 mg/cm² (considered finite dose) to 200 mg/cm² (considered infinite dose) The donor well was then capped to prevent evaporation. Receptor wells of the Franz cells were maintained at 37° C (temperature on the surface of the skin is ~31° C) in a stirring dry block with continual agitation via a stir bar Samples were drawn from the receptor wells at varying time points Measurements were made in six-fold replicates. The concentration of diclofenac in the samples was analyzed using high performance liquid chromatography. The inventive formulations performed better than the comparator at the limits of finite dosing—finite dosing being a much better predictor of the performance of a formulation in an in vivo situation as opposed to infinite dosing.

A) Gel Formulations Derived from a Comparative Liquid Base Solution

Example 2

Gel Formulations Using Various Thickeners in a Comparative Liquid Formulation Base Solution

Initially, several thickeners including carbomers, polyvinyl pyrrolidone, locust gum, cellulose polymers and polyvinyl alcohol were tested for their effectiveness at forming a diclofenac sodium gel using the comparative liquid formulation as a base solution In the gel formulations of this Example, a comparative liquid formulation solution was produced and a thickener was then added directly to this base. In order to facilitate the incorporation of the thickener, sonication and heating (at 60° C.), along with vigorous vortexing/homogenization were performed.

Some thickeners, specifically guar gum, locust bean gum, methocel (HPMC), polyvinyl alcohol, and poloxamer 407 failed to form stable gels. In particular, immediate separation, inefficient thickening, and insolubility of the thickeners was noted. Gels were formed that showed initial stability with several cellulose polymers including hydroxyethyl cellulose (Natrosol HHX) and hydroxypropylcellulose (HY119) Other thickeners that showed an initially stable gel were PVP, and acrylic polymer thickeners The specifics of gel formulation for each thickener are provided below.

HEC thickening agents A lower weight molecular weight hydroxyethyl cellulose (specifically Hydroxyethyl Cellulose (HEC) Type 250 M Pharm (Natrosol®)) was dispersed in the mixture of dimethyl sulfoxide, propylene glycol, glycerine and water and allowed to swell for about 1 hour. Diclofenac sodium was dissolved in ethanol and added to the HEC/ solvent blend to obtain a final formulation. Although HEC gels form relatively easily and demonstrate a good flux pro-

14

file, the gels are yellowish in color and are susceptible to phase separation over extended periods of storage. Table 2 shows the compositions of these formulations, and the resulting flux values of these compositions as compared with a comparative liquid formulation are shown in FIG. 1.

PVP thickening agents: PVP was added at up to 8% w/v after all other components of the comparative liquid base formulation were mixed. PVP gels are clear in nature, but suffer from an undesirable tacky feel when drying Table 2 and FIG. 1 shows the composition and flux data for this gel. In this example, Franz diffusion cells were dosed at 15 mg per Franz cell. As can be seen in FIG. 1, PVP gels performed reasonably well, but their undesirable aesthetic qualities do not make them ideal for a commercial embodiment.

TABLE 2

Components of HEC and PVP gels used to generate the flux rate data shown in FIG. 1.

| Percentages in | Formulation name | | | | |
|---|---|---|---|---|---|
| | Hec1b wt/wt % | Hec2b wt/wt % | PVP1b wt/wt % | PP54 wt/wt % | Comparative wt/wt % |
| Water | 18 81 | 18.81 | 18 81 | 18.31 | 18 81 |
| Dimethyl Sulfoxide | 45 5 | 45 5 | 45 5 | 45 5 | 45 5 |
| Propylene glycol | 11 2 | 11 2 | 11 2 | 11 2 | 11.2 |
| Ethanol | 11.79 | 11 79 | 11.79 | 11.79 | 11 79 |
| Glycerine | 11 2 | 11 2 | 11 2 | 11.2 | 11.2 |
| Diclofenac Sodium | 1.5 | 1 5 | 1 5 | 2 | 1 5 |
| Thickener | HEC | HEC | PVP | Carbopol 971 | none |
| w/vol % thickener added to solution | 1.1 | 1 3 | 8 | 1 | |

Carbopol thickening agents Carbopol gels were formed by (1) dispersing an acrylic polymer into a mixture of water, glycerol, and propylene glycol followed by stirring for 1 hour, (2) preparing a second solution of 1 5% diclofenac sodium dissolved in ethanol and DMSO, (3) mixing the diclofenac solution into the carbopol phase An alternate method for forming carbopol gels is as follows (1) dispersing the carbopol into dimethyl sulfoxide and stirring for 1 hour; (2) dissolving diclofenac sodium in an ethanol/water/propylene glycol mixture; (3) dispersing glycerol into the diclofenac solution; and (4) mixing the diclofenac solution into the poly-mer/dimethyl sulfoxide blend, along with stirring for 1 hour at ambient temperature. These methods of mixing can be carried out at room temperature, or elevated temperature if desired. Varying carbopols were used to make gels including: Carbopol 1342, 941, 971, 981, 974 and Ultrez 10 (Noveon, Inc.). All carbopol gels were clear, proved stable to both freeze-thaw cycling and incubation at elevated temperature (50° C ) for one month, and had good flow characteristics. Tables 2, 3, and 4 show their relative flux. A stable and clear gel could be formed at carbopol concentrations of ~>0 3% w/w when making gels with 1.5% w/w diclofenac sodium. For gels with 2% w/w diclofenac sodium, ~>0 9% w/w carbopol was needed to make a stable gel. The exact amount of carbopol needed to from a gel depended on the type of carbopol used

For the formulations of Table 3, Franz diffusion gels were dosed with 200 ul per Franz cell Carbopol gels uniformly showed increased flux rates over the comparative formulation (see FIG 2). Thicker gels (i e gels with higher weight percent carbopol) tended to have less flux with a composition with a lower weight percentage of the same carbopol.

TABLE 3

Components of gels made with Carbopol 981 and Ultrez 10 used to generate the flux rate data shown in FIG. 2

| | | | | Formulation name | | | |
|---|---|---|---|---|---|---|---|
| Percentages in | PUA wt/wt % | PUB wt/wt % | PUC wt/wt % | P981a wt/wt % | P981b wt/wt % | P981c wt/wt % | Comparative wt/wt % |
| Water | 18 81 | 18 81 | 18 81 | 18 81 | 18 81 | 18 81 | 18 81 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45 5 | 45 5 | 45 5 | 45 5 |
| Propylene glycol | 11.2 | 11.2 | 11 2 | 11 2 | 11 2 | 11.2 | 11 2 |
| Ethanol | 11 79 | 11.79 | 11 79 | 11 79 | 11 79 | 11 79 | 11 79 |
| Glycerine | 11 2 | 11.2 | 11 2 | 11 2 | 11 2 | 11.2 | 11 2 |
| Diclofenac Sodium | 1 5 | 1 5 | 1 5 | 1.5 | 1 5 | 1 5 | 1 5 |
| Thickener | Ultrez | Ultrez | Ultrez | Carb 981 | Carb 981 | Carb 981 | none |
| w/vol % thickener added to solution | 0.90 | 1 03 | 1 16 | 90 | 1 06 | t 22 | |

Antioxidants and chelating agents can also be added to the carbopol, HEC, or PVP gels The addition of EDTA to carbopol gels by itself leads to a slightly cloudy gel. BHA gels turned color with incubation at higher temperature The mixture of BHT and EDTA to carbopol gels did not show any discoloration and remained clear For the formulations of Table 4, Franz diffusion cells were dosed at 50 µl per cell. FIG. 3 shows flux rates from these gels. Additions of chelating agents and preservatives had no effect on flux rates.

TABLE 4

Components of gels made with carbopol 971 and carbopol 981 gels used to generate the flux rate data shown in FIG. 3

| | | Formulation name | | |
|---|---|---|---|---|
| Percentages in | PP51 wt/wt % | PP52 wt/wt % | PP53 wt/wt % | Comparative 2% wt/wt % |
| Water | qs | qs | qs | 18 31 |
| Dimethyl Sulfoxide | 45 5 | 45 5 | 45.5 | 45 5 |
| Propylene glycol | 11 2 | 11 2 | 11 2 | 11 2 |
| Ethanol | 11.79 | 11 79 | 11 8 | 11 79 |
| Glycerine | 11 2 | 11 2 | 11 2 | 11 2 |
| Diclofenac Sodium | 2 | 2 | 2 | 2 |
| BHT | 0 1 | | 0.1 | |
| EDTA | 0 05 | | 0.05 | |
| Thickener | Carbopol 971 | Carbopol 971 | Carbopol 981 | none |
| wt/wt % thickener | 1 | 1 | 0 9 | |

B. Comparative Examples

Example 3

Comparison of Transdermal Flux of Various DMSO Gel Formulations Versus a Comparative Liquid Formulation

A series of diclofenac gel formulations were made wherein the base solution was changed from the comparative base formulation In particular the weight percent of propylene glycol, ethanol, glycerine, water, and diclofenac were varied. In these new formulations, the weight percent of the constituent chemicals was as follows: 45 5% DMSO, 20-30% ethanol, 10-12% propylene glycol, 0-4% glycerine, 2% diclofenac sodium, thickener and water added to 100% w/w

Several thickeners were tested in this new base solution A number of these thickeners failed to form stable gels; in particular, carbopol gels did not remain stable. However, cellulose gels were uniformly effective at forming gels. The most aesthetically pleasing of these gels was formed with hydroxypropylcellulose (HY117, HY119, HY121). These gels spread easily, were uniform in nature, dried quickly, and demonstrated good flow characteristics.

Hydroxypropylcellulose gels were formed by mixing all the constituent parts and then adding the thickener at the end followed by agitation. The gel can also be formed by dispersing the hydroxypropylcellulose in the aqueous phase prior to solvent addition Heat can be used to facilitate gel formation. Hydroxypropylcellulose gels were clear and flowed easily. They remain stable for at least six months demonstrating no phase separation, negligible shift in pH, and low amounts of degradation products (<0 04%) The data in FIGS. 4-9, derived from the formulations of Tables 5-10, indicate that the hydroxypropylcellulose gel formulations of diclofenac sodium of the present invention also provide a transdermal flux rate that is as much as 4-fold higher than a comparative liquid formulation.

Studies were performed to determine the relative transdermal flux of various diclofenac gel formulations of the present invention when compared with a comparative liquid formulation of U S. Pat Nos 4,575,515 and 4,652,557 ("Comparative" in Tables 5-10) Accordingly, the Franz cell procedure described above was used to compare diclofenac flux rates of various diclofenac gel formulations with comparative liquid formulations.

For the formulations of Table 5, Franz cells were dosed at 10 mg per Franz cell. A new gel (F14/2) has an altered base solution over the comparative liquid formulation and demonstrates both faster drying times and better flux kinetics (see FIG 4). The flux rates for these gels is not as high as the carbopol gels (F971), but the drying rate is substantially faster.

DTX001.023

HZNPENN_00000023

APPX142

TABLE 5

Components of various gels and a comparative liquid formulation used to generate the flux rate data shown in FIG. 4

| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel 4.0% wt/wt % | F971 wt/wt % |
|---|---|---|---|---|
| Water | 18.81 | 12.5 | 12.5 | 17.16 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11.2 | 11 | 11 | 11.2 |
| Ethanol | 11.79 | 26.5 | 25 | 11.79 |
| Glycerine | 11.2 | | | 11.2 |
| Diclofenac Sodium | 1.5 | 2 | 2 | 2 |
| Thickener | none | HY119 | HY119 | Carbopol 971 |
| wt/wt % thickener | | 2.5 | 4 | 1.15 |

For the formulations of Table 6, Franz diffusion cells were dosed at 7 mg per cell. Lowering the pH shows a marked increase in flux rates (see FIG. 5).

TABLE 6

Components of various gels and a comparative liquid formulation used to generate the flux rate data shown in FIG. 5

| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel 4.0% wt/wt % | F971 wt/wt % | F14/2 gel 2.5% + HCL wt/wt % |
|---|---|---|---|---|---|
| Water | 18.81 | 12.5 | 12.5 | 17.16 | 12.5 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11.2 | 11 | 11 | 11.2 | 11 |
| Ethanol | 11.79 | 26.5 | 25 | 11.79 | 26.5 |
| Glycerine | 11.2 | | | 11.2 | |
| Diclofenac Sodium | 1.5 | 2 | 2 | 2 | 2 |
| concentrated HCL | | | | | *** added to pH 5.3 |
| pH | 9 | 9.43 | 9.67 | 6.77 | 5.3 |
| Thickener | none | HY119 | HY119 | Carb971 | HY119 |
| wt/wt % thickener | | 2.5 | 4 | 1.15 | 2.5 |

For the formulations of Table 7, Franz cells were dosed at 7 mg per Franz cell. The resulting flux rates for each of these formulations is shown in FIG. 6.

TABLE 7

Components of various gels used to generate the flux rate data shown in FIG. 6

| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | HaCa2 wt/wt % | HaCa wt/wt % | F14/2 gel pH 5.3 wt/wt % |
|---|---|---|---|---|---|
| Water | 18.81 | 12.5 | 22.3 | 26.3 | 12.5 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11.2 | 11 | 11.2 | 11.2 | 11 |
| Ethanol | 11.79 | 26.5 | 12 | 12 | 26.5 |
| Glycerine | 11.2 | | 6 | 6 | |
| Diclofenac Sodium | 1.5 | 2 | 2 | 2 | 2 |
| concentrated HCL | | | | | *** added to pH 5.3 |
| pH | 9 | 9.43 | 6.8 | 6.71 | 5.3 |
| Thickener | none | HY119 | Carbopol 971 | Carbopol 971 | HY119 |
| wt/wt % thickener | | 2.5 | 1 | 1 | 2.5 |

For the formulations of Table 8, the comparative liquid formulation (1.5% diclofenac sodium) was dosed at 20 mg per Franz cell. Solaraze® (a commercially available 3% diclofenac sodium gel) was dosed at 10 mg per Franz cell, and F14/2 was dosed at 15 mg per Franz diffusion cell. At this dosing, all cells were dosed with equivalent amounts of diclofenac sodium. F14/2 continued to show increased performance over other formulations (see FIG. 7).

TABLE 8

Components of various diclofenac formulations used to generate the flux rate data shown in FIG. 7

| Percentages in | Comparative wt/wt % | Solaraze ® wt/wt % | F14/2 gel 2.5% wt/wt % |
|---|---|---|---|
| Water | 18.81 | | 12.5 |
| Dimethyl Sulfoxide | 45.5 | | 45.5 |
| Propylene glycol | 11.2 | | 11 |
| Ethanol | 11.79 | | 26.5 |
| Glycerine | 11.2 | | |
| Diclofenac Sodium | 1.5 | 3 | 2 |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

19

TABLE 8-continued

Components of various diclofenac formulations used to
generate the flux rate data shown in FIG. 7

| Percentages in | Formulation name | | |
|---|---|---|---|
| | Comparative wt/wt % | Solaraze ® wt/wt % | F14/2 gel 2.5% wt/wt % |
| Thickener wt/wt % thickener | none | | HY119 2.5 |

For the formulations of Table 9, the comparative liquid
formulation was dosed at 0.9 mg per Franz cell at 0, 4, 8, and
12 hrs. F14/2 was dosed at 1.5 mg per Franz cell at 0 and 6 hrs.
The accumulated dose from the gel was considerably higher
in comparison to the comparative solution, providing a 1.5
fold increase in flux (see FIG. 8).

TABLE 9

Components of formulations used in the multidosing
experiments of FIG. 8

| Percentages in | Formulation name | | |
|---|---|---|---|
| | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel pH 8.5 wt/wt % |
| Water | 18.81 | 12.5 | 45.5 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 11 |
| Propylene glycol | 11.2 | 11 | 26.5 |
| Ethanol | 11.79 | 26.5 | 12.5 |
| Glycerine | 11.2 | | |
| Diclofenac Sodium concentrated HCL | 1.5 | 2 | 2 *** added to pH 8.5 |
| Thickener wt % thickener | none | HY119 2.5 | HY119 4/2.5 |

For the formulations of Table 10, Franz cells were dosed at
20 mg per cell. The resulting flux rates for these formulations
is shown in FIG. 9.

TABLE 10

Flux results from varying diclofenac formulations. Franz cells were dosed
at 20 mg per cell.

| Percentages in | Formulation name | | | | |
|---|---|---|---|---|---|
| | F14/2 gel 3.5% wt/wt % | F14/2 solution wt/wt % | F971 wt/wt % | Comparative 2% wt/wt % | Comparative wt/wt % |
| Water | 12.5 | 12.5 | 17.16 | 18.31 | 18.81 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11 | 11 | 11.2 | 11.2 | 11.2 |
| Ethanol | 25.5 | 29 | 11.79 | 11.79 | 11.79 |
| Glycerine | | | 11.2 | 11.2 | 11.2 |
| Diclofenac Sodium | 2 | 2 | 2 | 2 | 1.5 |
| Thickener wt/wt % thickener | HY119 3.5 | none | Carb 971 1.1 | none | none |

Example 4

Comparative Data on Transdermal Flux of Various
Diclofenac Gels

Studies were performed to determine the relative transdermal flux of the diclofenac gel formulations of the present
invention when compared with previously disclosed formulations, such as the diclofenac diethylamine gel formulation
described by Baboota (Baboota et al., *Methods Find. Exp
Clin. Pharmacol*, 28: 109-114 (2006)). Accordingly, the
Franz cell procedure described above was used to compare
flux rates of three of the diclofenac formulations described by
Baboota with a gel vehicle of the present invention. The
diethylamine form of diclofenac was used as the active agent,
as that is the form used by Baboota. The exact compositions
of the formulations used in this study are shown in Table 11
below. The Baboota formulations are labeled FY1, FY2, and
FY3, while a gel formulation using the vehicle of the present
invention with diclofenac diethylamine as the active is
labeled G14/2_m. A comparative liquid formulation was also
included in this study ("Comparative"). Among the primary
differences between the composition of Baboota's formulation and that disclosed in the present invention is the higher
DMSO concentrations in the present invention (45.5%
w/w versus 10% w/w).

As is apparent from the data shown in FIG. 10, although the
Baboota formulation is also a gel, the vehicle of the present
invention provides a significantly greater flux rate. After 12
hours, the gel of the present invention provides an accumulated dose of 26.8 $\mu g/cm^2$ versus 8.9 $\mu g/cm^2$ for Baboota's
best performing gel. Thus, the gel of the present invention has
a nearly 3-fold greater rate of flux and accumulation of
diclofenac than a similar gel, as described by Baboota. Note
that these experiments were conducted at finite dosing which
is more representative of clinical dosing of a non-occluded
composition that is applied periodically but which is not
meant to be in continuous contact with the skin. Additionally,
the Baboota gels also contained a higher percentage of the
active agent, 3.4% w/w as compared to 2% w/w for the
compositions using the vehicle of the invention.

Other advantages were also observed, including the consistency and stability of the gel of the present invention when
compared with the Baboota gel. In contrast to the smooth and
uniform consistency of the present gel, the Baboota gel formulations were cloudy and lumpy, thus, unable to maintain a
gel-like consistency. For this reason, the Baboota compositions would be expected to have some stability issues and a
short shelf life.

Thus, despite both being gel formulations, when a head-to-head comparison is performed, using a finite dosing protocol, the formulation of the present invention is significantly

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

DTX001.025

HZNPENN_00000025

APPX144

more effective at the transdermal delivery of a diclofenac active agent, when compared with another gel formulation, that described by Baboota et al. Furthermore, as shown in FIG. 7, the formulation of the present invention also performed remarkably better when compared to a diclofenac gel, Solaraze®, a product currently sold on the market. Thus, the present invention provides a diclofenac sodium gel formulation that has unexpectedly superior properties (e.g., with respect to parameters such as transdermal flux rates, favorable composition consistency, and greater stability and self life) when compared to the previously disclosed diclofenac diethylamine gel formulation described by Baboota or the diclofenac sodium formulation embodied by the Solaraze® gel.

time. By 24 hours, this difference was even more pronounced, as slightly over 20% and 30% of the weight of the two gel formulations containing 2% and 4% HPC, respectively, remained, and slightly under 60% of the weight of the F971 gel formulation which remained. This is a surprising result, as one would have expected the liquid formulation to lose weight more quickly, and thus have a shorter drying time, as compared to a semi-solid gel formulation. Thus, this example demonstrates that the gel compositions of the present invention display superior drying characteristics as compared to a comparable liquid formulation.

Thus, in certain embodiments, the present invention provides a formulation which has a drying time such that, at

TABLE 11

Components of diclofenac diethylamine gels used to generate the flux rate data shown in FIG. 10. For the formulations of Table 11, Franz diffusion cells were finite dosed at 4 mg per cell

| | Formulation name | | | | |
|---|---|---|---|---|---|
| Percentages in | FY1 wt/wt % | FY2 wt/wt % | FY3 wt/wt % | G14/2_m wt/wt % | Comparative_m wt/wt % |
| Dimethyl Sulfoxide | 10 | 10 | 10 | 45.5 | 45.5 |
| Ethanol | 25 | 25 | 25 | 26.5 | 11.79 |
| PEG 400 | 15 | 15 | 15 | | |
| Propylene glycol | 15 | 15 | 15 | 11 | 11.2 |
| triethanolamine | 0.5 | 0.5 | 0.5 | | |
| DMSO | | | | | |
| Water | qs | qs | qs | 12.5 | 18.81 |
| Sodium carboxymethylcellulose | | | 6 | | |
| Glycerine | | | | | 11.2 |
| Thickener | Carb 940 | PVA | Carb 940 | HY119 | none |
| wt % Thickener | 1 | 20 | 0.5 | 2.5 | |
| Active | 3.4 | 3.4 | 3.4 | 2 | 1.5 |
| diclofenac diethylamine wt % | | | | | |

## Example 5

Comparison of Drying Time/Residual Weight of a Comparative Liquid Formulation Solution Versus the Corresponding Gel

In order to evaluate the drying time of a comparative liquid formulation solution as compared to the corresponding gel, the study described in this example was performed. Equal weight amounts (100 mg) of either the comparative liquid formulation solution or diclofenac sodium gel formulations were measured on to plastic weigh dishes and spread over a 10 cm² area, and then left exposed to ambient conditions. At selected time points, the plastic weighing dishes were again weighed to determine the mass of the composition remaining on the weighing dish. As shown by the data in Table 12 below and in FIG. 11, it was surprisingly found that even after a 24 hour drying period, almost all (nearly 90%) of the weight of the initially applied comparative liquid formulation composition remained on the weighing dish. Thus, the weight of the comparative liquid formulation changed very little over the time points measured, indicating that the drying of the liquid formulation occurred very slowly.

In contrast, even within the first five minutes, the three gel formulations displayed more rapid drying than the liquid formulation. 70% of the weight of the two gels that contained 2% or 4% HPC remained, as compared to the over 90% of the liquid formulation which remained, after 4 hours of drying

most, a 50% weight of the starting amount remains as a residue after 24 hours of drying time, preferably a 30-40% or less weight of the starting amount remains as a residue after 24 hours of drying time.

The improved drying time of the gel formulations of the present invention provides improved ease of use and is expected to lead to better patient compliance. Thus, this invention provides a gel formulation with improved drying characteristics while also providing improved drug delivery, as evidenced by the advantageous transdermal flux data shown in the examples above.

TABLE 12

Drying times

Drying times for gels and a comparative liquid formulation solution. Equal weights of each formulation were measured and spread on weigh dishes. The weight of each remaining formulation was then followed with time. The gels of this invention showed faster drying kinetics than the comparative liquid formulation, with F14/2 showing the fastest drying rate. These gels also had improved "spreadability" characteristics, which most likely contributed to this improvement in drying rates.

| | Formulation name | | | |
|---|---|---|---|---|
| Percentages in | Comparative gel wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel 4.0% wt/wt % | F971 wt/wt % |
| Water | 18.81 | 12.5 | 12.5 | 17.16 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

23

**TABLE 12-continued**

Drying times

Drying times for gels and a comparative liquid formulation solution. Equal weights of each formulation were measured and spread on weigh dishes. The weight of each remaining formulation was then followed with time. The gels of this invention showed faster drying kinetics than the comparative liquid formulation, with F14/2 showing the fastest drying rate. These gels also had improved "spreadability" characteristics, which most likely contributed to this improvement in drying rates

| | | | | |
|---|---|---|---|---|
| Propylene glycol | 11 2 | 11 | 11 | 11 2 |
| Ethanol | 11 79 | 26 5 | 25 | 11 79 |
| Glycerne | 11 2 | | | 11 2 |
| Diclofenac Sodium | 1 5 | 2 | 2 | 2 |
| Thickener | none | HY119 | HY1:9 | Carbopol 971 |
| wt/wt % thickener | | 2 5 | 4 | 1 15 |

| | % Remaining | | | |
|---|---|---|---|---|
| Time (hr) | Comparative | F14/2 gel 2 5% | F14/2 gel 4 0% | F971 |
| 0 000 | 100 | 100 | 100 | 100 |
| 0 083 | 99 1 | 93 | 92 6 | 100 3 |
| 0 167 | 96 7 | 92 9 | 91 8 | 100 3 |
| 0 333 | 95 7 | 92 7 | 93 | 100 2 |
| 0 500 | 95 6 | 92 7 | 93 3 | 100 |
| 0 750 | 95 5 | 92 1 | 92 3 | 99 8 |
| 1 000 | 95 9 | 92 | 91 8 | 99 7 |
| 4 000 | 93 | 71 | 70 7 | 86 8 |
| 24 000 | 88 7 | 32 4 | 23 5 | 58 8 |

### Example 6

Comparison of Stability Characteristics of a Comparative Liquid Formulation Versus Diclofenac Sodium Gel Formulations

This example provides a comparison of the stability of the compositions of the present invention tested against reference formulations at room temperature over a six month period. It was unexpectedly found that while the compositions of the invention contain a higher concentration of active agent, they in fact resulted in a lower concentration of a degradation impurity as compared to the reference. It was also unexpectedly found that compositions using hydroxypropylcellulose (HPC) as the gelling agent had a significantly lower quantity of this impurity as compared to compositions made using carbomer gelling agents.

In this study, samples of the test compositions were placed into plastic screw cap bottles which were sealed and held at 25° C. at 60% humidity for 6 months. After the 6 month storage period, the samples were tested for impurities by high performance liquid chromatography (HPLC). The active agent, diclofenac sodium, was found to elute by HPLC with an elution time of about 11 minutes. It was found that upon 6 months of storage, an impurity, termed "impurity A", was seen to elute at about 6.6 minutes in varying amounts for the various compositions as shown in Table 13 below.

**TABLE 13**

| Composition | Percent "impurity A" after 6 months of storage (wt/wt) |
|---|---|
| 1 5% diclofenac sodium as a comparative liquid formulation solution | 0 034% |

24

**TABLE 13-continued**

| Composition | Percent "impurity A" after 6 months of storage (wt/wt) |
|---|---|
| 2.0% diclofenac sodium in 0.9% Carbopol gel | 0 09% |
| 2 0% diclofenac sodium in 3 5% HPC gel | 0 02% |

Thus, as indicated by the data in Table 13, while having a higher concentration of the active agent, diclofenac sodium, a gel formulation of the present invention containing 3.5% HPC shows a higher degree of stability, as reflected in the appearance of a lower percentage of "impurity A" as compared to a comparable liquid formation. The data shown in Table 13 also shows that the HPC gel formation is more stable than a comparable gel formation containing 0.9% Carbopol, as the HPC gel formation demonstrates an at least 4-fold reduction in the level of impurity A. Thus, a gel formation of the present invention provides improved stability of the active agent as compared to the reference formulations as evidenced in a formulation which degrades by less than 0 034% or 0 09%, over 6 months, as was observed for the reference formulations. Furthermore, the amount of "impurity A" found in the gel formulation of the present invention at a 6 month storage period would result in an exposure level well below limits that would require additional nonclinical testing testing of the impurity

### Example 7

Comparison of in Vivo Epicutaneous Absorption of Liquid Versus Gel Formulations

A study was conducted to compare systemic absorption after topical application (also referred to as epicutaneous absorption) of a comparative solution with a gel of the invention. A parallel design was employed with 6 Landrace pigs per arm. Drug was applied for 7 days with an additional dose on Day 8. Blood was sampled on Day 1 to determine a baseline; Day 6, Day 7 and Day 8 samples were taken to confirm steady state, and additional samples were taken at 0 hr, 2 hr, 5 hr, 7 hr, 12 hr, 15 hr, and 24 hr on Day 7 to determine a 24 hour steady state profile; samples taken from Days 8-13 were used to determine an elimination profile.

The doses used in this study were as follows. The comparative solution group received 3 85 mg diclofenac sodium per administration and animal 4 times daily, the gel Group received 8 08 mg diclofenac sodium per administration and animal 2 times daily, the administration area was 5 cm×10 cm/animal. These amounts represent the scaled human clinical doses.

Sufficient blood was collected from each animal per sampling time and processed for at least 2 mL Li-Heparin plasma/sample, which were split into two aliquots of 1 mL each. Blood was withdrawn from all animals as shown in Table 14.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

### TABLE 14

Blood sampling schedule

| Test Day(s) | Sampling times | No of samples | No of aliquots |
|---|---|---|---|
| 1 | 0 (prior to first administration) | 24 | 48 |
| 6 | 0 (prior to first administration) | 24 | 48 |
| 7 | 0 (prior to first administration), 2 hr post first dosing, 5 hr post first dosing (prior to second administration for Group 1), 7 hr post first dosing, 10 hr post first dosing (prior to third administration for Groups 2, 3, and 4) and prior to second administration for Group 1, 12 hr post first dosing, 15 post first dosing (prior to fourth administration for Group 1) | 168 | 336 |
| 8-13 | 0 (pre-doses), 4, 8, 12, 24, 48, 72, 96, and 120 hr post administration | 216 | 432 |
| Total number of samples | | 432 | 864 |

Pharmacokinetic evaluation of the plasma data was performed using TopFit 2 11. A non-compartment model was used for the calculation of the terminal half life and area under the curve (AUC). Elimination rate constants ($K_{el}$) and plasma elimination half-lives ($t_{1/2}$) were calculated by linear regression analysis of the log/linear portion of the individual plasma concentration-time curves (c=concentration, t=time). Half-life was determined using the formulae:

$$t_{1/2} = \ln 2/K_{el}[h]$$

$$dc/dt = (K_{el})(c)[h].$$

Area under the curve (AUC) values were calculated using the linear trapezoidal method and extrapolated to infinite time by dividing the last measurable plasma concentration by the terminal elimination rate constant Plasma concentrations at time zero were taken to be those at the pre-dose blood sampling time on Test Day 8 Area under the curve (AUC) was calculated using the formula

$$AUC = (fcdt)(pg/mL)(h), \text{ integrated from zero to infinity}$$

The following pharmacokinetic parameters for diclofenac sodium were calculated:

$AUC_{0-24}$ (Test Day 7)
$AUC_{0-t}$ (Test Day 8)
$AUC_{0-inf}$ (Test Day 8)
$T_{max}$ (Test Days 7, 8) (time to reach $C_{max}$)
$C_{max}$ (Test Days 7, 8) (maximum observed plasma concentration)
$C_{min}$ (Test Days 7, 8) (minimal observed plasma concentration)
$C_{(trough)}$ (Test Days 6, 7, and 8) (trough plasma concentration)

$K_{el}$ (elimination half-life)
$T_{1/2}$ (plasma elimination half-life)

The achievement of steady state was assessed by using repeated measures ANOVA with log-transformed trough concentrations on Test Days 6, 7, and 8 as the dependent variable, time as the independent variable, subject as a random effect, and day as a fixed effect.

The data is shown in FIG. 12 and Tables 16 and 17. Compositions of the invention show significantly more absorption of diclofenac sodium as measured by the mean AUC. This result holds even when adjusting for dose

### TABLE 15

Dosing in pigs

| | Diclofenac Sodium % (w/w) | Area of application (cm²) | Dose of the product per application (mL) | Diclofenac Sodium per dose (mg) | Number of doses per day | Diclofenac per day (mg) |
|---|---|---|---|---|---|---|
| Gel | 2 0 | 50 | 0.40 | 8.08 | bid | 16 2 |
| Comparative Solution | 1 5 | 50 | 0 24 | 3.85 | qid | 15 4 |

### TABLE 16

PK profile at steady state on Day 7

| treatment | subject | Tmax (h) | Cmax (pg/ml) | AUC 0-24 (pg * h/ml) |
|---|---|---|---|---|
| Gel | 13 | 12 | 13579 | 239818 |
| | 14 | 10 | 8570 | 175862 |
| | 15 | 5 | 6014 | 104122 |
| | 16 | 5 | 4877 | 63842 |
| | 17 | 15 | 434829 | 2687765 |
| | 18 | 24 | 14484 | 231494 |
| | Mean | 12 | 80684 | 384151 |
| | SD | 7 | 173549 | 1033866 |
| Comparative Solution | 1 | 10 | 8302 | 107122 |
| | 2 | 10 | 24 (?) | 133431 |
| | 3 | 15 | 14743 | 160294 |
| | 4 | 10 | 4350 | 44267 |
| | 5 | 24 | 9552 | 113460 |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

TABLE 16-continued

PK profile at steady state on Day 7

| treatment | subject | Tmax (h) | Cmax (pg/ml) | AUC 0-24 (pg * h/ml) |
|---|---|---|---|---|
| | 6 | 12 | 8628 | 77881 |
| Mean | 12 | 11714 | 105924 |
| SD | 8 | 7185 | 40865 |

TABLE 17

Relative bioavailability and exposure to a comparative liquid
formulation in comparison to the corresponding gel at steady state

| | Ratio Gel/Comparative Solution % |
|---|---|
| Cmax | 167.7 |
| Cmax/Dose | 161.5 |
| AUC 0-24 | 241.1 |
| AUC 0-24/Dose | 232.2 |

Example 8

Clinical Trials of Diclofenac Gel in the Treatment of
Osteoarthritis

A clinical trial will be performed to evaluate the safety and
efficacy of a gel formulation of the present invention in sub-
jects with symptoms of primary osteoarthritis (OA) of the
knee. Specifically, a 2-arm, double-blinded, placebo-con-
trolled, randomized, 12-week Phase III clinical trial will be
performed in 300 subjects randomized to receive either a
diclofenac gel formulation, placebo gel (the gel carrier con-
taining no diclofenac.) Subjects will apply 2 mL of study gel
to their OA knee per application.

The primary variables for assessment of efficacy will be the
WOMAC LK3.1 pain and physical function and Patient
Overall Health Assessment. Secondary variables will be the
WOMAC stiffness and Patient Global Assessment. The pri-
mary efficacy analyses will be the comparison of the change
from baseline to final assessment of the primary efficacy
variables for subjects in the diclofenac sodium gel arm versus
the placebo gel arm.

More specifically, the efficacy of diclofenac gel on knee
OA symptoms will be measured by the subjective response of
subjects as determined by an efficacy variables questionnaire
which includes the WOMAC LK3.1 OA Index (pain, physical
function, and stiffness dimensions), a Patient Overall Health
Assessment, and a Patient Global Assessment (See Bellamy,
N., *WOMAC Osteoarthritis Index User's Guide IV*, Queen-
sland, Australia (2003)).

The WOMAC LK3.1, Patient Overall Health Assessment
and Patient Global Assessment questionnaires will be based
on the five-point Likert scale. Numerical values will be
assigned to WOMAC LK3.1 scores, Patient Global Assess-
ment scores and Patient Overall Health Assessment scores, as
follows:

Patient Overall Health Assessment and
WOMAC LK3.1 Patient Global Assessment

None=0 Very Good=0
Mild=1 Good=1
Moderate=2 Fair=2
Severe=3 Poor=3
Extreme=4 Very Poor=4

The WOMAC LK3.1 OA Index is a segregated, multidi-
mensional, self-administered index with three independent

28

dimensions: pain, stiffness and physical function and will be
used as an efficacy variable in this study.

In a preferred embodiment of the invention, application of
the gel formulations of the invention when applied topically
will result in a reduction of pain or physical function on the
WOMAC scale of at least 1 Likert scale unit over a 12 week
period. Even more preferably, a reduction of 2, 3, or 4 Likert
scale units will result. Most preferably, application of the gel
formulations of the invention will result in complete relief of
pain and complete or nearly complete restoration of physical
function.

To assess safety, the frequency of adverse effects will be
tabulated, the worst skin irritation score will be documented,
and change in vital signs and laboratory parameters will be
assessed.

The foregoing discussion of the invention has been pre-
sented for purposes of illustration and description. The fore-
going is not intended to limit the invention to the form or
forms disclosed herein. Although the description of the inven-
tion has included description of one or more embodiments
and certain variations and modifications, other variations and
modifications are within the scope of the invention, e.g., as
may be within the skill and knowledge of those in the art, after
understanding the present disclosure. It is intended to obtain
rights which include alternative embodiments to the extent
permitted, including alternate, interchangeable, and/or
equivalent structures, functions, ranges, or steps to those
claimed, whether or not such alternate, interchangeable, and/
or equivalent structures, functions, ranges, or steps are dis-
closed herein, and without intending to publicly dedicate any
patentable subject matter.

All publications, patents and patent applications referred to
herein are incorporated by reference in their entirety to the
same extent as if each individual publication, patent or patent
application was specifically and individually indicated to be
incorporated by reference in its entirety.

What is claimed is:

1. A topical formulation, said topical formulation consist-
ing essentially of:

(i) diclofenac sodium present in 1-2% w/w,

(ii) DMSO present at 40-50% w/w,

(iii) ethanol present at 23-29% w/w;

(iv) propylene glycol present at 10-12% w/w;

(v) optionally glycerine,

(vi) a thickening agent, wherein said thickening agent is
hydroxypropyl cellulose, the topical formulation having
a viscosity of 500-5000 centipoise, and

(vii) water, wherein said topical formulation when applied
to the skin has

a) a greater drying rate, and

b) a transdermal flux of 1.5 times or greater than a
comparative liquid formulation as determined by a
Franz cell procedure at finite or infinite dosing,
wherein the comparative liquid formulation consists
of 1.5% diclofenac sodium. 45.5% dimethylsulfox-
ide, 11.79% ethanol, 11.2% propylene glycol, 11.2%
glycerine, and water.

2. The topical formulation of claim 1, wherein the ethanol
is present at 26.5%.

3. The topical formulation of claim 1, wherein the ethanol
is present at 25%.

4. The topical formulation of claim 1, wherein the ethanol
is present at 25.5%.

5. The topical formulation of claim 1, wherein said drying
rate results in a residue of at most 50% of a starting amount
after 24 hours.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

6. The topical formulation of claim 5, wherein said Franz cell procedure is performed at infinite dosing.

7. The topical formulation of claim 1, wherein said diclofenac sodium degrades by less than 0.04% over the course of 6 months.

8. The topical formulation of claim 1, wherein said topical formulation has a pH of 6.0-10.0.

9. The topical formulation of claim 1, wherein said topical formulation when applied topically provides a reduction of pain over 12 weeks.

10. The topical formulation of claim 9, wherein said topical formulation is applied twice daily.

11. The topical formulation of claim 9, wherein said pain is due to osteoarthritis.

12. The formulation of claim 1, having a viscosity of at least 1000 centipoise.

13. The formulation of claim 1, wherein the Franz cell procedure is performed at finite dosing.

14. The formulation of claim 1, wherein the Franz cell procedure is performed at infinite dosing.

15. The formulation of claim 1, wherein transdermal flux is measured at a time of 14 hours, or 18 hours, or 28 hours, or 31 hours or 40 hours or 42 hours after placing the formulations in the Franz cell.

16. The formulation of claim 1, wherein transdermal flux is at least 2.0 times greater than the comparative liquid formulation.

17. The formulation of claim 1, wherein transdermal flux is at least 4.0 times greater than the comparative liquid formulation.

18. The formulation of claim 1, wherein the formulation is dosed at 10 mg per Franz cell and the cell has an area of 0.5 cm$^2$.

19. The formulation of claim 1, wherein the hydroxypropyl cellulose is present at 2.5% w/w

20. The formulation of claim 1, wherein the hydroxypropyl cellulose is present at 3.5% w/w.

21. The formulation of claim 1, wherein the concentration of diclofenac sodium is a member selected from group consisting of 1%, 1.5% and 2% w/w, and all fractions in between.

22. The formulation of claim 1, wherein the concentration of DMSO is a member selected from group consisting of 40%, 41%, 42%, 43%, 44%, 45%, 46%, 47%, 48%, 49% and 50% w/w, and all fractions in between.

23. The formulation of claim 1, wherein the concentration of glycerine is 0-12% w/w.

24. A topical formulation consisting essentially of:
(i) 1-2% w/w diclofenac sodium;
(ii) 40-50% w/w DMSO;
(iii) 10-12% w/w propylene glycol;
(iv) 1-30% w/w ethanol;
(v) optionally glycerine;
(vi) water; and
(vii) at least one thickening agent selected from the group consisting of a cellulose polymer, a carbomer polymer, a carbomer derivative, a cellulose derivative, hydroxypropyl cellulose and mixtures thereof, the topical formulation having a viscosity of 500-5000 centipoise, wherein said topical formulation when applied to the skin has
a) a greater drying rate, and
b) a transdermal flux of 1.5 times or greater as determined by a Franz cell procedure at finite or infinite dosing, than a comparative liquid formulation wherein the comparative liquid formulation consists of 1.5% diclofenac sodium, 45.5% dimethylsulfoxide, 11.79% ethanol, 11.2% propylene glycol, 11.2% glycerine, and water.

25. The topical formulation of claim 24, wherein the at least one thickening agent is selected from the group consisting of a carbomer polymer, a carbomer derivative and mixtures thereof.

26. The topical formulation of claim 25, wherein the at least one thickening agent is selected from the group consisting of carbopol 97l, carbopol 981, carbopol 941, carbopol 1342 and ultrez 10

27. The topical formulation of claim 25, wherein the at least one thickening agent is hydroxypropyl cellulose.

28. The formulation of claim 24, wherein the Franz cell procedure is performed at finite dosing.

29. The formulation of claim 24, wherein the Franz cell procedure is performed at infinite dosing.

30. The formulation of claim 24, wherein transdermal flux is measured at a time of 14 hours, or 18 hours, or 28 hours, or 31 hours or 40 hours or 42 hours after placing the formulations in the Franz cell.

31. The formulation of claim 24, wherein transdermal flux is at least 2.0 times greater than the comparative liquid formulation.

32. The formulation of claim 24, wherein transdermal flux is at least 4.0 times greater than the comparative liquid formulation.

33. The formulation of claim 24, wherein the formulation is dosed at 10 mg per Franz cell and the cell has an area of 0.5 cm$^2$.

34. The formulation of claim 24, wherein the ethanol is present at 11.2% w/w.

35. The formulation of claim 24, wherein the concentration of diclofenac sodium is a member selected from group consisting of 1%, 1.5% and 2% w/w, and all fractions in between.

36. The formulation of claim 24, wherein the concentration of DMSO is a member selected from group consisting of 40%, 41%, 42%, 43%, 44%, 45%, 46%, 47%, 48%, 49% and 50% w/w, and all fractions in between

37. The formulation of claim 24, wherein the formulation has a viscosity of at least 1000 centipoise.

38. The formulation of claim 24, wherein the at least one thickening agent is a cellulose polymer

39. The formulation of claim 24, wherein the concentration of glycerine is 0-12% w/w.

40 The formulation of claim 24, wherein the formulation has a pH of 6 to 10.

41. The formulation of claim 24, wherein the propylene glycol is present at 11% w/w.

42 The formulation of claim 24, wherein the DMSO is present at 45.5% w/w

43. The formulation of claim 24, wherein the hydroxypropyl cellulose is present at 2.5% w/w

44 The formulation of claim 24, wherein the hydroxypropyl cellulose is present at 3.5% w/w.

45. The formulation of claim 24, wherein the hydroxypropyl cellulose is present at 4% w/w.

46. The formulation of claim 24, wherein the ethanol is present at 25% w/w

47. The formulation of claim 24, wherein the ethanol is present at 25.5% w/w.

48. The formulation of claim 24, wherein the ethanol is present at 26 5% w/w.

49. A topical formulation consisting essentially of:
1-2% w/w diclofenac sodium;
40-50% w/w DMSO;
23-29% w/w ethanol
10-12% w/w propylene glycol;
hydroxypropyl cellulose; and
water to make 100% w/w, wherein the topical formulation has a viscosity of 500-5000 centipoise.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

**50** The formulation of claim 49, wherein the propylene glycol is present at 11% w/w.

**51.** The formulation of claim 49, wherein the DMSO is present at 45 5% w/w

**52.** The formulation of claim 49, wherein the hydroxypropyl cellulose is present at 2.5% w/w.

**53.** The formulation of claim 49, wherein the hydroxypropyl cellulose is present at 3.5% w/w

**54.** The formulation of claim 49, wherein the hydroxypropyl cellulose is present at 4% w/w

**55** The formulation of claim 49, wherein the ethanol is present at 25% w/w

**56.** The formulation of claim 49, wherein the ethanol is present at 25.5% w/w

**57** The formulation of claim 49, wherein the ethanol is present at 26 5% w/w.

**58** The formulation of claim 49, having a viscosity of at least 1000 centipose

**59.** The formulation of claim 49, wherein the concentration of diclofenac sodium is a member selected from group consisting of 1%, 1 5% and 2% w/w, and all fractions in between

**60.** The formulation of claim 49, wherein the concentration of DMSO is a member selected from group consisting of 40%, 41%, 42%, 43%, 44%, 45%, 46%, 47%, 48%, 49% and 50% w/w, and all fractions in between

**61** The formulation of claim 49, wherein the formulation has a pH of 6 to 10

**62** A method of treating osteoarthritis in a subject suffering from articular pain, said method comprising the topical administration to an afflicted joint area of said subject a therapeutically effective amount of a topical formulation comprising:

    (i) diclofenac sodium present at 1-2% w/w;

    (ii) DMSO present at 40-50% w/w;

    (iii) ethanol present at 1-30% w/w;

    (iv) propylene glycol present at 10-12% w/w,

    (v) optionally glycerine;

    (vi) a thickening agent, wherein said thickening agent is selected from the group consisting of cellulose poly-

mers, carbomer polymers, a carbomer derivative, a cellulose derivative and mixtures thereof, wherein the topical formulation has a viscosity of 500-5000 centipose, and

    (vii) water, wherein said topical formulation when applied to the skin has

    a) a greater drying rate; and

    b) a transdermal flux of 1.5 times or greater than a comparative liquid formulation as determined by a Franz cell procedure at finite or infinite dosing, wherein the comparative liquid formulation consists of 1.5% diclofenac sodium, 45 5% dimethylsulfoxide, 11 79% ethanol, 11 2% propylene glycol, 11.2% glycerine, and water thereby treating osteoarthritis

**63** The method of claim 62, wherein diclofenac sodium is present at a concentration selected from the group consisting of 1, 1 5, and 2 w/w, DMSO is present at a concentration selected from the group consisting of 42, 43, 44, 45, 45.5, 46, 47, and 48% w/w and fractions in between; ethanol is present at 26 5% w/w, propylene glycol is present at a concentration selected from the group consisting of 10, 11, and 12, % and fractions in between w/w; the thickening agent is hydroxypropylcellulose (HY119), and water is added to make 100% w/w.

**64** The method of claim 62, wherein said drying rate results in a residue of at most 50% of a starting amount after 24 hours

**65** The method of claim 64, wherein said Franz cell procedure is performed at infinite dosing.

**66.** The method of claim 62, wherein said diclofenac sodium degrades by less than 0 04% over the course of 6 months.

**67** The method of claim 62, wherein said topical formulation has a pH of 6 0-10 0

**68.** The method of claim 62, wherein said topical administration provides a reduction of pain over 12 weeks.

**69.** The method of claim 68, wherein said topical formulation is applied twice daily

\* \* \* \* \*

DTX001.031

HZNPENN_00000031

APPX150

# Addendum 8

U.S. Patent No. 8,546,450

A151-A199



U 7531826

# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 19, 2015

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT:  *8,546,450*
ISSUE DATE:  *October 01, 2013*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

T. LAWRENCE
Certifying Officer

HZNPENN_00000149

APPX151

|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||
US008546450B1

(12) **United States Patent**
Singh et al.

(10) Patent No.: **US 8,546,450 B1**
(45) Date of Patent: **Oct. 1, 2013**

(54) **TREATMENT OF PAIN WITH TOPICAL DICLOFENAC COMPOUNDS**

(75) Inventors: **Jagat Singh**, Scarborough (CA); **Joseph Zev Shainhouse**, North York (CA); **Bradley S. Galer**, West Chester, PA (US); **Robert Dominic King-Smith**, San Diego, CA (US); **Lisa Marie Grierson**, Richmond Hill (CA); **Maria Burian**, Stolberg (DE); **Jonathan Wilkin**, Columbus, OH (US); **Edward T. Kisak**, San Diego, CA (US); **John M. Newsam**, La Jolla, CA (US)

(73) Assignee: **Nuvo Research Inc.**, Mississauga, Ont. (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 395 days.

(21) Appl. No.: **12/459,998**

(22) Filed: **Jul. 10, 2009**

**Related U.S. Application Data**

(60) Provisional application No. 61/211,600, filed on Mar. 31, 2009.

(51) Int. Cl.
| | |
|---|---|
| A01N 37/10 | (2006.01) |
| A01N 41/10 | (2006.01) |
| A61K 31/19 | (2006.01) |
| A61K 31/10 | (2006.01) |
| C07C 63/04 | (2006.01) |
| C07C 315/00 | (2006.01) |
| C07C 317/00 | (2006.01) |

(52) U.S. Cl.
USPC .............. 514/568; 514/708; 562/493; 568/27

(58) Field of Classification Search
USPC ................. 514/557, 568, 708; 562/442, 493; 568/27

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,740,421 | A | 6/1973 | Schmolka |
| 4,342,784 | A | 8/1982 | Havemeyer et al. |
| 4,441,739 | A | 4/1984 | Cluff et al. |
| 4,543,251 | A | 9/1985 | Kamishita |
| 4,575,515 | A | 3/1986 | Sandborn |
| 4,652,557 | A | 3/1987 | Sandborn |
| 4,707,354 | A * | 11/1987 | Garlen et al. ................. 424/47 |
| 4,855,294 | A | 8/1989 | Patel et al. |
| 4,871,767 | A | 10/1989 | Beckermann et al. |
| 5,350,769 | A | 9/1994 | Kasai et al. |
| 5,374,661 | A | 12/1994 | Betlach, II |
| 6,399,093 | B1 | 6/2002 | Petrus |
| 8,217,078 | B1 | 7/2012 | Singh et al. |
| 2002/0197292 | A1 * | 12/2002 | Fowler ........................ 424/401 |
| 2003/0082226 | A1 | 5/2003 | Samour et al. |
| 2004/0175415 | A1 | 9/2004 | Chan et al. |
| 2004/0222123 | A1 | 11/2004 | Niemann |
| 2005/0239894 | A1 | 10/2005 | Steiger |

| | | | |
|---|---|---|---|
| 2008/0300311 | A1 * | 12/2008 | Kisak et al. ................... 514/567 |
| 2009/0131447 | A1 | 5/2009 | Kamboj et al. |
| 2013/0041034 | A1 | 2/2013 | Singh et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 245 126 | 11/1987 |
| EP | 0 450 123 | 10/1991 |
| JP | 61-254519 | 11/1986 |
| JP | 61-277613 | 12/1986 |
| JP | 62-263122 | 11/1987 |
| JP | 63-83023 | 4/1988 |
| JP | 3-291222 | 12/1991 |
| JP | 2001-513543 | 9/2001 |
| WO | 97/13528 | 4/1997 |
| WO | 99/09954 | 3/1999 |
| WO | 03/094905 A1 | 11/2003 |
| WO | 2005-009510 | 2/2005 |
| WO | 2006/096360 | 9/2006 |
| WO | WO 2007010559 A2 * | 1/2007 |
| WO | WO 2007/016766 A1 | 2/2007 |
| WO | 2007/089617 A2 | 8/2007 |
| WO | 2008/049020 A2 | 4/2008 |
| WO | WO 2008088827 A2 * | 7/2008 |
| WO | WO 2010/060798 A1 | 6/2010 |

OTHER PUBLICATIONS

Popovich et. al., Remington: The Science and Practice of Pharmacy, 2005, Lippincott, Williams & Wilkins, 21st ed., p. 2033.*
Baboota et. al., Methods and Findings in Experimental and Clinical Pharmacology, 2006, Thomson Reuters, vol. 28, issue 2, pp. 109-114.*
Dua et. al., The Indian Pharmacist, 2006, Prabha Schroff, vol. 5, No. 45, pp. 73-75.*
Morison, The New England Journal of Medicine, 2004, Massachusetts Medical Society, vol. 350, pp. 1111-1117.*
Mehta, Inet Continuing Education, 2004, InetCE.com, pp. 1-10.*
Cevc et. al., Biochimica et Biophysica Acta, 2001, Elsevier, vol. 1514, pp. 191-205.*
Voltaren gel package insert, 2009, Novartis Inc., prescribing information.*
Bookman et al.; An article entitled "Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial." Canadian Medical Journal 2004; 171(4), 333-338. Retrieved from the Internet: http://canadianmedicaljournal.ca/cgi/reprint/171/4/333.
Towheed; An article entitled "Pennsaid® Therapy for Osteoarthritis of the Knee: A Systematic Review and Metaanalysis of Randomized Controlled Trials." The Journal of Rheumatology 2006, 33(3), 567-573.
Towheed; An article entitled "Published meta-analyses of pharmacological therapies for osteoarthritis". Osteoarthritis and Cartilage 2002, 10, 836-837.

(Continued)

*Primary Examiner* — Sreeni Padmanabhan
*Assistant Examiner* — Sarah Pihonak
(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

The field involves compositions useful for pain relief, including diclofenac solution and gel formulations, in particular methods of use thereof, articles of manufacture and kits that provide novel preclinical, clinical and other information to users.

**20 Claims, 7 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000150

(56)     **References Cited**

OTHER PUBLICATIONS

Tugwell et al.; An article entitled "Equivalence Study of a Topical Diclofenac Solution (Pennsaid®) Compared with Oral Diclofenac in Symptomatic Treatment of Osteoarthritis of the Knee: A Randomized Controlled Trial." The Journal of Rheumatology 2004; 31(10), 2002-2012.

Roth et al.; An article entitled "Efficacy and Safety of a Topical Diclofenac Solution (Pennsaid) in the Treatment of Primary Osteoarthritis of the Knee" Arch Intern Med. 2004, 164, 2017-2023.

Hui et al.; An article entitled "In Vivo Bioavailability and Metabolism of Topical Diclofenac Lotion in Human Volunteers." Pharmaceutical Research 1998, 15(10), 1589-1595.

Hewitt et al.; An article entitled "In Vitro Cutaneous Disposition of a Topical Diclofenac Lotion in Human Skin: Effect of a Multi-Dose Regimen." Pharmaceutical Research 1998, 15(7), 988-992.

Shainhouse; An article entitled "OARSI guidelines for hip and knee OA: deciphering the topical drug mélange." Osteoarthritis Cartilage, 2008, 16(12), 1586-7.

An article entitled "Other articles noted" by Evidence-Based Medicine, 2005, 10, 63-64.

Shainhouse et al.; An article entitled "A Long-Term, Open-Label Study to Confirm the Safety of Topical Diclofenac Solution Containing Dimethyl Sulfoxide in the Treatment of the Osteoarthritic Knee." American Journal of Therapeutics 0, 000-000 (2010).

Simon et al.; An article entitled "Efficacy and safety of topical diclofenac containing dimethyl sulfoxide (DMSO) compared with those of topical placebo, DMSO, vehicle and oral diclofenac for knee osteoarthritis." Pain, 2009, 143(3), 238-45.

Lin et al.; An article entitled "Efficacy of topical non-steroidal anti-inflammatory drugs in the treatment of osteoarthritis: meta-analysis of randomized controlled trials" BMJ 2004, 329(7461), ff.

Ozguney; An article entitled "An alternative topical treatment of osteoarthritis of the knee with cutaneous diclofenac solution." Expert Opinion on Pharmacotherapy 2008, 9(10), 1805-1816.

Baer et al.; An article entitled "Treatment of osteoarthritis of the knee with a topical diclofenac solution: a randomized controlled, 6-week trial [ISRCTN53366886]" BMC Musculoskeletal Disorders 2005, 6:44, Aug. 8, 2005. Retrieved from the Internet: http://www.ncbi. nlm.nih.gov/pmc/articles/PMC1201146/pdf/1471-2474-6-44.pdf.

Galer et al.; An article entitled "Use of Topiceuticals (Topically Applied, Peripherally Acting Drugs) in the Treatment of Chronic Pain." Current Drug Therapy 2006, 1(3), 273-282.

Moen; An article entitled "Topical Diclofenac Solution." Drugs, 2009, 69(18), 2621-32. Retrieved from the Internet: http://www.ncbi. nlm.nih.gov/pubmed/19943711.

"Product Monograph, PR Pennsaid®"; Dimethaid Health Care Ltd, Oct. 20, 2003. Retrieved from the Internet: http://www.osteo-arthritis.org/downloads/Pennsaid_HCP_Mono.pdf.

Nelson et al.; an article entitled "Phase IV, open-label assessment of the treatment of actinic keratosis with 3.0% diclofenac sodium topical gel (Solaraze™)." Journal of Drugs in Dermatology 2004,3(4), 401ff.

Anchordoguy, T.J., "Temperature-dependent perturbation of phospholipid bilayers by dimethylsulfoxide," Biochimica et Biophysica Acta, 1104:117-122, 1992.

Anigbogu, A.N.C. et al., "Fourier transform Raman spectroscopy of interactions between the penetration enhancer dimethyl sulfoxide and human stratum corneum," International Journal of Pharmaceutics, 125:265-282, 1995.

Barry, B.W., "Mode of action of penetration enhancers in human skin," Journal of Controlled Release, 6:85-97, 1987.

Baynes, R.E. and Riviere, J.E., "Influence of inert ingredients in pesticide formulations on dermal absorption of carbaryl," Am. J. Vet. Res., 59:168-175, 1998.

Baynes, R.E. et al., "The influence of diethyl-m-toluamide (DEET) on the percutaneous absorption of permethrin and carbaryl," Toxicology and Applied Pharmacology. 144:332-339, 1997.

Büyüktimkin, N. et al., "Chemical means of transdermal drug permeation enhancement," Chapter 11 of Transdermal and Topical Drug Delivery Systems, Tapash K. Ghosh et al., eds., pp. 357 and 404-407, 1997.

Carter-Homer Corp., "Kemsol®, Dimethylsulfoxide, Scleroderma Therapy," in 2000 Compendium of Pharmaceuticals and Specialties (CPS), Louise Wellbanks et al., eds., Canadian Pharmacists Association, Ontario, Canada, p. 804, 2000.

Dimethaid Research Inc., Product Monograph: PrPennsaid® (1.5% w/w diclofenac sodium solution), 41 pages, Dimethaid Health Care Ltd., Ontario, Canada, 2003.

Drug and Therapeutic Information, Inc., "A further warning on DMSO," The Medical Letter on Drugs and Therapeutics, vol. 7, No. 20, Issue 175, p. 80, 1965.

Drug and Therapeutic Information, Inc., "Dimethyl Sulfoxide (DMSO)," The Medical Letter on Drugs and Therapeutics, vol. 7, No. 11, Issue 166, pp. 42-44, 1965.

FDA's guidelines for inactive ingredients for Jan. 2010, 1 page, 2010.

FDA's guidelines for inactive ingredients for Jun. 2010, 1 page, 2010.

Fluhr, J.W. et al., "Transepidermal water loss reflects permeability barrier status: validation in human and rodent in vivo and ex vivo models," Experimental Dermatology, 15:483-492, 2006.

G.D. Searle & Co., CELEBREX® (Celecoxib) Capsules I Safety Information, Revised label based on FDA letter Feb. 23, 2000, 21 pages, G.D. Searle & Co, IL, USA and Pfizer Inc., NY, USA, Apr. 24, 2000.

G.D. Searle & Co., CELEBREX® (Celecoxib) Capsules, NDA 20-998/S-018, NDA 20-998/S-019, Revised: Jul. 2005, 25 pages (pp. 3-27), G.D. Searle LLC, Division of Pfizer Inc., NY, USA, 2005.

Greve, T.M. et al., "Penetration mechanism of dimethyl sulfoxide in human and pig ear skin: An ATR-FTIR and near-FT Raman spectroscopic in vivo and in vitro study," Spectroscopy, 22:405-417, 2008.

Hadgraft, J., "Mini review: Passive enhancement strategies in topical and transdermal drug delivery," International Journal of Pharmaceutics, 184:1-6, 1999.

Henderson, T.R. and Henderson, R.F., "Effects of dimethyl sulfoxide on subunit proteins," Ann. N.Y Acad. Sci., 243:38-53, 1975.

Heyneman, C.A. et al., "Oral versus topical NSAIDs in rheumatic diseases," Drugs, Adis International Limited, vol. 60, Issue 3, pp. 555-574, 2000.

Hsu, L.R. et al., "The effect of pretreatment by penetration enhancers on the in vivo percutaneous absorption of piroxicam from its gel form in rabbits," International Journal of Pharmaceutics, 71:193-200, 1991.

Kanikkannan, N. et al., "Structure-activity relationship of chemical penetration enhancers in transdermal drug delivery," Current Medicinal Chemistry, 6(7):593-608, 1999.

Kemppainen, B.W. et al., "Comparison of penetration and metabolism of [3H]Diacetoxyscirpenol, [3H]Verrucarin A and [3H]T-2 toxin in skin," Fd Chem. Toxic., 25(5):379-386, 1987.

Kemppainen, B.W. et al., "Evaluation of monkey skin as a model for in vitro percutaneous penetration and metabolism of [3H]T-2 Toxin in Human Skin," Fundamental and Applied Toxicology, 7:367-375, 1986.

Kemppainen, B.W. et al., "In vitro percutaneous penetration and metabolism of [3h]t-2 toxin: comparison of human, rabbit, guinea pig and rat," Toxicon, 25(2):185-194, 1987.

Kligman, A.M., "Topical pharmacology and toxicology of dimethyl sulfoxide-Part I," JAMA, 193(10):140-148, 1965.

Lin, S.Y., "Direct or indirect skin lipid-ordering effect of pyrrolidone carboxylate sodium after topical treatment with penetration enhancers," Bio-Medical Materials and Engineering, 5(1):9-20, 1995.

Malten, K.E. and Arend, J.D., "Topical toxicity of various concentrations of DMSO recorded with impedance measurements and water vapour loss measurements," Contact Dermatitis, 4:80-92, 1978.

Notman, R. et al., "The permeability enhancing mechanism of DMSO in ceramide bilayers simulated by molecular dynamics," Biophysical Journal, 93:2056-2068, 2007.

Novartis Consumer Health, Inc., Prescribing Information of Voltaren® Gel; pp. 1-23; revised Jul. 2009.

Oertel. R.P. "Protein conformational changes induced in human stratum corneum by organic sulfoxides: An infrared spectroscopic investigation," Biopolymers, 16:2329-2345, 1977.

Pharmacia, Product Label: Rogaine® Extra Strength Topical Solution, Pharmacia Consumer Healthcare, Peapack, NJ, USA, 2002.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

Physicians Total Care, Inc., Retin-A—tretinoin cream/tretinoin gel product insert, 6 pages, Ortho Dermatological, Division of Ortho-McNeil Pharmaceutical, Inc., Skillman, New Jersey, USA, 2001.

Rodgers, K. and Xiong, S., "Effect of acute administration of malathion by oral and dermal routes on serum histamine levels," Int. J. Immunopharmac., 19(8):437-441, 1997.

Walker, R.B. and Smith E.W., "The role of percutaneous penetration enhancers," Advanced Drug Delivery Reviews, 18:295-301, 1996.

Waller, J.M. et al., "'Keratolytic' properties of benzoyl peroxide and retinoic acid resemble salicylic acid in man," Skin Pharmacol Physiol, 19:283-289, 2006.

Williams, A.C. and Barry, B.W., "Penetration enhancers," Advanced Drug Delivery Reviews, 56:603-618, 2004.

*Mallinckrodt LLC al. v. Apotex Inc. et al.*, Complaint, Aug. 30, 2012, Richards, Layton & Finger, PA, 920 N. King St., Wilmington, DE 19801, 70 pages.

*Mallinckrodt LLC al. v. Apotex Inc. et al.*, Civil Cover Sheet, Aug. 30, 2012, Richards, Layton & Finger, PA, 920 N. King St., Wilmington, DE 19801, 2 pages.

*Mallinckrodt LLC et al. v. Apotex Inc. et al.*, Supplemental Information for Patent Cases Involving an Abbreviated New Drug Application (ANDA), Aug. 30, 2012, Richards, Layton & Finger, PA, 920 N. King St., Wilmington, DE 19801, 1 page.

*Mallinckrodt LLC al. v. Apotex Inc. et al.*, Plaintiffs' Rule 7.1 Statement, Aug. 30, 2012, Richards, Layton & Finger, PA, 920 N. King St., Wilmington, DE 19801, 2 pages.

Proprietary Material: Solomon, Andrew M., Notification of Certification of Invalidity, Unenforceability, and/or Non-Infringement for U.S. Patent No. 8,217,078 B1 Pursuant to § 505(j)(2)(B)(iv) of the Federal Food, Drug, and Cosmetic Act., Letter dated Jul. 17, 2012, Perrigo Co., 24 pages.

Proprietary Material: Breisblatt, Robert B., Notice of Certification Under 21 U.S.C. § 355(j)(2)(B)(ii) (§ 505(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act) and 21 C.F.R. § 314.95, Letter dated Jul. 13, 2012, Katten Muchin Rosenman LLP, 20 pages.

Proprietary Material: Reisman, J., Notice of Paragraph IV Certification Regarding NDA 020947 (Diclofenac Topical Solution, 1.5%) with Respect to U.S. Patent No. 8,217,078, Letter dated Jul. 17, 2012, Knobbe Martens Olson & Bear LLP, 20 pages.

Bellamy, N. et al., "Recommendations for a core set of outcome measures for future phase III clinical trials in knee, hip, and hand osteoarthritis," J Rheumatol, 24:799-802, 1997.

Browning, R. et al., "Reducing the dose of oral NSAIDs by use of feldene gel: an open study in elderly patients with osteoarthritis," Advances in Therapy, 11(4):198-207, 1994.

Franz, T. "Percutaneous absorption: on the relevance of in vitro data," J. Invest Derm, 64(3):190-195, 1975.

Ho, H. et al., "The influence of cosolvents on the in-vitro percutaneous penetration of diclofenac sodium from a gel system," J Pharm Pharmacol, 46:636-642, 1994.

ICIS News 1999-2011 (http://www.chemindustry.com/chemicals/0197997.html), Jul. 28, 2011.

Kantarci, G. et al., "In vitro permeation of diclofenac sodium from novel microemulsion formulations through rabbit skin," Drug Development Research, 65:17-25, 2005.

Karande, P. et al., "Insights into synergistic interactions in binary mixtures of chemical permeation enhancers for transdermal drug delivery," J. Controlled Release, 115:85-93, 2006.

Karande, P. et al., "High throughput screening of transdermal formulations," Pharm. Res., 19(5):655-660, 2002.

Laba, D., "Ch. 4. Rheological additives. Rheological properties of cosmetics and toiletries," Cosmetic Science and Technology Series, 13:55-152, 1993.

Miao et al. "Preparation and Clinical Application of Diclofenac Sodium Gel," Railway Medical Journal, 28(1):14-15, 2000.

Minghetti, P. et al., "Ex vivo study of transdermal permeation of four diclofenac salts from different vehicles," J. of Pharm. Sci., 96(4):1-10, 2007.

Naito, S. et al., Percutaneous absorption of diclofenac sodium ointment, Int. J. of Pharmaceutics, 24:115-124, 1985.

Nishihata, T. et al., "Percutaneous absorption of diclofenac in rats and humans: aqueous gel formulation," International Journal of Pharmaceutics, 46:1-7, 1988.

Obata, Y et al., "Effect of ethanol on skin permeation of nonionized and ionized diclofenac," Int. J. of Pharmaceutics, 89:191-198, 1993.

Ostrenga, J. et al., "Significance of vehicle composition I: Relationship between topical vehicle composition, skin penetrability, and clinical efficacy," J. Pharm Sciences, 60(8):1175-79, 1971.

Ozguney, I. et al., "Transdermal delivery of diclofenac sodium through rat skin from various formulations," AAPS PharmSciTech, 7(4) Article 88 E1-E7, 2006.

Prausnitz, M., "Current status and future potential of transdermal drug delivery," Nature Reviews, 3:115-124, 2004.

Rosenstein, E., "Topical agents in the treatment of rheumatic disorders," Rheum. Dis. Clin North Am., 25(4): 899-918, 1999.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000152

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

*FIG. 1*

MEAN TEWL SCORES FOR RETIN-A® BY DAY – ITT



— TREATED RETIN-A    --■-- UNTREATED RETIN-A

HZNPENN_00000153

HZNPENN_00000154



*FIG. 2*

MEAN TEWL SCORES FOR PENNSAID® BY DAY – ITT

— TREATED PENNSAID    --▲-- UNTREATED PENNSAID

APPX156



*FIG. 3*

MEAN PLASMA CONCENTRATION - TIME PROFILE FOR DICLOFENAC SODIUM (ng/mL)

ANALYTE = DICLOFENAC SODIUM

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

**APPX157**

HZNPENN_00000155

Copy provided by USPTO from the PIRS Image Database on 05/15/2015



FIG. 4

MEAN PLASMA CONCENTRATION - TIME PROFILE FOR DIMETHYL SULFOXIDE (μg/mL)

ANALYTE = DIMETHYL SULFOXIDE

MEAN DIMETHYL SULFOXIDE
PLASMA CONCENTRATION (μg/mL)

TIME

HZNPENN_00000156

APPX159

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000157

*FIG. 5*

MEAN PLASMA CONCENTRATION – TIME PROFILE FOR DICLOFENAC SODIUM (ng/mL)

ANALYTE = DICLOFENAC SODIUM





*FIG. 6*

MEAN PLASMA CONCENTRATION – TIME PROFILE FOR DIMETHYL SULFOXIDE (ng/mL)

ANALYTE = DIMETHYL SULFOXIDE

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

**APPX160**

HZNPENN_00000158



*FIG. 7*

MEAN PLASMA CONCENTRATION – TIME PROFILE FOR DIMETHYL SULFONE (µg/mL)

ANALYTE = DIMETHYL SULFONE

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

**APPX161**

HZNPENN_00000159

# TREATMENT OF PAIN WITH TOPICAL DICLOFENAC COMPOUNDS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application claims priority under 35 USC 119 to U.S. Provisional Application 61/211,600 filed. Mar. 31, 2009.

## FIELD

The field involves the delivery of compounds useful for pain relief, including diclofenac formulations, methods of use thereof, articles of manufacture and kits that include providing novel preclinical, clinical and other information to users.

## BACKGROUND

The following includes information that may be useful in understanding the present invention. It is not an admission that any of the information provided herein is prior art, or relevant, to the presently described or claimed inventions, or that any publication or document that is specifically or implicitly referenced is prior art.

Today, pain has become the universal disorder, a serious and costly public health issue, and a challenge for family, friends, and health care providers who must give support to the individual suffering from the physical as well as the emotional consequences of pain. In general, there are two basic types of pain, acute and chronic. Acute pain, for the most part, results from disease, inflammation, or injury to tissues. This type of pain generally comes on suddenly, for example, after trauma or surgery. In some instances, it can become chronic. Chronic pain is widely believed to represent disease itself. Chronic pain persists over a longer period of time than acute pain and is resistant to most medical treatments. It can, and often does, cause severe problems for patients.

Arthritis is considered to be one of the most pervasive diseases in the United States and a leading cause of disability. According to the Centers for Disease Control and Prevention, it is estimated that 1 of every 3 Americans is affected by one or more of the more than 100 types of arthritis. Pain, particularly of the joints throughout the body, characterizes arthritis. Psoriasis, primarily a skin disorder, can progress to psoriatic arthritis if left untreated. Rheumatoid arthritis, osteoarthritis, and ankylosing spondylitis are all examples of degenerative arthritic diseases.

In addition to, for example, arthritic causes, normal function of a joint and its movement, and other portions of the body, can be severely impaired as a result of trauma or following orthopedic and other surgical procedures. This may result in tenderness; aching, pain, and lengthy recovery times, as well as loss of joint mobility or reduced range of motion, tonicity, or elasticity of the joint/articular structures, such as for example, muscle, tendon, capsule, bone, or ligament. Reduced joint mobility may also involve permanently altered or shortened joint or tissue architecture. Altered or abnormal joint mobility or joint architecture may also be associated with or caused by a variety of injuries and conditions such as, for example, metabolic disorders, ischemia, injury to joint, capsule, bone, cartilage, tendon, ligament or muscle, fractures, subluxation, dislocation, crush injuries, prolonged immobilization (e.g., immobilization of a joint in a cast or splint), and paralysis.

When non-pharmacological measures are not sufficient to control the symptoms of osteoarthritis, current evidence-based guidelines support pharmacological treatment with

acetaminophen or oral nonsteroidal anti-inflammatory drugs ("NSAID"s) (American College of Rheumatology Subcommittee on Osteoarthritis Guidelines. Recommendations for the medical management of osteoarthritis of the hip and knee: 2000 update. *Arthritis Rheum.* 2000; 43:1905-15; National Collaborating Centre for Chronic Conditions. Osteoarthritis: National clinical guideline for care and management in adults. London: Royal College Physicians, 2008. Available at: http://www.nice.org.uk/nicemedia/pdf/CG059FullGuideline.pdf.; Zhang W, et al., *Osteoarthritis Cartilage* 2007; 15:981-1000; Zhang W, et al., *Osteoarthritis Cartilage* 2008; 16:137-62. Acetaminophen has been linked with an increased risk of hepatic, hypertensive and cardiovascular adverse effects (e.g., Chan A T, et al., *Circulation.* 2006; 113:1578-87. Epub 2006 Mar. 13; Pincus T, et al., *Ann Rheum Dis.* 2004; 63:931-9).

NSAIDs are more effective (Towheed T E, *J. Rheumatol.* 2006; 33:567-73) and carry more well-known gastrointestinal and cardiovascular risk (e.g., Antman E M, et al. Use of nonsteroidal anti-inflammatory drugs: an update for Clinicians: a scientific statement from the American Heart Association. *Circulation.* 2007; 115:1634-42; Chan A T, et al. Nonsteroidal anti-inflammatory drugs, acetaminophen, and the risk of cardiovascular events. *Circulation.* 2006; 113: 1578-87). The attempt to minimize the risk of both morbidity and potential mortality by prescribing COX-2 selective NSAIDs ('coxitis') has not achieved the goal (Kearney P M, et al. *BMJ.* 2006; 332:1302-8; Mamdani M, et al., *BMJ.* 2004; 328:1415-6).

Diclofenac is used, most commonly, as the sodium or potassium salt for relief from pain and inflammation such as musculoskeletal and joint disorders including rheumatoid arthritis, osteoarthritis, and ankylosing spondylitis. U.S. Pat. Nos. 4,575,515 and 4,652,557 disclose topical NSAID compositions, one of which, consisting of 1.5% diclofenac sodium, 45.5% dimethylsulphoxide ("DMSO"), ethanol, propylene glycol, glycerine, and water, has been shown to be effective in the treatment of chronic osteoarthritis (e.g., Towheed, *Journal of Rheumatology* 33:3 567-573 (2006); Oregon Evidence Based Practice Center entitled "Comparative Safety and Effectiveness of Analgesics for Osteoarthritis," AHRQ Pub. No. 06-EHC09-EF).

The skin provides a protective barrier against foreign materials and infection. In mammals this barrier is created primarily by the outermost epidermal layer, the stratum corneum. The stratum corneum is comprised of flat, extended, enucleated cells, termed corneocytes, the periphery of which comprises a highly insoluble protein and lipid structure, called the cornified envelope ("CE"), surrounded by lipids. (Downing et al., Dermatology in General Medicine, Fitzpatrick, et al., eds., pp. 210-221 (1993); Ponec, M, The Keratinocyte Handbook, Leigh, et al., eds., pp. 351-363 (1994)). The CE is composed of polar lipids, such as ceramides, sterols, and fatty acids, and a complicated network of cross-linked proteins; however, the cytoplasm of stratum corneum cells remains polar and aqueous. The stratum corneum is extremely thin (some 20 microns) but provides a substantial barrier. Nevertheless, the skin has been considered as a route for the administration of drugs. Various transdermal delivery systems achieve epidermal penetration by using a skin penetration enhancing vehicle.

Topical NSAIDs present a safer potential alternative to oral therapy. with decreased systemic exposure to the active NSAID molecule. While previous reviews (Mason L, et al., *BMC Musculoskelet Disord.* 2004; 5:28) have suggested that topical NSAIDs are effective for osteoarthritis, Lin et al. (*BMJ.* 2004; 329:324-6) in their meta-analysis of the same

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000160

3

studies stressed that the various products showed symptom relief at 1 or 2 weeks but loss of benefit at 4 weeks, and rejected them as there was insufficient evidence to justify a recommendation of long-term use.

Subsequently published randomized controlled studies have described a penetrating topical diclofenac solution in a dimethyl sulfoxide (DMSO)-containing vehicle as efficacious and safe in relieving the symptoms of primary osteoarthritis of the knee over 4-, 6-, and 12-week treatment periods (Baer P A, et al. *BMC Musculoskelet Disord.* 2005; 6:44; Bookman A A, et al. *CMAJ.* 2004; 171:333-8; Roth S H, Shainhouse J Z. *Arch Intern Med.* 2004; 164:2017-23; Tugwell P S, et al. *J Rheumatol.* 2004; 31:2002-12). Recent topical NSAID reviews and meta-analyses (Banning M., *Br J Community Nurs* 2006; 11:487-92; Banning M., *Expert Opin Pharmacother* 2008; 9:2921-9; Biswal S, et al., *J. Rheumatol.* 2006; 33:1841-4; Haynes S, Gemmell H., *Clinical Chiropractic* 2007; 10:126-38; Moore R A, et al., *Rheum Dis Clin N Am* 2008; 34:415-32; Ozguney I, *Expert Opin Pharmacother* 2008; 9:1805-16; Towheed T E, *J Rheumatol.* 2006; 33:567-73; Zacher J, et al., *Current Medical Research and Opinions* 2008; 24(4):925-950) have evaluated the data from these topical diclofenac solution studies, and subsequently published national guidelines (Chou R, et al. Comparative Effectiveness Review No. 4: Comparative Effectiveness and Safety of Analgesics for Osteoarthritis. Comparative Effectiveness Review No. 4: Rockville, Md.: Agency for Healthcare Research and Quality. September 2006. Available at: www.effectivehealthcare.ahrq.gov/reports/final.cfm; National Collaborating Centre for Chronic Conditions. Osteoarthritis: National clinical guideline for care and management in adults. London: Royal College Physicians, 2008. Available at: http://www.nice.org.uk/nicemedia/pdf/CG059FullGuideline.pdf; Tannenbaum H, et al., *J. Rheumatol.* 2006; 33:140-57; Zhang W, et al 2007, supra; Zhang W, et al 2008 supra) have cited these studies as evidence for the use of topical NSAIDs as first line therapy for osteoarthritis. Topical diclofenac solution is used for the treatment of osteoarthritis and is currently approved for sale in Canada and several European countries.

The efficacy of topical NSAIDs, such as topical diclofenac solution, is thought to be due to local action of the active NSAID molecule following its penetration through the skin to the tissue sites of inflammation and pain. Diclofenac sodium is a member of the arylacanoic acid group of NSAIDs with lipophilic properties that limit its percutaneous penetration (Nishihata T, et al., *Chem. Pharm. Bull* 1987; 35:3807-12). The biological property of DMSO to enhance skin penetration of both hydrophilic and lipophilic molecules is known (Williams A C, Barry B W, *Adv Drug Deliv Rev* 2004; 56:603-18), with recent research focusing on the mechanism of enhancement (Gurtovenko A A, Anwar J, *J Phys Chem B* 2007; 111:10453-60). The percutaneous absorption of diclofenac following a multidose regimen of a topical diclofenac solution (based on a DMSO-containing vehicle) was significantly enhanced compared to an aqueous diclofenac formulation without DMSO (Hewitt, P G, et al., *Pharmacol Res.* 1998; 15:988-92). Within the extensive literature on DMSO are unsubstantiated claims of therapeutic efficacy in the treatment of osteoarthritis, but no efficacy of DMSO vehicle was shown in a previous, 4-week randomized controlled study of a topical diclofenac solution (Bookman A A, et al. Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial. *CMAJ.* 2004; 171:333-8).

There remains a need in the art for methods of dosing topical diclofenac formulations, and providing users and prescribers with information regarding drug product attributes

4

and desired therapeutic effects as well as instructions on uses in conjunction with other topical agents. Such needs are met by the inventions and discoveries provided herein.

BRIEF SUMMARY

The inventions described and claimed herein have many attributes and embodiments including, but not limited to, those set forth or described or referenced in this Brief Summary. It is not intended to be all-inclusive and the inventions described and claimed herein are not limited to or by the features or nonlimiting embodiments identified in this Brief Summary, which is included for purposes of illustration only and not restriction.

Disclosed herein are methods of treatment and methods of manufacturing and using a topical diclofenac pharmaceutical product and related articles and kits. Also disclosed herein are methods of preventing or treating pain, including joint pain, and arthritis, including osteoarthritis.

In one nonlimiting embodiment, a method of using topical diclofenac, and related methods of treatment, comprises informing a user of certain information regarding topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, said information comprising one or more of the following: (1) the clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular four times per day ("QID") dosing; (b) the effects of QID dosing in one or more clinical trials; (c) the results from a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee; (d) the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; and (e) results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed; (2a) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone; (b) that the addition of topical diclofenac to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; and (d) the results of a clinical study showing that no eye lens abnormalities were observed with DMSO-vehicle or topical diclofenac in DMSO treatment; (2b) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone; (b) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, (a) the effect of the use of topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated application of topical diclofenac did not increase systemic environmental toxin exposure; and, (b) the effects of use of other topical products in conjunction with topical diclofenac, including, for example, that concomitant use of

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000161

diclofenac topical solution by repeated application with other topical products, including N,N-diethyl-m-toluamine ("DEET"—active ingredient in insect repellent), 2,4-dichlorophenoxy acetic acid ("2,4-D"—active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

In another nonlimiting embodiment, a method of using topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, and related methods of treatment, comprises obtaining topical diclofenac from a container providing information regarding (1) the clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) the results from a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee; (d) the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; and (e) results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed; (2a) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone; (b) that the addition of topical diclofenac to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; and (d) the results of a clinical study showing that no eye lens abnormalities were observed with DMSO-vehicle or topical diclofenac in DMSO treatment; (2b) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone; (b) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, (a) the effect of the use of topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated application of topical diclofenac did not increase systemic environmental toxin exposure; and, (b) the effects of use of other topical products in conjunction with topical diclofenac, including, for example, that concomitant use of diclofenac topical solution by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

In still yet another nonlimiting embodiment, a method of using topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, and related methods of treatment, comprises providing a user with topical diclofenac, and informing the user of one or more of the following: (1) the clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) the results from a

12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee; (d) the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; and (e) results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed; (2a) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone; (b) that the addition of topical diclofenac to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients; (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; and (d) the results of a clinical study showing that no eye lens abnormalities were observed with DMSO-vehicle or topical diclofenac in DMSO treatment; (2b) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone; (b) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, (a) the effect of the use of topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated application of topical diclofenac did not increase systemic environmental toxin exposure; and, (b) the effects of use of other topical products in conjunction with topical diclofenac, including, for example, that concomitant use of diclofenac topical solution by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

In another nonlimiting embodiment, a method of using topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, and related methods of treatment, comprises administering a topical diclofenac DMSO formulation to a patient, wherein the administration provides a therapeutic diclofenac concentration by application of about 40 drops to one or both knees to a subject having osteoarthritis of the knees, and the user is informed with regard to one or more of the following: (1) the clinical effects of topical diclofenac in DMSO dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) the results from a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing DMSO in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee; (d) the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; (2a) the adverse event profile of topical diclofenac in DMSO, including, for example (a) that administration of topical diclofenac does not increase the incidence of systemic adverse events; (b) that the addition of topical diclofenac in DMSO to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis

HZNPENN_00000162

7

patients; (c) the results of a clinical study demonstrating that the addition of topical diclofenac in DMSO to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; (2b) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone; (b) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac in DMSO, including, for example, (a) of the effects of use of other topical products in conjunction with topical diclofenac in DMSO, including, for example, that concomitant use of diclofenac in DMSO by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products; (b) the effect of the use of topical diclofenac in DMSO on absorption of environmental toxins, including, for example, the results of a study showing that repeated topical application of diclofenac in DMSO did not increase systemic environmental toxin exposure; (4) of the results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed.

In yet another nonlimiting embodiment, a method of manufacturing a topical diclofenac pharmaceutical product comprises packaging a topical diclofenac dosage form, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium 2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, with some or all of the following information, in written or electronic form: (1) the clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) the results from a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee; (d) the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; and (e) results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed; (2a) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone; (b) that the addition of topical diclofenac to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients; and, (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; (2b) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenace results in less frequent adverse events associated with the NSAID class than oral diclofenac alone; (b) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, (a) the effect of the use of topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated

8

application of topical diclofenace did not increase environmental systemic toxin exposure; and, (b) the effects of use of other topical products in conjunction with topical diclofenac, including, for example, that concomitant use of diclofenac topical solution by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

In one nonlimiting embodiment, an article of manufacture comprises a container containing a dosage form of topical diclofenac, for example, a topical diclofenac solution comprising or consisting essentially of 1.5% diclofenac sodium, 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, wherein the container is associated with published material providing some or all of the following information: (1) the clinical effects of topical diclofenac dosing, including, for example, (a) the effects of particular QID dosing; (b) the effects of QID dosing in one or more clinical trials; (c) the results from a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee; (d) the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; and (e) results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed; (2a) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone; (b) that the addition of topical diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients; and, (c) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; (2b) the adverse event profile of topical diclofenac, including, for example (a) that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone; (b) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone; (3) preclinical study results with topical diclofenac, including, for example, (a) the effect of the use of topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated topical application of topical diclofenac did not increase systemic environmental toxin exposure; and, (b) the effects of use of other topical products in conjunction with topical diclofenac, including, for example, that concomitant use of diclofenac topical solution by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

In one nonlimiting embodiment, the article of manufacture is a kit. Thus, one aspect of the invention provides a novel kit of parts comprising topical diclofenac (for example, a topical diclofenac solution or gel as described, or referenced, herein) and information informing a user or prescriber of novel results from preclinical and clinical studies.

In one nonlimiting embodiment, the user or prescriber is informed of the results of or more preclinical studies in which concomitant use of topical diclofenac with other topical prod-

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000163

ucts, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens), was investigated. In one aspect of this embodiment, the user or prescriber is informed that repeated application of topical diclofenac did not enhance the systemic absorption of these products. In another aspect of this embodiment, the user or prescriber is informed that before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same skin surface of the knee treated with topical diclofenac, one should wait until the treated area is dry, which occurs most often within 10 minutes. In another aspect of this embodiment, the user or prescriber is informed that concomitant use of topical diclofenac and sunscreens and insect repellants is safe. In another aspect of this embodiment, the user or prescriber is informed that use of topical diclofenac does not reduce the efficacy of a sunscreen. In another aspect of this embodiment, the user or prescriber is informed that use of topical diclofenac does not reduce the efficacy of an insect repellant.

In one nonlimiting embodiment, the user or prescriber is informed of the results of a transepidermal water loss study in which no alteration in skin barrier function following chronic use of topical diclofenac was found. In one aspect of this embodiment, the user or prescriber is informed that the study was performed on human volunteers' skin.

In one nonlimiting embodiment, the user or prescriber is informed of the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients. In one aspect of this embodiment, the user or prescriber is further informed that the combination of topical diclofenac and oral diclofenac did not increase the incidence of digestive system events over oral diclofenac alone. In another nonlimiting embodiment, the user or prescriber is informed of a study showing that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone and/or the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone.

In another nonlimiting embodiment, the user or prescriber is informed of the results of a clinical trial in which one knee was successfully treated with topical diclofenac even though most subjects had bilateral osteoarthritis of the knees. In one aspect of this embodiment, the user or prescriber is further informed that topical diclofenac may be applied to only one knee despite the existence of bilateral osteoarthritis.

In another nonlimiting embodiment, the user or prescriber is informed that a regimen of topical diclofenac and oral diclofenac is useful for treating an individual with persistent or breakthrough knee pain despite using an oral NSAID.

In another nonlimiting embodiment, the user or prescriber is informed that topical diclofenac, or a regimen of topical diclofenac and oral diclofenac, is useful when topical diclofenac is applied to only one knee of a subject with osteoarthritis even though both knees of an individual may be affected.

In yet another nonlimiting embodiment, the user is provided with some or all of the topical diclofenac clinical and preclinical information described herein for purposes of enhancing the safety profile of topical diclofenac.

The topical diclofenac composition will comprise diclofenac and at least one transdermal penetration enhancer in an amount sufficient to aid in the delivery of a therapeutically effective amount of diclofenac to a desired area. The topical diclofenac may also include one or more pharmaceutically acceptable carriers, thickening agents, solubilizing agents, dispersants, etc.

In certain embodiments, the diclofenac is in the form of a pharmaceutically acceptable salt or free acid. Examples of pharmaceutically acceptable salts include metal salts, including alkali metal, alkaline earth metal, and nitrogen-based salts such as ammonium salts. Sodium, potassium, epolamine and diethylamine salts are preferred. In one preferred embodiment the diclofenac is diclofenac monosodium salt.

In one nonlimiting embodiment, the topical diclofenac is a solution.

In another nonlimiting embodiment, the topical diclofenac is a gel.

In one nonlimiting embodiment, the topical diclofenac is a solution that comprises or consists essentially of diclofenac and between about 40% and about 85% DMSO by weight of the solution, preferably between about 40% and about 60% DMSO by weight of the solution, more preferably between about 40% and about 50% DMSO by weight of the solution, still more preferably between about 42.5% and about 48.5% DMSO by weight of the solution, and most preferably about 45.5% DMSO by weight of the solution; a polyalcohol, preferably having 3-5 carbon atoms, for the retention of moisture in the skin, which in certain embodiments is glycerol or glycerine; a dispersant for assisting to disperse the components in solution to provide a homogeneous solution when applied to the skin and when penetrating the skin, which in one embodiment is propylene glycol; and water.

In one nonlimiting embodiment, the topical diclofenac is a solution comprising or consisting essentially of 1.5% w/w diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt) and 45.5% w/w dimethyl sulfoxide.

In another nonlimiting embodiment, the topical diclofenac is a solution that comprises or consists essentially of 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation according to PCT/US2007/081674 (International Publication No. WO 2008/049020 A2), the contents of which are incorporated herein in their entirety by this reference. The topical diclofenac may be any of the formulations described or claimed therein. In another nonlimiting embodiment, the topical diclofenac is a gel formulation according to US Patent Application No. 20080300311 (published Dec. 4, 2008), the contents of which are incorporated herein in their entirety by this reference. The topical diclofenac may be any of the formulations described or claimed therein.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising diclofenac (e.g., diclofenac sodium), dimethyl sulfoxide, ethanol, propylene glycol, one or more thickening agents, and water. In one aspect of this embodiment, the topical diclofenac gel formulation further comprises glycerol. In another aspect, the thickening agent is selected from the group consisting of cellulose polymers, carbomer polymers, a carbomer derivative, a cellulose derivative, polyvinyl alcohol, poloxamers, polysaccharides, and mixtures thereof.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of 1-5% w/w diclofenac (preferably diclofenac monosodium); 30-60% w/w dimethyl sulfoxide; 1-50% w/w ethanol; 1-15% w/w propylene glycol; a thickener; and water (added to make

HZNPENN_00000164

11

100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of 10-50,000 centipoise.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of about 2% w/w diclofenac (preferably diclofenac monosodium); about 45.5% w/w dimethyl sulfoxide; about 23-29% w/w ethanol; about 11% w/w propylene glycol; about 0-6% w/w hydroxypropylcellulose (HY119); and water (added to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of 500-5,000 centipoise.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of diclofenac (preferably diclofenac monosodium) at a concentration selected from the group consisting of 1, 1.5, 2 and 3% w/w; dimethyl sulfoxide at a concentration selected from the group consisting of 42, 43, 44, 45, 45.5 46, 47, 48 and 49% w/w and fractions in between; ethanol at 23-29% w/w; propylene glycol at a concentration selected from the group consisting of 9, 10, 11, 12, 13% w/w and fractions in between; hydroxypropylcellulose (HY119) at 0-6% w/w; and water (included in an amount sufficient to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of about 500-5000 centipoise.

In certain embodiments, the above-described topical diclofenac gel formulations include 1-5% glycerol. In such embodiments, the gel formulation will have a drying rate and a transdermal flux that are greater than a comparative liquid topical diclofenac formulation. In other embodiments, the above-described topical diclofenac gel formulations will have a pH of about 6.0 to about 10.0.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising diclofenac (e.g., diclofenac sodium), ethanol, dimethyl sulfoxide, propylene glycol, hydroxypropylcellulose and water. In one aspect of this embodiment, the hydroxypropylcellulose is substituted with alkylcellulose, hydroxyalkylcellulose, carboxyalkylcellulose, or sodium carboxyalklycellulose, where alkyl is methyl, ethyl or propyl, or a mixture thereof.

In another aspect of the present invention, some or all of the user information described herein is provided and pain is reduced in a supporting body structure of a subject, including joints, muscles, tendons, ligaments, cartilage and skin, by topically administering to a subject in need thereof a pharmaceutical composition comprising a therapeutically effective amount of diclofenac in dimethyl sulfoxide, preferably 45.5% w/w dimethyl sulfoxide, or a pharmaceutical composition comprising a therapeutically effective amount of diclofenac in a gel formulation, as described herein, in PCT/US2007/081674, or in US Patent Application No. 20080300311. In another nonlimiting embodiment, pain in the musculoskeletal system of a subject is reduced. In another nonlimiting embodiment, pain in a supporting body structure of a subject and/or in the musculoskeletal system of a subject is reduced.

Various uses of the information provided herein following new clinical and preclinical studies include uses for treatment, or in the manufacture or preparation of formulations, compositions, articles of manufacture and kits.

The invention also includes methods employing topical diclofenac, kits and articles of manufacture useful for pain relief or prevention in the treatment of a subject, including in the treatment of a subject following an invasive medical procedure or surgery. including an orthopedic procedure or surgery, or a subject predisposed to or otherwise at risk for pain, wherein said methods, kits and articles of manufacture comprise some or all of the user information described herein. The topical diclofenac described herein is administered to a site of

12

pain (acute or chronic, for example) and/or proximally thereto (including, for example, areas of reflected or secondary pain). Thus, for example, some or all of the user information described herein is provided and the topical diclofenac is administered to the skin at a site of pain and/or to skin locations proximal thereto in a supporting body structure of a subject, including joints, muscles, tendons, ligaments, cartilage and skin (including any one or more of these, together, or in any combination), and/or in the musculoskeletal system, by topical administration as provided herein, whereby pain is reduced.

In one aspect, the present invention is directed to a method for reducing pain in a supporting body structure of a subject, comprising topically administering to said subject in need thereof a pharmaceutical composition comprising a therapeutically effective amount of a transdermal diclofenac solution or gel formulation comprising DMSO, whereby pain is reduced, and providing to a user some or all of the clinical and preclinical information described herein. According to one nonlimiting embodiment, the supporting body structure is a joint. According to another nonlimiting embodiment, the supporting body structure is selected from the group consisting of muscles, bones, tendons, ligaments and cartilage. These methods are suitable for treating a subject suffering from arthritis. Conditions which may be treated include osteoarthritis, rheumatoid arthritis, and anklyosing spondylitis.

In a further nonlimiting embodiment this method is suitable for treating a subject suffering from acute pain. Suitable pain conditions for treatment by this method include back pain, knee pain, hip pain, shoulder pain, ankle or leg pain, hand pain or finger pain, in which a user is also provided with some or all of the clinical and preclinical information described herein. In an alternate nonlimiting embodiment, the subject is suffering from chronic pain, which may include back pain, knee pain, hip pain, shoulder pain, ankle or leg pain, hand pain or finger pain. In another nonlimiting embodiment, the subject is suffering from postoperative pain.

In another aspect, the present invention is directed to a method for applying multiple topical agents to an subject with pain comprising topically administering a pharmaceutical composition comprising a therapeutically effective amount of a topical diclofenac comprising diclofenac in DMSO, waiting for the treated area to dry (the time for which can be dependent on individual skin characteristics, environmental conditions such as temperature and humidity, and surface area, being often about 5-30 minutes, or about 5-20 minutes, for example, or typically about 10 minutes or less for a topical diclofenac preparation, including a topical diclofenac solution as described in the Examples), and applying another topical agent(s). In one nonlimiting embodiment, the subject has osteoarthritis. In another nonlimiting embodiment, the subject has osteoarthritis of the knee. In one embodiment, the topical agent administered after the topical diclofenac is a sunscreen or an insect repellant.

In another nonlimiting embodiment, the invention includes a method of protecting a subject with osteoarthritis from UV exposure and alleviating the signs and symptoms of osteoarthritis in the subject comprising the steps of applying a therapeutically effective amount of a transdermal diclofenac solution or gel formulation comprising diclofenac in DMSO; waiting for the treated area to dry (the time for which can be dependent on individual skin characteristics. environmental conditions such as temperature and humidity, and surface area, being often about 5-30 minutes, or about 5-20 minutes, for example, or typically about 10 minutes or less for a topical diclofenac preparation, including a topical diclofenac solu-

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000165

13

tion as described in the Examples), and applying sunscreen to all or a portion of the same area of treatment.

In a further aspect, provided is an article of manufacture comprising a topical diclofenac preparation (e.g., a solution or gel formulation for transdermal administration as described herein) and a packaging material, wherein said topical diclofenac preparation comprises a pain relief effective amount of diclofenac in DMSO, wherein said packaging material comprises a label or insert that indicates that said composition may be used for reducing pain in a supporting structure, and wherein a user is also provided with some or all of the clinical and preclinical information described herein.

These and other aspects of the present inventions, which are not limited to or by the information in this Brief Summary, are provided below.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows mean TEWL scores for Retin-A® by Day-ITT.

FIG. 2 shows mean TEWL Scores for PENNSAID® by Day-ITT.

FIG. 3 shows mean plasma concentration-time profile for diclofenac sodium (ng/mL).

FIG. 4 shows mean plasma concentration-time profile for dimethyl sulfoxide (µg/mL).

FIG. 5 shows mean plasma concentration-time profile for diclofenac sodium (ng/mL).

FIG. 6 shows mean plasma concentration-time profile for dimethyl sulfoxide (µg/mL).

FIG. 7 shows mean plasma concentration-time profile for dimethyl sulfone (µg/mL).

DETAILED DESCRIPTION

As used herein, a "disorder" is any disorder, disease, or condition involving pain that would benefit from topical diclofenac.

"Enhancing the safety profile" of topical diclofenac means implementing actions or articles designed or intended to help reduce the incidence of adverse events associated with administration of topical diclofenac, including adverse effects associated with patient-related factors (e.g., age, gender, ethnicity, race, target illness, abnormalities of cardiovascular, gastrointestinal, renal or hepatic function, co-morbid illnesses, characteristics such as pregnancy or environment, including sun exposure) and topical diclofenac-related factors (e.g., dose, plasma level, duration of exposure, or concomitant medication).

"Informing" means referring to or providing, published material, for example, providing published material to a user; or presenting information orally, for example, by presentation at a seminar, conference, or other educational presentation, by conversation between a pharmaceutical sales representative and a medical care worker, or by conversation between a medical care worker and a patient; or demonstrating the intended information to a user for the purpose of comprehension.

A "medical care worker" means a worker in the health care field who may need or utilize information regarding topical diclofenac including a dosage form thereof, including information on safety, efficacy, dosing, administration, or pharmacokinetics. Examples of medical workers include physicians, pharmacists, physician's assistants, nurses, aides, caretakers (which can include family members or guardians), emergency medical workers, and veterinarians.

14

As used herein, "musculoskeletal system" (also known as the locomotor system) refers to the organ system that gives animals the ability to physically move using the muscles and the skeletal system. The musculoskeletal system includes the skeleton, made by bones attached to other bones with joints and ligaments, and skeletal muscle attached to the skeleton by tendons. Particularly useful applications of the present invention include the prevention or treatment of musculoskeletal pain, including pain that affects the joints, muscles, ligaments and tendons, along with bones.

As used herein, "pain" includes acute pain and chronic pain.

A "patient" means a subject in need of medical treatment. Medical treatment can include treatment of an existing condition, such as a disease or disorder, prophylactic or preventative treatment. In some embodiments the patient is a human patient.

A "pharmaceutical supplier" means a person (other than a medical care worker), business, charitable organization, governmental organization, or other entity involved in the transfer of topical diclofenac, including a dosage form thereof, between entities, for profit or not. Examples of pharmaceutical suppliers include pharmaceutical distributors, pharmacy chains, pharmacies (online or physical), hospitals, HMOs, supermarkets, the Veterans Administration, or foreign businesses or individuals importing topical diclofenac into the United States.

As used herein, "preventing" or "prevention" means preventing in whole or in part, or ameliorating, reducing or controlling.

A "product" or "pharmaceutical product" means a dosage form of topical diclofenac plus published material and optionally packaging.

"Providing" means giving, administering, selling, distributing, transferring (for profit or not), manufacturing, compounding, or dispensing.

"Published material" means a medium providing information, including printed, audio, visual, or electronic medium, for example a flyer, an advertisement, a product insert, printed labeling, an internet web site, an internet web page, an internet pop-up window, a radio or television broadcast, a compact disk, a DVD, a podcast, an audio recording, or other recording or electronic medium.

"Safety" means the incidence or severity of adverse events associated with administration of topical diclofenac, including adverse effects associated with patient-related factors, including as noted above, and topical diclofenac-related factors, including as noted above.

As used herein, "subject" refers to any mammal, including humans, domestic and farm animals, and zoo, sports, or pet animals, such as dogs, horses, cats, sheep, pigs, cows, etc. Non-limiting preferred mammals are a human, including adults, children, and the elderly. Non-limiting preferred sports animals are horses and dogs. Non-limiting preferred pet animals are dogs and cats.

As used herein, "supporting body structure of a subject" refers to skeletal elements, joints, muscles, tendons, ligaments, cartilage, and skin of that subject. Particularly useful applications of the present invention include the prevention or treatment of pain in and around joints, including shoulders, hips, knees, elbows, hands and fingers. Other particularly useful applications of the present invention include the prevention or treatment of pain in the knee, including pain resulting from osteoarthritis of the knee. Each of these may be treated separately, as may each of joints, muscles, tendons, ligaments, cartilage, and skin be the subject of separate treatment for pain.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000166

APPX168

15

As used herein, a "therapeutically effective amount" or "effective amount" in reference to the compounds or compositions of the instant invention refers to an amount sufficient to induce a desired biological, pharmaceutical, or therapeutic result. That result can be alleviation of the signs, symptoms, or causes of a disease or disorder or condition, or any other desired alteration of a biological system. In the present invention, the result will involve preventing pain.

The term "topical", as used herein, means the epicutaneous application of an agent to the skin.

Topical diclofenac solutions include any of the diclofenac solutions described or claimed herein (or described or claimed in U.S. Pat. Nos. 4,575,515 or 4,652,557), which are useful for the transdermal administration of diclofenac to a subject, including, for example, a formulation containing 1.5% w/w/diclofenac sodium (2-[(2,6-dichlorophenyl) amino]benzeneacetic acid, monosodium salt) and 45.5% w/w DMSO, and a formulation containing 1.5% w/w/diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% w/w DMSO ethanol, propylene glycol, glycerine, and water.

Topical diclofenac gel formulations include any one or more of the diclofenac gel formulations described or claimed herein (or described or claimed in PCT/US2007/081674 or US Patent Application No. 20080300311), which are useful for the transdermal administration of diclofenac to a subject.

The term "transdermal", as used herein, means the delivery of an agent into and/or through the skin for therapy.

The terms "treating" and "treatment" mean implementation of therapy with the intention of reducing the severity or frequency of symptoms. As used herein, the terms "treating" and "treatment" refer to both therapeutic treatment and prophylactic or preventative measures.

A "user" means a patient, a medical care worker, or a pharmaceutical supplier.

Disclosed herein are methods of using topical diclofenac formulations, articles of manufacture incorporating topical diclofenac formulations, and kits. Specifically disclosed are methods of using topical diclofenac and informing users of certain preclinical and/or clinical information.

In one nonlimiting embodiment, a method is provided in which a subject is treated for a disorder with a transdermally delivered therapeutically effective amount of topical diclofenac and a user is provided with some or all of the user information described herein. In another nonlimiting embodiment, a method is provided in which a supporting body structure or the musculoskeletal system of a subject is treated for a disorder with topical diclofenac and a user is provided with some or all of the user information described herein. In another nonlimiting embodiment, the supporting body structure is selected from joints, muscles, tendons, ligaments, cartilage and skin, and includes treatment of pain in and around joints, including shoulders, hips, knees, elbows, hands and fingers, as well as the back, particularly the lower back. In one nonlimiting embodiment the pain is acute pain. In one nonlimiting embodiment the pain is chronic pain. In one nonlimiting embodiment the pain is treated. In another nonlimiting embodiment the pain is prevented. In one preferred nonlimiting embodiment, the pain results from osteoarthritis of the knee. Preferably, the subject is a human subject.

In one nonlimiting embodiment, information provided to the user consists of, consists essentially of, or comprises

1. A clinical profile for topical diclofenac including, for example
   a. the effects of particular QID dosing of diclofenac;
   b. the effects of QID dosing in one or more clinical trials;

16

c. the results from a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee;
d. the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; and
e. results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed;

2. An adverse event profile for topical diclofenac, including, for example
   a. that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone;
   b. that the addition of topical diclofenac to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients;
   c. the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; and,
   d. the results of a clinical study showing that no eye lens abnormalities were observed with DMSO-vehicle or topical diclofenac solution treatment;

3. An adverse event profile for said topical diclofenac solution, including, for example,
   a. that administration of topical diclofenac results in less frequent adverse events associated with the NSAID class than oral diclofenac alone; and,
   b. the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone;

4. A preclinical study profile for topical diclofenac, including, for example,
   a. the effect of the use of topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated application of topical diclofenac solution did not increase systemic environmental toxin exposure; and,
   b. the effects of use of other topical products in conjunction with topical diclofenac, including, for example, that concomitant use of other topical solution by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

This information, which relates to a topical diclofenac containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl) amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, is sometimes referred to herein as the "Information."

In one nonlimiting embodiment, a user is provided with the Information, or with some or all of the Information, or with some or all of the topical diclofenac clinical and preclinical information described herein and in the Examples, for purposes of enhancing the safety profile of topical diclofenac and/or enhancing its application to or by a subject in need thereof.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000167

In one nonlimiting embodiment, information provided to the user comprises information regarding the clinical effects of dosing a topical diclofenac containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, including, for example, (1) the effects of particular QID dosing of diclofenac; (2) the effects of QID dosing in one or more clinical trials including the results from a 12-week, double-blind, double-dummy, randomized controlled trial of topical diclofenac in a vehicle solution containing dimethyl sulfoxide in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee; (3) the effect of treating osteoarthritis of the knee in one or more clinical trials, including the effect of treating one knee when both knees are affected with osteoarthritis; and/or (4) results of a human volunteer study on trans-epidermal water loss in which no alteration in skin barrier function was observed.

In another nonlimiting embodiment, information provided comprises information regarding the adverse event profile of a topical diclofenac containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, including, for example (1) that administration of topical diclofenac does not increase the incidence of systemic adverse events over use of oral diclofenac alone; (2) that the addition of topical diclofenac to oral diclofenac does not increase the incidence of systemic adverse events in osteoarthritis patients; (3) the results of a clinical study demonstrating that the addition of topical diclofenac to oral diclofenac did not increase the incidence of systemic adverse events in osteoarthritis patients; and/or (4) the results of a clinical study showing that no eye lens abnormalities were observed with DMSO-vehicle or topical diclofenac solution treatment.

In yet another nonlimiting embodiment, information provided comprises information regarding preclinical study results with a topical diclofenac containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, including, for example, (1) the effect of the use of the topical diclofenac on absorption of environmental toxins, including, for example, the results of a study showing that repeated application of the topical diclofenac did not increase systemic environmental toxin exposure; and, (2) the effects of use of other topical products in conjunction with the topical diclofenac, including, for example, that concomitant use of diclofenac topical solution by repeated application with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens) did not enhance the systemic absorption of these products.

In still another nonlimiting embodiment, information provided comprises information regarding the clinical effects of topical diclofenac dosing, information regarding the adverse event profile of topical diclofenac, and/or information regarding preclinical study results with topical diclofenac, as described herein, wherein the topical diclofenac contains 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

In one nonlimiting embodiment, the diclofenac is in the form of a topical diclofenac solution formulation. In another nonlimiting embodiment, the diclofenac is in the form of a topical diclofenac gel formulation.

Diclofenac sodium is a benzene-acetic acid derivative that is a nonsteroidal anti-inflammatory drug, designated chemically as 2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt, and may be prepared by means known in the art. See, for example, U.S. Pat. No. 4,575,515.

Following synthesis a topical diclofenac solution may be formulated by methods known in the art as 1.5% w/w diclofenac sodium in DMSO (45.5% w/w). It is a clear, colorless to faintly pink-orange solution for topical application. Each 1 mL of solution may contain 16.05 mg of diclofenac sodium. In addition, the topical diclofenac solution will preferably contain the following inactive ingredients: propylene glycol, alcohol, glycerin and purified water.

In this disclosure, examples relating to new preclinical and clinical discoveries regarding topical diclofenac are provided.

While topical non-steroidal anti-inflammatory drugs are considered safe, their long-term efficacy for osteoarthritis has been suspect. Example 1 describes the results of a 12-week, double-blind, double-dummy, randomized controlled trial of a topical diclofenac solution containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water was conducted in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee. This 5-arm study compared the topical diclofenac solution with a placebo solution, DMSO vehicle, oral diclofenac and a combination of the topical diclofenac solution+oral diclofenac for relieving the signs and symptoms of knee osteoarthritis. Subjects applied study solution, 40 drops QID (four times daily), and took one study tablet daily for 12 weeks. Co-primary efficacy variables were Western Ontario McMaster Universities Osteoarthritis Index ("WOMAC") pain and physical function scores and a patient overall health assessment. Secondary variables were WOMAC stiffness and patient global assessment ("PGA") of the knee osteoarthritis. The topical diclofenac solution was superior to placebo for pain (−6.0 vs.−4.7, P=0.015), physical function (−15.8 vs.−12.3, P=0.034), overall health (−0.95 vs.−0.37, P<0.0001), and PGA (−1.36 vs.−1.01, P=0.016), and was superior to DMSO vehicle for all efficacy variables. The most common adverse event was dry skin (18.2%). Surprisingly, no significant difference was observed between DMSO vehicle and placebo or between the topical diclofenac solution and oral diclofenac, yet fewer digestive system and laboratory abnormalities were observed with topical diclofenac than oral diclofenac. Further, addition of the topical diclofenac solution to oral diclofenac did not increase the incidence of systemic adverse events. Additionally, administration of topical diclofenac resulted in less frequent adverse events associated with the NSAID class than oral diclofenac alone, and the addition of topical diclofenac to oral diclofenac did not cause an elevation of liver transaminases in osteoarthritis patients over use of oral diclofenac alone. Users may be apprised of the above information according to the invention. A further unexpected discovery of the study, the results for which are provided as Example 1, is that in the study the topical diclofenac solution was applied to only one knee. Most patients suffer from osteoarthritis equally in both knees, yet single knee application yielded a clinical benefit in both knees. Users or prescribers may be further apprised of this additional information according to the invention.

Topical diclofenac in a DMSO vehicle is an effective treatment option for osteoarthritis of the knee with efficacy similar to, but tolerability better than, oral diclofenac. DMSO vehicle was no more efficacious than placebo. According to the invention, users may be apprised of this information with regard to

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000168

use of topical diclofenac, particularly with regard to the use of a topical diclofenac solution comprising 1.5% w/w diclofenac sodium and 45.5% w/w DMSO, which also optionally contains propylene glycol, alcohol, glycerin and purified water as inactive ingredients.

Examples 2 and 3 describe the results of environmental toxin studies. Surprisingly in light of the efficacy of DMSO in facilitating the skin penetration of diclofenac, these studies show that concomitant, repeated use of a topical diclofenac solution containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water, with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens), did not enhance the systemic absorption of these products. According to the invention, users may be apprised of this information with regard to use of topical diclofenac, particularly with regard to the use of a topical diclofenac solution containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

Example 4 describes the results of a transepidermal water loss ("TEWL") study performed on human volunteers' skin. TEWL is a parameter useful for measuring changes to stratum corneum barrier function. Unexpectedly given the role of DMSO in permeabilizing the skin for diclofenac uptake, the results show no alteration in skin barrier function following chronic use of topical diclofenac. According to the invention, users may be apprised of this information with regard to use of topical diclofenac, particularly with regard to the use of a topical diclofenac solution comprising 1.5% w/w diclofenac sodium and 45.5% w/w DMSO, which also optionally contains propylene glycol, alcohol, glycerin and purified water as inactive ingredients. Users may also be informed that, before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same skin surface, for example, a knee, that has been treated with topical diclofenac, the user should wait until the treated area is dry, which occurs most often within 10 minutes.

Example 5 describes the results of a study to evaluate the ophthalmologic effects of topically applied DMSO in a 52-week non-occluded dermal toxicity study in Göttingen minipigs. It provides information about the ocular safety profile of dermally applied formulations containing purified DMSO. Results showed that there was no increased risk for development of lens opacities or changes in refractive indices associated with DMSO. In fact no test article-related ophthalmoscopic abnormalities were detected during the study.

Example 6 describes the results of a study to evaluate the toxicity of test articles containing 9, 45.5, and 90% w/w DMSO after dermal administration for 26 weeks, three times per day, and to evaluate reversibility of any observed changes following a 12-week postdose observation period in male and female Sprague-Dawley rats. No test article-related ophthalmological abnormalities were detected in any animal during the pretest, terminal, and recovery ophthalmoscopic examinations.

Examples 7 and 8 describe studies to evaluate the pharmacokinetics of diclofenac sodium, dimethyl sulfoxide (DMSO) and dimethyl sulfone (the major metabolite of DMSO) after a single- and multiple-dose applications of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water. These data provide compelling evidence that the

systemic exposure to diclofenac caused by use of the topical diclofenac to treat osteoarthritis of the knee (40 drops per knee QID) is much lower than that caused by a typical oral dose of diclofenac used in treatment of osteoarthritis (e.g., 50 mg three times per day or "TID"). The fact that the topical diclofenac can be shown to be comparable to oral diclofenac sodium for treatment of osteoarthritis (see Example 1) is very surprising in view of these facts, especially as it is widely believed that NSAIDs, such as diclofenac, exert their analgesic effects both locally and centrally. From the data in Example 8 it also can be computed that $C_{max}$ of orally administered diclofenac is more than one hundred fold higher than $C_{max}$ for the topical diclofenac.

In one nonlimiting embodiment, the user is provided with information in the form of (or substantially in the form of) the Attachment. In another nonlimiting embodiment, the information in the Attachment is provided in a form that has been modified where appropriate to refer to the subject product as a topical diclofenac gel or other formulation rather than a topical solution. In another nonlimiting embodiment, the user is provided with information comprising or consisting essentially of in the Attachment. In another nonlimiting embodiment, the user is provided with information consisting essentially of the Attachment.

Many embodiments are suitable for treatment of subjects either as a preventive measure (e.g., to avoid pain) or as a therapeutic composition to treat subjects who are suffering from acute or chronic pain. In one nonlimiting embodiment, for example, a method of treatment or prevention of pain, including pain associated with an arthritic condition, and related kits and articles of manufacture, comprises using a topical diclofenac solution or topical gel formulation described herein together with some or all of the clinical and/or preclinical information described herein. Arthritic conditions include the various forms of arthritis, including rheumatoid arthritis, osteoarthritis, and ankylosing spondylitis.

Disclosed herein are topical diclofenac formulations, kits, and methods of using topical diclofenac and topical diclofenac formulations. Specifically disclosed are methods of using topical diclofenac and informing the user of certain information as provided herein. With the knowledge of the particular information, the administration of topical diclofenac to the patient can be optimized to provide safer and more effective use of topical diclofenac, alone or together with oral diclofenac. As used herein, topical diclofenac formulations include topical diclofenac solutions and topical diclofenac gel formulations, including a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

Topical diclofenac therapy can be considered optimal when combined with the new clinical, preclinical, adverse event information provided and described herein. Disclosed herein are methods of using topical diclofenac for transdermal administration, which may provide an increase in the safety or efficacy of topical diclofenac treatment. Extensive research has been performed on administering topical diclofenac that now reveal several developments relating to improvements in safe and effective treatment using topical diclofenac. In certain preferred embodiments, the topical diclofenac for transdermal administration is in the form of a solution or a gel.

In one nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 1, or a summary thereof.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000169

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Examples 2 and/or 3, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 4, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 5, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Example 6, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in Examples 7 and/or 8, or a summary thereof.

In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in two or more or all of Examples 1-6. In another nonlimiting embodiment, such nonlimiting information provided to a user includes the information described in two or more or all of Examples 1-8.

In yet another nonlimiting embodiment, such nonlimiting information provided to a user is the information in the Attachment.

In one embodiment, such nonlimiting information provided to a user is or comprises the information in one or more or all of Sections 5.9 ("Ophthamologic Effects"), 6 ("Adverse Reactions"), 7.8 ("Oral Nonsteroidal Anti-inflammatory Drugs"), 7.9 ("Topical Treatments"), 12.3 ("Pharmacokinetics") and 14 ("Clinical Studies") of the Attachment.

Topical diclofenac can be formulated for administration where the formulation generally contains DMSO and one or more pharmaceutically acceptable excipients. As used herein, "pharmaceutically acceptable excipient" means any other component added to the pharmaceutical formulation other than the diclofenac and the DMSO. Excipients may be added to facilitate manufacture, enhance stability, control release, enhance product characteristics, enhance bioavailability, enhance patient acceptability, etc. Pharmaceutical excipients include, for example, carriers, fillers, binders, disintegrants, lubricants, glidants, colors, preservatives, suspending agents, dispersing agents, film formers, buffer agents, pH adjusters, preservatives etc.

In certain embodiments, the diclofenac is in the form of a pharmaceutically acceptable salt or free acid. Examples of pharmaceutically acceptable salts include metal salts, including alkali metal, alkaline earth metal, and nitrogen-based salts, such as ammonium salts. Sodium, potassium, epolamine and diethylamine salts are preferred. In one preferred embodiment the diclofenac is diclofenac monosodium salt.

In one nonlimiting embodiment, the topical diclofenac is a solution.

In another nonlimiting embodiment, the topical diclofenac is a gel.

In one embodiment, the topical diclofenac is 1.5% w/w diclofenac sodium in a vehicle solution containing DMSO 45.5% w/w and other excipients. In one aspect of this embodiment, the other excipients comprise propylene glycol, alcohol, glycerin and purified water.

In one nonlimiting embodiment, the topical diclofenac is a gel formulation according to PCT/US2007/081674 (International Publication No. WO 2008/049020 A2), the contents of which are incorporated herein in their entirety by this reference. The topical diclofenac may be any of the gel formulations described or claimed therein. In another nonlimiting embodiment, the topical diclofenac is a gel formulation according to US Patent Application No. 20080300311 (pub-

lished Dec. 4, 2008), the contents of which are incorporated herein in their entirety by this reference. The topical diclofenac may be any of the gel formulations described or claimed therein.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising diclofenac sodium, dimethyl sulfoxide, ethanol, propylene glycol, one or more thickening agents, and water. In one aspect of this embodiment, the topical diclofenac gel formulation further comprises glycerol. In another aspect, the thickening agent is selected from the group consisting of cellulose polymers, carbomer polymers, a carbomer derivative, a cellulose derivative, polyvinyl alcohol, poloxamers, polysaccharides, and mixtures thereof.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of 1-5% w/w diclofenac sodium; 30-60% w/w dimethyl sulfoxide; 1-50% w/w ethanol; 1-15% w/w propylene glycol; a thickener; and water (added to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of 10-50,000 centipoise.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of about 2% w/w diclofenac sodium; about 45.5% w/w dimethyl sulfoxide; about 23-29% w/w ethanol; about 11% w/w propylene glycol; about 0-6% w/w hydroxypropylcellulose (HY119); and water (added to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of 500-5,000 centipoise.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising or consisting essentially of diclofenac sodium at a concentration selected from the group consisting of 1, 1.5, 2 and 3% w/w; dimethyl sulfoxide at a concentration selected from the group consisting of 42, 43, 44, 45, 45.5 46, 47, 48 and 49% w/w and fractions in between; ethanol at 23-29% w/w; propylene glycol at a concentration selected from the group consisting of 9, 10, 11, 12, 13% w/w and fractions in between; hydroxypropylcellulose (HY119) at 0-6% w/w; and water (included in an amount sufficient to make 100% w/w). In a preferred aspect of this embodiment, the gel formulation has a viscosity of about 500-5000 centipoise.

In certain embodiments, the above-described topical diclofenac gel formulations include 1-5% glycerol. In such embodiments, the gel formulation will have a drying rate and a transdermal flux that are greater than a comparative liquid topical diclofenac formulation. In other embodiments, the above-described topical diclofenac gel formulations will have a pH of about 6.0 to about 10.0.

In another nonlimiting embodiment, the topical diclofenac is a gel formulation comprising diclofenac sodium, ethanol, DMSO, propylene glycol, hydroxypropylcellulose and water. In one aspect of this embodiment, the hydroxypropylcellulose is substituted with alklycellulose, hydroxyalkylcellulose, carboxyalkylcellulose, or sodium carboxyalkylcellulose, where alkyl is methyl, ethyl or propyl, or a mixture thereof. In a further aspect of this embodiment, the said alklycellulose, hydroxyalkylcellulose, carboxyalkylcellulose, or sodium carboxyalkylcellulose is replaced in whole or in part by an acrylic polymer (for example, Carbopol polymers, Noveon polycarbophils and Pemulen polymeric emulsifiers available commercially from Noveon Inc. of Cleveland, Ohio), an acrylic polymer derivative, a cellulose polymer derivative, polyvinyl alcohol ("PVA"), polyvinylpyrrolidone ("PVP"), a poloxamer, a polysaccharide, or a mixture thereof.

In another aspect, gel formulations useful in the invention are NSAID gel formulations, such as a topical diclofenac gel formulation, and components of the formulations are as fol-

HZNPENN_00000170

lows: The gel formulations comprise an active agent, preferably a non-steroidal anti-inflammatory drug or pharmaceutically acceptable salts thereof. More preferably, the non-steroidal anti-inflammatory is diclofenac in the form of a pharmaceutically acceptable salt or free acid. Examples of pharmaceutically acceptable salts include metal salts, including alkali metal, alkaline earth metal, and nitrogen-based salts, such as ammonium salts. Sodium, potassium, epolamine and diethylamine salts are preferred. In one preferred embodiment the diclofenac is diclofenac monosodium salt.

In a preferred embodiment, the sodium salt of diclofenac is used. Diclofenac may be present in a range of approximately 0.1% to 10%, such as 1, 2, 3, 4, or 5% w/w. In another embodiment, the present invention includes a penetration enhancer. The penetration enhancer may be dimethyl sulfoxide ("DMSO") or derivatives thereof. The DMSO may be present in an amount by weight of 1% to 70%, and more preferably, between 25% and 60%, such as 25, 30, 40, 45, 50, 55, or 60% w/w. Preferably, DMSO is used in the present invention at a concentration of about 40 to about 50% w/w, such as 41, 42, 43, 44, 45, 46, 47, 48, 49 and 50% and all fractions in between such as 44, 44.5, 45, 45.5, 46, 46.5%, and the like. In certain embodiments, the gel formulation includes a lower alkanol, such as methanol, ethanol, propanol, butanol or mixtures thereof. In certain embodiments, the alkanol is present at about 1 to about 50% w/w. Preferably, ethanol is used at about 1-50% w/w, such as 1, 5, 10, 15, 20, 25, 30, 35, 40, 45, or 50% w/w, and all fractions in between. In certain embodiments, the gel formulation includes a polyhydric alcohol, such as a glycol. Suitable glycols include ethylene glycol, propylene glycol, butylene glycol, dipropylene glycol, hexanetriol and a combination thereof. Preferably, propylene glycol is used at about at 1-15% w/w, such as 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15% w/w, and all fractions in between. In certain embodiments, the gel formulation includes glycerol (also referred to as glycerine) at a concentration of 0-12% w/w. Preferably, glycerol is used at 0-4% w/w, such as 0, 1, 2, 3, or 4% w/w, and all fractions in between. In some embodiments, no glycerol is used in the formulation. In a preferred embodiment, the gel formulation provides comprises a diclofenac solution and at least one thickening agent to make a gel. The at least one thickening agent of the present invention may be an acrylic polymer (for example, Carbopol polymers, Noveon polycarbophils and Pemulen polymeric emulsifiers available commercially from Noveon Inc. of Cleveland, Ohio), an acrylic polymer derivative, a cellulose polymer, a cellulose polymer derivative, polyvinyl alcohol, poloxamers, polysaccharides or mixtures thereof. Preferably the at least one thickening agent is hydroxypropylcellulose (HPC) used such that the end viscosity is between 10 and 50000 centipoise (cps). More preferably the end viscosity is between 500 and 20000 cps. The gel formulation may optionally include at least one antioxidant and/or one chelating agent. Preferred antioxidants may be selected from the group consisting of butylated hydroxytoluene (BHT), butylated hydroxyanisole (BHA), ascorbyl linoleate, ascorbyl dipalmitate, ascorbyl tocopherol maleate, calcium ascorbate, carotenoids, kojic acid, thioglycolic acid, tocopherol, tocopherol acetate, tocophereth-5, tocophereth-12, tocophereth-18, tocophereth-80, and mixtures thereof. Preferred chelating agents may be selected from the group consisting of ethylenediamine tetraacetic acid (EDTA), diammonium EDTA, dipotassium EDTA, calcium disodium EDTA, HEDTA, TEA-EDTA, tetrasodium EDTA, tripotassium EDTA, trisodium phosphate, diammonium citrate, galactaric acid, galacturonic acid, gluconic acid, glucuronic acid, humic acid, cyclodextrin, potassium citrate, potassium

ethylenediaminetetramethylenephosphonic acid ("EDTMP"), sodium citrate, sodium EDTMP, and mixtures thereof. In addition, the topical gel formulations can also comprise a pH adjusting agent. In one particular embodiment, the pH adjusting agent is a base. Suitable pH adjusting bases include bicarbonates, carbonates, and hydroxides such as alkali or alkaline earth metal hydroxide as well as transition metal hydroxides. Alternatively, the pH adjusting agent can also be an acid, an acid salt, or mixtures thereof. Further, the pH adjusting agent can also be a buffer. Suitable buffers include citrate/citric acid buffers, acetate/acetic acid buffers, phosphate/phosphoric acid buffers, formate/formic acid buffers, propionate/propionic acid buffers, lactate/lactic acid buffers, carbonate/carbonic acid buffers, ammonium/ammonia buffers, and the like. The pH adjusting agent is present in an amount sufficient to adjust the pH of the composition to between about pH 4.0 to about 10.0, more preferably about pH 7.0 to about 9.5. In certain embodiments, the unadjusted pH of the admixed components is between 8 and 10, such as 9, without the need for the addition of any pH adjusting agents.

The present invention includes a method for applying multiple topical agents to a subject with pain comprising topically administering a pharmaceutical composition comprising a therapeutically effective amount of a topical diclofenac in DMSO, waiting for the treated area to dry (the time of which can be dependent on individual skin characteristics, environmental conditions such as temperature and humidity, and surface area, often about 5-30 minutes, about 5-20 minutes, for example, and typically about 10 minutes or less for a topical diclofenac preparation, including a topical diclofenac solution as described in the Examples), and applying another topical agents. In one nonlimiting embodiment, the subject has osteoarthritis. In another nonlimiting embodiment, the subject has osteoarthritis of the knee. In one embodiment, the topical agent administered after the topical diclofenac is a sunscreen or an insect repellant. In another nonlimiting embodiment, the invention includes a method of protecting a subject with osteoarthritis from UV exposure and alleviating the signs and symptoms of osteoarthritis in the subject comprising the steps of applying a therapeutically effective amount of a topical diclofenac in DMSO; waiting for the treated area to dry (the time of which can be dependent on individual skin characteristics, environmental conditions such as temperature and humidity, and surface area, often about 5-30 minutes, about 5-20 minutes, for example, and typically about 10 minutes or less for a topical diclofenac preparation, including a topical diclofenac solution as described in the Examples), applying sunscreen to the same area of treatment.

Also included herein are pharmaceutical products (kits) useful, for example, for the treatment or prevention of pain, including pain caused by arthritis, such as osteoarthritis, for example, which comprise one or more containers containing a topical diclofenac formulation and information or published material, e.g., as product inserts or product labels. The information can indicate quantities of the components to be administered, guidelines for administration, safety issues, and the like, all as disclosed and provided herein.

The kits may further comprise one or more conventional pharmaceutical kit components, such as, for example, one or more containers to aid in facilitating compliance with a particular dosage regimen, etc. Exemplary kits can be in the form of a package and packaging are known in the art or easily ascertained by one of ordinary skill in the art.

In one nonlimiting embodiment, the topical diclofenac formulation is packaged with information informing the user

HZNPENN_00000171

that the topical diclofenac solution will not cause an uptake of one or more environmental toxins. In another nonlimiting embodiment, the topical diclofenac formulation is packaged with information that includes reference to a lack of anticipated or expected adverse events or adverse reactions in patients from exposure to one or more environmental toxins following the acute and/or chronic use of a topical diclofenac solution, for example a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl) amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water.

In one nonlimiting embodiment, a method of manufacturing a topical diclofenac pharmaceutical product comprises packaging a topical diclofenac dosage form with the Information. Additional information can include the information disclosed, summarized or otherwise provided herein, including the information provided in any of Examples 1-4.

In another nonlimiting embodiment, an article of manufacture comprises a container containing a dosage form of topical diclofenac, wherein the container is associated with published material informing the user of some of all of the Information. Additional information can include the information disclosed, summarized or otherwise provided herein, including the information provided in any of Examples 1-4.

In one nonlimiting embodiment of the methods and articles of manufacture provided herein, a topical diclofenac dosage form can comprise about 40 drops per knee, QID. In one aspect of this embodiment, a diclofenac oral dosage form may also be provided or recommended or included within the methods and articles of manufacture provided herein. In another nonlimiting embodiment of the methods and articles of manufacture provided herein, a topical diclofenac dosage form can comprise application of a topical diclofenac gel formulation twice daily.

The following examples further illustrate the invention but, of course, are not to be construed as in any way limiting its scope.

## EXAMPLES

### Example 1

#### 12-Week, Double-Blind, Double-Dummy, Randomized Controlled Trial of Topical Diclofenac Solution

This Example describes novel clinical information that may, for example, be provided to a user according to the present invention, comprising safety and efficacy results from a 12-week, double-blind, double-dummy, randomized controlled trial of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino] benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") in 775 subjects with radiologically confirmed, symptomatic primary osteoarthritis of the knee. The study included a placebo arm to establish efficacy, a DMSO vehicle arm to address possible DMSO efficacy, an oral diclofenac arm for comparison with the topical diclofenac solution, and a combination of Topical Diclofenac Solution plus oral diclofenac to assess combined treatment.

Study Subjects: This randomized, double-blind, double-dummy, placebo-, vehicle- and active-controlled study was conducted at 40 outpatient centers in Canada and 21 centers in the United States following approval by the appropriate institutional review boards. Eligible subjects, after written informed consent, included men and non-pregnant women aged 40-85 with primary OA of the knee based on (i) standard radiological criteria for OA (Altman, R. D., et al., Atlas of individual radiographic features in osteoarthritis. *Osteoarthritis Cartilage* 1995; 3 (Suppl A):3-70) on a recent (within 3 months) examination, (ii) pain, with regular use of an NSAID or other analgesic medication (at least 3 days a week for the previous month) and (iii) a flare of pain and minimum Likert pain score of 8 (40 on a scale normalized to 0-100; see below, *Efficacy Measures*) at baseline, following washout of that medication. A flare was defined as an increase in total Likert pain score of 25% and at least 2, and a score of at least moderate on one or more of the five items/questions of the WOMAC LK3.1 pain subscale (Bellamy, N, et al., Validation study of WOMAC: a health status instrument for measuring clinically important patient relevant outcomes to antirheumatic drug therapy in patients with osteoarthritis of the hip or knee. *J. Rheumatol.* 1988 December; 15(12):1833-40). All knee films were reviewed by a single radiologist and each compartment was scored (none=1, mild=2, moderate=3, severe=4). Only one knee was treated; where both knees met all entry criteria, the more painful knee (or dominant knee if they scored the same) was selected. Standard exclusion criteria were employed, as described in Roth S H, Shainhouse J Z. Efficacy and safety of a topical diclofenac solution (Pennsaid®) in the treatment of primary osteoarthritis of the knee: a randomized, double-blind, vehicle-controlled clinical trial. *Arch Intern Med.* 2004; 164:2017-23.

Study Design: Eligible subjects were stratified by the investigator at baseline into stratum 1 (no pain and normal radiological examination in the non-study knee) or stratum 2 (pain and/or abnormal radiological examination in the non-study knee), and then randomized into the trial by receiving the next numbered study kit at that clinic for that stratum. Each study kit contained topical solution and oral tablets for one of the five treatment regimens: (i) Topical Diclofenac Solution [Pennsaid® Topical Solution, Nuvo Research Inc., Mississauga, Canada] plus oral placebo tablets, (ii) 'DMSO vehicle'; vehicle solution plus oral placebo tablets (vehicle solution was the complete carrier, including 45.5% DMSO and other excipients, with no diclofenac), (iii) 'placebo'; placebo solution plus oral placebo tablets (placebo solution was a modified vehicle solution with only 2.3% DMSO, for blinding purposes, and no diclofenac), (iv) 'oral diclofenac'; placebo solution plus oral diclofenac tablets (100 mg slow release), or (v) 'topical diclofenac+oral diclofenac'; Topical Diclofenac Solution plus oral diclofenac tablets. Subjects applied 40 drops of solution (approximately 1.2 mL) around the entire circumference of the study knee, without massage, 4 times daily, and took one study tablet daily for up to 12 weeks.

Concomitant analgesic and anti-inflammatory medications, including over the counter NSAIDs and other analgesics, were prohibited. Continuation of stable treatment with glucosamine, chondroitin, anti-depressants or a proton pump inhibitor (previous 90 days), or low-dose (≤325 mg/day) acetylsalicylic acid (previous 30 days) was permitted. Acetaminophen was provided, and permitted (up to four 325-mg caplets per day) except during the 3 days before each efficacy assessment. Other topical products on the knee, including skin emollients, were prohibited. A patient with a gastrointestinal adverse event was allowed to start a proton pump inhibitor. Compliance with the treatment regimen was assessed by weighing the solution bottles and counting study tablets at each clinic visit.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000172

All study solutions appeared as identical clear, colorless liquids. It was expected that some subjects applying Topical Diclofenac Solution or DMSO vehicle would report a garlic taste or odor from exhaling dimethyl sulfide, a volatile DMSO metabolite; therefore, a token amount of DMSO (2.3%) was included in the placebo solution. Previous trials with topical diclofenac confirmed the success of this blinding procedure as the incidence of 'taste perversion' adverse events was no different with placebo solution from topical diclofenac. Oral diclofenac and placebo tablets appeared identical (Novopharm® Inc.). Each study kit was assembled according to a computer-generated randomization schedule created by an external statistician for each stratum using a block size of 5. The randomization sequence was concealed from investigators, subjects and the sponsor's clinical research personnel until after data lock.

Efficacy Measures: Each subject completed a full efficacy assessment questionnaire after randomization at baseline and at 4, 8 and 12 weeks, or at drop out. The co-primary efficacy variables (Bookman A A, et al., Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial. *CMAJ.* 2004; 171: 333-8) were defined a priori as WOMAC pain and physical function, measured by the 5-point Likert scale (Biswal S, et al., Longterm efficacy of topical nonsteroidal anti-inflammatory drugs in knee osteoarthritis: metaanalysis of randomized placebo controlled clinical trials. *J. Rheumatol.* 2006; 33:1841-4), and patient overall health assessment ("POHA"). The POHA asked the question, "Considering all the ways your osteoarthritic (study) knee and its treatment affect you, including both positive and negative effects, how would you rate your overall state of health in the past 48 hours?" Secondary efficacy variables were WOMAC stiffness, and patient global assessment ("PGA") of knee osteoarthritis. The PGA asked the question, "How has the osteoarthritis in your study joint been over the last 48 hours?" The POHA and PGA were scored on a 5-point Likert scale. There was no assessment of the non-treated knee. Safety Measures: At all visits, vital signs were measured, dermatological evaluation of the study knee was done according to a standard numerical (0-4) scale (Shirley H H, et al. Efficacy and safety of a tropical diclofenac solution (Pennsaid®) in the treatment of primary osteoarthritis of the knee: a randomized, double-blind, vehicle-controlled clinical trial. *Arch. Intern. Med.* 2004; 164:2017-23) and adverse events were solicited using open-ended questions. Adverse events were categorized according to Coding Symbols for Thesaurus of Adverse Reaction Terms ("COSTART"). Blood and urine samples were obtained for routine laboratory analysis at baseline, 4 and 12 weeks. Ocular examination (visual acuity test, slit lamp examination and lens assessment) was conducted at the baseline and final visit.

Statistical Analysis Plan: All planned analyses were specified a priori. Analysis of the Likert efficacy data was by modified intent to treat ("mITT"), excluding only those subjects who had no baseline data or did not administer at least one dose of both study solution and tablets. Statistical tests were two-sided at the 5% level of significance. All efficacy analyses were by analysis of covariance of the change in score from baseline to landmark final assessment, with baseline score as the covariate. Subjects in both randomization strata were combined for all analyses.

The primary efficacy comparison was topical diclofenac vs. placebo for the primary efficacy variables, with no cor-

rection for analysis of multiple primary variables (regulatory design required superiority for each primary variable). The sample size required to show the superiority of topical diclofenac over placebo was 142 subjects per arm, based on an estimate from previous trials of the difference (standard deviation) between groups for the change in score of 1.5 (4.5) for pain, 5.0 (15) for physical function and 0.4 (1.2) for PGA, power of 80% and Type I error rate of $\alpha$=0.05$_{2\text{-tailed}}$ (Baer P A, et al., Treatment of osteoarthritis of the knee with a topical diclofenac solution: a randomised controlled, 6-week trial [ISRCTN53366886]. *BMC Musculoskelet Disord.* 2005; 6:44; Bookman A A, et al., Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial. *CMAJ.* 2004; 171: 333-8; Roth S H, Shainhouse J Z. Efficacy and safety of a Topical Diclofenac Solution (Pennsaid®) in the treatment of primary osteoarthritis of the knee: a randomized, double-blind, vehicle-controlled clinical trial. *Arch Intern Med.* 2004; 164:2017-23).

A post hoc sensitivity analysis of the primary efficacy data was performed by imputing no improvement (i.e., baseline score carried forward and imputed as final score ("BOCF") to non-completers by reason of an adverse event or lack of effect and for subjects excluded from mITT.

Secondary comparisons included topical diclofenac vs. placebo for the secondary variables, and topical diclofenac vs. DMSO vehicle and DMSO vehicle vs. placebo for all variables. A post hoc efficacy analysis compared topical diclofenac vs. oral diclofenac and topical diclofenac+oral diclofenac vs. oral diclofenac. For a missing final score, last observation was carried forward ("LOCF"). Safety analyses were performed on all subjects who received even one dose of either study medication. There was no imputation of missing safety data. Results were as follows.

Study Subjects: Of 1396 subjects screened, 775 were randomized to one of the 5 treatment arms and 527 subjects completed treatment. Over 95% of patients had bilateral disease (pain or abnormal radiological examination also in nonstudy knee) with pain in the contralateral knee in 90%. A total of 88% of subjects met the modified (Hochberg M C, et al., Guidelines for the Medical Management of Osteoarthritis Part II. Osteoarthritis of the Knee. *Arthritis & Rheumatism* 1995; 38(1):1541-1546) American College of Rheumatology (ACR) criteria (Altman R, et al., Development of criteria for the classification and reporting of osteoarthritis: classification of osteoarthritis of the knee. *Arthritis Rheum.* 1986; 29:1039-1049) for osteoarthritis, pain and osteophytes, and the remaining had pain with either joint space narrowing or subchondral sclerosis. Subjects in each treatment arm had similar demographic and baseline characteristics, duration of exposure and compliance (>89% of expected use for topical solution and oral tablets). Withdrawals for lack of effect were similar among treatment groups. Withdrawals for lack of effect were similar among topical diclofenac, placebo and DMSO vehicle arms, but fewer with the oral diclofenac arms.

There were 772 subjects included in the mITT group. Excluded were 3 subjects who did not take at least one dose of both topical and oral medication, or had no data. Individual subjects who omitted baseline assessment for a specific efficacy variable were excluded from that analysis.

Efficacy: The primary efficacy analyses, as shown in the below Table 2 ("Efficacy Variable Scores"), show the superiority of topical diclofenac over placebo for the three co-primary variables—pain (P=0.015), physical function (P=0.034), and POHA (P<0.0001). Superiority was observed also for the secondary variable PGA (P=0.016), but not for stiffness. There was greater improvement with topical

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000173

diclofenac (P<0.05) compared to DMSO vehicle for all five variables (Table 2). A post-hoc BOCF sensitivity analysis of the primary efficacy data of all 775 patients did not change any of the conclusions of superiority of topical diclofenac compared with placebo (pain, P=0.031; physical function, P=0.041; POHA, P=0.0001).

(0.55 [0.82], P=0.41) or topical diclofenac+oral diclofenac (0.46 [0.70]; P=0.10).

Safety: Skin adverse events predominated with topical diclofenac, most being dry skin. The overall incidence of skin adverse events was similar in topical diclofenac+oral diclofenac, and lower in placebo, and oral diclofenac arms.

TABLE 2

| | | | | | | P value | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | TDiclo vs. placebo | TDiclo vs. DMSO | TDiclo vs. ODiclo |
| | TDiclo[b] | placebo[b] | DMSO[b] | ODiclo[b] | TDiclo + ODiclo[b] | | | |
| WOMAC Pain | (n = 154) | (n = 155) | (n = 161) | (n = 151) | (n = 151) | | | |
| Baseline score | 13.2 (3.4) | 12.9 (3.3) | 13.0 (3.2) | 13.2 (3.0) | 13.2 (3.4) | | | |
| Change in score[c] | −6.0 (4.5) | −4.7 (4.4) | −4.7 (4.3) | −6.4 (4.1) | −7.0 (4.8) | 0.015 | 0.009 | 0.429 |
| WOMAC Physical Function | (n = 154) | (n = 153) | (n = 161) | (n = 151) | (n = 150) | | | |
| Baseline score | 41.7 (12.8) | 41.6 (11.7) | 41.4 (11.4) | 42.1 (12.0) | 41.0 (11.2) | | | |
| Change in score[c] | −15.8 (15.1) | −12.3 (14.7) | −12.1 (14.6) | −17.5 (14.3) | −18.7 (14.0) | 0.034 | 0.026 | 0.319 |
| POHA | (n = 154) | (n = 152) | (n = 160) | (n = 150) | (n = 148) | | | |
| Baseline | 2.34 (1.02) | 2.22 (1.03) | 2.30 (1.14) | 2.23 (1.12) | 2.19 (1.04) | | | |
| Change in score[c] | −0.95 (1.30) | −0.37 (1.04) | −0.65 (1.12) | −0.88 (1.31) | −0.95 (1.21) | <0.0001 | 0.016 | 0.956 |
| PGA | (n = 154) | (n = 153) | (n = 161) | (n = 151) | (n = 150) | | | |
| Baseline | 3.12 (0.78) | 3.04 (0.82) | 3.13 (0.74) | 3.04 (0.87) | 3.08 (0.81) | | | |
| Change in score[c] | −1.36 (1.19) | −1.01 (1.18) | −1.07 (1.10) | −1.42 (1.29) | −1.53 (1.27) | 0.016 | 0.018 | 0.439 |
| WOMAC Stiffness | (n = 154) | (n = 153) | (n = 161) | (n = 151) | (n = 150) | | | |
| Baseline | 5.14 (1.63) | 5.01 (1.70) | 5.12 (1.61) | 5.21 (1.72) | 5.07 (1.53) | | | |
| Change in score[c] | −1.93 (2.01) | −1.52 (2.05) | −1.48 (2.07) | −2.07 (2.02) | −2.30 (2.00) | 0.112 | 0.035 | 0.596 |

Abbreviations:

TDiclo, Topical Diclofenac Solution plus oral placebo;

placebo, topical placebo plus oral placebo;

DMSO, topical dimethyl sulfoxide-containing vehicle plus oral placebo;

ODiclo, oral diclofenac plus topical placebo;

TDiclo + ODiclo, Topical Diclofenac Solution plus oral diclofenac;

WOMAC, Western Ontario McMaster Universities LK3.1 Osteoarthritis Index;

POHA, patient overall health assessment;

PGA, patient global assessment of the study knee.

[a]Data are presented as mean (SD). Maximum score for pain, 20; physical function, 68; POHA and PGA, 4; stiffness, 8.

[b]The number of subjects (n) varied by efficacy parameter because individual subjects did not submit a full baseline assessment.

[c]Final score minus baseline score

Additionally, the Efficacy Variable Score shows that no significant efficacy advantage of the DMSO vehicle over placebo was observed for the primary or secondary variables, except for the POHA. Furthermore, a comparison of oral diclofenac vs. topical diclofenac found no statistical difference for any of the 5 efficacy variables. The combination of topical diclofenac+oral diclofenac was no better than topical diclofenac alone for all variables (pain, P=0.30; physical function, P=0.33; POHA, P=0.43; stiffness, P=0.16; PGA, P=0.50).

Mean [SD] acetaminophen use with topical diclofenac (0.64 [0.83] caplets per day) was lower than with placebo (0.95 [1.14], P=0.005) and DMSO vehicle (0.99 [1.11], P=0.002), and was not different than that for oral diclofenac

The rate with DMSO vehicle was intermediate between topical diclofenac and placebo. Only 5 (3.2%) subjects in topical diclofenac withdrew due to an application site reaction. Importantly, as shown in the below Table 3 ("Incidence of Adverse Events") the incidence of adverse events of the digestive system with topical diclofenac was no greater than placebo and much lower than oral diclofenac and topical diclofenac+oral diclofenac. Withdrawal due to a digestive system adverse event was higher in oral diclofenac (11 [7.3%]) vs. topical diclofenac (4 [2.6%]) and placebo (3 [1.9%]). Additionally, as shown in the below Table 3, the combination topical diclofenac+oral diclofenac did not increase the incidence of digestive system events over oral diclofenac alone.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000174

Table 3. Incidence of Adverse Events[a]

TABLE 3

|  | Incidence of adverse events[a] | | | | |
|---|---|---|---|---|---|
|  | TDiclo (n = 154) | placebo (n = 157) | DMSO (n = 161) | ODiclo (n = 151) | TDiclo + ODiclo (n = 152) |
| Adverse Event |  |  |  |  |  |
| Any adverse event | 96 (62.3) | 90 (57.3) | 97 (60.2) | 94 (62.3) | 98 (64.5) |
| Abnormal taste sensation or odor | 0 (0.0) | 1 (0.6) | 1 (0.6) | 0 (0.0) | 1 (0.7) |
| Any digestive system event | 10 (6.5) | 15 (9.6) | 18 (11.2) | 36 (23.8) | 39 (25.7) |
| Abdominal pain | 5 (3.2) | 1 (0.6) | 5 (3.1) | 11 (7.3) | 3 (2.0) |
| Dyspepsia | 4 (2.6) | 6 (3.8) | 6 (3.7) | 6 (4.0) | 5 (3.3) |
| Diarrhea | 2 (1.3) | 3 (1.9) | 2 (1.2) | 7 (4.6) | 12 (7.9) |
| Liver function tests abnormal | 3 (1.9) | 1 (0.6) | 6 (3.7) | 12 (7.9) | 11 (7.2) |
| Rectal hemorrhage | 1 (0.6) | 0 (0.0) | 0 (0.0) | 0 (0.0) | 5 (3.3) |
| Nausea | 0 (0.0) | 0 (0.0) | 1 (0.6) | 3 (2.0) | 5 (3.3) |
| Any skin/appendages event | 41 (26.6) | 12 (7.6) | 27 (16.8) | 11 (7.3) | 47 (30.9) |
| Dry skin (application site) | 28 (18.2) | 5 (3.2) | 18 (11.2) | 4 (2.6) | 30 (19.7) |
| Contact dermatitis (application site) | 4 (2.6) | 1 (0.6) | 5 (3.1) | 1 (0.7) | 12 (7.9) |
| Rash | 4 (2.6) | 0 (0.0) | 2 (1.2) | 0 (0.0) | 0 (0.0) |
| Contact dermatitis with vesicles (application site) | 3 (1.9) | 0 (0.0) | 0 (0.0) | 0 (0.0) | 0 (0.0) |
| Pruritis (application site) | 2 (1.3) | 0 (0.0) | 0 (0.0) | 0 (0.0) | 1 (0.7) |
| Other system event[b] |  |  |  |  |  |
| Headache | 27 (17.5) | 18 (11.5) | 21 (13.0) | 26 (17.2) | 21 (13.8) |
| Back pain | 15 (9.7) | 10 (6.4) | 15 (9.3) | 11 (7.3) | 4 (2.6) |
| Arthralgia | 14 (9.1) | 15 (9.6) | 25 (15.5) | 12 (7.9) | 7 (4.6) |
| Pain | 7 (4.5) | 5 (3.2) | 11 (6.8) | 8 (5.3) | 1 (0.7) |
| Respiratory disorder | 5 (3.2) | 6 (3.8) | 4 (2.5) | 8 (5.3) | 7 (4.6) |
| Accidental injury | 4 (2.6) | 6 (3.8) | 7 (4.3) | 4 (2.6) | 6 (3.9) |
| Abnormal vision | 4 (2.6) | 5 (3.2) | 4 (2.5) | 4 (2.6) | 1 (0.7) |
| Conjunctivitis | 4 (2.6) | 1 (0.6) | 0 (0.0) | 3 (2.0) | 0 (0.0) |

Abbreviation: TDiclo, Topical Diclofenac Solution plus oral placebo; placebo, topical placebo plus oral placebo; DMSO, topical dimethyl sulfoxide-containing vehicle plus oral placebo; ODiclo, oral diclofenac plus oral placebo; TDiclo + ODiclo, Topical Diclofenac Solution plus oral diclofenac
[a]Data are presented as number (%) of subjects.
[b]Other adverse events with incidence ≥9% in the TDiclo group

No difference between treatment groups was observed for cardiovascular events, which were <2% in each treatment group. The incidence of hypertension was similar for all groups (1.3% for Topical Diclofenac Solution, oral diclofenac and Topical Diclofenac Solution+oral diclofenac; 1.2% for DMSO vehicle; 0.6% for placebo). There was no difference among the groups in reports of an abnormal taste sensation or odor, confirming the success of the blinding procedure for DMSO.

There was no serious adverse event in the Topical Diclofenac Solution arm, 4 in placebo (1 anemia, 1 cerebrovascular accident, 1 fractured hip, 1 dislocated prosthetic hip), 1 in DMSO vehicle (acute enteritis), 1 in oral diclofenac (post-polypectomy lower gastrointestinal bleed, 8 days after withdrawal of study medication) and 3 in topical diclofenac+oral diclofenac (1 leg cellulitis, 1 unstable angina, 1 transient ischemic attack).

Changes in key NSAID-related laboratory parameters are shown in the below Table 4 ("Analysis of Change in Laboratory Parameters").

TABLE 4

|  | Analysis of change[a] in laboratory parameters | | | | |
|---|---|---|---|---|---|
|  | TDiclo (n = 145) | placebo (n = 142) | DMSO (n = 150) | ODiclo (n = 138) | TDiclo + ODiclo (n = 141) |
| AST |  |  |  |  |  |
| Mean change, U/L | −0.9 (10.3) | −0.6 (5.2) | 0.2 (8.5) | 2.5 (10.9) | 4.1 (29.6) |
| Normal to abnormal[b], N (%) | 10 (6.9) | 5 (3.5) | 8 (5.3) | 27 (19.6) | 20 (14.2) |
| ALT |  |  |  |  |  |
| Mean change, U/L | −1.0 (11.7) | −0.3 (9.9) | −0.6 (9.8) | 7.2 (25.3) | 8.2 (68.9) |
| Normal to abnormal, N (%) | 6 (4.1) | 4 (2.8) | 2 (1.3) | 26 (18.8) | 24 (17.0) |
| Hemoglobin |  |  |  |  |  |
| Mean change, g/L | −1.7 (6.2) | −0.8 (6.2) | −0.4 (6.5) | −3.8 (7.1) | −4.8 (6.8) |
| Normal to abnormal, N (%) | 3 (2.1) | 7 (4.9) | 5 (3.3) | 8 (5.8) | 18 (12.6) |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX177

HZNPENN_00000175

TABLE 4-continued

Analysis of change[a] in laboratory parameters

| | TDiclo (n = 145) | placebo (n = 142) | DMSO (n = 150) | ODiclo (n = 138) | TDiclo + ODiclo (n = 141) |
|---|---|---|---|---|---|
| Creatinine | | | | | |
| Mean change, μmol/L | −0.4 (10.5) | 0.8 (9.0) | 0.3 (10.3) | 3.1 (11.0) | 4.4 (11.2) |
| Normal to abnormal, N (%) | 4 (2.8) | 8 (5.6) | 6 (4.0) | 10 (7.2) | 15 (10.6) |
| Creatinine Clearance[c] | | | | | |
| Mean change, mL/min | 0.4 (10.3) | −0.5 (8.6) | −0.5 (8.3) | −2.4 (8.7) | −3.3 (9.7) |
| Normal to abnormal, N (%) | 11 (7.6) | 8 (5.7) | 9 (6.0) | 10 (7.2) | 16 (11.4) |

Abbreviations: TDiclo, Topical Diclofenac Solution plus oral placebo; placebo, topical placebo plus oral placebo; DMSO, topical dimethyl sulfoxide-containing vehicle plus oral placebo; ODiclo, oral diclofenac plus topical placebo; TDiclo + ODiclo, Topical Diclofenac Solution plus oral diclofenac; ALT, alanine aminotransferase; AST, aspartate aminotransferase.
[a]Change from normal at baseline to above upper limit of normal for AST, ALT, creatinine, or below lower limit of normal for hemoglobin, creatinine clearance.
[b]Mean (SD) unless otherwise indicated. Only subjects with both a baseline and final lab value for the parameter are shown.
[c]Calculated as per Cockcroft DW and Gault MW, Prediction of creatinine clearance from serum creatinine, *Nephron* 1976;16:31-41.

Overall, the mean change in the laboratory value and the number of subjects developing an abnormality showed no difference between topical diclofenac and placebo or DMSO vehicle, but a greater mean change and higher incidence of abnormality occurred with the oral diclofenac arms. With oral diclofenac compared with topical diclofenac, there was a greater mean change in hemoglobin, alanine aminotransferase, gamma-glutamyl transpeptidase, creatinine and creatinine clearance, and a greater number of subjects developing an abnormality for these parameters. With respect to the transaminases ALT (alanine aminotransferase) and AST (aspartate aminotransferase), there was no statistically significant change in mean values between the oral diclofenac and oral plus topical diclofenac treatment arms. Development of abnormal laboratory parameters was generally below clinically relevant levels. No subject developed a clinically significant change in hemoglobin or creatinine. An increase in any liver enzyme to three times the upper limit of normal occurred in 1 subject with placebo, 1 with DMSO vehicle, 2 with oral diclofenac and 3 with topical diclofenac+oral diclofenac, but none with topical diclofenac.

Ocular examination at baseline and final revealed no change in visual acuity (data not shown) and no difference in the development of lens abnormality (cataract) with placebo (4 [2.6%] subjects) vs. topical diclofenac (2 [1.3%]) or DMSO vehicle (6 [3.8%]).

Conclusions: The results of this clinical study clearly show the effectiveness of Topical Diclofenac Solution applied topically to treat the symptoms of osteoarthritis of the knee.

Topical Diclofenac Solution was superior to both topical comparator groups (placebo and DMSO vehicle) for all 3 primary efficacy variables, pain, function and patient overall health. Efficacy was confirmed by a conservative BOCF sensitivity analysis.

The WOMAC physical function questionnaire asks patients to score physical function in areas such as difficulty descending stairs, difficulty ascending stairs, difficulty rising from sitting, difficulty standing and difficulty walking on a flat surface. The superiority of topical diclofenac solution over placebo was surprising given that (i) the physical functions measured in the WOMAC physical function questionnaire are generally accomplished with the use of both knees, (ii) only one knee was treated in the study, (iii) 95% of patients had disease in both knees (with pain in the contralateral knee occurring in 90% of the study population) and (iv) the blood levels of diclofenac produced by the topical

diclofenac solution when treating one knee are far below the levels achieved by oral administration of the drug and regarded as necessary to achieve a systemic effect (see Examples 7 and 8 below). Remarkably, there was no statistical difference between topical diclofenac solution treatment of one knee and oral diclofenac (which would provide treatment for both knees) for the physical function efficacy variable.

This study followed a typical 12-week oral NSAID trial design, namely, primary osteoarthritis of the knee with pain and abnormal radiological findings. Although most subjects had bilateral osteoarthritis, only one painful knee was treated with topical solution. Inasmuch as outcome measures of physical function and overall patient health assessment are likely to be negatively influenced by symptoms in the non-treated knee, this trial design biased against Topical Diclofenac Solution. In any oral NSAID trial, and in this study's oral diclofenac arm, subjects automatically treat both knees, avoiding these factors. The inclusion of oral therapy for all groups added a second placebo effect to the topical comparator arms, imposing a yet higher burden to prove efficacy of Topical Diclofenac Solution over placebo. Despite these elements in trial design the efficacy of Topical Diclofenac Solution was robustly established.

The response of patients in the oral diclofenac group in this study (40-48% improvement in variable score) was the same as seen in other oral NSAID trials (Bellamy N, Buchanan W W et al., A multicenter study of tenoxicam and diclofenac in patients with osteoarthritis of the knee. *J. Rheum.* 1993; 20:999-1004; Yocum D, et al., Safety and efficacy of meloxicam in the treatment of osteoarthritis. *Arch Int Med.* 2000; 160:2947-54), providing a powerful external audit on the validity of the trial design and conduct, and further confirmation of the sustained efficacy of Topical Diclofenac Solution. Topical Diclofenac Solution was found to be as effective as oral diclofenac at relieving the symptoms of knee osteoarthritis with less NSAID-related systemic toxicity than oral diclofenac. These observations support the safety and efficacy results of a previous equivalence study of Topical Diclofenac Solution vs. oral diclofenac.

Claims of therapeutic efficacy for DMSO itself in osteoarthritis were discounted in an earlier, 4-week trial with topical diclofenac (Bookman A A, et al., Effect of a topical diclofenac solution for relieving symptoms of osteoarthritis of the knee: a randomized controlled trial. *CMAJ.* 2004; 171: 333-8) and are further disproven by this 12-week study.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000176

There was no apparent difference between Topical Diclofenac Solution and placebo in NSAID-associated gastrointestinal adverse events (the incidence was actually lower with Topical Diclofenac Solution). In this study, no eye lens abnormalities were observed with DMSO-vehicle or Topical Diclofenac Solution treatment. The combination Topical Diclofenac Solution+oral diclofenac showed no increase in adverse events relative to Topical Diclofenac Solution or oral diclofenac alone. The blood level of diclofenac following topical application as Topical Diclofenac Solution is only about 12 ng/mL and the incremental increase with the combination would be negligible compared with the predicted level of 1500 ng/mL that is reported with oral diclofenac. Although combined treatment with Topical Diclofenac Solution+oral diclofenac did not provide a statistical advantage over oral diclofenac alone, this regimen could be a reasonable treatment paradigm in an individual with persistent or breakthrough knee pain despite using an oral NSAID.

In conclusion, this Example shows that Topical Diclofenac Solution provides durable improvement in the symptoms of osteoarthritis of the knee, and that relief is not contributed by the DMSO-carrier. Efficacy of Topical Diclofenac Solution was comparable to that achieved with oral diclofenac. For the patient initiating pharmacological therapy for relief of symptoms associated with osteoarthritis of the knee based on current treatment guidelines, Topical Diclofenac Solution is a viable, evidence-based treatment option.

Example 2

Influence of a Topical Diclofenac Solution on Percutaneous Absorption of Three Different Environmental Toxins after Repeated Epicutaneous Administration to Minipigs

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, which relates to the influence of a topical diclofenac solution containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") on the percutaneous absorption of three different environmental toxins, as evaluated in a study involving repeated epicutaneous administration to minipigs.

The Test Item was Topical Diclofenac Solution [Pennsaid® Topical Solution, Nuvo Research Inc., Mississauga, Canada]. The environmental toxins selected for use in the study were oxybenzone (in the form of Equaline SPF 23 faces sunscreen; active compound 6% oxybenzone), DEET, i.e., N,N-diethyl-m-toluamide (in the form of Deep woods OFF!® pump spray; active compound 25% N,N-diethyl-m-toluamide), and 2,4-D, i.e., 2,4-D, dimethylamine salt (in the form of Spectracide Weed Stop 2× For Lawns Concentrate; active compound 7.57% 2,4-D, dimethylamine salt). The control items used in the study were Retin-A 0.1% (tretinoin) cream, Men's Rogaine® Extra Strength Topical Solution (minoxidil 5% w/v), both of which are approved and marketed in the United States. Both control products have skin permeation enhancing capabilities and were selected for comparison to the Topical Diclofenac Solution in the enhancement of environmental toxins. Retin-A (tretinoin) stimulates mitotic activity and increased turnover of follicular epithelial cells, resulting in disruption of the skin barrier function with consequent enhancement of transepidermal water loss. Compromising skin barrier function can cause enhancement in permeation of molecules through the skin.

The skin permeation enhancement of Rogaine is associated with its high content of propylene glycol (50%), a known skin permeation enhancer.

Methods: In this study, performed according to Good Laboratory Practices ("GLP"), 18 female Göttingen Minipigs, a commonly used non-rodent species for pharmacokinetic studies, were selected for entry into the study based on the results of a satisfactory preliminary health screening. There were six treatment groups with 3 female animals per group. Animals were allocated employing a pseudo-random body weight stratification procedure that yielded groups with approximately equal mean body weight.

The Test Item and the controls were supplied ready-to-use. Toxin No. 1 (sunscreen) was applied undiluted. Toxins Nos. 2 (DEET) and 3 (2,4-D) were diluted in ethanol and water, respectively, before use on test day 1 according to the below dilution scheme. The same toxin administration solutions were used on test day 1, 21, 28 and 35. Between the administrations, the solutions were stored at +2° C. to +4° C.

| | | Preparation of the toxin administration dose | | | |
|---|---|---|---|---|---|
| Toxin No. | Active compound | Strength of active cmpd in the toxin (w/v) | Targeted exposure of active cmpd to 150 cm² [µg] | Dilution of the toxin | Volume of diluted toxin to be applied to 150 cm² [mL] |
| 1 | oxybenzone | 6% | 300000 | — | 5 |
| 2 | DEET | 25% | 6723 | 40 | 1.08 |
| 3 | 2,4-D | 7.57% | 13.35 | 5000 | 0.88 |

Toxin was applied by epicutaneous administration via syringe onto the back region. There was a single administration on test day 1 (before administration of the Test Item or the Controls) and single administration on days 21, 28 and 35 (after administration of the Test Item or the Controls). The administration area was 150 cm²/animal. The administration site was situated on the animal's back between the fore and the hind extremities. The surface area of the application site was selected to provide a high toxin exposure that would ensure measurable systemic levels of the toxins.

Prior to the start of the study, the administration sites were cleared of bristles, if present. The remaining hairs were clipped. The toxin was spread onto the administration area using a syringe. The administration area was not covered with any dressing. Following administration the animals were restrained for at least 1 hour (until the toxin had completely dried) in slings which allowed free movement of the head but prevented a complete body turn in order to prevent access by the animals to the toxins.

The six treatment groups were assigned to receive toxins, Test Items and Controls as set forth in the following table.

| Group | Toxin No. (Name) | Test Item/Control |
|---|---|---|
| 1 | 1 (oxybenzone) | Topical Diclofenac Solution (Test Item) |
| 2 | 2 (DEET) | Topical Diclofenac Solution (Test Item) |
| 3 | 3 (2,4-D) | Topical Diclofenac Solution (Test Item) |
| 4 | 1 (oxybenzone) | Retin-A (Control No. 1) |
| 5 | 2 (DEET) | Rogaine ® (Control no. 2) |
| 6 | 3 (2,4-D) | Rogaine ® (Control no. 2) |

On test day 21, Topical Diclofenac Solution (Test Item) or Rogaine Topical Solution (Control No. 2), respectively, was applied 30 minutes before toxin administration based on a

37

38

pre-specified schedule. No administration of Retin-A (Control No. 1) was scheduled for test day 21. On test day 21 the toxin administration was carried out after the Test Item/Control administration according to the following schedule: Groups 1, 2 and 3: 30 minutes after Test Item/Control administration; Group 4: after an overnight break; Groups 5 and 6: 30 minutes after Test Item/Control administration.

In sum, Test Item/Control application was as follows: Topical Diclofenac Solution (Test Item), 0.22 mL/administration site four times daily from test days 6 to 20 (7:30, 12:30, 17:30, 22:30) and one single dose on day 21 (7:30); Retin-A 0.1% cream (Control No. 1), 112.5 mg/administration site once daily from test days 6 to 20 (22:30); Rogaine ES (Control No. 2), 0.8 mL/administration site twice daily from test days 6 to 20 (7:30, 17:30) and one single dose on day 21 (7:30). The administration site of the Test Item or Controls was exactly the same as for the toxins, i.e. 150 cm$^2$ on the animal's back between the fore and hind extremities, as noted above. Toxin dose levels were selected based upon available human environmental and occupational exposure data. Dose levels for the Test Item or Controls were based on the recommended doses of the products in humans.

The Test Item or Control was spread onto the administration area using a syringe. The administration area was not covered with any dressing. Following administration the animals were restrained for at least 1 hour (until the test item and controls had completely dried) in slings which allowed free movement of the head but prevented a complete body turn in order to prevent access by the animals to the Test Item or Controls.

Any contact of the test areas with water was avoided throughout the whole experiment.

Observations: Observations related to individual animals made throughout the study included clinical signs, body weight and food/water consumption.

For evaluation of local tolerance, skin reactions were examined once daily throughout the study, prior to each administration (end of the respective exposure period), if applicable. Reactions, namely, erythema, eschar and oedema formation were scored based on Draize J H, Appraisal of the Safety of Chemicals in Food, Drugs and Cosmetics, Association of Food and Drug Officials of the United States, Austin, Tex., 1959. Any other lesions were also recorded, if any occurred.

Blood sampling for pharmacokinetics was undertaken for each animal at predetermined sampling times and processed for at least 2 mL Li-Heparin plasma/sample, which were split into two aliquots of 1 mL each.

The area under the concentration-time curve ("AUC") from time zero to 48 h, $AUC_{0-48h}$, for each toxin was calculated for each minipig after each toxin administration on test days 1, 21, 28 and 35 using a linear trapezoid method. Descriptive statistics (arithmetic mean, standard deviation) of non-transformed $AUC_{0-48h}$ and natural log-transformed $AUC_{0-48h}$ were calculated for each treatment group for the administration days on test days 1, 21, 28 and 35. Log-transformed $AUC_{0-48h}$ were compared using the repeated measurements employing a generalised linear model of variance using treatment group and administration day as covariates. The achievement of steady state of diclofenac was assessed by using repeated measurements employing analysis of variance ("ANOVA") with log-transformed trough concentrations on test days 19, 20 and 21. All statistical analyses were two-sided and in all analyses the Type I (alpha) error was fixed at the 5% level.

Results: With regard to clinical signs, no signs of local intolerance reactions were observed in any of the minipigs after repeated epicutaneous administration of 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) and any of the Toxin Nos. 1, 2 or 3. Additionally, no signs of local intolerance reactions were observed in any of the minipigs after repeated epicutaneous administration of either Control No. 1 or Control No. 2.

Additionally, no signs of systemic intolerance reactions were observed in any of the minipigs after repeated epicutaneous administration of 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) and any of the three toxins. No signs of systemic intolerance reactions were observed in any of the minipigs after repeated epicutaneous administration of either 112.5 mg Retin-A 0.1% (tretinoin) cream/animal (control no. 1) or 0.8 mL Men's Rogaine® Extra Strength Topical Solution/animal (control no. 2) and any of the three toxins.

The body weight was in the normal range throughout the course of the study in all animals after repeated epicutaneous administration of 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) and the two controls and any of the three toxins.

No influence on the food consumption was noted for any of the animals after repeated epicutaneous administration of 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) or the two controls and any of the three toxins.

The visual appraisal of the drinking water consumption did not reveal any Test Item-related influence.

Pharmacokinetic data results indicated that systemic diclofenac steady state was reached by day 19.

Due to limitation in the sensitivity of the analytical methods employed in the study, no DEET (Toxin no. 2) or 2,4-D (Toxin no. 3) could be quantified in plasma for any of the animals treated with the Topical Diclofenac Solution or the Rogaine so no firm conclusions could be drawn from the study concerning the enhancement of systemic absorption of these toxins. A subsequent study (described in Example 3 below) using higher concentrations of DEET and 2,4-D was therefore conducted.

In contrast, the exposure to oxybenzone could be well quantified on all application days. The courses of the plasma concentrations of oxybenzone were summarized non-compartmentally by means of $C_{max}$ (maximum observed plasma concentration), tmax (time of $C_{max}$ after application of the toxin), and the $AUC_{0-48}$ (the trapezoidal area under the time course of the plasma concentrations up to 48 hours after application).

Based on the ANOVA of the log-transformed $AUC_{0-48}$, the area exposure to oxybenzone for the animals treated with Topical Diclofenac Solution was statistically significantly lower ($p \leq 0.05$) on days 21, 28 and 35 compared with the animals treated with the control (Retin-A), whereas there was no statistically significant difference between the treatments groups on day 1 (before the start of the treatments with the test and control items). No statistically significant differences were noted for the Topical Diclofenac Solution or control (Retin-A) treated animals of groups 1 and 4, respectively, for $C_{max}$ and AUC-values of test day 1 compared to test days 21, 28 and 35.

Conclusions: Epicutaneous application of Topical Diclofenac Solution four times daily from test day 6 to 20 with a single dose applied on the morning of day 21, while resulting in relevant systemic exposure to diclofenac, did not induce relevant local or systemic untoward changes. Treatment with Topical Diclofenac Solution, however, did not amplify the exposure of oxybenzone, an epicutaneously applied toxin.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000178

That systemic diclofenac steady state was reached by day 19 indicates that a maximum degree of skin permeabilization for diclofenac by the Topical Diclofenac Solution vehicle has been reached after 14 days of treatment with Topical Diclofenac Solution.

Results also showed that there was no quantifiable systemic absorption of DEET or 2,4-D at baseline (prior to treatment with Topical Diclofenac Solution or Rogaine) or following a 15-day pre-treatment with Topical Diclofenac Solution or Rogaine (Treatment Groups 2, 3, 5 and 6).

According to the results, systemic absorption of oxybenzone occurred prior to treatment with Topical Diclofenac Solution and Retin-A control (days 1-3) and this level thus represents baseline systemic absorption of oxybenzone. There was no significant difference in baseline oxybenzone systemic levels and systemic levels obtained following a 14 day pre-treatment period with Topical Diclofenac Solution and it is therefore concluded Topical Diclofenac Solution did not enhance the systemic absorption of oxybenzone. However, there was a significant difference in baseline oxybenzone systemic levels and systemic levels obtained following a 14 day pre-treatment period with Retin-A Control. Therefore, Retin-A enhances the systemic absorption of oxybenzone.

It can be concluded that a 15-day repeat dose treatment with Topical Diclofenac. Solution, QID, while resulting in a maximum degree of skin permeabilization for diclofenac, does not enhance the systemic absorption of oxybenzone.

Example 3

Influence of a Topical Diclofenac Solution on Percutaneous Absorption of Two Different Environmental Toxins after Repeated Epicutaneous Administration to Minipigs

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, which relates to the influence of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") on the percutaneous absorption of two environmental toxins from Example 2, evaluated at higher doses in a study involving repeated epicutaneous administration to minipigs. In Example 2 the dose levels for the toxins were selected based on the available human environmental and occupational exposure data but the results did not provide systemic exposure above the limit of quantitation. Thus, to increase the potential systemic exposure of the toxin, the maximum dermal exposure to the toxin was selected for this study. As in Example 2, the Test Item was Topical Diclofenac Solution.

The two environmental toxins DEET, i.e., N,N-diethyl-m-toluamide (in the form of Deep woods OFF!® pump spray; active compound 25% N,N-diethyl-m-toluamide) and 2,4-D, i.e., 2,4-D, dimethylamine salt (in the form of Spectracide Weed Stop 2x For Lawns Concentrate; active compound 7.57% 2,4-D, dimethylamine salt). The single Control Item used in the study was Retin-A 0.1% (tretinoin) cream.

Methods: The study was carried out as described in Example 2 using 12 minipigs (four groups of three female minipigs each). Animals of groups 1 and 2 were treated with the Test Item from the morning of day 6 until the morning of day 21; groups 3 and 4 were treated with Retin-A 0.1% (the Control Item) from the evening of day 6 until the evening of day 20.

Single doses of the toxins were administered on the morning of days 1, 21, 28, and 35. Groups no. 1 (Test Item) and 3 (Control Item) were investigated with Toxin no. 1 (DEET), whereas the animals of groups 2 (Test Item) and 4 (Control Item) were investigated with Toxin no. 2 (2,4-D). The volume of the toxin formulation applied was 1 mL on day 1 and 1.5 mL on subsequent doses starting on day 21. In contrast to Example 2, the 1.5 mL toxin volume resulted in an administered dose of DEET (Toxin No. 1) of 375,000 μg and an administered dose of 2,4-D (Toxin No. 2) of 113,550 μg.

The Test Item, Control Item and Toxins were administered as follows. The Test Item was administered four times daily from test days 6 to 20 (7:30, 12:30, 17:30, 22:30); one single dose on day 21 (7:30). The Control Item was administered once daily from test days 6 to 20 (22:30). Toxin Nos. 1 and 2 were administered once on test day 1 (before administration of the Test Item or the Controls) and once on test days 21 (after administration of the Test Item), 28 and 35.

Results: Exposure to DEET could be well-quantified on all application days. In the Topical Diclofenac Solution arm, the dose-normalized area exposure to DEET ($AUC_{0-48}$) on days 21, 28, and 35 was on average 1.18, 1.61, and 1.44 times higher than on day 1, respectively; but was not statistically significantly different. Under the Retin-A Control treatment, the dose normalized area exposure on these days was on average 1.56, 1.83, and 1.30 times higher than on day 1 and were statistically significantly different on test day 28.

Exposure to 2,4-D could be well-quantified on all application days. Under the Test treatment, the dose normalized area exposure to 2,4-D on days 21, 28, and 35 was on average 2.04, 1.27, and 1.16 times lower than on day 1, respectively, but was not statistically significantly different. Under the Control treatment, the dose normalized area exposure on these days was on average 10.84, 8.86, and 7.29 times higher than on day 1 and were statistically significantly different. Accordingly, there is a distinct amplification of the 2,4-D exposure in the control group (Retin-A), but not in the animals treated with the Test treatment (Topical Diclofenac Solution).

No signs of local intolerance were observed for any of the minipigs after repeated epicutaneous administration of 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) and Toxin No. 1. Animal no. 4 (group 2) treated with 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) and Toxin No. 2 revealed a very slight to well defined erythema on test days 7 to 14. Animal nos. 7 and 8 (group 3) treated with 112.5 mg Retin-A 0.1% (tretinoin) cream/animal and Toxin No. 1 revealed a well defined erythema on test days 21 and 22 and a very slight to well defined erythema on test day 35. Animal no. 12 (group 4) treated with 112.5 mg Retin-A 0.1% (tretinoin) cream/animal and toxin no.2 (group 4) revealed a moderate to severe erythema on test day 21 and a well defined erythema on test day 35.

No signs of systemic intolerance were noted for any of the minipigs after repeated epicutaneous administration of either 0.22 mL Topical Diclofenac Solution/animal (approx. 3.5 mg diclofenac sodium/animal) or the Control Item and the two toxins. Additionally, none of the animals died prematurely; the body weight was in the normal range in all animals throughout the course of the study; and no influence was noted on the food and drinking water consumption for any of the animals.

Epicutaneous application of Topical Diclofenac Solution four times daily from test day 6 to 20 with a single dose applied on the morning of day 21 resulted in relevant systemic exposure to diclofenac.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000179

41

Conclusions: Epicutaneous application of Topical Diclofenac Solution four times daily from test day 6 to 20 with a single dose applied on the morning of day 21, while resulting in relevant systemic exposure to diclofenac, did not induce relevant local or systemic untoward changes. The achievement of steady state levels of diclofenac by day 21 indicates that that a maximum degree of skin permeabilization for diclofenac had been reached. In contrast to Retin-A, treatment with Topical Diclofenac Solution did not amplify the toxic risk of epicutaneously applied toxins such as 2,4-D and DEET.

Example 4

Effect on Stratum Corneum Barrier Function of Multiple Doses of Topical Diclofenac Solution as Measured by Transepidermal Water-Loss

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, which comprise information regarding an assessment of the effect on stratum corneum barrier function, as measured by transepidermal water loss ("TEWL"), of multiple doses of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino] benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution") compared with a positive control, Retin-A®, and an untreated site as a negative control.

Study Design: The study was conducted as a four-period, open label, paired comparison in a single group. Period One (Baseline) was a period of one week prior to the first application on Day 1. At Period Two (Treatment), subjects applied test articles (Topical Diclofenac Solution or Retin-A®) for a period of six weeks. At Period Three (Recovery), subjects underwent a recovery period of two weeks following the treatment period. At Period Four (Retin-A® Challenge) subjects applied Retin-A® under occlusion to the same test site as during Period Two for a period of up to two weeks. Thus, the total study duration was approximately 12 weeks, with eight treatment weeks spread between Period Two (six-week treatment period) and Period Four (two-week treatment period).

Protocol: At Period One (Baseline), baseline measurements of TEWL were performed on Days–7, –5, and –3 prior to the first application on Day 1. At Period Two (Treatment), subjects applied test articles for a period of six weeks. TEWL was measured on each of the test sites (4 cm×4 cm) immediately before application of the morning dose of test articles on Days 1, 3, 5, 8, 15, 22, 29, 36 and 43. Each subject applied one drop (approximately 30 µL) of Topical Diclofenac Solution to a test site on the right or left volar forearm (as randomized) four times a day for six weeks, at approximately 08:00, 13:00, 18:00 and 23:00 hours. The dose of Topical Diclofenac Solution utilized in this study (approximately 30 µL to a surface area of 16 cm²) was calculated to approximate the Topical Diclofenac Solution dose that applied QID to the knee is shown in Example 1 to be effective for treatment of the pain and symptoms of knee osteoarthritis, namely 40 drops (approximately 1.2 mL) to a knee surface area of approximately 800 cm². Each subject applied a dab (about 12 mg) of Retin-A® to a separate test site on the opposite volar forearm once per day for six weeks, at approximately 08:00 hours. The subject used his/her finger to spread the test articles over their respective test sites. Each forearm had a test area that was left untreated as a negative control. The subjects allowed the test articles to dry before covering the test sites with clothing and

42

avoided sunlight exposure to the test sites during the study. At Period Three (Recovery), subjects underwent a recovery period of two weeks following the treatment period. TEWL was measured on each of the test sites on the morning of Days 45, 47, 50, and 58. At Period Four (Retin-A® Challenge) on Days 58-71, Retin-A® was applied under occlusion to the same test site to which Retin-A® had been applied during Period Two. A designated member of the study staff applied two dabs (about 24 mg) of Retin-A® to the Retin-A® test site, once daily for 14 days, at approximately 08:00 hours. The Retin-A® test site was occluded using polyethylene film (Saran Wrap®) for 15 hours following each application. TEWL was measured on the Retin-A® site and the untreated control site of the same arm on the morning of Days 59-72.

TEWL: TEWL analysis was carried out on the data of the intent-to-treat ("ITT") analysis group. The ITT analysis group included all enrolled subjects who received at least one dose of test article. TEWL was quantified using a VapoMeter, a closed chamber evaporimeter. Change in TEWL between the treated and untreated sites was monitored over time. Descriptive statistics (arithmetic mean, standard deviation, coefficient of variation, median, minimum, and maximum) for the TEWL data was summarized for each treatment. Individual and mean TEWL time profiles were plotted by treatment and period on a linear scale.

To assess the validity of the study to measure changes in TEWL, the post-treatment results for the positive control, Retin-A®, were compared to the untreated site on the same arm using repeated measures analysis of covariance ("ANCOVA") with the average pre-treatment TEWL measure as the covariate. During conduct of the study and preliminary review of the data, it appeared that the positive control was not causing skin irritation to the expected degree. In order to validate the study, a Retin-A® Challenge Period was added via a protocol amendment as described above, and the ANCOVA analysis was repeated for the Challenge Period using Day 58 TEWL measure as the baseline covariate. The TEWL response for the Topical Diclofenac Solution site during the Treatment Period was compared to the untreated site on the same arm using repeated measures ANCOVA with the average pre-treatment TEWL measure as the covariate. Secondary analyses included comparisons between Topical Diclofenac Solution and Retin-A® change in TEWL (difference from untreated site) for the Treatment Period, and correlation analyses between TEWL and the variables: skin irritation score, temperature and humidity.

Safety: Safety was assessed through evaluation of the safety variables: adverse events, skin irritation score, laboratory analysis and vital signs. Safety analysis was carried out on the data of every subject who received at least one treatment with study article.

TEWL Results: The results for treatment with Topical Diclofenac Solution indicate that it did not cause an increase in TEWL relative to the untreated site following 6 weeks of treatment at a dose, that applied QID to the knee, is shown in Example 1 to be effective for treatment of the pain and symptoms of knee osteoarthritis. No difference between Topical Diclofenac Solution and Retin-A® was noted during the Treatment Period (neither caused an increase in TEWL during this period of the study).

During the Challenge Period with Retin-A®, skin irritation was noted (see Safety Results) and a significant increase in TEWL relative to the untreated site was observed. These results for the Challenge Period validate the study design by showing that the subjects were responsive to this positive control, a known skin irritant.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000180

Mean TEWL time profiles are shown in FIG. 1 (Retín-A®) and FIG. 2 (Topical Diclofenac Solution). Review of FIG. 1 shows an increase in TEWL for the Retin-A® treated site during the Challenge Period relative to the untreated site, and no difference between treated and untreated sites for Topical Diclofenac Solution and Retin-A® during the Treatment Period.

Safety Results: There were a total of 51 adverse events reported by 12 subjects. The majority of adverse events were classified as mild in severity (35 events) and classified as probably related to the test article (32 events). The majority of the adverse events reported consisted of skin irritation responses (i.e. contact dermatitis, dry skin, pruritus). These were observed at the Retin-A® application test sites for all subjects except for one who reported the adverse event 'dry skin' that occurred at the Topical Diclofenac Solution treated test site.

The frequency of worst skin irritation score during the Treatment Period for Topical Diclofenac Solution revealed 14 of 15 subjects with a worst score of zero, indicating no skin irritation. One subject had a score of 0.5 (dryness or flaking) for the Topical Diclofenac Solution treated site. For Retin-A®, no skin irritation was observed during the Treatment and Recovery Periods. During the Challenge Period, 7 subjects had a worst score of 3 (erythema with induration and vesiculation) and one subject had a score of 1 (erythema) for the Retin-A® treated site. The occurrence of skin irritation for the Retin-A® sites was expected for this positive control.

Two subjects experienced changes in clinical laboratory evaluations (glucose, ALT and AST elevations) that were documented as adverse events. All three adverse events were considered mild and not related to the test articles.

There were no clinically significant findings related to blood pressure, pulse or respiration rates.

Conclusions: The objective of this study was to evaluate the effect on stratum corneum barrier function, as measured by TEWL, of chronic application of Topical Diclofenac Solution as compared with a positive control, Retin-A®, and an untreated site as a negative control.

The dose of Topical Diclofenac Solution utilized in this study (approximately 30 μL to a surface area of 16 cm$^2$) was calculated to approximate that shown in Example 1 to be effective for treatment of the pain and symptoms of knee osteoarthritis when applied QID to the knee (40 drops (approximately 1.2 mL) to a knee surface area of approximately 800 cm$^2$). Following chronic dosing with Topical Diclofenac Solution for 6 weeks in this study, no significant increase in TEWL was observed. As measurement of TEWL has been shown to be a validated method for assessing skin barrier function (Fluhr J W, Feingold K R, Elias P M. Transepidermal water loss reflects permeability status: validation in human and rodent in vivo and ex vivo models. Exp Dermatol 2006; 15:483-492), these results indicate that Topical Diclofenac Solution did not alter the stratum corneum barrier function.

Treatment with Retin-A®, used as a positive control in this study, in the Challenge Period confirmed skin irritation following Retin-A® treatment and a resulting increase in TEWL, thus validating the study.

In conclusion, the results of this study demonstrate that following chronic dosing with Topical Diclofenac Solution, no significant increase in TEWL was observed, indicating that Topical Diclofenac Solution did not substantially alter the stratum corneum barrier function.

### Example 5

Ophthalmologic Effects of Topically Applied DMSO in a 52-Week Non-Occluded Dermal Toxicity Study in Göttingen Minipigs

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, comprising the results of a study that was conducted on minipigs which provides information about the ocular safety profile of dermally applied formulations containing purified DMSO.

The broad aim of this study was to evaluate the potential dermal toxicity of DMSO when administered topically to four groups of Göttingen Minipigs® for 52 weeks at concentrations of 0, 9%, 45.5% and 90% (w/w) and to evaluate reversibility, progression, or delayed appearance of any observed changes following a 1-month postdose observation period. Two additional groups of Göttingen Minipigs® were dosed topically for 39 weeks at 0% and 90% followed by a 4-month recovery post dose observation period.

Four groups consisting of six animals/sex/group received DMSO at respective dose levels of 0, 9, 45.5, or 90% (w/w) by dermal application three times a day for 364 consecutive days. Following 52 weeks of administration, two animals/sex at 0, 9, 45.5, and 90% dose levels were maintained for a 4-week recovery period. Two additional groups consisting of six animals/sex/group received the control or 90% (w/w) DMSO by dermal application three times a day for 273 consecutive days. Following 39 weeks of administration, two animals/sex at 0 and 90% dose levels were maintained for a 4 month recovery period. The control or test article was administered to all groups at a dose volume of 4.5 mL/dose/application site (0.015 mL/cm$^2$; 300 cm$^2$ application site) until Week 20. Beginning Week 20 the control or test article was administered to all groups at a dose volume 5.6 mL/dose/application site (0.015 mL/cm$^2$; 375 cm$^2$ application site).

| Group Assignments | | | |
|---|---|---|---|
| Group | Dose Concentration | Number of Animals | |
| Number | (%) | Male | Female |
| 1$^a$ | 0 | 6 | 6 |
| 2$^a$ | 9 | 6 | 6 |
| 3$^a$ | 45.5 | 6 | 6 |
| 4$^a$ | 90 | 6 | 6 |
| 5$^b$ | 0 | 6 | 6 |
| 6$^b$ | 90 | 6 | 6 |

$^a$Four animals/sex/group were necropsied after 52 weeks of administration. Two animals/sex/group remained on study for a 4-week recovery period.
$^b$Four animals/sex/group were necropsied after 39 weeks of administration. Two animals/sex/group remained on study for a 4-month recovery period.

Compositions of the control and test articles were as follows

| Control Vehicle | |
|---|---|
| Ethanol (95% v/v) | 11.79% w/w |
| Propylene Glycol | 11.20% w/w |
| Glycerin | 11.20% w/w |
| Purified Water | 65.81% w/w |
| 9% DMSO | |
| Ethanol (95% v/v) | 11.79% w/w |
| Propylene Glycol | 11.20% w/w |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000181

-continued

| Glycerin | 11.20% w/w |
| DMSO | 9.00% w/w |
| Purified Water | 56.81% w/w |
| 45.5% DMSO | |
| Ethanol (95% v/v) | 11.79% w/w |
| Propylene Glycol | 11.20% w/w |
| Glycerin | 11.20% w/w |
| DMSO | 45.50% w/w |
| Purified Water | 20.31% w/w |
| 90% DMSO | |
| Ethanol (95% v/v) | 2.00% w/w |
| Propylene Glycol | 2.00% w/w |
| Glycerin | 2.00% w/w |
| DMSO | 90.00% w/w |
| Purified Water | 4.00% w/w |

Observations for morbidity, mortality, injury, and the availability of food and water were conducted twice daily for all animals. Clinical observations were conducted weekly. At the end of the each treatment and recovery period, necropsy examinations were performed, organ weights were recorded, and selected tissues were microscopically examined.

One female at 90% DMSO was euthanized in extremis on Day 151 of the study. The cause of the morbidity of this animal was determined to be respiratory distress and this was considered incidental to treatment and not test article-related. All remaining animals survived to their scheduled termination at the terminal necropsy at 39 or 52 weeks and the 4-week and 4-month recovery periods.

Ophthalmoscopic examinations were conducted pretest, and during Weeks 26, 39, and 52. Examinations were performed by a doctor of veterinary medicine with Diplomate, American College of Veterinary Ophthalmologists credentials.

Unexpectedly given the results of earlier studies on non-primate species, no increased risk for development of lens opacities or refractive index changes associated with DMSO were observed. In fact, no test article-related ophthalmoscopic abnormalities of any kind were detected during the study. One female in the control group (i.e. an animal that had not been exposed to DMSO) had a posterior cortical axial cataract with equatorial extrusion at the Week 39 ophthalmoscopic examination. One male at 45.5% DMSO, one male at 90% DMSO, and one control female had conjunctivitis in one or both eyes only at the pretest examination. No other abnormalities were detected in any male or female at any of the ophthalmoscopic examinations.

Example 6

Ophthalmologic Effects of DMSO in a 26-Week Dermal Toxicity Study in Sprague-Dawley Rats Followed by a 12-Week Recovery Period

This Example describes novel preclinical information that may, for example, be provided to a user according to the present invention, comprising the results of a study conducted to evaluate the toxicity of test articles containing DMSO after dermal administration for 26 weeks, three times per day, and to evaluate reversibility of any observed changes following a 12-week post-dose observation period. Three treatment groups of 25 male and 25 female CD® [Cr1:CD®(SD)] Sprague-Dawley rats were administered the test article, Dimethyl sulfoxide (DMSO), at respective dose concentrations of 9, 45.5, and 90% w/w. One additional group of 25 animals/sex served as the control and received the vehicle. Compositions

of the test articles and control were identical to those used in Example 5 above. The vehicle or test article was administered to all groups epicutaneously, three times a day for 182 consecutive days, at a dose volume of 0.65 mL. Prior to test article administration, the hair was clipped from the back of the animal comprising no less than 10% of the total body surface area as estimated using the equation $A=9.6*W^{2/3}$ where A was the estimated total body surface in square centimeters and W was the body weight in grams. The area was adjusted weekly by group based on the mean body weight for each sex. Following 182 days of administration, 5 animals/sex/group were maintained for a 12-week recovery period.

Observations for morbidity, mortality, injury, and the availability of food and water were conducted twice daily for all animals. Ophthalmoscopic examinations were conducted pretest on all animals and prior to the terminal and recovery necropsies on all main study animals by doctors of veterinary medicine with Diplomate, American College of Veterinary Ophthalmologists credentials.

One female at 9% DMSO (Low dose), two males and one female at 90% DMSO (High dose) died, and two females at 45.5% DMSO (Mid dose), and one female at 90% DMSO were euthanized in extremis during the study. None of these deaths were considered to be related to treatment.

No test article-related ophthalmoscopic abnormalities were detected in any animal during the pretest, terminal, and recovery ophthalmoscopic examinations. At the recovery ophthalmoscopic examination, one female at 45.5% DMSO was seen with superficial keratitis in both eyes. This isolated common finding was considered incidental to treatment.

Example 7

A Single-Dose Pharmacokinetic Evaluation of a Topical Solution Containing 1.5% w/w Diclofenac Sodium and 45.5% DMSO in Normal Healthy Non-Smoking Male and Female Subjects

This Example describes novel clinical information that may, for example, be provided to a user according to the present invention, comprising the results of study conducted to evaluate the pharmacokinetics of diclofenac sodium, dimethyl sulfoxide (DMSO) and dimethyl sulfone (the major metabolite of DMSO) after a single-dose application of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution" [Pennsaid® [Nuvo Research Inc, Mississauga, Ontario Canada]). The study followed a one-period, open-label, single-dose design in 18 normal, healthy, non-smoking male and female subjects in which Topical Diclofenac Solution was applied to both knees of each subject in the study.

The 18 subjects enrolled in the study consisted of 14 Caucasians, 1 Asian and 3 Blacks (9 males, 9 females) with a mean age of 33 years (range=22 to 46 years). The subjects' mean height was 174 cm (range=163 to 188 cm) and the mean weight was 75 kg (range=54 to 90 kg).

Each subject was instructed to apply Topical Diclofenac Solution to clean knees, total 40 drops per knee: 10 drops each to the front of the knee, to each side and to the back. To avoid spillage, the subject was instructed to apply and spread 5 drops at a time, directly onto his/her hand, and then onto the site. The application left the area visibly wet for several minutes and was applied without massaging. Topical Diclofenac Solution was applied to both knees; the order of application did not matter. After each dosing, subjects waited

HZNPENN_00000182

for the application site to dry prior to dressing. The subject washed his/her hands after complete application to both knees.

The subjects fasted overnight for at least ten hours prior to Topical Diclofenac Solution administration and at least four hours following dosing. The treatments were administered topically to both knees in each subject starting at 7:00 a.m. (0.0 hour), with three-minute intervals between subjects.

Subjects were informed not to take any prescription medication, other than hormonal contraceptives, from at least 14 days prior to the study until the end of the study. Subjects were also advised not to take any over-the-counter drugs, except for spermicidal barrier contraceptive products, for at least seven days prior to the study up until the end of the study. They were specifically reminded that this included cold preparations, Aspirin®, Bufferin®, Excedrin®, Anacin®, etc., herbal/natural supplements, vitamins and antacid (magnesium and aluminium hydroxide) preparations. Subjects were informed that concomitant medication, whether prescription or over-the-counter, was not permitted during the study. Subjects were requested to abstain from grapefruit products, xanthine- and caffeine-containing foods and beverages (this included tea, coffee, chocolate and cola drinks) for 24 hours prior to the start of the study and until after the final blood draws for the study. Subjects were also requested to abstain from alcohol products for 48 hours prior to the start of the study and until after the final blood draws of the study.

Blood samples were collected at 0.0 hour (pre-dose), 1.0, 2.0, 4.0, 6.0, 8.0, 10.0, 12.0, 24.0, 36.0, 48.0, 60.0, 72.0, 96.0, 120.0, 144.0, 168.0, 192.0, 216.0 and 240.0 (hours post-dose).

The blood samples were kept in an ice bath prior to centrifugation and were centrifuged as soon as possible (within 30 minutes) under refrigerated conditions at 3,500 rpm for seven minutes. The plasma was removed from each blood collection tube and aliquotted into pre-cooled, labeled, duplicate, polypropylene tubes, kept in an ice bath prior to, being flash frozen in an upright position, in a dry-ice acetone bath and stored frozen at minus (−) 70° C.±10° C. The tubes were labeled with the study number, dosing period, subject number, study period, sampling time point, aliquot/tube number and matrix. Upon completion of the clinical portion of the study, all samples were transported in dry-ice to an analytical laboratory (Maxxam Analytics Inc.) for the analysis of diclofenac sodium, dimethyl sulfoxide and dimethyl sulfone using validated analytical methods.

Dimethyl sulfone was below the limit of quantitation in most samples and therefore pharmacokinetic analysis was not conducted. Graphs showing the average measured diclofenac sodium concentration and DMSO concentration in the subjects as a function of time are provided in FIGS. 3 and 4.

Pharmacokinetic analysis of the data was conducted using WinNonlin version 4.0 (Pharsight, Carry, US). The principal statistical software used was SAS®, version 8.00 (Statistical Analysis System). Results for pharmacokinetic parameters are summarized in the following tables.

| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 18 Mean ± SD |
|---|---|
| AUC₀₋ᵗ (ng · hr/mL) | 177.51 ± 72.62 |
| AUC₀₋ᵢₙf(ng · hr/mL)† | 196.27 ± 68.47 |

-continued

| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 18 Mean ± SD |
|---|---|
| $C_{max}$ (ng/mL) | 8.05 ± 5.94 |
| $T_{max}$ (hr) | 11.01 ± 6.44 |
| $t_{1/2}$ (hr)† | 36.72 ± 20.82 |
| $K_{el}$ (hr⁻¹)† | 0.024 ± 0.0098 |
| CL/F (L/hr)† | 244.66 ± 84.72 |

†n = 13

Single-Dose Pharmacokinetic Parameters for Diclofenac Sodium (for Two Knee Application)

| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 18 Mean ± SD |
|---|---|
| $AUC_{0-t}$ (µg · hr/mL) | 8.719 ± 4.611 |
| $AUC_{0-inf}$(µg · hr/mL)† | 9.174 ± 3.751 |
| $C_{max}$ (µg/mL) | 0.475 ± 0.335 |
| $T_{max}$ (hr) | 8.451 ± 2.708 |
| $t_{1/2}$ (hr)† | 8.422 ± 7.307 |
| $K_{el}$ (hr⁻¹)† | 0.1136 ± 0.0470 |
| CL/F (L/hr)† | 163.49 ± 64.14 |

†n = 9

Single-Dose Pharmacokinetic Parameters for Dimethyl Sulfoxide (for Two Knee Application)

Meanings of each of the parameters in the tables above are as follows:

$AUC_{0-t}$ Area under the concentration-time curve from time zero to time of last sampling time point

$AUC_{0-inf}$ Area under the concentration-time curve from time zero to infinity

$C_{max}$ Maximum plasma concentration after dosing

$T_{max}$ Time to occurrence of Cmax

$t_{1/2}$ Apparent elimination half-life

$K_{el}$ Apparent elimination rate constant

CL/F Apparent total body clearance

## Example 8

A Multi-Dose Pharmacokinetic Evaluation of a Topical Solution Containing 1.5% w/w Diclofenac Sodium and 45.5% DMSO in Normal Healthy Non-Smoking Male and Female Subjects

This Example describes novel clinical information that may, for example, be provided to a user according to the present invention, comprising the results of a study conducted to evaluate the pharmacokinetics of diclofenac sodium, dimethyl sulfoxide and dimethyl sulfone after multiple doses of a topical diclofenac preparation containing 1.5% diclofenac sodium (2-[(2,6-dichlorophenyl)amino]benzeneacetic acid, monosodium salt), 45.5% DMSO, ethanol, propylene glycol, glycerine, and water ("Topical Diclofenac Solution" [Pennsaid® [Nuvo Research Inc. Mississauga. Ontario Canada]) which, as in the previous Example 7, was applied to both knees of each subject. This study followed a one-period, open-label, multiple-dose design in 20 normal healthy, non-smoking male and female subjects.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000183

Twenty subjects (10 males, 10 females) with a mean age of 33 years (range=18 to 43 years) were enrolled in this study. The subjects' mean height was 171 cm (range=157 to 185 cm) and their mean weight was 69 kg (range=48 to 87 kg). The subjects consisted of 15 Caucasians, 3 Asians and 2 Blacks.

The treatment (40 drops, applied on the knee four times a day) was carried on for 7 days, and the pharmacokinetic profile was characterized on Day 8 after the 29th administration. Each dose of Topical Diclofenac Solution was applied to the knee following the procedure described previously in Example 7.

Doses were applied either at a clinic or at home according to following schedule:

Days 1 and 6: The subjects applied the first dose of Topical Diclofenac Solution to both knees in the clinic under supervision. The subjects applied the second, third and fourth doses of Topical Diclofenac Solution at home.

Days 2 to 5: The subjects applied all four doses of Topical Diclofenac Solution at home.

Day 7: The subjects applied the first dose of Topical Diclofenac Solution in the clinic and then exited. The second and third doses were applied at home. The fourth dose was applied in the clinic.

Day 8: The subjects applied the last dose of Topical Diclofenac Solution to both knees in the clinic following an overnight fast of at least ten hours.

Blood samples were drawn according to the following:

Days 1 and Day 6: 0.0 hour (pre-dose).

Day 7: 0.0 hour (pre-dose).

Day 8: 0.0 hour (pre-dose), 1.0, 2.0, 4.0, 6.0, 8.0, 12.0, 24.0, 36.0, 48.0, 60.0, 72.0, 96.0, 120.0, 168.0, 216.0, 264.0, 312.0 and 360.0 hours post 0.0 hour post-drug administration Day 8.

Blood samples were processed and analyzed using the methods described previously in Example 7.

One subject dropped out of the study for personal reasons so plasma concentration data from the 19 subjects who received the Topical Diclofenac Solution and who completed the study period were used in the pharmacokinetic analyses.

Steady state was achieved on Day 6 (after 20 doses) for the 3 molecular entities analyzed. On Day 8, diclofenac sodium remained measurable up to 360 hours post-dose in 11 subjects. On Day 8, DMSO and dimethyl sulfone ("DMSO₂") remained measurable up to 120 hours (10 subjects) and 216 hours (9 subjects) post-dose, respectively.

Plots of Diclofenac, DMSO and DMSO₂ concentrations are provided in FIGS. 5-7.

The pharmacokinetic analysis was conducted using Win-Nonlin Version 4.0 (Pharsight, Carry, US). The principal statistical software used was SAS®, version 8.00. Results for important pharmacokinetic parameters are provided in the tables below.

| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 19 Mean ± SD |
|---|---|
| $AUC_{0-t}$ (ng · hr/mL) | 695.398 ± 348.866 |
| $AUC_{0-inf}$ (ng · hr/mL)† | 745.192 ± 374.740 |
| $C_{max}$ (ng/mL) | 19.415 ± 9.326 |
| $T_{max}$ (hr) | 4.005 ± 6.541 |
| $t_{1/2}$ (hr)† | 76.972 ± 38.133 |
| $K_{el}$ (hr⁻¹)† | 0.0105 ± 0.0040 |

†n = 15

Multiple-Dose Pharmacokinetic Parameters for Diclofenac Sodium (for Two-Knee Application)

| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 19 Mean ± SD |
|---|---|
| $AUC_{0-t}$ (ug · hr/mL) | 31.887 ± 15.520 |
| $AUC_{0-inf}$ (ug · hr/mL)† | 35.979 ± 15.419 |
| $C_{max}$ (ug/mL) | 1.206 ± 0.575 |
| $T_{max}$ (hr) | 3.842 ± 3.468 |
| $t_{1/2}$ (hr)† | 43.123 ± 22.968 |
| $K_{el}$ (hr⁻¹)† | 0.0213 ± 0.0124 |

†n = 13

Multiple Dose Pharmacokinetic Parameters for Dimethyl Sulfoxide (for Two-Knee Application)

| Pharmacokinetic Parameter | PENNSAID ® TOPICAL SOLUTION n = 19 Mean ± SD |
|---|---|
| $AUC_{0-t}$ (ug · hr/mL) | 1525.292 ± 1065.245 |
| $AUC_{0-inf}$ (ug · hr/mL)† | 2339.190 ± 1276.555 |
| $C_{max}$ (ug/mL) | 18.033 ± 10.587 |
| $T_{max}$ (hr) | 9.397 ± 13.341 |
| $t_{1/2}$ (hr)† | 61.287 ± 18.376 |
| $K_{el}$ (hr⁻¹)† | 0.0123 ± 0.0039 |

†n = 11

Multiple-Dose Pharmacokinetic Parameters for Dimethyl Sulfone (for Two-Knee Application)

Quantities reported in the above tables have the meanings provided previously in Example 7. Origin of time (t=0) for calculation of $AUC_{0-t}$ and $AUC_{0-inf}$ is time of the last dose of drug on Day 8.

It will be appreciated that the data provided in Examples 7 and 8 evidence that the systemic exposure to diclofenac caused by use of Topical Diclofenac Solution to treat osteoarthritis of the knee (40 drops per knee QID) is much lower than that caused by a typical oral dose of diclofenac used in treatment of osteoarthritis (e.g. 50 mg TID). For example the label of Voltaren® Gel (http://www.voltarengel.com/pdf/Voltaren-PI-10-19.pdf) reports mean $AUC_{0-24}$=3890 ng·h/mL and mean $C_{max}$ of 2270 ng/mL for subjects taking 50 mg of oral diclofenac TID. Assuming the effects of additional doses of Topical Diclofenac Solution are additive, one would conclude from the $AUC_{0-inf}$ provided in Example 7 that the Topical Diclofenac Solution osteoarthritis dose results in only about 20% of the systemic exposure to the active provided by the oral drug. The fact that Topical Diclofenac Solution is shown to be comparable in efficacy to oral diclofenac sodium for treatment of osteoarthritis (see Example 1) is very surprising in view of these facts, especially as it is widely believed that NSAIDs, such as diclofenac, exert their analgesic effects both locally and centrally. Using the data from Example 8 it also can be computed that $C_{max}$ of orally administered diclofenac is more than one hundred fold higher than $C_{max}$ for Topical Diclofenac Solution.

ATTACHMENT

Full Prescribing Information

Warning: Cardiovascular and Gastrointestinal Risk

Cardiovascular Risk

Nonsteroidal anti-inflammatory drugs (NSAIDs) may cause an increased risk of serious cardiovascular throm-

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000184

botic events, myocardial infarction, and stroke, which can be fatal. This risk may increase with duration of use. Patients with cardiovascular disease or risk factors for cardiovascular disease may be at greater risk (see Warnings and Precautions (5.1)].

PENNSAID® Topical Solution is contraindicated in the peri-operative setting of coronary artery bypass graft (CABG) surgery/see Contraindications (4)].

Gastrointestinal Risk

NSAIDs cause an increased risk of serious gastrointestinal adverse events including bleeding, ulceration, and perforation of the stomach or intestines, which can be fatal. These events can occur at any time during use and without warning symptoms. Elderly patients are at greater risk for serious gastrointestinal events/see Warnings and Precautions (5.2)].

1. Indications and Usage

PENNSAID® Topical Solution is a nonsteroidal anti-inflammatory drug (NSAID) indicated for the treatment of signs and symptoms of osteoarthritis of the knee(s), including pain and impaired ability to perform daily activities.

2. Dosage and Administration

2.1 General Instructions

For the relief of the signs and symptoms of osteoarthritis of the knee(s), the recommended dose is 40 drops per knee, 4 times a day. Apply PENNSAID® Topical Solution to clean, dry skin. Wash the hands before and after application of PENNSAID® Topical Solution. To avoid spillage, dispense PENNSAID® 10 drops at a time either directly onto the knee or first into the hand and then onto the knee. Spread PENNSAID® Topical Solution evenly around front, back and sides of the knee. Repeat this procedure until 40 drops have been applied and the knee is completely covered with solution. To treat the other knee, if symptomatic, repeat the procedure. Application of PENNSAID® Topical Solution in an amount exceeding or less than the recommended dose has not been studied and is therefore not recommended.

2.2 Special Precautions

Showering/bathing should be avoided for at least 30 minutes after the application of PENNSAID® Topical Solution to the treated knee.

Patient should wash his/her hands after use.

PENNSAID® Topical Solution should not be applied to open wounds.

Contact of PENNSAID® Topical Solution with eyes and mucous membranes should be avoided.

External heat and/or occlusive dressings should not be applied to treated knees.

The wearing of clothing over the PENNSAID® Topical Solution-treated knee should be avoided until the treated knee is dry.

Exposure of the treated knee(s) to sunlight should be avoided.

Wait until the treated area is dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID® Topical Solution.

3. Dosage Forms and Strengths

1.5% w/w topical solution

4. Contraindications

The use of PENNSAID® Topical Solution is contraindicated in patients with a known hypersensitivity to diclofenac sodium or any other component of PENNSAID® Topical Solution.

PENNSAID® Topical Solution should not be administered in patients who have experienced asthma, urticaria, or allergic-type reactions after taking aspirin or other NSAIDs. Severe, rarely fatal, anaphylactic-like reactions to NSAIDs have been reported in such patients [see Warnings and Precautions (5.7, 5.14)].

PENNSAID® Topical Solution is contraindicated in the setting of coronary artery bypass graft (CABG) surgery [see Warnings and Precautions (5.1)].

5. Warnings and Precautions

5.1 Cardiovascular Thrombotic Events

Clinical trials of several oral COX-2 selective and nonselective NSAIDs of up to three years duration have shown an increased risk of serious cardiovascular (CV) thrombotic events, myocardial infarction (MI), and stroke, which can be fatal. All NSAIDs, including PENNSAID® and COX-2 selective and nonselective orally administered NSAIDS, may have a similar risk. Patients with known CV disease or risk factors for CV disease may be at greater risk. To minimize the potential risk for an adverse CV event in patients treated with an NSAID, the lowest effective dose should be used for the shortest duration possible. Physicians and patients should remain alert for the development of such events, even in the absence of previous CV symptoms. Patients should be informed about the signs and/or symptoms of serious CV events and the steps to take if they occur.

There is no consistent evidence that concurrent use of aspirin mitigates the increased risk of serious CV thrombotic events associated with NSAID use. The concurrent use of aspirin and NSAIDs, such as diclofenac, does increase the risk of serious GI events [see Warnings and Precautions (5.2)].

Two large, controlled, clinical trials of an orally administered COX-2 selective NSAID for the treatment of pain in the first 10-14 days following CABG surgery found an increased incidence of myocardial infarction and stroke [see Contraindications (4)].

5.2 Gastrointestinal Effects—Risk of GI Ulceration, Bleeding, and Perforation

The controlled studies of topically-applied PENNSAID® Topical Solution have demonstrated a profile of systemic adverse events similar to that of orally administered diclofenac sodium, including adverse gastrointestinal effects, but at a significantly lower incidence [see Adverse Reactions (6.1)].

NSAIDs, including diclofenac, can cause serious gastrointestinal (GI) adverse events including bleeding, ulceration, and perforation of the stomach, small intestine, or large intestine, which can be fatal. These serious adverse events can occur at any time, with or without warning symptoms, in patients treated with NSAIDs. Only one in five patients who develop a serious upper GI adverse event on NSAID therapy is symptomatic. Upper GI ulcers, gross bleeding, or perforation caused by NSAIDs occur in approximately 1% of patients treated for 3-6 months, and in about 2-4% of patients treated for one year. These trends continue with longer duration of use, increasing the likelihood of developing a serious GI event at some time during the course of therapy. However, even short-term therapy is not without risk.

NSAIDs should be prescribed with extreme caution in those with a prior history of ulcer disease or gastrointestinal bleeding. Patients with a prior history of peptic ulcer disease and/or gastrointestinal bleeding who use NSAIDs have a greater than 10-fold increased risk for developing a GI bleed compared to patients with neither

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000185

of these risk factors. Other factors that increase the risk of GI bleeding in patients treated with NSAIDs include concomitant use of oral corticosteroids or anticoagulants, longer duration of NSAID therapy, smoking, use of alcohol, older age, and poor general health status. Most spontaneous reports of fatal GI events are in elderly or debilitated patients and therefore, special care should be taken in treating this population.

To minimize the potential risk for an adverse GI event, the lowest effective dose should be used, for the shortest possible duration. Patients and physicians should remain alert for signs and symptoms of GI ulceration and bleeding during diclofenac therapy and promptly initiate additional evaluation and treatment if a serious GI adverse event is suspected. For high-risk patients, alternate therapies that do not involve NSAIDs should be considered.

5.3 Hepatic Effects

The controlled studies of topically-applied PENNSAID® Topical Solution have demonstrated a profile of systemic adverse events similar to that of orally administered diclofenac sodium, including adverse hepatic effects (increased transaminases), but at a significantly lower incidence [see *Adverse Reactions* (6.1)].

In addition to the borderline elevations of one or more liver tests that may occur in up to 15% of patients taking oral NSAIDs, in clinical trials of oral diclofenac of up to 3 years in duration, notable elevations of ALT or AST (approximately three or more times the upper limit of normal) have been reported in 1-5% of patients including elevations of more than 8 times the ULN. In addition to enzyme elevations seen in clinical trials, postmarketing surveillance has reported cases of severe hepatic reactions, including liver necrosis, jaundice, fulminant hepatitis with and without jaundice, and liver failure with rates generally higher than for other NSAIDs. Some of these reported cases resulted in fatalities or liver transplantation. Physicians should measure transaminases periodically in patients receiving long-term therapy with oral diclofenac, because severe hepatotoxicity may develop without a prodrome of distinguishing symptoms. The optimum times for making the first and subsequent transaminase measurements are not known. In one U.S. trial (open-label) of oral diclofenac that involved 3,700 patients monitored first at 8 weeks and 1,200 patients monitored again at 24 weeks, almost all meaningful elevations in transaminases were detected before patients became symptomatic. In 42 of the 51 patients in all trials who developed marked transaminase elevations, abnormal tests occurred during the first 2 months of treatment with diclofenac. Postmarketing experience has shown severe hepatic reactions can occur at any time during treatment with oral diclofenac. Cases of drug-induced hepatotoxicity have been reported in the first month, and in some cases, the first 2 months of therapy. Based on these experiences, transaminases should be monitored within 4 to 8 weeks after initiating treatment with oral diclofenac.

If abnormal liver tests persist or worsen, if clinical signs and/or symptoms consistent with liver disease develop, or if systemic manifestations occur (e.g., eosinophilia, rash), PENNSAID® Topical Solution should be discontinued immediately.

To minimize the possibility that hepatic injury will become severe between transaminase measurements, physicians should inform patients of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy,

pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms), and the appropriate action patients should take if these signs and symptoms appear.

5.4 Hypertension

No difference in hypertension was detected between PENNSAID® Topical Solution and placebo in controlled clinical studies [see *Adverse Reactions* (6.1)].

NSAIDs, including PENNSAID® Topical Solution, can lead to the onset of new hypertension or worsening of preexisting hypertension, either of which may contribute to the increased incidence of CV events. Patients taking thiazides or loop diuretics may have impaired response to these therapies when taking NSAIDs. NSAIDs, including PENNSAID® Topical Solution, should be used with caution in patients with hypertension. As with all NSAIDs, blood pressure should be monitored closely during the initiation of therapy with PENNSAID® Topical Solution and throughout the course of therapy.

5.5 Congestive Heart Failure and Edema

Fluid retention and edema have been observed in some patients treated with NSAIDs, including PENNSAID® Topical Solution. PENNSAID® Topical Solution should be used with caution in patients with fluid retention or heart failure.

5.6 Renal Effects

The controlled studies of topically-applied PENNSAID® Topical Solution have demonstrated a profile of systemic adverse events similar to that of orally administered diclofenac sodium, including adverse renal effects, but at a lower incidence [see *Adverse Reactions* (6.1)].

Long-term administration of NSAIDs has resulted in renal papillary necrosis and other renal injury. Renal toxicity has also been seen in patients in whom renal prostaglandins have a compensatory role in the maintenance of renal perfusion. In these patients, administration of an NSAID may cause a dose-dependent reduction in prostaglandin formation and, secondarily, in renal blood flow, which may precipitate overt renal decompensation. Patients at greatest risk of this reaction are those with impaired renal function, heart failure, liver dysfunction, those taking diuretics and ACE inhibitors, and the elderly. Discontinuation of NSAID therapy is usually followed by recovery to the pretreatment state.

No information is available from controlled clinical studies regarding the use of PENNSAID® Topical Solution in patients with advanced renal disease. Therefore, treatment with PENNSAID® Topical Solution is not recommended in patients with advanced renal disease. If PENNSAID® Topical Solution therapy is initiated, close monitoring of the patient's renal function is advisable.

5.7 Anaphylactoid Reactions

As with other NSAIDs, anaphylactoid reactions may occur in patients without prior exposure to PENNSAID® Topical Solution. PENNSAID® Topical Solution should not be given to patients with the aspirin triad. This symptom complex typically occurs in asthmatic patients who experience rhinitis with or without nasal polyps, or who exhibit severe, potentially fatal bronchospasm after taking aspirin or other NSAIDs [see *Contraindications* (4) and *Warnings and Precautions* (5.14)]. Emergency help should be sought in cases where an anaphylactoid reaction occurs.

5.8 Skin Reactions

No serious skin adverse events have been reported in clinical trials with PENNSAID® Topical Solution.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000186

55

PENNSAID® Topical Solution should not be applied to open skin wounds, infections, inflammations, or exfoliative dermatitis, as it may affect absorption and tolerability of the drug.

NSAIDs, including PENNSAID® Topical Solution, can cause serious skin adverse events such as exfoliative dermatitis, Stevens-Johnson Syndrome (SJS), and toxic epidermal necrolysis (TEN), which can be fatal. These serious events may occur without warning. Patients should be informed about the signs and symptoms of serious skin manifestations, and the use of the drug should be discontinued at the first appearance of skin rash or any other signs of hypersensitivity.

The effect of PENNSAID® Topical Solution under occlusive dressing has not been evaluated, and should be avoided.

5.9 Ophthalmologic Effects

In a recent 26 week rat study and a 52 week minipig study, conducted according to current GLP and using the same source of purified DMSO as in PENNSAID® Topical Solution, no abnormal eye changes were observed. In human clinical studies of PENNSAID® Topical Solution with treatment for up to one year, no abnormal changes other than normal age-related findings were observed. Some early studies (1960s-1970s) in rabbits, dogs and pigs and one study in monkeys demonstrated an increased risk for development of lens opacities and changes in refractive index associated with DMSO. Three other monkey studies of up to one year showed no abnormality.

5.10 Pregnancy

As with other NSAIDs, PENNSAID® Topical Solution should be avoided because it may cause premature closure of the ductus arteriosus. The effect of DMSO on the human fetus is unknown.

5.11 Corticosteroid Treatment

PENNSAID® Topical Solution cannot be expected to substitute for corticosteroids or to treat corticosteroid insufficiency. Abrupt discontinuation of corticosteroids may lead to exacerbation of corticosteroid-response illness. Patients on prolonged corticosteroid therapy should have their therapy tapered slowly if a decision is made to discontinue corticosteroids.

5.12 Inflammation

The pharmacological activity of PENNSAID® Topical Solution in reducing inflammation, and possibly fever, may diminish the utility of these diagnostic signs in detecting complications of presumed noninfectious, painful conditions.

5.13 Hematological Effects

No difference in hemoglobin abnormality was detected between PENNSAID® Topical Solution and placebo in controlled clinical studies [see Adverse Reactions (6.1)].

The effects of PENNSAID® Topical Solution on platelet function were studied in 10 healthy subjects administered 80 drops four times a day for 7 days. There was no significant change in platelet aggregation following one week of treatment [see Clinical Pharmacology (12.4)].

Anemia is sometimes seen in patients receiving NSAIDs. This may be due to fluid retention, occult or gross GI blood loss, or an incompletely described effect upon erythropoiesis. Patients on long-term treatment with NSAIDs, including PENNSAID® Topical Solution, should have their hemoglobin or hematocrit checked if they exhibit any signs or symptoms of anemia or blood loss.

56

NSAIDs inhibit platelet aggregation and have been shown to prolong bleeding time in some patients. Unlike aspirin, their effect on platelet function is quantitatively less, of shorter duration and reversible. Patients receiving PENNSAID® Topical Solution who may be adversely affected by alterations in platelet function, such as those with coagulation disorders or patients receiving anticoagulants, should be carefully monitored.

5.14 Preexisting Asthma

Patients with asthma may have aspirin-sensitive asthma. The use of aspirin in patients with aspirin-sensitive asthma has been associated with severe bronchospasm, which can be fatal. Since cross-reactivity, including bronchospasm, between aspirin and other nonsteroidal anti-inflammatory drugs has been reported in such aspirin-sensitive patients, PENNSAID® Topical Solution should not be administered to patients with this form of aspirin sensitivity and should be used with caution in patients with preexisting asthma.

5.15 Sun Exposure

Patients should minimize or avoid exposure to natural or artificial sunlight on treated knee(s) because studies in animals indicated topical diclofenac treatment resulted in an earlier onset of ultraviolet light-induced skin tumors. The potential effects of PENNSAID® Topical Solution on skin response to ultraviolet damage in humans are not known.

5.16 Eye Exposure

Contact of PENNSAID® Topical Solution with eyes and mucosa, although not studied, should be avoided. Patients should be advised that if eye contact occurs, they should immediately wash out the eye with water or saline and consult a physician if irritation persists for more than an hour.

5.17 Laboratory Tests

The controlled studies of topically-applied PENNSAID® Topical Solution have demonstrated a profile of systemic adverse events similar to that of orally administered diclofenac sodium, including abnormal laboratory tests, but at a significantly lower incidence [see Adverse Reactions (6.1)].

Because serious GI tract ulcerations and bleeding can occur without warning symptoms in patients taking NSAIDs, physicians should monitor for signs or symptoms of GI bleeding. Patients on long-term treatment with NSAIDs, should have their CBC and a chemistry profile checked periodically. If abnormal liver tests or renal tests persist or worsen, PENNSAID® Topical Solution should be discontinued.

6. Adverse Reactions

6.1 Clinical Studies Experience

Because clinical trials are conducted under widely varying conditions, adverse reaction rates observed in the clinical trials of a drug cannot be directly compared to rates in the clinical trials of another drug and may not reflect the rates observed in practice.

The data described below reflect exposure to PENNSAID® Topical Solution of 911 patients treated between 4 and 12 weeks (mean duration of 49 days) in seven Phase 3 controlled trials, as well as exposure of 793 patients treated in an open label study, including 463 patients treated for at least 6 months, and 144 patients treated for at least 12 months. The population mean age was approximately 60 years, 89% of patients were Caucasians, 64% were females, and all patients had primary osteoarthritis. The most common adverse events with PENNSAID® Topical Solution were application site

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX189

skin reactions. These events were the most common reason for withdrawing from the studies.

Application site reactions:

In the controlled trials, the most common treatment-related adverse events in patients receiving PENNSAID® Topical Solution were application site skin reactions. Application site reactions were characterized by one or more of the following: dryness, erythema, induration, vesicles, paresthesia, pruritus, vasodilation, acne, and urticaria. The most frequent of these reactions were dry skin (32%), contact dermatitis characterized by skin erythema and induration (9%), contact dermatitis with vesicles (2%) and pruritus (4%). In one controlled trial, a higher rate of contact dermatitis with vesicles (4%) was observed after treatment of 152 subjects with the combination of PENNSAID® Topical Solution and oral diclofenac. In the open label uncontrolled long-term safety study, contact dermatitis occurred in 13% and contact dermatitis with vesicles in 10% of patients, generally within the first 6 months of exposure, leading to a withdrawal rate for an application site event of 14%.

Adverse events common to the NSAID class:

In controlled trials, subjects treated with PENNSAID® Topical Solution experienced some adverse events associated with the NSAID class more frequently than subjects using placebo (constipation, diarrhea, dyspepsia, nausea, flatulence, abdominal pain, edema; see Table 1). In direct comparative trials these adverse events occurred less frequently with PENNSAID® Topical Solution than with oral diclofenac (see Table 1). The adverse event hypertension was reported less frequently with PENNSAID® Topical Solution (less than 1%) than oral diclofenac (2%), and was not different from placebo (less than 1%). Based on a clinical definition of hypertension (20% increase in diastolic blood pressure or increase in blood pressure to >150/100), less hypertension was detected with PENNSAID® Topical Solution (4%) than oral diclofenac (7%), and no difference was found compared to placebo (3%). Serious adverse events were observed in the controlled and open label long-term trial in less than 1% of patients (upper and lower GI hemorrhage, partial small bowel obstruction, myocardial infarction, angina, cerebrovascular accident, transient ischemic attack).

Some laboratory abnormalities associated with the NSAID class were detected more frequently with PENNSAID® Topical Solution than with placebo (abnormal serum sodium, chloride and urea). Some NSAID-related laboratory abnormalities were not different between PENNSAID® Topical Solution and placebo (abnormal hemoglobin, transaminases, and creatinine). Elevation in liver function tests occurred marginally more frequently with PENNSAID® Topical Solution (ALT, 4.1%; AST, 3.7%) than with placebo (ALT, 2.4%; AST, 2.3%). In direct comparative trials laboratory abnormalities associated with the NSAID class occurred less frequently with PENNSAID® Topical Solution than with oral diclofenac (hemoglobin, 3% vs. 9%; ALT, 4% vs. 17%; AST, 4% vs. 13%; creatinine, 3% vs. 7%; urea, 9% vs. 12%).

The combination of PENNSAID® Topical Solution and oral diclofenac, compared to oral diclofenac alone, resulted in a higher rate of rectal hemorrhage (3% vs. less than 1%), and more frequent abnormal creatinine (12% vs. 7%), urea (20% vs. 12%), and hemoglobin (13% vs. 9%), but no difference in elevation of liver transaminases.

Table 1 lists all adverse reactions occurring in ≥1% of patients receiving PENNSAID® Topical Solution, where the rate in the PENNSAID® Topical Solution group exceeded placebo, from seven controlled trials conducted in patients with osteoarthritis. Since these trials were of different durations, these

### TABLE 1

Adverse Reactions occurring in ≥1% of patients treated with PENNSAID ® Topical Solution in placebo and oral diclofenac-controlled trials.

| | Treatment Group: | | |
| | PENNSAID ® Topical Solution N = 911 | Topical Placebo N = 332 | Oral diclofenac N = 462 |
| Adverse Reaction† | N (%) | N (%) | N (%) |
|---|---|---|---|
| Dry Skin (Application Site) | 292 (32) | 17 (5) | 8 (2) |
| Contact Dermatitis (Application Site) | 83 (9) | 6 (2) | 6 (1) |
| Dyspepsia | 72 (8) | 13 (4) | 87 (19) |
| Abdominal Pain | 54 (6) | 10 (3) | 78 (17) |
| Flatulence | 35 (4) | 1 (<1) | 52 (11) |
| Pruritus (Application Site) | 34 (4) | 7 (2) | 2 (<1) |
| Diarrhea | 33 (4) | 7 (2) | 61 (13) |
| Nausea | 33 (4) | 3 (1) | 44 (10) |
| Pharyngitis | 40 (4) | 13 (4) | 4 (<1) |
| Constipation | 29 (3) | 1 (<1) | 33 (7) |
| Edema | 26 (3) | 0 | 27 (6) |
| Rash | 25 (3) | 5 (2) | 7 (2) |
| Infection | 25 (3) | 8 (2) | 18 (4) |
| Ecchymosis | 19 (2) | 1 (<1) | 9 (2) |
| Dry Skin | 19 (2) | 1 (<1) | 1 (<1) |
| Contact Dermatitis, vesicles (Application Site) | 18 (2) | 0 | 1 (<1) |
| Paresthesia | 14 (2) | 3 (<1) | 4 (<1) |
| Accidental Injury | 22 (2) | 7 (2) | 11 (2) |
| Pruritus | 15 (2) | 2 (<1) | 10 (2) |
| Sinusitis | 10 (1) | 2 (<1) | 6 (1) |
| Halitosis | 11 (1) | 1 (<1) | 1 (<1) |
| Application Site Reaction | 11 (1) | 3 (<1) | 0 (0) |

†Preferred Term according to COSTART

6.2 Postmarketing Experience

Over 6 million bottles of PENNSAID® Topical Solution have been prescribed in non-US countries. In non-US post-marketing surveillance, the following adverse reactions have been reported during post-approval use of PENNSAID® Topical Solution. Because these reactions are reported voluntarily from a population of uncertain size, it is not always possible to reliably estimate their frequency or establish a causal relationship to drug exposure.

Body as a whole: abdominal pain, accidental injury, allergic reaction, asthenia, back pain, body odor, chest pain, edema, face edema, halitosis, headache, lack of drug effect, neck rigidity, pain

Cardiovascular: palpitation, cardiovascular disorder

Digestive: diarrhea, dry mouth, dyspepsia, gastroenteritis, decreased appetite, mouth ulceration, nausea, rectal hemorrhage, ulcerative stomatitis

Metabolic and Nutritional: creatinine increased

Musculoskeletal: leg cramps, myalgia

Nervous: depression, dizziness, drowsiness, lethargy, paresthesia, paresthesia at application site

Respiratory: asthma, dyspnea, laryngismus, laryngitis, pharyngitis

Skin and Appendages: At the Application Site: contact dermatitis, contact dermatitis with vesicles, dry skin,

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000188

pruritus, rash; Other Skin and Appendages Adverse Reactions: eczema, rash, pruritus, skin discoloration, urticaria

Special senses: abnormal vision, blurred vision, cataract, ear pain, eye disorder, eye pain, taste perversion

Urogenital: breast enlargement

## 7. Drug Interactions

Drug interactions with the use of PENNSAID® Topical Solution have not been studied. The following drug interactions are noted for oral diclofenac sodium.

### 7.1 Aspirin

When diclofenac is administered with aspirin, the binding of diclofenac to protein is reduced, although the clearance of free diclofenac is not altered. The clinical significance of this interaction is not known; however, as with other NSAIDs, concomitant administration of diclofenac and aspirin is not generally recommended because of the potential of increased adverse effects.

### 7.2 Anticoagulants

The effects of anticoagulants such as warfarin and NSAIDs on GI bleeding are synergistic, such that users of both drugs together have a risk of serious GI bleeding higher than users of either drug alone.

### 7.3 ACE-Inhibitors

NSAIDs may diminish the antihypertensive effect of angiotensin converting enzyme (ACE) inhibitors. This interaction should be given consideration in patients taking NSAIDs concomitantly with ACE-inhibitors.

### 7.4 Diuretics

Clinical studies, as well as post-marketing observations, have shown that NSAIDs can reduce the natriuretic effect of furosemide and thiazides in some patients. The response has been attributed to inhibition of renal prostaglandin synthesis. During concomitant therapy with NSAIDs, the patient should be observed closely for signs of renal failure [see *Warnings and Precautions* (5.6)], as well as to assure diuretic efficacy.

### 7.5 Lithium

NSAIDs have produced an elevation of plasma lithium levels and a reduction in renal lithium clearance. The mean minimum lithium concentration increased 15% and the renal clearance was decreased by approximately 20%. These effects have been attributed to inhibition of renal prostaglandin synthesis by the NSAID. Thus, when NSAIDs, including diclofenac, and lithium are administered concurrently, patients should be observed carefully for signs of lithium toxicity.

### 7.6 Methotrexate

NSAIDs have been reported to competitively inhibit methotrexate accumulation in rabbit kidney slices. This may indicate that they could enhance the toxicity of Methotrexate. Caution should be used when NSAIDs, including diclofenac, are administered concomitantly with methotrexate.

### 7.7 Cyclosporine

Diclofenac, like other NSAIDs, may affect renal prostaglandins and increase the toxicity of certain drugs. Therefore, concomitant therapy with diclofenac may increase cyclosporine's nephrotoxicity. Caution should be used when diclofenac is administered concomitantly with cyclosporine.

### 7.8 Oral Nonsteroidal Anti-inflammatory Drugs

Concomitant use of oral NSAIDs with PENNSAID® Topical Solution has been evaluated in one Phase 3 controlled trial and was generally well tolerated. The combination of PENNSAID® Topical Solution and oral diclofenac, compared to oral diclofenac alone, was well

tolerated but resulted in a higher rate of rectal hemorrhage (3% vs. less than 1%), and more frequent abnormal creatinine (12% vs. 7%), urea (20% vs. 12%) and hemoglobin (13% vs. 9%). Patients on combination therapy with PENNSAID® Topical Solution and an oral NSAID should have periodic laboratory evaluations, as for any long-term treatment with an oral NSAID.

### 7.9 Topical Treatments

Concomitant use of PENNSAID® Topical Solution with other topical products, including DEET (active ingredient in insect repellent), 2,4-D (active ingredient in commonly used pesticides) and oxybenzone (active ingredient in sunscreens), on the same skin site has been tested in the minipig. The results show that repeated application of PENNSAID® Topical Solution did not enhance the systemic absorption of these products.

In addition, a transepidermal water loss study was performed on human volunteers' skin and found no alteration in skin barrier function following chronic use of PENNSAID® Topical Solution.

Before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same skin surface of the knee you have just treated with PENNSAID® Topical Solution, wait until the treated area is dry, which occurs most often within 10 minutes.

## 8. Use in Specific Populations

### 8.1 Pregnancy

The safety of PENNSAID® Topical Solution has not been established during pregnancy. There are no adequate and well-controlled studies of diclofenac in pregnant women. Human and animal studies indicate that diclofenac crosses the placenta. As with other NSAIDs, PENNSAID® Topical Solution should be avoided during pregnancy because it may cause premature closure of the ductus arteriosus.

Teratogenic Effects

Pregnancy Category C: Studies in mice administered diclofenac at doses up to up to 20 mg/kg/day and in rats and rabbits at doses up to 10 mg/kg/day resulted in no evidence of developmental teratogenicity despite the induction of maternal toxicity and fetal toxicity. DMSO administered orally to pregnant female rats during days 6-15 of gestation was not teratogenic at doses up to 5 mg/kg/day. DMSO administered orally to pregnant female rabbits during Day 7 to Day 28 post-coitum of gestation was not teratogenic at doses up to 1000 mg/kg/day.

Nonteratogenic Effects

Because of the known effects of NSAIDs on the fetal cardiovascular system (closure of ductus arteriosus) and unknown effect of DMSO on the human fetus, use of PENNSAID® Topical Solution during pregnancy should be avoided.

### 8.2 Labor and Delivery

In rat studies with oral NSAIDs, including diclofenac, as with other drugs known to inhibit prostaglandin synthesis, there is an increased incidence of dystocia and delayed parturition with exposure corresponding in humans to the maximum recommended clinical dose (based on bioavailability and body surface area comparison). The effects of PENNSAID® Topical Solution on labor and delivery in pregnant women are unknown.

### 8.3 Nursing Mothers

It is not known whether diclofenac is excreted in human milk following application of PENNSAID® Topical Solution. Studies in animals detected diclofenac in the milk after oral administration. Because many drugs are excreted in human milk and because of the potential for

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000189

serious adverse reactions in nursing infants, a decision should be made whether to discontinue nursing or to discontinue PENNSAID® Topical Solution, taking into account the importance of the drug to the mother.

8.4 Pediatric Use

Safety and effectiveness in pediatric patients have not been established.

8.5 Geriatric Use

Of the 911 patients treated with PENNSAID® Topical Solution in seven controlled, Phase 3 clinical trials, 444 subjects were 65 years of age and over. There was no age-related difference in the incidence of adverse events. Of the 793 patients treated with PENNSAID® Topical Solution in one open-labeled safety trial, 334 subjects were 65 years of age and over including 107 subjects 75 and over. There was no difference in the incidence of adverse events with long-term exposure to PENNSAID® Topical Solution for this elderly population. As with any NSAID, caution should be exercised in treating the elderly (65 years and, older) and it may be useful to monitor renal function since they are more likely to have decreased baseline renal function.

10. Overdosage

There have been no known experiences of overdose with PENNSAID® Topical Solution.

In the event of accidental oral ingestion of PENNSAID® Topical Solution, the maximum exposure from an entire 60 mL bottle is 963 mg of diclofenac and 29 g of DMSO.

Symptoms following acute NSAID overdose are usually limited to lethargy, drowsiness, nausea, vomiting, and epigastric pain, which are generally reversible with supportive care. Gastrointestinal bleeding can occur. Hypertension, acute renal failure, respiratory depression and coma may occur, but are rare. Anaphylactoid reactions have been reported with therapeutic ingestion of NSAIDs, and may occur following an overdose.

Patients should be managed by symptomatic and supportive care following an NSAID overdose. There are no specific antidotes. Emesis is not recommended due to a possibility of aspiration and subsequent respiratory irritation by DMSO contained in PENNSAID® Topical Solution. Activated charcoal (60 to 100 g in adults, 1 to 2 g/kg in children) and/or osmotic cathartic may be indicated in patients seen within 4 hours of ingestion with symptoms or following a large overdose (5 to 10 times the usual dose). Forced diuresis, alkalinization of urine, hemodialysis, or hemoperfusion may not be useful due to high protein binding.

For additional information about overdose treatment, call a poison control center (1-800-222-1222).

11. Description

PENNSAID® Topical Solution is a clear, colorless to faintly pink-orange solution for topical application.

PENNSAID® Topical Solution contains 1.5% w/w diclofenac sodium, a benzene-acetic acid derivative that is a nonsteroidal anti-inflammatory drug (NSAID), designated chemically as 2-[(2,6-dichlorophenyl)amino] benzeneacetic acid, monosodium salt. The molecular weight is 318.14. Its molecular formula is $C_{14}H_{10}Cl_2NNaO_2$ and it has the following structural formula:

Each 1 mL of solution contains 16.05 mg of diclofenac sodium. In addition, PENNSAID® Topical Solution contains the following inactive ingredients: dimethyl sulfoxide (DMSO, 45.5% w/w), propylene glycol, alcohol, glycerin and purified water. The DMSO used in PENNSAID® Topical Solution is manufactured under cGMP conditions and conforms to USP specifications.

12. Clinical Pharmacology

12.1 Mechanism of Action

The mechanism of action of diclofenac is similar to that of other nonsteroidal anti-inflammatory drugs. Diclofenac inhibits the enzyme, cyclooxygenase (COX), an early component of the arachidonic acid cascade, resulting in the reduced formation of prostaglandins, thromboxanes and prostacylin. It is not completely understood how reduced synthesis of these compounds results in therapeutic efficacy.

12.2 Pharmacodynamics

Diclofenac, the active component of PENNSAID® Topical Solution has anti-inflammatory, anti-nociception, and antipyretic effects. The diclofenac sodium in PENNSAID® Topical Solution is formulated in a solution base containing DMSO, which enhances diclofenac penetration through the skin.

12.3 Pharmacokinetics

After topical administration to 18 healthy human volunteers of a single maximum dose of PENNSAID® Topical Solution, 40 drops (approximately 1.2 mL) to each knee (80 drops total dose), the peak plasma concentration of diclofenac sodium was $8.1 \pm 5.9$ ng/mL. (see Table 2).

After topical administration to 19 healthy human volunteers of multiple maximum doses of PENNSAID® Topical Solution, 40 drops (approximately 1.2 mL) to each knee (80 drops total dose) q.i.d. for 7 days, the peak plasma concentration of diclofenac sodium was $19.4 \pm 9.3$ ng/mL.

(see TABLE 2)

TABLE 2

| | Single-dose (80 drops) and Multiple Dose (80 drops q.i.d. for 7 days) PENNSAID ® Topical Solution Pharmacokinetic Parameters | |
|---|---|---|
| | Diclofenac sodium | |
| Pharmacokinetic Parameters | Normal Adults [N = 18] (Age: 18-55 years) Single Dose | Normal Adults [N = 19] (Age: 18-55 years) Multiple Dose |
| $AUC_{0-t}$ | $177.5 \pm 72.6$ ng · h/mL | $695.4 \pm 348.9$ ng · h/mL |
| $AUC_{0-inf}$ | $196.3 \pm 68.5$ ng · h/mL | $745.2 \pm 374.7$ ng · h/mL |
| Plasma $C_{max}$ | $8.1 \pm 5.9$ ng/mL | $19.4 \pm 9.3$ ng/mL |
| Plasma $T_{max}$ (h) | $11.0 \pm 6.4$ | $4.0 \pm 6.5$ |
| Plasma $T_{1/2}$ (h) | $36.7 \pm 20.8$ | $79.0 \pm 38.1$ |
| $K_{el}$ (h$^{-1}$) | $0.024 \pm 0.010$ | $0.011 \pm 0.004$ |
| CL/F (L/h) | $244.7 \pm 84.7^1$ | — |

$^1$Apparent total body clearance

Maximum plasma concentration of diclofenac appears to be significantly lower with use of PENNSAID® Topical Solution than with comparable treatment using oral

HZNPENN_00000190

diclofenac. Literature review indicates that, following oral administration of a single dose of 50 mg diclofenac sodium, the observed diclofenac mean plasma concentration was 1,500-1,600 ng/mL. This level is approximately 185-198 times higher than the level observed following a single topical application of 40 drops PENNSAID® Topical Solution to both knees.

12.4 Platelets

The effect of PENNSAID® Topical Solution on platelet function was evaluated in 10 healthy human volunteers as a sub-study of a multiple-dose pharmacokinetic study [see *Pharmacokinetics* (12.3)]. Average (range) platelet aggregation ratio following stimulation with adenosine diphosphate, collagen, epinephrine and arachidonic acid was 101.3% (73.3-128.1), 99.8% (69.6-112.9), 109.9% (66.2-178.1) and 99.0% (15.5-126.6) of baseline value, respectively. These results indicate that there was no effect on platelet aggregation after application of the maximum clinical dose for 7 days [see *Pharmacokinetics* (12.3)].

13. Nonclinical Toxicology

13.1 Carcinogenesis, Mutagenesis, Impairment of Fertility.

Long-term studies in animals to evaluate the carcinogenic potential of PENNSAID® Topical Solution have not been performed.

In rats, a lifetime (2-year) oral administration of diclofenac up to 2 mg/kg/day resulted in no significant increases in tumor incidence, although there was a slight increase in benign mammary fibroadenomas in females of the high-dose (0.5 mg/kg/day) group. The high-dose female group had excessive mortality and could not be evaluated. A similar lifetime (2-year) oral administration of diclofenac in mice at doses up to 0.3 mg/kg/day in males and 1 mg/kg/day in females also resulted in no significant increase in tumor incidence.

In a dermal carcinogenicity study conducted in albino mice, daily topical applications of a diclofenac sodium gel product for two years at concentrations up to 0.035% diclofenac sodium (a 43-fold lower diclofenac sodium concentration than present in PENNSAID® Topical Solution) did not increase neoplasm incidence.

In a photococarcinogenicity study conducted in hairless mice, topical application of a diclofenac sodium gel product at doses up to 0.035% diclofenac sodium (a 43-fold lower diclofenac sodium concentration than present in PENNSAID® Topical Solution) resulted in an earlier median time of onset of tumors.

Diclofenac has been shown to be neither mutagenic nor clastogenic in a battery of genotoxicity tests that included the bacterial reverse mutation assay, in vitro mouse lymphoma point mutation assay, chromosomal aberration studies in Chinese hamster ovarian cells in vitro, and in vivo rat chromosomal aberration assay of bone marrow cells. Published studies indicated DMSO was not mutagenic in the Ames test. PENNSAID® Topical Solution was not clastogenic in the in vivo mouse micronucleus assay at doses close to the maximum tolerated dose of 12 mL/kg (corresponding to 178 mg/kg diclofenac and 5.86 g/kg DMSO administered to the mouse).

Fertility studies have not been conducted with PENNSAID® Topical Solution. For diclofenac, male and female rats orally administered 4 mg/kg/day did not affect fertility. In rats, maternal toxic doses were associated with dystocia, prolonged gestation, reduced fetal weights and growth, and reduced fetal survival. Rabbits treated with oral doses of 5 or 10 mg/animal/day during the gestation period resulted in a dose-dependent increase in resorptions, reduced fetus weights, and abnormal skeletons.

14. Clinical Studies

14.1 Pivotal Studies in Osteoarthritis of the Knee

The use of PENNSAID® Topical Solution for the treatment of the signs and symptoms of osteoarthritis of the knee was evaluated in two pivotal double-blind controlled trials conducted in the US and Canada, involving patients treated with PENNSAID® Topical Solution at a dose of 40 drops four times a day for 12 weeks. PENNSAID® Topical Solution was compared to topical placebo (2.3% DMSO with other excipients) and/or topical vehicle solution (45.5% w/w DMSO with other excipients), applied directly to the study knee; in addition one study also had an oral diclofenac (100 mg SR) arm and a combination oral diclofenac plus PENNSAID® Topical Solution treatment arm. In both trials, PENNSAID® Topical Solution treatment resulted in statistically significant clinical improvement compared to placebo and/or vehicle, in all three primary efficacy variables—pain, physical function (Western Ontario and McMaster Universities LK3.1 OA Index (WOMAC) pain and physical function dimensions) and Patient Overall Health Assessment (POHA)/Patient Global Assessment (PGA) and the secondary variable stiffness.

TABLE 3

| | Change in treatment outcomes after 12 weeks of treatment in two studies of efficacy of PENNSAID® Topical Solution | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mean baseline score and mean change in efficacy variables after 12 weeks of treatment | | | | | | | |
| | Study I[1] | | | | | Study II[1] | | |
| Efficacy Variable | Mean Baseline score | PENNSAID® N = 154 | Topical placebo[2] N = 155 | Topical vehicle[3] N = 161 | Oral diclofenac N = 151 | Mean Baseline score | PENNSAID® N = 164 | Topical vehicle[3] N = 162 |
| WOMAC pain score (Likert 3.1, 0-20) | 13 | −6.0 | −4.7 | −4.7 | −6.4 | 13 | −5.9 | −4.4 |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000191

TABLE 3-continued

Change in treatment outcomes after 12 weeks of treatment in two
studies of efficacy of PENNSAID® Topical Solution

| | Mean baseline score and mean change in efficacy variables after 12 weeks of treatment | | | | | | |
|---|---|---|---|---|---|---|---|
| | Study I[1] | | | | | Study II[1] | |
| Efficacy Variable | Mean Baseline score | PENNSAID® N = 154 | Topical placebo[2] N = 155 | Topical vehicle[3] N = 161 | Oral diclofenac N = 151 | Mean Baseline score | PENNSAID® N = 164 | Topical vehicle[3] N = 162 |
| WOMAC physical function (Likert 3.1, 0-68) | 42 | −15.7 | −12.3 | −12.1 | −17.5 | 42 | −15.3 | −10.3 |
| POHA/PGA (0-4)[4] | 2.3 | −1.0 | −0.4 | −0.6 | −0.9 | 3.1 | −1.3 | −1.0 |
| WOMAC stiffness (Likert 3.1, 0-8) | 5 | −1.9 | −1.5 | −1.5 | −2.1 | 5 | −1.8 | −1.3 |

[1]p-value: PENNSAID ® vs. placebo: pain, p = 0.015; physical function, p = 0.034; POHA, p < 0.0001; stiffness, p = 0.11
Study I: PENNSAID ® vs vehicle: pain, p = 0.009; physical function, p = 0.026; POHA, p = 0.016; stiffness, p = 0.035
PENNSAID ® vs oral-diclofenac: pain, p = 0.43; physical function, p = 0.32; POHA, p = 0.96; stiffness, p = 0.60
Study II: PENNSAID ® vs vehicle: pain, p = 0.002; physical function, p = 0.002; PGA, p = 0.005; stiffness, p = 0.009
[2]placebo formulation included 2.3% DMSO
[3]vehicle formulation included 45.5% DMSO
[4]POHA (Patient Overall Health Assessment) for Study I; PGA (Patient Global Assessment) for Study II

PENNSAID® Topical Solution provided statistically significant improvement in signs and symptoms of osteoarthritis of the knee, including pain, impaired ability to perform daily activities and reduced quality of life, in both Study I and Study II (Table 3).

In Study I, a 12-week, 5-arm, double-blinded, double-dummy, vehicle-, placebo- and oral diclofenac-controlled study, patients with primary osteoarthritis of the knee were treated with application of a topical solution (PENNSAID® Topical Solution, vehicle-control solution containing 45.5% DMSO, or placebo solution), plus 1 oral tablet (diclofenac 100 mg SR or oral placebo). Only one painful knee, the designated study knee, was treated regardless of symptoms in the contralateral knee (97% patients had bilateral knee OA). Statistically greater improvement in three primary efficacy variables—pain, physical function and Patient Overall Health Assessment—was observed following 12 weeks of treatment with PENNSAID® Topical Solution compared to placebo and vehicle-controlled solution. In relief of stiffness, PENNSAID® Topical Solution was superior to vehicle but not placebo. There was no statistical difference between PENNSAID® Topical Solution and oral diclofenac on any of the primary efficacy variables.

In Study II, PENNSAID® Topical Solution treatment resulted in statistically significantly greater improvement over vehicle-control solution in all four variables measured (pain, physical function, Patient Global Assessment and stiffness).

Due to PENNSAID® Topical Solution's unique formulation properties, which includes the penetration enhancer DMSO (manufactured under cGMP conditions and conforming to USP specifications), these efficacy data should not be generalized to other topical NSAIDs. Topical NSAIDs should not be considered a homogeneous class and findings with one product may not apply to others.

16. How Supplied/Storage and Handling

PENNSAID® Topical Solution is supplied as a clear, colorless to faintly pink-orange solution containing 16.05 mg of diclofenac sodium per mL of solution, in a white high density polyethylene bottle with a white low-density dropper cap.

| NDC Number & Size | |
|---|---|
| 15 mL bottle (physician sample) | NDC# |
| 60 mL bottle | NDC # |
| 150 mL bottle | NDC # |

Storage

Store at 25° C. (77° F.); excursions permitted to 15-30° C. (59-86° F.) [See USP Controlled Room Temperature].

17. Patient Counseling Information

See Medication Guide.

17.1 Medication Guide

Patients should be informed of the following information before initiating therapy with an NSAID and periodically during the course of ongoing therapy. Patients should also be encouraged to read the NSAID Medication Guide that accompanies each prescription dispensed prior to using PENNSAID®Topical Solution.

17.2 Cardiovascular Effects

PENNSAID® Topical Solution, like other NSAIDs, may cause serious CV side effects, such as MI or stroke, which may result in hospitalization and even death. Although serious CV events can occur without warning symptoms, patients should be alert for the signs and symptoms of chest pain, shortness of breath, weakness, slurring of speech, and should ask for medical advice when observing any indicative sign or symptoms. Patients should be apprised of the importance of this follow-up [see *Warnings and Precautions* (5.1)].

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000192

17.3 Gastrointestinal Effects

PENNSAID® Topical Solution, like other NSAIDs, may cause GI discomfort and, rarely, serious GI side effects, such as ulcers and bleeding, which may result in hospitalization and even death. Although serious GI tract ulcerations and bleeding can occur without warning symptoms, patients should be alert for the signs and symptoms of ulceration and bleeding, and should ask for medical advice when observing any indicative sign or symptoms including epigastric pain, dyspepsia, melena, and hematemesis. Patients should be apprised for the importance of this follow-up [see *Warnings and Precautions* (5.2)].

17.4 Hepatoxicity

Patients should be informed of the warning signs and symptoms of hepatotoxicity (e.g., nausea, fatigue, lethargy, pruritus, jaundice, right upper quadrant tenderness, and "flu-like" symptoms). If these occur, patients should be instructed to stop therapy with PENNSAID® Topical Solution and seek immediate medical therapy [see *Warnings and Precautions* (5.3)].

17.5 Adverse Skin Reactions

PENNSAID® Topical Solution, like other NSAIDs, can cause serious systemic skin side effects such as exfoliative dermatitis, SJS, and TEN, which may result in hospitalizations and even death. Although serious systemic skin reactions may occur without warning, patients should be alert for the signs and symptoms of skin rash and blisters, fever, or other signs of hypersensitivity such as itching, and should ask for medical advice when observing any indicative signs or symptoms. [see *Warnings and Precautions* (5.8)].

Patients should be advised to stop PENNSAID® Topical Solution immediately if they develop any type of generalized rash and contact their physicians as soon as possible.

PENNSAID® Topical Solution can cause a localized skin reaction at the application site. Patients should be advised to contact their physicians as soon as possible if they develop any type of localized application site rash.

Patients should be instructed not to apply PENNSAID® Topical Solution to open skin wounds, infections, inflammations, or exfoliative dermatitis, as it may affect absorption and tolerability of the drug.

Before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID® Topical Solution, wait until the treated area is dry.

Patients should be instructed to minimize or avoid exposure of treated knee(s) to natural or artificial sunlight.

17.6 Weight Gain and Edema

Patients should promptly report to their physician signs or symptoms of unexplained weight gain or edema following treatment with PENNSAID® Topical Solution [see *Warnings and Precautions* (5.5)].

17.7 Anaphylactoid Reactions

Patients should be informed of the signs of an anaphylactoid reaction (e.g., difficulty breathing, swelling of the face or throat). If these occur, patients should be instructed to seek immediate emergency help [see *Warnings and Precautions* (5.7)].

17.8 Effects During Pregnancy

In late pregnancy, as with other NSAIDs, PENNSAID® Topical Solution should be avoided because it will cause premature closure of the ductus arteriosus [see *Warnings and Precautions* (5.10)].

17.9 Eye Exposure

Patients should be instructed to avoid contact of PENNSAID® Topical Solution with the eyes and mucosa. Patients should be advised that if eye contact occurs, they should immediately wash out the eye with water or saline and consult a physician if irritation persists for more than an hour.

Medication Guide For Non-Steroidal
Anti-Inflammatory Drugs (NSAIDS)

(See the end of this Medication Guide for a list of prescription NSAID medicines.)

What is the most important information I should know about medicines called Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?

NSAID medicines may increase the chance of a heart attack or stroke that can lead to death. This chance increases:

with longer use of NSAID medicines

in people who have heart disease

NSAID medicines should never be used right before or after a heart surgery called a "coronary artery bypass graft (CABG)."

NSAID medicines can cause ulcers and bleeding in the stomach and intestines at any time during treatment. Ulcers and bleeding:

can happen without warning symptoms

may cause death

The chance of a person getting an ulcer or bleeding increases with:

taking medicines called "corticosteroids" and "anticoagulants"

longer use

smoking

drinking alcohol

older age

having poor health

NSAID medicines should only be used:

exactly as prescribed

at the lowest dose possible for your treatment

for the shortest time needed

What are Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?

NSAID medicines are used to treat pain and redness, swelling, and heat (inflammation) from medical conditions such as:

different types of arthritis

menstrual cramps and other types of short-term pain

Who should not take a Non-Steroidal Anti-Inflammatory Drug (NSAID)?

Do not take an NSAID medicine:

if you had an asthma attack, hives, or other allergic reaction with aspirin or any other NSAID medicine

for pain right before or after heart bypass surgery

Tell your healthcare provider:

about all of your medical conditions.

about all of the medicines you take. NSAIDs and some other medicines can interact with each other and cause serious side effects. Keep a list of your medicines to show to your healthcare provider and pharmacist.

if you are pregnant. NSAID medicines should not be used by pregnant women late in their pregnancy.

if you are breastfeeding. Talk to your doctor.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000193

What are the possible side effects of Non-Steroidal Anti-Inflammatory Drugs (NSAIDs)?

| Serious side effects include: | Other side effects include: |
| --- | --- |
| heart attack | stomach pain |
| stroke | constipation |
| high blood pressure | diarrhea |
| heart failure from body swelling (fluid retention) | gas |
| kidney problems including kidney failure | heartburn |
| bleeding and ulcers in the stomach and intestine | nausea |
| low red blood cells (anemia) | vomiting |
| life-threatening skin reactions | dizziness |
| life-threatening allergic reactions | |
| liver problems including liver failure | |
| asthma attacks in people who have asthma | |

Get emergency help right away if you have any of the following symptoms:

shortness of breath or trouble breathing

chest pain

weakness in one part or side of your body

slurred speech

swelling of the face or throat

Stop your NSAID medicine and call your healthcare provider right away if you have any of the following symptoms:

nausea

more tired or weaker than usual

itching

your skin or eyes look yellow

stomach pain

flu-like symptoms

vomit blood

there is blood in your bowel movement or it is black and sticky like tar

unusual weight gain

skin rash or blisters with fever

swelling of the arms and legs, hands and feet

These are not all the side effects with NSAID medicines. Talk to your healthcare provider or pharmacist for more information about NSAID medicines.

Other information about Non-Steroidal Anti-Inflammatory Drugs (NSAIDs):

Aspirin is an NSAID medicine but it does not increase the chance of a heart attack. Aspirin can cause bleeding in the brain, stomach, and intestines. Aspirin can also cause ulcers in the stomach and intestines.

Some of these NSAID medicines are sold in lower doses without a prescription (over-the-counter). Talk to your healthcare provider before using over-the-counter NSAIDs for more than 10 days.

NSAID medicines that need a prescription

| Generic Name | Tradename |
| --- | --- |
| Celecoxib | Celebrex ® |
| Diclofenac | Flector, Cataflam ®, Voltaren ®, Arthrotec ™ (combined with misoprostol), PENNSAID ® Topical Solution |
| Diflunisal | Dolobid ® |
| Etodolac | Lodine ®, Lodine ®XL |
| Fenoprofen | Nalfon ®, Nalfon ®200 |
| Flurbiprofen | Ansaid ® |
| Ibuprofen | Motrin ®, Tab-Profen ®, Vicoprofen ®* (combined with hydrocodone), Combunox ™ (combined with oxycodone) |

-continued

| Generic Name | Tradename |
| --- | --- |
| Indomethacin | Indocin ®, Indocin ®SR, Indo-Lemmon ™, Indomethagan ™ |
| Ketoprofen | Oruvail ® |
| Ketorolac | Toradol ® |
| Mefenamic Acid | Ponstel ® |
| Meloxicam | Mobic ® |
| Nabumetone | Relafen ® |
| Naproxen | Naprosyn ®, Anaprox ®, Anaprox ®DS, EC-Naprosyn ®, Naprelan ®, Naprapac ® (copackaged with lansoprazole) |
| Oxaprozin | Daypro ® |
| Piroxicam | Feldene ® |
| Sulindac | Clinoril ® |
| Tolmetin | Tolectin ®, Tolectin DS ®, Tolectin ®600 |

*Vicoprofen contains the same dose of ibuprofen as over-the-counter (OTC) NSAID, and is usually used for less than 10 days to treat pain. The OTC NSAID label warns that long term continuous use may increase the risk of heart attack or stroke.

Patient Instructions for Use

Your doctor has prescribed PENNSAID® Topical Solution to relieve your pain, limited function, mobility, and ability to manage your daily activities caused by osteoarthritis in your knee(s). This medicine will help you only as long as you continue to use it as directed.

Use PENNSAID® Topical Solution exactly how your doctor prescribes it for you. Do not apply PENNSAID® Topical Solution anywhere other than where your doctor instructs you.

The dose for your knee is 40 drops (equivalent to 1.2 mL) of PENNSAID® Topical Solution every time you apply it.

Apply PENNSAID® Topical Solution 4 times a day directly to the skin of symptomatic knee(s).

Apply PENNSAID® Topical Solution to clean, dry skin that does not have any cuts, infections or rashes.

Do not use heating pads or apply bandages to the skin where you have applied PENNSAID® Topical Solution.

Avoid exposing skin where you apply PENNSAID® Topical Solution to sunlight and artificial light, such as tanning booths.

Before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID® Topical Solution, wait until the treated area is dry.

Do not get PENNSAID® Topical Solution in your eyes, nose or mouth. PENNSAID® Topical Solution is only to be used on your skin (topical use). If you get PENNSAID® Topical Solution in your eyes, rinse your eyes right away with water or saline. Talk with your doctor if eye irritation lasts for more than one hour.

What to do if you miss a dose:

If you miss a dose of PENNSAID® Topical Solution, continue with your next scheduled dose using the prescribed amount of PENNSAID® Topical Solution.

Do not double the dose the next time you apply PENNSAID® Topical Solution.

Applying PENNSAID® Topical Solution:

1. The dose for each knee is 40 drops of PENNSAID® Topical Solution.

2. Apply PENNSAID® Topical Solution 4 times a day, spaced evenly throughout the day. PENNSAID® treatment has no relationship to food intake.

3. To measure the right amount of PENNSAID® Topical Solution, it is recommended to dispense 10 drops of PENNSAID® into the hand, or directly onto the knee; spread PENNSAID® evenly around front, back and

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000194

71

72

sides of the knee; then repeat this procedure until 40 drops have been applied and the knee is completely covered. To treat the other knee, repeat this exact procedure.

4. Wash your hands after applying PENNSAID® Topical Solution.

5. Do not shower or bathe for at least 30 minutes after application of PENNSAID® Topical Solution to the treated knee(s).

6. Wait until the treated knee area is completely dry before covering the treated knee with clothing.

Store PENNSAID® Topical Solution at room temperature, 59° F. to 86° F. (15° C. to 30° C.).

All patents, publications, scientific articles, web sites, and other documents and materials referenced or mentioned herein are indicative of the levels of skill of those skilled in the art to which the invention pertains, and each such referenced document and material is hereby incorporated by reference to the same extent as if it had been incorporated by reference in its entirety individually or set forth herein in its entirety. Applicants reserve the right to physically incorporate into this specification any and all materials and information from any such patents, publications, scientific articles, web sites, electronically available information, and other referenced materials or documents.

The written description portion of this patent includes all claims. Furthermore, all claims, including all original claims as well as all claims from any and all priority documents, are hereby incorporated by reference in their entirety into the written description portion of the specification, and Applicants reserve the right to physically incorporate into the written description or any other portion of the application, any and all such claims. Thus, for example, under no circumstances may the patent be interpreted as allegedly not providing a written description for a claim on the assertion that the precise wording of the claim is not set forth in haec verba in written description portion of the patent.

The claims will be interpreted according to law. However, and notwithstanding the alleged or perceived ease or difficulty of interpreting any claim or portion thereof, under no circumstances may any adjustment or amendment of a claim or any portion thereof during prosecution of the application or applications leading to this patent be interpreted as having forfeited any right to any and all equivalents thereof that do not form a part of the prior art.

All of the features disclosed in this specification may be combined in any combination. Thus, unless expressly stated otherwise, each feature disclosed is only an example of a generic series of equivalent or similar features.

It is to be understood that while the invention has been described in conjunction with the detailed description thereof, the foregoing description is intended to illustrate and not limit the scope of the invention, which is defined by the scope of the appended claims. Thus, from the foregoing, it will be appreciated that, although specific nonlimiting embodiments of the invention have been described herein for the purpose of illustration, various modifications may be made without deviating from the spirit and scope of the invention. Other aspects, advantages, and modifications are within the scope of the following claims and the present invention is not limited except as by the appended claims.

The specific methods and compositions described herein are representative of preferred nonlimiting embodiments and are exemplary and not intended as limitations on the scope of the invention. Other objects, aspects, and embodiments will occur to those skilled in the art upon consideration of this specification, and are encompassed within the spirit of the invention as defined by the scope of the claims. It will be readily apparent to one skilled in the art that varying substitutions and modifications may be made to the invention disclosed herein without departing from the scope and spirit of the invention. The invention illustratively described herein suitably may be practiced in the absence of any element or elements, or limitation or limitations, which is not specifically disclosed herein as essential. Thus, for example, in each instance herein, in nonlimiting embodiments or examples of the present invention, the terms "comprising", "including", "containing", etc. are to be read expansively and without limitation. The methods and processes illustratively described herein suitably may be practiced in differing orders of steps, and that they are not necessarily restricted to the orders of steps indicated herein or in the claims.

The terms and expressions that have been employed are used as terms of description and not of limitation, and there is no intent in the use of such terms and expressions to exclude any equivalent of the features shown and described or portions thereof, but it is recognized that various modifications are possible within the scope of the invention as claimed. Thus, it will be understood that although the present invention has been specifically disclosed by various nonlimiting embodiments and/or preferred nonlimiting embodiments and optional features, any and all modifications and variations of the concepts herein disclosed that may be resorted to by those skilled in the art are considered to be within the scope of this invention as defined by the appended claims.

The invention has been described broadly and generically herein. Each of the narrower species and subgeneric groupings falling within the generic disclosure also form part of the invention. This includes the generic description of the invention with a proviso or negative limitation removing any subject matter from the genus, regardless of whether or not the excised material is specifically recited herein.

It is also to be understood that as used herein and in the appended claims, the singular forms "a," "an," and "the" include plural reference unless the context clearly dictates otherwise, the term "X and/or Y" means "X" or "Y" or both "X" and "Y", and the letter "s" following a noun designates both the plural and singular forms of that noun. In addition, where features or aspects of the invention are described in terms of Markush groups, it is intended, and those skilled in the art will recognize, that the invention embraces and is also thereby described in terms of any individual member and any subgroup of members of the Markush group, and applicants reserve the right to revise the application or claims to refer specifically to any individual member or any subgroup of members of the Markush group.

Other nonlimiting embodiments are within the following claims. The patent may not, be interpreted to be limited to the specific examples or nonlimiting embodiments or methods specifically and/or expressly disclosed herein. Under no circumstances may the patent be interpreted to be limited by any statement made by any Examiner or any other official or employee of the Patent and Trademark Office unless such statement is specifically and without qualification or reservation expressly adopted in a responsive writing by Applicants.

We claim:

1. A method for treating a patient with combination therapy, said combination therapy comprising:

administering a therapeutically effective amount of an oral NSAID; and

applying a topical diclofenac preparation to a knee of said patient to treat osteoarthritis of the knee of said patient, wherein said topical diclofenac preparation comprises a

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

**APPX197**

HZNPENN_00000195

therapeutically effective amount of a diclofenac salt and 40-50% w/w dimethyl sulfoxide,

wherein the therapeutically effective amount of oral NSAID is the amount required to achieve a therapeutic effect in the absence of applying a topical diclofenac preparation.

**2.** The method according to claim **1**, wherein the patient is treated for severe knee pain.

**3.** The method according to claim **1**, wherein the patient is treated for breakthrough knee pain.

**4.** The method according to claim **1**, further comprising: conducting periodic laboratory evaluations regarding said patient and the combination therapy.

**5.** The method according to claim **1**, wherein said diclofenac preparation comprises about 45.5% w/w dimethyl sulfoxide.

**6.** The method according to claim **1**, wherein said diclofenac preparation further comprises ethanol, propylene glycol, glycerine, and water.

**7.** The method according to claim **1**, wherein said therapeutically effective amount of diclofenac comprises a pharmaceutically acceptable salt of diclofenac selected from a sodium salt, a potassium salt, a diethylamine salt, or an epolamine salt.

**8.** The method according to claim **1**, wherein said therapeutically effective amount of diclofenac is 1.5% w/w diclofenac sodium.

**9.** The method according to claim **1**, wherein said oral NSAID is a member selected from the group consisting of a COX-2 selective NSAID, diclofenac, tenoxicam, meloxicam, celecoxib, diflunisal, etodolac, fenoprofen, flurbiprofen, ibuprofen, indomethacin, ketoprofen, ketorolac, mefenamic acid, nabumetone, naproxen, oxaprozin, piroxicam, sulindac, and tolmetin.

**10.** A method for applying topical agents to a knee of a patient with pain, said method comprising:

applying a first medication consisting of a topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient, wherein the topical diclofenac preparation comprises a

therapeutically effective amount of a diclofenac salt and 40-50% w/w dimethyl sulfoxide;

waiting for the treated area to dry;

subsequently applying a sunscreen, or an insect repellant to said treated area after said treated area is dry, wherein said step of applying a first medication does not enhance the systemic absorption of the subsequently applied sunscreen, or insect repellant; and

wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation.

**11.** The method according to claim **10**, wherein said diclofenac preparation comprises about 45.5% w/w dimethyl sulfoxide.

**12.** The method according to claim **10**, wherein said therapeutically effective amount of diclofenac is 1.5% w/w diclofenac sodium.

**13.** The method according to claim **10**, wherein said diclofenac preparation further comprises ethanol, propylene glycol, glycerine, and water.

**14.** The method according to claim **10**, wherein said therapeutically effective amount of diclofenac comprises a pharmaceutically acceptable salt of diclofenac selected from a sodium salt, a potassium salt, a diethylamine salt, or an epolamine salt.

**15.** The method according to claim **10**, wherein said step of subsequently applying comprises subsequently applying said sunscreen.

**16.** The method according to claim **15**, wherein said sunscreen comprises oxybenzone.

**17.** The method according to claim **10**, wherein said step of subsequently applying comprises subsequently applying said insect repellant.

**18.** The method according to claim **17**, wherein said insect repellant comprises N,N-diethyl-m-toluamide (DEET).

**19.** The method according to claim **17**, wherein said insect repellant comprises 2,4 D dimethylamine salt (2,4 D).

**20.** The method according to claim **14**, wherein said therapeutically effective amount of diclofenac comprises diclofenac sodium.

\* \* \* \* \*

APPX198

HZNPENN_00000196

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.     : 8,546,450 B1
APPLICATION NO.     : 12/459998
DATED     : October 1, 2013
INVENTOR(S)     : Singh et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

    In the "References Cited" Section:

    On the title page, second column, item (56), in the "OTHER PUBLICATIONS" subsection, line 13 of that paragraph: please delete "presribing" and insert --prescribing--.

Signed and Sealed this
Twenty-eighth Day of October, 2014

*Michelle K. Lee*

Michelle K. Lee
*Deputy Director of the United States Patent and Trademark Office*

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

**APPX199**

HZNPENN_00000197

# Addendum 9

U.S. Patent No. 8,563,613

A200-A229



# THE UNITED STATES OF AMERICA

## TO ALL TO WHOM THESE PRESENTS SHALL COME:

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

May 19, 2015

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: 8,563,613
ISSUE DATE: October 22, 2013

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

T. LAWRENCE
Certifying Officer

HZNPENN_00000119

**APPX200**



US008563613B2

(12) **United States Patent**
Kisak et al.

(10) Patent No.: **US 8,563,613 B2**
(45) Date of Patent: *Oct. 22, 2013

(54) **DICLOFENAC TOPICAL FORMULATION**

(75) Inventors: **Ed Kisak**, San Diego, CA (US); **Jagat Singh**, Toronto (CA)

(73) Assignee: **Nuvo Research Inc.**, Mississauga, Ontario (CA)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **13/564,688**

(22) Filed: **Aug. 1, 2012**

(65) **Prior Publication Data**
US 2012/0295978 A1 Nov. 22, 2012

**Related U.S. Application Data**

(63) Continuation of application No. 12/134,121, filed on Jun. 5, 2008, now Pat. No. 8,252,838, which is a continuation of application No. PCT/US2007/081674, filed on Oct. 17, 2007.

(60) Provisional application No. 60/829,756, filed on Oct. 17, 2006.

(51) Int. Cl.
*A61K 31/196* (2006.01)
*A61K 47/10* (2006.01)
*A61K 47/18* (2006.01)
*A61K 47/38* (2006.01)

(52) U.S. Cl.
USPC .......................................... **514/567**

(58) Field of Classification Search
None
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,740,421 A | 6/1973 | Schmolka et al. | |
| 4,342,784 A | 8/1982 | Havemeyer et al. | |
| 4,441,739 A | 4/1984 | Cluff et al. | |
| 4,543,251 A | 9/1985 | Kamishita | |
| 4,575,515 A | 3/1986 | Sandborn | |
| 4,652,557 A | 3/1987 | Sandborn | |
| 4,707,354 A | 11/1987 | Garlen et al. | |
| 4,855,294 A | 8/1989 | Patel et al. | |
| 4,871,767 A | 10/1989 | Beckermann et al. | |
| 5,350,769 A * | 9/1994 | Kasai et al. | .......... 514/567 |
| 5,374,661 A | 12/1994 | Betlach, II | |
| 6,399,093 B1 | 6/2002 | Petrus | |
| 8,252,838 B2 | 8/2012 | Kisak et al. | |
| 2002/0197292 A1 | 12/2002 | Fowler | |
| 2003/0082226 A1 | 5/2003 | Samour et al. | |
| 2004/0175415 A1 | 9/2004 | Chan et al. | |
| 2004/0222123 A1 | 11/2004 | Niemann | |
| 2005/0239894 A1 | 10/2005 | Steiger | |
| 2009/0131447 A1 | 5/2009 | Kamboj et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 245 126 | 11/1987 |
| EP | 0 450 123 | 10/1991 |
| JP | 61-254519 | 11/1986 |
| JP | 61-277613 | 12/1986 |
| JP | 62-263122 | 11/1987 |
| JP | 3-291222 | 12/1991 |
| WO | WO 97/13528 | 4/1997 |
| WO | WO 99/00954 | 3/1999 |
| WO | WO 03/094905 A1 | 11/2003 |
| WO | WO 2005/009510 | 2/2005 |
| WO | WO 2006/096360 | 9/2006 |
| WO | 2007/010559 A2 | 1/2007 |
| WO | WO 2007/016766 A1 | 2/2007 |
| WO | WO 2008/049020 A2 | 4/2008 |
| WO | WO 2008/088827 A2 | 7/2008 |
| WO | WO 2010/060798 A1 | 6/2010 |

OTHER PUBLICATIONS

Hewitt et al ("In vitro cutaneous disposition of a topical diclofenac lotion in human skin: effect of a multi-dose regimen," Pharmaceutical Research, vol. 15(7): 988-992, 1998).*
ICIS News 1999-2011 (http://www. cheminindustry.com/chemicals/0197997.html).*
U.S. Appl. No. 12/459,998, filed Jul. 10, 2009, Singh et al.
U.S. Appl. No. 12/660,865, filed Mar. 4, 2010, Singh et al.
U.S. Appl. No. 12/914,867, filed Oct. 28, 2010, Singh et al.
"Product Monograph, PR Pennsaid®," Dimethaid Health Care Ltd, Oct. 20, 2003. Retrieved from the internet: http://wvvw.osteoarthritis.org/downloads/Pennsaid_HCP_Mono.pdf.
An article entitled "Other articles noted" by Evidence-Based Medicine, 2005, 10:63-64.
Anigbogu et al., "Fourier transform Raman spectroscopy of interactions between the penetration enhancer dimethyl sulfoxide and human stratum corneum," International Journal of Pharmaceutics, 1995, 125:265-282.
Baboota et al., Formulation and evaluation of once-a-day transdermal gels of diclofenac diethylamine, Methods Find. Exp. Clin. Pharmacol., 2006; 28:109-114.
Baer et al., "Treatment of osteoarthritis of the knee with a topical diclofenac solution: a randomized controlled, 6-week trial [ISRCTN53366886]," BMC Musculoskeletal Disorders, 2005, 6:44, Aug. 8, 2005. Retrieved from the internet: http://www.ncbi.n1m.nih.gov/pmc/articles/PMC 120 1146/pdf/14 71-24 74-6-44.pdf.
Barry, B.W., "Mode of action of penetration enhancers in human skin," Journal of Controlled Release, 1987, 6:85-97.
Bellamy et al., "Recommendations for a core set of outcome measures for future phase III clinical trials in knee, hip, and hand osteoarthritis," J Rheumatol, 1997, 24:799-802.
Bookman et al., "Effect of a topical diclofenac solution for relieving symptoms of primary osteoarthritis of the knee: a randomized controlled trial," Canadian Medical Journal, 2004, 171(4):333-338. Retrieved from the internet: http://canadianmedicaljournal.ca/cgi/reprint/171/4/333.

(Continued)

*Primary Examiner* — Suzanne Ziska
(74) *Attorney, Agent, or Firm* — Kilpatrick Townsend & Stockton LLP

(57) **ABSTRACT**

The present invention provides a gel formulation comprising diclofenac sodium which has superior transdermal flux properties, which may be used for the topical treatment of pain, such as in osteoarthritis.

**26 Claims, 12 Drawing Sheets**

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000120

(56) **References Cited**

OTHER PUBLICATIONS

Büyüktimkin et al., "Chemical means of transdermal drug permeation enhancement," Chapter 11 of Transdermal and Topical Drug Delivery Systems, Tapash K. Ghosh et al., eds., 1997, pp. 357, 404-407.

Franz, "Percutaneous absorption: on the Relevance of In Vitro Data," J. Invest Derm, 1975; 64:190-195.

Galer et al., "Use of topicuticals (topically applied, peripherally acting drugs) in the treatment of chronic pain," Current Drug Therapy, 2006, 1(3):273-282.

Hadgraft, J., "Mini review: Passive enhancement strategies in topical and transdermal drug delivery," International Journal of Pharmaceutics, 1999, 184:1-6.

Hewitt et al, "In vitro cutaneous disposition of a topical diclofenac lotion in human skin: effect of a multi-dose regimen," Pharmaceutical Research, 1998, 15(7):988-992.

Ho et al., "The influence of cosolvents on the in-vitro percutaneous penetration of diclofenac sodium from a gel system," J. Pharm. Pharmacol., 1994, 45:636-642.

Hui et al., "In vivo bioavailability and metabolism of topical diclofenac lotion in human volunteers," Pharmaceutical Research, 1998, 15(10):1589-1595.

ICIS News 1999-2011 (http://www. chemindustry.com /chemicals/ 0197997.html).

Kantarci et al., "In vitro permeation of diclofenac sodium from novel microemulsion formulations through rabbit skin," Drug Development Research, 2005, 65:17-25.

Karande, P., "High throughput screening of transdermal formulations," Pharmaceutical Research, 2002, 19(5):655-660.

Karande, P., "Insights into synergistic interactions in binary mixtures of chemical permeation enhancers for transdermal drug delivery," Journal of Controlled Release, 2006, 115:85-93.

Laba, "Chapter 4. Rheological Additives. Rheological Properties of Cosmetics and Toiletries," Cosmetic Science and Technology Series, 1993, vol. 13, pp. 55-152.

Lin et al., "Efficacy of topical non-steroidal anti-inflammatory drugs in the treatment of osteoarthritis: meta-analysis of randomized controlled trials," BMJ, 2004, 329:7461, ff.

Miao et al., "Preparation and clinical application of diclofenac sodium gel," Railway Medical Journal, 2000, 28(1):14-15.

Minghetti et al., "Ex vivo study of transdermal permeation of four diclofenac salts from different vehicles," J. of Pharm. Sci., 2007, 96(4).

Moen, "Topical diclofenac solution," Drugs, 2009, 69(18):2621-32. Retrieved from the internet: http://www.ncbi.nlm.nih.gov/pubmed/ 19943711.

Naito et al., "Percutaneous absorption of diclofenac sodium ointment," Int. J. of Pharmaceutics, 1985, 24:115-124.

Nelson et al., "Phase IV, open-label assessment of the treatment of actinic keratosis with 3.0% diclofenac sodium topical gel (Solaraze™)," Journal of Drugs in Dermatology, 2004, 3(4):401 ff.

Nishihata et al., "Percutaneous absorption of diclofenac in rats and humans: aqueous gel formulation," International Journal of Pharmaceutics, 1988, 46:1-7.

Obata et al., "Effect of ethanol on skin permeation of nonionized and ionized diclofenac," International Journal of Pharmaceutics, 1993, 89:191-198.

Ostrenga et al., "Significance of vehicle composition I: Relationship between topical vehicle composition, skin penetrability, and clinical efficacy," J. Pharm Sciences, 1971, 60(8).

Ozguney, "An alternative topical treatment of osteoarthritis of the knee with cutaneous diclofenac solution," Expert Opinion on Pharmacotherapy, 2008, 9(10)1805-1816.

Prausnitz et al., "Current status and future potential of transdermal drug delivery," Nature Reviews, 2004, 3:115-124.

Rosenstein, "Topical agents in the treatment of rheumatic disorders," Rheum. Dis. Clin North Am., 1999, 25(4):899-918.

Roth et al., "Efficacy and safety of a topical diclofenac solution (Pennsaid) in the treatment of primary osteoarthritis of the knee," Arch Intern Med, 2004, 164:2017-2023.

Sarigullu et al., "Transdermal delivery of diclofenac sodium through rat skin from various formulations," APS PharmSciTech, 2006, 7(4) Article 88 E1-E7.

Shainhouse, "OARSI guidelines for hip and knee OA: deciphering the topical drug mélange," Osteoarthritis Cartilage, 2008, 16(12):1586-7.

Simon et al., "Efficacy and safety of topical diclofenac containing dimethyl sulfoxide (DMSO) compared with those of topical placebo, DMSO, vehicle and oral diclofenac for knee osteoarthritis," Pain, 2009, 143(3):238-45.

Towheed, "Pennsaid® therapy for osteoarthritis of the knee: a systematic review and metaanalysis of randomized controlled trials," The Journal of Rheumatology, 2006, 33(3):567-573.

Towheed, "Published meta-analyses of pharmacological therapies for osteoarthritis," Osteoarthritis and Cartilage, 2002, 10:836-837.

Tugwell et al., "Equivalence study of a topical diclofenac solution (Pennsaid®) compared with oral diclofenac in symptomatic treatment of osteoarthritis of the knee: a randomized controlled trial," The Journal of Rheumatology, 2004, 31(10):2002-2012.

Walker, R.B. and Smith E.W., "The role of percutaneous penetration enhancers," Advanced Drug Delivery Reviews, 1996, 18:295-301.

Williams, A.C. and Barry, B.W., "Penetration enhancers," Advanced Drug Delivery Reviews, 2004, 56:603-618.

Anchordoguy, T.J., "Temperature-dependent perturbation of phospholipid bilayers by dimethylsulfoxide," Biochimica et Biophysica Acta, 1104:117-122, 1992.

Baynes, R.E. and Riviere, J.E., "Influence of inert ingredients in pesticide formulations on dermal absorption of carbaryl," Am. J. Vet. Res., 59:168-175, 1998.

Baynes, R.E. et al., "The influence of diethyl-m-toluamide (DEET) on the percutaneous absorption of permethrin and carbaryl," Toxicology and Applied Pharmacology, 144:332-339, 1997.

Browning, R. et al., "Reducing the dose of oral NSAIDs by use of feldene gel: an open study in elderly patients with osteoarthritis," Advances in Therapy, 11(4):198-207, 1994.

Carter-Homer Corp., "Kemsol®, Dimethylsulfoxide, Scleroderma Therapy," in 2000 Compendium of Pharmaceuticals and Specialties (CPS), Louise Wellbanks et al., eds., Canadian Pharmacists Association, Ontario, Canada, p. 804, 2000.

Dimethaid Research Inc., Product Monograph: PrPennsaid® (1.5% w/w diclofenac sodium solution), 41 pages, Dimethaid Health Care Ltd., Ontario, Canada, 2003.

Drug and Therapeutic Information, Inc., "A further warning on DMSO," The Medical Letter on Drugs and Therapeutics, vol. 7, No. 20, Issue 175, p. 80, 1965.

Drug and Therapeutic Information, Inc., "Dimethyl Sulfoxide (DMSO)," The Medical Letter on Drugs and Therapeutics, vol. 7, No. 11, Issue 166, pp. 42-44, 1965.

Dua, K. et al., "Formulation and evaluation of topical bases of aceclofenac," The Indian Pharmacist, Prabha Shroff, 5(45):73-75, 2006.

FDA's guidelines for inactive ingredients for Jan. 2010, 1 page, 2010.

FDA's guidelines for inactive ingredients for Jun. 2010, 1 page, 2010.

Fluhr, J.W. et al., "Transepidermal water loss reflects permeability barrier status: validation in human and rodent in vivo and ex vivo models," Experimental Dermatology, 15:483-492, 2006.

G.D. Searle & Co., CELEBREX® (Celecoxib) Capsules | Safety Information, Revised label based on FDA letter Feb. 23, 2000, 21 pages, G.D. Searle & Co, IL, USA and Pfizer Inc., NY, USA, Apr. 24, 2000.

G.D. Searle & Co., CELEBREX® (Celecoxib) Capsules, NDA 20-998/S-018, NDA 20-998/S-019, Revised: Jul. 2005, 25 pages (pp. 3-27), G.D. Searle LLC, Division of Pfizer Inc., NY, USA, 2005.

Greve, T.M. et al., "Penetration mechanism of dimethyl sulfoxide in human and pig ear skin: An ATR-FTIR and near-FT Raman spectroscopic in vivo and in vitro study," Spectroscopy, 22:405-417, 2008.

Henderson, T.R. and Henderson, R.F., "Effects of dimethyl sulfoxide on subunit proteins," Ann. N Y Acad. Sci., 243:38-53, 1975.

Heyneman, C.A. et al., "Oral versus topical NSAIDs in rheumatic diseases," Drugs, Adis International Limited, vol. 60, Issue 3, pp. 555-574, 2000.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

(56)        **References Cited**

OTHER PUBLICATIONS

Hsu, L.R. et al., "The effect of pretreatment by penetration enhancers on the in vivo percutaneous absorption of piroxicam from its gel form in rabbits," International Journal of Pharmaceutics, 71:193-200, 1991.

Kanikkannan, N. et al., "Structure-activity relationship of chemical penetration enhancers in transdermal drug delivery," Current Medicinal Chemistry, 6(7):593-608, 1999.

Kemppainen, B.W. et al., "Comparison of penetration and metabolism of [3H]Diacetoxyscirpenol, [3H]Verrucarin A and [3H]T-2 toxin in skin," Fd Chem. Toxic., 25(5):379-386, 1987.

Kemppainen, B.W. et al., "Evaluation of monkey skin as a model for in vitro percutaneous penetration and metabolism of [3H]T-2 Toxin in Human Skin," Fundamental and Applied Toxicology, 7:367-375, 1986.

Kemppainen, B.W. et al., "In vitro percutaneous penetration and metabolism of [3h]t-2 toxin: comparison of human, rabbit, guinea pig and rat," Toxicon, 25(2):185-194, 1987.

Kligman, A.M., "Topical pharmacology and toxicology of dimethyl sulfoxide—Part 1," JAMA, 193(10):140-148, 1965.

Lin, S.Y., "Direct or indirect skin lipid-ordering effect of pyrrolidone carboxylate sodium after topical treatment with penetration enhancers," Bio-Medical Materials and Engineering, 5(1):9-20, 1995.

Malten, K.E. and Arend, J.D., "Topical toxicity of various concentrations of DMSO recorded with impedance measurements and water vapour loss measurements," Contact Dermatitis, 4:80-92, 1978.

Mehta, R., "Topical and transdermal drug delivery: What a pharmacist needs to know," Inet Continuing education, InetCE.com, pp. 1-10, 2004.

Morison, W., "Photosensitivity," The New England Journal of Medicine, Mass. Med. Soc., 350:1111-17, 2004.

Notman, R. et al., "The permeability enhancing mechanism of DMSO in ceramide bilayers simulated by molecular dynamics," Biophysical Journal, 93:2056-2068, 2007.

Novartis Consumer Health, Inc., Prescribing Information of Voltaren® Gel; pp. 1-23; revised Jul. 2009.

Oertel, R.P., "Protein conformational changes induced in human stratum corneum by organic sulfoxides: An infrared spectroscopic investigation," Biopolymers, 16:2329-2345, 1977.

Pharmacia, Product Label: Rogaine® Extra Strength Topical Solution, Pharmacia Consumer Healthcare, Peapack, NJ, USA, 2002.

Physicians Total Care, Inc., Retin-A—tretinoin cream/tretinoin gel product insert, 6 pages, Ortho Dermatological, Division of Ortho-McNeil Pharmaceutical, Inc., Skillman, New Jersey, USA, 2001.

Popovich et al., Remington: The Science and Practice of Pharmacy, 2005, Lippincott, Williams & Wilkins, 21st Ed., p. 2033.

Rodgers, K. and Xiong, S., "Effect of acute administration of malathion by oral and dermal routes on serum histamine levels," Int. J. Immunopharmac., 19(8):437-441, 1997.

Waller, J.M. et al., "'Keratolytic' properties of benzoyl peroxide and retinoic acid resemble salicylic acid in man," Skin Pharmacol Physiol, 19:283-289, 2006.

* cited by examiner

APPX203

HZNPENN_00000122

Copy provided by USPTO from the PIRS Image Database on 05/15/2015





( g/cm²)

45
40
35
30
25
20
15
10
5
0

4hr accumulated dose

24hr accumulated dose

48hr accumulated dose

**FIG. 1**

Hec1b
Hec2b
PVP1b
PP54
Comparative

HZNPENN_00000123



**FIG. 2**

Copy provided by USPTO from the PIRS Image Database on 05/15/2015



FIG. 3

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000125





FIG. 4

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX207

HZNPENN_00000126

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX208

HZNPENN_00000127



FIG. 5



**FIG. 6**

Copy provided by USPTO from the PIRS Image Database on 05/15/2015



**FIG. 7**

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX210

HZNPENN_00000129



**FIG. 8**

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000130

APPX211

Copy provided by USPTO from the PIRS Image Database on 05/15/2015



( g/cm² )

**FIG. 9**

Accumulated dose

- ☐ F14/2 gel 3.5%
- ☐ F14/2 solution
- ☒ F971
- ☒ Comparative 2%
- ▨ Comparative

HZNPENN_00000131

Copy provided by USPTO from the PIRS Image Database on 05/15/2015



FIG. 10

APPX213

HZNPENN_00000132

HZNPENN_00000133



FIG. 11

Copy provided by USPTO from the PIRS Image Database on 05/15/2015



FIG. 12

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000134

# DICLOFENAC TOPICAL FORMULATION

## CROSS-REFERENCES TO RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 12/134,121, filed Jun. 5, 2008, now issued as U.S. Pat. No. 8,252,838, which application is a continuation of PCT/US2007/081674, filed Oct. 17, 2007, which application claims priority to U.S. Provisional Application No. 60/829, 756, filed Oct. 17, 2006, the teachings all of which are incorporated herein by reference in their entireties for all purposes.

## FIELD OF THE INVENTION

The present invention relates generally to compositions and methods for treating osteoarthritis.

## BACKGROUND OF THE INVENTION

### 1. Osteoarthritis

Osteoarthritis (OA) is a chronic joint disease characterized by progressive degeneration of articular cartilage. Symptoms include joint pain and impaired movement. OA is one of the leading causes of disability worldwide and a major financial burden to health care systems. It is estimated to affect over 15 million adults in the United States alone. See Boh L. E. Osteoarthritis. In: DiPiro J. T., Talbert R. L., Yee G. C., et al., editors. *Pharmacotherapy: a pathophysiological approach.* 4th ed. Norwalk (CT): Appleton & Lange, pp. 1441-59 (1999).

Oral non-steroidal anti-inflammatory drugs (NSAIDs) are a mainstay in the management of OA. They have analgesic, anti-inflammatory and antipyretic effects and are useful in reducing pain and inflammation. NSAIDS are however associated with serious potential side effects including nausea, vomiting, peptic ulcer disease, GI haemorrhage, and cardiovascular events.

Topical NSAIDs offer the possibility of achieving local therapeutic benefit while reducing or eliminating the risk of systemic side effects. There has been widespread interest in this approach to treating OA, but data in support of the efficacy of topical NSAIDs in the treatment of OA is limited. For instance, a study of 13 randomized placebo controlled trials (RCT's) of various topical NSAIDs tested specifically for use in the treatment of OA concluded that they were not generally efficacious for chronic use in OA. (Lin et al., Efficacy of topical non-steroidal anti-inflammatory drugs in the treatment of osteoarthritis: meta-analysis of randomized controlled trials, *BMJ*, doi:10.1136/bmj.38159.639028.7C (2004)).

There are generally three outcomes used to measure the efficacy of an OA treatment: pain, physical function, and a patient global assessment. See Bellamy N., Kirwan J., Boers M., Brooks P., Strand V., Tugwell P., et al. Recommendations for a core set of outcome measures for future phase III clinical trials in knee, hip and hand osteoarthritis. Consensus development at OMERACT III., *J Rheumatol*, 24:799-802 (1997). To be suitable for chronic use, a therapy must generally show efficacy on these three variables over a sustained period of time. In the U.S. for instance, the Food and Drug Administration (FDA) requires OA therapies to show superiority over placebo over a 12 week period. Notwithstanding the significant potential for topical NSAIDs in the treatment of OA, as of the time of filing this application, none have been approved for such treatment in the U.S.

U.S. Pat. Nos. 4,575,515 and 4,652,557 disclose topical NSAID compositions, one of which, consisting of 1.5% diclofenac sodium, 45.5% dimethylsulphoxide, 11.79% ethanol, 11.2% propylene glycol, 11.2% glycerine, and water, has been shown to be effective in chronic OA treatment. See Towheed, *Journal of Rheumatology* 33:3 567-573 (2006) and also Oregon Evidence Based Practice Center entitled "Comparative Safety and Effectiveness of Analgesics for Osteoarthritis", ABRQ Pub. No. 06-EHC009-EF. This particular composition is referred to herein as "comparative liquid formulation" or "comparative" in the Examples section. However, the compositions of these prior inventions have drawbacks in that they are slow to dry and runny. They also require frequent dosing of three to four times a day to achieve efficacy in OA, which increases exposure to potential skin irritants and increases the risk of skin irritation.

In general, the failure of topical NSAIDs to fulfill their promise in OA may be due in part to the difficulty associated with delivering a molecule through the skin in sufficient quantities to exert a therapeutic effect and in a manner that makes the treatment itself tolerable. It is generally believed that clinical efficacy in OA requires absorption of the active ingredient and its penetration in sufficient quantities into underlying inflamed tissues including the synovium and synovial fluid of joints. See Rosenstein, Topical agents in the treatment of rheumatic disorders, *Rheum. Dis. Clin North Am.*, 25: 899-918 (1999).

However, the skin is a significant barrier to drug permeation, and despite nearly four decades of extensive research, the success of transdermal drug delivery in general remains fairly limited with only a small number of transdermal drug products commercially available.

In connection with topical dosage forms applied to the skin, a number of interactions can occur including vehicle-skin, vehicle-drug, and drug-skin. Each can affect the release of an active agent from a topical dosage form (Roberts, M. S.: Structure-permeability considerations in percutaneous absorption. In *Prediction of Percutaneous Penetration*, ed. by R. C. Scott et al., vol. 2, pp. 210-228, IBC Technical Services, London, 1991). Thus various factors can affect absorption rates and penetration depth including the active ingredient, the vehicle, the pH, and the relative solubility of the active in the vehicle versus the skin (Ostrenga J. et al., Significance of vehicle composition I: relationship between topical vehicle composition, skin penetrability, and clinical efficacy, *Journal of Pharmaceutical Sciences*, 60: 1175-1179 (1971)). More specifically, drug attributes such as solubility, size and charge, as well as, vehicle attributes such as the drug dissolution rate, spreading-ability, adhesion, and ability to alter membrane permeability can have significant effects on permeability.

There is significant variability observed from seemingly minor variations in formulations. For instance, Naito demonstrates significant variability in penetration among topical NSAID formulations simply by changing the gelling agent used in the compositions (Naito et al., Percutaneous absorption of diclofenac sodium ointment, *Int. Jour. of Pharmaceutics*, 24: 115-124 (1985)). Similarly, Ho noted significant variability in penetration by changing the proportions of alcohol, propylene glycol, and water (Ho et al., The influence of cosolvents on the in-vitro percutaneous penetration of diclofenac sodium from a gel system, *J. Pharm. Pharmacol.*, 46:636-642 (1994)). It was noted that the changes affected three distinct variables: (i) the solubility of the drug in the vehicle, (ii) the partition coefficient, and (iii) effects on alteration of skin structure.

Ho et al. (1994) also noted that (i) the pH of the vehicle, (ii) the drug solubility, and (iii) the viscosity of a gel matrix can

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000135

influence penetration from a gel dosage form. The pH value affects the balance between ionized and non-ionized forms of the drug, which have different penetration properties (Obata, *International Journal of Pharmaceutics*, 89: 191-198 (1993)). The viscosity can affect diffusion of the drug through the gel matrix and release of the drug from the vehicle into the skin. The solubility of the drug in the vehicle will affect the partition coefficient of the drug between the formulation and the recipient membrane/tissue (Ho et al. 1994).

Chemical penetration enhancers are one means for reversibly lowering the skin barrier. Other methods include iontophoresis, ultrasound, electroporation, heat, and microneedles. At least 250 chemicals have been identified as enhancers that can increase skin permeability. General categories include pyrrolidones, fatty acids, esters and alcohols, sulfoxides, essential oils, terpenes, oxazolidines, surfactants, polyols, azone and derivatives, and epidermal enzymes.

The mechanisms by which penetration enhancers reduce the skin barrier function are not well understood (see Williams and Barry "Penetration Enhancers" *Advanced Drug Delivery Reviews* 56: 603-618 (2004) although it has been proposed that the mechanisms can be grouped into three broad categories: lipid disruption, increasing corneocyte permeability, and promoting partitioning of the drug into the tissue.

The challenge with use of chemical penetration enhancers is that few seem to induce a significant or therapeutic enhancement of drug transport at tolerable levels. This is because the act of disrupting the skin barrier will have the potential of causing skin irritation. With increased disruption, skin irritation will become a greater issue. This is particularly problematic with topical OA treatments where the goal is to have the active penetrate into joint tissue and where the drug must be utilized on a long-term basis due to the nature of the disease. The inventors have developed methods and compositions that deliver more active ingredient per unit dose than previously known compositions, and this would be expected to lead to a lower incidence of skin irritation.

The compositions of the invention use diclofenac sodium which is a commonly used NSAID. Diclofenac has four different salts that show significant variability in the degree of permeation in solutions using different solvents. Minghetti, for instance, teaches that a diclofenac salt with an organic base is best for topical applications (Minghetti et al., Ex vivo study of transdermal permeation of four diclofenac salts from different vehicles, *Jour. of Pharm. Sci*, DOI 10.1002/jps.20770 (2007)).

Other research points to microemulsion formulations as a means for delivery of diclofenac sodium (Kantarci et al., In vitro permeation of diclofenac sodium from novel microemulsion formulations through rabbit skin, *Drug Development Research*, 65:17-25 (2005); and Sarigullu I. et al., Transdermal delivery of diclofenac sodium through rat skin from various formulations, *APS PharmSciTech*, 7(4) Article 88, E1-E7 (2006)).

Other topical diclofenac compositions are disclosed in a number of patents including U.S. Pat. No. 4,543,251, U.S. Pat. No. 4,670,254, U.S. Pat. No. 5,374,661, U.S. Pat. No. 5,738,869, U.S. Pat. No. 6,399,093 and U.S. Pat. No. 6,004,566. United States Patent Application No. 20050158348 points out that various solvents are widely used for gel preparations, but notes that they are limited in potential due to skin irritation. This reference also notes that gel compositions are associated with fast termination of action as the active precipitates from solution in the upper skin layers, limiting anti-inflammatory action in deeper tissues. The gels of the present

invention are designed to accomplish the opposite, namely prolonged action and anti-inflammatory action in the deeper tissues.

2. Gel Formulations of Diclofenac

None of the previous references disclose the compositions of the invention or their use in the treatment of OA. Rather, these references highlight the significant unmet need with respect to topical OA treatments for chronic use and the complexity of transdermal transport in general where significant variability in permeation is observed by changing composition elements or their relative proportions.

In light of the foregoing, there is a considerable need for improvement in the development of a topical NSAID suitable for long term use in the treatment of OA. The challenge has been to develop an optimal formulation which will deliver the active agent to the underlying tissue in sufficient concentration to treat OA on a long term basis, while reducing or minimizing the incidence of intolerable skin irritation caused by disrupting the skin barrier and while providing a formulation and dosage that leads to and encourages patient compliance. The present invention satisfies these and other needs.

BRIEF SUMMARY OF THE INVENTION

The present invention overcomes the disadvantages of the prior art by providing diclofenac sodium gel formulations for the treatment of osteoarthritis that display a better drying time, higher viscosity, increased transdermal flux, and greater pharmacokinetic absorption in vivo when compared to previously described compositions. Furthermore, the preferred diclofenac sodium gel formulations of the present invention provide other advantages including favorable stability at six (6) months as reflected in the lack of any substantial changes in viscosity, the absence of phase separation and crystallization at low temperatures, and a low level of impurities. Moreover, the present gel formulations adhere well to the skin, spread easily, dry quicker, and show greater in vivo absorption in comparison to previously described compositions. Thus, the gel formulations of the present invention provide superior means for delivery of diclofenac sodium through the skin for the treatment of osteoarthritis, as compared to previously described formulations.

As such, in one embodiment, the present invention provides a gel formulation comprising, consisting essentially of, or consisting of:

(i) diclofenac sodium;

(ii) DMSO;

(ii) ethanol;

(iii) propylene glycol;

(v) a thickening agent;

(vi) optionally glycerol; and

(vii) water.

In another embodiment, the present invention provides a method of treating osteoarthritis in a subject suffering from articular pain, the method comprising the topical administration to an afflicted joint area of a subject a therapeutically effective amount of a gel formulation comprising, consisting essentially of, or consisting of:

(i) diclofenac sodium;

(ii) DMSO;

(ii) ethanol;

(iii) propylene glycol;

(v) a thickening agent;

(vi) optionally glycerol; and

(vi) water,

thereby treating osteoarthritis.

HZNPENN_00000136

5

A further embodiment provides for the use of diclofenac sodium in the preparation of a medicament for the treatment of pain, the medicament comprising a gel formulation comprising, consisting essentially of, or consisting of:

(i) diclofenac sodium;
(ii) DMSO;
(ii) ethanol;
(iii) propylene glycol;
(v) a thickening agent;
(vi) optionally glycerol; and
(vii) water.

In yet a further embodiment, the present invention provides a gel formulation comprising, consisting essentially of, or consisting of: a diclofenac sodium solution and at least one thickening agent, which can be selected from cellulose polymer, a carbomer polymer, a carbomer derivative, a cellulose derivative, polyvinyl alcohol, poloxamers, polysaccharides, and mixtures thereof.

In an aspect of this embodiment, the diclofenac sodium solution comprises, consists essentially of, or consists of:

(i) diclofenac sodium;
(ii) DMSO;
(ii) ethanol;
(iii) propylene glycol;
(iv) optionally glycerol; and
(v) water.

In an aspect of the above embodiments, the thickening agents can be selected from cellulose polymers, carbomer polymers, a carbomer derivative, a cellulose derivative, polyvinyl alcohol, poloxamers, polysaccharides, and mixtures thereof.

In an aspect of the above gel embodiments, diclofenac sodium is present at 1-5% w/w, such as 1, 2, 3, 4, or 5% w/w; DMSO is present at 30-60% w/w; ethanol is present at 1-50% w/w; propylene glycol is present at 1-15% w/w; glycerol is present at 0-15% w/w, a thickening agent is present such that the end viscosity of the gel is between 10 and 50000 centipoise; and water is added to make 100% w/w. In other aspects, glycerol is present at 0-4% w/w. In further aspects, no glycerol is present.

In another aspect of the above embodiments, diclofenac sodium is present at 2% w/w; DMSO is present at 45.5% w/w; ethanol is present at 23-29% w/w; propylene glycol is present at 10-12% w/w; hydroxypropylcellulose (HY119) is present at 0-6% w/w; glycerol is present at 0-4%, and water is added to make 100% w/w. In other aspects, there is no glycerol in the gel formulation. In further aspects, the end viscosity of the gel is 500-5000 centipoise.

A feature of the above gel formulations is that when such formulations are applied to the skin, the drying rate is quicker and transdermal flux is higher than previously described compositions, such as those in U.S. Pat. Nos. 4,575,515 and 4,652,557. Additional features of the preferred formulations include decreased degradation of diclofenac sodium, which degrades by less than 0.04% over the course of 6 months and a pH of 6.0-10.0, for example around pH 9.0.

In certain embodiments, the gel formulations of the invention comprise 1-5% glycerol, wherein the gel formulation when applied to the skin has a drying rate and transdermal flux greater than a comparative liquid formulation. In some aspects, the drying rate results in a residue of at most 50% of a starting amount after 24 hours and the transdermal flux is 1.5 or more greater than a comparative liquid formulation as determined by Franz cell procedure at finite or infinite dosing or both.

In other embodiments, the gel formulations and methods of their use provide a reduction of pain over 12 weeks when the

6

formulations are applied topically. In various aspects, the gel formulations are applied twice daily and the pain can be due to osteoarthritis.

These and other objects, embodiments, and advantages will become more apparent when read with the figures and detailed description which follow.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 shows a bar graph of flux rate of HEC and PVP gels. Franz diffusion cells were dosed at 15 mg per Franz cell.

FIG. 2 shows a bar graph of flux rate of gels made with Carbopol 981 and Ultrez 10. Franz diffusion gels were dosed with 200 μl per Franz cell.

FIG. 3 shows a bar graph of flux rate of carbopol 971 and carbopol 981 gels. Franz diffusion cells were dosed at 50 μl per cell.

FIG. 4 shows a bar graph of flux rate of various gels and a comparative liquid formulation. Franz cells were dosed at 10 mg per Franz cell.

FIG. 5 shows a bar graph illustrating the effect of the pH of various gels and a comparative liquid formulation on flux rate. Franz diffusion cells were dosed at 7 mg per cell.

FIG. 6 shows a bar graph of flux rates of various gels. Franz cells were dosed at 7 mg per Franz cell.

FIG. 7 shows a bar graph of flux rates of various diclofenac formulations. The comparative liquid formulation (1.5% diclofenac sodium) was dosed at 20 mg per Franz cell, Solaraze® (a commercially available 3% diclofenac sodium gel) was dosed at 10 mg per Franz cell, and a formulation of the invention, F14/2, was dosed at 15 mg per Franz diffusion cell. At this dosing, all cells were dosed with equivalent amounts of diclofenac sodium.

FIG. 8 shows a bar graph of flux rates in multidosing experiments. The comparative liquid formulation was dosed at 0.9 mg per Franz cell at 0, 4, 8, and 12 hrs. A formulation of the invention, F14/2, was dosed at 1.5 mg per Franz cell at 0 and 6 hrs.

FIG. 9 shows a bar graph of flux rates of various diclofenac formulations. Franz cells were dosed at 20 mg per cell.

FIG. 10 shows a bar graph of data on diclofenac flux rates from gels disclosed in Baboota et al. and gels of this invention. Franz cells were dosed at 4 mg per cell.

FIG. 11 shows the drying profile over time of three gel formulations and one liquid formulation of diclofenac sodium.

FIG. 12 shows the in vivo steady state plasma concentrations of diclofenac sodium after administration of either a liquid or gel formulation.

DETAILED DESCRIPTION OF THE INVENTION

I. Definitions

The term "transdermal" is used herein to generally include a process that occurs through the skin. The terms "transdermal" and "percutaneous" are used interchangeably throughout this specification.

The term "topical formulation" is used herein to generally include a formulation that can be applied to skin or a mucosa. Topical formulations may, for example, be used to confer therapeutic benefit to a patient or cosmetic benefits to a consumer. Topical formulations can be used for both topical and transdermal administration of substances.

The term "topical administration" is used herein to generally include the delivery of a substance, such as a therapeutically active agent, to the skin or a localized region of the body.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000137

The term "transdermal administration" is used herein to generally include administration through the skin. Transdermal administration is often applied where systemic delivery of an active is desired, although it may also be useful for delivering an active to tissues underlying the skin with minimal systemic absorption.

The term "penetration enhancer" is used herein to generally include an agent that improves the transport of molecules such as an active agent (e.g., a medicine) into or through the skin. Various conditions may occur at different sites in the body either in the skin or below the skin creating a need to target delivery of compounds. For example, in a treatment for osteoarthritis, the delivery of the active agent into relatively deep underlying joint tissue may be necessary to achieve therapeutic benefit. Thus, a "penetration enhancer" may be used to assist in the delivery of an active agent directly to the skin or underlying tissue or indirectly to the site of the disease through systemic distribution. A penetration enhancer may be a pure substance or may comprise a mixture of different chemical entities.

The term "finite dosing" is used herein to generally include an application of a limited reservoir of an active agent. The reservoir of the active agent is depleted with time leading to a tapering off of the active absorption rate after a maximum absorption rate is reached.

The term "infinite dosing" is used herein to generally include an application of a large reservoir of an active agent. The reservoir is not significantly depleted with time, thereby providing a long term, continuous steady state of active absorption.

As used herein, the term "comparative liquid formation" or "comparative" refers to a formulation such as that described in U.S. Pat. Nos. 4,575,515 and 4,652,557 consisting of 1.5% diclofenac sodium, 45.5% dimethylsulfoxide, 11.79% ethanol, 11.2% propylene glycol, 11.2% glycerine, and water.

## II. Gel Formulations

### 1. Components of the Gel Formulations

In order to provide a diclofenac sodium gel formulation having improved properties of drying time, increased transdermal flux and greater pharmacokinetic absorption in vivo, higher viscosity, good adherence to the skin, and ready spreadability, while maintaining stability over time, the inventors have discovered that a surprisingly advantageous combination of the following components can be used in the preparation of the gel compositions of the present invention.

The present invention provides gel formulations comprising an active agent, preferably a non-steroidal anti-inflammatory drug or pharmaceutically acceptable salts thereof. More preferably, the non-steroidal anti-inflammatory is diclofenac, which can exist in a variety of salt forms, including sodium, potassium, and diethylamine forms. In a preferred embodiment, the sodium salt of diclofenac is used. Diclofenac sodium may be present in a range of approximately 0.1% to 10%, such as 1, 2, 3, 4, or 5% w/w. Use of the sodium salt has been known to create a challenge with respect to stability of an aqueous gel in that higher salt concentrations can cause a breakdown in the gel matrix through interaction with certain thickening agents.

In another embodiment, the present invention includes a penetration enhancer. The penetration enhancer may be dimethyl sulfoxide ("DMSO") or derivatives thereof. The DMSO may be present in an amount by weight of 1% to 70%, and more preferably, between 25% and 60%, such as 25, 30, 40, 45, 50, 55, or 60% w/w. Preferably, DMSO is used in the present invention at a concentration of about 40 to about 50%

w/w, such as 41, 42, 43, 44, 45, 46, 47, 48, 49 and 50% and all fractions in between such as 44, 44.5, 45, 45.5, 46, 46.5%, and the like.

In certain embodiments, the present invention includes a lower alkanol, such as methanol, ethanol, propanol, butanol or mixtures thereof. In certain embodiments, the alkanol is present at about 1 to about 50% w/w. Preferably, ethanol is used at about 1-50% w/w, such as 1, 5, 10, 15, 20, 25, 30, 35, 40, 45, or 50% w/w, and all fractions in between.

In certain embodiments, the present invention includes a polyhydric alcohol, such as glycol. Suitable glycols include ethylene glycol, propylene glycol, butylene glycol, dipropylene glycol, hexanetriol and a combination thereof. Preferably, propylene glycol is used at about at 1-15% w/w, such as 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, or 15% w/w, and all fractions in between.

In certain embodiments, the present invention includes glycerol (also referred to herein as glycerine) at a concentration of 0-12% w/w. Preferably, glycerol is used at 0-4% w/w, such as 0, 1, 2, 3, or 4% w/w, and all fractions in between. In some embodiments, no glycerol is used in the formulation.

In a preferred embodiment, the present invention provides a formulation comprising a diclofenac solution and at least one thickening agent to make a gel. The at least one thickening agent of the present invention may be an acrylic polymer (for example, Carbopol polymers, Noveon polycarbophils and Pemulen polymeric emulsifiers available commercially from Noveon Inc. of Cleveland, Ohio), an acrylic polymer derivative, a cellulose polymer, a cellulose polymer derivative, polyvinyl alcohol, poloxamers, polysaccharides or mixtures thereof. Preferably the at least one thickening agent is hydroxypropylcellulose (HPC) used such that the end viscosity is between 10 and 50000 centipoise (cps). More preferably the end viscosity is between 500 and 20000 cps.

The present gel formulation may optionally include at least one antioxidant and/or one chelating agent.

Preferred antioxidants for use in the present invention may be selected from the group consisting of butylated hydroxytoluene (BHT), butylated hydroxyanisole (BHA), ascorbyl linoleate, ascorbyl dipalmitate, ascorbyl tocopherol maleate, calcium ascorbate, carotenoids, kojic acid, thioglycolic acid, tocopherol, tocopherol acetate, tocophereth-5, tocophereth-12, tocophereth-18, tocophereth-80, and mixtures thereof.

Preferred chelating agents may be selected from the group consisting of ethylenediamine tetraacetic acid (EDTA), diammonium EDTA, dipotassium EDTA, calcium disodium EDTA, HEDTA, TEA-EDTA, tetrasodium EDTA, tripotassium EDTA, trisodium phosphate, diammonium citrate, galactaric acid, galacturonic acid, gluconic acid, glucuronic acid, humic acid, cyclodextrin, potassium citrate, potassium EDTMP, sodium citrate, sodium EDTMP, and mixtures thereof.

In addition, the topical formulations of the present invention can also comprise a pH adjusting agent. In one particular embodiment, the pH adjusting agent is a base. Suitable pH adjusting bases include bicarbonates, carbonates, and hydroxides such as alkali or alkaline earth metal hydroxide as well as transition metal hydroxides. Alternatively, the pH adjusting agent can also be an acid, such as acid salt, or mixtures thereof. Further, the pH adjusting agent can also be a buffer. Suitable buffers include citrate/citric acid buffers, acetate/acetic acid buffers, phosphate/phosphoric acid buffers, formate/formic acid buffers, propionate/propionic acid buffers, lactate/lactic acid buffers, carbonate/carbonic acid buffers, ammonium/ammonia buffers, and the like. The pH adjusting agent is present in an amount sufficient to adjust the pH of the composition to between about pH 4.0 to about 10.0, more

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000138

preferably about pH 7.0 to about 9.5. In certain embodiments, the unadjusted pH of the admixed components is between 8 and 10, such as 9, without the need for the addition of any pH adjusting agents.

### 2. Characteristics of the Gel Formulation

#### a) Transdermal Flux

As shown below in the Examples, the present invention provides diclofenac sodium gel formulations that display surprisingly effective rates of transdermal flux when compared to previously described formulations.

Accordingly, in one embodiment, the present gel formulation comprises a non-steroidal anti-inflammatory and at least one thickening agent and having a flux, as determined by a finite dose Franz cell procedure, equal to or greater than the flux of a comparative liquid formulation. Preferably, the flux is greater than the flux of the comparative liquid formulation. More preferably, the flux is at least 1.5 times greater than the flux of the comparative liquid formulation. In other words, the ratio of: (i) the flux of the gel formulation comprising the non-steroidal anti-inflammatory and at least one thickening agent to (ii) the flux of the comparative liquid formulation is preferably greater than 1.0, and more preferably at least about 1.5.

In a further embodiment, the present invention further provides a diclofenac sodium gel formulation comprising a diclofenac solution and at least one thickening agent and having a flux as determined by the finite Franz cell procedure at least equivalent to the flux of the diclofenac solution alone. Preferably, the diclofenac sodium gel formulation has a flux that is at least 2.0 times greater compared to the flux of the diclofenac solution solution alone. More preferably, the present invention provides a diclofenac sodium gel formulation having a flux that is at least 4.0 times greater compared to the flux of the diclofenac sodium solution alone. In other words, the ratio of: (i) the flux of the diclofenac sodium gel formulation to (ii) the flux of the diclofenac sodium solution is at least about 1.0, preferably at least about 2.0, more preferably at least about 4.0.

In a yet further embodiment, the present invention provides a diclofenac sodium gel formulation comprising diclofenac sodium and at least one thickening agent and having a flux as determined by the multiple finite dosing Franz cell procedure (dosing at 2.5 mg/cm$^2$ at 0 and 6 hours) of at least 0.1 µg/hr/cm$^2$ at 24 hours, preferably at least 0.2 µg/hr/cm$^2$ at 24 hours.

#### b) Viscosity

In another embodiment, the present invention provides a gel formulation comprising a non-steroidal anti-inflammatory drug (NSAID) and at least one thickening agent, the gel formulation having a viscosity of at least 100 cP. Preferably, the gel formulation has a viscosity of at least 500 cP. More preferably, the gel formulation has a viscosity of at least 1000 cP. In other embodiments, the viscosity is 5000-10,000, 10,000-15,000, or 15,000-20,000 cP.

In a further embodiment, the present invention provides a diclofenac gel formulation comprising a diclofenac solution and at least one thickening agent, the gel formulation having a viscosity of around 1000 cP and a flux of at least 0.2 µg/cm$^2$/hr as determined by the multiple finite dose Franz cell procedure (2.5 mg/cm$^2$ at 0 and 6 hours) at 24 hours.

#### c) Stability

The stability of a drug product composition can have a significant impact on the length and cost of drug development, the nature of the studies required to support regulatory submissions, and the ultimate safety and approvability.

It is important for instance to minimize the amount of impurities or degradation products that form over time due to interactions between the various ingredients in a composi-

tion. This can be particularly important in compositions that are designed to increase skin permeability.

Thus, in some embodiments, the present invention provides a diclofenac sodium gel formulation that degrades by less than 1% over the course of 6 months at room temperature. More preferably, the rate of degradation is less than 0.9, 0.8, 0.7, 0.6, 0.5, 0.4, 0.3, 0.2, or less than 0.1%, and all fractions in between, over the course of 6 months at room temperature.

#### d) Drying Time

Relative to previously disclosed compositions, such as those in U.S. Pat. Nos. 4,575,515 and 4,652,557 (termed herein as "comparative liquid formulation" or "comparative"), the compositions of the invention dry quicker while achieving higher transdermal flux of the drug. It is surprising that higher flux rate and quicker drying can be achieved together as skin hydration is known to increase transdermal flux or penetration. The drying of the skin caused by rapid evaporation would tend to reduce the transdermal transport of drug remaining on the skin. The drying time difference is evident when equal amounts of the two products are tested on opposite limbs. Within thirty (30) minutes the compositions of the invention are almost completely dry whereas a significant amount of the previously described liquid formulation remains.

To compare the drying times more quantitatively, side-by-side comparisons were conducted. To accomplish this, the inventors measured the residual weight of formulations by placing equal amounts (100 mg) of a prior art formulation and compositions of the invention in weighing dishes over 10 cm$^2$ areas and weighing the amount remaining over time. Using this methodology, a difference is immediately noticeable, and becomes dramatically different by 4 hours (Table 11 and FIG. 10).

#### e) Pharmacokinetics

A comparison of the absorption of diclofenac sodium of compositions of the invention and a comparable composition from U.S. Pat. Nos. 4,575,515 and 4,652,557 was conducted in animals. The gels of the invention were shown to have improved absorption on a per dose basis than the comparative liquid compositions of these patents. In absolute terms, the clinical dose of the gels of the invention delivered a maximum observed plasma concentration ($C_{max}$) at steady state of 81 ng/ml and an area under the curve (AUC) of 584 ng/ml. This compared to 12 ng/ml and 106 ng/ml for the comparator compositions.

These results speak to the properties of the vehicle in delivering the active agent. The higher numbers for gel were seen even though the solution composition was dosed four (4) times per day (total 5.2 ml) compared to twice (2) per day (total 4.0 ml) for the gels.

### III Preparation of Gel Formulations

In another embodiment, the present invention provides a method for making gel formulations of diclofenac sodium. The gel formulations of the present invention are preferably made by carrying out the following steps: (i) dispersing the thickener, derivative thereof and/or mixture thereof in dimethyl sulfoxide and stirring for 1 hour; (ii) dissolving diclofenac sodium in an aqueous alcohol mixture (e.g., an ethanol/water mixture); (iii) dispersing propylene glycol and glycerol into the NSAID solution from (ii); and (iv) mixing the resulting NSAID solution into the thickener/dimethyl sulfoxide blend and stirring for 1 hour at ambient temperature. Alternatively, the gel formulations of the present invention may be made by carrying out the following steps: (i) dissolving the NSAID (e.g., diclofenac sodium) in an alcohol

HZNPENN_00000139

solution of DMSO (e.g., an ethanol/dimethyl sulfoxide mixture); (ii) dispersing the thickener, derivative thereof and/or mixture thereof in a solution of water/propylene glycol/glycerol and stirring for 1 hour; (iii) mixing the NSAID solution from (i) into the thickener blend from (ii) and stirring for 1 hour at ambient temperature. Heating can also be used during these mixing processes to help facilitate the gel formation.

Diclofenac sodium may be present in a range of approximately 0.1% to 10% w/w, such as 0.5, 1.0, 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, 5.0, 6.0, 7.0, 8.0, and 9.0% w/w.

### IV Methods of Use

Compositions of the invention are particularly suited for use in treating osteoarthritis (OA) chronically. They may also be useful for the treatment of other chronic joint diseases characterized by joint pain, degeneration of articular cartilage, impaired movement, and stiffness. Suitable joints include the knee, elbow, hand, wrist and hip.

Due to the properties of higher flux and greater in vivo absorption, it is believed that the formulations of the present invention can be administered at lower dosing than previously described formulations. In particular, it is expected that the compositions of the invention can be used at twice a day dosing or once a day dosing in the treatment of OA. This would represent a significant improvement as lower dosing is associated with better patient compliance, an important factor in treating chronic conditions.

Suitable amounts per administration will generally depend on the size of the joint, which varies per individual and per joint, however a suitable amount may range from 0.5 μl/cm² to 4.0 μl/cm². Preferably the amount ranges from 2.0 to 3.0 μl/cm².

Compositions of the present invention may, if desired, be presented in a bottle or jar or other container approved by the FDA, which may contain one or more unit dosage forms containing the active ingredient. The pack or dispenser may also be accompanied by a notice associated with the container in a form prescribed by a governmental agency regulating the manufacture, use or sale of pharmaceuticals, which notice indicates approval by the agency of the form of the compositions for human or veterinary administration. Such notice, for example, may be of labeling approved by the U.S. Food and Drug Administration for prescription drugs, or of an approved product insert. Compositions comprising a preparation of the invention formulated in a compatible pharmaceutical carrier may also be prepared, placed in an appropriate container, and labeled for treatment of an indicated condition.

The following examples are offered to illustrate, but not to limit, the claimed invention.

### V Examples

### Example 1

### Materials and Methods

Table 1 provides a list of the materials used in the examples provided below:

TABLE 1

| | | Materials | | | |
|---|---|---|---|---|---|
| Abbr | Chemical | FW | Source | Vendor # | CAS |
| BHA | Butylated hydroxyanisole | 180.24 | Sigma | B1253 | 25013-16-5 |
| BHT | Butylated hydroxytoluene | 220.36 | Spectrum | BH110-07 | 128-37-0 |
| Carb940 | Carbopol 940 | | Noveon | Carbopol 940 | 9003-01-4 |
| Carb971 | Carbopol 971 | | Noveon | Carbopol 971 | 9003-01-4 |
| Carb974 | Carbopol 974 | | Noveon | Carbopol 974 | 9003-01-4 |
| Carb981 | Carbopol 981 | | Noveon | Carbopol 981 | 9003-01-4 |
| Carb1342 | Carbopol 1342 | | Noveon | Carbopol 1342 | 9003-01-4 |
| Diclo | Diclofenac Sodium | 318.1 | Labchim | | 15307-79-6 |
| DMSO | Dimethyl Sulfoxide (USP) | 78.1 | Gaylord | EM-2951 | 67-68-5 |
| EDTA | Disodium Ethylenediaminetetraacetate Dihydrate | | VWR | MK139504 | 6381-92-6 |
| EtOH | Ethanol (USP) | 46.1 | Spectrum | G1015 | 64-17-5 |
| Gly | Glycerin (USP) | 92.1 | Proctor & Gamble | Superol V | 56-81-5 |
| Guar | Guar gum | | Spectrum | G1044 | 9000-30-0 |
| HEC | Hydroxyethyl cellulose—Natrasol 250 M | | Hercules | Natrasol 250 M | 9004-62-0 |
| HPMC | Hydroxypropyl methyl cellulose | | Dow Chemical | Methocel E4M | 9004-65-3 |
| HY117 | Hydroxypropyl cellulose | 95,000 | Spectrum | HY117 | 9004-64-2 |
| HY119 | Hydroxypropyl cellulose | 370,000 | Spectrum | HY119 | 9004-64-2 |
| Locu | Locust Bean gum | | Spectrum | L1135 | 9000-40-2 |
| Peg300 | Poly(ethylene glycol) 300 (USP) | ~300 | Spectrum | PO108 | 25322-68-3 |
| PG | Propylene Glycol (USP) | 76.1 | Dow Chemical | | 57-55-6 |
| PVA | Polyvinyl alcohol | 44.1 | Sigma | 81386 | 9002-89-5 |
| PVP | Polyvinyl pyrrolidone | 360,000 | Sigma | 81440 | 9003-39-8 |
| P407 | Poloxmer 407 | | Spectrum | P1126 | 9003-11-6 |
| Ultrez10 | Ultrez 10 | | Noveon | Ultrez10 | 9003-01-4 |

The general methodology for preparation of each example provided is as follows, unless otherwise indicated.

Final weight for each formulation was 25 g prepared in 50-mL glass vials. Vortexing or magnetic stir bars were used to mix the gels.

Viscosity was measured at 22° C. using Brookfield DV-III Ultra, programmable Rheometer with LV Spindle #31 at 10 rpm. For stability testing, gels were stored at ambient temperature or in an incubator at 50° C. Discoloration or changes in appearance including phase separation over time were evaluated.

The concentration of the DMSO was consistent in all of the experiments (45.5% w/w). Propylene glycol was at either 11 or 11.2% w/w. Ethanol concentration varied from 11% to 30% w/w. Glycerol concentrations were varied from 0 to 11.2% w/w. The diclofenac sodium concentration was at either 1.5% (w/w) or 2% (w/w). Water was adjusted to com-

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000140

pensate for the amount of inactives, thickening agents, and diclofenac sodium present in solution.

Franz diffusion cell experiments were used to analyze diclofenac sodium flux rates of varying gel formulations across a substrate membrane. Franz diffusion cells are a common and well known method for measuring transdermal flux rates. The general Franz cell procedure is described in Franz, T. J., Percutaneous absorption: on the relevance of in vitro data. *J Invest Derm*, 64:190-195 (1975). The following was the methodology used in the present Examples.

Franz cells with a 3 ml receptor well volume were used in conjunction with split thickness cadaver skin (0.015"-0.018", AlloSource). The donor well had an area of ~0.5 cm². Receptor wells were filled with isotonic phosphate buffered saline (PBS) doped with 0.01% sodium azide. The flanges of the Franz cells were coated with vacuum grease to ensure a complete seal and were clamped together with uniform pressure using a pinch clamp (SS #18 VWR 80073-350). After Franz cells were assembled, the skin was allowed to pre-hydrate for 45 minutes with PBS. PBS was then removed and an appropriate amount of formulation is added to the skin. Dosing levels varied from 2 mg/cm² (considered finite dose) to 200 mg/cm² (considered infinite dose). The donor well was then capped to prevent evaporation. Receptor wells of the Franz cells were maintained at 37° C. (temperature on the surface of the skin is ~31° C.) in a stirring dry block with continual agitation via a stir bar. Samples were drawn from the receptor wells at varying time points. Measurements were made in six-fold replicates. The concentration of diclofenac in the samples was analyzed using high performance liquid chromatography. The inventive formulations performed better than the comparator at the limits of finite dosing—finite dosing being a much better predictor of the performance of a formulation in an in vivo situation as opposed to infinite dosing.

A) Gel Formulations Derived from a Comparative Liquid Base Solution

Example 2

Gel Formulations Using Various Thickeners in a Comparative Liquid Formulation Base Solution

Initially, several thickeners including carbomers, polyvinyl pyrrolidone, locust gum, cellulose polymers and polyvinyl alcohol were tested for their effectiveness at forming a diclofenac sodium gel using the comparative liquid formulation as a base solution. In the gel formulations of this Example, a comparative liquid formulation solution was produced and a thickener was then added directly to this base. In order to facilitate the incorporation of the thickener, sonication and heating (at 60° C.), along with vigorous vortexing/homogenization were performed.

Some thickeners, specifically guar gum, locust bean gum, methocel (HPMC), polyvinyl alcohol, and poloxamer 407 failed to form stable gels. In particular, immediate separation, inefficient thickening, and insolubility of the thickeners was noted. Gels were formed that showed initial stability with several cellulose polymers including hydroxyethyl cellulose (Natrosol HHX) and hydroxypropylcellulose (HY119). Other thickeners that showed an initially stable gel were PVP, and acrylic polymer thickeners.

The specifics of gel formulation for each thickener are provided below:

HEC Thickening Agents:

A lower weight molecular weight hydroxyethyl cellulose (specifically Hydroxyethyl Cellulose (HEC) Type 250 M Pharm (Natrosol®)) was dispersed in the mixture of dimethyl sulfoxide, propylene glycol, glycerine and water and allowed to swell for about 1 hour. Diclofenac sodium was dissolved in ethanol and added to the HEC/solvent blend to obtain a final formulation. Although HEC gels form relatively easily and demonstrate a good flux profile, the gels are yellowish in color and are susceptible to phase separation over extended periods of storage. Table 2 shows the compositions of these formulations, and the resulting flux values of these compositions as compared with a comparative liquid formulation are shown in FIG. 1.

PVP Thickening Agents:

PVP was added at up to 8% w/v after all other components of the comparative liquid base formulation were mixed. PVP gels are clear in nature, but suffer from an undesirable tacky feel when drying. Table 2 and FIG. 1 shows the composition and flux data for this gel. In this example, Franz diffusion cells were dosed at 15 mg per Franz cell. As can be seen in FIG. 1, PVP gels performed reasonably well, but their undesirable aesthetic qualities do not make them ideal for a commercial embodiment.

TABLE 2

Components of HEC and PVP gels used to generate the flux rate data shown in FIG. 1.

| Percentages in | Formulation name | | | | |
| --- | --- | --- | --- | --- | --- |
| | Hec1b wt/wt % | Hec2b wt/wt % | PVP1b wt/wt % | PP54 wt/wt % | Comparative wt/wt % |
| Water | 18.81 | 18.81 | 18.81 | 18.31 | 18.81 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11.2 | 11.2 | 11.2 | 11.2 | 11.2 |
| Ethanol | 11.79 | 11.79 | 11.79 | 11.79 | 11.79 |
| Glycerine | 11.2 | 11.2 | 11.2 | 11.2 | 11.2 |
| Diclofenac Sodium | 1.5 | 1.5 | 1.5 | 2 | 1.5 |
| Thickener | HEC | HEC | PVP | Carbopol 971 | none |
| w/vol % thickener added to solution | 1.1 | 1.3 | 8 | 1 | |

Carbopol Thickening Agents:

Carbopol gels were formed by: (1) dispersing an acrylic polymer into a mixture of water, glycerol, and propylene glycol followed by stirring for 1 hour; (2) preparing a second solution of 1.5% diclofenac sodium dissolved in ethanol and DMSO; (3) mixing the diclofenac solution into the carbopol phase. An alternate method for forming carbopol gels is as follows: (1) dispersing the carbopol into dimethyl sulfoxide and stirring for 1 hour; (2) dissolving diclofenac sodium in an ethanol/water/propylene glycol mixture; (3) dispersing glycerol into the diclofenac solution; and (4) mixing the diclofenac solution into the polymer/dimethyl sulfoxide blend, and stirring for 1 hour at ambient temperature. These methods of mixing can be carried out at room temperature, or elevated temperature if desired. Varying carbopols were used to make gels including: Carbopol 1342, 941, 971, 981, 974 and Ultrez 10 (Noveon, Inc.). All carbopol gels were clear, proved stable to both freeze-thaw cycling and incubation at elevated temperature (50° C.) for one month, and had good flow characteristics. Tables 2, 3, and 4 show the composition of these gels, and FIGS. 1, 2, and 3 show their relative flux. A

HZNPENN_00000141

15

stable and clear gel could be formed at carbopol concentrations of ~>0.3% w/w when making gels with 1.5% w/w diclofenac sodium. For gels with 2% w/w diclofenac sodium, ~>0.9% w/w carbopol was needed to make a stable gel. The exact amount of carbopol needed to from a gel depended on the type of carbopol used.

For the formulations of Table 3, Franz diffusion gels were dosed with 200 µl per Franz cell. Carbopol gels uniformly showed increased flux rates over the comparative formulation (see FIG. 2). Thicker gels (i.e. gels with higher weight percent carbopols) tended to have less flux than a composition with a lower weight percentage of the same carbopol.

TABLE 3

Components of gels made with Carbopol 981 and Ultrez 10 used to generate the flux rate data shown in FIG. 2.

| | Formulation name | | | | | | |
|---|---|---|---|---|---|---|---|
| Percentages in | PUA wt/wt % | PUB wt/wt % | PUC wt/wt % | P981a wt/wt % | P981b wt/wt % | P981c wt/wt % | Comparative wt/wt % |
| Water | 18.81 | 18.81 | 18.81 | 18.81 | 18.81 | 18.81 | 18.81 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11.2 | 11.2 | 11.2 | 11.2 | 11.2 | 11.2 | 11.2 |
| Ethanol | 11.79 | 11.79 | 11.79 | 11.79 | 11.79 | 11.79 | 11.79 |
| Glycerine | 11.2 | 11.2 | 11.2 | 11.2 | 11.2 | 11.2 | 11.2 |
| Diclofenac Sodium | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 | 1.5 |
| Thickener | Ultrez | Ultrez | Ultrez | Carb 981 | Carb 981 | Carb 981 | none |
| w/vol % thickener added to solution | 0.90 | 1.03 | 1.16 | .90 | 1.06 | 1.22 | |

Antioxidants and chelating agents can also be added to the carbopol, HEC, or PVP gels. The addition of EDTA to carbopol gels by itself leads to a slightly cloudy gel. BHA gels turned color with incubation at higher temperature. The mixture of BHT and EDTA to carbopol gels did not show any discoloration and remained clear. For the formulations of Table 4, Franz diffusion cells were dosed at 50 µl per cell. FIG. 3 shows flux rates from these gels. Additions of chelating agents and preservatives had no effect on flux rates.

TABLE 4

Components of gels made with carbopol 971 and carbopol 981 gels used to generate the flux rate data shown in FIG. 3.

| | Formulation name | | | |
|---|---|---|---|---|
| Percentages in | PP51 wt/wt % | PP52 wt/wt % | PP53 wt/wt % | Comparative wt/wt % |
| Water | qs | qs | qs | 18.31 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11.2 | 11.2 | 11.2 | 11.2 |
| Ethanol | 11.79 | 11.79 | 11.8 | 11.79 |
| Glycerine | 11.2 | 11.2 | 11.2 | 11.2 |
| Diclofenac Sodium | 2 | 2 | 2 | 2 |
| BHT | 0.1 | | | 0.1 |
| EDTA | 0.05 | | | 0.05 |
| Thickener | Carbopol 971 | Carbopol 971 | Carbopol 981 | none |
| wt/wt % thickener | 1 | 1 | 0.9 | |

16

B. Comparative Examples

Example 3

Comparison of Transdermal Flux of Various DMSO Gel Formulations Versus a Comparative Liquid Formulation

A series of diclofenac gel formulations were made wherein the base solution was changed from the comparative base formulation. In particular, the weight percent of propylene glycol, ethanol, glycerine, water, and diclofenac were varied.

In these new formulations, the weight percent of the constituent chemicals was as follows: 45.5% DMSO, 20-30% ethanol, 10-12% propylene glycol, 0-4% glycerine, 2% diclofenac sodium, thickener and water added to 100% w/w.

Several thickeners were tested in this new base solution. A number of these thickeners failed to form stable gels; in particular, carbopol gels did not remain stable. However, cellulose gels were uniformly effective at forming gels. The most aesthetically pleasing of these gels was formed with hydroxypropylcellulose (HY117, HY119, HY121). These gels spread easily, were uniform in nature, dried quickly, and demonstrated good flow characteristics.

Hydroxypropylcellulose gels were formed by mixing all the constituent parts and then adding the thickener at the end followed by agitation. The gel can also be formed by dispersing the hydroxypropylcellulose in the aqueous phase prior to solvent addition. Heat can be used to facilitate gel formation. Hydroxypropylcellulose gels were clear and flowed easily. They remain stable for at least six months demonstrating: no phase separation, negligible shift in pH, and low amounts of degradation products (<0.04%). The data in FIGS. 4-9, derived from the formulations of Tables 5-10, indicate that the hydroxypropylcellulose gel formulations of diclofenac sodium of the present invention also provide a transdermal flux rate that is as much as 4-fold higher than a comparative liquid formulation.

Studies were performed to determine the relative transdermal flux of various diclofenac gel formulations of the present invention when compared with a comparative liquid formulation of U.S. Pat. Nos. 4,575,515 and 4,652,557 ("Comparative" in Tables 5-10). Accordingly, the Franz cell procedure described above was used to compare diclofenac flux rates of various diclofenac gel formulations with comparative liquid formulations.

For the formulations of Table 5, Franz cells were dosed at 10 mg per Franz cell. A new gel (F14/2) has an altered base

HZNPENN_00000142

solution over the comparative liquid formulation and demonstrates faster drying times and better flux kinetics (see FIG. 4). The flux rates for these gels is not as high as the carbopol gels (F971), but the drying rate is substantially faster.

TABLE 5

Components of various gels and a comparative liquid formulation used to generate the flux rate data shown in FIG. 4.

| | Formulation name | | | |
|---|---|---|---|---|
| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel 4.0% wt/wt % | F971 wt/wt % |
| Water | 18.81 | 12.5 | 12.5 | 17.16 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11.2 | 11 | 11 | 11.2 |
| Ethanol | 11.79 | 26.5 | 25 | 11.79 |
| Glycerine | 11.2 | | | 11.2 |
| Diclofenac Sodium | 1.5 | 2 | 2 | 2 |
| Thickener | none | HY119 | HY119 | Carbopol 971 |
| wt/wt % thickener | | 2.5 | 4 | 1.15 |

For the formulations of Table 6, Franz diffusion cells were dosed at 7 mg per cell. Lowering the pH shows a marked increase in flux rates (see FIG. 5).

TABLE 6

Components of various gels and a comparative liquid formulation used to generate the flux rate data shown in FIG. 5.

| | Formulation name | | | | |
|---|---|---|---|---|---|
| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel 4.0% wt/wt % | F971 wt/wt % | F14/2 gel 2.5% + HCL wt/wt % |
| Water | 18.81 | 12.5 | 12.5 | 17.16 | 12.5 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11.2 | 11 | 11 | 11.2 | 11 |
| Ethanol | 11.79 | 26.5 | 25 | 11.79 | 26.5 |
| Glycerine | 11.2 | | | 11.2 | |
| Diclofenac Sodium concentrated HCL | 1.5 | 2 | 2 | 2 | 2 *** added to pH 5.3 |
| pH | 9 | 9.43 | 9.67 | 6.77 | 5.3 |
| Thickener | none | HY119 | HY119 | Carb971 | HY119 |
| wt/wt % thickener | | 2.5 | 4 | 1.15 | 2.5 |

For the formulations of Table 7, Franz cells were dosed at 7 mg per Franz cell. The resulting flux rates for each of these formulations is shown in FIG. 6.

TABLE 7

Components of various gels used to generate the flux rate data shown in FIG. 6.

| | Formulation name | | | | |
|---|---|---|---|---|---|
| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | HaCa2 wt/wt % | HaCa wt/wt % | F14/2 gel pH 5.3 wt/wt % |
| Water | 18.81 | 12.5 | 22.3 | 26.3 | 12.5 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |

TABLE 7-continued

Components of various gels used to generate the flux rate data shown in FIG. 6.

| | Formulation name | | | | |
|---|---|---|---|---|---|
| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | HaCa2 wt/wt % | HaCa wt/wt % | F14/2 gel pH 5.3 wt/wt % |
| Propylene glycol | 11.2 | 11 | 11.2 | 11.2 | 11 |
| Ethanol | 11.79 | 26.5 | 12 | 12 | 26.5 |
| Glycerine | 11.2 | | 6 | 2 | |
| Diclofenac Sodium concentrated HCL | 1.5 | 2 | 2 | 2 | 2 *** added to pH 5.3 |
| pH | 9 | 9.43 | 6.8 | 6.71 | 5.3 |
| Thickener | none | HY119 | Carbopol 971 | Carbopol 971 | HY119 |
| wt/wt % thickener | | 2.5 | 1 | 1 | 2.5 |

For the formulations of Table 8, the comparative liquid formulation (1.5% diclofenac sodium) was dosed at 20 mg per Franz cell. Solaraze® (a commercially available 3% diclofenac sodium gel) was dosed at 10 mg per Franz cell, and F14/2 was dosed at 15 mg per Franz diffusion cell. At this dosing, all cells were dosed with equivalent amounts of diclofenac sodium. F14/2 continued to show increased performance over other formulations (see FIG. 7).

TABLE 8

Components of various diclofenac formulations used to generate the flux rate data shown in FIG. 7.

| | Formulation name | | |
|---|---|---|---|
| Percentages in | Comparative wt/wt % | Solaraze ® wt/wt % | F14/2 gel 2.5% wt/wt % |
| Water | 18.81 | | 12.5 |
| Dimethyl Sulfoxide | 45.5 | | 45.5 |
| Propylene glycol | 11.2 | | 11 |
| Ethanol | 11.79 | | 26.5 |
| Glycerine | 11.2 | | |
| Diclofenac Sodium | 1.5 | 3 | 2 |
| Thickener | none | | HY119 |
| wt/wt % thickener | | | 2 |

For the formulations of Table 9, the comparative liquid formulation was dosed at 0.9 mg per Franz cell at 0, 4, 8, and 12 hrs. F14/2 was dosed at 1.5 mg per Franz cell at 0 and 6 hrs. The accumulated dose from the gel was considerably higher in comparison to the comparative solution, providing a ~1.5 fold increase in flux (see FIG. 8).

TABLE 9

Components of formulations used in the multidosing experiments of FIG. 8.

| | Formulation name | | |
|---|---|---|---|
| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel pH 8.5 wt/wt % |
| Water | 18.81 | 12.5 | 45.5 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 11 |
| Propylene glycol | 11.2 | 11 | 26.5 |
| Ethanol | 11.79 | 26.5 | 12.5 |
| Glycerine | 11.2 | | 2.5 |

HZNPENN_00000143

TABLE 9-continued

Components of formulations used in the
multidosing experiments of FIG. 8.

| | Formulation name | | |
|---|---|---|---|
| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel pH 8.5 wt/wt % |
| Diclofenac Sodium concentrated HCL | 1.5 | 2 | 2 *** added to pH 8.5 |
| Thickener wt % thickener | none | HY119 2.5 | HY119 4\2.5 |

For the formulations of Table 10, Franz cells were dosed at 20 mg per cell. The resulting flux rates for these formulations is shown in FIG. 9.

TABLE 10

Flux results from varying diclofenac formulations.
Franz cells were dosed at 20 mg per cell.

| | Formulation name | | | | |
|---|---|---|---|---|---|
| Percentages in | F14/2 gel 3.5% wt/wt % | F14/2 solution wt/wt % | F971 wt/wt % | Comparative 2% wt/wt % | Comparative wt/wt % |
| Water | 12.5 | 12.5 | 17.16 | 18.31 | 18.81 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 | 45.5 |
| Propylene glycol | 11 | 11 | 11.2 | 11.2 | 11.2 |
| Ethanol | 25.5 | 29 | 11.79 | 11.79 | 11.79 |
| Glycerine | | | 11.2 | 11.2 | 11.2 |
| Diclofenac Sodium | 2 | 2 | 2 | 2 | 1.5 |
| Thickener wt/wt % thickener | HY119 3.5 | none | Carb 971 1.1 | none | none |

Example 4

Comparative Data on Transdermal Flux of Various
Diclofenac Gels

Studies were performed to determine the relative transdermal flux of the diclofenac gel formulations of the present invention when compared with previously disclosed formulations, such as the diclofenac diethylamine gel formulation described by Baboota (Baboota et al., *Methods Find Exp. Clin. Pharmacol.*, 28: 109-114 (2006)). Accordingly, the Franz cell procedure described above was used to compare flux rates of three of the diclofenac formulations described by Baboota with a gel vehicle of the present invention. The diethylamine form of diclofenac was used as the active agent, as that is the form used by Baboota. The exact compositions of the formulations used in this study are shown in Table 11 below. The Baboota formulations are labeled FY1, FY2, and FY3, while a gel formulation using the vehicle of the present invention with diclofenac diethylamine as the active is labeled G14/2_m. A comparative liquid formulation was also included in this study ("Comparative"). Among the primary differences between the composition of Baboota's formulation and that disclosed in the present invention is the higher DMSO concentrations in the present formulations (45.5% w/w versus 10% w/w).

As is apparent from the data shown in FIG. **10**, although the Baboota formulation is also a gel, the vehicle of the present

invention provides a significantly greater flux rate. After 12 hours, the gel of the present invention provides an accumulated dose of 26.8 $\mu$g/cm$^2$ versus 8.9 m/cm$^2$ for Baboota's best performing gel. Thus, the gel of the present invention has a nearly 3-fold greater rate of flux and accumulation of diclofenac than a similar gel, as described by Baboota. Note that these experiments were conducted at finite dosing which is more representative of clinical dosing of a non-occluded composition that is applied periodically but which is not meant to be in continuous contact with the skin. Additionally, the Baboota gels also contained a higher percentage of the active agent, 3.4% w/w as compared to 2% w/w for the compositions using the vehicle of the invention.

Other advantages were also observed, including the consistency and stability of the gel of the present invention when compared with the Baboota. In contrast to the smooth and uniform consistency of the present gel, the Baboota gel formulations were cloudy and lumpy, thus, unable to maintain a gel-like consistency. For this reason, the Baboota compositions would be expected to have some stability issues and a short shelf life.

Thus, despite both being gel formulations, when a head-to-head comparison is performed, using a finite dosing protocol, the formulation of the present invention is significantly more effective at the transdermal delivery of a diclofenac active agent, when compared with another gel formulation, that described by Baboota et al. Furthermore, as shown in FIG. **7**, the formulation of the present invention also performed remarkably better when compared to a diclofenac gel, Solaraze®, a product currently sold on the market. Thus, the present invention provides a diclofenac sodium gel formulation that has unexpectedly superior properties (e.g., with respect to parameters such as transdermal flux rates, favorable composition consistency, and greater stability and self life) when compared to the previously disclosed diclofenac diethylamine gel formulation described by Baboota or the diclofenac sodium formulation embodied by the Solaraze® gel.

TABLE 11

Components of diclofenac diethylamine gels used to generate the
flux rate data shown in FIG. 10. For the formulations of Table 11,
Franz diffusion cells were finite dosed at 4 mg per cell.

| | Formulation name | | | | |
|---|---|---|---|---|---|
| Percentages in | FY1 wt/wt % | FY2 wt/wt % | FY3 wt/wt % | G14/2_m wt/wt % | Comparative_m wt/wt % |
| Dimethyl Sulfoxide | 10 | 10 | 10 | 45.5 | 45.5 |
| Ethanol | 25 | 25 | 25 | 26.5 | 11.79 |
| PEG 400 | 15 | 15 | 15 | | |
| Propylene glycol | 15 | 15 | 15 | 11 | 11.2 |
| triethanolamine | 0.5 | 0.5 | 0.5 | | |
| DMSO | | | | | |
| Water | qs | qs | qs | 12.5 | 18.81 |
| Sodium carboxymethyl-cellulose | | | 6 | | |
| Glycerine | | | | | 11.2 |
| Thickener | Carb 940 | PVA | Carb 940 | HY119 | none |
| wt % Thickener | 1 | 20 | 0.5 | 2.5 | |
| Active: diclofenac diethylamine wt % | 3.4 | 3.4 | 3.4 | 2 | 1.5 |

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

HZNPENN_00000144

21

Example 5

Comparison of Drying Time/Residual Weight of a Comparative Liquid Formulation Solution Versus the Corresponding Gel

In order to evaluate the drying time of a comparative liquid formulation solution as compared to the corresponding gel, the study described in this example was performed. Equal weight amounts (100 mg) of either the comparative liquid formulation solution or diclofenac sodium gel formulations were measured on to plastic weigh dishes and spread over a 10 cm² area, and then left exposed to ambient conditions. At selected time points, the plastic weighing dishes were again weighed to determine the mass of the composition remaining on the weighing dish. As shown by the data in Table 12 below and in FIG. 11, it was surprisingly found that even after a 24 hour drying period, almost all (nearly 90%) of the weight of the initially applied comparative liquid formulation composition remained on the drying dish. Thus, the weight of the comparative liquid formulation changed very little over the time points measured, indicating that the drying of the liquid formulation occurred very slowly.

In contrast, even within the first five minutes, the three gel formulations displayed more rapid drying than the liquid formulation. 70% of the weight of the two gels that contained 2% or 4% HPC remained, as compared to the over 90% of the liquid formulation which remained, after 4 hours of drying time. By 24 hours, this difference was even more pronounced, as slightly over 20% and 30% of the weight of the two gel formulations containing 2% and 4% HPC, respectively, remained, and slightly under 60% of the weight of the F971 gel remained, as compared to the almost 90% of the liquid formulation which remained. This is a surprising result, as one would have expected the liquid formulation to lose weight more quickly, and thus have a shorter drying time, as compared to a semi-solid gel formulation. Thus, this example demonstrates that the gel compositions of the present invention display superior drying characteristics as compared to a comparable liquid formulation.

Thus, in certain embodiments, the present invention provides a formulation which has a drying time such that, at most, a 50% weight of the starting amount remains as a residue after 24 hours of drying time, preferably a 30-40% or less weight of the starting amount remains as a residue after 24 hours of drying time.

The improved drying time of the gel formulations of the present invention provides improved ease of use and is expected to lead to better patient compliance. Thus, this invention provides a gel formulation with improved drying characteristics while also providing improved drug delivery, as evidenced by the advantageous transdermal flux data shown in the examples above.

TABLE 12

Drying times for gels and a comparative liquid formulation solution. Equal weights of each formulation were measured and spread on weigh dishes. The weight of each remaining formulation was then followed with time. The gels of this invention showed faster drying kinetics than the comparative liquid formulation, with F14/2 showing the fastest drying rate. These gels also had improved "spreadability" characteristics, which most likely contributed to this improvement in drying rates.

| | Drying times | | | |
| | Formulation name | | | |
| Percentages in | Comparative wt-wt % | F14/2 gel 2.5% wt-wt % | F14/2 gel 4.0% wt-wt % | F971 wt-wt % |
|---|---|---|---|---|
| Water | 18.81 | 12.5 | 12.5 | 17.16 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 |

22

TABLE 12-continued

Drying times for gels and a comparative liquid formulation solution. Equal weights of each formulation were measured and spread on weigh dishes. The weight of each remaining formulation was then followed with time. The gels of this invention showed faster drying kinetics than the comparative liquid formulation, with F14/2 showing the fastest drying rate. These gels also had improved "spreadability" characteristics, which most likely contributed to this improvement in drying rates.

| | Drying times | | | |
|---|---|---|---|---|
| Propylene glycol | 11.2 | 11 | 11 | 11.2 |
| Ethanol | 11.79 | 26.5 | 25 | 11.79 |
| Glycerine | 11.2 | | | 11.2 |
| Diclofenac Sodium | 1.5 | 2 | 2 | 2 |
| Thickener | none | HY119 | HY119 | Carbopol 971 |
| wt/wt % thickener | 3.5 | 2.5 | 4 | 1.15 |

| | % Remaining | | | |
| Time (hr) | Comparative | F14/2 gel 2.5% | F14/2 gel 4.0% | F971 |
|---|---|---|---|---|
| 0.000 | 100 | 100 | 100 | 100 |
| 0.083 | 98.1 | 93 | 92.6 | 100.3 |
| 0.167 | 96.7 | 92.9 | 91.8 | 100.3 |
| 0.333 | 95.7 | 92.7 | 93 | 100.2 |
| 0.500 | 95.6 | 92.7 | 93.3 | 100 |
| 0.750 | 95.5 | 92.1 | 92.3 | 99.8 |
| 1.000 | 95.9 | 92 | 91.8 | 99.7 |
| 4.000 | 93 | 71 | 70.7 | 86.8 |
| 24.000 | 88.7 | 32.4 | 23.5 | 58.9 |

Example 6

Comparison of Stability Characteristics of a Comparative Liquid Formulation Versus Diclofenac Sodium Gel Formulations

This example provides a comparison of the stability of the compositions of the present invention tested against reference formulations at room temperature over a six month period. It was unexpectedly found that while the compositions of the invention contain a higher concentration of active agent, they in fact resulted in a lower concentration of a degradation impurity as compared to the reference. It was also unexpectedly found that compositions using hydroxypropylcellulose (HPC) as the gelling agent had a significantly lower quantity of this impurity as compared to compositions made using carbomer gelling agents.

In this study, samples of the test compositions were placed into plastic screw cap bottles which were sealed and held at 25° C. at 60% humidity for 6 months. After the 6 month storage period, the samples were tested for impurities by high performance liquid chromatography (HPLC). The active agent, diclofenac sodium, was found to elute by HPLC with an elution time of about 11 minutes. It was found that upon 6 months of storage, an impurity, termed "impurity A", was seen to elute at about 6.6 minutes in varying amounts for the various compositions as shown in Table 13 below.

TABLE 13

| Composition | Percent "impurity A" after 6 months of storage (wt/wt) |
|---|---|
| 1.5% diclofenac sodium as a comparative liquid formulation solution | 0.034% |
| 2.0% diclofenac sodium in 0.9% Carbopol gel | 0.09% |
| 2.0% diclofenac sodium in 3.5% HPC gel | 0.02% |

Thus, as indicated by the data in Table 13, while having a higher concentration of the active agent, diclofenac sodium, a

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX226

HZNPENN_00000145

gel formulation of the present invention containing 3.5% HPC shows a higher degree of stability, as reflected in the appearance of a lower percentage of "impurity A" as compared to a comparable liquid formation. The data shown in Table 13 also shows that the HPC gel formation is more stable than a comparable gel formation containing 0.9% Carbopol, as the HPC gel formation demonstrates an at least 4-fold reduction in the level of impurity A. Thus, a gel formation of the present invention provides improved stability of the active agent as compared to the reference formulations as evidenced in a formulation which degrades by less than 0.034% or 0.09%, over 6 months, as was observed for the reference formulations. Furthermore, the amount of "impurity A" found in the gel formulation of the present invention after a 6 month storage period would result in an exposure level well below limits that would require additional nonclinical testing testing of the impurity.

Example 7

Comparison of In Vivo Epicutaneous Absorption of Liquid Versus Gel Formulations

A study was conducted to compare systemic absorption after topical application (also referred to as epicutaneous absorption) of a comparative solution with a gel of the invention. A parallel design was employed with 6 Landrace pigs per arm. Drug was applied for 7 days with an additional dose on Day 8. Blood was sampled on Day 1 to determine a baseline; Day 6, Day 7 and Day 8 samples were taken to confirm steady state, and additional samples were taken at 0 hr, 2 hr, 5 hr, 7 hr, 12 hr, 15 hr, and 24 hr on Day 7 to determine a 24 hour steady state profile; samples taken from Days 8-13 were used to determine an elimination profile.

The doses used in this study were as follows: The comparative solution group received 3.85 mg diclofenac sodium per administration and animal 4 times daily; the gel Group received 8.08 mg diclofenac sodium per administration and animal 2 times daily; the administration area was 5 cm×10 cm/animal. These amounts represent the scaled human clinical doses.

Sufficient blood was collected from each animal per sampling time and processed for at least 2 mL Li-Heparin plasma/sample, which were split into two aliquots of 1 mL each. Blood was withdrawn from all animals as shown in Table 14.

TABLE 14

Blood sampling schedule

| Test Day(s) | Sampling times | No. of samples | No. of aliquots |
|---|---|---|---|
| 1 | 0 (prior to first administration) | 24 | 48 |
| 6 | 0 (prior to first administration), | 24 | 48 |
| 7 | 0 (prior to first administration), | 168 | 336 |
| | 2 hr post first dosing, | | |
| | 5 hr post first dosing (prior to second administration for Group 1), | | |
| | 7 hr post first dosing, | | |
| | 10 hr post first dosing (prior to third administration for Group 1 and prior to second administration for Groups 2, 3. and 4,) | | |
| | 12 hr post first dosing | | |
| | 15 hr post first dosing (prior to fourth administration for Group 1) | | |

TABLE 14-continued

Blood sampling schedule

| Test Day(s) | Sampling times | No. of samples | No. of aliquots |
|---|---|---|---|
| 8-13 | 0 (pre-dose), 4, 8, 12, 24, 48, 72, 96, and 120 hr post administration | 216 | 432 |
| Total number of samples | | 432 | 864 |

Pharmacokinetic evaluation of the plasma data was performed using TopFit 2.11. A non-compartment model was used for the calculation of the terminal half life and area under the curve (AUC). Elimination rate constants (KO and plasma elimination half-lives ($t_{1/2}$) were calculated by linear regression analysis of the log/linear portion of the individual plasma concentration-time curves (c=concentration, t=time). Half-life was determined using the formulae:

$$t_{1/2} = \ln 2/K_{el}[h]$$

$$dc/dt = (K_{el})(c)[h].$$

Area under the curve (AUC) values were calculated using the linear trapezoidal method and extrapolated to infinite time by dividing the last measurable plasma concentration by the terminal elimination rate constant. Plasma concentrations at time zero were taken to be those at the pre-dose blood sampling time on Test Day 8. Area under the curve (AUC) was calculated using the formula:

$$AUC = \int [c \, dt](ng/mL)(h), \text{ integrated from zero to infinity.}$$

The following pharmacokinetic parameters for diclofenac sodium were calculated:

$AUC_{0-24}$ (Test Day 7)

$AUC_{0-\tau}$ (Test Day 8)

$AUC_{0-inf}$ (Test Day 8)

$T_{max}$ (Test Days 7, 8) (time to reach $C_{max}$)

$C_{max}$ (Test Days 7, 8) (maximum observed plasma concentration)

$C_{min}$ (Test Days 7, 8) (minimal observed plasma concentration)

$C_{(trough)}$ (Test Days 6, 7, and 8) (trough plasma concentration)

$K_{el}$ (elimination half-life)

$T_{1/2}$ (plasma elimination half-life).

The achievement of steady state was assessed by using repeated measures ANOVA with log-transformed trough concentrations on Test Days 6, 7, and 8 as the dependent variable, time as the independent variable, subject as a random effect, and day as a fixed effect.

The data is shown in FIG. 12 and Tables 16 and 17. Compositions of the invention show significantly more absorption of diclofenac sodium as measured by the mean AUC. This result holds even when adjusting for dose.

HZNPENN_00000146

25

26

### TABLE 15

Dosing in pigs

| | Diclofenac Sodium % (w/w) | Area of application (cm²) | Dose of the product per application (mL) | Diclofenac Sodium per dose (mg) | Number of doses per day | Diclofenac per day (mg) |
|---|---|---|---|---|---|---|
| Gel | 2.0 | 50 | 0.40 | 8.08 | bid | 16.2 |
| Comparative Solution | 1.5 | 50 | 0.24 | 3.85 | qid | 15.4 |

### TABLE 16

PK profile at steady state on Day 7

| treatment | subject | Tmax (h) | Cmax (pg/ml) | AUC 0-24 (pg * h/ml) |
|---|---|---|---|---|
| Gel | 13 | 12 | 15379 | 239818 |
| | 14 | 10 | 8570 | 175862 |
| | 15 | 5 | 6014 | 104122 |
| | 16 | 5 | 4827 | 63842 |
| | 17 | 15 | 434829 | 2689765 |
| | 18 | 24 | 14484 | 231494 |
| | Mean | 12 | 80684 | 584151 |
| | SD | 7 | 173549 | 1033866 |
| Comparative Solution | 1 | 10 | 8302 | 1071.22 |
| | 2 | 10 | 24709 | 133521 |
| | 3 | 15 | 14743 | 160294 |
| | 4 | 0 | 4350 | 44267 |
| | 5 | 24 | 9552 | 112460 |
| | 6 | 12 | 8628 | 77881 |
| | Mean | 12 | 11714 | 105924 |
| | SD | 8 | 7185 | 40865 |

### TABLE 17

Relative bioavailability and exposure to a comparative liquid formulation in comparison to the corresponding gel at steady state

| | Ratio Gel/Comparative Solution % |
|---|---|
| C_max | 167.7 |
| C_max/Dose | 161.5 |
| AUC 0-24 | 241.1 |
| AUC 0-24/Dose | 232.2 |

### Example 8

Clinical Trials of Diclofenac Gel in the Treatment of Osteoarthritis

A clinical trial will be performed to evaluate the safety and efficacy of a gel formulation of the present invention in subjects with symptoms of primary osteoarthritis (OA) of the knee. Specifically, a 2-arm, double-blinded, placebo-controlled, randomized, 12-week Phase III clinical trial will be performed in 300 subjects randomized to receive either a diclofenac gel formulation, placebo gel (the gel carrier containing no diclofenac). Subjects will apply 2 mL of study gel to their OA knee per application.

The primary variables for assessment of efficacy will be the WOMAC LK3.1 pain and physical function and Patient Overall Health Assessment. Secondary variables will be the WOMAC stiffness and Patient Global Assessment. The primary efficacy analyses will be the comparison of the change from baseline to final assessment of the primary efficacy variables for subjects in the diclofenac sodium gel arm versus the placebo gel arm.

More specifically, the efficacy of diclofenac gel on knee OA symptoms will be measured by the subjective response of subjects as determined by an efficacy variables questionnaire which includes the WOMAC LK3.1 OA Index (pain, physical function, and stiffness dimensions), a Patient Overall Health Assessment, and a Patient Global Assessment. (See Bellamy, N., *WOMAC Osteoarthritis Index User's Guide IV*, Queensland, Australia (2003)).

The WOMAC LK3.1, Patient Overall Health Assessment and Patient Global Assessment questionnaires will be based on the five-point Likert scale. Numerical values will be assigned to WOMAC LK3.1 scores, Patient Global Assessment scores and Patient Overall Health Assessment scores, as follows:

Patient Overall Health Assessment and
WOMAC LK3.1 Patient Global Assessment
  None=0 Very Good=0
  Mild=1 Good=1
  Moderate=2 Fair=2
  Severe=3 Poor=3
  Extreme=4 Very Poor=4.

The WOMAC LK3.1 OA Index is a segregated, multidimensional, self-administered index with three independent dimensions: pain, stiffness and physical function and will be used as an efficacy variable in this study.

In a preferred embodiment of the invention, application of the gel formulations of the invention when applied topically will result in a reduction of pain or physical function on the WOMAC scale of at least 1 Likert scale unit over a 12 week period. Even more preferably, a reduction of 2, 3, or 4 Likert scale units will result. Most preferably, application of the gel formulations of the invention will result in complete relief of pain and complete or nearly complete restoration of physical function.

To assess safety, the frequency of adverse effects will be tabulated, the worst skin irritation score will be documented, and change in vital signs and laboratory parameters will be assessed.

The foregoing discussion of the invention has been presented for purposes of illustration and description. The foregoing is not intended to limit the invention to the form or forms disclosed herein. Although the description of the invention has included description of one or more embodiments and certain variations and modifications, other variations and modifications are within the scope of the invention, e.g., as may be within the skill and knowledge of those in the art, after understanding the present disclosure. It is intended to obtain rights which include alternative embodiments to the extent permitted, including alternate, interchangeable, and/or equivalent structures, functions, ranges, or steps to those claimed, whether or not such alternate, interchangeable, and/or equivalent structures, functions, ranges, or steps are disclosed herein, and without intending to publicly dedicate any patentable subject matter.

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX228

HZNPENN_00000147

27

28

All publications, patents and patent applications referred to herein are incorporated by reference in their entirety to the same extent as if each individual publication, patent or patent application was specifically and individually indicated to be incorporated by reference in its entirety.

What is claimed is:

1. A topical formulation comprising:
   (i) 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, or 5.0% w/w and all fractions in between, diclofenac sodium;
   (ii) 30-60% w/w DMSO;
   (iii) 1-15% w/w propylene glycol;
   (iv) 1-30% w/w ethanol;
   (v) optionally glycerine;
   (vi) water;
   (vii) at least one thickening agent selected from the group consisting of a
   cellulose polymer, a carbomer polymer, a carbomer derivative, a cellulose derivative, and mixtures thereof; wherein the topical formulation has a viscosity of 500-5000 centipoise; and wherein the formulation degrades by less than 1% over 6 months.

2. The topical formulation of claim 1, wherein the concentration of diclofenac sodium is a member selected from the group consisting of 1%, 1.5% and 2% w/w, and all fractions in between.

3. The topical formulation of claim 1, wherein the concentration of DMSO is about 40% to about 50% w/w.

4. The topical formulation of claim 3, wherein the concentration of DMSO is a member selected from the group consisting of 40%, 41%, 42%, 43%, 44%, 45%, 46%, 47%, 48%, 49% and 50% w/w, and all fractions in between.

5. The topical formulation of claim 1, wherein the concentration of ethanol is present at 23-29% w/w.

6. The topical formulation of claim 1, wherein the at least one thickening agent is selected from the group consisting of a carbomer polymer, a carbomer derivative and mixtures thereof.

7. The topical formulation of claim 6, wherein the at least one thickening agent is selected from the group consisting of carbopol 971, carbopol 981, carbopol 941, carbopol 1342 and ultrez 10.

8. The topical formulation of claim 6, wherein glycerine is present.

9. The topical formulation of claim 1, wherein the at least one thickening agent is selected from the group consisting of a cellulose polymer, a cellulose derivative, and mixtures thereof.

10. The topical formulation of claim 9, wherein the at least one thickening agent is hydroxypropyl cellulose.

11. The topical formulation of claim 10, wherein the formulation comprises:
   (i) 1.5, 2.0, 2.5, 3.0, 3.5, 4.0 or 5.0% w/w, and all fractions in between, of diclofenac sodium;
   (ii) 40-50% w/w of DMSO;
   (iii) 23-29% w/w of ethanol; and
   (iv) 10-12% w/w of propylene glycol.

12. The topical formulation of claim 11, wherein the concentration of diclofenac sodium is a member selected from the group consisting of 1.5% and 2% w/w, and all fractions in between.

13. The topical formulation of claim 11, wherein the concentration of DMSO is a member selected from the group consisting of 40%, 41%, 42%, 43%, 44%, 45%, 46%, 47%, 48%, 49% and 50% w/w, and all fractions in between.

14. The topical formulation of claim 11, wherein the concentration of ethanol is present at 26.5% w/w.

15. A method for treating pain in a subject suffering from pain, said method comprising the topical administration of a formulation comprising:
   (i) diclofenac sodium present at 1.5, 2.0, 2.5, 3.0, 3.5, 4.0, or 5.0% w/w and all fractions in between;
   (ii) DMSO present at 30-60% w/w;
   (iii) ethanol present at 1-30% w/w;
   (iv) propylene glycol present at 1-15% w/w;
   (v) optionally glycerine;
   (vi) a thickening agent, wherein said thickening agent is selected from the group consisting of cellulose polymers, carbomer polymers, a carbomer derivative, a cellulose derivative and mixtures thereof; and
   (vii) water; wherein the formulation has a viscosity of 500-5000 centipoise; and
   wherein the formulation degrades by less than 1% over 6 months.

16. The method of claim 15, wherein the concentration of diclofenac sodium is a member selected from the group consisting of 1%, 1.5% and 2% w/w, and all fractions in between.

17. The method of claim 15, wherein the concentration of DMSO is about 40% to about 50% w/w.

18. The method of claim 17, wherein the concentration of DMSO is a member selected from the group consisting of 40%, 41%, 42%, 43%, 44%, 45%, 46%, 47%, 48%, 49% and 50% w/w, and all fractions in between.

19. The method of claim 15, wherein the concentration of ethanol is present at 23-29% w/w.

20. The method of claim 15, wherein the at least one thickening agent is selected from the group consisting of a carbomer polymer, a carbomer derivative and mixtures thereof.

21. The method of claim 20, wherein glycerine is present.

22. The method of claim 15, wherein the at least one thickening agent is selected from the group consisting of a cellulose polymer, a cellulose derivative, and mixtures thereof.

23. The method of claim 22, wherein the at least one thickening agent is hydroxypropyl cellulose.

24. The formulation of claim 1, wherein the formulation degrades by less than 0.5% over 6 months.

25. The formulation of claim 1, wherein the formulation degrades by less than 0.2% over 6 months.

26. The formulation of claim 1, wherein the formulation degrades by less than 1% over 6 months at room temperature.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 05/15/2015

APPX229

HZNPENN_00000148