2017-2149, -2152, -2153, -2202, -2203, -2206

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## HORIZON PHARMA IRELAND LIMITED, HZNP LIMITED, HORIZON PHARMA USA, INC.,

**Plaintiffs-Appellants**

v.

## ACTAVIS LABORATORIES UT, INC.,

**Defendant-Cross-Appellant**

Appeal from the United States District Court for the
District of New Jersey, Case No. 1:14-cv-7992 (consolidated with
1:15-cv-5025, 1:15-cv-6131, and 1:15-cv-6989), Judge Noel L. Hillman

## Defendant-Cross-Appellant's

## PRINCIPAL BRIEF

John Christopher Rozendaal
Michael E. Joffre
Kristina Caggiano Kelly
William H. Milliken
**STERNE KESSLER GOLDSTEIN & FOX PLLC**
1100 New York Avenue, NW
Washington, DC 20005
202.371.2600


*Counsel for Defendant-Cross-Appellant,*
*Actavis Laboratories UT, Inc.*

Dated: October 10, 2017

# CERTIFICATE OF INTEREST

Counsel for Cross-Appellant Actavis Laboratories UT, Inc. certifies the following:

| 1. Full Name of Party Represented by me | 2. Name of Real Party in interest (Please only include any real party in interest NOT identified in Question 3) represented by me is: | 3. Parent corporations and publicly held companies that own 10 % or more of stock in the party |
|---|---|---|
| Actavis Laboratories UT, Inc. | Not applicable. | Teva Pharmaceuticals USA, Inc.<br><br>Teva Pharmaceutical Industries Ltd. |

4. The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this Court (**and who have not or will not enter an appearance in this case**) are:

| | |
|---|---|
| Liza M. Walsh<br>Christine I. Gannon<br>Katelyn O'Reilly<br>WALSH PIZZI O'REILLY FALANGA LLP<br><br>Christopher J. Borchert (formerly with the firm)<br>CONNELL FOLEY | Ralph J. Gabric<br>Mark H. Remus<br>Laura A. Lydigsen<br>Joshua E. Ney, Ph.D.<br>Joshua H. James<br>Andrew S. McElligott<br>Yun (Sophie) Wei, Ph.D. (formerly with the firm)<br>BRINKS GILSON & LIONE<br><br>John Christopher Rozendaal<br>Michael E. Joffre<br>Kristina Caggiano Kelly<br>William H. Milliken<br>STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C. |

5.  The title and number of any case known to counsel to be pending in this or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal.

No appeal in or from the same civil actions in the lower court was

previously before this or any other appellate court.

The following cases presently pending may directly affect or be affected by

the Court's decision in this matter:

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:16-cv-05051-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 1:16-cv-00732-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:16-cv-00645-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 1:15-cv-07745-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:15-cv-07742-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:15-cv-05989-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 1:15-cv-06935-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:15-cv-06131-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 1:15-cv-05027-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:15-cv-05025-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 15 cv-03051-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:14-cv-07992-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:17-cv-03342-NLH-AMD (D.N.J.)


October 10, 2017                    /s/ *John Christopher Rozendaal*
                                    John Christopher Rozendaal

# TABLE OF CONTENTS

RULE 47.5 STATEMENT OF RELATED CASES ................................................ vii

COUNTERSTATEMENT OF THE ISSUES ON APPEAL .................................... 1

STATEMENT OF THE ISSUE ON CROSS-APPEAL ........................................ 2

RESPONSIVE BRIEF ON APPEAL ................................................................ 3

COUNTERSTATEMENT OF FACTS ON APPEAL .......................................... 3

    A.    The Asserted Patents ........................................................ 3

        1.    The Formulation Patents ............................................ 3

        2.    The Method-of-Use Patents ...................................... 8

    B.    Actavis's ANDA Product and Labeling ............................ 9

    C.    Procedural History .......................................................... 11

        1.    Claim Construction .................................................. 11

        2.    Summary Judgment ................................................. 14

SUMMARY OF RESPONSIVE ARGUMENT ON APPEAL ............................. 15

RESPONSIVE ARGUMENT ON APPEAL ...................................................... 17

I.    THE DISTRICT COURT CORRECTLY HELD THAT ACTAVIS'S LABEL DOES NOT INDUCE INFRINGEMENT OF THE METHOD-OF-USE PATENTS ................................................................ 17

    A.    Actavis's proposed label does not encourage, recommend, or promote infringement .................................................. 17

    B.    The cases Horizon cites do not support reversal ............... 21

    C.    There are no disputed questions of fact that could preclude summary judgment .......................................................... 24

II.    THE DISTRICT COURT CORRECTLY HELD THAT THE FORMULATION PATENT CLAIMS ARE INDEFINITE ....................... 25

    A.    The claim term "impurity A" is indefinite ...................... 25

    B.    The "degrades" claims are indefinite .............................. 32

    C.    The "consisting essentially of" claims are indefinite ........ 36

        1.      The Basic and Novel Properties of the Claimed Formulation Cannot be Determined with Reasonable Certainty ..................................................37

        2.      At least two of Horizon's suggested basic and novel properties are themselves indefinite................................40

             a.     The district court correctly applied the Nautilus standard to the purported "basic and novel properties" of the invention ..............................................40

             b.     "Better drying time" is indefinite ...................................43

             c.     "Favorable stability" is indefinite..................................51

BRIEF ON CROSS-APPEAL ..................................................54

STATEMENT OF THE CASE ON CROSS-APPEAL...........................54

SUMMARY OF THE ARGUMENT ON CROSS-APPEAL ..................60

STANDARD OF REVIEW ON CROSS-APPEAL ..............................62

ARGUMENT ON CROSS-APPEAL ...........................................62

I.     THERE IS NO REQUIREMENT IN OBVIOUSNESS LAW THAT THE PRIOR ART PREDICT THE *EXACT FORMULATION* OF THE ASSERTED CLAIM ........................63

II.    REQUIRING THAT PRIOR ART *PREDICT* THE EXACT FORMULATION OF THE ASSERTED CLAIM MISAPPREHENDS THE SECONDARY CONSIDERATION OF UNEXPECTED RESULTS ...................67

CONCLUSION ..................................................74

# TABLE OF AUTHORITIES

## Cases

*A. Schulman, Inc. v. Polyone Corp., Inc.*,
2017 WL 2805857 (N.D. Ohio Apr. 27, 2017) ..................................................47

*AK Steel Corp. v. Sollac & Ugine*,
344 F.3d 1234 (Fed. Cir. 2003) ............................................................36

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
632 F.3d 1246 (Fed. Cir. 2011) ............................................................33

*Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*,
499 F.3d 1293 (Fed. Cir. 2007) ............................................................69

*AstraZeneca LP v. Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2010) ............................................................22

*Bayer AG v. Sony Elecs., Inc.*,
229 F. Supp. 2d 332 (D. Del. 2002)........................................................40

*Bayer Schering Pharma AG v. Lupin, Ltd.*,
676 F.3d 1316 (Fed. Cir. 2012) ............................................................24

*Braintree Labs., Inc. v. Breckenridge Pharm., Inc.*,
688 F. App'x 905 (Fed. Cir. 2017) ........................................................23

*Bristol-Myers Squibb Co. v. Teva Pharm. USA, Inc.*,
752 F.3d 967 (Fed. Cir. 2014) ............................................................69

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
358 F.3d 1371 (Fed. Cir. 2004) ............................................................31

*Cordis Corp. v. Bos. Sci. Corp.*,
561 F.3d 1319 (Fed. Cir. 2009) ............................................................43

*Dow Chem. Co. v. Nova Chems. Corp. (Canada)*,
803 F.3d 620 (Fed. Cir. 2015) .........................................35, 46, 47, 51

*DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*,
464 F.3d 1356 (Fed. Cir. 2006) ............................................................65

*E-Pass Techs., Inc. v. 3Com Corp*,
473 F.3d 1213 (Fed. Cir. 2007) ........................................................53

*Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*,
845 F.3d 1357 (Fed. Cir. 2017) ...........................................22, 23, 29

*Gen. Elec. Co. v. Hoechst Celanese Corp.*,
698 F. Supp. 1181 (D. Del. 1988)......................................................40

*Golden Bridge Tech., Inc. v. Apple Inc.*,
758 F.3d 1362 (Fed. Cir. 2014) ........................................................50

*Graham v. John Deere Co.*,
383 U.S. 1 (1966)...............................................................................62

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
341 F.3d 1332 (Fed. Cir. 2003) ..................................................41, 43

*HTC Corp. v. Cellular Commc'ns Equip., LLC*,
2017 WL 3016954 (Fed. Cir. July 17, 2017)....................................50

*In re Applied Materials, Inc.*,
692 F.3d 1289 (Fed. Cir. 2012) ........................................................68

*In re Bozek*,
416 F.2d 1385 (C.C.P.A. 1969) ........................................................65

*In re O'Farrell*,
853 F.2d 894 (Fed. Cir. 1988) ..........................................................68

*Insite Vision Inc. v. Sandoz, Inc.*,
783 F.3d 853 (Fed. Cir. 2015) ..........................................................62

*Interval Licensing LLC v. AOL, Inc.*,
766 F.3d 1364 (Fed. Cir. 2014) ..................................................41, 46

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007).....................................................................*passim*

*L'Oreal S.A. v. Johnson & Johnson Consumer Cos.*,
2014 U.S. Dist. LEXIS 190268 (D. Del. Nov. 5, 2014)...................36

*Mangosoft, Inc. v. Oracle Corp.*,
  525 F.3d 1327 (Fed. Cir. 2008) .........................................................38

*Mayne Pharma Int'l Pty Ltd. v. Merck & Co.*,
  2016 WL 7441069 (D. Del. Dec. 27, 2016) ......................................41

*Medtronic, Inc. v. Daig Corp.*,
  789 F.2d 903 (Fed. Cir. 1986) ...........................................................53

*Merck & Co. v. Biocraft Labs., Inc.*,
  874 F.2d 804 (Fed. Cir. 1989) ...........................................................65

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014)..............................................................*passim*

*Novo Indus., L.P. v. Micro Molds Corp.*,
  350 F.3d 1348 (Fed. Cir. 2003) .........................................................29

*Otsuka Pharm. Co. v. Torrent Pharms. Ltd., Inc.*,
  99 F. Supp. 3d 461 (D.N.J. 2015)................................................18, 24

*Perfect Web Techs., Inc. v. InfoUSA, Inc.*,
  587 F.3d 1324 (Fed. Cir. 2009) ...................................................64, 65

*Pfizer Inc. v. Mylan Pharms. Inc.*,
  71 F. Supp. 3d 458 (D. Del. 2014)...............................................65, 66

*Pordy v. Land O'Lakes, Inc.*,
  97 F. App'x 921 (Fed. Cir. 2004) ......................................................36

*PPG Indus. v. Guardian Indus. Corp.*,
  156 F.3d 1351 (Fed. Cir. 1998) ...................................................12, 42

*Prostrakan, Inc. v. Actavis Labs. UT, Inc.*,
  2017 WL 3028876 (E.D. Tex. July 15, 2017) ...................................41

*Shire LLC v. Amneal Pharms., LLC*,
  2014 WL 2861430 (D.N.J. June 23, 2014)........................................20

*Shire LLC v. Amneal Pharms., LLC*,
  802 F.3d 1301 (Fed. Cir. 2015) .........................................................20

*Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*,
785 F.3d 625 (Fed. Cir. 2015) ..................................................................*passim*

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
789 F.3d 1335 (Fed. Cir. 2015) ...................................................29, 48

*Trs. of Bos. Univ. v. Everlight Elecs. Co.*,
23 F. Supp. 3d 50 (D. Mass. 2014) .............................................36, 43

*Tyco Healthcare Grp. LP v. Ethicon Endo–Surgery, Inc.*,
774 F.3d 968 (Fed. Cir. 2014) ...........................................................62

*Versa Corp. v. Ag-Bag Int'l Ltd.*,
392 F.3d 1325 (Fed. Cir. 2004) ........................................................33

**Statutes**

35 U.S.C. § 103 .................................................................................65, 67

35 U.S.C. § 103(a) .....................................................................................59

35 U.S.C. § 112 ¶ 2 ..............................................................26, 30, 42, 43

35 U.S.C. § 271(e)(2) ................................................................................24

# RULE 47.5 STATEMENT OF RELATED CASES

No appeal in or from the same civil actions in the lower court was previously before this or any other appellate court.

The following cases presently pending may directly affect or be affected by the Court's decision in this matter:

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:16-cv-05051-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 1:16-cv-00732-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:16-cv-00645-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 1:15-cv-07745-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:15-cv-07742-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:15-cv-05989-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 1:15-cv-06935-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:15-cv-06131-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 1:15-cv-05027-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:15-cv-05025-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Lupin Limited, et al.*, Civil Action No. 15 cv-03051-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:14-cv-07992-NLH-AMD (D.N.J.)

- *Horizon Pharma Ireland Limited, et al. v. Actavis Laboratories UT, Inc.*, Civil Action No. 1:17-cv-03342-NLH-AMD (D.N.J.)

# COUNTERSTATEMENT OF THE ISSUES ON APPEAL

1.      Whether the district court correctly held that Actavis is not liable for inducing infringement, where the claims require application of both a drug product and a second topical product and where Actavis's label does not instruct or encourage the patient to apply a second topical product.

2.      Whether claim 4 of the '913 patent is indefinite, where the claim recites a topical formulation that produces less than a certain percentage of "impurity A"; the specification never identifies, defines, or explains how to test for impurity A; and the district court credited expert testimony that a person of skill in the art would not have known the identity of "impurity A."

3.      Whether the asserted claims of the '613 patent and claims 10-11 and 19 of the '591 patent are indefinite, where the claims recite a topical formulation that "degrades at less than 1% over 6 months"; the claims contain no information about the procedures or conditions for testing degradation; and the specification's only description of degradation relates to the presence of an unknown "impurity A."

4.      Whether the asserted claims of the '838, '304, '305, and '784 patents and claims 12-15, 17, 19, and 24-25 of the '591 patent are indefinite, where the claims recite a topical formulation "consisting essentially of" several specified ingredients, but the specification does not describe: (a) any information about

whether the addition of other ingredients would affect the invention's "basic and novel properties"; (b) how to measure those properties; or even (c) the identity of those properties.

## STATEMENT OF THE ISSUE ON CROSS-APPEAL

1.      Whether the claimed optimization of the prior art is obvious, where all adjustments made to the prior art were the product of routine optimization and common sense and every limitation of the claims falls entirely within the expected ranges taught by the prior art, even if a person of skill in the art "would not have predicted the exact formulation" of the claims.

## RESPONSIVE BRIEF ON APPEAL

## COUNTERSTATEMENT OF FACTS ON APPEAL

### A.    The Asserted Patents

The patents on appeal relate to topical gels containing diclofenac sodium and methods of using the gels to treat osteoarthritis. *See* Appx121 ('838 patent Abstract); Appx152 ('450 patent Abstract).[1] These patents are listed in the Orange Book in connection with Horizon's PENNSAID® 2% product. The patents purport to provide certain advantages over prior art liquid formulations containing diclofenac sodium, specifically Horizon's PENNSAID® 1.5% product (sometimes called the "comparative liquid formulation"). *See* Appx135-136 (1:64-2:12, 4:22-39).

### 1.    The Formulation Patents

The formulation patents claim topical gels containing diclofenac sodium. According to the specification, the claimed gels "display a better drying time [gel dries faster than liquid], higher viscosity [gel is thicker than liquid], increased

---

[1] This brief cites to the '838 patent's specification, *see* Appx120-150, when discussing the family of patents related to the '838 patent (the formulation patents), except where otherwise indicated. The formulation patents include the '838, '591, '304, '305, '784, '613, and '913 patents; each shares a substantially similar specification. Similarly, the brief cites to the '450 patent's specification, *see* Appx151-199, when discussing the family of patents related to the '450 patent (the method-of-use patents), except where otherwise indicated. The method-of-use patents include the '450, '078, and '110 patents; each shares a substantially similar specification.

transdermal flux [gel delivers more drug through the skin], and greater pharmacokinetic absorption in vivo [more drug enters the bloodstream] when compared to previously described compositions." Appx136 (4:24-27). The gels also purportedly reduce skin irritation by disrupting the skin barrier less than a liquid. Appx136 (4:11-18). Finally, the formulations purportedly display "favorable stability at six (6) months as reflected in the lack of any substantial changes in viscosity, the absence of phase separation and crystallization at low temperatures, and a low level of impurities"—i.e., the gels have a better shelf-life than the liquid formulation. Appx136 (4:27-35).

The specification lists stability as a defining characteristic of the gel. Appx139 (9:1-10:47) (listing "Characteristics of the Gel Formulation"). While, in some places, the specification defines stability as involving the viscosity, phase separation, crystallization, and the formation of impurities in the gel, *see* Appx136 (4:27-32), in other places the specification appears to define stability solely by the amount of impurities (also called "degradation products") in the gel, *see* Appx146 (24:15-20) (claimed gel "shows a higher degree of stability, as reflected in the appearance of a lower percentage of 'impurity A' as compared to" both the prior art liquid formulation and the claimed formulation made with Carbopol).[2]

_____

[2] The specification also states that, "while the compositions of the invention contain a higher concentration of active agent, they in fact resulted in a lower

4

The specification never identifies what "impurities" entails, providing only an example experiment in which samples were "tested for impurities by high performance liquid chromatography (HPLC)." Appx146 (23:48-52). The specification reports that "[i]t was found that upon 6 months of storage, an impurity, termed 'impurity A', was seen to elute at about 6.6 minutes in varying amounts for the various compositions." Appx146 (23:55-58). The specification, however, does not give any of the HPLC parameters, such as pressure or flow rate, so that a skilled artisan would know what portion of the sample corresponds to the 6.6 minute eluent.[3] The specification also does not explain what "impurity A" is or whether the identity of impurity A was known. *See* Appx146. It merely states that the amount of "impurity A" produced in the gel "would result in an exposure level well below limits that would require additional nonclinical testing of the impurity." *See* Appx146 (24:29-33).

The specification also does not explain what is meant by the gel's purportedly better drying time. *See* Appx139 (10:6-11). The specification

---

concentration of a degradation impurity as compared to the reference." Appx146 (23:40-43). But Table 13 in the specification makes clear that that statement is not accurate as to the claimed formulation made with Carbopol; that formulation contained a higher amount of "impurity A" after storage than the comparative liquid formulation.

[3] For example, if one were to identify a meeting point as 6.6 minutes away from a landmark, then it would necessary to know whether the 6.6 minutes were measured by someone traveling at 60 mph or 25 mph.

describes the results of two different tests performed to assess drying time.  But the two tests measure drying time in inconsistent ways (subjectively and objectively), and the specification contradicts itself in reporting on the results of the objective test.

In the first test, equal amounts of the claimed gel and the liquid composition were "tested on opposite limbs," and the dryness on the skin was subjectively assessed after 30 minutes.  Appx139 (10:16-21).  The second test "measured the residual weight of formulations [placed] in weighing dishes."  Appx139 (10:22-27).  Table 12 displays the data from this "more quantitative[]," Appx139 (10:22), *in vitro* test:

TABLE 12

Drying times
Drying times for gels and a comparative liquid formulation solution.
Equal weights of each formulation were measured and spread on
weigh dishes. The weight of each remaining formulation was
then followed with time. The gels of this invention showed faster
drying kinetics than the comparative liquid formulation, with F14/2
showing the fastest drying rate. These gels also had improved
"spreadability" characteristics, which most likely contributed
to this improvement in drying rates.

| Percentages in | Formulation name | | | |
| --- | --- | --- | --- | --- |
| | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel 4.0% wt/wt % | F971 wt/wt % |
| Water | 18.81 | 12.5 | 12.5 | 17.16 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 |

## TABLE 12-continued

**Drying times**

Drying times for gels and a comparative liquid formulation solution. Equal weights of each formulation were measured and spread on weigh dishes. The weight of each remaining formulation was then followed with time. The gels of this invention showed faster drying kinetics than the comparative liquid formulation, with F14/2 showing the fastest drying rate. These gels also had improved "spreadability" characteristics, which most likely contributed to this improvement in drying rates.

| Propyelene glycol | 11.2 | 11 | 11 | 11.2 |
|---|---|---|---|---|
| Ethanol | 11.79 | 26.5 | 25 | 11.79 |
| Glycerine | 11.2 | | | 11.2 |
| Diclofenac Sodium | 1.5 | 2 | 2 | 2 |
| Thickener | none | HY119 | HY119 | Carbopol 971 |
| wt/wt % thickener | | 2.5 | 4 | 1:15 |

|  | % Remaining | | | |
|---|---|---|---|---|
| Time (hr) | Comparative | F14/2 gel 2.5% | F14/2 gel 4.0% | F971 |
| 0.000 | 100 | 100 | 100 | 100 |
| 0.083 | 98.1 | 93 | 92.6 | 100.3 |
| 0.167 | 96.7 | 92.9 | 91.8 | 100.3 |
| 0.333 | 95.7 | 92.7 | 93 | 100.2 |
| 0.500 | 95.6 | 92.7 | 93.3 | 100 |
| 0.750 | 95.5 | 92.1 | 92.3 | 99.8 |
| 1.000 | 95.9 | 92 | 91.8 | 99.7 |
| 4.000 | 93 | 71 | 70.7 | 86.8 |
| 24.000 | 88.7 | 32.4 | 23.5 | 58.8 |

Appx145-146.

