# In the
# United States Court of Appeals
## For the Federal Circuit

HORIZON PHARMA IRELAND LIMITED, HZNP
LIMITED, HORIZON PHARMA USA, INC.,

*Plaintiffs-Appellants*

v.

ACTAVIS LABORATORIES UT, INC.,

*Defendant-Cross-Appellant*

_____

2017-2149, -2152, -2153, -2202, -2203, -2206
_____

Appeal from the United States District Court for the
District of New Jersey in Nos. 1:14-cv-07992-NLH-AMD,
1:15-cv-05025-NLH-AMD, 1:15-cv-06131-NLH-AMD,
1:15-cv-06989-NLH-AMD, 1:15-cv-07742-NLH-AMD,
1:16-cv-00645-NLH-AMD, Judge Noel Lawrence Hillman.

## CORRECTED RESPONSE AND REPLY BRIEF OF
## PLAINTIFFS-APPELLANTS

ROBERT F. GREEN
CARYN C. BORG-BREEN
JESSICA M. TYRUS
GREEN, GRIFFITH & BORG-BREEN LLP
City Place, Suite 3900
676 North Michigan Avenue
Chicago, IL 60611
(312) 883-8000

*Counsel for Plaintiffs-Appellants*

# CERTIFICATE OF INTEREST

Counsel for Plaintiffs-Appellants Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma USA, Inc. certifies the following:

- The full name of every party or amicus represented by me is: Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma USA, Inc.

- The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is: N/A.

- All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: Horizon Pharma plc, Horizon Pharma, Inc.

- The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| | |
|---|---|
| John E. Flaherty | Robert F. Green |
| Ravin R. Patel | Christopher T. Griffith |
| Guillermo C. Artiles | Caryn C. Borg-Breen |
| McCARTER & ENGLISH | L. Scott Beall |
| | Jessica M. Tyrus |
| Dennis A. Bennett | Benjamin D. Witte |
| GLOBAL PATENT GROUP, LLC | GREEN, GRIFFITH & BORG-BREEN LLP |

Dated:  November 21, 2017                    Respectfully submitted,

/s/ Caryn C. Borg-Breen
Caryn C. Borg-Breen

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF CONTENTS ..................................................................... iii

TABLE OF AUTHORITIES ................................................................ vi

TABLE OF ABBREVIATIONS ........................................................... ix

RESPONSIVE BRIEF ON CROSS-APPEAL ........................................1

COUNTERSTATEMENT OF THE ISSUES ON CROSS-APPEAL .....................1

COUNTERSTATEMENT OF THE CASE ON CROSS-APPEAL..........................2

    I.        CLAIM 12 OF THE '913 PATENT ..................................3

    II.       SKIN BARRIER AND TOPICAL FORMULATION
              DEVELOPMENT ..............................................4

    III.     PENNSAID® 1.5%..............................................7

    IV.    THE MULTI-PHASE DEVELOPMENT OF PENNSAID® 2% ........7

    V.       THE DISTRICT COURT'S OPINION ..............................9

          A.    The Evidence Presented at Trial .................................9

          B.    Actavis's Obviousness Argument.............................13

          C.    The District Court's Findings ...................................15

SUMMARY OF THE ARGUMENT ON CROSS-APPEAL ................................18

STANDARD OF REVIEW ON CROSS-APPEAL ................................19

ARGUMENT ON CROSS-APPEAL ................................................20

    I.        LEGAL STANDARD ......................................22

II.    THE DISTRICT COURT CORRECTLY FOUND THAT A POSA COULD NOT HAVE REASONABLY PREDICTED THAT THE CHANGES TO PENNSAID® 1.5% WOULD RESULT IN TWICE-DAILY DOSING............................................25

    A.    Skin is a Formidable Barrier to Drug Absorption ....................25

    B.    PENNSAID® 1.5% is a Complex System Because Its Formulation Components Interact with Each Other in Unpredictable Ways ................................................................26

    C.    Fick's Law Cannot Be Used to Predict How Changes to PENNSAID® 1.5% Will Affect Drug Absorption...................28

III.    THE DISTRICT COURT CORRECTLY FOUND THAT THE INGREDIENTS IN PENNSAID® 1.5% ARE NOT "RESULT-EFFECTIVE VARIABLES," AND THAT TWICE-DAILY DOSING COULD NOT BE ACHIEVED THROUGH MERE ROUTINE OPTIMIZATION ............................................................30

IV.    ACTAVIS'S ARGUMENTS ON APPEAL ARE BASED ON AN INCORRECT INTERPRETATION OF THE DISTRICT COURT'S OPINION ........................................................................38

    A.    Key Findings of Fact Were Resolved in Horizon's Favor .......38

    B.    The District Court Did Not Rely on Unexpected Results to Find Claim 12 of the '913 Patent Not Obvious ....................39

    C.    The District Court Applied the Correct Legal Standard...........41

V.    CONCLUSION REGARDING NONOBVIOUSNESS.....................45

REPLY BRIEF ON APPEAL...................................................................46

I.    THE DISTRICT COURT ERRED WHEN IT FOUND THAT ACTAVIS'S LABELING DOES NOT INDUCE INFRINGEMENT OF THE '450 PATENT FAMILY.......................46

    A.    The District Court Correctly Found in Actavis's Labeling Sufficient Elements to Establish Induced Infringement ..........46

B.     The District Court Committed Error When It Found No Encouragement to Infringe, and Actavis's Brief Does Not Support Affirmance ....................................................................47

C.     The District Court's Ruling and Actavis's Arguments for Affirmance are Based on Misapplication of the Law ..............50

D.     If This Court Finds that Questions of Fact Exist, the Case Should be Remanded .................................................................52

II.     THE DISTRICT COURT ERRED WHEN IT FOUND THE CLAIM TERM "CONSISTING ESSENTIALLY OF" INDEFINITE......................................................................................52

A.     The District Court Correctly Found that A POSA Could Determine the Basic and Novel Properties of the Claimed Formulation with Reasonable Certainty ...................................52

B.     The District Court Committed Legal Error When It Applied the Nautilus Definiteness Standard to the Basic and Novel Properties of the Claimed Invention ......................57

C.     The District Court Committed Legal Error When It Found "Better Drying Time" Indefinite....................................61

D.     The District Court Committed Legal Error When It Found "Favorable Stability" Indefinite.....................................63

CERTIFICATE OF SERVICE AND FILING ......................................... i

# TABLE OF AUTHORITIES

**Cases**

*AK Steel Corp. v. Sollac & Ugine,*
  344 F.3d 1234 (Fed. Cir. 2003) ..........................................................55

*Amgen, Inc. v. Chugai Pharm. Co.*,
  927 F.2d 1200 (Fed. Cir. 1991),
  *cert. denied*, 502 U.S. 856 (1991) .......................................................23

*Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,*
  750 F.2d 1569 (Fed. Cir. 1984) ..........................................................55

*Auxilium Pharm. Inc. v. Watson Labs., Inc.*,
  No. 12-3084, 2014 WL 9859224 (D.N.J. Dec. 16, 2014) ...................23

*Bayer AG v. Sony Elecs., Inc.*,
  229 F. Supp. 2d 332 (D. Del. 2002),
  *aff'd*, 83 F. App'x 334 (Fed. Cir. 2003) ....................................... 58, 59

*Braintree Labs., Inc. v. Novel Labs., Inc.*,
  749 F.3d 1349 (Fed. Cir. 2014) ..........................................................51

*Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*,
  845 F. 3d 1357 (Fed. Cir. 2017) ........................................................51

*Gen. Elec. Co. v. Hoechst Celanese Corp.*,
  698 F. Supp. 1181 (D. Del. 1988) ............................................... 58, 59

*Gillette Co. v. S.C. Johnson & Son, Inc.*,
  919 F.2d 720 (Fed. Cir. 1990) ................................................ 22, 23, 31

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966) ...............................................................................22

*Honeywell Int'l. Inc. v. Int'l Trade Comm'n*,
  341 F.3d 1332 (Fed. Cir. 2003) ..........................................................60

*In re Applied Materials, Inc.*,
  692 F.3d 1289 (Fed. Cir. 2012) ................................................. passim

*In re Depomed Patent Litigation*,
  Civ. No. 13-4507, 2016 WL 7163647 (D.N.J. Sept. 30, 2016),
  *appeal docketed*, No. 17-1153 (Fed. Cir. Nov. 3, 2016)......................................50

*In re Urbanski*,
  809 F.3d 1237 (Fed. Cir. 2016) ............................................. 24, 38, 40

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014)........................................................60

*JVW Enters., Inc. v. Interact Accessories, Inc.*,
  424 F.3d 1324 (Fed. Cir. 2005) ............................................. 20, 27, 29

*KSR Int'l Co. v. Teleflex Inc.*,
  550 U.S. 398 (2007) .................................................................. passim

*Mangosoft, Inc. v. Oracle Corp.*,
  525 F.3d 1327 (Fed. Cir. 2008).......................................................54

*Mayne Pharma Int'l Pty Ltd. v. Merck & Co., Inc.*,
  2016 WL 7441069 (D. Del. Dec. 27, 2016)......................................60

*Merck & Co. v. Biocraft Labs., Inc.*,
  874 F.2d 804 (Fed. Cir. 1989).........................................................43

*Merck Sharp & Dohme Corp. v. Hospira Inc.*,
  2016 WL 5872620 (D. Del. 2016) ...................................................24

*Microsoft Corp. v. i4i Ltd. P'ship*,
  564 U.S. 91 (2011) .........................................................................19

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  134 S. Ct. 2120 (2014) ............................................................. 57, 58

*Pfizer Inc. v. Mylan Pharmaceuticals Inc.*,
  71 F. Supp. 3d 458 (D. Del. 2014) ..................................................41

*Pfizer, Inc. v. Apotex, Inc.*,
  480 F.3d 1348 (Fed. Cir. 2007).......................................................23

*PPG Indus. v. Guardian Indus. Corp.*,
  156 F.3d 1351 (Fed. Cir. 1998).......................................................60

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) ............................................................... 20, 23, 27

*Prostrakan, Inc. v. Actavis Labs. UT, Inc.*,
   2017 WL 3028876 (E.D. Tex. July 15, 2017) ...................................................... 60

*Purdue Pharm. Prods. L. .P. v. Actavis Elizabeth LLC*,
   No. 12-5311 JLL, 2015 WL 5032650 (D.N.J. Aug. 25, 2015) ........................... 66

*Senju Pharm. Co. v. Lupin Ltd.*,
   Civ. No. 11-271-SLR, 2013 WL 4101820 (D. Del. Aug. 9, 2013),
   *aff'd sub nom.*, 780 F.3d 1337 (Fed. Cir. 2015) .................................................. 22

*Shire LLC v. Amneal Pharms., LLC*,
   Civ. No. 11-3781, 2014 WL 2861430 (D.N.J. June 23, 2014),
   *aff'd in part, rev'd in part*, 802 F.3d 1301 (Fed. Cir. 2015) ............................... 50

*Standard Oil Co. v. Am. Cyanamid Co.*,
   774 F.2d 448, 227 USPQ 293 (Fed. Cir. 1985) ................................................... 63

*Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*,
   743 F.3d 1359 (Fed. Cir. 2014) ........................................................................... 65

*Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*,
   785 F.3d 625 (Fed. Cir. 2015) ............................................................................. 50

**Statutes**

35 U.S.C. § 103(a)(pre-AIA) .................................................................................. 22

35 U.S.C. § 112, ¶ 2 ......................................................................................... passim

35 U.S.C. § 282 ...................................................................................................... 19

**Rules**

Fed. R. Civ. P. 52(a)(6) ......................................................................................... 20