Based on these data, the specification contends that "within the first five minutes, the three gel formulations displayed more rapid drying than the liquid formulation" and that "[b]y 24 hours, this difference was even more pronounced." Appx145 (21:62-22:1). The reported data, however, does not support the first part

of that claim; the F971gel had a greater percentage weight remaining relative to the liquid formulation at all measured time points up to 4 hours.  *See id.*

## 2.    *The Method-of-Use Patents*

The method-of-use patents claim the use of compositions containing diclofenac sodium in combination with other topical products, like sunscreen or insect repellent.  *See* Appx152 ('450 patent Abstract); Appx165-166 (8:65-9:12).

Claim 10 of the '450 patent is representative of the asserted claims and reads as follows:

> A method for applying topical agents to a knee of a patient with pain, said method comprising:
>> applying a first medication consisting of a topical diclofenac preparation to an area of the knee of said patient to treat osteoarthritis of the knee of said patient, wherein the topical diclofenac preparation comprises a therapeutically effective amount of a diclofenac salt and 40-50% w/w dimethyl sulfoxide;
>> waiting for the treated area to dry;
>> *subsequently applying a sunscreen, or an insect repellant to said treated area after said treated area is dry*, wherein said step of applying a first medication does not enhance the systemic absorption of the subsequently applied sunscreen, or insect repellant; and
>> wherein said subsequent application occurs during a course of treatment of said patient with said topical diclofenac preparation.

Appx198 (73:36-74:11) (emphasis added for terms relevant to this appeal).

**B.    Actavis's ANDA Product and Labeling**

Actavis filed ANDA No. 207238 with the FDA seeking to market a generic version of Horizon's PENNSAID 2% drug.  *See* Appx8420.  According to the drug label, Actavis's "[d]iclofenac sodium topical solution 2% is a nonsteroidal anti-inflammatory drug indicated for the treatment of the pain of osteoarthritis of the knee(s)."  Appx5873, 5875.

Actavis's label instructs the patient to "[d]ispense 40 mg (2 pump actuations) [of the topical solution] directly onto the knee or first into the hand and then onto the knee.  Spread evenly around front, back and sides of the knee." Appx5873 (Highlights of Prescribing Information – Dosage and Administration). The label then cautions that the patient should "[w]ait until the area is completely dry before covering with clothing or applying sunscreen, insect repellant, cosmetics, topical medications, or other substances" or experiencing "skin-to-skin contact between other people and the treated knee(s)."  *Id.*

The "Full Prescribing Information" section of the label elaborates on these instructions.  Section 2.1, "General Dosing Instructions," reads:  "For relief of the pain of osteoarthritis (OA) of the knee(s), the recommended dose is 40 mg of diclofenac sodium (2 pump actuations) on each painful knee, 2 times a day.  Apply diclofenac sodium topical solution to clean, dry skin."  Appx5875.  Section 2.2, "Special Precautions," contains the following warnings, among others:

- "Protect the treated knee(s) from natural and artificial sunlight." Appx5876.

- "Wait until the treated area is dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with diclofenac sodium topical solution." *Id.*

- "Until the treated knee(s) is completely dry, avoid skin-to-skin contact between other people and the treated knee(s)." *Id.*

Other sections of the label similarly instruct the patient to "avoid exposure to natural or artificial sunlight on treated knee(s)." Appx5881 (Section 5.14 – Sun Exposure). The "Instructions for Use" section contains the following longer list of warnings:

**After you use diclofenac sodium topical solution:**
**Do not:**
- cover your knee with clothing until your knee is completely dry.

- put sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medicines on your knee until it is completely dry.

- take a shower or a bath for at least 30 minutes after you put diclofenac sodium topical solution on your knee(s).

- use heating pads or cover the treated area with bandages where you have applied diclofenac sodium topical solution.

- exercise following application of diclofenac sodium topical solution.

- use sunlamp and tanning beds. Protect your treated knee from sunlight. Wear clothes that cover your skin if you have to be in the sunlight.

Appx5898-5899. The label does not include any affirmative suggestion to apply a second topical agent, such as sunscreen, insect repellent, lotion, or the like, nor does it state that any such second topical agent is beneficial.

## C.     Procedural History

### 1.     Claim Construction

After holding two *Markman* hearings, Appx36, the district court issued an order construing certain disputed terms in the formulation patents.  In that order, the court held that the claim term "impurity A" was indefinite.  Appx7-8.  The court rejected Horizon's argument that "impurity A" refers to "USP Diclofenac Related Compound A RS," noting that the specification "never mention[s]" USP Compound A and does not disclose enough information about the impurity to determine its identity.  *See* Appx8-12.

The court also found the claim limitation "the formulation degrades by less than 1% over 6 months" to be indefinite.  The court explained that it was unclear from the patent specification how to measure "degradation," and even if—as Horizon argued—degradation referred to the production of "impurity A," the limitation was still indefinite because the identity of impurity A was unknown.  *See* Appx12-14.

Finally, the court found the claims containing the transitional phrase "consisting essentially of" to be indefinite.  The court noted that the term has a "well-established legal meaning," under which the claim covers the listed ingredients and any unlisted ingredients that "do not materially affect the basic and

novel properties of the invention." Appx14-15 (quoting *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1354 (Fed. Cir. 1998)).

Horizon contended that the '838 patent identifies five "basic and novel properties"—(1) better drying time, (2) higher viscosity, (3) increased transdermal flux, (4) greater pharmacokinetic absorption, and (5) favorable stability—corresponding to the "Characteristics of the Gel Formulation" listed in the specification. *See* Appx23. The court held that the "consisting essentially of" claims were indefinite because at least one of the basic and novel properties—better drying time—was itself indefinite. *See* Appx24-27. Therefore, it was impossible to determine which unlisted ingredients could fall with the scope of the claims and not affect the basic and novel properties of the invention. *See* Appx27. The specification, the court explained, "describes two different methods for evaluating 'better drying time,' and the two methods do not provide consistent results at consistent times. Further, the claimed results are not seen across all formulations of the claimed invention, and when 'dryness' is evaluated at any time shorter than four hours, not all formulations of the claimed invention actually exhibit 'better drying time.'" Appx26. Based on these observations, the court credited Actavis's expert's testimony that "a [person of ordinary skill] would not know under what standard to evaluate the drying rate of the claimed invention," and accordingly held that this property was indefinite. Appx27.

Horizon filed a motion for reconsideration arguing that (1) the court erred in failing to consider indefiniteness on a claim-by-claim basis; (2) Horizon had not had a chance to fully develop the record with regard to the "better drying time" property; and (3) the court erred in applying the *Nautilus* standard for indefiniteness to the invention's basic and novel properties. *See* Appx4082, 4085.

After another hearing, the district court denied Horizon's motion for reconsideration. The court explained that Horizon's first argument was waived (because it had been presented for the first time in the motion for reconsideration) and meritless in any event (because the "consisting essentially of" claims were indefinite even if considered on a claim-by-claim basis). *See* Appx36-39. With regard to Horizon's second argument, the court found that "Horizon had ample notice of Actavis's indefiniteness challenge to 'better drying time,' and several opportunities—including during the two *Markman* hearings . . . , the supplemental briefing in between, and during the ten weeks after the second *Markman* hearing and the issuance of the Court's *Markman* Opinion . . .—to voice its concerns about presenting all of its evidence to support its construction of 'better drying time.'" Appx36. Finally, the court "st[ood] by its *Markman* Opinion['s] . . . expla[nation] of why *Nautilus* should, and does, apply here." Appx39.

*2.    Summary Judgment*

In January 2017—shortly after the district court's second *Markman* ruling—Actavis moved for summary judgment of non-infringement of the method-of-use patents, arguing that it would not induce infringement of the claimed method because Actavis's ANDA product is not indicated for use with a second topical agent and because Actavis's label does not encourage, recommend, or promote application of a second topical agent.  *See* Appx4995-5026.

The district court granted Actavis's motion.  The court noted that "[t]he primary language in dispute [in the label] is, 'Wait until the area is completely dry before covering with clothing or applying sunscreen, insect repellant, cosmetics, topical medications, or other substances' and 'Wait until the treated area is dry before applying sunscreen, insect repellant, lotion, moisturizer, cosmetics, or other topical medication to the same knee you have just treated with PENNSAID.'"  Appx49.  The district court stated that this language was not sufficient to show inducement because this language did no "more than simply permit, rather than require or direct, the post-product application of sunscreen, insect repellant, or a second topical medication."  Appx58.  "[T]hat permission," the court explained, "does not amount to encouragement because those items are just three examples of what a patient might wish to apply to his knee after treatment, if anything is to be applied at all."  Appx59.

This appeal followed.

## SUMMARY OF RESPONSIVE ARGUMENT ON APPEAL

1.      The district court correctly granted summary judgment that Actavis is not liable for induced infringement of the asserted claims of the method-of-use patents.  Actavis's label does not encourage, recommend, or promote the application of a second topical agent, as required by the claims; instead, the label merely instructs the patient to allow the treated area to dry *if* the patient chooses to apply a second topical agent after application of the diclofenac sodium gel. Accordingly, the most that can be said is that the label permits an infringing use. Under this Court's precedents, that is insufficient as a matter of law to support a finding of induced infringement.

2.      The district court correctly held that the claim term "impurity A" in claim 4 of the '913 formulation patent is indefinite.  The patent claims and specification do not define the term "impurity A," instead referring to it as "an impurity, termed 'impurity A," that eluted after performing an unspecified HPLC procedure."  The district court credited Actavis's expert's testimony that a person of ordinary skill would not have understood with reasonable certainty the identity of the undefined "impurity A," and rejected Horizon's argument that the term referred to "USP Diclofenac Related Compound A RS" (a phrase not mentioned in the specification).  The district court's findings were not clearly erroneous.

15

3. The district court also correctly held that the claims reciting a topical formulation that "degrades at less than 1% over 6 months" (all asserted claims of the '613 formulation patent and claims 10-11 and 19 of the '591 formulation patent) are indefinite. To the extent the specification provides any guidance as to how to measure "degradation," it suggests that degradation may refer to the amount of "impurity A" present in the sample after six months. If that is correct, then the claims are indefinite for the same reason that the claim term "impurity A" is indefinite. If that is *not* correct, then the limitations are indefinite because the specification provides no other indication regarding how to measure degradation.

4. Finally, the district court correctly held the claims reciting a formulation "consisting essentially of" various ingredients (the asserted claims of the '838, '304, '305, and '784 patents and claims 12-15, 17, 19, and 24-25 of the '591 patent) indefinite. A "consisting essentially of" claim encompasses the ingredients listed in the claim, as well as other ingredients that do not materially affect the "basic and novel properties" of the invention. The asserted "consisting essentially of" claims are indefinite for two reasons. *First*, a skilled artisan would not be able to determine with reasonable certainty the *identity* of the basic and novel properties of the claimed invention, therefore it would be impossible to determine what non-named ingredients fall within the scope of the claim. *Second*, even if the identity of the basic and novel properties were those identified by

Horizon, the claims would still be indefinite because at least two of those properties—"better drying time" and "favorable stability"—are themselves indefinite. The former is indefinite because the specification provides two different methods of measuring "better drying time" that yield inconsistent results, so that a skilled artisan would not know which method to use. And the latter is indefinite because the specification links "stability" to the degradation of the formulation into "impurity A"—a term that is indefinite, as explained above.

## RESPONSIVE ARGUMENT ON APPEAL

## I. THE DISTRICT COURT CORRECTLY HELD THAT ACTAVIS'S LABEL DOES NOT INDUCE INFRINGEMENT OF THE METHOD-OF-USE PATENTS

Actavis's label does not encourage, recommend, or promote the application of a second topical agent after the application of the diclofenac sodium gel, as required by the claims of the method-of-use patents. At most, the label *permits* the application of a second topical agent—so long as the patient allows the diclofenac sodium gel to dry first. That is insufficient as a matter of law to establish inducement.

### A. Actavis's proposed label does not encourage, recommend, or promote infringement

In the Hatch-Waxman context, the inducement inquiry turns on the language of the proposed generic drug label. *See Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015). For an ANDA applicant to be

liable for inducement, "[t]he label must encourage, recommend, or promote infringement." *Id.* That is, the label's instructions must "evidence intent to encourage infringement"; it is not sufficient that the label merely describes "an infringing mode." *Id.* (citation omitted). Indeed, "it is well-established that mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven." *Id.* (citation omitted).

Actavis's label never affirmatively instructs or encourages the patient to apply sunscreen, insect repellant, or anything else after the patient applies the diclofenac sodium gel. Rather, the label warns that, *if* the patient chooses to apply a second topical agent, then the patient should "[w]ait until the treated area is dry" before doing so. Appx5876. *Cf. Otsuka Pharm. Co., Ltd. v. Torrent Pharms. Ltd., Inc.*, 99 F. Supp. 3d 461, 490 (D.N.J. 2015) ("[C]ourts have repeatedly found incidental references to even infringing uses in [the warnings] sections insufficient to constitute instruction or encouragement, as opposed to mere permission, and have consistently rejected safety discussions as a basis for inducement liability."). Actavis's label is thus entirely agnostic as to whether a second topical agent is applied; it merely provides precautions the patient should take if the patient

18

decides to apply a second topical agent. Accordingly, as the district court correctly concluded, Horizon's claim of induced infringement fails as a matter of law.[4]

Horizon repeatedly argues (*e.g.*, at 12, 24) that "Actavis's labeling is not 'indifferent' to *how* subsequent topical agents, such sunscreen, insect repellant, and topical medications, are applied" (emphasis added). Even if true, that is irrelevant; what matters is that the labeling is indifferent to *whether* subsequent topical agents are applied. That fact is fatal to Horizon's induced infringement claim.[5]

Horizon also contends (at 27) that the label encourages the application of sunscreen because it instructs patients to "avoid exposure to natural or artificial sunlight on treated knee(s)." But that statement suggests, if anything, that a patient using the medication should *avoid* sunlight entirely, which would vitiate any need for application of sunscreen.

---

[4] If Horizon's position were accepted, it would necessarily follow that the label *also* recommends, encourages, or promotes application of cosmetics and lotion, covering the knee with clothing, taking a shower or bath, and having skin-to-skin contact between other people and the treated knee. But of course that is absurd. The label does not encourage the patient to do any of these things; it merely tells the patient that, if those things are done, the diclofenac sodium gel needs to dry first.

[5] To the extent Horizon is suggesting that Actavis's label induces infringement because it does not *prohibit* the application of any other topical agent, Horizon is wrong on the law. Such an argument would "turn[] the legal test on its head. [Horizon] needs to show that [Actavis] took affirmative steps to induce, not affirmative steps to make sure others avoid infringement." *Takeda*, 785 F.3d at 632 n.4.

*Shire, LLC v. Amneal Pharmaceuticals, LLC*, 2014 WL 2861430 (D.N.J. June 23, 2014), *rev'd in part on other grounds*, 802 F.3d 1301 (Fed. Cir. 2015), demonstrates why Horizon's arguments are wrong.  In *Shire*, the patent claims were directed toward a method of treating ADHD in a subject by administering a given drug product "with intake of food by said subject."  *Id.* at *4.  The proposed drug label, however, said "that the products may be taken 'with or without food.'"  *Id.* at *5.  The court granted summary judgment of no induced infringement because "the statement that the medication may be taken with or without food cannot be reasonably understood to be an instruction to engage in an infringing use. . . . [I]t is indifferent to which option is selected.  At most, it may be understood to permit an infringing use, but permission is different from encouragement."  *Id.*  The same conclusion is appropriate here.  Actavis's label is "indifferent" to whether a second topical agent is applied: the label *permits*, but does not *encourage*, application of a second topical agent.

Similarly, in *Takeda*, this Court found that the patentee had not raised a "substantial question" of induced infringement where the asserted patent was directed to methods of treating acute gout flares and the ANDA applicant's product was indicated only for prophylaxis of gout.  *See* 785 F.3d at 630.  The patentee argued that the label's statement, "if you have a gout flare while taking Mitigare, tell your healthcare provider," showed intent to induce infringement "because, in

the case of the patient taking Mitigare for prophylaxis, the physician would likely tell the patient to use the Mitigare product to treat the acute flare." *Id.* This Court rejected that argument, explaining that the label must *inevitably* lead to an infringing use. "Speculation or even proof that some, or even many, doctors would prescribe Mitigare for acute gout flares is hardly evidence of inevitability." *Id.* at 633.

Similarly here, Horizon has done no more than speculate that "patients who will use Actavis's ANDA product *may* have a 'need' to apply sunscreen, insect repellant, or another topical medication to the area of treatment." Horizon Br. 23 (emphasis added); *see also id.* at 29-30 (noting Horizon's expert's testimony that "while *not all patients will have a 'need' to apply* [a second topical agent] *following application of Actavis's ANDA product*, those patients who have such a 'need' will inevitably infringe") (emphasis added). That is insufficient to establish induced infringement under *Takeda*, because, as Horizon and its expert admit, patients following the instructions in Actavis's label will not *inevitably* apply a second topical agent as required by the asserted claims.

### B. The cases Horizon cites do not support reversal

Horizon attempts (at 27-29) to analogize the facts here to three cases in which this Court held that an ANDA applicant's label language induced infringement. The stark difference between the language of the labels in those

21

cases and the label here provides a good illustration of why Actavis is *not* liable for inducement.

In *AstraZeneca LP v. Apotex, Inc.*, the patent-in-suit claimed a method of administering a composition via nebulizer once per day. *See* 633 F.3d 1042, 1046 (Fed. Cir. 2010). The label for Apotex's proposed generic did not "explicit[ly] mention . . . once-day administration" but did instruct that the patient should begin with two daily doses of 0.25 mg each and then "downward-titrate to the lowest effective dose once asthma stability is achieved." *Id.* at 1047, 1057. This Court held that this label language induced infringement because the downward-titration language *necessarily* instructed users to infringe: "the first step in titrating down from [0.25 twice daily] would have to be 0.25 mg once daily, as there was no way of decreasing the amount of each dose below 0.25 mg." *Id.* at 1057. The instructions here, in contrast, do not necessarily result in infringement, because a patient following the instructions could easily choose never to apply a second topical agent.

In *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, the patent-in-suit was directed to methods of treating patients with pemetrexed in combination with folic acid. *See* 845 F.3d 1357, 1362 (Fed. Cir. 2017). The proposed ANDA label contained various instructions for physicians to "[i]nstruct patients to initiate folic acid," and "[i]nstruct patients on the need for folic acid . . . supplementation," as

well as instructions for patients stating that "you must also take folic acid . . . prior to and during your treatment" and that "[i]t is very important to take folic acid and vitamin B12 during your treatment with [pemetrexed] to lower your chances of harmful side effects." *Id.* at 1364. This Court held that the "repeated instructions" to take the drug in combination with folic acid were "unambiguous on their face and encourage or recommend infringement." *Id.* at 1369. Actavis's label here, in contrast, contains *no* instructions to apply diclofenac sodium in combination with a second topical agent (much less the unambiguous, repeated, mandatory instructions in the label in *Lilly*).

Finally, in *Braintree Laboratories, Inc. v. Breckenridge Pharmaceutical, Inc.*, the patent-in-suit was directed to a composition for "inducing purgation of the colon of a patient." 688 F. App'x 905, 906 (Fed. Cir. 2017). The ANDA applicant "concede[d] that its proposed product 'cleanses the colon of a patient *by inducing purgation*' when taken as directed by its label." *Id.* at 909. The Court found that the proposed label recommended or suggested inducing purgation as claimed by the patent—because that was the sole method by which the product cleansed the colon—and hence held that the applicant was liable for induced infringement.