# TABLE OF ABBREVIATIONS

| Parties | |
|---|---|
| Horizon | *Plaintiffs-Appellants* Horizon Pharma Ireland Ltd., HZNP Ltd., and Horizon Pharma USA, Inc. |
| Actavis | *Defendant-Cross-Appellant* Actavis PLC, Actavis, Inc., and/or Watson Laboratories, Inc. (later known as Actavis Laboratories UT, Inc.) |
| **Defined Terms** | |
| Actavis's ANDA | Actavis's ANDA No. 207238 filed with FDA |
| Actavis's labeling | Actavis's proposed labeling for Actavis's ANDA product described in ANDA No. 207238 |
| ANDA | Abbreviated New Drug Application |
| APB | Actavis's Principal Brief, filed on October 10, 2017 |
| Barry | Barry, "Breaching the Skin's Barrier to Drugs," Nature Biotech 22(2):165-167 (February 2004) (APPX25026-29) |
| Betlach | United States Patent No. 5,374,661 (APPX24945-52) |
| C.A. No(s). | Civil Action Number(s) |
| Court | United States Court of Appeals for the Federal Circuit |
| cP | centipoise |
| Dimethaid | Dimethaid Health Care Ltd. |
| District Court | United States District Court for the District of New Jersey |
| DMSO | Dimethyl Sulfoxide |
| Dow | United States Patent No. 6,387,383 (APPX24959-71) |
| EPA, Dermal Exposure Assessment | EPA, Dermal Exposure Assessment: Principles and Applications, Interim Report (Jan. 1992) (APPX18818) |
| FDA | The United States Food and Drug Administration |

| | |
|---|---|
| Flynn | Flynn, "Cutaneous and Transdermal Delivery: Processes and Systems of Delivery," Modern Pharmaceutics 239-99 (Banker et al. eds., Marcel Dekker, Inc., 3d ed.) (APPX18515-77) |
| Handbook of Pharmaceutical Excipients | Handbook of Pharmaceutical Excipients, 13-15, 219-221, 257- 59, 289- 293 and 300 (R.C. Rowe et al. eds., 4th ed.) (APPX18578-602) |
| Herschler | United States Patent No. 3,740,420 (APPX18503-8) |
| Hewitt | Hewitt, "In Vitro Cutaneous Disposition of a Topical Diclofenac Lotion in Human Skin: Effect of a Multi-Dose Regimen," Pharm. Res. 15(7):988-992 (1998) (APPX25254-59) |
| Ho | Ho, et al., "The Influence of Cosolvents on the In-vitro Percutaneous Penetration of Diclofenac Sodium from a Gel System," 46 J. Pharm. Pharmacol. 636 (1994) (APPX25363-69) |
| HPB | Horizon's Principal Brief, filed on August 16, 2017 |
| HPC | hydroxypropylcellulose |
| HPLC | High Performance Liquid Chromatography |
| Ikeda | United States Patent No. 5,422,102 (APPX24953-58) |
| Kasai | United States Patent No. 5,350,769 (APPX24933-44) |
| Kamishita III | United States Patent No. 5,350,769 (APPX24925-32) |
| Klucel Brochure | Klucel Physical and Chemical Properties, Hercules Inc, Aqualon Division (2001) (APPX25416-41) |
| Lu | United States Patent Application Publication No. 2003/0161867 (APPX24972-93) |
| Mallinckrodt | Mallinckrodt, Inc. |
| Michniak-Kohn | Phillips and Michniak, "Transdermal Delivery of Drugs with Differing Lipophilicities Using Azone Analogs as Dermal Penetration Enhancers," J. Pharm. Sci. 84(12):1427-1433 (December 1995) (APPX25018-25) |

| | |
|---|---|
| Nishihata | Nishihata, et al., "Percutaneous absorption of diclofenac in rats and humans: aqueous gel formulation," Int'l J. Pharm. 46:1-7 (1988) (APPX25272-79) |
| Nuvo | Nuvo Research Inc. |
| PENNSAID® 1.5% | PENNSAID® (diclofenac sodium topical solution) 1.5% w/w product |
| PENNSAID® 2% | Horizon's PENNSAID® (diclofenac sodium topical solution) 2% w/w product |
| POSA | A Person of Ordinary Skill in the Art |
| Sandborn 1986 | United States Patent No. 4,575,515 (APPX25248-53) |
| the '450 patent | United States Patent No. 8,546,450 |
| the '078 patent | United States Patent No. 8,217,078 |
| the '110 patent | United States Patent No. 9,132,110 |
| the '838 patent | United States Patent No. 8,252,838 |
| The '913 patent | United States Patent No. 9,066,913 |
| the '450 patent family | the '450 patent, the '078 patent, and the '110 patent |
| WHO paper | Environmental Health Criteria 235 - Dermal Absorption, World Health Organization (2006) (APPX25030-247) |
| Williams | Williams, et al., "Penetration Enhancers," 56 Advanced Drug Delivery Reviews 603 (2004) (APPX25280-295) |
| Zhang | United States Patent Application Publication No. 2007/0280972 (APPX24994-25017) |

## RESPONSIVE BRIEF ON CROSS-APPEAL

## COUNTERSTATEMENT OF THE ISSUES ON CROSS-APPEAL

Did the District Court clearly err in finding, after carefully considering all of the evidence and assessing the credibility of the witnesses in a bench trial, that Actavis failed to prove the obviousness of claim 12 of the '913 patent by clear and convincing evidence, when:

1. The District Court made factual findings, supported by ample record evidence, that topical formulation development is complex and unpredictable; that PENNSAID® 1.5% is a complex system such that drug absorption from PENNSAID® 1.5% will not behave predictably; and as a result, a POSA would not have reasonably predicted that the changes to PENNSAID® 1.5% would result in sufficient drug absorption to achieve twice-daily dosing; and

2. The District Court made further factual findings, supported by ample record evidence, that given the unpredictability evidenced in the prior art concerning drug absorption through the skin, the components of PENNSAID® 1.5% are not "result-effective variables," and changes made to the formulation to achieve twice-daily dosing were not the result of routine optimization.

## COUNTERSTATEMENT OF THE CASE ON CROSS-APPEAL

Actavis's statement of the case on cross-appeal is inaccurate and incomplete. Actavis ignores key fact findings that are not clearly erroneous and are favorable to Horizon, and frequently provides no citation to the record to support its alleged "facts," or provides only citations to the District Court's opinion that are not supportive of the alleged "facts."

For example, Actavis states, "The success of reducing the dosage from four times per day to two times per day, in light of the changes to the formulation, was not unexpected," and then cites to the District Court's opinion at APPX15923. (APB, 57, n. 15.)  But, not only does this particular page of the District Court's opinion not support Actavis's statement, the District Court ultimately found that a POSA could not reasonably predict whether twice-daily dosing could be achieved. (*See, e.g.*, APPX15929 ("Dr. Bunge's ultimate opinion of non-obviousness more fully appreciates the lack of predictability of whether twice a day dosing could be achieved[.]").)

As another example, Actavis states, "These are standard problems with topical drug products, and they have a standard set of solutions."  (APB, 54.) Actavis provides no citation to the record to support such an assertion, and, as discussed in detail herein, the evidence introduced at trial reflects the opposite—

that nothing is "standard" when formulating a topical product because topical formulation development is complex and unpredictable.

Consequently, Horizon provides below a complete counterstatement of the case on cross-appeal.

# I.     CLAIM 12 OF THE '913 PATENT

Only a single claim—claim 12 of the '913 patent—is at issue in this cross-appeal.  (APPX15907-08.)  The '913 patent issued on June 30, 2015.  (APPX8403, ¶39; APPX8404, ¶40.)  The named inventors of the '913 patent are Ed Kisak and Jagat Singh.  (APPX8404, ¶44.)  The '913 patent is assigned on its face to, and is currently owned by, HZNP Limited.  (APPX24660-67; APPX24668-73.)  The '913 patent matured from U.S. Patent Application No. 14/497,096, which was filed on September 25, 2014, and claims priority to several other U.S. patent applications.[1] (APPX8404, ¶41.)

Claim 12 recites a method for treating pain due to osteoarthritis of a knee of a patient.  (APPX261.)  This method claim depends from formulation claims 1, 8 and 9, and because of this dependency includes the limitations of each of these formulation claims.  (APPX8404, ¶¶46-47, ¶49.)  The claimed method provides

---

[1] The '913 patent claims priority to U.S. Patent Application Nos. 14/025,781, 13/564,688 and 12/134,121, International Application No. PCT/US2007/081674, and U.S. Provisional Patent Application No. 60/829,756, filed October 17, 2006. (APPX8404, ¶¶42-53.)

efficacy by the *twice-daily* administration to the knee of a topical diclofenac composition comprising a specific list of ingredients, which ingredients are required to be present in very specific weight percent amounts: 2% w/w diclofenac sodium; 45.5% w/w DMSO; 23-29% w/w ethanol; 10-12% w/w propylene glycol; 2.5% w/w HPC; and water to make 100% w/w. (APPX261.) Claim 12 also recites that the claimed composition has a viscosity of 500-5000 centipoise. (*Id*.)

## II.    SKIN BARRIER AND TOPICAL FORMULATION DEVELOPMENT

Topical pharmaceutical formulation development is a complex and unpredictable science. This is because the stratum corneum, the outer layer of the skin, functions as an extremely effective barrier that prevents most molecules, including drug molecules, from permeating through the skin to reach the intended site of action. (APPX15401:4-APPX15402:3.) The stratum corneum consists of layers of corneocytes arranged in a very dense brick and mortar structure, comprised of long-chain lipids, that prevents such permeation. (APPX15403:3-18; APPX13772-73.)

To overcome the effectiveness of the skin as a barrier, formulators use chemicals referred to as "penetration enhancers" to assist the drug molecule in permeating the skin's "mortar." (APPX15405:15-APPX15406:4.) Approximately 200 different types of chemical penetration enhancers exist, which often function via different mechanisms. (APPX15406:5-12.) For example, DMSO, one

component of PENNSAID® 2% and the formulation in claim 12 of the '913 patent, is a known penetration enhancer that functions by a different mechanism than other penetration enhancers, such as fatty alcohol esters and ether alcohols. (APPX15406:24-APPX15407:15.) Because penetration enhancers often function via different mechanisms, formulators often use multiple penetration enhancers in a single formulation. (APPX15406:5-APPX15409:7.) The effect of using multiple penetration enhancers in a single formulation is difficult to predict because the result can be additive and lead to improved penetration, or the result can be competitive and lead to reduced penetration. (APPX15408:23-APPX15409:7.)

Numerous prior art publications demonstrate that the development of topical pharmaceutical formulations as of October 2006 was complex and unpredictable. For example, **Barry** (APPX25026-29) discloses that, despite studying chemical penetration enhancers for decades, "we still cannot predict *a priori* those safe enhancers that will work for named drugs under clinical conditions," that the complexity of penetration enhancers "militates against *in silico* predictions," and that "multiple skin experiments are necessary to develop formulations and satisfy drug regulatory bodies. Such a blunderbuss approach can be a time-consuming undertaking." (APPX14825:3-APPX14826:14; APPX14826:21-APPX14827:4; APPX25027.)

The **Michniak-Kohn** paper (APPX25018-25), published in 1995, also discloses that "[t]he skin, as a whole is amphiphilic in nature, which makes penetration predictions through this relatively impermeable membrane complex." (APPX14823:10-APPX14824:17; APPX25018.) And **Flynn** (APPX18515-77) discloses that "[w]hen the target of therapy lies beneath the stratum corneum, topical drug delivery is more difficult and becomes more uncertain," and that "[r]egional therapy involves effects in musculature and joints deep beneath the site of application" and "[t]o be successful, this requires a greater delivery rate, because an enormous fraction of the drug that passes through the epidermis is routed systemically by the local vasculature" or bloodstream. (APPX14916:25-APPX14917:4; APPX18536; APPX14917:11-21; APPX18537.)

The **WHO paper** (APPX25030-247) discloses that important considerations in dermal absorption include solubility, volatility, distribution of stratum corneum, excipients, effect on the stratum corneum and pH. (APPX14918:23-APPX14919:6; APPX25058 (Table 1).) This document discloses that the type of application and vehicle has the "potential to either increase or decrease the solubility and/or diffusion of a compound in the horny layer" and thereby "increase or decrease penetration." (APPX14920:18-APPX14921:1; APPX25126.)

## III.  PENNSAID® 1.5%

The prior art topical formulation, PENNSAID® 1.5%, was described in 1986 in **Sandborn 1986** (APPX25248-53).  (APPX14841:13-15; APPX14842:7-8; APPX14887:24-APPX14888:2.)  Since March 13, 2003, Dimethaid, a predecessor-in-interest to Nuvo, marketed PENNSAID® 1.5% in Canada.  (APPX8418, ¶¶188-189.)  PENNSAID® 1.5% was indicated for the treatment of the symptoms of osteoarthritis of the knee with a *four-times-daily* dosing regimen in Canada.  (APPX14675:9-23; APPX24896.)  In October 2006, the FDA had not yet approved PENNSAID® 1.5% in the United States.  (APPX14673:25-APPX14674:2.)

On November 4, 2009, FDA approved NDA 20947 for PENNSAID® 1.5% for use in treatment of the pain of osteoarthritis of the knees following the dosing regimen "40 drops four times a day."  (APPX8418, ¶187; APPX24896; APPX17748.)  **Hewitt** (APPX25254-59) discloses the formulation of PENNSAID® 1.5% as: 45% DMSO; 11% glycerine; 11% ethanol; 11% propylene glycol; and water.  (APPX14680:10-APPX14681:1; APPX25254, n. 5.)