Actavis's label here, in contrast, does not contain any instruction that *necessarily* results in infringement. Using diclofenac sodium in combination with a second topical agent is not an indication of Actavis's product at all, much less the

sole indication like the one in *Braintree*.  Horizon's argument that some patients who "need" to apply a second topical agent will "inevitably" infringe is not the kind of inevitability that this Court requires.  *Compare* Horizon Br. at 23, 29-30, *with Takeda*, 785 F.3d at 632-33 (ANDA label must *inevitably* lead all users to infringement to support a finding of inducement; speculation that some or even many users will infringe based on the label instructions is insufficient to show inevitability).

### C.     There are no disputed questions of fact that could preclude summary judgment

In a final attempt to avoid non-infringement, Horizon argues (at 29-31) that there are disputed questions of material fact that preclude summary judgment. Horizon is wrong.  Because this is a Hatch-Waxman case, the only relevant question is whether the label language evidences an intent to induce infringement. *See Bayer Schering Pharma AG v. Lupin, Ltd.*, 676 F.3d 1316, 1326 (Fed. Cir. 2012) (granting motion for judgment on the pleadings that ANDA applicant did not induce infringement under § 271(e)(2) because "[t]he FDA-approved label for [the drug product] d[id] not indicate to physicians that the specific use claimed in the [asserted] patent . . . [was] safe and effective"); *Otsuka*, 99 F. Supp. 3d at 484-95 (relying exclusively on the language of the label in evaluating claim that ANDA applicant was liable for induced infringement under § 271(e)(2)).  The contents of Actavis's label are undisputed; the only dispute is over the legal consequences

flowing from the language of the label. Under the governing legal standard, as explained above, Actavis cannot be held liable for induced infringement based on that language. This Court should affirm the district court's grant of summary judgment.

## II. THE DISTRICT COURT CORRECTLY HELD THAT THE FORMULATION PATENT CLAIMS ARE INDEFINITE

The district court held that several of the formulation patent claims were indefinite. Specifically, the court found that a skilled artisan would not have understood with reasonable certainty the scope of the claims reciting (i) "impurity A," (claim 4 of the '913 patent); (ii) a formulation that "degrades at less than 1% over 6 months" (asserted claims of the '613 patent and claims 10-11 and 19 of the '591 patent); and (iii) a formulation "consisting essentially of" specified ingredients (asserted claims of the '838, '304, '305, and '784 patents and claims 12-15, 17, 19, and 24-25 of the '591 patent). Those holdings should be affirmed.

### A. The claim term "impurity A" is indefinite

Claim 4 of the '913 patent recites a "formulation [that] produces less than 1% of 'impurity A' after six months of storage at 25° C and 60% humidity." Appx261 (30:22-24). But the specification provides no clues as to the identity of "impurity A," and indeed implies that it is an unknown impurity whose identity would require further testing to determine. The district court thus correctly held that this claim is indefinite.

Under 35 U.S.C. § 112 ¶ 2, a patent specification must "conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as [the] invention." The purpose of the definiteness requirement is to "afford clear notice of what is claimed, thereby apprising the public of what is still open to them." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "Otherwise there would be a zone of uncertainty which enterprise and experimentation may enter only at the risk of infringing claims," and patent applicants would "face powerful incentives to inject ambiguity into their claims." *Id.*

*Nautilus* rejected the then-prevailing test for indefiniteness, under which a claim was found indefinite only if it was not "amenable to construction" or was "insolubly ambiguous." *Id.* at 2130. That low standard, the Supreme Court explained, threatened to "diminish the definiteness requirement's public-notice function and foster the innovation-discouraging 'zone of uncertainty' against which th[e] Court has warned." *Id.* (citation omitted). Under *Nautilus*, § 112 ¶ 2 "require[s] that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus*, 134 S. Ct. at 2129.

Neither the claims nor the specification affords clear notice as to what "impurity A" is. The only relevant disclosure in the specification recounts that,

when samples of the claimed formulations were "tested for impurities via high performance liquid chromatography (HPLC)," "an impurity, termed 'impurity A'" eluted "at about 6.6 minutes in varying amounts for the various compositions" as shown in the following table:

## TABLE 13

| Composition | Percent "impurity A" after 6 months of storage (wt/wt) |
|---|---|
| 1.5% diclofenac sodium as a comparative liquid formulation solution | 0.034% |

## TABLE 13-continued

| Composition | Percent "impurity A" after 6 months of storage (wt/wt) |
|---|---|
| 2.0% diclofenac sodium in 0.9% Carbopol gel | 0.09% |
| 2.0% diclofenac sodium in 3.5% HPC gel | 0.02% |

Appx146 (23:48-24:10).  The example concludes with the observation that "the amount of 'impurity A' found in the gel formulation of the present invention after a 6 month storage period would result in an exposure level well below limits that would require additional nonclinical testing."  Appx146 (24:29-34).

As Actavis's expert Dr. Michniak-Kohn explained, based on the disclosures in the specification, a skilled artisan would not have known the identity of "impurity A" for at least three reasons. *See* Appx 2030 (¶ 48). *First*, the specification would have disclosed the chemical name of the impurity if it were known, but instead the specification merely identifies "impurity A" as a generic "degradation impurity." *See id.* *Second*, the specification places the name "impurity A" in quotes "to indicate that it is not the formal name of a known impurity." *Id.* *Third*, the inventors' conclusion that it was unnecessary to perform additional tests to identify the impurity because it appears in such a low amount suggests that the inventors themselves did not know the identity of "impurity A." *See id.*

Nor could a skilled artisan determine the identity of "impurity A" through testing, because the specification provides no information regarding the HPLC procedure that would allow it to be replicated. *See* Appx2030-2032 (¶¶ 49-54). "Without information about the HPLC procedure used (including column type, mobile solvent, and temperature)," Dr. Michniak-Kohn explained, "the '838 patent's disclosure that 'impurity A' eluted at 6.6 minutes does not provide adequate information for a person of ordinary skill to assess whether a particular formulation contains the same unknown 'impurity A' as reported in the '838 patent," because a person of skill in the art "would understand that 'impurity A'

would likely elute at different times depending on the particular HPLC procedure used."  Appx2032 (¶ 54).

The district court credited this testimony in holding the claim term indefinite.  *See* Appx7-12.  That is a finding of fact based on extrinsic evidence that, as Horizon admits (at 60), this Court must affirm unless Horizon can show that it was clearly erroneous.  *See Eli Lilly*, 845 F.3d at 1371 ("[T]he district court's underlying determination, based on extrinsic evidence, of what a person of ordinary skill would understand 'vitamin B12' to mean in different contexts is a question of fact."); *see also Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1342 (Fed. Cir. 2015).  Horizon does not and cannot make that showing.

Horizon argues (at 61-63) that the district court should have instead credited Horizon's argument that a person of skill would have surmised "from the pertinent pharmacopeias available at the time of the invention" that "impurity A" is "USP Diclofenac Related Compound A RS."  But Horizon's theory fails to establish clear error on the part of the district court.

The patent specification *never mentions* USP Diclofenac Related Compound A RS.  Horizon's argument is essentially that a skilled artisan would guess that impurity A referred to this USP compound because they both use the designation "A."  But that is not sufficient under § 112 ¶ 2.  *See Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1358 (Fed. Cir. 2003) (claim is indefinite if, "in order

29

to make sense out of the patent, [a] court [is] required to guess as to what was intended").

Additionally, USP Diclofenac Related Compound A RS is a degradation of diclofenac sodium (the active ingredient), while the claims are written in terms of the degradation of the entire *formulation* (which contains additional excipients, including DMSO, propylene glycol, ethanol, and a thickening agent, which themselves may have degradation products). *See* Appx2031 (¶ 51). Thus, there is considerable doubt whether "impurity A" (disclosed as an impurity of the formulation) is actually USP Diclofenac Related Compound A RS (an impurity of the active ingredient) or a mix of compounds that may or may not include USP Diclofenac Related Compound A RS.

The pharmacopeias cited by Horizon only reinforce the conclusion that a skilled artisan would not have understood "an impurity, termed 'impurity A'" to refer to USP Related Diclofenac Compound A RS.[6] The USPs identify "USP Diclofenac Related Compound A RS" by its chemical name and structure, but nowhere refer to it as "impurity A." *See* Appx1652, Appx1655. Horizon's claim (at 62) that "'[i]mpurity A' was so well-known even at the time of the invention

_____

[6] Thus, Horizon's citation (at 61) to the principle that a POSA is "presumed to be aware of all the pertinent prior art" is of no help to it.

that the USP made it available as a reference standard, denoted by the 'RS' in 'USP Related Diclofenac Compound A RS'" is unsupported by any evidence.

The European Pharamacopeias refer to an impurity called "diclofenac impurity A CRS" also by chemical name and structure. They do not mention "USP Related Diclofenac Compound A RS." Since these references do not demonstrate any accepted nomenclature for impurities, they only reinforce that a person of skill in the art would *need* the chemical name and structure to know the identity of "impurity A." *See* Appx 1659-1660, Appx1665-1666. Namely, a person of skill faced with a reference to "*an* impurity" would not know whether the "impurity A" designation was a reference to an impurity described in one of the Pharmacopeias, or just coincidently a use of the generic identifier "A."

At bottom, Horizon is attempting to rewrite "impurity A" as "USP Diclofenac Related Compound A RS," without any support in the claims, the specification, or the extrinsic evidence, simply to avoid a finding of indefiniteness. But "courts may not redraft claims . . . to sustain their validity." *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1374 (Fed. Cir. 2004). Claims must be construed "as written, not as the patentees wish they had written [them]." *Id.* The district court's finding that a person of skill in the art would not have understood the identity of "impurity A" with reasonable certainty was not clearly erroneous. The court's holding that the term is indefinite must be affirmed.

## B.    The "degrades" claims are indefinite

The asserted claims of the '613 patent and claims 10-11 and 19 of the '591 patent recite a topical formulation that "degrades by less than 1% over 6 months." Appx229 (27:7-28:51); Appx292 (28:19-20).[7]  But neither the claims nor the specification instructs with reasonable certainty how to measure "degradation." Accordingly, the district court correctly found these claims indefinite as well.

The claims themselves say nothing about how to measure degradation or the conditions under which degradation is to be tested.  To the extent the specification provides any guidance, it appears to equate "degradation" with the amount of "impurity A" present in the sample after storage.  *See* Appx146 (Example 6); *see also id.* (23:38-42) ("[T]he compositions of the invention . . . resulted in a lower concentration of a degradation impurity as compared to the reference."); (23:55-56) ("term[ing]" this "degradation impurity" "impurity A").  This is the interpretation urged by Horizon.  *See* Horizon Br. 59-60.  If this interpretation is correct, however, then the claims are indefinite for the same reason that the claim term "impurity A" is indefinite.  *See supra* Section II.A.[8]

_____

[7] The '591 patent claims read "degrades *at*" instead of "degrades by."

[8] Indeed, even if the identity of impurity A were *not* indefinite, the "degrades" limitation would still be indefinite because the specification does not provide reasonable certainty as to what storage and test conditions should be used to measure degradation.  Unlike other claims of the formulation patents, the asserted claims reciting the degradation limitation do not specify the temperature

However, Horizon's interpretation of "degrades" is incorrect, for at least three reasons. *First*, the patentees referred to the presence of "impurity A" in some claims and "degradation" in others, which suggests that they intended the terms to mean different things. *Compare, e.g.*, Appx261 ('913 patent claim 4), *with* Appx150 ('838 patent claim 66); *see Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254 (Fed. Cir. 2011) (it is "improper[]" to "discount[] substantive differences between the claims"); *Versa Corp. v. Ag-Bag Int'l Ltd.*, 392 F.3d 1325, 1330 (Fed. Cir. 2004) (different claim terms using different words are presumed to have different scopes).

*Second*, Example 6 in the specification recites the amount of "impurity A" *present* in the formulation after storage, not the amount that was *created during storage*. That is, the amounts listed in Table 13 could include pre-existing impurities that are present before storage. *See* Appx2030-2031 (¶ 50). "Degradation," in contrast, connotes the *change* in the formulation *during storage*—and in order to know how the formulation has changed, one must account for any impurities present at the beginning of the storage period. This makes it

---

or humidity associated with the percent degradation. *Compare, e.g.*, Appx229 (28:54-55), *with* Appx261 (30:22-24). And the patents discuss testing at various different temperatures with different results. *See* Appx140 (12:55-58) (discussion in the specification regarding testing for stability "in an incubator at 50º C"); Appx261 (30:22-24) (claiming a topical formulation that produces a certain percentage impurity A when stored at 25º C).

even more unlikely that "degradation" and "amount of impurity A present" are synonymous.

*Third*, there are multiple "degradation" claims in this patent family, and some (like the ones asserted here) are written in terms of the degradation of the *formulation*, whereas others (for example, claim 7 of the '838 patent) are written in terms of the degradation of the *diclofenac sodium* (i.e., the active ingredient). *See* Appx149 (29:3-5) (reciting a formulation "wherein said diclofenac sodium degrades by less than 0.04% over the course of 6 months"). Horizon's position before the district court was that "degrades" should be read to refer to the amount of "impurity A" present in the sample regardless of whether the claim refers to degradation of the formulation or just of the active ingredient. *See* Appx883, 888. But that interpretation is more than a little odd; the content of the impurities produced by the formulation, on the one hand, and the diclofenac sodium itself, on the other, would almost certainly be different. *See* Appx2031 (¶ 51).

If the "degrades" claim limitations are *not* tied to the presence of impurity A, then there is no indication whatsoever regarding how to measure the extent to which a formulation "degrades." Thus, as the district court correctly found, "no matter how [one] tries to interpret the term, the result is indefiniteness. Either degradation is equated with 'impurity A,' which has already been deemed indefinite, or [one] is presented with multiple methods as to how to evaluate

stability—and therefore degradation—without further guidance, rendering the term indefinite." Appx14; *see also Dow Chem. Co. v. Nova Chems. Corp. (Canada)*, 803 F.3d 620, 630 (Fed. Cir. 2015) ("the patent and prosecution history must disclose a single known approach [to measuring a claimed property] or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select").

Horizon's contention (at 57-59) that the district court "committed clear factual error in finding that the specification equated stability and degradation" is both wrong and beside the point. The argument is wrong because the district court did not "equate" the two at all; the court correctly recognized that the specification uses the term "stability" to encompass "a number of things," including "degradation." Appx13.[9] And the argument is beside the point because, regardless of whether "stability" and "degradation" are "equated" or not, the district court's point holds: either "degradation" refers to the production of "impurity A," in which case it is indefinite; or "degradation" refers to some unidentified something else, in which case it is also indefinite. The court's holding that the "degradation" limitations are indefinite should be affirmed.

---

[9] Even if the district court *had* "equated" the two, Horizon could hardly complain. Horizon's counsel stated at the *Markman* hearing that "[t]he patent uses the word 'stability,' but I guess the flip side of stability, you can express stability in terms of degradation. So highly stable, low degradant; high degradants, low stability. So they kind of mean the same thing . . . ." Appx4286-4287.

## C. The "consisting essentially of" claims are indefinite

Several of the asserted claims recite a formulation "consisting essentially of" various ingredients, meaning the claims cover the listed ingredients in addition to other ingredients that do not materially affect the "basic and novel properties" of the invention. *See AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1239 (Fed. Cir. 2003). The proper identification of the basic and novel properties of an invention is a question of law that the court determines as a matter of claim construction if the identity of those properties is disputed. *See id.* at 1239-40 (determining the basic and novel properties as a matter of claim construction by consulting the specification); *Trs. of Bos. Univ. v. Everlight Elecs. Co.*, 23 F. Supp. 3d 50, 64 (D. Mass. 2014) ("determin[ation of] the basic and novel properties of the invention" is a "threshold question" resolved at claim construction).[10] Without

_____

[10] *See also Pordy v. Land O'Lakes, Inc.*, 97 F. App'x 921, 927 (Fed. Cir. 2004) (holding that district court "correctly identified the[ basic and novel] properties, and construed the claim accordingly"); *L'Oreal S.A. v. Johnson & Johnson Consumer Cos.*, 2014 U.S. Dist. LEXIS 190268, at *4 n.2 (D. Del. Nov. 5, 2014) ("As with claim construction, the court determines the basic and novel properties of an invention as a matter of law, while resorting to the same sources of evidence as used for claim construction."). Horizon has agreed on this point, both in its brief and in the court below. *See* Horizon Br. 33; Appx3944 n.2 (admitting that court "may[] identify the basic and novel properties at the claim construction phase"). Thus, Horizon's statement later in its brief (at 41) that "[t]his Court . . . considers 'basic and novel properties' *solely* as a part of the factual determinations of validity and infringement" (emphasis added) is, by Horizon's own admission, incorrect.

determining the "basic and novel properties" of the invention, it is otherwise

impossible to know which other ingredients fall within the scope of the claims.

Here, it is not possible to determine with reasonable certainty the identity of

the basic and novel properties of the invention claimed in the formulation patents.

Moreover, even if the basic and novel properties are defined—as Horizon argues—

as the five "Characteristics of the Gel Formulation" listed in the specification, the

claims are still indefinite because, as the district court correctly found, at least two

of those properties—"better drying time" and "favorable stability"—are

themselves indefinite.

1.  *The Basic and Novel Properties of the Claimed Formulation Cannot be Determined with Reasonable Certainty*

The asserted claims of the '838, '304, '305, and '784 patents and claims 12-

15, 17, 19, and 24-25 of the '591 patent recite a topical formulation "consisting

essentially of" several specified ingredients.  For example, claim 49 of the '838

patent recites a topical formulation "consisting essentially of: 1-2% w/w diclofenac

sodium; 40-50% w/w DMSO; 23-29% w/w ethanol; 10-12% propylene glycol;

hydroxypropyl cellulose; and water to make 100% w/w, wherein the topical

formulation has a viscosity of 500-5000 centipoise."  Appx149 (30:60-67).  The

specification of the formulation patents recites a multitude of properties of the

invention, yet provides no guidance as to which of these are the "basic and novel

properties" for purposes of the "consisting essentially of" claims.

Horizon's position is that the basic and novel properties correspond to the five "Characteristics of the Gel Formulation" listed in the Detailed Description of the Invention: (1) increased transdermal flux, (2) higher viscosity, (3) favorable stability, (4) better drying time, and (5) greater pharmacokinetic absorption. *See* Appx139 (9:1-10:47). But a skilled artisan would not be reasonably certain of that interpretation for at least two reasons. *First*, the specification also identifies *other* desirable properties of the clamed formulations, stating, for example, that they "adhere well to the skin," "spread easily," and "reduc[e] or minimiz[e] the incidence of intolerable skin irritation caused by disrupting the skin barrier." Appx136 (4:14-16, 4:32-34).

*Second*, several of the "consisting essentially of" claims explicitly require the formulation to satisfy certain requirements related to viscosity, drying rate, and transdermal flux. For example, claim 1 of the '838 patent requires the formulation to have "a viscosity of 500-5000 centipoise," as well as "greater drying rate" and "a transdermal flux of 1.5 times or greater" than the comparative liquid formulation. Appx148 (28:48-53). It is unclear if and how these expressly required properties overlap with the "basic and novel properties" that are otherwise inherent to the "consisting essentially of language." *Cf. Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330-31 (Fed. Cir. 2008) (rejecting construction that

"ascribe[d] no meaning to the term 'local' not already implicit in the rest of the claim").

The prosecution history sheds no light on the term. The patentees never identified the invention's basic and novel properties when they amended the claims to change the transition term to "consisting essentially of" to distinguish the prior art. Instead, they simply made piecemeal arguments based on individual prior art references. *See, e.g.*, Appx2430 ("Independent claim 61 has been amended to recite 'consisting essentially of' . . . . As such, the claims exclude the dibasic ester of Kasai et al. as well as the ether alcohol and a fatty alcohol ester of Betlach et al."). For example, Horizon argued, during prosecution and litigation, that the "consisting essentially of" phrase excluded (among other things) dibasic acid esters, a surfactant, PEG-7-glycerol cocoate, thickening bases, and a polyacrylic acid polymer, without ever explaining what basic and novel property those ingredients would alter. *See* Appx2759-2775; Appx2743-2747. Even in its opening *Markman* brief, Horizon still was unable to identify the basic and novel properties, stating that the meaning of the "consisting essentially of" term "cannot be ascertained in the absence of proper context." Appx875. It was only later that Horizon finally, in response to an interrogatory from Actavis, was forced to make an attempt to identify the invention's basic and novel properties. But, as explained above, that attempt fails to take full account of the many desirable characteristics

39

of the claimed formulations listed in the specification. Because it is impossible to tell with reasonable certainty which of these characteristics are sufficiently important to be considered basic and novel properties, the "consisting essentially of" claims are indefinite.