## IV.  THE MULTI-PHASE DEVELOPMENT OF PENNSAID® 2%

Inventors Dr. Edward Kisak and Dr. Jagat Singh developed the topical formulation used in the twice-daily method described by claim 12 of the '913 patent.  (APPX14952:7-12.)  Claim 12 is limited in scope, and narrowly reads on the FDA-approved PENNSAID® 2% product.  Actavis stipulated that

PENNSAID® 2% falls within the scope of claim 12 of the '913 patent. (APPX26072-APPX26074, ¶1.)

Nuvo originally asked inventors Kisak and Singh to make a thickened version of PENNSAID® 1.5%. The development of PENNSAID® 2% was performed in multiple phases, requiring a team of highly qualified scientists working as lab technicians with Kisak and Singh. (APPX14957:16-APPX14958:8; APPX14962:10-13; APPX14964:3-5; APPX13713.) Horizon hereby incorporates by reference the District Court's discussion of the development of PENNSAID® 2% set forth in the District Court's opinion at pages 8-11. (*See also* APPX15911-14; APPX14960:19-APPX15041:4; APPX25442-APPX25537; APPX25554-56; APPX25557-64; APPX25565-77; APPX25578-83; APPX25595-611; APPX25612-33; APPX25634-658; APPX25934-46.)

To arrive at the formulation recited in claim 12 of the '913 patent—and PENNSAID® 2%—from PENNSAID® 1.5%, a POSA would have had to (1) increase the diclofenac concentration from 1.5% to exactly 2%, (2) increase the concentration of ethanol from 11% to exactly the range of 23-29%, (3) add a thickening agent, (4) choose the thickening agent to be HPC, (5) identify the concentration of HPC to be exactly 2.5%, (6) select a viscosity range of between 500 and 5000 cP, and then (7) decide not to change the concentrations of DMSO or propylene glycol but instead (8) remove or reduce glycerin and/or water to account

for the increases in diclofenac, ethanol and thickening agent concentrations and still total 100%.  (APPX15207:21-APPX15208:17; APPX13661.)

In January 2014, the FDA approved PENNSAID® 2% for use in the treatment of the pain of osteoarthritis of the knees.  (APPX8419, ¶190.) Importantly, PENNSAID® 2% was FDA-approved for use in the treatment of pain of osteoarthritis of the knee when administered only *two times* per day. (APPX8419, ¶¶190, 193; APPX26072-74, ¶1; APPX17748; APPX17754.)  Since October 2014, Horizon Pharma Inc. holds the approved NDA for PENNSAID® 2%.  (APPX8419, ¶191.)

## V.    THE DISTRICT COURT'S OPINION

### A.    The Evidence Presented at Trial

The District Court carefully considered all evidence presented by the parties during a seven-day bench trial concerning the alleged obviousness of the twice-daily method of claim 12 of the '913 patent.  The parties' evidence was presented by three expert witnesses and seven fact witnesses.

Horizon presented live fact testimony from Dr. Edward Kisak and expert testimony from Drs. Annette Bunge and Norman Weiner.  Actavis presented expert testimony from Dr. Bozena Michniak-Kohn.

**Dr. Bunge** testified regarding the nonobviousness of claim 12 of the '913 patent.  The Court recognized Dr. Bunge as an expert in the field of dermal

absorption and pharmacokinetics of topical formulations. (APPX15182:21-APPX15183:3.) Dr. Bunge is Professor Emeritus and Research Professor of Chemical Engineering in the Department of Chemical and Biological Engineering at the Colorado School of Mines. (APPX15172:1-6; APPX25299.) Dr. Bunge received a Bachelor of Science degree, *summa cum laude*, in Chemical Engineering in 1976 from the State University of New York at Buffalo, and a Ph.D. in Chemical Engineering in 1982 from the University of California, Berkeley. (APPX15172:22-APPX15173:3; APPX25299.)

Dr. Bunge has performed research in the area of dermal absorption science for the past 30 years, where she has studied the rate and amount of drugs or chemicals that are absorbed into and through the skin. (APPX15173:21-APPX15174:5; APPX25320-23.) Her research has focused on developing methodologies for estimating or predicting the amount of chemical that is absorbed into and through the skin and the rate at which such absorption occurs. (APPX15174:6-17.) Her research has also focused on developing pharmacokinetic models that describe the absorption, including the rate of absorption of chemicals, including drugs, into and through the skin. (APPX15182:1-11.)

Dr. Bunge has written over 60 scientific papers, 18 book chapters, and over 140 published abstracts, on the subject of dermal absorption. (APPX15175:7-11; APPX25301-18.) She has also given an estimated 150 lectures concerning dermal

absorption at national or international conferences or universities.
(APPX15175:12-18; APPX25318-20.)

**Dr. Weiner** testified regarding the nonobviousness of Claim 12 of the '913
patent.  The Court recognized Dr. Weiner as an expert in the field of topical
formulation development.  (APPX15400:2-10.)  Dr. Weiner is an Emeritus
Professor at the University of Michigan.  (APPX15392:20-APPX15393:6;
APPX25327.)  Dr. Weiner received his undergraduate degree from Long Island
University, Brooklyn College of Pharmacy, in 1959, and a Ph.D. in Pharmaceutics
and Surface Chemistry from Columbia University in 1965.  (APPX15392:5-12;
APPX25327.)

During his career, Dr. Weiner has performed research in the area of
membranes, particularly skin, and how chemicals, including pharmaceutical
formulations, move through the skin.  (APPX15394:10-19.)  He has also studied
how the ingredients of a pharmaceutical formulation affect how the active
pharmaceutical ingredient, or drug, moves through the skin.  (*Id.*)  In particular, Dr.
Weiner has studied topical pharmaceutical formulations, including emulsions,
liposomes, creams, lotions, and gels.  (APPX15394:6-22; APPX25350-54.)  Dr.
Weiner has over 170 publications relating to his research.  (APPX15395:8-11;
APPX25328-338.)  He also has been invited to present at several hundred seminars
on topics relating to topical drug delivery.  (APPX15395:7-22; APPX25339-49.)

**Dr. Edward Kisak**, one of the inventors of the '913 patent, testified regarding the multiple phases of research and development that led to the invention recited in claim 12 of the '913 patent. (APPX231; APPX14952:7-9.)

**Dr. Michniak-Kohn**, Actavis's only expert, is a tenured professor at the College of Pharmacy, Ernest Mario College of Pharmacy, Rutgers University. She is also the founder and director of the Center for Dermal Research at Rutgers University. (APPX14634:24-APPX14635:5; APPX18410.) Dr. Michniak-Kohn received her Ph.D. in 1980 from Leicester Polytechnic, now known as De Montfort University, in England. (APPX14635:6-16; APPX18410.)

The parties presented additional fact testimony via deposition designations from six witnesses: (1) Dr. Bradley Galer provided testimony concerning PENNSAID® 1.5% and communications with the FDA relating thereto; (2) Dr. John London provided testimony concerning Nuvo's decision to develop, and the research and development of, PENNSAID® 2%, as well as PENNSAID® 1.5% and communications with the FDA relating thereto; (3) Dr. Jeffrey Sherman, the Executive Vice President of Research and Development and Chief Medical Officer at Horizon Pharma, provided testimony regarding Horizon's knowledge of PENNSAID® 2%; (4) Dr. Jagat Singh, one of the inventors of the '913 patent, provided testimony regarding the research and development that led to the invention recited in Claim 12 of the '913 patent; (5) Mr. Joseph Whalen, the Senior

Vice President of Business Development & Alliance Management at Horizon

Pharma, provided testimony regarding Horizon's purchase of PENNSAID® 2%

and the related patent portfolio, including the '913 patent; and (6) Mr. Saleh Rifaat,

the Executive Director of Transdermal Development at Actavis, provided

testimony on behalf of Actavis concerning the development of the Actavis ANDA

Product. (APPX15907, n.3.)

## B.    Actavis's Obviousness Argument

At trial, Actavis presented an obviousness argument that centered on routine

optimization—i.e., that the components of the prior art PENNSAID® 1.5%

product are "result-effective variables," or variables which achieve a recognized

result, such that modifying the amounts of these components in PENNSAID®

1.5% to arrive at the twice-daily method of PENNSAID® 2% produced known

effects on drug absorption leading to the predictable result of reduced dosing

frequency. (APPX15919-20.)

Actavis's obviousness argument began with PENNSAID® 1.5%.

(APPX15918.) Actavis contended that PENNSAID® 1.5% was known to be safe

and effective for treating osteoarthritis of the knee, but had a few drawbacks,

including that it was applied in forty drops, four times a day, and was runny, such

that it tended to run off the knee. (*Id.*) According to Actavis, a POSA would have

been motivated to modify PENNSAID® 1.5% to address these drawbacks by

increasing drug absorption to reduce the dosing frequency from four times a day to just two times a day, and by thickening and reducing the drying time of the formulation to prevent the product from running off the knee. (APPX15918-19.)

To bring about these desired results, Actavis argued that a POSA would have (1) added a thickening agent, specifically HPC, to PENNSAID® 1.5%, (2) looked to the prior art, in particular Kasai (APPX24933-44), to determine optimal ranges for diclofenac sodium, ethanol, and HPC, (3) looked to Dow (APPX24959-71) and Kamishita III (APPX24925-32) to arrive at the claimed viscosity of 500-5000 centipoise, and (4) maintained propylene glycol and DMSO at the particular amounts used in PENNSAID® 1.5%. (APPX15918-19.) Actavis argued that these three changes, and leaving two ingredients unchanged, were obvious optimizations of result-effective variables that produced a predictable result of twice-daily dosing. (APPX15918.) Actavis additionally argued that it would have been obvious to administer the claimed formulation twice a day, given the teachings of Betlach (APPX24945-52), which set forth a dosing frequency of two times a day. (APPX15918-19.)

Actavis thus concluded that a POSA would have "reasonably expected" that the formulation set forth in claim 12 of the '913 patent would be effective for treating pain due to osteoarthritis of the knee when administered twice-daily because each of the modifications Actavis argues a POSA would make to the

PENNSAID® 1.5% formulation would have been "reasonably expected" to increase the absorption of diclofenac sodium. (*Id*.)

## C. The District Court's Findings

The District Court found that the inventive twice-daily method set forth in claim 12 of the '913 patent is not the result of mere routine optimization of "result-effective variables" and is therefore nonobvious. (APPX15922-23.) The District Court's overall findings rested upon many findings of fact.

The District Court accepted the first part of Actavis's argument—i.e., "that prior art would have informed a POSA in October 17, 2006 of the various components to change in PENNSAID® 1.5% to improve upon that formulation's drawbacks, such as increasing the amount of drug absorbed per application in order to reduce the application frequency, making the formulation thicker to prevent run-off and improve absorption, and utilize [sic] penetration enhancers to reduce drying time and increase flux." (APPX15922.) The District Court further accepted that the prior art would have informed a POSA of compatible thickening agents and suitable ranges for diclofenac sodium, ethanol, and HPC, and that a POSA would have known from general principles in the prior art that glycerin hinders drying time; ethanol reduces drying time and can serve as a penetration enhancer; HPC was an attractive thickening agent that had been used in other diclofenac sodium formulations; increasing diclofenac concentration can increase

diclofenac absorption; and other diclofenac formulations had been applied less than four times a day resulting in the same daily therapeutic effect. (APPX15922-23.)

But the District Court rejected the crux of Actavis's argument—i.e., that the addition of HPC as a thickening agent and the changes to the concentrations of diclofenac sodium, ethanol, and HPC, while leaving DMSO and propylene glycol unchanged, were obvious optimizations of result-effective variables that produced a predictable result. (APPX15923-39.) Indeed, the District Court found that the changes made to PENNSAID® 1.5% to achieve twice-daily dosing were *not* the result of mere routine optimization because the components in PENNSAID® 1.5% are *not* result-effective variables. (APPX15933.) *See KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 399 (2007); *In re Applied Materials, Inc.*, 692 F.3d 1289, 1295 (Fed. Cir. 2012).

The fact findings that led the District Court to its conclusion that claim 12 of the '913 patent was not obvious included (1) that topical formulation development is complex and unpredictable, (2) that PENNSAID® 1.5% is a complex topical formulation, such that changes to the components of the PENNSAID® 1.5% formulation might not always affect absorption as predicted by Fick's Law, and (3) the prior art did not allow a POSA to reasonably predict the effect that a combination of changes to the formulation components would have on drug

absorption.  (*See, e.g.*, APPX15931-39.)  Thus, the District Court concluded that given the unpredictability evidenced in the prior art concerning drug absorption through the skin, the ingredients in PENNSAID® 1.5% are not "result-effective variables," such that the combination of changes made to this formulation to achieve twice-daily dosing were expected through mere routine optimization. (APPX15933-34, APPX15938-39.)  *See KSR Int'l*, 550 U.S. at 399; *Applied Materials, Inc.*, 692 F.3d at 1295.