> 2. *At least two of Horizon's suggested basic and novel properties are themselves indefinite*
>
> > a. *The district court correctly applied the Nautilus standard to the purported "basic and novel properties" of the invention*

The purpose of the definiteness requirement is to afford the public notice regarding the scope of the claims, "thereby apprising the public of what is still open to them." *Nautilus*, 134 S. Ct. at 2129. The basic and novel properties of an invention are "a part of . . . the scope of the claim," *Gen. Elec. Co. v. Hoechst Celanese Corp.*, 698 F. Supp. 1181, 1187 (D. Del. 1988); *see also Bayer AG v. Sony Elecs., Inc.*, 229 F. Supp. 2d 332, 344 (D. Del. 2002)—indeed, it could hardly be otherwise, given as, as Horizon admits, courts determine the basic and novel properties as a matter of law *as a part of claim construction. See supra*.

It follows that the basic and novel properties are subject to the definiteness requirement of § 112 ¶ 2. If it is impossible to discern with reasonable certainty how to tell whether a given ingredient in a potentially infringing product would "materially affect" one of the "basic and novel properties of the invention," the POSA will be faced with "a zone of uncertainty which enterprise and

40

experimentation may enter only at the risk of infringement claims." *Nautilus*, 134

S. Ct. at 2129. That is the very danger the definiteness requirement is designed to

guard against. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed.

Cir. 2014) ("The claims, when read in light of the specification and the prosecution

history, must provide objective boundaries for those of skill in the art.");

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003)

(noting that, if indefinite claims were allowed to stand, "[c]ompetitors trying to

practice the invention or to design around it would be unable to discern the bounds

of the invention").

All three district courts to have considered the issue (including the court

below) have held that the definiteness requirement of § 112 ¶ 2, as interpreted in

*Nautilus*, applies to the basic and novel properties of an invention involving a

"consisting essentially of" claim. *See Prostrakan, Inc. v. Actavis Labs. UT, Inc.*,

2017 WL 3028876, at *8-9 (E.D. Tex. July 15, 2017); *Mayne Pharma Int'l Pty

Ltd. v. Merck & Co., Inc.*, 2016 WL 7441069 (D. Del. Dec. 27, 2016).[11] And while

this Court has never squarely addressed the issue, it has strongly suggested that

basic and novel properties are subject to § 112 ¶ 2. *See PPG Indus.*, 156 F.3d at

---

[11] Horizon's observation (at 36 n.2) that the *Prostrkan* and *Mayne Pharma* courts did not find the basic and novel properties indefinite is of course irrelevant; these cases flatly contradict Horizon's position that the definiteness requirement is inapplicable to the basic and novel properties in the first place.

1355 (noting, in the context of discussing the basic and novel properties of a "consisting essentially of" claim, that claim terminology need not be overly "precise or specific" as "long as the result complies with" § 112 ¶ 2).[12]

Horizon rejoins (at 39-43) that the basic and novel properties need not be definite because they are not part of the actual claim language. But that is not the proper inquiry; the question is whether the basic and novel properties define the *scope of the claim*. *See Nautilus*, 134 S. Ct. at 2129. As explained above, they do.

Horizon also cites four cases (at 42) for the proposition that the analysis at the claim construction stage "consists solely of identification of 'basic and novel properties,' with issues relating to infringement or validity being addressed only after a full record is developed." But none of these cases states any such rule; indeed, in none of those cases was the definiteness of a "consisting essentially of" claim even at issue. These cases stand, at most, for the proposition that the question of *whether the addition of a given ingredient affects one of the basic and novel properties of an invention* is a factual question going to infringement that is not appropriately resolved at claim construction. *See, e.g.*, *Trs. of Bos. Univ.*, 23 F.

---

[12] Horizon's argument (at 36-39) that "there is no legal basis to apply" the definiteness requirement to the basic and novel properties of an invention essentially boils down to the observation that there is no Supreme Court or Federal Circuit case squarely holding as much. That observation ignores the reasoning of *Nautilus* regarding the purpose of the definiteness requirement and the case law holding that the basic and novel properties are part of the scope of a claim.

Supp. 3d at 65 ("To the extent defendants argue that the addition of specific ingredients materially affects this property, that dispute involves a question of infringement, not claim construction.").  But that is a separate inquiry from the inquiry here: whether the basic and novel properties themselves are definite.  The latter question is "an issue of claim construction and a question of law."  *Cordis Corp. v. Bos. Sci. Corp.*, 561 F.3d 1319, 1331 (Fed. Cir. 2009).[13]

In short, the district court correctly applied the *Nautilus* indefiniteness standard to the invention's purported basic and novel properties.  And, as explained below, the court also correctly found that two of those properties are indefinite.

### b. *"Better drying time" is indefinite*

The patent specification asserts that the claimed compositions "dry quicker" than the comparative liquid formulations.  Appx139 (10:9-10).  As evidence for this claim, the specification discloses the results from two tests; an *in vivo* test and a "more quantitative[]" *in vitro* test.

---

[13] Horizon's suggestion (at 36-37) that the district court need not have conducted the § 112 ¶ 2 inquiry because "Actavis's ANDA product does not contain any 'unspecified ingredients'" fails to understand that indefiniteness is an inquiry that is independent from—and logically prior to—the infringement inquiry. Claims that are indefinite "by definition[] cannot be construed.  Without a discernable claim construction, an infringement analysis cannot be performed." *Honeywell*, 341 F.3d at 1342 (citation omitted).

In the *in vivo* test, "equal amounts of the two products [were placed] on opposite limbs.  Within thirty (30) minutes the compositions of the invention are almost completely dry whereas a significant amount of the [comparative] liquid formulation remains."  Appx139 (10:16-21).  To conduct the *in vitro* test, the inventors "measured the residual weight of formulations by placing equal amounts (100 mg) of a prior art formulation and compositions of the invention in weighing dishes" and "weighing the amount remaining over time."  Appx139 (10:21-27). Using this methodology," the specification states, "a difference is immediately noticeable, and becomes dramatically different by 4 hours."  Appx139 (10:27-29). Table 12 relates the results of the *in vitro* experiment:

50

## TABLE 12

Drying times
Drying times for gels and a comparative liquid formulation solution.
Equal weights of each formulation were measured and spread on
55    weigh dishes. The weight of each remaining formulation was
then followed with time. The gels of this invention showed faster
drying kinetics than the comparative liquid formulation, with F14/2
showing the fastest drying rate. These gels also had improved
"spreadability" characteristics, which most likely contributed
to this improvement in drying rates.

|  | Formulation name | | | |
| --- | --- | --- | --- | --- |
| Percentages in | Comparative wt/wt % | F14/2 gel 2.5% wt/wt % | F14/2 gel 4.0% wt/wt % | F971 wt/wt % |
| Water | 18.81 | 12.5 | 12.5 | 17.16 |
| Dimethyl Sulfoxide | 45.5 | 45.5 | 45.5 | 45.5 |

## TABLE 12-continued

Drying times
Drying times for gels and a comparative liquid formulation solution.
Equal weights of each formulation were measured and spread on
weigh dishes. The weight of each remaining formulation was
then followed with time. The gels of this invention showed faster
drying kinetics than the comparative liquid formulation, with F14/2
showing the fastest drying rate. These gels also had improved
"spreadability" characteristics, which most likely contributed
to this improvement in drying rates.

| | | | | |
|---|---|---|---|---|
| Propyelene glycol | 11.2 | 11 | 11 | 11.2 |
| Ethanol | 11.79 | 26.5 | 25 | 11.79 |
| Glycerine | 11.2 | | | 11.2 |
| Diclofenac Sodium | 1.5 | 2 | 2 | 2 |
| Thickener | none | HY119 | HY119 | Carbopol 971 |
| wt/wt % thickener | | 2.5 | 4 | 1:15 |

| | % Remaining | | | |
|---|---|---|---|---|
| Time (hr) | Comparative | F14/2 gel 2.5% | F14/2 gel 4.0% | F971 |
| 0.000 | 100 | 100 | 100 | 100 |
| 0.083 | 98.1 | 93 | 92.6 | 100.3 |
| 0.167 | 96.7 | 92.9 | 91.8 | 100.3 |
| 0.333 | 95.7 | 92.7 | 93 | 100.2 |
| 0.500 | 95.6 | 92.7 | 93.3 | 100 |
| 0.750 | 95.5 | 92.1 | 92.3 | 99.8 |
| 1.000 | 95.9 | 92 | 91.8 | 99.7 |
| 4.000 | 93 | 71 | 70.7 | 86.8 |
| 24.000 | 88.7 | 32.4 | 23.5 | 58.8 |

Appx146.  As these data make clear, the specification is incorrect to state that the

claimed formulations all "dry quicker" than the comparative liquid formulation.

Specifically, the F971 formulation is less dry than the comparator at all time points

up to four hours.  Moreover, the results from the two different methods of

evaluating drying time are not consistent: all three claimed formulations still have

over 90% weight remaining and are not significantly different than the comparative

liquid at 30 minutes in the *in vitro* test, in contrast to the results from the *in vivo*

test, in which the claimed compositions were "almost completely dry" by the 30-minute mark and the comparative liquid was not. *Compare* Appx139 (10:19), *with* Appx145-146 (Table 12). This leaves a person of skill with no idea which method to use.

As the district court correctly found, "better drying time" is indefinite because it is impossible to know with reasonable certainty how to measure drying time (via the *in vivo* or *in vitro* method) or at what point to measure it (at 5 minutes, 1 hour, 24 hours, or some other time point). And that uncertainty is compounded by the fact that the data fail to support the specification's assertion that all of the gel formulations "dry quicker" than the comparative liquid formulation. *Cf. Interval Licensing*, 766 F.3d at 1372 ("The hazy relationship between the claims and the written description fails to provide the clarity that the subjective claim language needs.").

This Court's decision in *Dow Chemical* is instructive and compels the conclusion that the district court correctly found "better drying time" indefinite. *Dow Chemical* explained that "the patent and prosecution history must disclose a single known approach [to measuring a claimed parameter] or establish that, where multiple known approaches exist, a person having ordinary skill in the art would know which approach to select." 803 F.3d at 630. Applying that principle, the Court found that a claim directed to "a slope of strain hardening coefficient greater

than or equal to 1.3" was indefinite because (i) there existed multiple methods for measuring slope that produced different results and (ii) a person of skill would not have known which method to choose. *See id.* at 633. "Because the methods do not always produce the same results," the Court explained, "the method chosen for calculating the slope of strain hardening could affect whether or not a given product infringes the claims." *Id* at 634.

The same conclusion is appropriate here. Because the specification discloses "multiple methods [of evaluating drying time] leading to different results without guidance in the patent or the prosecution history as to which method should be used," the "better drying time" property is indefinite. *Id.* at 634; *see also Teva*, 789 F.3d at 1338-44 (claims reciting the term "molecular weight" were indefinite because (i) there were three ways to measure molecular weight that could yield different values and (ii) a person of skill would not have known which method to choose, because neither the claims, the specification, nor the prosecution history offered sufficient guidance); *A. Schulman, Inc. v. Polyone Corp.*, 2017 WL 2805857, at *3-7 (N.D. Ohio Apr. 27, 2017) (finding claim requiring "a DOI of 70 or greater" indefinite because there existed multiple methods available for measuring DOI and a person of skill in the art would not have known which method to choose).

Horizon's arguments to the contrary (at 45-47, 49-54) rest on a purported distinction between "drying rate" and "drying time." According to Horizon, the district court improperly focused on "'drying rate' (how quickly it dries)" instead of "'drying time' (how long it takes to dry) during its review of the intrinsic evidence." Horizon Br. 49. This argument is a nonstarter.

As explained by Dr. Michniak-Kohn, the data related to "drying time" in the patent does not in fact show any specific "drying time"—or "drying rate," for that matter. Instead, the data in Table 12 show "the residual weight of each formulation at different time points." Appx2017 (¶ 22). The patent uses the concepts of "drying time" and "drying rate" interchangeably, *see, e.g.*, Appx139 (10:9-16) (treating "quicker drying" and a "drying time difference" as equivalent), and both are apparently intended to refer to the residual weight of the formulation that is left as time progresses. *See* Appx145 (21:41-43) (Example 5 entitled "Comparison of *Drying Time/Residual Weight* of a Comparative Liquid Formulation Solution Versus the Corresponding Gel) (emphasis added); *id.* (21:63-64) ("the three gel formulations displayed *more rapid drying*") (emphasis added); Appx145-146 (Table 12) (table entitled "Drying times" showing the percentage of the formulation remaining at various points from t=0 hours to t=24 hours). Indeed, the patent does not discuss "drying time" (as Horizon now defines that term) at all,

given that the data *never* show a time point at which the formulations have dried entirely.

Horizon's expert agreed with Dr. Michniak-Kohn on this point, stating that a skilled artisan "would understand the claim term 'a greater drying rate' to mean wherein a lesser amount (wt) of the claimed formulation remains relative to the amount (wt) of the comparative liquid formulation after 100 mg of both formulations are . . . exposed to ambient conditions over a 24 hour period." Appx1552-53 (¶ 89); *see also* Appx1553 (¶ 90)  (skilled artisan "would understand that the specification describes the exact process the inventors used to compare the drying times of the claimed formulation relative to the comparative liquid formulation.").  Indeed, *Horizon's own briefing* before the district court used the terms "drying time" and "drying rate" interchangeably, and used both to refer to the residual weight of the formulation remaining at various time points.  *See* Appx896-897 ("The specifications and file history support that *'a greater drying rate' refers to the comparison of the drying times* of the claimed formulation relative to the liquid formulation . . . ."); *accord* Appx4084, 4088 (acknowledging that the parties and the Court used the terms interchangeably).  During prosecution, the patentees themselves treated the terms as having equivalent meaning.  *See* Appx1383 ("Applicants assert that it is completely unexpected that a gel

composition would have a *greater drying rate (i.e. a shorter drying period) . . .* compared to a comparative liquid formulation.") (emphasis added).

In short, Horizon's eleventh-hour attempt to draw a nonexistent distinction between "drying rate" and "drying time" is meritless and inconsistent with its own representations below.

Horizon also argues (at 47-48) that the district court should have considered the definiteness of "better drying time" on a claim-by-claim basis. As the district court correctly found, however, Horizon waived this argument by raising it for the first time in its motion for reconsideration of the district court's *Markman* order. *See* Appx36; *see also Golden Bridge Tech., Inc. v. Apple Inc.*, 758 F.3d 1362, 1369 (Fed. Cir. 2014) ("An argument made for the first time in a motion for reconsideration comes too late and is ordinarily deemed waived."). Horizon was on notice of Actavis's argument that the "better drying time" property was indefinite by the time Actavis filed its responsive *Markman* brief, at the latest. *See* Appx3231-3232. Yet Horizon continued to treat the formulation patents as a whole, without differentiating among claims, throughout two subsequent *Markman* hearings and the submission of supplemental letter briefs. It was only after the *Markman* opinion issued that Horizon argued that there was a meaningful difference among the claims for purposes of the definiteness inquiry. That is not sufficient to preserve the argument. *See HTC Corp. v. Cellular Commc'ns Equip.,*

*LLC*, 2017 WL 3016954, at *5 (Fed. Cir. July 17, 2017) (party waived argument that differentiated between claims because party had not argued below that there was any meaningful difference between the claims).

In any event, the district court considered Horizon's claim-by-claim argument on the merits and found it wanting because—among other things—even with respect to the HPC polymer claims, the better drying time property is indefinite because "the two methods [of evaluating drying time] do not provide consistent results at consistent times," and the court credited Actavis's expert "that a POSA would not know under what standard to evaluate the drying rate of the claimed invention." Appx36-37. That conclusion was unassailable. *See Dow Chem.*, 803 F.3d at 633-34. The district court's holding that the "better drying time" property is indefinite should be affirmed.

### c. *"Favorable stability" is indefinite*

The specification asserts that the claimed formulations display "favorable stability at six (6) months as reflected in the lack of any substantial changes in viscosity, the absence of phase separation and crystallization at low temperatures, and a low level of impurities." Appx136 (4:27-32). Under the "Stability" heading in the "Characteristics of the Gel Formulation" section, the specification notes that "[i]t is important . . . to minimize the amount of impurities or degradation products

that form over time due to interactions between the various ingredients in a composition." Appx139 (9:61-64).

Accordingly, the amount of "impurities or degradation products" produced by the formulation is at least one aspect of the "favorable stability" property—a point Horizon concedes (at 58). But the only "impurity" identified in the specification is the unknown "impurity A." Thus, the basic and novel property "favorable stability" is indefinite for the same reasons that the "impurity A" and "degrades" claim limitations are indefinite. *See supra* Sections II.A-B.[14]

Horizon makes two arguments in response, but both are meritless. Horizon's first argument—that the district court "erred in equating the basic and novel property 'favorable stability' with the 'degrades' claim terms"—is wrong for the reasons discussed *supra* Section II.B.

Horizon's other complaint is that the district court purportedly "ignored" Horizon's expert's testimony that a person of skill in the art would be able to determine how to measure this basic and novel property with reasonable certainty. That argument fails as well. This Court "presume[s] that a fact finder reviews all

---

[14] It is unclear from the specification whether "favorable stability" means favorable in an absolute sense or favorable relative to the comparative liquid formulation. If it is the latter, there is a second indefiniteness problem: the claimed formulation made with Carbopol actually produced *more* "impurity A" following 6 months of storage than did the comparative liquid formulation. *See* Appx146 (23:60-24:10).

the evidence presented unless he explicitly expresses otherwise." *E-Pass Techs., Inc. v. 3Com Corp*, 473 F.3d 1213, 1221 (Fed. Cir. 2007) (quoting *Medtronic, Inc. v. Daig Corp.*, 789 F.2d 903, 906 (Fed. Cir. 1986)).  Accordingly, the appropriate inference to be drawn is that the district court reviewed Horizon's expert's vague and conclusory declaration and simply found it unpersuasive.

*     *     *

In sum, the "consisting essentially of" claims of the formulation patents fail the definiteness standard articulated in *Nautilus* for two reasons: (i) a skilled artisan would not be able to discern with reasonable certainty the identity of the basic and novel properties of the invention—and thus would be unable to identify which ingredients fall within the scope of the claims; and (ii) even if one accepts at face value the basic and novel properties identified by Horizon, at least two of those properties are themselves indefinite, which renders the claims indefinite in their entirety.  The district court's holding that these claims are invalid should be affirmed.

# BRIEF ON CROSS-APPEAL

## STATEMENT OF THE CASE ON CROSS-APPEAL

Plaintiff-Appellant Horizon owns U.S. Patent No. 9,066,913 ("the '913 patent"), which is among the patents listed in the Orange Book for PENNSAID® 2%. Pennsaid 2% is a twice-daily topical diclofenac sodium formulation for the treatment of the pain of osteoarthritis of the knees. Appx15908.

Pennsaid 2% is actually a reformulation of Horizon's prior art product, Pennsaid 1.5%. Pennsaid 1.5% is a topical diclofenac sodium solution that has the approximate viscosity of water. Appx15911. Patients applied it to their knees using a dropper applicator. Horizon's label for Pennsaid 1.5% instructed patents to apply about 40 drops to each affected knee, up to four times a day, in order to receive relief from their osteoarthritis pain. *Id.*

Although Pennsaid 1.5% topical solution was effective in treating arthritis pain of the knee, it had some readily apparent problems. It was too runny, it didn't dry fast enough, and it required too many applications per day. Appx15918. There was therefore a market need to improve the viscosity, drying time, and dosing frequency of the product. Appx15918-19. These are standard problems with topical drug products, and they have a standard set of solutions. The Pennsaid 2% formulation was simply a revision of the Pennsaid 1.5% formulation that dealt with these problems.

Specifically, one objective in reformulating Pennsaid 1.5% was to decrease the dosing frequency. It is well-known maxim in drug formulation that one can decrease dosing frequency by increasing the amount of active ingredient in each dose. Appx15918. The formulators therefore increased the active concentration in the formulation from 1.5% to 2%, another concentration also known in the art to be safe and effective. Appx15919.

Another objective was to ameliorate the prior art's problem with runoff of the drug from the area of body to be treated. Pennsaid 1.5% was a liquid with the viscosity of water—hence the runoff issue—and the inventors desired to create a formulation with the viscosity of a gel or lotion that would not run off the knee when applied. Appx15912. The developers tested a few common thickeners, adding a standard amount that would be expected to achieve the viscosity range typical for a topical formulation (i.e. the typical viscosity of a gel or lotion). Appx15913-14. Each thickener had the effect that the developers expected it would have, and the developers selected the one that worked best. Appx15914.