In making such findings of fact, the District Court credited Dr. Bunge over Dr. Michniak-Kohn.  (*See, e.g.*, APPX15933-36.)  The District Court stated that Dr. Bunge "paint[ed] a much more accurate picture of the dynamic and complex formulation at issue" and "more fully appreciate[d] the lack of predictability", (APPX15926-27), while Dr. Michniak-Kohn "fail[ed] to address, much less explain, this interrelatedness of the relevant variables" and "oversimplifie[d] the process that resulted in the claimed invention," (APPX15927, APPX15931-32). The District Court also found that "there is ample record evidence that contradicts the result [Dr. Michniak-Kohn] predicts for individual variables from the prior art," and characterized her analysis as a "cherry-picked . . . discussion of the prior art for the noted variables."  (APPX15933-34.)

## SUMMARY OF THE ARGUMENT ON CROSS-APPEAL

The District Court's finding that the twice-daily method of treating osteoarthritis of the knee recited in claim 12 of the '913 patent is not obvious should be affirmed. The District Court based its findings on the ample evidence of record, which showed that a POSA could not have reasonably predicted that the changes required to transform the prior art product PENNSAID® 1.5% to the formulation recited in claim 12 would result in a formulation having sufficient drug absorption to achieve efficacy via twice-daily dosing. This is because skin is a formidable barrier to drug absorption, and while general principles, such as Fick's Law, may be used to predict drug absorption in simple topical formulations, PENNSAID® 1.5% is a complex topical formulation because the components of PENNSAID® 1.5% interact with each other and with the skin, causing non-linear and unpredictable effects on drug absorption.

The ample evidence of record also showed that a POSA would not understand the components of PENNSAID® 1.5% to be "result-effective variables," such that the claimed twice-daily method could be achieved through mere routine optimization. This evidence, unrebutted by Actavis, showed that the addition of a thickening agent, such as HPC, to PENNSAID® 1.5%, and an increase in the amounts of ethanol and diclofenac sodium in PENNSAID® 1.5%, might either increase or decrease drug absorption. Thus, none of the components

of PENNSAID® 1.5% were understood in the art at the time of the invention to be adjustable in a particular manner to produce a particular result. The District Court did not commit legal error in finding, based upon its assessment of a robust factual record and its determination that the testimony and opinions of Horizon's expert witnesses were more credible than those of Actavis's expert witness, that the components of PENNSAID® 1.5% were not "result-effective variables" because a POSA could not reasonably predict that a given change to a component would produce a predictable effect on drug absorption.

## STANDARD OF REVIEW ON CROSS-APPEAL

The '913 patent is presumed valid. *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95-97 (2011); 35 U.S.C. §282.

Actavis's description of the standard of review of the District Court's opinion regarding the validity of claim 12 of the '913 patent is inaccurate, based on Actavis's fundamental misreading of the District Court's opinion. Actavis wrongly asserts that "the district court essentially found all the facts underlying obviousness in Actavis' favor and arrived at its ultimate conclusion of nonobviousness solely as the result of an error in applying the law," and that "[t]his Court therefore reviews the issue presented on cross-appeal without deference." (APB, 62.) While the District Court did resolve certain findings of fact in favor of Actavis, the District Court resolved key factual findings in Horizon's favor—

namely, that the ingredients in PENNSAID® 1.5% are *not* "result-effective variables," such that changes made to this formulation were mere routine optimization. (APPX15933-34; APPX15939-41.) Thus, while the District Court's legal conclusion of non-obviousness is reviewed *de novo*, the underlying factual determinations, including its determination that the ingredients in PENNSAID® 1.5% are not "result-effective variables," are reviewed for clear error. *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 993 (Fed. Cir. 2009); *see* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous, and the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility.").

When the findings of the trial court are based on determinations about the credibility of witnesses, they "can virtually never be clear error." *JVW Enters., Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1334 (Fed. Cir. 2005) (internal quotation omitted).

## ARGUMENT ON CROSS-APPEAL

The District Court correctly found that claim 12 of the '913 patent is not obvious. This overall finding rests on several findings of fact. The District Court correctly found that the invention of claim 12 of the '913 patent is not the result of routine optimization because:

- Topical formulation development is complex and unpredictable;

- PENNSAID® 1.5% is a complex topical formulation;

- The effect of changes to the components of PENNSAID® 1.5% on drug absorption are unpredictable and cannot be predicted by Fick's Law;

- A POSA would not have reasonably predicted that the combination of changes to PENNSAID® 1.5% would result in drug absorption that resulted in twice-daily dosing; and

- The ingredients in PENNSAID® 1.5% are not "result-effective variables."

Each of these findings of fact is supported by a robust evidentiary record, based in large part upon the District Court's repeated crediting of the testimony of Horizon's expert, Dr. Bunge, over that of Actavis's expert, Dr. Michniak-Kohn. Each of these findings of fact is not clearly erroneous and warrants affirmance of judgment.

Actavis's argument that all findings of fact were resolved in Actavis's favor is flatly wrong. Actavis ignores the findings set forth above, which were resolved in favor of Horizon and ultimately led to the District Court's conclusion of non-obviousness. Actavis's additional argument that the District Court erred in

applying the wrong legal standard is also unsupported by the District Court's opinion.

## I.    LEGAL STANDARD

Obviousness may be shown if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art . . . ." 35 U.S.C. §103(a)(pre-AIA). Courts following this statute have evaluated: (1) the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill; and (4) objective considerations of nonobviousness. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966); *see also KSR Int'l*, 550 U.S. at 399.

Because Claim 12 of the '913 patent recites a combination of several elements, a "limitation-by-limitation" approach to assessing obviousness is improper. One cannot prove an invention to a combination of elements "obvious merely by demonstrating that each of its elements was, independently, known in the prior art." *Senju Pharm. Co. v. Lupin Ltd.*, Civ. No. 11-271-SLR, 2013 WL 4101820, *9 (D. Del. Aug. 9, 2013), *aff'd sub nom.*, 780 F.3d 1337 (Fed. Cir. 2015), (citing *KSR Int'l*, 550 U.S. at 418). An obviousness analysis of Claim 12 of the '913 patent must view the "claimed invention as a whole." *Gillette Co. v. S.C. Johnson & Son, Inc.*, 919 F.2d 720, 724 (Fed. Cir. 1990). Indeed, "[f]ocusing on

the obviousness of substitutions and differences, instead of on the invention as a whole, is a legally improper way to simplify the often difficult determination of obviousness." *Id.*

For claim 12 of the '913 patent to be invalid due to obviousness, it is not enough that a POSA would have had a reason to attempt to modify the prior art in an effort to achieve the claimed invention. *See Amgen, Inc. v. Chugai Pharm. Co.*, 927 F.2d 1200, 1207 (Fed. Cir. 1991), *cert. denied*, 502 U.S. 856 (1991). Rather, it must be shown "that a person of ordinary skill in the art 'would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and . . . would have had a reasonable expectation of success in doing so.'" *Auxilium Pharm. Inc. v. Watson Labs., Inc.*, No. 12-3084, 2014 WL 9859224, at *12 (D.N.J. Dec. 16, 2014)(quoting *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009)). "[T]o have a reasonable expectation of success, one must be motivated to do more than merely to vary all parameters and to try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1365 (Fed. Cir. 2007) (internal quotation omitted). "Where . . . a researcher is confronted with numerous variables and possibilities, and lacks adequate guidance from the prior

art, it cannot be said that a particular combination was accompanied by a reasonable expectation of success." *Merck Sharp & Dohme Corp. v. Hospira Inc.*, 2016 WL 5872620, *11 (D. Del. 2016) (internal quotations omitted).

While it is a general rule that it is obvious to discover "the optimum or workable ranges" of a component of an invention "by routine experimentation" "[w]here the general conditions of a claim are disclosed in the prior art," this rule is limited only to cases in which the optimized variable is a result-effective variable. *Applied Materials, Inc.*, 692 F.3d at 1295. To be a result-effective variable, the variable must be understood in the art at the time of the invention to be adjustable in a particular manner to produce a predictable result. *Urbanski*, 809 F.3d at 1242-43. Thus, for a POSA to have arrived at the invention of claim 12 using only routine optimization to change the components and amounts thereof in PENNSAID® 1.5%, not only must a basis for each change be shown in the prior art, but it must also be shown that these "changed" components of the claimed formulation are "result-effective variables," meaning that, e.g., a POSA would have reasonably expected that an increase in concentration of a component would produce a predictable effect (increase) in drug absorption.

However, while "[t]he mere fact that multiple result-effective variables were combined does not necessarily render their combination beyond the capability of a person having ordinary skill in the art," "[e]vidence that the variables interacted in

an unpredictable or unexpected way could render the combination nonobvious."

*Applied Materials*, 692 F.3d at 1298 (citing *KSR Int'l*, 550 U.S. at 421). Moreover, "[t]he outcome of optimizing a result-effective variable may still be patentable if the claimed ranges are 'critical' and 'produce a new and unexpected result which is different in kind and not merely in degree from the results of the prior art.'" *Id.* at 1295 (internal quotation omitted).

## II.   THE DISTRICT COURT CORRECTLY FOUND THAT A POSA COULD NOT HAVE REASONABLY PREDICTED THAT THE CHANGES TO PENNSAID® 1.5% WOULD RESULT IN TWICE-DAILY DOSING

### A.   Skin is a Formidable Barrier to Drug Absorption

The District Court correctly found that skin is a formidable barrier to drug absorption, and that topical formulations are applied to a "complex environment," "the vertically and horizontally multilayered organ of human skin, and adjacent areas of tissue and bone." (APPX15928.) The District Court recognized that the skin is "a surface Nature intended to be a formidable barrier against intruders," and cited to Dr. Bunge's testimony in support. (APPX15932.) The District Court recognized that the record contained numerous examples "concerning the difficulties in achieving a therapeutic result for internal pain by use of a topical formulation," citing the portions of Dr. Bunge's trial testimony where she explained that "only about 5% of the drug that's applied to the skin . . . actually go[es] through the skin." (*Id.*; APPX15188:19-APPX15189:5.)

Horizon's expert, Dr. Weiner, also presented evidence at trial supporting the difficulty in moving a drug molecule through the skin. Dr. Weiner explained that drug molecules have difficulty penetrating through the skin. (APPX15403:2-18; APPX13772-73.) To overcome this difficulty, topical formulators utilize penetration enhancers, which are chemicals that assist drug molecules in permeating through the skin barrier. (APPX15405:15-APPX15406:4.) There are approximately 200 different types of chemical penetration enhancers, which often function via different mechanisms. (APPX15406:5-12.) To take advantage of these different mechanisms, formulators often utilize more than one penetration enhancer in a formulation. (APPX15408:18-APPX15409:7.) The effect of using multiple penetration enhancers in a single formulation is difficult to predict, however, as the result can be either additive and lead to improved penetration, or competitive and lead to reduced penetration. (APPX15408:25-APPX15409:7.)

The complexity associated with the development of topical pharmaceutical formulations as of October 2006 is reflected in the prior art. (*See, e.g*., APPX25026-29, APPX25018-25, APPX18575-77, APPX25030-247, and discussion in Section II of the Counterstatement of the Case, above.)

## B. PENNSAID® 1.5% is a Complex System Because Its Formulation Components Interact with Each Other in Unpredictable Ways

The District Court properly found that in complex systems, a change to one formulation component must result in changes to others, and that the components

in complex systems interact with one another in unpredictable ways. (APPX15925.) The District Court also properly found that PENNSAID® 1.5% is a complex system. (*Id*.) In making such findings of fact, the District Court observed that Dr. Bunge "presented a much more accurate picture of the dynamic and complex formulation at issue," while Dr. Michniak-Kohn "fail[ed] to address, much less explain, the interrelatedness of the relevant variables." (APPX15927.) Additionally, the District Court rejected Dr. Michniak-Kohn's stereo analogy, referred to as the "Optimizer 300," finding that this analogy "fail[ed] to show that an adjustment to one PENNSAID® 1.5% ingredient does not automatically predict the impact, or need for adjustment, of the other ingredients." (APPX15925.) The ample evidence of record supports these findings of fact, such that they are not clearly erroneous. *JVW Enters., Inc.*, 424 F.3d at 1334; *Procter & Gamble Co.*, 566 F.3d at 993.