Another problem with Pennsaid 1.5% was that the topical application did not dry very quickly. Thus one objective of the reformulation was to decrease the drying time by adding a drying agent and penetration enhancer. Appx15922. Ethanol is a well-known drying agent and penetration enhancer. Appx15922. The developers of Pennsaid 2% increased the ethanol content of the formulation, and

they achieved the improved drying time that they expected to achieve. Appx15919. Evaporation rates can change when other aspects of formulations change, but the ways in which they change are generally known. Appx15927. There was no evidence that the confluence of agents in the formulation led any of the ingredients to have an evaporation rate, or a viscosity, or a skin absorption rate other than what was within the range expected in light of the prior art.

Three ingredients changed between the Pennsaid 1.5% and Pennsaid 2% formulation because the task of reformulation had three objectives (thicker medium, faster drying time, less frequent dosing). Each of those objectives involved a change that altered the formulation exactly as expected. Although the various changes affected each other to some extent, those interactions themselves were expected and the ways in which the formulators compensated for those interactions was exactly as common knowledge in the field dictated. Appx15946.

Horizon filed a series of patent applications on various formulations and methods of use of Pennsaid 2%. Claim 12 of the '913 patent, the only claim at issue in this cross-appeal, is directed to a formulation and dosing frequency for Pennsaid 2%. Claim 12 depends from 3 other claims and, when written to include the limitations of all the claims from which it depends, reads as follows:

12. A method for treating pain due to osteoarthritis of a knee of a patient in need thereof, said method comprising:
administering to the knee a topical formulation [comprising]

56

[diclofenac sodium present at 2% w/w;
DMSO present at [45.5%] w/w;
ethanol present at 23-29% w/w;
propylene glycol present at 10-12% w/w;
hydroxypropyl cellulose [present at 2.5% w/w]; and
water to make 100% w/w,
wherein the formulation has a viscosity of 500-5000 centipoise]
wherein the administration of the formulation is twice daily.

Appx261 (30:10-50).

The prior art undisputedly disclosed a method for treating osteoarthritic knee by administering a very similar topical formulation–namely, Pennsaid 1.5%.

Comparing the present claims to Pennsaid 1.5% reveals only minor differences:

| Limitation | Pennsaid 1.5% | Pennsaid 2% |
|---|---|---|
| Diclofenac Sodium | 1.5% = ~ 4x per day[15] | 2% = 2x per day |
| DMSO | 45.5% | 45.5% |
| Ethanol (drying agent) | 11.79% | 23-29% |
| Glycerin | 11.2% | 0-11.2%[16] |
| Propylene glycol | 11.2% | 10-12% |
| HPC (thickener) | 0% = 5cp (like water) | 2.5% = 500-1500 cp (gel) |
| Water | To make 100% | To make 100% |

---

[15] It was known that many patients applied Pennsaid 1.5% fewer than four times per day and still had therapeutic effects. *See* Appx15923. The success of reducing the dosage from four times per day to two times per day, in light of the changes to the formulation, was not unexpected. *See id.*

[16] The claims do not recite glycerin, but do not exclude it. *See* Appx15915. The claims therefore cover compositions containing 11.2% glycerin for purposes of comparing the claims to the prior art. However, glycerin was also known to hinder drying time, so removing or reducing it would also have been a clear design choice for a formulator who wanted to increase drying time. *See* Appx15922.

As shown, the increase in the active ingredient from 1.5% to 2% had the expected reduction in dosing frequency. *See* Appx15922. The increase in ethanol improved the drying time and penetration, as ethanol was known to do. *See id.* The addition of a common thickener increased the viscosity as expected; from that of water to that of a gel. *See* Appx15922-23.

Each of the differences between Pennsaid 1.5% to Pennsaid 2% was itself within the numerical ranges of the teachings of the prior art. Appx15919 (recounting that the Kasai reference discloses 2% w/w diclofenac sodium, 23-29% w/w ethanol, and 2.5% w/w HPC, and the Dow and Kamishita III references disclose claimed viscosity (500-5000 centipoise)). As the experts testified, getting the balance right among the moving parts involved some optimization. However, none of the final amounts for the ingredients were outside the range of what was expected. *See* Appx15923.

Horizon listed the '913 patent (as well as several other patents) in the Orange Book in connection with Pennsaid 2%. Actavis filed an Abbreviated New Drug Application No. 207238 for its generic copy of Pennsaid 2%, in which it certified that the claims of all patents listed in connection with Pennsaid 2% are invalid. Horizon brought suit against Actavis pursuant to the Hatch-Waxman Act, asserting multiple claims of multiple patents concerning Pennsaid 2% (including those patents at issue in Horizon's appeal). Ultimately, the district court held a

bench trial to resolve a single issue: whether claim 12 of the '913 patent, which covers the formulation and dosing frequency of Pennsaid 2%, is invalid as obvious.

The district court agreed with Actavis that Pennsaid 2% would have started with the Pennsaid 1.5% prior art and adjusted that formulation to solve known problems with it. *See* Appx15941 ("a POSA in October 2006 would have recognized PENNSAID® 1.5%'s drawbacks and would have been aware of potential ways to alter PENNSAID® 1.5% to ameliorate those drawbacks"). Indeed, the district court found all of the underlying facts relevant to a determination of obviousness under 35 U.S.C. §103(a) in in favor of Actavis:

> The Court accepts Actavis's position that prior art would have informed a POSA in October 17, 2006 of the various components to change in PENNSAID® 1.5% to improve upon that formulation's drawbacks, such as increasing the amount of drug absorbed per application in order to reduce the application frequency, making the formulation thicker to prevent run-off and improve absorption, and utilize penetration enhancers to reduce drying time and increase flux. The Court also accepts Actavis's position that a POSA would know from prior art, or even the POSA's general experience with formulating drugs, that: (1) glycerin hinders drying time, (2) ethanol reduces drying time, (3) ethanol can serve as a penetration enhancer, (4) HPC was an attractive thickener because it had been used in other diclofenac sodium formulations and formulations with other ingredients also found in PENNSAID® 1.5%, (5) an increase in concentration of diclofenac sodium can increase absorption, and (6) other diclofenac sodium formulations had been successfully applied less than four times a day resulting in the same daily therapeutic effect. The Court further accepts Actavis's position that prior art would have informed a POSA of compatible thickening agents and the suitable ranges for diclofenac sodium, ethanol, and HPC. All of these things flow logically from the prior art.

Appx15922-23.

The district court's ultimate legal conclusion, however, was that claim 12 was not obvious. The sole reason that the court failed to find the asserted claim obvious was due to alleged unexpected results. *Id.* at 15923-24. Importantly, the district court did not find that anything about Pennsaid 2% was actually unexpected. Rather, the record clearly shows—and the district court found—that every single adjustment from Pennsaid 1.5% to Pennsaid 2% had the textbook outcome that one of skill would have been aiming for in making the adjustment.

Instead, the district court interpreted the law governing obviousness to require that the prior art predict the "*exact* formulation and dosing frequency" of the claimed composition, rather than describing a *range* of concentrations into which the claimed formulation fell. Appx15917. The district court also observed that drug formulation is inherently complex and reasoned that making multiple adjustments to a composition *might* yield unexpected results. The district court therefore held that prior art cannot invalidate a claimed formulation unless the "exact formulation and dosing frequency" of the claim is found in the prior art. *Id.*

Actavis timely filed this cross-appeal.

## SUMMARY OF THE ARGUMENT ON CROSS-APPEAL

The district court's factual findings support a strong prima facie case of obviousness. The district court made extensive factual findings regarding every

limitation of the claims and how that limitation "flow[ed] logically from the prior art." Appx15923. The district court even found that every numerical limitation fell within the range of what would be expected in light of the prior art. *See* Appx15922-23. The sole reason that the district court found claim 12 nonobvious was that the ranges disclosed in the prior art did not "predict[] the exact formulation and dosing frequency" that resulted in Pennsaid 2%. *Id.* That was an error of law.

There is no requirement in obviousness law that the prior art predict the exact composition claimed. Indeed, controlling Supreme Court precedent holds the opposite. The district court justified its imposition of this erroneous legal requirement by observing that drug reformulation is inherently complex, and therefore unpredictable. The court reasoned from that observation that any change to a drug formulation, especially multiple changes, might yield unexpected results. But the district court never pointed to a single feature of Pennsaid 2% that was actually unexpected.

Instead, the court effectively held as a matter of law that the unpredictable task of drug reformulation is categorically impossible to predict and, therefore, per se leads to unexpected results. That analysis misapprehends the unexpected results inquiry and turns obviousness law upside down. This Court should reverse the

district court's legal holding of nonobviousness and invalidate the patent based on the district court's extensive (and correct) factual findings that favor obviousness.

## STANDARD OF REVIEW ON CROSS-APPEAL

Actavis challenges the district court's holding of nonobviousness regarding claim 12. The ultimate conclusion of obviousness is a legal holding that is premised on several underlying factual considerations. *See Insite Vision Inc. v. Sandoz, Inc.*, 783 F.3d 853, 858 (Fed. Cir. 2015) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966)). "Following a bench trial on the issue of obviousness, [this Court reviews] the [district] court's ultimate legal conclusions de novo and the underlying factual findings for clear error." *Id.* (quoting *Tyco Healthcare Grp. LP v. Ethicon Endo–Surgery, Inc.*, 774 F.3d 968, 974 (Fed. Cir. 2014)). Here, the district court essentially found all of the facts underlying obviousness in Actavis' favor and arrived at its ultimate conclusion of nonobviousness solely as the result of an error in applying the law. *See* Appx15922-23. This Court therefore reviews the issue presented on cross-appeal without deference.

## ARGUMENT ON CROSS-APPEAL

The district court observed that routine optimization and unexpected results lie on opposite ends of a spectrum and concluded that the invention recited in claim 12 falls towards the latter end of this spectrum. Appx15906-07. The district court identified that conclusion as the sole basis for its judgment that Actavis failed

to prove obviousness. Appx15923. Although the district court generally attributed its obviousness holding to its collective weighing of the evidence and testimony, the district court weighed that evidence using a scale that was biased by a legally erroneous standard: that the prior art had to predict "the exact formulation and dosing frequency" recited in the claims. Appx15923. That is not the law governing obviousness.

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). A correct application of the law to the facts as found by the district court in this case compels the legal conclusion that claim 12 is invalid as obvious.

## I.   THERE IS NO REQUIREMENT IN OBVIOUSNESS LAW THAT THE PRIOR ART PREDICT THE *EXACT FORMULATION* OF THE ASSERTED CLAIM

Despite finding that each adjustment embodied in Pennsaid 2% flowed logically from the prior art, the district court nonetheless concluded that the overall formulation was not the result of routine optimization because "general principles and ranges of permissible concentrations would not have predicted the exact formulation and dosing frequency that resulted in Pennsaid 2%." Appx15923. In other words, even though every modification to Pennsaid 1.5% was made pursuant

to general formulation principles and involved standard ranges of concentrations, the district court found that Pennsaid 2% was not obvious solely because its "exact formulation" was not found in the prior art.[17]  *Id.*  That conclusion is legal error. There is no requirement in the law that the prior art have predicted the *exact* formulation and dosing frequency claimed in order to support a determination of obviousness.  Indeed, if the exact formulation were found in the prior art, then there would be no need to rely on an obviousness analysis, because the composition would be anticipated.

Courts "need not seek out precise teachings directed to the specific subject matter of the challenged claim," in order to support of finding of obviousness. *Perfect Web Techs., Inc., v. InfoUSA, Inc.*, 587 F.3d 1324, 1329 (Fed. Cir. 2009) (citing *KSR*, 550 U.S. at 418).  Indeed, "[c]ommon sense has long been recognized to inform the analysis of obviousness if explained with sufficient reasoning."  *Id.* at 1328 (citing *In re Bozek*, 416 F.2d 1385, 1390 (C.C.P.A. 1969), as an example of obviousness premised on "common knowledge and common sense of the person of ordinary skill in the art without any specific hint or suggestion in a particular

---

[17] The district court points to the active concentration being "exactly 2%" as though that was something unusual.  It was simply the next round number increment increase from Pennsaid 1.5%.  The district court opinion also quotes portions of expert testimony that talk about complexity and unpredictability in general, but never identifies anything about the Pennsaid 2% formulation or dosing frequency that defied expectations.  *See, e.g.*, Appx15931.

reference"). The use of common sense in concluding that a patent claim is obvious thus does not require the exact formulation or dosing frequency to be found in the prior art, but rather, only that the challenger provide a "reasoned explanation that avoids conclusory generalizations." *Id.* at 1329 (citing *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1366 (Fed. Cir. 2006)). Accordingly, "while an analysis of obviousness always depends on evidence that supports the required *Graham* factual findings, it also may include recourse to logic, judgment, and common sense available to the person of ordinary skill that do not necessarily require explication in any reference or expert opinion." *Id.* at 1329.

The district court departed from this guidance, instead relying—extensively and admittedly *sua sponte*—on *Pfizer Inc. v. Mylan Pharmaceuticals Inc.*, 71 F. Supp. 3d 458, 468-69 (D. Del. 2014), for its discussion of the difference between routine optimization and inventive steps. *See* Appx15936-38. There are several problems with the district court's analysis of that case. First, the district court leans heavily on the portions of *Pfizer* that distinguish *Merck & Co. v. Biocraft Laboratories, Inc.*, 874 F.2d 804 (Fed. Cir. 1989). The district court quotes the critical analysis from *Merck*, which distinguished the obvious optimization at issue there with optimizations that, according to the *Merck* court, are merely "obvious to try" and therefore not barred by § 103. *See* Appx15937-38.

That analysis in *Merck* was expressly overruled by the Supreme Court in *KSR*, which held that combinations that are "obvious to try" *are indeed unpatentable* under § 103. *KSR*, 550 U.S. at 415. Thus, the "critical" distinction that defined the obviousness inquiry in *Merck* is no longer good law. *Cf.* Appx15938 (quoting *Pfizer*, 71 F. Supp. 3d at 469). Finding that the claimed combination here did not rise to the same level of routine optimization found in *Merck* is therefore a meaningless exercise because *KSR* lowered the relevant threshold. *See KSR*, 550 U.S. at 415.

The district court in *Pfizer* acknowledged that *Merck* predated *KSR*, but performed the analysis anyway because the defendant in that case had relied so extensively on the fact pattern in *Merck*. *See Pfizer*, 71 F. Supp. 3d at 469. Incredibly, the district court here block-quoted *Pfizer*'s entire obsolete analysis of *Merck*, omitting with ellipsis the sentence in which the *Pfizer* court acknowledged that the analysis had been overruled by the Supreme Court. *See* Appx15938. That the district court here declined to observe (or failed to understand) the impact that *KSR* has on the present analysis dooms the entire judgment, especially its reliance on *Pfizer*. It is no longer the law that the prior art must show "clearly delineated steps" or avoid "significant guesswork and variation of parameters to achieve the end result." *Compare* Appx15938 (quoting *Pfizer*, 71 F. Supp. 3d at 469), *with KSR*, 550 U.S. at 421 ("[A] person of ordinary skill in the art has good reason to

pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.").

The district court thus held the prior art to an erroneously high standard. The law requires only that the prior art suggest or give rise to an expectation of success, for solutions within the finite range of what the prior art teaches a skilled artisan. *See KSR*, 550 U.S. at 421. The "schematic or roadmap" of the prior art need not provide turn-by-turn directions; it need only teach a skilled artisan what direction to go and give a reason to start moving. Appx15934; *cf. KSR*, 550 U.S. at 421 ("A person of ordinary skill is also a person of ordinary creativity, not an automaton."). This Court's de novo review should therefore demand nothing more from the prior art than what the law requires: that it render the claimed formulation obvious (or obvious to try) in light of the ordinary skill, creativity, and motivation of an artisan aware of Pennsaid 1.5%'s well-known problems and the prior art's well-known solutions.

## II.   REQUIRING THAT PRIOR ART *PREDICT* THE EXACT FORMULATION OF THE ASSERTED CLAIM MISAPPREHENDS THE SECONDARY CONSIDERATION OF UNEXPECTED RESULTS

The district court's legal error in holding the prior art to an erroneously high standard also resulted in the false equivalency between the level of unpredictability

in the art and the presence of unexpected results as a secondary consideration of nonobviousness. While there is no dispute that the level of unpredictability in biological and chemical arts is high, that is not the beginning and the end of a proper obviousness analysis.

"Obviousness does not require absolute predictability of success." *In re O'Farrell*, 853 F.2d 894, 903 (Fed. Cir. 1988). Indeed, "[t]here is always at least a possibility of unexpected results," and if that possibility controlled the analysis, it "would then [erroneously] provide an objective basis for showing that the invention, although apparently obvious, was in law nonobvious." *Id.* That is why obviousness only requires "a reasonable expectation of success;" not absolute certainty. *Aventis Pharma Deutschland GmbH v. Lupin, Ltd.*, 499 F.3d 1293, 1301 (Fed. Cir. 2007).

The district court expressly and erroneously departed from this guidance, instead drawing a false equivalency between the level of predictability in the art and unexpected results that swallows the entire obviousness analysis:

> Even if the range of values for a particular variable was set out in the prior art and even if the combination of variables was itself predicted, the result will still not be obvious if the variables interacted in an unpredictable or unexpected way.

Appx15936. For this proposition, the district court cited *KSR*, even though *KSR* never mentions unexpected results, and *In re Applied Materials*, 692 F.3d 1289, 1298 (Fed. Cir. 2012), even though that case did not hold that unexpected results

overcame a prima facie showing of obviousness. Indeed, "unexpected results do not per se defeat, or prevent, the finding that a modification to a lead compound will yield expected, beneficial properties." *Bristol-Myers Squib Co. v. Teva Pharms. USA, Inc.*, 752 F.3d 967, 976 (Fed. Cir. 2014).

The district court observed that "the prior art does not predict without contradiction that drug concentration necessarily equates with increased permeation." Appx15933-34. The court further observed that the prior art would not predict that increased ethanol enhances penetration "as a given." *Id.* But the law does not require that the prior art be unanimous and conclusive. It does not require that the prior art convince one of ordinary still that success is a given. It merely requires that a skilled artisan's expectation of success is high enough that a finite number of solutions become obvious to try. *See KSR*, 550 U.S. at 415. All of the evidence of record in this case indicates that the formulation for Pennsaid 2% was obvious.[18]

Part of the way in which Actavis explained its common sense obviousness theory with sufficient reasoning was through its expert's use of a stereo receiver analogy. Appx15923. The bass, treble, fade, volume, and so forth, are analogous to the various components of Pennsaid. *See* Appx15924. If one wants to change

---

[18] Importantly, as discussed further below, the district court never found as a matter of fact that the variables here *actually* interacted in an unexpected way—it only implied that they *might have* because formulation is a complex art.

the presentation of Pennsaid in a particular way, he may adjust the knob upwards or downwards for the parameter corresponding to his desired change. *See* Appx15924. Of course, adjusting one parameter would be expected to impact the other parameters in known ways. One of ordinary skill in the art would know how the various parameters interact and how certain modifications affect the overall balance of the composition, and would be able to adjust the other parameters in order to compensate for expected collateral effects. Appx15924.

The district court anchored its nonobviousness rationale on Actavis' stereo receiver analogy, *see* Appx15923, but rejected the analogy for three reasons. *See* Appx15925. Each reason demonstrates a fundamental misunderstanding of the analogy or of the law. *First*, the district court distinguished the analogy, finding that chemistry is not like a stereo, in that you cannot adjust one variable without it affecting the other variables as well.[19] *See* Appx15925. That underestimates the complexity of a stereo. Any sound technician will confirm that one can never merely turn up, for instance, the treble and expect the overall sound to improve in a

---

[19] For example, the district court noted that formulations must total 100 wt %, and posited that if one increases the wt % of diclofenac sodium by .5% then some other ingredient must be reduced by .5 wt %. Appx15925-26. The district court then faulted Actavis for failing to address how one would compensate for such a change, as though that kind of adjustment were a challenging issue unique to Pennsaid. Appx15926. Of course, as Actavis explained, the formulation for both versions of Pennsaid includes water "up to 100 wt %," which is a standard notation in chemistry indicating that one can always change the amount of water to compensate for changes in the volumes of other ingredients. Appx15925.

linear fashion. One needs to adjust the other variables to compensate for the increased treble, in order to avoid an imbalance or detriment to the sound quality. Nonetheless, any sound technician would know how changing certain variables influences others, and how to adjust the different variables in order to optimize the sound quality for a desired purpose. The same is true here: a formulator would know how changing one component could affect the others and how to adjust accordingly. Appx15924.