The District Court correctly recognized the difference between simple and complex systems in pharmaceutical formulations. (APPX15927.) As Dr. Bunge explained, a simple system is a pharmaceutical formulation that contains an active pharmaceutical ingredient in water, wherein the two components of this formulation (i.e., the drug and water) do not interact in any way with each other or with the skin. (APPX15202:11-25; APPX13655.) In contrast, a complex system is one in which interactions do occur between the components of the formulation and

the skin. (*Id.*) Dr. Bunge explained at length that in a complex system, the vehicle typically contains components that evaporate at different rates and absorb into the skin at different rates, such that the concentration of each component in the formulation is changing over time. (APPX15203:1-16; APPX13656.) Given the changing concentrations of the components over time, the interactions between the components, and with the skin, also change over time. (*Id.*)

The District Court also correctly recognized that PENNSAID® 1.5% is a complex system. (APPX15928.) As Dr. Bunge explained, PENNSAID® 1.5% consists of five different components (i.e., ethanol, glycerin, propylene glycol, water, DMSO), some of which will evaporate, all of which can potentially interact with each other and with the skin, and all of which can be absorbed into the skin, albeit at different rates, such that the composition is constantly changing as the various components evaporate and absorb into the skin. (APPX15204:13-24; APPX13658; APPX14667:18-APPX14668:2; APPX14669:15-19.)

**C.** **Fick's Law Cannot Be Used to Predict How Changes to PENNSAID® 1.5% Will Affect Drug Absorption**

The District Court correctly found that in a complex system, the components of the formulation interact with one another in unpredictable ways, and thus, Fick's Law, a theoretical concept that states that the amount of drug per area that goes through the skin per time is equal to the permeability coefficient times the drug concentration, cannot be used to predict drug absorption. (APPX15932.) Once

again, in making this finding, the District Court credited Dr. Bunge's testimony over that of Dr. Michniak-Kohn, finding that Dr. Bunge "more fully appreciate[d] the lack of predictability of whether twice a day dosing could be achieved through the application of PENNSAID® 2% gel on and through a dense, at times impermeable, tangle of skin, tissue and bone." (APPX15929.) In contrast, the District Court found that Dr. Michniak-Kohn "oversimplifie[d] the process that resulted in the claimed invention" by relying solely on general principles, such as Fick's Law. (APPX15931-32.) *See JVW Enters., Inc.*, 424 F.3d at 1334.

The ample evidence of record supports the District Court's findings that general principles cannot be used to predict drug absorption in complex systems. As Dr. Bunge explained, for *simple* systems, predictions regarding drug absorption through the skin may be made based on Fick's Law. (APPX13654; APPX15201:14-APPX15202:10; APPX15209:12-APPX15210:24.) For simple systems, the permeability coefficient, which is a value that relates drug concentration in the formulation to drug absorption, would be expected to remain constant in response to changes in the formulation, such that an increase in drug concentration would result in a linear increase in drug absorption. (APPX13663; APPX15210:10-APPX15211:7; APPX15214:3-APPX15216:3.) However, in *complex* systems, the linear relationship between drug concentration and drug absorption does not hold true because as the interactions between the components

in the formulation change, the permeability coefficient can change. (APPX15216:4-12.)  Because the permeability coefficient in complex systems is not constant, a POSA cannot rely on Fick's Law to predict changes to drug absorption.  (APPX15211:19-APPX15212:1.)  And a POSA could not have predicted how changes to the complex PENNSAID® 1.5% formulation would affect the absorption of diclofenac sodium across the skin, and whether twice-daily dosing could be achieved.  (APPX15204:25-APPX15205:4.)

Thus, the district court correctly found that a POSA could not reasonably predict whether twice-a-day dosing could be achieved with the PENNSAID® 2% formulation.  (APPX15933.)

## III. THE DISTRICT COURT CORRECTLY FOUND THAT THE INGREDIENTS IN PENNSAID® 1.5% ARE NOT "RESULT-EFFECTIVE VARIABLES," AND THAT TWICE-DAILY DOSING COULD NOT BE ACHIEVED THROUGH MERE ROUTINE OPTIMIZATION

The District Court correctly found that there was ample record evidence that contradicted Dr. Michniak-Kohn's assertions that the components of PENNSAID® 1.5% were result-effective variables.  (APPX15933.)  Once again, the District Court credited the testimony of Dr. Bunge over that of Dr. Michniak-Kohn, which the District Court described as a "cherry-picked manner of . . . discussion of the prior art for the noted variables."  (APPX15933-34.)  The District Court further found that there was "insufficient record evidence to support . . . that the three

changes to the PENNSAID® 1.5% formulation – and the two ingredients left unchanged – either in isolation or in combination were obvious optimizations of so-called result-effective variables that would produce a predictable result." (APPX15933.) *See Applied Materials*, 692 F.3d at 1298; *Gillette Co.*, 919 F.2d at 724.

The evidence of record—unrebutted by Actavis or Actavis's expert Dr. Michniak-Kohn—amply supports the District Court's findings that the components of the PENNSAID® 1.5% formulation are not "result effective variables" that could be routinely optimized to achieve twice-daily dosing.

**HPC**.  The evidence of record, unrebutted by Dr. Michniak-Kohn, supports that a POSA would have expected that the addition of a thickening agent, such as HPC, to the PENNSAID® 1.5% formulation would *reduce*, rather than increase, the ability of the formulation to deliver diclofenac sodium through the skin.  As Horizon's experts Drs. Weiner and Bunge explained, the addition of a thickening agent to a formulation makes the formulation more viscous, i.e., harder to flow. (APPX15246:5-APPX15247:9.)  This is because as the viscosity of a formulation increases, it is harder for the drug molecule to move through the formulation and into the skin, thereby having a detrimental effect on absorption.  (*Id.*, APPX15425:8-APPX15426:7; APPX14750:9-24.)  This expectation regarding the

addition of a thickener on drug absorption is supported by numerous prior art references.

**Zhang** (APPX24994-25017): Zhang warns against the addition of a thickening agent to the formulations disclosed therein based on a concern that the increase in viscosity of the formulation would cause a reduction in drug absorption, such that the formulation would no longer be therapeutically effective. (APPX15247:15-APPX15249:6; APPX15261:6-14; APPX13690; APPX25009-APPX25010, ¶[110].)

**Ho** (APPX25363-69): Ho teaches that the viscosity of a gel matrix (i.e., a gelled formulation) may control the release of the drug dispersed therein by preventing the drug molecules from moving through the formulation to be absorbed into the skin. (APPX15261:6-14; APPX15444:15-APPX15445:11; APPX25363-APPX25365; APPX13797.)

**Handbook of Pharmaceutical Excipients** (APPX18578-602): The Handbook of Pharmaceutical Excipients teaches that the rate of drug absorption decreases as viscosity increases. (APPX18589; APPX15501:14-17; APPX15595:14-APPX15596:8.)

**Klucel Brochure** (APPX25416-41): The Klucel Brochure describes HPC as a "diffusion barrier," which is something that reduces the movement of molecules

through a formulation, and teaches that HPC is expected to decrease absorption of drug molecules.  (APPX25420; APPX15597:19-APPX15598:16.)

**Sandborn 1986** (APPX25248-53):  Sandborn 1986 teaches that the thickened formulations in Herschler (APPX18503-508) are "solely for surface penetration, very little penetrating deeply into affected areas where the greatest need arises."  (APPX25249, 1:52-55; APPX14841:24-APPX14842:4.)

**Ikeda** (APPX24953-58):  Ikeda teaches that the effect of viscosity on drug absorption is unpredictable.  Specifically, Ikeda evaluated the effect of viscosity on diclofenac absorption, by comparing diclofenac absorption in three formulations containing HPC and having viscosities of 1967 cP, 7267 cP, and 68433 cP. (APPX24956; APPX13691-APPX13692; APPX15249:22-APPX15251:20.)  Ikeda shows that the formulation having a viscosity of 7267 cP had the highest drug absorption, while the formulations having both lower (i.e., 1967 cP) and higher (i.e., 68433 cP) viscosities had lower drug absorption.  (*Id*.)

**Ethanol.**  The evidence of record, also unrebutted by Dr. Michniak-Kohn, supports that a POSA would have expected that increasing the ethanol concentration in the PENNSAID® 1.5% formulation would have *no effect or a negative effect* on the absorption of diclofenac sodium through the skin.  *See Applied Materials*, 692 F.3d at 1298.  Actavis, and expert Dr. Michniak-Kohn, did not identify any publication that demonstrates experimentally that an increase in

ethanol concentration resulted in an increase in drug absorption. (APPX15702:25-APPX15703:12.) Rather, multiple prior art references provide experimental evidence that the effect of ethanol concentration on drug absorption is unpredictable.

**Nishihata** (APPX25272-79): Nishihata evaluated diclofenac absorption in rats from formulations containing diclofenac and buffered water, at three different drug concentrations, both with and without the presence of ethanol. (APPX25274; APPX13685; APPX15239:5-16.) Nishihata determined that the addition of 10% ethanol had *no effect* on diclofenac absorption. (APPX25275; APPX13686; APPX15238:23-APPX15242:14.)

**Ho** (APPX25363-69): Ho measured the in vitro absorption of diclofenac sodium from thickened solutions that contained drug, a carbomer thickening agent, ethanol, water, and propylene glycol, where the concentration of both the drug and the thickening agent were held constant. (APPX25365; APPX13677; APPX15234:9-25.) In the absence of propylene glycol, the increase of ethanol from 0% to 25% showed an increase in absorption, while the second increase in ethanol from 25% to 50% caused a *decrease* in absorption. (APPX25365; APPX13678; APPX15235:1-11.) When 25% propylene glycol was added to these formulations, the addition of ethanol from 0% to 25% caused a *decrease* in

absorption.  (APPX25365; APPX13680-APPX13681; APPX15236:9-APPX15237:13.)

The **Williams** (APPX25280-295) reference, from which Dr. Michniak-Kohn cherry-picked certain teachings while ignoring others, further supports the unpredictable effects of ethanol on drug absorption.  Williams discusses several of the potential mechanisms that ethanol may exhibit on drug absorption, including that increasing ethanol concentration can either reduce drug absorption or increase drug absorption.  (APPX25287-APPX25288; APPX13675; APPX15231:11-24.)  Williams teaches that increasing ethanol concentration can increase drug absorption by decreasing saturation and preventing drug depletion of poorly soluble drugs, by improving drug saturation into the skin, and by achieving supersaturation.  (APPX25288; APPX16375; APPX15228:4-APPX15231:15.)  However, Williams also teaches that increasing ethanol concentration can *reduce* drug absorption by decreasing relative saturation, by dehydrating the skin, and by causing the drug to come out of solution because the drug concentration has exceeded the saturation concentration.  (*Id.*)

Other prior art references support that ethanol can dehydrate the skin, which, in turn, can *reduce* drug absorption.  **EPA, Dermal Exposure Assessment** (APPX18818) teaches that, as a rule, hydration increases the permeability of the skin for most compounds.  (APPX15601:11-13; APPX15602:10-14; APPX18818.)

**Betlach** (APPX24945-52) teaches that chronic application of ethanol causes skin dehydration. (APPX24949, 4:47-54; APPX13820; APPX15472:10-25; APPX14906:1-4.) And **Sandborn 1986** (APPX25248-53) teaches that DMSO causes dehydration of the skin. (APPX25249, 1:62-2:3; APPX13821; APPX15473:21-APPX15474:1.) Accordingly, a POSA would understand that increasing the concentration of ethanol in PENNSAID® 1.5% could dehydrate the skin, and absorption of diclofenac would be reduced. (APPX15225:17-25.) A POSA would further understand that increasing ethanol in a formulation that also contains a large (i.e., 45.5%) amount of DMSO, which is also known to dehydrate the skin, would result in a further reduction in drug absorption. (APPX15474:2-11.)

The prior art also teaches that an increase in ethanol concentration may reduce drug absorption because ethanol might compete with DMSO as a penetration enhancer. Diclofenac sodium is soluble in both DMSO and ethanol. (APPX15429:5-APPX15430:2.) Accordingly, the ethanol could compete with DMSO to solubilize diclofenac sodium, taking away molecules from DMSO and its strong penetration enhancing capabilities, thereby reducing drug absorption. (APPX15474:24-APPX15475:21.)

**Diclofenac sodium.** Ample evidence was presented at trial, unrebutted by Dr. Michniak-Kohn, which showed that the relationship between drug

concentration and drug absorption in complex systems is nonlinear and not predictable.  *See Applied Materials*, 692 F.3d at 1298.  This finding is supported by multiple prior art references.