*Second*, the district court reversed course and tried to lean into the analogy, identifying the many complexities in the stereo, the wiring, different types of music, different acoustic environments, etc. *See* Appx15928-29. The district court then concluded that even under Actavis' analogy, making adjustments to a complex system will, by definition, always yield unexpected results. *See* Appx15932. That reasoning fails to acknowledge the role of the skilled artisan in the analysis. Any ordinarily-skilled sound technician would have no difficulty in navigating the interactions among the variables and possible adjustments. Appx15928. Similarly, any ordinarily skilled formulator would have easily navigated the variables in optimizing Pennsaid 1.5% into Pennsaid 2%. Appx15928-29. Indeed, that is what a formulator *does*.

The district court went so far as to indicate that, even where the results of a modification are exactly as expected, the fact that the system is complex implies

that the modification *could have had* unexpected results, and therefore any and all results are unpredictable. *See* Appx15932 (reasoning that because "a time-tested, accepted, even venerated hornbook scientific principle" like Fick's Law "might not always work as predicted," the results of applying Fick's Law are therefore nonobvious, even when those results are exactly what the Law predicted they would be). Importantly, the district court never once found that a single result of the formulators' modifications to Pennsaid was actually unexpected—only that the results *might have been* unexpected due to the complexity of the system, and therefore the expected results could not have been predicted. *See* Appx15934-35 (quoting expert testimony that formulation was unpredictable, but not that any particular results here were unexpected). That is not the law of obviousness.

*Third*, the district court found that even if Actavis effectively demonstrated that each individual change made to Pennsaid 1.5% to arrive at Pennsaid 2% was the product of routine optimization and common sense, and even if the result was exactly as expected, the totality of the changes was not obvious because the effect of multiple simultaneous modifications to a complex system cannot be predicted based on the prior art. *See* Appx15933. Again, this sentiment is infected with the false premise that simply because modifying a complex system *might* yield unexpected results, any and all results—expected or not—are therefore unpredictable and by definition nonobvious. To affirm the district court's

72

reasoning would thus be to hold that any optimized drug formulation, no matter how routine and expected, is *per se* nonobvious.

* * *

If one assumes that drug formulation is a field where everyone expects the unexpected, then all results are, per se, unexpected and nothing can ever be obvious. But drug formulation is not "a crap shoot." Appx15939. It is science. Every adjustment made to Pennsaid 1.5% was made deliberately, in light of known principles, and with an expectation of a particular result. Every expected result happened exactly within the range of what was expected. It is true that multiple parameters were adjusted, and that adjusting certain parameters required compensation in other parameters. That is always the case in drug formulation. The potential interactions among the parameters of Pennsaid 2%, however, were known in the art, and the required compensations yielded the results that they were expected to yield. This Court should reverse the district court's holding that the asserted claim was not obvious over the prior art.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court's conclusion that Actavis does not infringe the method-of-use claims. It should also affirm the district court's conclusion that the formulation claims are indefinite. Finally, the Court should reverse the district court's conclusion that claim 12 of the '913 patent is not obvious.

Dated: October 10, 2017

Respectfully submitted,

/s/ *John Christopher Rozendaal*
John Christopher Rozendaal
Michael E. Joffre
Kristina Caggiano Kelly
William H. Milliken
**STERNE KESSLER GOLDSTEIN & FOX PLLC**
1100 New York Ave., N.W.
Washington, DC 20005
202.371.2600
*Counsel for Appellant/Appellee,*
*Actavis Laboratories UT, Inc.*

# ADDENDUM

# TABLE OF CONTENTS

Page

May 23, 2017 Final Judgment, *Horizon Pharma Ireland Limited et al. v. Actavis Laboratories UT, Inc.*, 14-cv-7992 (D.N.J.) ........................................................................ Appx62-Appx64

May 12, 2017 Opinion, *Horizon Pharma Ireland Limited et al. v. Actavis Laboratories UT, Inc.*, 14-cv-7992 (D.N.J.) .......................................................... Appx15904-Appx15941

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| HORIZON PHARMA IRELAND LIMITED, HZNP LIMITED and HORIZON PHARMA USA, INC., <br><br> *Plaintiffs,* <br><br> v. <br><br> ACTAVIS LABORATORIES UT, INC., <br><br> *Defendant.* | Civil Action No. 1:14-cv-07992; 1:15-cv-07742; 1:16-cv-00645-NLH-AMD |

## <u>FINAL JUDGMENT</u>

This matter having been tried before this Court from March 21, 2017 through March 30, 2017, the Court having heard testimony on behalf of Plaintiffs Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma USA, Inc. ("Plaintiffs"), and Defendant Actavis Laboratories UT, Inc. ("Defendant"), the Court having considered the written post-trial submissions of the parties, and the Court having issued its Opinion on May 12, 2017 (Dkt. 371);

The Court having held *Markman* hearings on March 3, 2016 and June 7, 2016, the Court having considered the written submissions of the parties, and the Court having issued Opinions and Orders on August 17, 2016 (Dkts. 188, 189) and January 6, 2017 (Dkt. 234);

The Court having received Defendant's Motion for Summary Judgment of Non-Infringement of U.S. Patent Nos. 8,217,078, 8,546,450, and 9,132,110 (Dkt. 245), the Court having considered the written submissions of the parties, and the Court having issued an Opinion granting Defendant's Motion for Summary Judgment on March 16, 2017 (Dkt. 300);

**IT IS ORDERED AND ADJUDGED**, for the reasons set forth in the Court's Opinion dated May 12, 2017, that Judgment is entered in favor of Plaintiffs and against Defendant on all claims and counterclaims regarding the validity of claim 12 of U.S. Patent No. 9,066,913;

**IT IS ORDERED AND ADJUDGED**, pursuant to the Stipulation And Order Regarding Infringement (Dkt. 233), that the use, offer for sale, or sale of Actavis' ANDA Product (*i.e.*, the generic version of PENNSAID® 2% that is the subject of Actavis' ANDA No. 207238, submitted under 35 U.S.C. § 271(e)(2)(A)) within the United States or administration of Actavis' ANDA Product for the treatment of the pain of osteoarthritis of the knee(s) according to its prescribing information within the United States would infringe claim 12 of U.S. Patent No. 9,066,913;

**IT IS ORDERED AND ADJUDGED**, for the reasons set forth in the Court's Opinions dated August 17, 2016 and January 6, 2017 (Dkts. 188, 189, 234), that Judgment is entered in favor of Defendant and against Plaintiffs on all claims and counterclaims regarding the invalidity of claims 49-52 and 55-61 of U.S. Patent No. 8,252,838, claims 1-5, 9-19, and 22-24 of U.S. Patent No. 8,563,613, claim 4 of U.S. Patent No. 9,066,913, claims 10-15, 17, 19, 24, and 25 of U.S. Patent No. 9,101,591, claims 2-5 and 8-11 of U.S. Patent No. 9,168,304, claims 2-5 and 9-12 of U.S. Patent No. 9,168,305, and claims 2-5 and 9-12 of U.S. Patent No. 9,220,784;

**IT IS ORDERED AND ADJUDGED**, for the reasons set forth in the Court's Opinion dated March 16, 2017 (Dkt. 300), that Judgment is entered in favor of Defendant and against Plaintiffs on all claims and counterclaims regarding the noninfringement of claims 10, 11, 15, and 17 of U.S. Patent No. 8,546,450, claim 14 of U.S. Patent No. 8,217,078, and claims 3, 11, and 13 of U.S. Patent No. 9,132,110; and

**IT IS ORDERED AND ADJUDGED**, that all claims for infringement of any claim of the following patents that is not expressly enumerated above are dismissed with prejudice: U.S. Patent Nos. 8,217,078; 8,252,838; 8,546,450; 8,563,613; 8,618,164; 8,871,809; 9,066,913; 9,101,591; 9,132,110; 9,168,304; 9,168,305; and 9,220,784;

**IT IS ORDERED AND ADJUDGED**, that all counterclaims for any claim of the following patents that is not expressly enumerated above are dismissed without prejudice: U.S. Patent Nos. 8,217,078; 8,252,838; 8,546,450; 8,563,613; 8,618,164; 8,871,809; 9,066,913; 9,101,591; 9,132,110; 9,168,304; 9,168,305; and 9,220,784;

**ORDERED** that, pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any final approval by the United States Food and Drug Administration ("FDA") of Defendant's ANDA No. 207238 shall be a date which is not earlier than the expiration of U.S. Patent No. 9,066,913, or any later expiration or exclusivity to which Plaintiffs are or become entitled; and it is further,

**ORDERED** that, pursuant to 35 U.S.C. § 271(e)(4)(B), Defendant and its officers, agents and employees, and those acting in privity or in concert with any of them, and their successors and assigns, are enjoined from engaging in the commercial use, offer for sale or sale within the United States, of products that are the subject of Actavis' ANDA No. 207238 until the expiration of U.S. Patent No. 9,066,913.

Dated this _22nd_ day of May, 2017

_Noel L. Hillman_
Honorable Noel L. Hillman
United States District Court Judge

---

HORIZON PHARMA IRELAND        Civil No. 14-7992 (NLH/AMD)
LIMITED, et al.,

            Plaintiffs,        **FED. R. CIV. P. 52(a)1**
                               **OPINION**

      v.
                               <u>**FILED UNDER SEAL**</u>
ACTAVIS LABORATORIES, UT,
INC., et al.,

            Defendants.

---

<u>**APPEARANCES**</u>:

John E. Flaherty
Ravin R. Patel
Guillermo C. Artiles
McCARTER & ENGLISH LLP
Four Gateway Center
100 Mulberry St.
Newark, NJ  07102

Robert F. Green
Christopher T. Griffith
Caryn C. Borg-Breen
L. Scott Beall
Jessica M. Tyrus
Benjamin D. Witte
GREEN, GRIFFITH & BORG-BREEN LLP
NBC Tower, Suite 3100
455 North Cityfront Plaza Drive
Chicago, Illinois 60611

Dennis A. Bennett
GLOBAL PATENT GROUP, LLC
1005 North Warson Road, Suite 404
St. Louis, Missouri 63132
      On behalf of Plaintiffs

Liza M. Walsh
Christine I. Gannon

Katelyn O'Reilly
WALSH PIZZI O'REILLY FALANGA LLP
One Riverfront Plaza
1037 Raymond Blvd., Suite 600
Newark, New Jersey 07102

Ralph J. Gabric
Mark H. Remus
Laura A. Lydigsen
Joshua E. Ney, Ph.D.
Joshua H. James
Andrew S. McElligott
BRINKS GILSON & LIONE
455 North Cityfront Plaza Drive, Suite 3600
Chicago, Illinois 60611
        On behalf of Defendants

*"It is not that every physical, chemical, or biological observable needs to have a complicated cause.  But we would argue that in the complex dance of ingenuity that is modern science, in the gaining of reliable knowledge, one should beware of the inherent weaknesses of the beautiful human mind.  The most prominent shortcoming is not weak logic, but prejudice, preferring simple solutions.  Uncritical application of Ockham's Razor plays to that weakness.  What is worse, it dresses up that weakness in the pretense of logical erudition."*

Ockham's Razor and Chemistry[1]
*Roald Hoffmann, Vladimir I. Minkin, Barry K. Carpenter*


**HILLMAN**, District Judge

To be sure, Ockham's Razor[2] and the concept it encapsulates,

is not directly relevant to the chemical formulation at issue in

---

[1] HYLE – An International Journal for the Philosophy of Chemistry, Vol. 3 (1997), 3-28. Copyright © 1997 by Elsevier, Paris.

[2] *Ockham's razor*, Merriam Webster's Collegiate Dictionary (11th Ed. 2006).

this Hatch-Waxman case.  However, that concept – a preference for the known and for parsimonious explanations – and the observations of the philosopher-scientists who warn against oversimplification in assessing dynamic complex systems, does provide an interesting lens or paradigm by which one can address the relevant arguments of the parties in this case.

To the defendant and its expert, this is a simple case which largely involves the application of a few well-known and accepted general principles that when applied faithfully to a small set of defined variables readily explain how the improved patented chemical composition was predictably "optimized" from the patented earlier product.  The plaintiff's experts, on the other hand, describe a much more nuanced set of complex and interdependent circumstances in which the same defined variables and the principles applied to them predict little, both in theory and in practice, other than perhaps unpredictability itself.

The parties' positions thus represent a spectrum and this line with opposites at each end is legally significant because a chemical composition that springs from mere routine experimentation on a known composition is likely obvious and therefore not a protectable invention.  On the other hand, a product that overcomes unexpected results to combine in harmonious interplay previously known components in a unique and

beneficial way can be the inventive step the law protects.

This Court concludes, after hearing all the testimony and reviewing the exhibits accepted into evidence, that this case falls more toward the latter end of the spectrum. For that reason alone, defendant has failed to meet its high burden of overcoming the presumption of validity and establishing obviousness by the relevant legal standard.

A seven-day bench trial[3] was held involving Defendant Actavis Laboratories UT, Inc.'s infringement of claim 12 of Plaintiff Horizon's (Horizon Pharma Ireland Limited, HZNP

---

[3] The Court held oral argument on the parties' motions in limine on the morning of March 21, 2017. Trial was conducted in the afternoon of March 21, and then continued on March 22, 24, 27, 28, 29, and 30, 2017. Four witnesses testified at trial: Dr. Bozena Michniak-Kohn, Actavis's expert; Dr. Annette Bunge and Dr. Norman Weiner, Horizon's experts; and Dr. Edward Kisak, one of the patent's inventors. The parties also submitted fact testimony from Dr. Bradley Galer, Dr. John London, Dr. Jeffrey Sherman, Dr. Jagat Singh, Mr. Joseph Whalen, and Mr. Saleh Rifaat in the form of deposition designations. Post-trial submissions were filed by the parties on April 20, 2017. The 30-month stay of the FDA's approval of Actavis's ANDA expires on May 14, 2017. See In re Modafinil Antitrust Litigation, 837 F.3d 238, 243 (3d Cir. 2016) (citation omitted) ("If the brand manufacturer initiates a patent infringement suit, the FDA must withhold approval of the generic for at least 30 months while the parties litigate the validity or infringement of the patent; if the suit has concluded at the end of this 30-month period, then the FDA will follow the outcome of the litigation."); 21 U.S.C. § 355(j)(5)(B)(iii). The Court appreciates the professionalism and diligence shown by both sides in streamlining and expediting this proceeding without compromising the quality of their advocacy which was at all times helpful to this Court in understanding the law, concepts, and science at issue.

Limited and Horizon Pharma USA, Inc.) U.S. Patent No. 9,066,913 (the "'913 patent"). The '913 patent concerns PENNSAID® 2%, the first FDA-approved twice-daily topical diclofenac sodium formulation for the treatment of the pain of osteoarthritis ("OA") of the knees.[4] Actavis filed an Abbreviated New Drug Application No. 207238 ("ANDA") for its generic copy of PENNSAID® 2%, and contends that claim 12 of the '913 patent is not patentable because it is "obvious."[5] The Court issues this Opinion in accordance with Federal Rule of Civil Procedure 52(a)(1).[6]

## DISCUSSION

### A.   Development of the '913 patent

Human skin is made up of several layers. Progressing from the outermost layer inward, these layers include: the *stratum corneum*, the viable epidermis, the dermis, and the hypodermis or

---

[4] This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1338(a), 2201, 2202 and 35 U.S.C. § 271.

[5] Actavis stipulated to the infringement of claim 12 of the '913 patent if it is found valid.  (Docket No. 313.)

[6] This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a)(1).  Pierre v. Hess Oil Virgin Islands Corp., 624 F.2d 445, 450 (3d Cir. 1980) (holding that to be in compliance with Rule 52(a), findings of fact and conclusions of law do not need to be stated separately in a court's memorandum opinion); see also Ciolino v. Ameriquest Transp. Services, Inc., 751 F. Supp. 2d 776, 778 (D.N.J. 2010) (issuing an opinion which constituted the courts findings of fact and conclusions of law).

subcutaneous tissue.  The skin also includes various structures that traverse several layers of the skin, including hair shafts, sebaceous glands, and sweat glands.  The *stratum corneum* generally presents the greatest barrier to the passage of drugs through the skin.  When drugs are applied topically, they permeate the *stratum corneum* by diffusing through the skin cells, by traveling down hair follicles and sweat glands, or both.

Topically applied drugs diffuse into and through the skin as a result of a concentration gradient.  The concentration of the drug in the topical formulation is relatively high, compared to the concentration of the drug in the skin, and the concentration of drug decreases further in deeper layers of the skin.  This concentration gradient creates a "driving force," which pushes the drug from the formulation into and through the skin.

At higher concentrations of the drug in the topical formulation, the rate of permeation through the skin also tends to be higher.  Under Fick's First Law of Diffusion, a larger concentration of the drug in the topical formulation results in a larger concentration gradient, and leads to a greater permeation – or flux – rate of the drug through the skin.

When a topical formulation is applied to the skin, the amount of drug absorbed also depends on the volume of the

formulation that is applied.  When a larger volume is applied, a greater amount of drug generally is absorbed.  A thickened solution tends to increase the volume of the formulation on the skin because it will not run off the skin in the way that a liquid would.

Topical drug formulations commonly include some or all of the following components:  an active ingredient, a solvent, a penetration enhancer, a humectant, and a thickening agent. Solvents are liquids that dissolve the active ingredient in a topical formulation so that the active ingredient can be absorbed into the skin.  Penetration or permeation enhancers are compounds that enhance the absorption of the drug into and through the skin.  Penetration enhancers act by various mechanisms, including by fluidizing the *stratum corneum*, increasing the solubility of the drug in the skin, by carrying the drug into the skin, and by evaporating or penetrating the skin, leading to an increase in the concentration of drug in the formulation remaining on the skin, which increases the concentration gradient driving the drug from the formulation and across the skin barrier.  Humectants are non-volatile substances (i.e., substances that do not dry) which hold water onto the skin.  Thickening, or gelling, agents generally are polymers that are added to topical formulations to increase the viscosity of the formulations.

The development of what would become PENNSAID® 2% was performed in multiple phases.  The prior art, PENNSAID® 1.5%, approved by the FDA on November 4, 2009, was indicated for the treatment of symptomatic osteoarthritis of the knees, with the dosing regimen "40 drops four times a day."  PENNSAID® 1.5% is an unthickened liquid solution that has a viscosity similar to water.  This formulation has been in existence since 1986.[7]

The formulation of PENNSAID® 1.5% is as follows:

| Ingredient | PENNSAID® 1.5% |
|---|---|
| Diclofenac sodium (active ingredient) | 1.5% |
| Dimethyl sulfoxide ("DMSO") (penetration enhancer) | 45.5% |
| Ethanol (solvent/penetration enhancer) | 11.79% |
| Propylene glycol (solvent) | 11.2% |
| Glycerin (humectant) | 11.2% |
| Water (solvent) | To make 100% |

---

[7] Prior to receiving FDA approval in the United States, PENNSAID® 1.5% was approved in Canada and several European countries for the treatment of symptomatic osteoarthritis of the knees, and by the early 1990s, more than 8,000 prescriptions had been written for PENNSAID® 1.5% for local treatment of arthritic pain in Canada alone.  Before the FDA approved PENNSAID® 1.5%, the FDA had not approved of any other topical drug formulation containing dimethyl sulfoxide or "DMSO."

In 2005, the inventors of the '913 patent – Dr. Edward Kisak and Dr. Jagat Singh – were first asked by Nuvo Research Inc.[8] to make a thickened version of PENNSAID® 1.5%.  In this first phase of the project, the inventors endeavored to identify a suitable thickener that could be added to the PENNSAID® 1.5% formulation to form a clear gel with a viscosity ideally between 500 to 2000 centipoise ("cp").  That range is similar to maple syrup (under 500 cp), motor oil (1000 cp), hand lotion (1500 cp), or honey (2000 cp).  By way of comparison, PENNSAID® 1.5%, the unthickened liquid solution, had a viscosity of around 9 cp.

The inventors tried several thickeners, and found that the only thickeners that formed a clear and homogenous gel in PENNSAID® 1.5% were Carbopols.  The inventors also found that the addition of a certain Carbopol increased the flux; that is, more of the active ingredient – diclofenac sodium – permeated the skin.  According to Dr. Kisak, however, the Carbopol gels were also very touchy, at times did not swell properly, they clumped and had viscosities that would change over time.