**Nishihata** (APPX25272-79):  Nishihata shows that addition of just 10% ethanol to a simple system containing drug and water caused the permeability coefficient to change, such that the system behaved as a complex system, rather than a simple system.  (APPX15221:9-15.)  Nishihata looked at dermal absorption of diclofenac sodium in rats from six formulations, three containing water plus diclofenac sodium, and three containing water, diclofenac sodium, and ethanol.  (APPX25274; APPX13664; APPX15217:25-APPX15218:16.)  The results of Nishihata's experiment showed that the diclofenac sodium absorbed from the simple systems containing just diclofenac sodium and water behaved predictably and linearly, with drug absorption increasing linearly with drug concentration until the saturation concentration was reached and no more drug could dissolve in solution.  (APPX25275; APPX13668; APPX15218:21-APPX15220:6.)  However, when ethanol was added, the system became complex and behaved unpredictably and nonlinearly, with drug absorption for the 1% diclofenac sodium formulation lower than a linear increase, even though all the drug had dissolved and the saturation concentration had not yet been reached.  (APPX25275; APPX13669; APPX15220:11-APPX15221:8.)  This illustrates that once 10% ethanol was added,

Fick's Law no longer applied to the complex system.  (APPX13670; APPX15221:20-APPX15222:11.)

**Lu** (APPX24972-93):  Lu presents data showing that an increase in drug concentration did not result in a proportional, or linear, increase in drug absorption, according to Fick's Law.  (APPX13671; APPX15222:22-APPX15223:4.)  In the experiment set forth in Lu, although the concentration of the drug, celecoxib, was doubled from 2.5% to 5%, there was no significant change in drug absorption. (APPX24986 (Ex. 8); APPX13672; APPX15223:5-APPX15224:13.)

Given this support in the prior art, all of which was unrebutted by Dr. Michniak-Kohn, the District Court correctly determined that the components of PENNSAID® 1.5% are not "result-effective variables," such that twice-daily dosing could not be achieved through mere routine optimization.  *See Applied Materials*, 692 F.3d at 1298; *Urbanski*, 809 F.3d at 1242-1243.

## IV.   ACTAVIS'S ARGUMENTS ON APPEAL ARE BASED ON AN INCORRECT INTERPRETATION OF THE DISTRICT COURT'S OPINION

### A.   Key Findings of Fact Were Resolved in Horizon's Favor

Actavis argues that the District Court "found all underlying facts relevant to a determination of obviousness under 35 U.S.C. § 103(a) in favor of Actavis." (APB, 59.)  As set forth at length above, such a statement lacks any basis in the District Court's opinion, as the District Court resolved numerous—and key—

findings of fact in Horizon's favor.  Namely, the District Court resolved the following facts in Horizon's favor:

- Topical formulation development is complex and unpredictable (APPX15925-27);

- PENNSAID® 1.5% is a complex topical formulation (APPX15928);

- The effect of changes to the components of the PENNSAID® 1.5% formulation on drug absorption are unpredictable and cannot be predicted by Fick's Law (APPX15931-32);

- A POSA would not have had a reasonable expectation of success that the combination of changes to PENNSAID® 1.5% would result in drug absorption that resulted in twice-daily dosing (APPX15933-36); and

- The ingredients in PENNSAID® 1.5% are not "result-effective variables" (APPX15933-15936).

These findings of fact then led the District Court to properly conclude that claim 12 of the '913 patent is nonobvious.

**B.    The District Court Did Not Rely on Unexpected Results to Find Claim 12 of the '913 Patent Not Obvious**

Actavis argues incorrectly that "the sole reason that the court failed to find the asserted claims obvious was due to alleged unexpected results," and that "the district court did not find anything about PENNSAID® 2% was actually

unexpected," "only that the results *might* have been unexpected due to the complexity of the system." (APB, 60, 72 (emphasis in original).) The District Court's finding of non-obviousness is based on a proper analysis pursuant to the case law concerning routine optimization and result-effective variables, with the District Court finding that Actavis had not presented evidence that "the three changes to the PENNSAID® 1.5% formulation – and the two ingredients left unchanged – either in isolation or in combination were obvious optimizations of so-called result-effective variables that would produce a predictable result." (APPX15933.)

The District Court cited to key cases from this Court, namely *In re Applied Materials* and *In re Urbanski* (APPX15917-18; APPX15936), which concern the obviousness of alleged "result effective variables." These cases instruct that the general rule that "it is not inventive to discover the optimum or workable ranges by routine experimentation" "is limited to cases in which the optimized variable is a 'result-effective variable.'" *Applied Materials*, 692 F.3d at 1295. These cases further instruct that *only* if the court finds the variables at issue to be result-effective does the court need to consider whether the claimed ranges are "critical" or "produce a new and unexpected result." *See id.* at 1297; *see also Urbanski*, 809 F.3d at 1242-1243. Because the District Court did not find the components in

PENNSAID® 1.5% to be result-effective variables, it was not necessary for the District Court to consider whether the variables produced an unexpected result.

While the District Court used the phrase "unexpected results" in its Opinion (*see* APPX15936), the District Court used this term to refer to unpredictability or variables interacting in an unexpected way. The District Court's opinion makes this clear by stating that "the result will still not be obvious if the variables interacted in an unpredictable or unexpected way." (*See id.*) Indeed, the District Court properly concluded that the components of PENNSAID® 1.5% did interact in an unpredictable way, such that modification of these variables was not routine optimization. (APPX15928-36.) *See Applied Materials*, 692 F.3d at 1298.

## C. The District Court Applied the Correct Legal Standard

Actavis alleges, based on cherry-picked statements from the District Court's opinion, that the District Court applied the wrong legal standard in determining that claim 12 of the '913 patent was not obvious. Specifically, Actavis argues that the District Court held the prior art to an impossibly high standard, such that the prior art had to predict the exact formulation and dosing frequency recited in claim 12 of the '913 patent (APPX15923) and that the District Court improperly relied "extensively" on *Pfizer Inc. v. Mylan Pharmaceuticals Inc.*, 71 F. Supp. 3d 458 (D. Del. 2014). (APB, 63-67.)

Actavis ignores the remaining thirty-eight pages of the District Court's analysis, which set forth a detailed discussion of the unpredictability associated with topical formulation development. These pages explain that in the particular case of modifying PENNSAID® 1.5%, (1) the effects of changing the components of PENNSAID® 1.5% cannot be predicted by Fick's Law, such that a POSA would not have been able to predict that the combination of changes to PENNSAID® 1.5% would result in a formulation capable of twice-daily dosing, and (2) the components of PENNSAID® 1.5% are not "result-effective variables," such that changing the amounts of these components to reduce dosing frequency was mere routine optimization. (APPX15923-36.) Indeed, the District Court's opinion makes clear that the District Court conducted a proper obviousness analysis pursuant to *In re Applied Materials*.

While the District Court did cite to *Pfizer v. Mylan*, its reliance on this case can hardly be characterized as extensive. The District Court cited this case only *after* it concluded that modification of PENNSAID® 1.5% was not "the routine optimization of result-effective variables," relying both *KSR* and *In re Applied Materials*. (APPX15916-17, APPX15936.)

Actavis states that the District Court "lean[ed] heavily on the portions of *Pfizer* that distinguish *Merck v. Biocraft*," and that the District Court "quotes critical analysis from *Merck*" that was "expressly overruled by the Supreme Court

in *KSR*" such that "the 'critical' distinction that defined the obviousness inquiry is no longer good law." (APB, 65-66.) First, Actavis's statement that *Merck* was "expressly overruled by the Supreme Court in *KSR*" is incorrect. While *Merck* pre-dates *KSR*, there is no statement in *KSR* that "expressly overrule[s]" *Merck*. Moreover, this Court in *Merck* found the patent at issue to be obvious. *Merck & Co. v. Biocraft Labs., Inc.,* 874 F.2d 804, 809 (Fed. Cir. 1989). Thus, there is nothing in *Merck* for *KSR* to overrule—had *Merck* been decided post-*KSR*, the outcome of obviousness would have been the same.

Second, the District Court did not "lean[] heavily on the portions of *Pfizer* that distinguish *Merck*." (APB, 65.) Rather, as the District Court stated before quoting *Pfizer*, the District Court was not relying upon the *Pfizer* decision as a guide for its obviousness analysis. Instead, it merely looked to *Pfizer* because in that case, "former Chief Judge Sleet was confronted with a similar set of contrasting arguments" of obviousness as those made by Actavis and Horizon, and the District Court found "Judge Sleet's mode of contrasting these two competing legal principles" to be helpful. (APPX15936-37.) The District Court did not follow Judge Sleet's actual obviousness analysis, but rather, drew a comparison to the arguments presented in *Pfizer* with those presented at trial, finding that "there was more that met the eye." (APPX15937.) The District Court ultimately returned to a "result-effective variable" analysis, once again re-stating that the components

43

of PENNSAID® 1.5% interact with one another in unpredictable ways. (APPX15939) ("All in the context of not knowing how choosing one component and at what concentration would compel a change to another component and, even if it stayed, what concentration would allow it to work harmoniously with the other variables.").

At no time did the District Court indicate that the invention of claim 12 of the '913 patent was nonobvious because it was "merely 'obvious to try' and therefore not barred by § 103." Accordingly, Actavis's entire argument concerning any alleged misapplication of *Pfizer* or *Merck* is misplaced. Notably, at trial, Actavis never argued that claim 12 of the '913 patent was obvious pursuant to an "obvious to try" analysis. Rather, Actavis repeatedly argued that the components of PENNSAID® 1.5% were "result-effective variables," and therefore, modifying such variables to arrive at PENNSAID® 2% was routine optimization. Now, however, in Actavis's brief, Actavis has abandoned its arguments concerning "result-effective variables." Indeed, the phrase "result-effective variable" does not appear in Actavis's brief whatsoever—despite the District Court's clear holding that the variables in PENNSAID® 1.5% were *not* "result-effective variables" (based on the abundance of evidence presented at trial supporting this finding), and therefore, claim 12 of the '913 patent is not obvious.

## V.    CONCLUSION REGARDING NONOBVIOUSNESS

For the reasons above, the District Court's judgment that claim 12 of the

'913 patent is not obvious should be affirmed.

<u>**REPLY BRIEF ON APPEAL**</u>

**I.    THE DISTRICT COURT ERRED WHEN IT FOUND THAT ACTAVIS'S LABELING DOES NOT INDUCE INFRINGEMENT OF THE '450 PATENT FAMILY**

The District Court correctly found that Actavis's labeling contains all the elements required by this Court to support a charge of induced infringement, but then improperly applied this Court's caselaw. Actavis's argument for affirmance is based on the same misapplication of this Court's prior precedential opinions concerning induced infringement.

**A.    The District Court Correctly Found in Actavis's Labeling Sufficient Elements to Establish Induced Infringement**

Actavis's labeling instructs patients to (1) apply Actavis's ANDA Product to clean, dry skin of the knee, (2) protect the treated knee(s) from natural and artificial sunlight because studies in animals indicated topical diclofenac treatment resulted in an earlier onset of ultraviolet light-induced skin tumors, and (3) wait until the area is completely dry before covering with clothing or applying sunscreen, insect repellant, cosmetics, topical medications, or other substances. (HPB, 7.) These facts are not in dispute.

The District Court correctly found that Actavis's labeling "directs a patient on how to apply the ANDA Product, and provides guidance to the patient on how to proceed from there if he wishes to have anything else come in contact with [h]is knee afterward." (APPX60.)

The District Court also correctly found that Actavis's labeling "says that if a patient wants anything - such as clothing, sunscreen, insect repellant, lotion, moisturizer, cosmetics, topical medication, other substances, water or another person's skin - to come into contact with a treated knee, the knee must be completely dry before doing so." (APPX58.) The District Court further specifically found that "[t]he medical reason for specifying 'sunscreen, insect repellant and other topical medications' is important." (APPX59.) And the District Court recognized the inevitability of patients practicing the claimed invention, "accepting that it is inevitable that at some point a patient will apply one of those items [sunscreen, insect repellant, and other topical medications] to his knee after using the ANDA product." (*Id*.)

Actavis has not disputed any of the foregoing findings.

**B.    The District Court Committed Error When It Found No Encouragement to Infringe, and Actavis's Brief Does Not Support Affirmance**

The District Court found that Horizon had not met its burden to show that Actavis's labeling recommends, encourages, or promotes a use of its ANDA Product with the intent to directly infringe on Horizon's claimed methods. Simply put, the District Court adopted Actavis's theory that there is no induced infringement because that labelling allegedly is indifferent as to "whether"

subsequent topical agents are applied.  This position ignores the totality of Actavis's labeling.

The District Court agreed that Actavis's labeling may "permit an infringing use," and that some patients will follow Actavis's labeling in applying agents such as sunscreen, but then held that such permission is not encouragement:

> Although the inclusion of 'sunscreen, insect repellant, and other topical medications' in the proposed label may be understood to permit an infringing use, and accepting that *it is inevitable* that at some point a patient will apply one of those items to his knee after using the ANDA product, that permission does not amount to encouragement because those items are just three examples of what a patient might wish to apply to his knee after treatment, if anything is to be applied at all.

(APPX58-59 (emphasis added).)