_____

[8] Nuvo Research Inc. developed PENNSAID® 2% and licensed U.S. sales and marketing rights to Mallinckrodt Inc., which applied for and, in January 2014, obtained FDA approval to make, sell, promote and market PENNSAID® 2% for use in the treatment of the pain of osteoarthritis of the knees.  In October 2014, Horizon acquired the NDA for PENNSAID® 2%, and since January 2015, Horizon has been selling, promoting, distributing, and marketing PENNSAID® 2% in the United States.

Because of the increase in flux from the addition of Carbopol, Nuvo moved to a new goal for the project: developing a formulation that could be applied twice a day instead of the four times a day required by PENNSAID® 1.5%. Nuvo also made the decision to increase the concentration of the diclofenac sodium from 1.5% to 2%.

The inventors initially found that the increase in diclofenac sodium concentration from 1.5% to 2% had a destabilizing effect on the Carbopol gel formulations, but the second phase of development concluded with a formulation which contained 2% diclofenac sodium and 1.15% Carbopol 971. According to Dr. Kisak, there were still concerns that the Carbopol gel would not make a viable commercial product because of chemical impurity issues, long-term physical stability concerns, its tackiness, and its inability to dry well.

During phase three, the inventors varied the concentrations of the excipients propylene glycol, glycerin, ethanol, and water, and various thickeners were tested. The inventors varied propylene glycol from 0 to 11.2%, ethanol from 11.79 to 37%, glycerin from 0 to 11.2%, and water from 7.5 to 40%, and looked at a number of different thickening agents. During this phase, all of the different Carbopol gels failed due to various issues, such as a failure to gel entirely, separation, formulations which did not flow properly, physical stability, grittiness, as

well as the accelerated production of Impurity A, an impurity associated with diclofenac sodium.

Turning away from Carbopols, and after testing several cellulose gels that failed, the inventors were able to make stable gels with hydroxypropyl cellulose ("HPC") as the thickening agent. The inventors found, however, that if the ethanol concentration was reduced below approximately 25%, the gels would became hazy and prone to precipitation after prolonged storage.

During phase four, the inventors varied the ethanol concentration and cellulose thickener concentration to determine the impact on flux. The inventors determined that if they varied the ethanol concentrations from 21.1% to 29%, it did not affect statistically the flux. This formulation became the PENNSAID® 2% product claimed in claim 12 of '913 patent.[9]

_____

[9] The '913 patent arises from U.S. Patent Application No. 14/497,096 ("the '096 application"), which was filed on September 25, 2014. The '913 patent is a continuation of U.S. Patent Application 14/025,781, filed on September 12, 2013, now the '809 patent, which is a continuation of U.S. Patent Application No. 13/564,688, filed August 1, 2012, now the '613 patent, which is a continuation of U.S. Patent Application 12/134,121, filed June 5, 2008, now the '838 patent, which is a continuation of International Application No. PCT/US2007/081674, filed October 17, 2007. The '913 patent also claims priority to U.S. Provisional Patent Application No. 60/829,756 ("'756 provisional application"), filed October 17, 2006.

Claim 12 of the '913 patent depends from claim 9, which depends from claim 8, which depends from claim 1, and claim 12 thus includes the following limitations:

> Claim 1:  A topical formulation comprising:
> diclofenac sodium present at 2% w/w;
> DMSO present at about 40 to about 50% w/w;
> ethanol present at 23-29% w/w;
> propylene glycol present at 10-12% w/w;
> hydroxypropyl cellulose; and
> water to make 100% w/w,
> wherein the formulation has a viscosity of 500-5000 centipoise.
>
> Claim 8:  The topical formulation of claim 1, wherein the DMSO is present at 45.5% w/w.
>
> Claim 9:  The topical formulation of claim 8, wherein the hydroxypropyl cellulose is present at 2.5% w/w.
>
> Claim 12:  A method for treating pain due to osteoarthritis of a knee of a patient in need thereof, said method comprising:
> administering to the knee a topical formulation of claim 9, wherein the administration of the formulation is twice daily.

The differences between PENNSAID® 1.5% and PENNSAID® 2% are:

| Ingredient | Prior Art PENNSAID® 1.5% | Formulation of '913 Patent, Claim 12 |
|---|---|---|
| Diclofenac sodium | 1.5% | 2% |
| Dimethyl sulfoxide ("DMSO") | 45.5% | 45.5% |
| Ethanol | 11.79% | 23-29% |
| Propylene glycol | 11.2% | 10-12% |
| Hydroxypropyl cellulose ("HPC") | – | 2.5% |
| Glycerin | 11.2% | Not required, but not excluded |
| Water | To make 100% | To make 100% |

**B.    Analysis of Actavis's contention that claim 12 of the '913 patent is obvious**

Horizon's '913 patent is presumed valid, including claim 12 independently.  35 U.S.C. § 282(a).  Actavis contends that the patent never should have issued because the claimed invention was obvious at the time – October 17, 2006 - and, thus, one of the conditions of patentability was lacking.[10]  See 35 U.S.C. § 103 (providing that a patent claim is invalid as obvious where the "differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a person having ordinary skill in the art to which the claimed invention pertains").  The burden of establishing invalidity of claim 12 in the '913 patent rests on Actavis.  Id.  Actavis must meet its burden by clear and convincing evidence.  Microsoft Corp. v. I4I Ltd. Partnership, 564 U.S. 91, 97 (2011).

Four factors guide the obviousness inquiry under § 103: (1) "the scope and content of the prior art"; (2) "differences between the prior art and the claims at issue"; (3) "the level of ordinary skill in the pertinent art"; and (4) "[s]uch secondary considerations as commercial success, long felt but

_____

[10] Based on the October 17, 2006 filing date of the '756 provisional application, the parties and their experts have assumed that the invention date for the '913 patent is October 17, 2006.

unsolved needs, [and] failure of others." KSR Int'l Co. v.
Teleflex Inc., 550 U.S. 398, 406 (2007) (quoting Graham v. John
Deere Co., 383 U.S. 1, 17–18 (1966)).

"A prima facie case of obviousness typically exists when
the ranges of a claimed composition overlap the ranges disclosed
in the prior art," because the "overlap itself provides
sufficient motivation to optimize the ranges." In re Applied
Materials, Inc., 692 F.3d 1289, 1295 (Fed. Cir. 2012) (citations
omitted). "[W]here the general conditions of a claim are
disclosed in the prior art, it is not inventive to discover the
optimum or workable ranges by routine experimentation." Id.
(citation omitted). A prima facie case of obviousness may be
rebutted, however, "where the results of optimizing a variable,
which was known to be result effective, are unexpectedly good."
Id. (citing In re Boesch, 617 F.2d 272, 276 (Cust. & Pat. App.
1980)); see also In re Urbanski, 809 F.3d 1237, 1243 (Fed. Cir.
2016) (citing Applied Materials, 692 F.3d at 1297, 1298)
(explaining that optimizing a variable is not obvious when it
produces an unexpected result as compared to prior art, or when
the variables interacted in an unpredictable or unexpected way).

Obviousness is a question of law based on underlying
factual findings, including what a reference teaches, the
existence of a reason to combine references, and whether the

prior art teaches away from the claimed invention.  Urbanski,
809 F.3d at 1241.

Actavis argues that the changes made to PENNSAID® 1.5%
which resulted in the PENNSAID® 2% formulation would have been
obvious to a person having ordinary skill in the art ("POSA")[11]
based upon the prior art available to the POSA as of October 17,
2006.  More specifically, Actavis contends:

- PENNSAID® 1.5% was known to be safe and effective for
  treating osteoarthritis of the knee, but it was known to
  have several drawbacks, such as requiring frequent
  application and being vulnerable to run-off;
- a person of ordinary skill would have been motivated to
  modify the PENNSAID® 1.5% product to address these
  drawbacks by (1) increasing the amount of drug absorbed
  per application in order to reduce the application
  frequency and (2) thickening the PENNSAID® 1.5%

_____

[11] Horizon's POSA would have had a bachelor's degree in pharmacy,
chemistry, or a related discipline; an advanced degree in a
related field; a few years of experience in the development of
topical formulations; and access to a clinician experienced in
treating patients with topical formulations; or a clinician with
access to such a formulator.  Actavis's POSA would have had an
advanced degree, either a master's or a Ph.D., in pharmaceutics,
pharmacology, or a related discipline, and would have had at
least three years of experience in his or her field.  The
parties agree that using either POSA definition does not change
their experts' opinions.

formulation and reducing its drying time in order to

prevent run-off and improve the ease of application;

- a person of ordinary skill would have had a reasonable

  expectation that these modifications would address the

  known drawbacks of PENNSAID® 1.5%;

- PENNSAID® 1.5% included all of the ingredients required

  by claim 12 of the '913 patent except for a thickener;

- PENNSAID® 1.5% further included the claimed amounts of

  DMSO (45.5% w/w), propylene glycol (11.2% w/w), and water

  (to make 100% w/w); and

- the remaining limitations were disclosed in the prior

  art, such as Kasai, which disclosed ranges encompassing

  the claimed concentrations of diclofenac sodium (2% w/w),

  ethanol (23-29% w/w), and HPC (2.5% w/w), and Dow and

  Kamishita III, which disclosed the claimed viscosity

  (500-5000 centipoise).


Actavis argues that the three changes – and the two

ingredients left unchanged – were obvious optimizations of

result-effective variables that produced a predictable result,

particularly as to the formulation's absorption, thickness, and

drying time.  Actavis also argues that it would have been

obvious to administer the claimed formulation in accordance with

the method of claim 12, as Betlach discloses the claimed

application frequency of twice-a-day dosing, and a POSA would have reasonably expected that the claimed formulation would be effective for treating pain due to osteoarthritis of the knee when administered twice daily because each of the modifications leading from the PENNSAID® 1.5% formulation to the claimed formulation would have been reasonably expected to increase the absorption of diclofenac sodium at the site of action.

Unsurprisingly, Horizon argues that PENNSAID® 2% is not obvious because changes made to PENNSAID® 1.5% were not routine optimizations, and the results of the various changes could not be predicted based on prior art. Horizon contends:

- The effect of using multiple penetration enhancers is difficult to predict, as they can be additive or can compete with one another;
- numerous prior art publications demonstrate that the development of topical pharmaceutical formulations as of October 2006 was complex and unpredictable, because a complex system is one in which interactions between components including the drug and the vehicle can occur;
- a POSA as of October 2006 would have also known that PENNSAID® 1.5% consists of five different vehicle components (ethanol, glycerin, propylene glycol, water, DMSO), some of which can evaporate, all of which can

potentially interact with each other and with skin, and
all of which could be absorbed into the skin, and thus
the composition is constantly changing upon application
as the components evaporate and absorb at different
rates;

- a POSA would have understood that the differences between
claim 12 of the '913 patent and the prior art PENNSAID®
1.5% include: (1) the concentration of diclofenac sodium,
(2) the concentration of ethanol, (3) the presence of
glycerin, (4) the presence of a thickening agent, (5) the
viscosity requirement, and (6) the method of
administration, i.e., a reduction in dosing frequency to
twice daily;

- but in order to arrive at the formulation recited in
claim 12 of the '913 patent, a POSA would have had to (1)
increase the diclofenac concentration from 1.5% to
exactly 2%, (2) increase the concentration of ethanol
from 11% to exactly the range of 23-29%, (3) add a
thickening agent, (4) choose the thickening agent to be
HPC, (5) identify the concentration of HPC to be exactly
2.5%, (6) select a viscosity range of between 500 and
5000 cps, and then (7) decide not to change the
concentrations of DMSO or propylene glycol, but instead
(8) remove or reduce glycerin and/or water to account for

the increases in diclofenac, ethanol and thickening agent
concentrations and still total 100%, and the POSA would
also have had to change the method of administration from
3-4 times per day to twice a day; and

- a POSA in October 2006 would have understood that when
you increase viscosity of a topical formulation, it is
harder for a drug molecule to move through the
formulation and into the skin, and this can have a
detrimental effect on flux.

The Court has thoroughly considered all of the evidence
presented at trial and the parties' post-trial submissions.  The
Court accepts Actavis's position that prior art would have
informed a POSA in October 17, 2006 of the various components to
change in PENNSAID® 1.5% to improve upon that formulation's
drawbacks, such as increasing the amount of drug absorbed per
application in order to reduce the application frequency, making
the formulation thicker to prevent run-off and improve
absorption, and utilize penetration enhancers to reduce drying
time and increase flux.  The Court also accepts Actavis's
position that a POSA would know from prior art, or even the
POSA's general experience with formulating drugs, that: (1)
glycerin hinders drying time, (2) ethanol reduces drying time,
(3) ethanol can serve as a penetration enhancer, (4) HPC was an

attractive thickener because it had been used in other diclofenac sodium formulations and formulations with other ingredients also found in PENNSAID® 1.5%, (5) an increase in concentration of diclofenac sodium can increase absorption, and (6) other diclofenac sodium formulations had been successfully applied less than four times a day resulting in the same daily therapeutic effect.  The Court further accepts Actavis's position that prior art would have informed a POSA of compatible thickening agents and the suitable ranges for diclofenac sodium, ethanol, and HPC.  All of these things flow logically from the prior art.

Even accepting all of the above, however, the Court finds that claim 12 in the '913 patent was not a result of routine optimization of PENNSAID® 1.5%.  This is because general principles and ranges of permissible concentrations would not have predicted the exact formulation and dosing frequency that resulted in PENNSAID® 2%.  A demonstrative used by Actavis's expert, Dr. Bozena Michniak-Kohn, illustrates the Court's conclusion.

Dr. Michniak-Kohn analogized the formulation of PENNSAID® 2% to a stereo receiver. [12]  A typical, more vintage-style, stereo receiver has dials to adjust the bass, midrange, treble,

_____

[12] "AV receiver," Wikipedia, https://en.wikipedia.org/wiki/AV_receiver (last visited May 12, 2017).

balance, and volume of the sound to suit a listener's

preferences and achieve the best acoustics for a particular

piece of music.  Dr. Michniak-Kohn testified that drug

formulation is like adjusting a stereo receiver, and the

formulation of PENNSAID® 2% from the PENNSAID® 1.5% chassis was

simply like turning the knobs to adjust the bass and treble to

achieve the desired result, in this case the delivery of the

active agreement to the desired spot under the skin and at the

knee at a reduced dosing regimen.  Dr. Michniak-Kohn created a

graphic to visually explain her analogy:



(Docket No. 317-1 at 18.)

Dr. Michniak-Kohn explained that a POSA would have used her

own knowledge about drug formulations and the available

literature to perform a routine optimization of PENNSAID® 1.5%

by turning up the dial for a little more diclofenac sodium,

turning up the dial for ethanol by double, turning off the dial

for glycerin, turning on the dial for HPC, leaving the dials for

DMSO and propylene glycol at their current setting, and turning the dial for water to sufficiently fill in the remainder. The credible evidence in this case demonstrates, however, that Dr. Michniak-Kohn's analogy fails for a least three reasons.

The first problem with defendant's analogy is the failure to differentiate between a system that allows independent change of one variable with little or no predicable or material effect on other variables and a system where the change to one variable must result in changes to the others. The latter is certainly more complex that the former. This not a case where a researcher could be assured that they had the ability to merely adjust, say the treble, without the need to adjust at least one or perhaps other variables as well. In the context of this case a drug formulator might be inspired by general knowledge and prior art to adjust one variable in the drug's composition but could do so only in a complex system in which the variables interact with each other in unpredictable ways.

More specifically, Dr. Michniak-Kohn's "Optimizer 300" fails to show that an adjustment to one PENNSAID® 1.5% ingredient does not automatically predict the impact, or need for adjustment, of the other ingredients. A formulation must total 100% w/w. Even a simple change of adding an additional 0.5% w/w of diclofenac sodium to the PENNSAID® 1.5% chassis would necessitate the reduction of another ingredient by 0.5%

w/w.  What effect that change, or any other required change has on the desired effect is left unaddressed.

The goal of the invention here was to improve PENNSAID® 1.5% by making it a gel and reducing application frequency.  To make a gel, the inventors needed to add a thickening agent.  The addition of that ingredient, which was not in PENNSAID® 1.5%, required the reduction of another ingredient to maintain the 100% w/w.  To increase flux so that more drug was absorbed by the skin, thereby allowing the product to only be applied twice a day, the inventors needed to increase the amount of a penetration enhancer.  Again, another ingredient would need to be reduced to equal 100% w/w for the entire formulation.

The testimony of Plaintiff's expert, Dr. Annette Bunge, highlights this defect in Defendant's position in a way the Court finds convincing:

> Q.   So now what's the difference between a simple solution and a complex one?
>
> A.   . . . So, interactions can occur between the components of the formulation, so the drug and the vehicle can interact, that means they are changing the behavior of each other or at least the vehicle might be changing the behavior of the drug, the drug might change the behavior of the vehicle.  It also means that the components of the formulation, the drug and the vehicle, are not interacting in any way with the skin.
>
> Now that we have these interactions, the state of the science is that we are not able to, in a quantitative or even really semi quantitative basis, represent what their effect would be, and so we are not able any longer to

predict dermal absorption, drug absorption or the drug
flux.

Q.    So, generally speaking, does adding more components to
a topical formulation make it more complex?

A.    Yes, it does.  And so if we imagine a vehicle that
contains five components, those components can all interact
with each other or at least they may.  Quite often one or
more of them are volatile and will evaporate.  Their
evaporation rates are different.  And in addition, all of
the components have the possibility of absorbing into and
through the skin. And so the concentration of each of the
excipients in the vehicle is changing over time, because
some of them are evaporating, some of them are absorbing,
all of this is happening at a different rate.  And that
changes the interactions between all of these.  So, this is
an additional level of complexity that makes the system
unpredictable in terms of the effect of making formulation
changes to drug absorption, to predicting what drug
absorption would be.

Q.    And so then is it fair to say complex formulations
don't have the same level of predictability that simple
solutions do?

A.    Yes.

(March 27, 2017 – Direct of Dr. Bunge, Page 742 line 11 to Page

743 line 20, Docket No. 336 at 131-132.)

Simply put, Dr. Bunge paints a much more accurate picture

of the dynamic and complex formulation at issue in this case and

the challenges in predicting the relative ratios of the various

components a POSA would face in the effort to reach the desired

goal.  Dr. Michniak-Kohn's analysis, while technically correct

in the sense of the general and accepted concepts it begins

with, fails to address, much less explain, the interrelatedness

of the relevant variables.

The Defendant's stereo receiver analogy also fails in fully assessing the unpredictability that flows from applying the formulation, itself complex, in a similarly complex environment, in this case the vertically and horizontally multilayered organ of human skin, and adjacent areas of tissue and bone. Once again, the Defendant's "Optimizer 300" analogy begins with a truism but descends into a tangled web of more questions than answers.

For example, it is true that if one wants to increase the amount of bass frequencies one hears through the "Optimizer 300," increasing the level on the bass knob should have the desired effect. However, that signal boost must traverse the pre-amplifier into a power amplifier that transmits an analog electrical signal over strands of wire which, when attached to a paper diaphragm or cone, propagates a sound wave the rough equivalent of the original recorded sound. There is, in this process, many a slip between the cup and the lip.

The bass boost must not exceed the dynamic range of the power amplifier, the wires must be intact and not crimped, the connections secure, and the paper speaker must be efficient enough to physically move rapidly and accurately enough to reproduce the intended frequency. Any failure along the way

will distort or clip the final product.[13]  Moreover, one setting

for a piece of music in one room may not be the proper setting

in a different room, depending on the room acoustics and other

variables.

Once again, Dr. Bunge's ultimate opinion of non-obviousness

more fully appreciates the lack of predictability of whether

twice a day dosing could be achieved through the application of

PENNSAID® 2% gel on and through a dense, at times impermeable,

tangle of skin, tissue and bone:

> Q.   Do you recall when Dr. Michniak-Kohn referred to this
> animation during her direct testimony?
>
> A.   Yes, I do.
>
> Q.   And what is it that this animation illustrates?
>
> A.   So, she was illustrating the effect of the
> concentration driving force, so that the idea that the drug
> is present in the formulation at a high concentration, and
> that drives the drug into and through the skin and the body
> where the concentration is low.  And she used this to
> illustrate the effect of a theoretical concept that helps
> us understand drug delivery into and through skin called
> Fick's law.
>
>                    *    *    *
>
> Q.   So, in your opinion, what is Fick's law?
>
> A.   So, Fick's law is sort of illustrated -- is described
> just in words at the bottom of this slide.  I want to make
> one correction.  The "area" term should not be there.  It's
> already been incorporated into the flux.  The flux is the

---

[13] "AV receiver", Wikipedia, https://en.wikipedia.org/wiki/
AV_receiver (last visited May 12, 2017)(factors to be considered
in rating amplifier output include distortion, headroom, speaker
efficiency, among other things).

amount of drug per area that goes through the skin per time.  So, it's just already incorporated.  So, on the right-hand side of the equal sign, there should be two terms, the permeability coefficient and the concentration.