The District Court's ruling ignores its own finding that "[t]he medical reason for specifying 'sunscreen, insect repellant and other topical medications' is important."  (APPX59.)  Moreover, the District Court never specifically acknowledged or addressed the compelling reason why Actavis's labeling encourages at least some patients to apply sunscreen.  As Actavis's labeling warns, studies in animals indicated topical diclofenac treatment resulted in an earlier onset of ultraviolet light-induced skin tumors.  (APPX5881.)

Actavis does not argue that no patient will follow Actavis's labeling and apply sunscreen in accordance with that label, thus infringing the asserted claims.  Indeed, to do so would ignore reality.  Inevitably, as inherently recognized by the

District Court, some patients will risk exposure of their treated knee(s) to sunlight and will follow Actavis's labeling instruction to "protect the treated knee(s) from natural and artificial sunlight" by applying sunscreen in accordance with that label. Actavis's reliance on *Shire* is misplaced, because as explained in Horizon's Principal Brief, Actavis's labeling is not "indifferent" to infringement. (*See* HPB, 24.)

Actavis's labeling encourages a patient to practice the claimed invention, as it instructs to "[w]ait until the area is completely dry before covering with clothing or applying sunscreen, insect repellant, cosmetics, topical medications or other substances." Actavis's labeling also encourages the use of sunscreen to "[p]rotect the treated knee(s) from natural and artificial sunlight" because studies in animals indicated topical diclofenac treatment resulted in an earlier onset of ultraviolet light-induced skin tumors.

Actavis has not disputed that patients who will use Actavis's ANDA Product may have a "need" to apply sunscreen, insect repellant, or another topical medication to the area of treatment, and has not disputed that if a patient follows the label instructions regarding application of a second topical such as sunscreen, the patients will infringe the claimed method of treatment of pain of osteoarthritis of the knee.

### C. The District Court's Ruling and Actavis's Arguments for Affirmance are Based on Misapplication of the Law

As set forth in detail in Horizon's Principal Brief, the District Court opinion improperly relied on two cases, *Shire LLC v. Amneal Pharm., LLC*, No. 11-3781, 2014 WL 2861430, at *5 (D.N.J. June 23, 2014), *aff'd in part, rev'd in part*, 802 F.3d 1301 (Fed. Cir. 2015), and *In re Depomed Patent Litigation*, Civ. No. 13-4507, 2016 WL 7163647, at *58 (D.N.J. Sept. 30, 2016), *appeal docketed*, No. 17-1153 (Fed. Cir. Nov. 3, 2016). (HPB, 24-26.)

Actavis's assertion that induced infringement cannot occur when *only some*, and not all, patients inevitably follow Actavis's labeling and engage in infringing application of an agent such as sunscreen, relies on *Takeda Pharm. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 632-33 (Fed. Cir. 2015). But *Takeda* is inapplicable to the present case. *Takeda* is an "off-label" case in which Takeda asserted that patients would inevitably use the drug product for the off-label treatment of gout flares (the claimed use in the asserted patent). The present case is not an off-label case, as the asserted induced infringement is based solely on Actavis's labeling. This Court's opinion in *Takeda* does not require that induced infringement must be based on a finding that *all* patients will use the ANDA product in an infringing manner. Indeed, this Court has found induced infringement when the label "would inevitably lead some consumers to practice the claimed method. (HPB, 27-28.)

Actavis's attempt to distinguish *AstraZeneca* on the basis that a patient "could easily choose never to apply a second topical agent" (APB, 22) misses Horizon's point. In *AstraZeneca*, it was inevitable that some patients would downward titrate and infringe, and here it is inevitable that some patients will follow Actavis's label and apply a topical agent, such as sunscreen, after waiting for Actavis's ANDA Product to dry.

Actavis's arguments to distinguish *Eli Lilly* (APB, 22-23) and *Braintree* (APB, 23-24) also miss the point. In *Eli Lilly*, this Court, in finding induced infringement, interpreted as "instructions" the label recommendations to use vitamin supplementation to avoid side effects. *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1366-67 (Fed. Cir. 2017). And in *Braintree*, this Court found that the label "recommends or suggests" the claimed use, and that the instruction on the label how to engage in an infringing use showed an intent that the product be used in an infringing manner. *Braintree Labs., Inc. v. Breckenridge Pharm., Inc.*, 688 F. App'x 905, 908-909 (Fed. Cir. 2017). Actavis attempts to distinguish these cases by arguing that Actavis's labeling does not contain any instructions that *necessarily* result in infringement. But the question is not whether *all* use of the ANDA product necessarily results in infringement. Use by some patients in the infringing manner is enough to find induced infringement.

**D.** **If This Court Finds that Questions of Fact Exist, the Case Should be Remanded**

If this Court concludes that questions of fact exists (*see* HPB, 29-31), then Horizon respectfully requests that this case be remanded to the District Court.

**II.** **THE DISTRICT COURT ERRED WHEN IT FOUND THE CLAIM TERM "CONSISTING ESSENTIALLY OF" INDEFINITE**

The District Court properly identified the "basic and novel properties" as part of its construction of "consisting essentially of." However, the District Court erred when it went on to assess whether its construction of "consisting essentially of" met the requirements of 35 U.S.C. §112, ¶2. The language of the statute makes clear that the requirement to "particularly point[] out and distinctly claim[]" is a requirement of the "claims," not a requirement of the language a court uses to define claim terms.

**A.** **The District Court Correctly Found that A POSA Could Determine the Basic and Novel Properties of the Claimed Formulation with Reasonable Certainty**

The District Court did not err in finding clear support in the '838 patent for identifying the "basic and novel properties" as: (1) better drying time; (2) higher viscosity; (3) increased transdermal absorption; (4) greater pharmacokinetic absorption; and (5) favorable stability. (APPX23.) As the District Court noted, these five characteristics are clearly identified in the Summary of the Invention as being "the characteristics that demonstrate improvement over the prior art"

52

comparative liquid formulation. (APPX23.) No other characteristics of the invention are so prominently identified.

Actavis's assertion that the patent describes other "basic and novel properties" is unsupported. (APB, 37-38.) The portion of the specification cited by Actavis in support of "reducing or minimizing the incidence of intolerable skin irritation caused by disrupting the skin barrier" as a basic and novel property describes only that there was "a considerable need" for a topical NSAID formulation that could overcome the "challenge" of development, by including to reduce skin irritation. (APPX136, 4:9-18.) Nowhere does the patent identify reducing irritation as a "basic and novel property." Actavis's citation of support for its assertion that adherence to skin and spreadability are "basic and novel properties" is similarly flawed. These properties are discussed only indirectly, using the transition phrase "[m]orever" (APPX136, 4:32-36), and then are excluded from the Section titled "Characteristics of the Gel Formulation" (APPX139, 9:1-10:47).

Actavis's argument that the "basic and novel properties" are undefined because some claims also recite elements "related to viscosity, drying rate, and transdermal flux," is similarly misplaced. (APB, 38-39.) The fact that certain elements are "related" to or "overlap" with the "basic and novel properties," does not require that the basic and novel properties are indefinite. A POSA would

recognize that the claim phrase "a viscosity of 500-5000 centipoise" further narrows and defines the basic and novel property of "higher viscosity," by specifying a particular range. Similarly, a POSA would recognize that the claim phrase "a transdermal flux of 1.5 times or greater" further narrows and defines the basic and novel property of "increased transdermal flux," by specifying a specific ratio. A POSA would also understand that the claim term "greater drying rate" and the property "better drying time" are two different, albeit related, features. (*See* HPB, 45-47, 49-54.)

Actavis cites to *Mangosoft* in support of its allegation that a claim cannot have a claim limitation that overlaps with a "basic and novel property," but this case is inapposite. (APB, 38.) *Mangosoft* does not discuss "consisting essentially of," identification of basic and novel properties, or even definiteness. *Mangosoft* is a factually unrelated case about claim construction, wherein the Court rejected a proposed construction of "local" because it extended beyond the specification's disclosure and rendered the inclusion of the term in the claim superfluous since the proposed construction did not require "local" to convey anything other than what was already required by the rest of the claim. *Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327, 1330-31 (Fed. Cir. 2008).

Actavis admonishes the patentees for never identifying the invention's basic and novel properties during prosecution (APB, 39); however, this Court has made

clear that the basic and novel properties can be defined simply by distinguishing the invention from the prior art. *See AK Steel Corp. v. Sollac & Ugine,* 344 F.3d 1234, 1239-40 (Fed. Cir. 2003) (defining basic and novel properties from the specification which stated the goal of the invention, as distinguished from prior art); *see also Atlas Powder Co. v. E.I. du Pont De Nemours & Co.,* 750 F.2d 1569, 1574–75 (Fed. Cir. 1984) (defining properties in light of the "essence of the claimed composition," as distinguished from prior art). This is exactly what the patentees did in this case, in the specification of the patent. (APPX136, 4:22-32.)

The prosecution history also makes clear that the invention was distinguished from the prior art on the basis of these basic and novel properties. For example, the patentee referred to viscosity in distinguishing the claimed invention from the prior art formulations of Kasai, in which a dibasic ester was argued to be required to achieve viscosity. (APPX2422-2423.) Similarly, the patentee referred to transdermal absorption in distinguishing the claimed invention from the prior art formulations of Betlach, in which the ether alcohol and fatty alcohol ester were argued to be required to achieve enhanced absorption. (APPX2423.) The patentees then stated that "[a]pplicants have discovered a novel and non-obvious topical formulation having a viscosity between 500 to 5000 centipoise that has increased absorption and drying rate compared to the closest prior art ("the comparator formulation") [and] the present formulation has an

increase in absorption and better drying time than the comparative formulation."

(APPX2428-2429.)  The patentees concluded, "[i]ndependent claim 61 has been

amended to recite 'consisting essentially of' *thereby limiting the formulations to*

*the basic and novel characteristics of the recited formulation.*  As such, the claims

exclude the dibasic ester of Kasai et al. as well as the ether alcohol and a fatty

alcohol ester of Betlach et al."  (APPX2430) (italicized text not cited by Actavis in

its brief on page 39).

The falsity of Actavis's argument that the "patentees simply made piecemeal

arguments based on individual prior art references" (APB, 39) is apparent from a

complete iteration of the document that Actavis did not use to support its

argument.  The patentee did distinguish the prior art from the claimed inventions

on the basis of certain components disclosed in the prior art compositions—dibasic

acid esters, surfactant, PEG-7-glycerol cocoate, thickening bases, and a polyacrylic

acid polymer—and how these would affect basic and novel properties including

viscosity and absorption.  (*See* APPX3314-3326, APPX3341-3343, APPX3365-

3367.)

Contrary to Actavis's assertion (APB, 39), Horizon had no trouble during

the District Court proceedings to identify the "basic and novel properties" once it

became evident, after the filing of Actavis's Opening *Markman* Brief (APPX1977-

1980), that Actavis's indefiniteness argument was centered on the belief that the

"basic and novel properties" were unidentifiable.  (APPX3620-3626.)

**B.    The District Court Committed Legal Error When It Applied the Nautilus Definiteness Standard to the Basic and Novel Properties of the Claimed Invention**

Actavis repeatedly emphasizes the impact of *Nautilus* on "consisting

essentially of," but until the court below, there was no impact.  Nowhere does

*Nautilus* discuss the term "consisting essentially of"—let alone address the concept

of "basic and novel properties."  *Nautilus* sets forth an indefiniteness standard for

<u>claims</u>: "a patent is invalid for indefiniteness if its <u>claims</u>, read in light of the

specification delineating the patent, and the prosecution history, fail to inform,

with reasonable certainty, those skilled in the art about the scope of the invention."

*Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014) (emphasis

added).  Actavis's position requires (improperly) importing and appending the

"reasonable certainty" standard onto "basic and novel properties," and, in addition,

requires that these properties have "objective boundaries."  *Nautilus* itself does not

support this position—it focuses solely on claims and does not mention "basic and

novel properties" at all.  Horizon reiterates that *Nautilus* does not compel or

sanction application of the definiteness requirements of 35 U.S.C. §112, ¶2 to the

"basic and novel properties" of an invention.  (APPX21-23.)

This is a case of first impression.  In no case has this Court held or even

suggested that "basic and novel properties" are part of the language of the claims

such that they are subject to the definiteness requirements of 35 U.S.C. §112, ¶2.

Most courts, including the four cases cited in Horizon's Opening (HPB, 42),

identify the "basic and novel properties" and find that they are tools for assessing

whether, as a matter of fact, claims with "consisting essentially of" limitations are

either invalid in view of prior art or infringed.