Now, Dr. Michniak-Kohn spent a lot of time talking about concentration.  She didn't talk about the permeability coefficient very much except to say the units were centimeters per hour.  But the permeability coefficient is the parameter that relates whatever the drug concentration is in the formulation to what the drug absorption would be.

Q.   So, would a person of ordinary skill in the art need to consider the effect of formulation changes on this permeability coefficient?

A.   Yes, they would, because formulation changes can change that permeability coefficient.  In fact, they frequently do change it, except for very simple systems.  In simple systems, then sometimes we know or at least it would be reasonably expected to be constant.

Q.   So, if you increase drug concentration, will there be an effect on permeability coefficient?

A.   In non-simple solutions, there can be, yes.  And so that's -- and if we change formulations completely, so we go from a formulation, even a simple formulation A where we know it should be constant, to a different simple formulation where we know the permeability coefficient is also constant, the second simple solution will not usually have the same permeability coefficient as the first.  So, two different simple solutions that have the same concentration almost always do not have the same drug absorption.

Q.   And so in practice, if you're a person of ordinary skill in the art who is contemplating changes to a topical formulation, can you use Fick's law to help you predict what the changes to that formulation may be on drug absorption?

A.   You can only use it if you have -- if you could predict the permeability coefficient you would have or how it might change with the formulation, and except for these very simple ones, simple solutions, that would not be possible.

Q.   Now, during his Honor's questioning of Dr. Michniak-Kohn last week, he asked a question about whether there existed simple guidelines.  Are there simple guidelines that assist a person of ordinary skill in the art in predicting what the changes to a topical formulation would have on the permeability coefficient?

A.   So, for simple solutions, the guidelines would be that the permeability coefficient could be reasonably expected to be constant.  If you had some data on what the drug absorption was for a given concentration, you could use that constant value that related the data you have to how the drug absorption would then change in further concentration changes.

But if you have a complex formulation where the permeability coefficient will depend on all those interactions, so the interactions of excipient with the drug, the drug with the excipient, either one with the skin, they are changing the permeability coefficient, and so the guidelines there that are very simple ideas like some enhancers are known to affect certain elements of the skin, but those guidelines don't give us any information about what that value of that permeability coefficient would be, and without that kind of information, we can't predict what the relationship will be between drug concentration and drug absorption.

Q.   So, do the simple guidelines even give you any information about what the direction of change would be in the permeability coefficient in a complex topical pharmaceutical formulation?

A.   No, they do not.

(March 27, 2017 – Direct of Dr. Bunge, Page 749 line 16 to Page 750 line 1; Page 750 line 10 to Page 753 line 4, Docket No. 336 at 138-142.)

The import of this testimony is clear and is just one example of how Dr. Michniak-Kohn's reliance on uncontroverted general principles oversimplifies the process that resulted in

the claimed invention. Both Dr. Michniak-Kohn and Dr. Bunge agree, as they must, that Fick's Law is just that, a time-tested, accepted, even venerated hornbook scientific principle that explains flux dynamics in simple solutions. But it is Dr. Bunge's testimony that establishes that it might not always work as predicted when a complex topical formulation attempts to drive an active ingredient across human skin, a surface Nature intended to be a formidable barrier against intruders.[14] Stated differently, Fick's Law is obvious. What that law predicts might actually happen in the actual factual scenario of this case is not.

---

[14] There are other examples in the record concerning the difficulties in achieving a therapeutic result for internal pain by use of a topical formulation:

> Q.   All right.  So, generally speaking, from topical formulations, about how much of the drug that's in the topical formulation actually crosses that skin barrier, the stratum corneum?

> A.   Topical formulations are notoriously ineffective at delivering drug through the skin.  It's quite common for only about 5 percent of the drug that's applied to the skin to actually go through the skin.

> Q.   So, then what happens to the remainder of the drug from the topical formulation, the other 95 percent?

> A.   It's left on top of the skin where it will either be washed off or fall off.

(March 27, 2017 – Direct of Dr. Bunge, Page 773 line 29 to Page 774 at 25, Docket No. 336 at 117-118.)

Finally, there is insufficient record evidence to support the Defendant's legal argument that the three changes to the PENNSAID® 1.5% formulation – and the two ingredients left unchanged – either in isolation or in combination were obvious optimizations of so-called result-effective variables that would produce a predictable result, particularly as to the formulation's absorption, thickness, and drying time.  In the terms of Defendant's analogy, the tweaking of a formulation's "knobs" in this case did not result in the routine optimization of result-effective variables.  Although individually adjusting one ingredient at a time may provide a predictable result, the combination of adjustments needed to change PENNSAID® 1.5% into PENNSAID® 2% was not predictable from the prior art.

One would search in vain for any reference in Dr. Michniak-Kohn's testimony to "result-effective variables."  This is, of course, because this is a legal principle not a scientific one, but her opinions when juxtaposed with the Plaintiff's experts' testimony do not support that conclusion.  Putting aside that there is ample record evidence that contradicts the result she predicts for individual variables from the prior art (for example, we have noted on another point regarding flux, that the prior art does not predict without contradiction that drug

concentration necessarily equates with increased permeation),[15]
it is equally true that nowhere in the prior art, either
singularly or in the cherry-picked manner of her discussion of
the prior art for the noted variables, would a POSA find the
schematic or roadmap to a diclofenac gel effective at two doses
a day.

Dr. Bunge's testimony succinctly makes this point:

Q. I want you to just follow with me from 50,000 feet,
and then I'm going to ask you a question at the end that
will allow to you elaborate a little bit on some of this.

A. Okay. So, [drug] concentration could cause an
increase [in flux], yes.

Q. Right. And a person of ordinary skill in the art
would know that ethanol was a known penetration enhancer,
yes? Could be a penetration enhancer?

---

[15] Another example is the contention that increased ethanol
enhances penetration. Again the record evidence establishes
that the prior art would not predict this as a given:

A. Yeah, so, what we've shown is that the prior art
shows, for example, ethanol does not always increase
absorption. It depends on what the other components are in
the formulation.

Q. All right. Okay.

A. And ethanol, if we're adding it to dry faster, we have
by design designed it so that the ethanol isn't there very
long. So, the enhancement, by at least a lot of the
mechanisms that are used to say it enhances, it has to be
present, and so its effect would have to be very fast over
a short time. And the difference in how effective it can
be.

(March 28, 2017 – The Court's questioning of Dr. Bunge, Page 908
line 6 to line 16, Docket No. 337 at 48.)

A.   Could be.  There's certainly --

                    *     *     *

Q.   Okay.  And the person of ordinary skill in the art
prior to the issuance of the patent would know that HPC had
been used as a thickener in DMSO-containing formulations to
form a gel?

A.   Yes.

Q.   And a person of ordinary skill in the art would know
that glycerine was a humectant, and if your goal was to
reduce drying time, the elimination of glycerine could
enhance drying time?

A.   Yes.

Q.   Yes.  So, taking all of those things together, that an
increase in concentration could result in lower dosing,
that ethanol could be a penetration enhancer, that HPC is
likely to be an effective thickening agent, and the
elimination of glycerine would increase drying time, why
would a person of ordinary skill in the art not add two
plus two plus two plus two plus two, whatever the numbers
are, and come up with eight or 10, whatever it is?

A.   Well, first of all, the prior art demonstrates
unpredictability of formulation changes, even small ones,
on the drug absorption, and in this case you have to have
enough additional drug absorption sustained over twice as
long in order to achieve the twice daily dosing.  That's
where -- so, already it's unpredictable.  Many of these
things might help, not all necessarily, but you have to
have a reasonable expectation of succeeding to make it all
the way to twice daily dosing.  That's the high bar.

                    *     *     *

So, reaching enough additional drug absorption is
difficult, and to get from four-times-a-day dosing to
twice-a-day dosing with a reasonable expectation of
success, a person of ordinary skill, understanding the
unpredictability presented in the prior art about making
such formulation changes in formulations of this
complexity, would give them considerable pause about
whether they could achieve that.

They would have -- I don't -- my opinion is they would not
have a reasonable expectation of success.

(March 28, 2017 – The Court's questioning of Dr. Bunge, Page 906

line 2 to line 9; Page 906 line 12 to Page 907 line 13; Page 908

line 17 to line 25, Docket No. 337 at 46-48.)

Even if the range of values for a particular variable was

set out in the prior art and even if the combination of

variables was itself predicted, the result will still not be

obvious if the variables interacted in an unpredictable or

unexpected way.  KSR Int'l Co. v. Teleflex Inc., 550 U.S. 398,

421 (2007); In re Applied Materials, 692 F.3d 1289, 1298 (Fed.

Cir. 2012).  Dr. Bunge's testimony convincingly establishes the

unpredicted and unexpected results obtained from the changes

made to the original PENNSAID® 1.5% formulation.

Although the parties debate the applicability of other

authority in analyzing this point of law,[16] the Court's own

research reveals a case more worthy of comparison.  In Pfizer

Inc. v. Mylan Pharmaceuticals Inc., 71 F. Supp. 3d 458, 468-69

(D. Del. 2014), aff'd 628 F. App'x 764 (Fed. Cir. 2016), former

Chief Judge Sleet was confronted with a similar set of

contrasting arguments.  The science is not relevant here but

Judge Sleet's mode of contrasting these two competing legal

---

[16] Auxilium Pharmaceuticals, Inc. v. Watson Laboratories, Inc.,
2014 WL 9859224, at *1 (D.N.J. 2014).

principles is:

> Mylan argues that the asserted claims are obvious for two
> reasons: (1) a nearly identical analog of sunitinib was
> disclosed [in the prior art]; and (2) the lead compounds
> available as of the priority date would have motivated one
> skilled in the art to derive the claimed sunitinib malate.
> The court addresses each of these arguments in turn.
>
> Mylan argues . . . [the prior art] discloses approximately
> 1200 possible combinations . . . and instructs that each of
> the combinations will work, and therefore the "routine"
> steps of going from dimethyl sunitinib to sunitinib and
> finally to sunitinib malate were obvious . . . . Mylan
> relies on Merck & Co. v. Biocraft Laboratories, Inc. for
> this proposition. 874 F.2d 804 (Fed. Cir. 1989). In Merck,
> the Federal Circuit distinguished between compounds that
> are merely "obvious to try"—which are not barred by § 103—
> versus compounds with an expectation of success, i.e.,
> compounds that will work for their intended purpose. Id. at
> 807. When a prior art reference lists a number of
> combinations, all of which should achieve the desired
> result, "routine" alterations or optimization will not
> preclude a finding of obviousness. Id. at 809.

Pfizer Inc., 71 F. Supp. 3d at 468.

After setting out the defendant's arguments, Judge Sleet

rejects them finding, as this Court does here, that there was

more that met the eye:

> The court finds, however, that Mylan's reliance on Merck
> goes too far. In Merck, the prior art reference disclosed
> individual diuretic agents that could be co-administered to
> achieve the desired properties. Id. at 807. The Federal
> Circuit found the patent-in-suit obvious in light of the
> prior art reference because the patentee **had merely**
> **followed the instructions and optimized the dosage levels.**
> Id. at 808-09. Similarly, in Mylan's other cited case, the
> claimed compound was simply a salt form of one of the
> compounds disclosed in the prior art, a step which was in
> fact suggested by the prior art reference. See Pfizer, Inc.
> v. Apotex, Inc., 480 F.3d 1348, 1367 (Fed. Cir. 2007)
> ("[T]he prior art provided not only the means of creating

acid addition salts but also predicted the results, which
Pfizer merely had to verify through routine testing.")

The court is not convinced that the steps needed to go from
dimethyl sunitinib ultimately to sunitinib malate
constituted "routine optimization" on par with that in
Merck or Pfizer. (D.I. 152 at 27-29.) Although Mylan states
matter-of-factly that "the optimization of dimethyl to
diethyl is even more routine and therefore obvious" than
the steps taken in Merck and Pfizer, those cases **involved
little more than following clearly delineated steps
outlined by the prior art.** (Id. at 28.) Critical to the
Federal Circuit's decision in Merck was the fact that
"success [was] not dependent upon random variation of
numerous parameters." Merck, 874 F.2d at 807. The court
finds that the process of going from . . . . [the prior art
ultimately to the claimed compound] . . . . **would have
required significant guesswork and variation of parameters
to achieve the end result. The [prior art] did not
indicate that these steps would yield better [results], nor
is the court convinced that the one skilled in the art
would have found these "optimization" steps obvious without
some data to support it. . . . [G]iven the sheer volume of
possible combinations and the additional subsequent
chemical alterations necessary to arrive at the claimed
compound**, the court cannot say that one skilled in the art
would have had a reason to [the prior art] as Mylan
suggests. Thus, the asserted claims are not obvious in
light of the [prior art].

Id. at 469 (emphasis added).

The analysis here is the same. Defendant's evidence does

not show that the prior art showed "clearly delineated steps"

that if taken and merely tweaked would achieve the desired

result. Rather, as in Judge Sleet's Pfizer case, at best, a

POSA would have been led to a wide range of possible penetration

enhancers, humectants, thickening agents, and other components,

each with strengths and weaknesses. Even then only broad ranges

were disclosed and without any guidance on how to choose within

a range. All in the context of not knowing how choosing one component and at what concentration would compel a change to another component and, even if it stayed, what concentration would allow it to work harmoniously with the other variables. This is not routine optimization of a known formula proven in the prior art to achieve a particular result. As Dr. Kisak's testimony demonstrated, it was more akin to a crap shoot.

This Court must be vigilant in insuring that patent owners do not extend impermissibly the patent monopoly by the clever masking of routine and obvious improvements as something new and inventive. But it is equally true that the clarity of hindsight should not be used to deny an inventor the rewards of what the above-cited Dr. Hoffman, a Nobel laureate in Chemistry, has called the "complex dance of ingenuity." The weight of the record evidence – the phased history of the effort to improve PENNSAID® 1.5% to a gel of decreased dosage frequency – and the expert opinions proffered by the Plaintiff of the daunting hurdles overcome through experimentation satisfy this Court that the manner and method of getting there would not have been obvious to the relevant POSA and reflects a protectable step forward.

In sum, the Court must determine whether Actavis has shown through clear and convincing evidence that claim 12 of the '913 patent would have been obvious to a POSA as of October 17,

2006.[17]  That changes are made to a complex formulation does not

necessarily mean that such a formulation will never be deemed

obvious simply because it is complex.  But, "[f]ocusing on the

obviousness of substitutions and differences, instead of on the

invention as a whole, is a legally improper way to simplify the

---

[17] Because the weight of the evidence discussed above supports
the finding that claim 12 of the '913 patent is not obvious, the
Court does not need to consider the proceedings before the U.S.
Patent and Trademark Office ("PTO"), other than to note that if
the PTO had considered the prior art Actavis has presented here,
Actavis would "ha[ve] the added burden of overcoming the
deference that is due to a qualified government agency presumed
to have properly done its job, which includes one or more
examiners who are assumed to have some expertise in interpreting
the references and to be familiar from their work with the level
of skill in the art and whose duty it is to issue only valid
patents." Shire LLC v. Amneal Pharmaceuticals, LLC, 802 F.3d
1301, 1307 (Fed. Cir. 2015) (citation omitted).  Actavis would
not have that extra burden, however, if the PTO was not provided
with prior art relied up by Actavis.  The Court also does not
need to discuss whether Actavis's ANDA, which copies claim 12 of
the '913 patent, is evidence of non-obviousness. Cf. Bayer
Healthcare Pharmaceuticals, Inc. v. Watson Pharmaceuticals,
Inc., 713 F.3d 1369, 1377 (Fed. Cir. 2013) (providing that
"evidence of copying in the ANDA context is not probative of
nonobviousness because a showing of bioequivalence is required
for FDA approval"); Ortho-McNeil Pharmaceutical, Inc. v. Mylan
Laboratories, Inc., 520 F.3d 1358, 1365 (Fed. Cir. 2008)
(explaining that evidence of copying is a respected source of
objective evidence of nonobviousness).  Finally, the Court does
not need to consider the secondary consideration of a "long-
felt" but "unmet need." See AstraZeneca LP v. Breath Ltd., 88
F. Supp. 3d 326, 387 (D.N.J. 2015) (quoting Perfect Web Techs.,
Inc. v. InfoUSA, Inc., 587 F.3d 1324, 1332 (Fed. Cir. 2009)
("'Evidence that an invention satisfied a long-felt and unmet
need that existed on the patent's filing date is a secondary
consideration of nonobviousness.'")) (citing B.F. Goodrich Co.
v. Aircraft Braking Sys. Corp., 72 F.3d 1577, 1583 (Fed. Cir.
1996) ("If prior art products were effective for the purpose of
the claimed invention, there is no long-felt need.")).

often difficult determination of obviousness." <u>Gillette Co. v.</u>

<u>S.C. Johnson & Son, Inc.</u>, 919 F.2d 720, 724 (Fed. Cir. 1990).

Even though a POSA in October 2006 would have recognized

PENNSAID® 1.5%'s drawbacks and would have been aware of

potential ways to alter PENNSAID® 1.5% to ameliorate those

drawbacks, the changes to PENNSAID® 1.5% which resulted in the

PENNSAID® 2% product were a result of optimizations that did not

derive from routine experimentation.

### CONCLUSION

"Recognition of a need does not render obvious the

achievement that meets that need." <u>Cardiac Pacemakers, Inc. v.</u>

<u>St. Jude Medical, Inc.</u>, 381 F.3d 1371, 1377 (Fed. Cir. 2004).

Such is the case here. For the reasons stated, Actavis has not

shown by clear and convincing evidence that claim 12 of the '913

patent is invalid for obviousness under 35 U.S.C. § 103.

Horizon is directed to provide to the Court a proposed form

of Order and Judgment. This Opinion shall remain under seal

until the resolution of the parties' motions to seal their

submissions relating to the trial. In their motions to seal,

the parties shall indicate which, if any, portions of this

Opinion should be redacted in accordance with Local Civil Rule

5.3.

Date: __May 12, 2017__          __s/ Noel L. Hillman__
At Camden, New Jersey          NOEL L. HILLMAN, U.S.D.J.

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

I certify that I served a copy on counsel of record on  October 10, 2017

by:

☐ U.S. Mail

☐ Fax

☐ Hand

☒ Electronic Means (by E-mail or CM/ECF)

John Christopher Rozendaal

Name of Counsel

/s/ John Christopher Rozendaal

Signature of Counsel

| | |
|---|---|
| Law Firm | Sterne, Kessler, Goldstein & Fox P.L.L.C. |
| Address | 1100 New York Avenue, NW |
| City, State, Zip | Washington, DC 20005 |
| Telephone Number | (202) 772-8747 |
| Fax Number | (202) 371-2540 |
| E-Mail Address | jcrozendaal@skgf.com |

NOTE: For attorneys filing documents electronically, the name of the filer under whose log-in and password a document is submitted must be preceded by an "/s/" and typed in the space where the signature would otherwise appear. Graphic and other electronic signatures are discouraged.

Reset Fields

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.  This brief complies with the type-volume limitation of Federal Rule of Federal Circuit Rule 32(a) or Federal Rule of Federal Circuit Rule 28.1.

☒  This brief contains [*state the number of*] 16,497 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), or

☐  This brief uses a monospaced typeface and contains [*state the number of*] _____ lines of text, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) or Federal Rule of Federal Circuit Rule 28.1 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).

☒  This brief has been prepared in a proportionally spaced typeface using

[*state name and version of word processing program* ] Microsoft Word 2010 in

[*state font size and name of type style* ] 14 point Times New Roman , or

☐  This brief has been prepared in a monospaced typeface using

[*state name and version of word processing program* ] _____ with

[*state number of characters per inch and name of type style*] _____ .

/s/ John Christopher Rozendaal
_____

(Signature of Attorney)

John Christopher Rozendaal
_____

(Name of Attorney)

for Defendant - Cross-Appellant
_____

(State whether representing appellant, appellee, etc.)

Oct 10, 2017
_____

(Date)

Reset Fields