The fact that courts often identify the basic and novel properties of the

invention as part of the construction of "consisting essentially of" does not support

Actavis's argument that the requirement of §112, ¶2, as interpreted in *Nautilus*,

applies to the basic and novel properties themselves.  There is no case that holds

that basic and novel properties are part of the claims *per se*.  *General Electric*, a

District of Delaware case cited by Actavis in its brief, states only that

"determination of the basic and novel characteristics . . . is a part of determining

the scope of the claim."  *Gen. Elec. Co. v. Hoechst Celanese Corp.*, 698 F. Supp.

1181, 1187 (D. Del. 1988).[2]  This is simply the court observing that identifying

---

[2] Actavis also cites *Bayer AG v. Sony Elecs., Inc.*, 229 F. Supp. 2d 332, 344 (D.
Del. 2002), *aff'd*, 83 F. App'x 334 (Fed. Cir. 2003), but this case does not in
support Actavis's argument that the basic and novel properties of an invention are
"a part of . . . the scope of the claim."  In *Bayer*, the court was able to determine,
based upon the factual record, including testimony from the inventor, the
maximum amount of other metal additives that would not affect the basic and

basic and novel properties is required to define the meaning of the claim term

"consisting essentially of," which itself is a legal term of art that does not have a

plain and ordinary meaning. And significantly, in *General Electric*, the court

declined to identify the basic and novel properties, concluding that there is a

predicate factual dispute that the court did not want to address until it has taken

"advantage of the availability of expert witnesses at trial." *Id.* at 1187.

Requiring courts to evaluate definiteness of basic and novel properties is

akin to requiring courts to evaluate the definiteness of each and every construed

claim meaning. If a court determines that "round" means "having an aspect ratio

of less than 1.5:1," is the court then required to determine whether "aspect ratio" is

definite pursuant to §112, ¶2? The answer is clearly no.

Determining whether a given ingredient in a potentially infringing product

would "materially affect" one of the basic and novel properties of an invention is

necessarily a factual inquiry to be assessed by reference to the potentially

infringing product. If, *in the context of the infringement analysis,* the available test

methods for evaluating whether the presence of an additional element in a

potentially infringing product affects the basic and novel properties fail to produce

---

novel properties. *Id.* at 346-347. The court did not make this determination solely
as part of claim construction. Rather, the court made this determination following
a nine-day bench trial as part of its determination of infringement. *Id.*

definitive results, the court can make a finding of noninfringement on the basis that there is no evidence to support that the additional element has a "material effect."

The cases cited by Actavis as warning of the "danger the definiteness requirement is designed to guard against" only emphasize that it is the *claims* that provide the boundaries of the invention, not limitations that are imported from outside the bounds of the claims.  *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014); *Honeywell Int'l. Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1341 (Fed. Cir. 2003); *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998).

Actavis makes much of the fact that two other district courts have considered the issue of whether the definiteness requirement of §112, ¶2, as interpreted in *Nautilus*, applies to the "basic and novel properties."  Actavis ignores that these courts addressed the issue only *because of* the decision of the court below, and further ignores that in each case the court failed to find indefiniteness.  *Prostrakan, Inc. v. Actavis Labs. UT, Inc.*, 2017 WL 3028876, at *8-*9 (E.D. Tex. July 15, 2017) (finding the basic and novel properties definite); *Mayne Pharma Int'l Pty Ltd. v. Merck & Co., Inc.*, 2016 WL 7441069 (D. Del. Dec. 27, 2016) (declining to make a finding of definiteness of a basic and novel property on the basis that the record was insufficient to address the underlying factual questions).

## C. The District Court Committed Legal Error When It Found "Better Drying Time" Indefinite

Actavis's assertion that the '838 patent uses the concepts of "drying time" and "drying rate" interchangeably is unsupported. Nowhere does the '838 patent state that these are equivalent terms. To the contrary, the '838 patent specification differentiates these two concepts, referencing "drying time" as a characteristic of the inventive formulations (APPX139, 10:5-30), and then separately discussing drying rate in relation to the speed ("more rapid," "quicker" or "faster") of drying (APPX145-146). This discussion of drying rate appears mostly in the context of Example 5, which compares the extent of drying at different time points, which in turn enables one to compare the relative speed of drying "over the time points measured." (APPX145-146.) For example, the patent evaluates drying rates after the first five minutes, after four hours, and after 24 hours. (APPX145, 21:63-22:10.)

Actavis's assertion that Horizon's briefing used the concepts of "drying time" and "drying rate" interchangeably (APB, 49-50) is also unsupported. While Horizon's briefing acknowledged that the Court and Actavis's expert had used those terms interchangeably, Horizon's point in the briefing was that it was prejudiced because the basic and novel property "greater drying time" was never briefed, by agreement of the parties. (APPX4084-4085, APPX4088-4090.)

Thus, while Horizon may have been on notice that Actavis considered the "drying rate" claim term indefinite, on the basis that different time points reflected different drying rates, Horizon was not on notice, and was not afforded an opportunity to even brief, whether the basic and novel property of "better drying time" was definite. Because none of the record relied upon by the District Court related to "drying time," but rather related to "drying rate," the finding that the basic and novel property of "better drying time" is indefinite is clear error.

Furthermore, despite arguing that Horizon waived the argument (APB, 50-51), the Court did consider the definiteness of "better drying time" on a claim-by-claim basis on the merits. (APPX36.) The Court, however, then erred in finding the term indefinite, stating that "the two methods [of evaluating drying time] do not provide consistent results at consistent times." (APPX36-37.) The basic and novel property is "better drying time"—better than the comparative formulation. For the "consisting essentially of" claims that are limited to HPC, the inventive formulations all have better drying times than the comparative formulations at every time point using either method. (APPX146, Table 12, columns F14/2 gel 2.5% and F14/2 gel 4.0% versus Comparative; APPX139 (10:16-21).) The Court considered Horizon's claim-by-claim argument on the merits and erred in finding "better drying time" indefinite.

**D.    The District Court Committed Legal Error When It Found "Favorable Stability" Indefinite**

The District Court concluded that "consisting essentially of" was indefinite because one of the five basic and novel properties, "favorable stability," was indefinite.  However, the District Court only found "favorable stability" indefinite because it determined "favorable stability" meant "degradation," which in turn meant "Impurity A."  (APPX37-38.)  Thus, "consisting essentially of" was found indefinite because a term three steps away was found to be indefinite, without any intervening claim construction analysis.  This bootstrapping approach is wholly inappropriate.  The District Court was unaware, and never made itself aware, of how a POSA would interpret "favorable stability," as Horizon's and Actavis's experts never conducted a definiteness analysis of "favorable stability."  (*See* APPX37.)

The District Court also erred in finding the "degrades" term indefinite. Actavis, like the Court below, erroneously engages in a lengthy discussion of HPLC data and testing conditions to support its belief that "impurity A" is indefinite.  (APB, 25-29.)  The District Court ignored, and Actavis dismisses in a footnote (APB, 30, n. 6), the law of this Court that the hypothetical POSA is "presumed to be aware of **all** the pertinent prior art."  *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed. Cir. 1985) (emphasis added).  The POSA reading the claims in light of the specification would know that the "degrades"

claim terms refer to the degradation of the active ingredient, i.e. the appearance of "impurity A," also known as Diclofenac Related Compound A RS.  (HPB, 59-60.)

The POSA would not need to guess the identity of "impurity A," as alleged by Actavis (APB, 29), because the Ph. Eur. uses the terms "diclofenac <u>impurity A</u> CRS" and "<u>impurity A</u>" to designate the compound l-(2,6-dichlorophenyl)-l,3-dihydro-2H-indol-2-one (APPX1366), i.e., "USP Diclofenac Related Compound A RS," a well-known impurity of diclofenac sodium.  (HPB, 60-63.)  Moreover, that "impurity A" was well-known is further confirmed by differences in language used by the patentees: "As used herein, the term . . ." is used in cols. 6 & 7 of the '838 patent to specifically define unknown terms, e.g., the "comparative liquid formulation."  (APPX138, 7:28-33.)  The patentees did not include "impurity A" in that list, nor use the same "as used herein" language because they knew that "impurity A" was already known to the person of ordinary skill—no definition in the patent was needed.

Horizon is not attempting to rewrite the claims.  Example 6, not Horizon, identifies "impurity A" as the proxy for the phrase "formulation degrades."  (HPB, 60.)  Moreover, while an infinite number of designations were available to identify a truly unknown impurity, it is no coincidence that the patentees selected "impurity A."  Per the intrinsic evidence, "formulation degrades" can only be referring to "impurity A."

Actavis is wrong in its allegation (APB, 31) that Horizon does not support the fact that "USP Diclofenac Related Compound A RS" was so well-known that the USP sold it as a reference standard, designated "RS"—the document itself, in the page heading, designates the contents of the page as "USP Reference Standards" and appends each compound on the page with "RS." (APPX1652.)

Actavis also argues that there may be impurities at time zero and that the POSA would need to know the amount of impurities at time zero to determine what the claim references as $t_0 \rightarrow t_{6 \text{ months}}$. (APB, 33-34.) This is contrary to the intrinsic evidence—the patents say nothing about $t_0 \rightarrow t_{6 \text{ months}}$, but rather measure impurities only after (i.e., at) 6 months storage. (*See* APPX146, 23:51-53.) Actavis further argues that "degradation" cannot refer to "impurity A" because "the content of the impurities produced by the formulation, on the one hand, and the diclofenac sodium itself, on the other, would almost certainly be different." (APB, 34.) These arguments are inconsistent with the intrinsic evidence (*see* APPX146, 23:30-24:33; *see also* APPX1547-1548, ¶¶57-62), and are further nothing but hypothetical arguments of potential inconsistent results, which are insufficient to establish indefiniteness. *See Takeda Pharm. Co. v. Zydus Pharm. USA, Inc.*, 743 F.3d 1359, 1367, n.3 (Fed. Cir. 2014) (finding that "there is the potential for inconsistent results even within the same method of measurement, but that surely does not render a claim indefinite."); *see also Purdue Pharm. Prods.*

*L.P. v. Actavis Elizabeth LLC*, No. 12-5311, 2015 WL 5032650, *57 (D.N.J. Aug.

25, 2015). The intrinsic evidence supports Horizon's proposed construction, and

the District Court erred in finding the term "impurity A" to be indefinite.

                              Respectfully submitted,

                              /s/ Robert F. Green
                              Robert F. Green
                              Caryn C. Borg-Breen
                              Jessica M. Tyrus
                              GREEN, GRIFFITH & BORG-BREEN
                              LLP
                              City Place, Suite 3900
                              676 North Michigan Avenue
                              Chicago, Illinois 60611
                              Telephone: (312) 883-8000

                              *Counsel for Plaintiffs-Appellants*
                              *Horizon Pharma Ireland Limited,*
                              *HZNP Limited and Horizon*
                              *Pharma USA, Inc.*

**CERTIFICATE OF SERVICE AND FILING**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

I hereby certify that on November 21, 2017, the foregoing RESPONSE AND REPLY BRIEF OF PLAINTIFFS-APPELLANTS was filed electronically with the U.S Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on the following counsel of record, by means of electronic mail:

| | |
|---|---|
| John Christopher Rozendaal | (jcrozendaal@skgf.com) |
| Michael E. Joffre | (mjoffre@skgf.com) |
| Kristina Caggiano Kelly | (kckelly@skgf.com) |
| William H. Milliken | (wmilliken@skgf.com) |

STERNE, KESSLER, GOLDSTEIN & FOX P.L.L.C.
1100 New York Avenue, NW
Washington, D.C.
Phone: (202) 772-8854

*Attorneys for Defendant-Cross-Appellant Actavis Laboratories UT, Inc.*

Dated: November 21, 2017

/s/ Jessica M. Tyrus
Jessica M. Tyrus
GREEN, GRIFFITH & BORG-BREEN LLP
City Place, Suite 3900
676 North Michigan Avenue
Chicago, Illinois 60611
Telephone: (312) 883-8000

*Counsel for Plaintiffs-Appellants Horizon Pharma Ireland Limited, HZNP Limited and Horizon Pharma USA, Inc.*

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME
LIMITATION, TYPEFACE REQUIREMENTS,
<u>AND TYPE STYLE REQUIREMENTS</u>**

1.  This brief complies with the type-volume limitation of Federal Rule of
    Appellate Procedure 32(a)(7)(B) because this brief contains 13,821 words,
    excluding the parts of the brief exempted by Federal Rule of Appellate
    Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.  This brief complies with the typeface requirements of Federal Rule of
    Appellate Procedure 32(a)(5) and the type style requirements of Federal
    Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in
    proportionally spaced typeface using Microsoft Word 14-point Times New
    Roman font.  As permitted by Federal Rule of Appellate Procedure
    32(a)(7)(C)(i), the undersigned has relied upon the word count feature of this
    word processing system in preparing this certificate.

Dated:      November 21, 2017          /s/ Caryn C. Borg-Breen
                                       Caryn C. Borg-Breen